**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DYNATA, LLC, *et al.*,[1] | Case No. 24-11057 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED POSTPETITION
FINANCING, (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (III)
GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE
PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING FINAL
HEARING, AND (VII) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors") hereby file this motion (this "Motion")[2] for entry of an interim order,

substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the

"Final Order",[3] and together with the Interim Order, the "DIP Orders"), (i) authorizing the Debtors

to obtain postpetition senior secured financing on the terms set forth in the DIP Documents and

use of Cash Collateral; (ii) granting adequate protection to the Prepetition Secured Parties, (iii)

granting liens and superpriority administrative expense claims with respect to such postpetition

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Dynata, LLC (8807), New Insight Holdings, Inc. (1844), New Insight Intermediate Holdings, Inc. (6495), Dynata Holdings Corp. (0668), Research Now Group, LLC (7588), SSI/Opiniology Interco LLC (1855), iPinion, Inc. (9463), Research Now, Inc. (5523), SSI Holdings, LLC (6379), New Insight International, Inc. (0453), Imperium LLC (8375), inBrain, LLC (8031), Apps That Pay, LLC (9028), inBrain Holdings, LLC (9696), Branded Research, Inc. (9577), Screenlift.io, LLC, Research Now DE I, LLC (5528), Research Now DE II, LLC (5613), and Instantly, Inc. (6756).  The Debtors' headquarters is located at 4 Research Drive, Suite 300, Shelton, CT 06484.

[2] Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings given to them in the First Day Declaration, the Kopp Declaration or the DIP Credit Agreement (as such terms are defined below), as applicable.

[3] The Debtors will file a proposed form of Final Order prior to the Final Hearing (as defined below).

financing; (iv) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim Order; (v) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order; and (vi) granting related relief.  The facts and circumstances supporting this Motion are set forth in the *Declaration of Steven Macri in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), and the *Declaration of Ethan Kopp In Support of Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Senior Secured Postpetition Financing, (III) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Statute, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling Final Hearing, and (VII) Granting Related Relief* in support of this Motion (the "Kopp Declaration"), which were each filed concurrently herewith and are incorporated herein by reference.  In further support of this Motion, the Debtors respectfully submit as follows:

## PRELIMINARY STATEMENT

1.      As noted in the First Day Declaration, the Debtors commenced these chapter 11 cases (these "Chapter 11 Cases") with overwhelming support from their Consenting Stakeholders, to effectuate a comprehensive financial restructuring of their existing first and second lien debt. The proposed restructuring transactions will allow the Debtors to reduce their overall debt by approximately $550 million, while paying all General Unsecured Claims in full and maintaining their operations in the ordinary course.  To support these transactions, the Debtors have secured a $31.5 million new-money superpriority senior secured debtor-in-possession term loan credit facility (the "DIP Facility"), all of which will be available on an interim basis.  Additionally, participation in the DIP Facility will be open to all of the Debtors' First Lien Lenders on a pro rata basis. The DIP Facility, along with the consensual use of Cash Collateral, will provide the Debtors with necessary liquidity to fund these Chapter 11 Cases and complete their financial restructuring

2

while continuing to operate their business in the ordinary course.  With limited cash on hand, immediate access to DIP Financing is critical to ensure the Debtors' smooth entry into chapter 11 and their ability to prudently and effectively operate their business during the pendency of these Chapter 11 Cases.  The DIP Facility is therefore critical to sustaining the Debtors' business in the near term and is an integral component of the restructuring contemplated by the Plan.

2.      In parallel with discussions with the Prepetition Secured Parties on the terms of the Restructuring Support Agreement, in the weeks leading up to these Chapter 11 Cases, the Debtors' investment banker, Houlihan Lokey Capital, Inc. ("Houlihan"), conducted a marketing process designed to identify other parties that may be interested in providing postpetition financing to the Debtors.  The Prepetition Secured Parties would not consent to being primed by a third party, so Houlihan contacted multiple third-party institutions to solicit non-consensual priming or junior or unsecured postpetition financing.  No third-party institution expressed willingness to provide debtor-in-possession financing on those terms.  The Debtors and their advisors thus continued to engage in thorough negotiations in order to obtain the best possible postpetition financing terms, and, following weeks of extensive arm's-length, good-faith negotiations, the Debtors finalized the terms of the DIP Facility, which represent the best possible debtor-in-possession financing facility that the Debtors could obtain. Not only is the DIP Facility the best and only financing currently available to the Debtors, but together with the proposed restructuring transactions contemplated by the Restructuring Support Agreement, it will provide a clear path to emerge from the Chapter 11 Cases with a delevered balance sheet better positioned for long-term success.

3.      The Debtors' proposed interim draw of $31.5 million is necessary for the Debtors to avoid immediate and irreparable harm to their estates.  The Debtors expect their customers, vendors, and employees will be highly focused on whether the Chapter 11 Cases are appropriately

funded to maximize the greatest possibility of success, while minimizing interruptions to the Debtors' business. Put simply, the DIP Facility is an essential component to providing a successful path forward while the Debtors expeditiously conduct their restructuring transactions. The proposed DIP Facility is therefore in the best interests of the Debtors, is necessary to avoid irreparable harm to the Debtors and their estates, and should be approved.

## JURISDICTION

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delawar*e, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      Pursuant to Local Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

6.      On the date hereof (the "Petition Date"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

8.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 1015-1.

9.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the Kopp Declaration and the First Day Declaration.

## RELIEF REQUESTED

10.     By this Motion, pursuant to sections 105, 361, 362, 363, 364, 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 , and Local Rule 4001-2, the Debtors seek entry of the DIP Orders:

- *DIP Facility*: authorizing the Debtors to obtain postpetition financing (the "DIP Financing") and enter into a superpriority senior secured debtor-in-possession term loan credit facility (the "DIP Facility" and, together with the DIP Lenders' commitments under the DIP Facility, the "DIP Commitments") in an aggregate principal amount of $31.5 million (the "DIP Loans"), pursuant to the terms and conditions of the DIP Orders, and that certain debtor-in-possession credit agreement (as the same may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "DIP Credit Agreement") and the other documents, agreements, and instruments delivered or executed in connection therewith (including the fee letters executed by the DIP Borrower in connection with the DIP Facility, and all guarantee and security documentation) (collectively, the "DIP Documents"), by among Research Now Group, LLC and Dynata, LLC, in their capacities as borrowers (together, the "DIP Borrower"), and the other Loan Parties party thereto from time to time (together with the DIP Borrower, the "DIP Loan Parties") the lenders party thereto from time to time, the ("DIP Lenders"), and Wilmington Savings Fund Society, FSB, as administrative agent (in such capacity, and together with any successors and assigns thereto, the "DIP Agent" and together with the DIP Lenders, the "DIP Secured Parties");

- *Cash Collateral*: authorizing the Debtors to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which the Prepetition Secured Parties have an interest and granting of adequate protection in favor of the Prepetition Secured Parties with respect to, *inter alia*, such use of Cash Collateral and the other Prepetition Collateral subject to the restrictions set forth in the DIP Loan Documents and the DIP Orders;

- ***DIP Backstop Parties***: approving a Backstop Premium (as defined below) for certain members of the First Lien Ad Hoc Group (as defined below) (the "<u>DIP Backstop Parties</u>") in exchange for backstopping the DIP Facility as discussed below;

- ***DIP Documents***: authorizing the Debtors to enter into the DIP Credit Agreement, substantially in the form attached as **<u>Exhibit 1</u>** to the Interim Order, and all other DIP Documents and to perform all of the DIP Obligations;

- ***Use of Proceeds***: authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral, including Cash Collateral, in each case (x) solely in accordance with the Approved DIP Budget (as defined below) (subject to any Permitted Variance (as defined below) set forth herein and in the DIP Credit Agreement), and (y) to provide working capital for, and for other general corporate purposes of, the Debtors, including payment of any Adequate Protection Payments (as defined below);

- ***Adequate Protection***: granting adequate protection to the Prepetition Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral;

- ***Security and Priority***: granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtors' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date to secure the DIP Loans, subject only to the (x) Carve Out (as defined below) and (y) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that, by operation of law or as permitted by the Prepetition Loan Documents, are senior to the liens and/or security interests of the Prepetition Secured Parties as of the Petition Date (the "<u>Prior Senior Liens</u>"); and granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature, subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the other DIP Documents;

- ***Section 506(c) Waiver***: waiving the Debtors' and the Debtors' estates' right to surcharge the DIP Collateral (as defined below) and, subject to entry of the Final Order, the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

- ***Section 552(b) Exception***: providing for the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to the DIP Secured Parties, and subject to entry of the Final Order, the Prepetition Secured Parties with respect to

the proceeds, products, offspring, or profits of any of the DIP Collateral or the
Prepetition Collateral, as applicable; and

- ***Final Hearing***: scheduling a final hearing (the "<u>Final Hearing</u>") to consider the
relief requested in the Motion and the entry of the Final Order, and approving the
form of notice with respect to the Final Hearing.

### CONCISE STATEMENTS REGARDING DIP FACILITYPURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2[4]

11.    In accordance with Bankruptcy Rule 4001(b)–(d) and Local Rule 4001-2(a),

the below chart summarizes the significant terms of the DIP Facility, the proposed Interim Order,

and the DIP Documents.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Research Now Group, LLC and Dynata, LLC, both Delaware limited liability companies.<br><br>*See* DIP Credit Agreement, Introduction. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Research Now Group, LLC and Dynata, LLC, each other Loan Party (as defined in the Existing First Lien Credit Agreement) and all other Subsidiaries (as defined in the Existing First Lien Credit Agreement) of the Borrowers other than Excluded Subsidiaries (as defined in the Existing First Lien Credit Agreement).<br><br>*See* DIP Credit Agreement, Introduction. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the lenders under the DIP Facility.<br><br>*See* DIP Credit Agreement, Introduction. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB<br><br>*See* DIP Credit Agreement, Introduction. |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B); | A super-priority senior secured debtor-in-possession term loan facility comprised of new money loans in an aggregate principal amount of up to $31.5 million (the "<u>DIP Loans</u>" and the claims thereunder, the "<u>DIP Facility Claims</u>"), which participation shall be |

---

[4]    The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of
the DIP Credit Agreement, the relevant DIP Documents, and/or the Interim Order, as applicable.  To the extent
there are any inconsistencies between this summary and the provisions of the DIP Credit Agreement, the DIP
Documents, or the Interim Order, the provisions of the Interim Order shall control.  Any capitalized terms used
but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP
Credit Agreement, the DIP Documents, and/or the Interim Order, as applicable.  The Debtors reserve the right to
supplement the statements made herein.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(A)<br><br>**Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(i)(A) | available to the Consenting First Lien Lenders to the Borrower thereunder (the "<u>DIP Commitments</u>"). Once repaid or converted into First Out Term Loans as set forth below, the DIP Loans may not be reborrowed.<br><br>*See* Interim Order, Introduction. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget is attached as **<u>Exhibit 2</u>** to the Interim Order.<br><br>*See* Interim Order, Ex. B. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(i)(B) | SOFR + 8.75% *per annum*.<br><br>Default Interest: 2.00%, plus the rate otherwise applicable, payable in cash on demand.<br><br>*See* DIP Credit Agreement, Section 2.13. |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rules 4001-2(a)(i)(B) | "<u>Backstop Premium</u>" of 9.0% of the aggregate principal amount of the DIP Loans backstopped by the DIP Backstop Parties, payable in cash on demand upon entry of the Interim Order.<br><br>"<u>Upfront Fee</u>" of 3.50% of the aggregate amount of DIP Commitments on the closing date of the DIP Facility, payable in cash on a pro rata basis.<br><br>"<u>Exit Fee</u>" upon the repayment or conversion of DIP Loans into First Out Term Loans, of 2.00% of the aggregate amount of such DIP Loans being repaid or converted, payable in cash to the DIP Lenders on a pro rata basis.<br><br>*See* DIP Credit Agreement, Section 2.12. |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B) | Unless converted to First Out Term Loans upon the event set forth in clause (iv) below and subject to the Carve-Out (as defined below), earliest of (such date, the "<u>Maturity Date</u>"):<br><br>(i) the date that is 75 days after the closing date of the DIP Facility,<br><br>(ii) the date of acceleration of the obligations under the DIP Facility,<br><br>(iii) the date the Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Loan Party,<br><br>(iv) the consummation of a plan of reorganization of the Loan Parties, which has been confirmed by an order entered by the Court, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (v) the appointment of a chapter 11 trustee, examiner or other fiduciary with decision-making authority the effective date of any chapter 11 plan of reorganization, and |
| | (vi) the date of consummation of a sale of all or substantially all of the Loan Parties' assets. |
| | *See* DIP Credit Agreement, Section 1.01. |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii); Local Rules 4001-2(a)(i)(F) and 4001-2(a)(i)(G) | <u>DIP Collateral</u>:  Any and all assets, whether real or personal, tangible or intangible are purported to be granted pursuant to the Security Documents as security for the Secured Obligations. *See* DIP Credit Agreement, Section 1.1; Interim Order § 7. |
| **Superpriority Claim** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | <u>DIP Superpriority Claims</u>:  Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, but subject to entry of a Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions") *See* Interim Order § 6. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Use of DIP Proceeds**<br><br>Bankruptcy Rules 4001(b)(1)(B)(ii) and 4001(c)(1)(B) | Solely in accordance with and subject to the DIP Budget subject to permitted variances, and the DIP Orders, the proceeds of the DIP Facility may be used only (i) pay related transaction costs, fees and expenses (including attorney's fees required to be paid hereunder) with respect to the DIP Facility, (ii) fund interest, fees, and other payments contemplated in respect of the DIP Facility and (iii) to provide working capital and for other general corporate purposes of the Loan Parties and their Subsidiaries.<br><br>*See* DIP Credit Agreement, Section 5.10. |
| **Prepayment Features/ Provisions Limiting Repayment**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ii)<br>Local Rules 4001-2(a)(i)(I) | The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, first to outstanding ABR Borrowings and second to outstanding SOFR Borrowings, with the nearest expiring Interest Period being repaid first.  Any Lender may elect to decline all (but not part) of any prepayment of its Loans pursuant to the DIP Credit Agreement.  Borrowers shall notify the Administrative Agent by telephone of any prepayment.<br><br>*See* DIP Credit Agreement, Section 2.11. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(i)(M) | The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents shall constitute an event of default: (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, (b) the failure of the Debtors to comply with any of the Required Milestones, (c) the occurrence of an "Event of Default" under the DIP Credit Agreement, or (d) a superpriority claim has been granted or allowed in these Cases except as set forth in this Interim Order or the Final Order.<br><br>*See* DIP Credit Agreement, Section 7.01, Interim Order, § 13. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi);<br>Local Rule 4001-2(a)(i)(H) | Compliance with the following Milestones:<br><br>• no later than 11:59 pm (New York City time) on May 21, 2024 (or such later date as the Administrative Agent shall agree (acting at the Direction of the Required Lenders)), (i) enter into a restructuring support agreement in form and substance acceptable to the Required Lenders in their sole discretion, and (ii) commence solicitation of the Chapter 11 Plan;<br><br>• no later than May 22, 2024, the Petition Date shall have occurred; |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • no later than the Petition Date, the Debtors shall have filed a Chapter 11 Plan and Disclosure Statement, in form and substance acceptable to the Consenting First Lien Lenders;<br><br>• no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall enter, on an interim basis, the DIP Order;<br><br>• no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall enter, on a final basis, the DIP Order;<br><br>• no later than thirty-five (45) days after the Petition Date, the Bankruptcy Court shall enter the Disclosure Statement Order and Confirmation Order;<br><br>• no later than fifty (50) days after the Petition Date, the Chapter 11 Plan effective date shall occur and the Restructuring Transactions shall be consummated.<br><br>*See*, DIP Credit Agreement, Section 5.18, Interim Order, § 14. |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F) | "Carve Out" means the following expenses:<br><br>(i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below);<br><br>(ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below);<br><br>(iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (the amounts set forth in clauses (i) through (iii), the "Pre-Carve Out Trigger Notice Cap"); and<br><br>(iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of the Carve Out Trigger Notice (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" and, together with the Pre-Carve Out Trigger Notice Cap, the "Carve Out Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors, their lead restructuring counsel (Willkie Farr & Gallagher LLP), the Second Lien Advisors, the U.S. Trustee, and counsel to the Committee (to the extent one has been appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility (or the Debtors' breach of the provisions of this Interim Order governing use of Cash Collateral that is not timely cured), stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>*See* Interim DIP Order, § 9. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) | "Challenge Period" is until (i)  the earlier of (a) seventy-five (75) calendar days after entry of the Interim Order and (b) the date of entry of an order confirming a plan of reorganization or liquidation (the "Challenge Period" and, the date of expiration of the Challenge Period, the "Challenge Period Termination Date"); *provided* that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus twenty (20) calendar days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | liens of the Prepetition Agents and the Prepetition Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "Challenge"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.<br><br>*See* Interim Order ¶ 11. |
| **Debtors' Stipulations Concerning the Validity, Enforceability, Priority, or Amount of Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)); Local Rule 4001-2(a)(i)(Q) | Upon entry of the Interim Order, but only subject to the Challenge Period, the Company Parties (as defined in the Restructuring Term Sheet) will provide customary stipulations and releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Prepetition Obligations, the Prepetition Collateral, and documentation related thereto.<br><br>*See* Interim DIP Order, § E. |
| **Waivers/ Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(a)(i)(R) | The automatic stay is lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation solely to the extent necessary to (i) permit the DIP Agent to exercise remedies upon five business days' notice of an event of default and (ii) to perform all acts and to pay all fees (including all amounts owed to (a) the DIP Lenders and the DIP Agent under the DIP Documents, (b) the Escrow Agent under the Escrow Agreement, and (c) the Backstop Premium, Participation Fee, and Fronting Fee (each as defined in the DIP Credit Agreement)), including, without limitation:<br><br>(a)      the execution, delivery, and performance of the DIP Documents;<br><br>(b)      the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in accordance with the terms of the applicable DIP Documents), without further approval of the Court for such amendments that are not material; *provided* that any such non- |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | material amendment shall be provided to the U.S. Trustee and counsel for the Committee, if any;<br><br>(c)　　the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Documents or the Motion, including (x) all premiums, fees, expenses and other amounts owed to the DIP Agent and the DIP Lenders (which premiums, fees and expenses, in each case, are deemed approved upon entry of this Interim Order), including, without limitation, the Backstop Premium, the Upfront Fee and the Exit Fee and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and the Interim Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel), PJT Partners, Inc. (as investment bank and financial advisor), Klerh Harrison Harvey Branzburg LLP (as Delaware bankruptcy counsel), Mercer (US) LLP (as compensation consultant), and any other specialty counsel and other professionals necessary to represent the interests of the DIP Lenders and the ad hoc group of the First Lien Lenders (the "DIP/First Lien Group") in connection with the Cases (collectively, the "DIP/First Lien Advisors"); and (b) ArentFox Schiff LLP (as counsel), and any Delaware bankruptcy counsel to the DIP Agent to the DIP Agent, and, to the extent necessary to exercise its rights and fulfill its obligations under the DIP Documents, one counsel to the DIP Agent in any jurisdictions reasonably required (collectively, the "DIP Agent Advisors"), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payments be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of Paragraph 18 of the Interim Order; and<br><br>(d)　　the performance of all other acts required under or in connection with the DIP Documents.<br><br>*See* Interim Order ¶ 3(f). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will indemnify each of the DIP Lenders, the DIP Agent, and the Prepetition Secured Parties and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement as well as the use of Cash Collateral. No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct. In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; *provided*, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.<br><br>*See* Interim Order ¶ 18 (c). |
| **Cross-Collateralization** Local Rule 4001-2(a)(i)(N) | Not applicable. |
| **Non-Consensual Priming Liens** Local Rule 4001-2(a)(i)(P) | Subject only to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, that to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.<br><br>*See* Interim Order ¶ 7(b). |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** | The Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Prepetition Loan Parties, enforceable in accordance with the terms of the applicable Prepetition First Lien Security Documents or the Prepetition First Lien Credit Agreement. No offsets, challenges, objections, defenses, claims, or counterclaims of any nature to any of the Prepetition First Priority Liens or Prepetition First Lien Obligations exist. No portion of the Prepetition First Priority Liens or Prepetition First Lien Obligations |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(vii) | is subject to set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attack, offset, defense, counterclaims, cross-claims or "claim" (as defined in the Bankruptcy Code) pursuant to the Bankruptcy Code or applicable nonbankruptcy law<br><br>*See* Interim Order ¶ E(i)(d). |
| **Provision Providing for the Funding of Non-Debtor Affiliates** Local Rule 4001-2(a)(i)(D) | No proceeds of the DIP Loans (including payments from DIP Collateral) shall be used, except as expressly provided or permitted under the Interim Order, under the DIP Credit Agreement or in the DIP Budget or as otherwise approved in advance in writing by the Required DIP Lenders (and approved by the Court, if necessary), to make any payment or distribution, directly or indirectly, to any non-Debtor affiliate; *provided* that, notwithstanding anything else herein, any consent of the Required DIP Lenders to payments or distributions to non-Debtor Affiliates shall not be deemed, inferred, or assumed absent express line-item approval of such payment or distribution in the DIP Budget.<br><br>Except as otherwise set forth in the DIP Budget (subject to Permitted Variances) or otherwise consented to by the Required DIP Lenders, Cash Collateral may not be used (i) by any non-Debtor entity or (ii) to pay any fees, costs, expenses and/or any other amounts of any non-Debtor entity.<br><br>*See* Interim Order ¶¶ 3(d), 3(e). |
| **Joint Liability of Debtors** Local Rule 4001-2(a)(i)(J) | All obligations of the DIP Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the DIP Guarantors.<br><br>*See* DIP Credit Agreement, Section 2.24. |
| **Section 506(c) and Section 552(b) Waivers** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(V) and 4001-2(a)(i)(W) | The Prepetition Secured Parties shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, a waiver of (i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) the provisions of section 506(c) of the Bankruptcy Code.<br><br>*See* Interim Order, ¶¶ 3(f); 41. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Conditions to Borrowing** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) | The DIP Facility shall be subject to customary conditions to closing for facilities of this type, which shall be satisfactory to the Required DIP Lenders, including without limitation:<br><br>• execution and delivery of the DIP Loan Agreement and any other related documentation being executed and delivered on the closing date of the DIP Facility;<br>• receipt of certain reporting in form and substance reasonably acceptable to the Required DIP Lenders;<br>• receipt of the Initial DIP Budget in form and substance acceptable to the Required DIP Lenders;<br>• the Loan Parties being in compliance with the DIP Budget in all respects and the proceeds of any such DIP Loan being made on the closing date of the DIP Facility being used solely in accordance with the DIP Budget, subject to permitted variances;<br>• entry of Interim Order followed by entry of the Final Order;<br>• the payment when due and payable of all reasonable and documented fees and expenses of the First Lien Ad Hoc Group Advisors; and<br>• the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto.<br><br>*See* DIP Credit Agreement, Section 4.01. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U) | Subject only to the Carve Out, the DIP Liens shall include a first priority lien on any unencumbered property, including but not limited to all proceeds and property recovered in respect of Avoidance Actions.<br><br>*See* Interim Order ¶ 7(a). |
| **Waiver of Claims Against Secured Creditors** Local Rule 4001-2(a)(i)(Q)<br><br>**Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Upon entry of the Interim Order, but only subject to the Challenge Period, the Company Parties will provide customary stipulations and releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Prepetition Obligations, the Prepetition Collateral, and documentation related thereto.<br><br>*See* Interim Order, ¶ 11. |
| **Adequate Protection Provided for Use of** | The DIP Orders shall approve customary adequate protection to be provided to the First Lien Lenders, including (i) replacement or new |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) | liens, as well as superpriority claims, on the unencumbered and encumbered assets of the Loan Parties junior to the liens securing the DIP Facility, (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code, and (iii) the payment of all reasonable and documented out-of-pocket fees and expenses of the First Lien Ad Hoc Group Advisors.<br><br>*See* Interim Order ¶¶ 8(a), 8(e). |
| **Marshaling**<br>Local Rule 4001-2(a)(i)(X) | The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order, the DIP Documents and the Prepetition Loan Documents, notwithstanding any other agreement or provision to the contrary and, subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral<br><br>*See* Final Order, ¶ 39. |

## **PREPETITION INDEBTEDNESS**

12.     As of the Petition Date, the Debtors had an aggregate principal amount of approximately $1.3 billion in funded debt principal obligations, not including accrued interest and fees arising under the First Lien Revolving Credit Loan, the First Lien Term Loan and the Second Lien Term Loan (each as defined below), and approximately $159 million in total outstanding general operating debt and similar unsecured obligations.

13.     An illustrative summary demonstrating the Debtors' prepetition indebtedness is set forth below:

| Type of Debt | Maturity | Amount |
|---|---|---|
| **Secured Debt** | | |
| First Lien Revolving Credit Loan | June 14, 2024 | $96,899,999.99 |
| First Lien Term Loan | December 20, 2024 | $920,767,206.45 |
| Second Lien Term Loan | December 20, 2025 | $250,000,000.00 |
| **Total Secured Debt** | | **$1,267,667,206.44** |
| **Unsecured Debt** | | |
| General Unsecured Obligations | | $158,942,464.00 |
| **Total** | | **$1,426,609,670.38** |

14.     **First Lien Revolving Credit Loan.** Debtors Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC) as borrowers, Debtor New Insight Holdings, Inc. as parent, Debtors New Insight Intermediate Holdings, Inc., SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp. and iPinion, Inc., as guarantors, the lenders party to the First Lien Revolving Credit Loan (as defined below) from time to time (the "First Lien Revolving Credit Loan Lenders"), and Goldman Sachs Bank USA, as administrative agent (the "First Lien Revolving Credit Loan Agent") are parties to that certain First Lien Revolving Credit Agreement, dated as December 20, 2017, providing for the Debtors' first-lien revolving credit facility (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Revolving Credit Loan").

15.     The Debtors entered into various security and collateral documents in favor of the First Lien Revolving Credit Loan Agent (for the benefit of the First Lien Revolving Credit Loan Lenders) and various security and collateral documents, pursuant to which the First Lien Revolving Credit Loan Lenders were granted first priority liens on substantially all of the Debtors' assets (the "First Lien Collateral").   The First Lien Revolving Credit Loan matures on June 14, 2024.   As of the Petition Date, approximately $97 million is outstanding under the First Lien Revolving Credit Loan, excluding accrued and outstanding interest, fees, reimbursements, expenses and all other obligations outstanding under the First Lien Revolving Credit Loan documents as of the Petition Date.

16.     **First Lien Term Loan.**  Debtors Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC) as borrowers, Debtor New Insight Holdings, Inc. as parent, Debtors New Insight Intermediate Holdings, Inc., SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp. and iPinion, Inc., as guarantors, the lenders party to the First Lien Term Loan (as defined below) from time to time (the "First Lien Term Loan Lenders" with the First Lien Revolving Credit Loan Lenders, the "First Lien Lenders"), and Goldman Sachs Bank USA, as administrative agent (the "First Lien Agent") are parties to that certain First Lien Credit Agreement, dated as December 20, 2017, providing for the Debtors' first-lien term loan credit facility (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Term Loan", and together with the First Lien Revolving Credit Loan, the "First Lien Loans").

17.     The Debtors entered into various security and collateral documents in favor of the First Lien Agent (for the benefit of the First Lien Term Loan Lenders) and various security and

collateral documents, pursuant to which the First Lien Term Loan Lenders were granted first priority liens the First Lien Collateral. The First Lien Term Loan matures on December 20, 2024. As of the Petition Date, approximately $921 million of principal remains outstanding under the First Lien Term Loan, excluding accrued and outstanding interest, fees, reimbursements, expenses and all other obligations outstanding under the First Lien Term Loan documents as of the Petition Date.

18.     **Second Lien Term Loan.** Debtors Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC) as borrowers, Debtor New Insight Holdings, Inc. as parent, Debtors New Insight Intermediate Holdings, Inc., SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp., and iPinion, Inc. as guarantors, the lenders party to the Second Lien Term Loan (as defined below) from time to time (the "Second Lien Term Loan Lenders" with the First Lien Lenders the "Lenders"), and Acquiom Agency Services LLC, as administrative agent (the "Second Lien Agent"), are parties to that certain Second Lien Credit Agreement dated as of December 20, 2017, providing for the Debtors' second-lien term loan credit facility (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Term Loan").

19.     The Debtors entered into various security and collateral documents in favor of the Second Lien Agent (for the benefit of the Second Lien Term Loan Lenders) and various security and collateral documents, pursuant to which the Second Lien Term Loan Lenders were granted second priority liens on substantially all of the Debtors' assets (the "Second Lien Collateral"). The Second Lien Term Loan matures on December 20, 2025.   As of the Petition Date, approximately $250 million of principal remains outstanding under the Second Lien Term Loan, excluding

accrued and outstanding interest, fees, reimbursements, expenses and all other obligations outstanding under the Second Lien Term Loan documents as of the Petition Date.

20. **Other Unsecured Claims.** The Debtors also have numerous other unsecured obligations outstanding as of the Petition Date, including trade vendor claims and litigation claims. The Debtors estimate that, as of the Petition Date, such claims totaled approximately $159 million.

A. **Debtors' Immediate Need for DIP Financing**

21. The Debtors require immediate access to DIP Financing to (i) ensure sufficient working capital to operate their global market research business and administer their estates, (ii) allow for timely payment of administrative expenses, including payroll and professionals' fees, and (iii) provide positive reassurances to the Debtors' customers, vendors, employees, and other stakeholders that the Debtors' lenders support a successful reorganization. The Debtors are entering chapter 11 with severely constrained liquidity. Without additional financing and the ability to use Cash Collateral, the Debtors will lack the liquidity needed to continue operating their business, paying their employees, and providing to their customers without disruption. Immediate access to the proceeds of the DIP Facility is necessary so that the Debtors will have the funds they need to remain a going concern and to avoid immediate and irreparable harm to their estates.

22. Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared an Initial DIP Budget outlining the Debtors' postpetition cash need in the initial thirteen weeks of these Chapter 11 Cases. The Debtors believe the Initial DIP Budget will provide the Debtors with the funds necessary to, among other things, make payroll and satisfy their other working capital and general corporate obligations, including essential payments to vendors and research panelists.

B.     **Debtors' Efforts to Obtain Postpetition Financing**

23.     As explained in the First Day Declaration and in the Kopp Declaration, in the months leading up to the Petition Date the Debtors faced numerous challenges.  These included industry headwinds, rising competition, and the increased risk that the Debtors would be unable to satisfy certain requirements under the Debtors' prepetition loan facilities.   The Debtors commenced negotiations with certain of the Debtors' prepetition secured lenders and were unable to secure a comprehensive out of court solution to address these challenges.

24.     The Debtors and Houlihan conducted a debtor-in-possession financing marketing process designed to identify specific parties that might be interested in providing postpetition financing to the Debtors.  In parallel, the Debtors' initiated negotiations with its First Lien Lenders.  Although none of the parties contacted by Houlihan were willing to submit an offer on an unsecured or junior basis, the First Lien Lenders expressed willingness to provide DIP Financing in conjunction with a restructuring support agreement and chapter 11 process.

25.     The Debtors and Houlihan engaged in an arm's-length, extensive negotiation with the First Lien Lenders, which culminated in the First Lien Lenders agreeing to provide the DIP Facility pursuant to the terms set forth herein and in the DIP Orders.

### BASIS FOR RELIEF

A.     **Entry into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.**

26.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to execute and deliver the DIP Documents, obtain access to the proceeds of the DIP Facility, and continue using Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, discussed in detail below.  Courts grant debtors considerable deference in acting in accordance with their business

judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  See, e.g., In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Barbara K. Enters., Inc., No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.    Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code."  In re Curlew Valley Assocs., 14 B.R. 506, 513-514 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Dura Auto. Sys. Inc., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007).

28.     In determining whether the Debtors have exercised sound business judgment and whether the terms of postpetition financing are fair and reasonable, courts consider the economic terms of the proposed financing under the totality of the circumstances. See Hr'g Tr. at 734:23-35:24, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as they once were previously); Unsecured Creditors Comm. v. First Nat'l Bank & Tr. (In re Elingsen McLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization), aff'd, 834 F.2d 599 (6th Cir. 1987).  Courts may also appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility.  For example, in In re ION Media Networks, Inc., the court held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

29.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  As further discussed in the Kopp Declaration, the DIP Financing is the best available option to the Debtors under the circumstances and is the product of arm's-length negotiations.  Weighing the advantages and risks of the proposed DIP Financing, the Debtors ultimately decided that moving forward with the proposed DIP Financing was appropriate and in the Debtors' estates' best interests.  Given the Debtors' current cash position, absent access to the proceeds of the DIP Financing, the only alternative path available is liquidation, which would be value destructive and detrimental to all stakeholders.  The Debtors could not secure sufficient financing in the form of unsecured credit, as an administrative expense in exchange for the grant of a superpriority administrative expense claim, or without granting priming liens, and were not able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is being sought.

30.     Moreover, the DIP Financing facilitated the Debtors' entry into the Restructuring Support Agreement, which provides the Debtors with the concrete support of their key stakeholders and sets forth a blueprint for these Chapter 11 Cases.  The DIP Credit Agreement also contemplates a conversion of the DIP Facility into a senior secured term loan facility upon the Debtors' exit from these Chapter 11 Cases rather than requiring the DIP Facility to be repaid in full in cash at emergence, which will help facilitate the Debtors' successful restructuring and emergence.  Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates, is necessary to avoid immediate and irreparable harm, and is a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

31.     The Debtors propose to obtain DIP Financing by providing security interests and liens as set forth in the DIP Documents and described above.  More specifically, the Debtors propose to provide to the DIP Agent, for the benefit of the DIP Lenders, subject to the Carve Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, which include substantially all of the Debtors' assets, and, specifically, (a) a priming security interest in, and lien on the Prepetition Collateral to the extent such Prepetition Collateral is subject to prepetition liens that secure the prepetition facilities of the Prepetition Secured Parties, (b) a junior security interest in and lien on all property of the Debtors that is subject to Prepetition Permitted Liens, (c) a first lien priority senior security interest in all property of the Debtors that is not subject to a valid, perfected and non-avoidable lien, subject to and as further provided for in the DIP Documents and the Interim Order.

32.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien . . . .

11 U.S.C. § 364(c).

33.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (requiring for secured credit under section 364(c) of the Bankruptcy Code to be authorized, after notice and hearing, a showing that unsecured credit cannot be obtained).   "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  In re Snowshoe Co., 789 F.2d, at 1088; see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley Inc., 99 B.R. 117 (N.D. Ga. 1989); see also In re Snowshoe Co., 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two (2) national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); In re Ames Dep't Stores, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

34.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing a lender only an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

See In re Aqua Assocs., 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); In re Ames Dep't Stores, 115 B.R. at 37–40; Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.), 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); Crouse Grp., 71 B.R. at 549.

35.     Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).  As described above and in the Kopp Declaration, the Debtors do not believe alternative financing is presently available on an unsecured or administrative priority-only basis. Thus, the Debtors determined that the DIP Facility provided the best opportunity available to the Debtors under the circumstances to fund these Chapter 11 Cases.   Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

36.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is

proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming

obviates the need to show adequate protection.  See Anchor Savs. Bank FSB v. Sky Valley, Inc.,

99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those

[undersecured] creditors relieved the debtor of having to demonstrate that they were adequately

protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either

(a) the Prepetition Secured Parties support the priming or (b) the Prepetition Secured Parties'

interests in collateral are adequately protected.

37.     Here, the Prepetition Secured Parties have affirmatively consented to the DIP

Facility and actively participated in facilitating the proposed DIP Facility. Moreover, as set forth

more fully herein and in the Interim Order, the Debtors propose to provide an adequate protection

package to protect the interests of the Prepetition Secured Parties. Therefore, the relief requested

pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.    The Interests of Prepetition Secured Parties Are Adequately Protected.**

38.     Parties with an interest in prepetition collateral are entitled to adequate protection.

See 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including payment

of adequate protection fees, payment of interest, or granting of replacement liens or administrative

claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  See, e.g.,

RTC v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir.

1994); In re Satcon Tech. Corp., No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del.

Dec. 7, 2012); In re N.J. Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at

*14 (Bankr. D.N.J. June 29, 2006); In re Columbia Gas Sys., Inc., Nos. 91- 803, 91-804, 1992 WL

79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also In re Dynaco Corp., 162 B.R. 389, 394

(Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.03[4][b] (16th ed. 2024) (explaining

that adequate protection can take many forms and "must be determined on a case by case basis, with the relief tailored to the facts of the situation," including equitable considerations)).

39.     The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, to the extent of any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral from and after the Petition Date, if any, for any reasons provided for under the Bankruptcy Code.  The Debtors propose to grant the Prepetition Secured Parties certain adequate protection liens over the DIP Collateral and other adequate protection described herein, to the extent of any diminution in value of the Prepetition Collateral, in exchange for the Prepetition Secured Parties' support of the priming of their Prepetition Collateral.  Granting such adequate protection liens to the Prepetition Secured Parties to obtain their consent to the Debtors' use of the Prepetition Collateral as provided in the Interim Order and DIP Credit Agreement was a reasonable exercise of the Debtors' business judgment.  Following the prepetition marketing process conducted by the Debtors' advisors, and discussions with the Prepetition Secured Parties, the Debtors are not aware of any available financing on equal or better terms from a third party absent the granting of superpriority senior liens on the Prepetition Collateral to such third party, to which the Prepetition Secured Parties would be unwilling to consent.

40.     The adequate protection provided to the Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of its interests in the Prepetition Collateral. The Debtors submit that its provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**D.      The Debtors Should be Authorized to Use the Cash Collateral.**

41.      Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders and the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

42.      Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. See In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case by case basis. See, e.g., Resol. Tr. Corp. v. Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); In re Satcon Tech. Corp., No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); In re N.J. Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); In re Columbia Gas Sys., Inc., No. 91-803 (HSB) 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate

32

protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

43.     Under the terms of the Interim Order and consistent with the terms of the Restructuring Support Agreement, the Debtors propose to provide the Prepetition Secured Parties with certain forms of adequate protection to protect against the postpetition Diminution of Value of the Prepetition Collateral (including Cash Collateral) resulting from the use, sale, or lease of the Prepetition Collateral (including Cash Collateral) by the Debtors, priming of their security interests and liens by the DIP Liens, and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations") and Adequate Protection Payments:

(a)     Subject to the Carve-Out, payment of all reasonable out-of-pocket fees, costs and expenses of the Prepetition First Lien Agent and the Prepetition First Lien Lenders;

(b)     replacement liens to the extent of any postpetition Diminution in Value of the Prepetition Secured Parties' interest in the Prepetition Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay, which liens will be junior to DIP Liens and senior to Prepetition Secured Liens; and

(c)     superpriority administrative expense claims to the extent of any postpetition Diminution in Value of the Prepetition Secured Parties' interest in the Prepetition Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors.

44.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential Diminution in Value to the Prepetition Collateral (including Cash Collateral).  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus,

the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Prepetition Collateral (including Cash Collateral), subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

### E. The Carve Out Is Appropriate.

45.     The liens granted pursuant to the DIP Facility, adequate protection claims, and the superpriority claims of the DIP Lenders are subject and subordinate to the Carve Out.  The Carve Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  See, e.g., In re Sunlight Financial Holdings, Inc., No. 23-11794 (MFW) (Bankr. D. Del. Nov. 30, 2023) (Docket No. 169); In re Western Global Airlines, Inc., No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) (Docket No. 236); In re Brooks Brothers Group, Inc., No. 20-11785 (CSS) (Bankr. D. Del. Aug. 14, 2020) (Docket No. 443); In re Exide Holdings, Inc., No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) (Docket No. 123); In re Claire's Stores, Inc., No. 18-10584 (MFW) (Bankr. D. Del. March 20, 2018) (Docket No. 130); In re Ames Dep't Stores, 115 B.R. at 40–41; In re Halcón Res. Corp., No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) (Docket No. 130); In re Am. Apparel, Inc., No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) (Docket No. 248); In re Reichold Holdings US, Inc., No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) (Docket No. 54).

46.     Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers because the services for which professionals may be paid in these cases is restricted.  See In re Ames Dep't Stores, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects

against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee Fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of Prepetition Secured Parties' interests in the Prepetition Collateral.

**F.     The Debtors Should Be Authorized to Pay the Fees Due Under the DIP Documents.**

47.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, premiums, and expenses under the DIP Facility (collectively, the "<u>DIP Fees</u>") to the DIP Lenders, DIP Agent, and DIP Backstop Parties in exchange for their providing, backstopping, serving as agent, and/or arranging the DIP Facility, including the Backstop Premium, the Upfront Fee, and Exit Fee, and the reasonable and documented fees and expenses of the legal and financial advisors to each of the Ad Hoc First Lien Group and the DIP Agent.  The following summarizes certain key economic terms the Debtors have agreed to in connection with the DIP Facility:

- **Interest Rate**: S + 8.75% per annum (based on the actual number of days elapsed in a 360-day year) and, during the continuance of an Event of Default, an additional 2.00% per annum (on the DIP Loans and any overdue amounts (including overdue interest and fees)). Default interest, if applicable, shall be payable in cash on demand.

- **Backstop Premium**: to each DIP Backstop Party, 9.0% of the aggregate principal amount of the DIP Loans backstopped by each DIP Backstop Party, payable in cash on demand.  The Backstop Premium shall be fully and finally approved pursuant to the Interim Order.

- **Upfront Fee**: on the closing date of the DIP Facility, the Borrowers shall pay to the DIP Lenders 3.50% of the aggregate amount of DIP Commitments in cash on a pro rata basis.

- **Exit Fee**: upon the repayment or conversion of DIP Loans into First Out Term Loans, the Borrowers shall pay in cash to the DIP Lenders in cash on a pro rata basis an exit fee equal to 2.00% of the aggregate amount of such DIP Loans being repaid or converted.

48.     As set forth in the Kopp Declaration, the terms of the DIP Documents, including the DIP Fees imposed thereunder, are fair and reasonable under these circumstances, are within the market for comparable debtor-in-possession financing, and were negotiated at arms' length. The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing.  As set forth in the Kopp Declaration, the Debtors believe these economic terms are the best terms available and are fair and reasonable under the circumstances, particularly given (i) the trading price of the Debtors' prepetition secured debt, (ii) that the Debtors' primary assets are its people and systems, rather than hard assets with a durable value to lend against as collateral, and (iii) the terms are coupled with a conversion to an exit facility, thereby not requiring the Debtors to rapidly repay the DIP Financing in full in cash upon emergence.  Furthermore, participation in the DIP Facility is being made available and syndicated to all First Lien Secured Parties after the entry of the Interim Order on a pro rata basis, such that First Lien Secured Parties that wish to provide DIP Financing to the Debtors have the opportunity and the ability to share in the economics that go along with participation.  The benefits to the Debtors and their estates provided by the DIP Facility significantly outweigh the fees incurred by the Debtors thereunder and are, taken as a whole, reasonable and appropriate under the circumstances of these Chapter 11 Cases.

49.     Accordingly, the Debtors believe paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates and seek approval of the terms of the DIP Financing and authority to pay the DIP Fees.

**G.     The DIP Lenders Should Be Deemed Good Faith Lender Under Section 364(e).**

50.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or the grant of such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

51.     Here, the Debtors believe the DIP Financing embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As described in the Kopp Declaration, all negotiations of the DIP Documents with the DIP Lenders were conducted in good faith and at arms' length.  The terms and conditions of the DIP Documents are fair and reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Initial DIP Budget (subject to permitted variances). Further, no consideration is being provided to any party to the DIP Documents other than as described herein and in the Kopp Declaration.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

**H.     Modification of the Automatic Stay Is Warranted.**

52.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and the First Lien Secured Parties, as applicable, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) permit the Debtors to incur all liabilities and obligations to

the DIP Agent, DIP Lenders, and First Lien Secured Parties under the DIP Documents, the DIP Facility, and the Interim Order, as applicable; and (c) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, and the First Lien Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order and the DIP Documents.

53.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.

## REQUEST FOR A FINAL HEARING

54.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).  The Debtors request a date which is no later than thirty (30) days after entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the final approval of the relief requested in this Motion.

## BANKRUPTCY RULE 4001(A)(3) SHOULD BE WAIVED

55.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." As explained herein, access to the DIP Facility is essential to prevent irreparable damage to the Debtors' estates. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such applies.

**BANKRUPTCY RULE 6003(b) HAS BEEN SATISFIED**

56.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Petition Date. Fed. R. Bankr. P. 6003(b). As explained above and in the First Day Declaration and in the Kopp Declaration, the Debtors risk a significant disruption in business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Financing. The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important customer and vendor relationships, meet payroll, and satisfy working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

**REQUEST FOR BANKRUPTCY RULE 6004(A) AND (H) WAIVERS**

57.     To implement the foregoing successfully, the Debtors seek waivers of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Kopp Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**DEBTORS' STATEMENT PURSUANT TO LOCAL RULE 4001-2(a)(iii)**

58.     The Debtors believe that the Approved Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Approved Budget.

**NOTICE**

59.     Notice of this Motion has been or will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) counsel to the First Lien Ad Hoc Group; (v) the DIP Agent; (vi) counsel to the DIP Agent; (vii) the First Lien Agent; (viii) counsel to the First Lien Agent; (ix) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis); (x) the Banks; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**<u>CONCLUSION</u>**

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested in this Motion, and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: May 22, 2024

Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Matthew B. Lunn*
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Shella Borovinskaya (No. 6758)
Kristin L. McElroy (No. 6871)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: emorton@ycst.com
mlunn@ycst.com
sborovinskaya@ycst.com
kmcelroy@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Jeffrey D. Pawlitz (*pro hac vice* pending)
Andrew S. Mordkoff (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
Amanda X. Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Email: jpawlitz@willkie.com
amordkoff@willkie.com
eryan@willkie.com
afang@willkie.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
                :
**In re**                :       **Chapter 11**
                :
**DYNATA, LLC *et al.*,**    :       **Case No. 24–11057 (    )**
                :
        **Debtors.**[1]      :       **(Joint Administration Requested)**
                :
---------------------------------------------------------- x

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED POSTPETITION FINANCING, (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-referenced debtors, as debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), pursuant to sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of this interim order (together with all annexes and exhibits hereto, this "Interim Order"):

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Dynata, LLC (8807), New Insight Holdings, Inc. (1844), New Insight Intermediate Holdings, Inc. (6495), Dynata Holdings Corp. (0668), Research Now Group, LLC (7588), SSI/Opiniology Interco LLC (1855), iPinion, Inc. (9463), Research Now, Inc. (5523), SSI Holdings, LLC (6379), New Insight International, Inc. (0453), Imperium LLC (8375), inBrain, LLC (8031), Apps That Pay, LLC (9028), inBrain Holdings, LLC (9696), Branded Research, Inc. (9577), Screenlift.io, LLC, Research Now DE I, LLC (5528), Research Now DE II, LLC (5613), Instantly, Inc. (6756). The Debtors' headquarters is located at 4 Research Drive, Suite 300, Shelton, CT 06484.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement (as defined below), as applicable.

(i)      authorizing Research Now Group, LLC and Dynata, LLC, in their capacities as borrowers (together, the "<u>DIP Borrower</u>"), to obtain postpetition financing, and for each of the other Debtors (such Debtors, other than the DIP Borrower, the "<u>DIP Guarantors</u>", and together with the DIP Borrower, the "<u>DIP Loan Parties</u>") to guarantee unconditionally, on a joint and several basis, the DIP Borrower's obligations pursuant to and in connection with such superpriority senior secured term loan credit facility in the aggregate principal amount of up to $31,500,000.00 (the "<u>DIP Facility</u>" and such funding commitment thereunder, the "<u>DIP Commitment</u>", and loans issued thereunder, the "<u>DIP Loans</u>"), which will be made available to be drawn in a single drawing upon entry of this Interim Order and satisfaction of the other applicable conditions set forth in the DIP Credit Agreement;

(ii)     authorizing the DIP Borrower and the DIP Guarantors to (a) enter into and perform under that certain Super-Priority Senior Secured Debtor-In-Possession Credit Agreement dated as of May 23, 2024, among the DIP Borrower, the DIP Guarantors, the lenders party thereto (collectively in such capacities, the "<u>DIP Lenders</u>"), and Wilmington Savings Society, FSB, as administrative agent, and collateral agent (in such capacities, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>"), annexed hereto as **<u>Exhibit A</u>** (as the same may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>") and the other DIP Documents and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the DIP Borrower in connection with the DIP Facility, and all guarantee and security documentation) (collectively, the "<u>DIP Documents</u>"); and (b) perform such other and further acts as may be required in connection with the DIP Documents;

(iii)    authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in each case (x) solely in accordance with the Approved DIP Budget (as defined below) (subject to any Permitted Variance (as defined below) set forth herein and in the DIP Credit Agreement, the Non-Loan Party Debt Amount (as defined in the DIP Credit Agreement) and the Non-Loan Party Investment Amount (as defined in the DIP Credit Agreement)), and (y) to provide working capital for, and for other general corporate purposes of, the Debtors, including payment of any Adequate Protection Payments (as defined below);

(iv)    granting adequate protection to the Prepetition Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral;

(v)     granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtors' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever,

real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below) to secure the DIP Loans, subject only to the (x) Carve Out (as defined below) and (y) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that, by operation of law or as permitted by the Prepetition Loan Documents, are senior to the liens and/or security interests of the Prepetition Secured Parties as of the Petition Date (the "Prior Senior Liens");

(vi)     granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature, subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the other DIP Documents;

(vii)    waiving the Debtors' and the Debtors' estates' right to surcharge the DIP Collateral (as defined below) and, subject to entry of the Final Order, the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(viii)   providing for the "equities of the case" exception under section 552(b) of the Bankruptcy Code to not apply to the DIP Secured Parties, and subject to entry of the Final Order, the Prepetition Secured Parties (defined below) with respect to the proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, as applicable;

(ix)     pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "Interim Hearing") on the Motion to consider entry of this Interim Order;

(x)      scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a final order (the "Final Order"), and approving the form of notice with respect to the Final Hearing; and

(xi)     granting related relief.

This Court having considered the Motion, the exhibits thereto, the *Declaration of Steven Macri in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. __] (the "First Day Declaration"), the *Declaration of Ethan Kopp in Support of the Motion of the Debtors (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors Use of Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. __] (the "Kopp

Declaration"), and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held on May 23, 2024; and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion and the Interim Hearing as set forth in the Motion, and it appearing that no other or further notice of the interim relief granted herein need be given under the circumstances; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.     _Petition Date_.  On May 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "Court") commencing these Cases.

---

[3]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

B.      *Debtors in Possession*.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction over the Motion, these Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of the United States Constitution.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.      *Committee*.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (any such committee subsequently appointed, the "Committee").

E.      *Debtors' Stipulations*.  Subject only to the rights of parties in interest specifically set forth in Paragraph 11 of this Interim Order (and subject to the limitations thereon contained in such Paragraph or as otherwise provided in this Interim Order), the Debtors stipulate and agree that (Paragraphs E(i) through (vii) below, collectively, the "Debtors' Stipulations"):

(i)      Prepetition First Lien Loans.

(a)      *Prepetition First Lien Credit Agreement*.  The First Lien Lenders (as defined below) provided loans (the "Prepetition First Lien Loans") in a total aggregate principal amount outstanding as of the Petition Date of not less than (i) $920,767,206.45 on account of outstanding Term Loans and (ii) $96,899,999.99 on account of Revolving Loans under that certain First Lien Credit Agreement, dated as of December 20, 2017, by and among Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International,

LLC), in their capacities as borrowers (the "Prepetition First Lien Borrowers"), New Insight Holdings, Inc., a Delaware corporation ("Holdings"), each of the Intermediate Holdings Guarantors (as defined in the Prepetition First Lien Credit Agreement) party thereto, each of the lenders from time to time a party thereto (collectively, the "First Lien Lenders"), and Goldman Sachs Bank USA, as administrative agent and collateral agent for the lenders (in such capacities, and together with any of its successors in any such capacity, the "Prepetition First Lien Agent" and, together with the First Lien Lenders and the other Secured Parties (as defined in the Prepetition First Lien Credit Agreement), the "Prepetition First Lien Secured Parties") (such credit agreement, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement" and, together with the other "Loan Documents" (as defined in the Prepetition First Lien Credit Agreement), the "Prepetition First Lien Loan Documents").

(b)      *Prepetition First Lien Obligations*.  As of the Petition Date, the Prepetition Loan Parties (as defined below) were jointly and severally indebted to the Prepetition First Lien Secured Parties pursuant to the Prepetition First Lien Loan Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $1,017,667,206.44 on account of the Prepetition First Lien Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Loan Document Obligations (as defined in the Prepetition

First Lien Credit Agreement), in each case, owing under or in connection with the Prepetition First Lien Loan Documents (collectively, the "Prepetition First Lien Obligations").

(c)    *Prepetition First Priority Liens*.  In connection with the Prepetition First Lien Credit Agreement, the Prepetition Loan Parties (as defined below) entered into the Security Documents (as defined in the Prepetition First Lien Credit Agreement, the "Prepetition First Lien Security Documents").  As set forth in the Prepetition First Lien Security Documents and the other Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "Prepetition First Priority Liens") on all of the Collateral (as defined in the Prepetition First Lien Credit Agreement, the "Prepetition Collateral"), which consists of substantially all of each Prepetition Loan Parties' assets.

(d)    *Validity, Perfection, and Priority of Prepetition First Priority Liens and Prepetition First Lien Obligations*.  Each of the Debtors acknowledge and agree that, in each case, as of the Petition Date:  (A) the Prepetition First Priority Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Prepetition First Priority Liens are subject and subordinate only to the Carve Out and the Prior Senior Liens (if any); (C) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties; (D) the Prepetition First Priority Liens encumber all of the Prepetition Collateral; (E) the Prepetition First Priority Liens were granted to or for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (F) no offsets, challenges, objections, defenses, claims, or

counterclaims of any kind or nature to any of the Prepetition First Priority Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Priority Liens or Prepetition First Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (G) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against any of the Prepetition First Lien Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition First Lien Loans, the Prepetition First Lien Obligations, or the Prepetition First Priority Liens; and (H) the Prepetition First Lien Obligations constitute an allowed, secured claim within the meaning of section 502 and 506 of the Bankruptcy Code.

(ii)     Prepetition Second Lien Loans.

(a)     *Prepetition Second Lien Credit Agreement*.  The Second Lien Lenders (as defined below) provided loans (the "Prepetition Second Lien Loans" and, together with the Prepetition First Lien Loans, the "Prepetition Loans") in a total aggregate principal amount outstanding as of the Petition Date of $250,000,000.00, under that certain Second Lien Credit Agreement, dated as of December 20, 2017, by and among Research Now Group, LLC (f/k/a

Research Now Group, Inc.), a Delaware limited liability company, and Dynata, LLC (f/k/a Survey Sampling International, LLC), a Delaware limited liability company, in their capacities as borrowers (the "Prepetition Second Lien Borrowers" and, in their capacity as both Prepetition First Lien Borrowers and Prepetition Second Lien Borrowers, the "Prepetition Borrowers"), Holdings, each of the Intermediate Holdings Guarantors (as defined in the Prepetition Second Lien Credit Agreement) party thereto, each of the lenders from time to time a party thereto (collectively, the "Second Lien Lenders" and, together with the First Lien Lenders, the "Lenders"), and Acquiom Agency Services LLC, as administrative agent and collateral agent (in such capacities, and together with any of its successors in any such capacity, the "Prepetition Second Lien Agent" and, together the Prepetition First Lien Agent, the "Prepetition Agents" and, the Prepetition Second Lien Agent together with the Second Lien Lenders and the other Secured Parties (as defined in the Prepetition Second Lien Credit Agreement), the "Prepetition Second Lien Secured Parties" and, the Prepetition Second Lien Secured Parties together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties") (such credit agreement, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Second Lien Credit Agreement" and, such Prepetition Second Lien Credit Agreement together the with Prepetition First Lien Credit Agreement, the "Prepetition Credit Agreements" and, the Prepetition Second Lien Credit Agreement together with the other "Loan Documents" (as defined in the Prepetition Second Lien Credit Agreement), the "Prepetition Second Lien Loan Documents" and, together with the Prepetition First Lien Loan Documents, the "Prepetition Loan Documents").

       (b)    *Prepetition Second Lien Obligations*.  As of the Petition Date, the Prepetition Loan Parties were jointly and severally indebted to the Prepetition Second Lien

Secured Parties pursuant to the Prepetition Second Lien Loan Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $250,000,000.00, on account of Prepetition Second Lien Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Loan Document Obligations (as defined in the Prepetition Second Lien Credit Agreement), in each case, owing under or in connection with the Prepetition Second Lien Loan Documents (collectively, the "Prepetition Second Lien Obligations" and, together with the Prepetition First Lien Obligations, the "Prepetition Obligations").

(c)     *Prepetition Second Priority Liens*.   In connection with the Prepetition Second Lien Credit Agreement, the Prepetition Loan Parties entered into the Security Documents (as defined in the Prepetition Second Lien Credit Agreement, the "Prepetition Second Lien Security Documents").   As set forth in the Prepetition Second Lien Security Documents and the other Prepetition Second Lien Loan Documents, the Prepetition Second Lien Obligations are secured by valid, binding, perfected, and enforceable second-priority security interests in and liens (the "Prepetition Second Priority Liens" and, together with the Prepetition First Priority Liens, the "Prepetition Liens") on the Prepetition Collateral held by the Prepetition Second Lien Secured Parties.

(d)     *Validity, Perfection, and Priority of Prepetition Second Priority Liens and Prepetition Second Lien Obligations*.   Each of the Debtors acknowledge and agree that, in each case, as of the Petition Date:  (A) the Prepetition Second Priority Liens are valid, binding,

enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the Prepetition Second Priority Liens are subject and subordinate only to the Carve Out and the Prior Senior Liens (if any) and the Prepetition First Priority Liens; (C) the Prepetition Second Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties; (D) the Prepetition Second Priority Liens encumber all of the Prepetition Collateral; (E) the Prepetition Second Priority Liens were granted to or for the benefit of the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (F) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Second Priority Liens or Prepetition Second Lien Obligations exist, and no portion of the Prepetition Second Priority Liens or Prepetition Second Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (G) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition Second Lien Agent, the Prepetition Second Lien Secured Parties, or any of their respective affiliates,

agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition Second Lien Loan Documents, the Prepetition Second Lien Obligations, or the Prepetition Second Priority Liens and (H) the Prepetition Second Lien Obligations constitute an allowed, secured claim within the meaning of section 502 and 506 of the Bankruptcy Code.

(iii)    *Cash Collateral*.  Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or deposited into the Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(iv)    *Bank Accounts*.  The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "Cash Management Order").

(v)    *Intercreditor Agreement*.  The Prepetition Agents, in their capacities as Prepetition First Lien Agent and Prepetition Second Lien Agent, respectively, and each additional Representative from time to time party thereto, are parties to the First Lien/Second Lien Intercreditor Agreement, dated as of December 20, 2017 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Intercreditor Agreement").  Pursuant to the terms of the Intercreditor Agreement, the Prepetition First Lien Agent is the Designated Senior Priority Representative (as defined in the Intercreditor Agreement)

as of the Petition Date and, with respect to any Shared Collateral (as defined in the Intercreditor Agreement).  The Intercreditor Agreement is binding and enforceable against the parties thereto in accordance with its terms and shall not be deemed to be otherwise amended, altered, or modified by the terms of this Interim Order, unless expressly set forth herein.

(vi)   *No Control*.  As of the Petition Date, none of the Prepetition Secured Parties or the DIP Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Documents, or the Prepetition Loan Documents.

(vii)   *Default*.  The relevant Debtors party thereto are in default under the Prepetition Loan Documents as a result of these Chapter 11 Cases, and an event of default has occurred under the Prepetition Loan Documents.

(viii)   *Superpriority Claims*.  There are no other superpriority claims other than the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims, and the Second Lien Adequate Protection Superpriority Claims.

F.   *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(i)   The Debtors have an immediate need to obtain the DIP Facility, to access the liquidity available under the DIP Facility, and to use Cash Collateral (solely to the extent consistent with the Approved DIP Budget, subject to any Permitted Variance set forth herein and in the DIP Credit Agreement, the Non-Loan Party Debt Amount (as defined in the DIP Credit Agreement) and the Non-Loan Party Investment Amount (as defined in the DIP Credit Agreement)) to, among other things, (A) permit the orderly continuation of their businesses;

13

(B) pay certain Adequate Protection Payments; and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors and certain subsidiaries thereof.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern value and successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)      The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the DIP Loan Parties granting to the DIP Secured Parties the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the other DIP Documents.

(iii)      The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express

reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted, or payments made, in each case, to the DIP Agent and/or the DIP Lenders and arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all of the rights, remedies, privileges, and benefits granted herein.

(iv)     *Adequate Protection*. Each of the Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including but not limited to Cash Collateral, and for any diminution in the in the value of such interests (each such diminution, a "Diminution in Value").

(v)     *Sections 506(c) and 552(b)*. In light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, the Prepetition Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, a waiver of (i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) the provisions of section 506(c) of the Bankruptcy Code.

(vi)     *Consent by Prepetition Agent*. The Prepetition Agents (at the direction of the applicable Required Lenders (as defined in each of the Prepetition Credit Agreements)), on behalf of and for the benefit of each of the Prepetition Secured Parties, have consented to, or is deemed to have consented under the Intercreditor Agreement, the DIP Loan Parties' incurrence of

the DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, including, without limitation, the terms of the adequate protection provided for in this Interim Order.

G.     *Good Cause Shown; Best Interest*.   Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' and their estates, creditors, and other stakeholders, as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

H.     *Notice*.   In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.   Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and the applicable Local Rules.

I.     *Arm's Length, Good Faith Negotiations*.   The terms and conditions of the DIP Facility, the use of Cash Collateral, and of this Interim Order were negotiated in good faith and at arm's length between the DIP Loan Parties, the DIP Secured Parties, the DIP Agent, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors.   The DIP Secured Parties and the Prepetition Secured Parties have acted without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Loan Parties' incurrence of the DIP Facility and the Debtors' use of Cash Collateral, including in respect of all of the terms of this Interim Order, all documents related thereto, and all transactions

16

contemplated by the foregoing. The terms and conditions of the DIP Facility, the DIP Loan Documents, and the fees paid and to be paid thereunder to the DIP Secured Parties, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured postpetition financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made or extended in good faith by the DIP Secured Parties, within the meaning of section 364(e) of the Bankruptcy Code. The Prepetition First Lien Secured Parties have agreed to the use of Cash Collateral in good faith and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim DIP Order or any provision hereof is reversed or modified on appeal. Based on the Motion, the Kopp Declaration, the First Day Declaration, and on the record presented at the Interim Hearing, the terms of the DIP Facility are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

J.      *Immediate Entry*. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003. Absent entry of this Interim Order, the Debtors' businesses, and estates would be immediately and irreparably harmed. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and stakeholders and sufficient cause exists for the immediate entry of this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.  <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.  <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.  <u>Authorization of the DIP Facility and the DIP Documents</u>.

(a)  The DIP Borrower and the DIP Guarantors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.  To the extent not entered into as of the date hereof, the DIP Loan Parties and the DIP Secured Parties shall negotiate the DIP Documents in good faith, and in all respects such DIP Documents shall be, subject to the terms of this Interim Order and the Final Order, consistent with the terms of the DIP Credit Agreement and otherwise acceptable to the DIP Agent (acting at the direction of the "<u>Required Lenders</u>" under and as defined in the DIP Credit Agreement (such lenders, the "<u>Required DIP Lenders</u>")) and the Required DIP Lenders.  Upon entry of this Interim Order and until execution and delivery of the DIP Credit Agreement and the other DIP Documents required to be delivered thereunder, the DIP Loan Parties and the DIP Secured Parties shall be bound by the terms and conditions and other provisions set forth in any executed DIP Documents (including the fee letters executed in connection with the DIP Facility) to the DIP Agent by the

DIP Loan Parties, and this Interim Order and the executed DIP Documents (including the fee letters executed in connection with the DIP Facility) shall govern and control the DIP Facility. Upon entry of this Interim Order, the Interim Order, the DIP Credit Agreement, and the other DIP Documents shall govern and control the DIP Facility. The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Documents, subject to the terms and conditions set forth therein and in this Interim Order. Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the DIP Loan Parties enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.

(b)     Upon entry of this Interim Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $31,500,000.00 of DIP Loans, subject to and in accordance with this Interim Order, without any further action by the Debtors or any other party.

(c)     The proceeds from the DIP Loans shall be deposited into the Loan Proceeds Account (as defined in the DIP Credit Agreement), in accordance with Section 2.06 of the DIP Credit Agreement (such account the "DIP Account"), which amounts may only be drawn in accordance with the DIP Budget (subject to Permitted Variances) and the DIP Credit Agreement, and which amounts shall be deemed to be DIP Collateral. Funds in the DIP Account will become available to be drawn by and/or shall be disbursed to the Debtors in accordance with the DIP Budget (subject to Permitted Variances) and the DIP Credit Agreement. The DIP Agent shall be deemed to have "control" over the DIP Account for all purposes of perfection under the Uniform Commercial Code pursuant to this Interim Order. In accordance with the terms of this Interim

19

Order and the other DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under this Interim Order and the other DIP Documents, and in accordance with the Approved DIP Budget, subject to any Permitted Variance as set forth in this Interim Order and the other DIP Documents, the Non-Loan Party Debt Amount (as defined in the DIP Credit Agreement) and the Non-Loan Party Investment Amount (as defined in the DIP Credit Agreement). Attached as **Exhibit B** hereto and incorporated herein by reference is a budget prepared by the Debtors and approved by the Required DIP Lenders in accordance with section 5.17 of the DIP Credit Agreement (the "Initial DIP Budget").

(d)     For the avoidance of doubt, no proceeds of the DIP Loans (including payments from DIP Collateral) shall be used (i) to make any payment in settlement or satisfaction of any prepetition claim or administrative claim (other than the DIP Obligations as provided herein and in the DIP Credit Agreement), unless (x) in compliance with the DIP Budget (subject to Permitted Variances) or (y) as separately approved by the Court and in compliance with the DIP Budget (subject to Permitted Variances); (ii) except as expressly provided or permitted hereunder, under the DIP Credit Agreement or in the DIP Budget or as otherwise approved in advance in writing by the Required DIP Lenders (and approved by the Court, if necessary), to make any payment or distribution, directly or indirectly, to any non-Debtor affiliate; provided that, notwithstanding anything else herein, any consent of the Required DIP Lenders to payments or distributions to non-Debtors Affiliates shall not be deemed, inferred, or assumed absent express line item approval of such payment or distribution in the DIP Budget; (iii) except as expressly provided or permitted hereunder, under the DIP Credit Agreement or in the DIP Budget or as otherwise approved in advance in writing by the Required DIP Lenders (and approved by the Court, if necessary), to make any payment or distribution to any insider of the Debtors that is

outside the ordinary course, and in no event shall any non-ordinary course management, advisory, consulting or similar fees be paid to or for the benefit of any affiliate that is not a Debtor; (iv) to make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreement and the DIP Budget (subject to Permitted Variances); (v) to make any payment otherwise prohibited by the Interim Order or the Final Order (as applicable); or (vi) to make any intercompany loans and investments (including to and in foreign subsidiaries) unless permitted by this Interim Order, the Final Order, or the other DIP Documents and the DIP Budget (subject to Permitted Variances).

(e)     Authorization to Use Cash Collateral.  Subject to the terms and conditions of the this Interim Order, the DIP Budget (subject to the Permitted Variances), and the DIP Documents, the Debtors are authorized to continue using Cash Collateral.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as is permitted in this Interim Order (including with respect to the Carve Out), and the DIP Documents.  For the avoidance of doubt, except as otherwise set forth in the DIP Budget (subject to Permitted Variances) or otherwise consented to by the Required DIP Lenders, Cash Collateral may not be used (i) by any non-Debtor entity or (ii) to pay any fees, costs, expenses and/or any other amounts of any non-Debtor entity.

(f)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP

Credit Agreement), and to pay all fees (including all amounts owed to (i) the DIP Lenders and the DIP Agent under the DIP Documents, (ii) the Backstop Premium, (iii) the Upfront Fee and (iv) the Exit Fee) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(1) the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent required thereby;

(2) the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that (a) no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents or the DIP Obligations that are not material; provided that any such non-material amendment shall be provided to the U.S. Trustee and counsel for the Committee, to the extent one has been appointed at such time; and (b) any amendment that is materially adverse to the interests of the Debtors or their Estates shall be filed on the docket of the Chapter 11 Cases and served on counsel to the U.S. Trustee, counsel to the Committee, and all parties in the Chapter 11 Cases that, as of the date thereof, are entitled to notice pursuant to Bankruptcy Rule 2002, and the Debtors shall only be permitted to enter into such an amendment pursuant to an order of this Court entered after at least five (5) days' notice to such parties;

(3) the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Documents or the Motion, including (x) all premiums, fees, expenses and other amounts owed to the DIP Agent and the DIP Lenders (which premiums, fees and expenses, in each case, are deemed approved upon entry of this Interim Order), including, without limitation, the Backstop Premium, the Upfront Fee and the Exit Fee and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel), PJT Partners, Inc. (as financial advisor), Klehr

22

Harrison Harvey Branzburg LLP (as Delaware bankruptcy counsel), Mercer (US) LLP (as compensation consultant), and any other specialty counsel and other professionals necessary to represent the interests of the DIP Lenders and the ad hoc group of the First Lien Lenders (the "<u>DIP/First Lien Group</u>") in connection with the Cases (collectively, the "<u>DIP/First Lien Advisors</u>"); and (b) ArentFox Schiff LLP (as counsel), and any Delaware bankruptcy counsel to the DIP Agent, and, to the extent necessary to exercise its rights and fulfill its obligations under the DIP Documents, one counsel to the DIP Agent in any jurisdictions reasonably required (collectively, the "<u>DIP Agent Advisors</u>"), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payments be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of Paragraph 18 of this Interim Order; and

(4)    the performance of all other acts required under or in connection with the DIP Documents.

(g)    Upon entry of this Interim Order, the DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, and after any dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted to or on behalf of (a) the DIP Agent or any DIP Secured Parties or (b) the Prepetition Secured Parties (subject only to Paragraph 11 of this Interim Order, if applicable), pursuant to the DIP Documents, the provisions of this Interim Order, or any

subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) and the "equities of the case" exception of section 552(b), in each case solely as to the Prepetition Secured Parties, subject to the entry of the Final Order).

(h)     The DIP Guarantors are hereby authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

4.     Budget and Variance Reporting.

(a)     Beginning on the Friday of the third week following the Petition Date, and every other Friday thereafter (or more frequently if determined by the Debtors), the Debtors will deliver to the Prepetition First Lien Agent, the DIP/First Lien Advisors, and Vinson & Elkins as counsel to the Second Lien Group, Lazard Freres & Co., LLC as financial advisors to the Second Lien Group, and Morris, Nichols, Arsht & Tunnell LLP as Delaware bankruptcy counsel to that certain group of Second Lien Lenders (the "Second Lien Group") (collectively, the "Second Lien Advisors") an updated budget for the subsequent 13-week period (a "Subsequent DIP Budget"), which shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion.  The Initial DIP Budget or any Subsequent DIP Budget shall be deemed to constitute the "Approved DIP Budget" for purposes of this Interim Order with the most recently delivered budget constituting the "Approved DIP Budget" solely upon approval by the Required DIP Lenders (which must be in writing, email being sufficient) in their sole discretion.  In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP

Budget" are not met as set forth herein, the prior Approved DIP Budget shall remain in full force and effect and the Debtors shall be required to work in good faith with the Required DIP Lenders to modify such Subsequent DIP Budget until the Required DIP Lenders approve such Subsequent DIP Budget as an "Approved DIP Budget."

(b)     Permitted Variances (as defined below) shall be tested on a bi-weekly basis beginning with the period ending on May 31, 2024, delivered on June 7, 2024 and due on every other Friday thereafter for the prior two-week period (each such date, a "Testing Date").  On or before 5:00 p.m. (prevailing Eastern time) on each Testing Date, the Debtors shall deliver to the DIP Agent, the Prepetition First Lien Agent, the DIP Agent, the DIP/First Lien Advisors, and the Second Lien Advisors a budget variance report/reconciliation in form and substance reasonably satisfactory to the DIP/First Lien Group (the "Approved DIP Budget Variance Report"), setting forth in detail (i) the Debtors' operating disbursements (the "Actual Disbursements") on a line-by-line and aggregate basis for the two-week period ending the Friday preceding the applicable Testing Date (the "Testing Period"); (ii) the Debtors' operating receipts (the "Actual Receipts"), on a line-by-line and aggregate basis during the Testing Period; (iii) the fees and expenses of Professional Persons (as defined below) incurred during the Testing Period; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) for the Testing Period of the Actual Receipts (and each line item thereof), the Actual Disbursements (and each line item thereof), and the fees and expenses of Professional Persons for the Testing Period to the amount of Debtors' projected cash receipts (and each line item thereof) set forth in the Approved DIP Budget for such prior week period and the Debtors' projected disbursements (and each line item thereof), respectively, set forth in the Approved DIP Budget for such Testing Period; and (v) as to each variance contained in the Approved DIP Budget Variance Report, an indication as to whether

such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance.

(c)     The Debtors shall not permit on any Testing Date:  (i) a deviation of 12.5% from the Approved DIP Budget of the Debtors' Actual Disbursements in the aggregate during the preceding two weeks; or (ii) a deviation of 15% from the Approved DIP Budget of the Debtors' Actual Receipts in the aggregate for such two week period (the "Permitted Variances").  For the avoidance of doubt, for purposes of Permitted Variances testing, the fees and expenses of Professional Persons, the DIP Agent Advisors, the DIP/First Lien Advisors, and the Second Lien Advisors shall be excluded.

5.     Access to Records.  The Debtors shall provide the DIP/First Lien Advisors, the Second Lien Advisors, the DIP Agent, and the Prepetition First Lien Agent with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to counsel to the Debtors (email being sufficient), the Debtors shall permit representatives, agents, and employees of the Prepetition First Lien Agent, the Prepetition Second Lien Agent, and the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the Prepetition First Lien Agent, the Prepetition Second Lien Agent, and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject

to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.    <u>DIP Superpriority Claims</u>.   Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "<u>DIP Superpriority Claims</u>") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, but subject to entry of a Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "<u>Avoidance Actions</u>").

7.    <u>DIP Liens</u>.   As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP

Lender of, or over, any DIP Collateral, the following security interests and liens are hereby granted

by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified

in clauses (a) and (b) below being collectively referred to as the "DIP Collateral"), subject only to

(x) Prior Senior Liens (y) the Carve Out, and (z) exclusions, if any, set forth in the DIP Documents

(all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Secured

Parties, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

   (a)  First Priority Lien On Any Unencumbered Property.  Subject only to the

Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority

senior security interest in and lien upon all property of the Debtors, whether existing on the Petition

Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and

non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b)

of the Bankruptcy Code), including, without limitation (in each case, to the extent not subject to

valid, perfected, and non-avoidable liens), a 100% pledge of equity interests in any direct or

indirect subsidiaries and all unencumbered assets of the Debtors; all prepetition property and post-

petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof,

whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without

limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether

maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment

intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any

accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof,

equity interests, instruments, intercompany claims, accounts receivable, other rights to payment,

all general intangibles, all contracts and contract rights, securities, investment property, letters of

credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; all patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, to the extent unencumbered as of Petition Date, the "Previously Unencumbered Property"); *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, that to the extent a lien cannot attach to any of the foregoing pursuant to applicable law or contract, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(b)     Liens Priming the Prepetition Liens.   Subject only to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, that to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)     <u>Liens Junior to Certain Other Liens</u>.  Subject only to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and post-petition property of the Debtors that is encumbered by Prior Senior Liens, immediately junior to such Prior Senior Liens.

8.     <u>Adequate Protection for the Prepetition Secured Parties</u>.  Subject only to the Carve Out, the DIP Obligations, and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any Diminution in Value, resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Agents, for the benefit of themselves and the other Prepetition Secured Parties, are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"):

(a)     <u>Adequate Protection Liens</u>.  To the extent any Diminution in Value of their interests in the Prepetition Collateral, the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, is hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements), valid, perfected replacement and additional security interests in and liens (the "<u>First Lien Adequate Protection Liens</u>") on the DIP Collateral, which First Lien Adequate Protection Liens shall be junior only to the DIP Liens and to any Prior Senior Liens, and senior to all other liens, subject to the Carve Out.  To the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien

Secured Parties, is hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements), valid, perfected replacement and additional security interests in and liens (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens") on the DIP Collateral, which Second Lien Adequate Protection Liens shall be junior only to the DIP Liens, any Prior Senior Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens and senior to all other liens, subject to the Carve Out.  For the avoidance of doubt and notwithstanding anything to the contrary herein, to the extent a lien cannot attach to such property, assets or rights pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach instead to the Debtors' economic rights therein, including, without limitation, any and all proceeds thereof.  The Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided in this Interim Order.  The Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Parties and not in substitution therefor.

(b)     Adequate Protection Superpriority Claims.  To the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, is hereby granted an allowed administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code (each a "First Lien Adequate Protection Superpriority Claim" and together the "First Lien Adequate Protection Superpriority Claims") against the Debtors and their estates on a joint and several basis,

31

which First Lien Adequate Protection Superpriority Claims shall have priority over all other claims and administrative claims in the Chapter 11 Cases, including, without limitation, all claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726(b), 1113 and 1114 of the Bankruptcy Code, 503(b) and 507(b) of the Bankruptcy Code, in each case subject only to the Carve Out, and immediately junior to the DIP Superpriority Claims, which First Lien Adequate Protection Superpriority Claims shall have recourse to and be payable from all assets and property of the DIP Loan Parties.   To the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, the Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Secured Parties, is hereby granted an allowed administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code (each a "Second Lien Adequate Protection Superpriority Claim" and together the "Second Lien Adequate Protection Superpriority Claims" and, together with the First Lien Adequate Protection Superpriority Claims, the "Adequate Protection Superpriority Claims") against the Debtors and their estates on a joint and several basis, consistent with the Intercreditor Agreement, which Second Lien Adequate Protection Superpriority Claims shall have priority over all other claims and administrative claims in the Chapter 11 Cases, including, without limitation, all claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726(b), 1113 and 1114 of the Bankruptcy Code, 503(b) and 507(b) of the Bankruptcy Code, in each case subject only to the Carve Out, and immediately junior to the First Lien Adequate Protection Superpriority Claims  (and, for the avoidance of doubt, junior to the DIP Superpriority Claims), which Second Lien Adequate Protection Superpriority Claims shall have recourse to and be payable from all assets and property of the DIP Loan Parties.

32

(c)     <u>Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of Paragraph 18 of this Interim Order, all reasonable and documented fees and expenses of the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties, whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to Paragraph 3(f)(3) hereof, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order, including, for the avoidance of doubt, with respect to the Prepetition First Lien Secured Parties (i) the DIP/First Lien Advisors, (ii) the DIP Agent Advisors, and (iii) (x) Cahill, Gordon & Reindel LLP, as counsel to the Prepetition First Lien Agent and (y) Richards, Layton & Finger, PA, as Delaware counsel to the Prepetition First Lien Agent, and with respect to the Prepetition Second Lien Secured Parties, the Second Lien Advisors and Pryor Cashman LLP as counsel to the Prepetition Second Lien Agent (all payments referenced in this sentence, collectively, the "<u>Adequate Protection Payments</u>").  None of the Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)     <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate

for any Diminution in Value of their interests in the Prepetition Collateral during the Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

(e)     *Other Covenants*.   The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order and this Interim Order or as otherwise agreed to by the Required DIP Lenders.  The DIP Loan Parties shall comply with the covenants contained in the DIP Credit Agreement regarding conduct of business, including, without limitation, preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations and intellectual property rights material to the conduct of their business and the maintenance of properties and insurance.

(f)     Maintenance of DIP Collateral and Prepetition Collateral; Cash Management.  Unless the DIP Loan Parties have the consent of the DIP Agent (at the direction of the Required DIP Lenders), or upon termination of the DIP Secured Parties' obligations to extend credit under the DIP Documents, as provided therein, the DIP Loan Parties shall insure the Prepetition Collateral and the DIP Collateral as required under DIP Documents and the Prepetition Loan Documents.  Upon entry of the Interim Order and to the fullest extent provided by applicable law, the DIP Agent was, and shall continue to be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the DIP Loan Parties that in any way relates to the DIP Collateral, and the DIP Agent shall distribute any proceeds recovered or received in respect of any such insurance policies, in accordance with

the terms of the DIP Documents, this Interim Order, and subject to the terms and conditions of the Intercreditor Agreement.

(g)     *Reporting Requirements*.   As additional adequate protection to the Prepetition Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement.

(h)     *Miscellaneous*.  Except for (i) the Carve Out, (ii) the DIP Liens and the DIP Obligations and (iii) as otherwise provided in this Paragraph 8, the Adequate Protection Liens and Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise. Except for (i) the Carve Out, (ii) the DIP Liens and the DIP Obligations (iii) the Adequate Protection Liens and Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties (iv) the Prepetition First Priority Liens and (v) as otherwise provided in this Paragraph 8, the Adequate Protection Liens and Adequate Protection Superpriority Claims granted to the Prepetition Second Lien Secured Parties shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

9.      Carve Out.

(a)      Priority of Carve Out.  Subject to the terms and conditions contained in this Paragraph 9, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve Out.  The Carve Out shall have such priority claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral.

(b)      Definition of Carve Out.  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, (the amounts set forth in clauses (i) through (iii), the "Pre-Carve Out Trigger Notice Cap"); and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day

36

following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of the Carve

Out Trigger Notice (or by the Prepetition First Lien Secured Parties after repayment of the DIP

Obligations in full) (such date, the "Trigger Date"), to the extent allowed at any time, whether by

interim order, procedural order, or otherwise, less the amount of any prepetition retainers received

by any such Professional Persons and not previously returned or applied to fees and expenses (the

amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" and, together

with the Pre-Carve Out Trigger Notice Cap, the "Carve Out Cap").  For purposes of the foregoing,

"Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic

means) by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition

First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors, their lead

restructuring counsel (Willkie Farr & Gallagher LLP), the Second Lien Advisors, the U.S. Trustee,

and counsel to the Committee (to the extent one has been appointed), which notice may be

delivered following the occurrence and during the continuation of an Event of Default and

acceleration of the DIP Obligations under the DIP Facility (or the Debtors' breach of the provisions

of this Interim Order governing use of Cash Collateral that is not timely cured), stating that the

Post-Carve Out Trigger Notice Cap has been invoked.

(c)     Carve Out Reserve.  Notwithstanding the occurrence of an Event of Default,

on the day on which a Carve Out Trigger Notice is given by the DIP Agent (at the direction of the

Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the

DIP Obligations in full) to the Debtors (the "Termination Declaration Date"), the Carve Out

Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date

and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the

then unpaid amounts of the Professional Fees.  The Debtors shall deposit and hold such amounts

in a segregated account, not subject to the control of the Prepetition Secured Parties, in trust to pay

such then unpaid Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and

all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also

constitute a demand to the Debtors to utilize all cash on hand as of such date and any available

cash thereafter held by any Debtor after funding the Pre-Carve Out Trigger Notice Reserve to fund

a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit

and hold such amounts in a segregated account in trust to pay such Professional Fees benefiting

from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and,

together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any

and all other claims.  Notwithstanding anything to the contrary in the DIP Documents or this

Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition

Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other

disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but

shall have a security interest in any residual interest in the Carve Out Reserves, with any excess

paid to the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been

indefeasibly paid in full, in cash, and the DIP Commitment has been terminated, in which case any

such excess shall be paid to the Prepetition First Lien Agent for the benefit of the Prepetition First

Lien Secured Parties.

(d)     Notwithstanding anything to the contrary in this Interim Order, (i) the

failure of the Carve Out Reserves to satisfy in full the allowed Professional Fees shall not affect

the priority of the Carve Out and (ii) in no way shall the Approved DIP Budget, Carve Out, Post-

Carve Out Trigger Notice Cap, the Carve Out Reserves, or any of the foregoing be construed as a

cap, limitation or admission with respect to the amount of allowed Professional Fees due and payable by the Debtors.

(e)     No Direct Obligation to Pay Professional Fees.  The Prepetition Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved DIP Budget.  Except for permitting the funding of the Carve Out Reserves as provided herein, none of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the other DIP Documents, the Bankruptcy Code, and applicable law.

10.     Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties.  Subject only to the Carve Out and the Intercreditor Agreement, notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not

constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Parties or DIP Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek different or additional adequate protection; provided that any such further or different adequate protection of the Prepetition Secured Parties shall at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the other DIP Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Documents, the Prepetition Loan Documents, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code solely in connection with the DIP Facility, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties, subject in all respects to the Intercreditor Agreement.  The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies.  For all adequate protection purposes throughout the Cases, each of the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date.  For the avoidance of doubt, such request will survive termination of this Interim Order.  For the further avoidance of doubt, the entry of this

Interim Order is without prejudice to the rights of Second Lien Secured Parties to seek similar relief and shall not constitute a waiver of any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Second Lien Secured Parties.

11.    <u>Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims</u>.  Subject only to the Challenge Period (as defined below), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date and upon entry of the Interim Order.  The stipulations, admissions, and waivers contained in this Interim Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of this Court (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Period Termination Date (as defined below) and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding has timely and properly filed an adversary proceeding or contested matter as required under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules: (i) before the earlier of (a) seventy-five (75) calendar days after entry of this Interim Order and (b) the date of entry of an order confirming a plan of reorganization or liquidation(the "<u>Challenge Period</u>" and, the date of expiration of the Challenge Period, the "<u>Challenge Period Termination Date</u>"); *provided* that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed,

then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus twenty (20) calendar days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Agents and the Prepetition Secured Parties;  or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "Challenge"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.  Upon the expiration of the Challenge Period Termination Date without the proper and timely filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim

Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

12.    <u>Termination Date</u>.  On the Termination Date (as defined below), consistent with Article VII of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable, all Commitments will terminate, and the Carve Out Reserves shall be funded as set forth in this Interim Order; (b) all authority to use Cash Collateral shall cease; provided that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund

the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved DIP Budget; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

13.    <u>Events of Default</u>.  The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):  (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, (b) the failure of the Debtors to comply with any of the Required Milestones (as defined below), (c) the occurrence of an "Event of Default" under the DIP Credit Agreement, or (d) a superpriority claim has been granted or allowed in these Cases except as set forth in this Interim Order or the Final Order.

14.    <u>Milestones</u>.  The DIP Loan Parties' failure to comply with those certain case milestones set forth in section 5.18 of the DIP Credit Agreement (collectively, the "<u>Required Milestones</u>") shall constitute an "Event of Default" in accordance with the terms of the DIP Credit Agreement.

15.    <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (as defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders) may declare (email being sufficient) (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") (i) all DIP Obligations owing under the DIP Documents to be immediately due and

payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice to the DIP Borrower (with a copy also delivered to the Committee and the U.S. Trustee) and (b) subject to Paragraph 12(b), the DIP Agent (at the direction of the Required DIP Lenders) may declare (email being sufficient) a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "Termination Date"). The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "Remedies Notice Period"):   (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; (b) subject to the foregoing clause (a), the applicable Prepetition Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents (including the Intercreditor Agreement) and this Interim Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing, subject to Court discretion.  Except as set forth in this Paragraph 15 or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies

Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under this Interim Order.  Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Prepetition Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders), and the Prepetition Secured Parties (subject to the Intercreditor Agreement) shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order; provided that the Prepetition Secured Parties shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

16.     <u>Limitation on Charging Expenses Against Collateral</u>.   No expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, or the DIP Lenders or (b) subject to entry of the Final Order, the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

17.     <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the Approved DIP Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the Termination Date. Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

18.     <u>Expenses and Indemnification</u>.

(a)     The Debtors are hereby authorized and directed to pay, upon entry of this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, backstop, fronting, closing, arrangement, or commitment payments (including all payments and other amounts owed to the DIP Lenders), the Backstop Premium, the Upfront Fee, the Exit Fee, the administrative agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in Paragraphs 3(f)(3)and 8(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, the Prepetition First Lien Agent, the DIP/First Lien Group, the Second Lien Advisors, and Pryor Cashman LLP as counsel to the Prepetition Second Lien Agent incurred on or prior to such date without the need

for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition First Lien Agent, the DIP/First Lien Group, the Second Lien Group, or the Prepetition Second Lien Agent to first deliver a copy of its invoice as provided for herein.

(b)     The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in Paragraphs 3(f)(3)and 8(c) of this Interim Order, which for the avoidance of doubt includes the Second Lien Advisors and Pryor Cashman LLP as counsel to the Prepetition Second Lien Agent, (collectively, the "Lender Professionals" and, each, a "Lender Professional") no later than five (5) business days (the "Review Period") after the receipt by counsel for the Debtors, any Committee, or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.

The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, any Committee that may be appointed in these Cases, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) calendar days prior written notice to the submitting party of any hearing on such motion or other pleading). For avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)     The Prepetition Secured Parties, the DIP Lenders, and the DIP Agent (solely in their capacities as such and not in any other capacity) have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Financing and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Financing and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Financing or the use of Cash Collateral, the DIP Documents, and all other documents related to the DIP Financing. Accordingly, without limitation to any other right to indemnification, the Debtors will indemnify each of the DIP Lenders, the DIP Agent, and the Prepetition Secured Parties and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out

of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement as well as the use of Cash Collateral.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct.  In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

19.     No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

20.     Section 507(b) Reservation.  Subject only to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

21.   <u>Insurance</u>.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Agent as loss payee or additional insured, as applicable, thereunder.

22.   <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Agent or the Required DIP Lenders to exercise rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.  The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder, or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties, respectively.

23.   <u>Perfection of the DIP Liens and Adequate Protection Liens</u>.

(a)   The DIP Agent and the Prepetition Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository

account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agent or the Prepetition Agents shall (at the direction of the applicable Required Lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order. If the DIP Agent or the Prepetition Agents (at the direction of the applicable Required Lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments, the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition Agents (at the direction of the applicable Required Lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Interim Order.

(b)       A certified copy of this Interim Order may, at the direction of the applicable Required Lenders, be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition Agents in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided* that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)       Prior to entry of the Final Order, the Debtors shall use commercially reasonable efforts (subject to applicable local law limitations) to identify any additional unencumbered property of the Debtors and, to the extent the Debtors determine practicable in their reasonable judgment, shall cause non-Debtor subsidiaries to pledge any applicable assets to secure the DIP Commitments.

(d)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

24.    <u>Release</u>.  Subject to the rights and limitations set forth in Paragraph 11 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of this Interim Order, each of the DIP Secured Parties and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "<u>Related Parties</u>") and each of the Prepetition Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type,

whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition Secured Parties; *provided* that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents.

25.  Credit Bidding.  The DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agents (at the direction of the Required Lenders (as respectively defined in each of the Prepetition Credit Agreements)) shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority Claims, if any, subject to the Intercreditor Agreement and to the terms of this Interim Order, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

26.  Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or

any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Interim Order at any time, including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be applied in accordance with this Interim Order, the Intercreditor Agreement, and the DIP Documents.

27.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all DIP Commitments are terminated, the Prepetition Secured Parties shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 23 herein or as the Second Lien Group deems appropriate in connection with the appointment of any successor second lien agent.

(b)    In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)     Unless and until all DIP Obligations, Prepetition Obligations, and Adequate Protection Payments are indefeasibly paid in full, in cash, and all DIP Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, and the Prepetition Agents (respectively acting at the direction of the applicable Required Lenders), (x) any modification, stay, vacatur, or amendment of this Interim Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(d)     Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate

Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code (collectively, the "Successor Cases"). The DIP Liens,

the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders)).

(f)    Other than as set forth in this Interim Order, subject to the Carve Out, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

28.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction,

occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, the Prepetition Loan Documents, or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Obligations, or the DIP Agent's, the DIP Lenders', and the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agent's, the DIP Lenders', the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection,

or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition Obligations, or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Obligations or the Prepetition Liens, *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any Committee appointed in these Cases, if any, solely to investigate or prosecute, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Obligations.

29.     <u>No Obligation to Extend Credit</u>.  The DIP Lenders shall have no obligation to make any loan under the DIP Documents unless (and subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement, the "<u>Closing Date</u>")) all of the conditions precedent to the making of such extension of credit under the DIP Documents or this Interim Order, as applicable,

have been satisfied in full or waived by the DIP Agent (at the direction of the Required DIP Lenders).

30.  <u>Discharge Waiver</u>.  The DIP Obligations, the DIP Superpriority Claims, the DIP Liens, and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Adequate Protection Liens and claims under section 507(b) of the Bankruptcy Code, shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (or with respect to any letters of credit, cash collateralized) on or before the effective date of such confirmed plan of reorganization, or each of the Required DIP Lenders, and the "Required Lenders" under the Prepetition First Lien Credit Agreement, and the "Required Lenders" under the Prepetition Second Lien Credit Agreement respectively, has otherwise agreed in writing.  Subject to the terms of the Restructuring Support Agreement and the DIP Credit Agreement, none of the Debtors shall propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order without the consent of the DIP Secured Parties.

31.  <u>Conditions Precedent</u>.  Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

32.  <u>Intercreditor Provisions</u>.  Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (including in the Intercreditor Agreement) shall remain in full force and effect;

provided that nothing in this Interim Order shall be deemed to provide liens to any Prepetition

Secured Party on any assets of the Debtors except as set forth herein.

33.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions

of this Interim Order, including all findings herein, shall be binding upon all parties in interest in

these Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties,

any Committee appointed in these Cases, and the Debtors and their respective successors and

permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected

for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the

Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors

or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of

the DIP Secured Parties and the applicable Prepetition Secured Parties; *provided* that, except to

the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no

obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee

or similar responsible person appointed for the estates of the Debtors.  In determining to make any

loan (whether under the DIP Credit Agreement, a promissory note or otherwise) to permit the use

of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this

Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties

shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary

duty to the Debtors, their respective creditors, shareholders, or estates.

34.     <u>Limitation of Liability</u>.  In determining to make any loan under the DIP Documents,

permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted

pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition

Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the

Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

35.     <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, this Interim Order, or applicable law.  The provisions set forth in this Paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

36.     <u>No Requirement to File Claim for Prepetition First Lien Obligations or Second Lien Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition First Lien Agent nor any First Lien Lender nor the Prepetition Second Lien Agent nor any Second Lien Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition First Lien Obligations or Prepetition Second Lien Obligations (as applicable); and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition First Lien Loan Documents, the Prepetition Second Lien Loan Documents, or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition First Lien Agent's, the Prepetition Second Lien Agent's, any First Lien Lenders', or any Second Lien Lenders' rights, remedies, powers, or privileges under any of the Prepetition Loan Documents, this Interim Order, or applicable law.  The provisions of such indebtedness set forth in this Interim Order and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  Any order entered by this Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the Prepetition First Lien Secured Parties with respect to the Prepetition First Lien Obligations or the First Lien Adequate Protection Superpriority Claims or to the Prepetition Second Lien Secured Parties with respect to the Prepetition Second Lien Obligations or the Second Lien Adequate Protection Superpriority Claims.  However, in order to facilitate the processing of claims, to ease the burden upon the Court

and to reduce an unnecessary expense to the Debtors' estates, the Prepetition First Lien Agent (acting at the direction of the "Required Lenders" under the Prepetition First Lien Credit Agreement) and the Prepetition Second Lien Agent (acting at the direction of the "Required Lenders" under the Prepetition Second Lien Credit Agreement) are authorized, but not directed or required, to file in the Debtors' lead chapter 11 case In re Dynata, LLC, Case No. 24-11057 a single master proof of claim on behalf of the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties respectively on account of any and all of their respective claims against any of the Debtors arising under the applicable Prepetition Loan Documents and hereunder (any such proof of claim, a "Master Proof of Claim").  Upon the filing of a Master Proof of Claim by the Prepetition First Lien Agent (acting at the direction of the "Required Lenders" under the Prepetition First Lien Credit Agreement) or the Prepetition Second Lien Agent (acting at the direction of the "Required Lenders" under the Prepetition Second Lien Credit Agreement) it shall be deemed to have filed a proof of claim in the amount set forth therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the Prepetition First Lien Loan Documents and the Prepetition Second Lien Loan Documents respectively, and the claim of each applicable Prepetition First Lien Secured Party (and each of its respective successors and assigns) and Prepetition Second Lien Secured Party (and each of its respective successors and assigns) specified in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  A Master Proof of Claim shall not be required to identify whether any Prepetition First Lien Secured Party or Prepetition Second Lien Secured Party acquired its claim from another party or the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The

provisions of this paragraph 36 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition First Lien Secured Party (or its successors in interest) and Prepetition Second Lien Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  A Master Proof of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition First Lien Secured Parties or Prepetition Second Lien Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition First Lien Agent or counsel to the Prepetition Second Lien Agent respectively.

37. <u>Limits on Lender Liability</u>.  Nothing in this Interim Order, any of the DIP Documents, any of the Prepetition Loan Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Secured Parties, or any of the Prepetition Secured Parties, respectively, of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties shall not, solely by reason of having made loans under the DIP Facility or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any of the DIP Secured Parties, or any of

the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

38.     <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and the DIP Documents.

39.     <u>No Marshaling</u>.  The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order, the DIP Documents and the Prepetition Loan Documents, notwithstanding any other agreement or provision to the contrary and, subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

40.     <u>Application of Proceeds of DIP Collateral</u>.  Subject to entry of a Final Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

41.     <u>Equities of the Case</u>.  The Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

42.   <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on [_____],

2024, at [__:__ ].m., prevailing Eastern time.  Any objections or responses to entry of the Final

Order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern time, on [_____],

2024, and shall be served on:  (a) the Debtors; (b) proposed counsel to the Debtors, (i) Willkie Farr

& Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Jeffrey D. Pawlitz, Esq.,

Andrew S. Mordkoff, Esq., and Erin C. Ryan, Esq.; and (ii) Young Conaway Stargatt & Taylor,

LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton and Matthew B.

Lunn (c) counsel to the DIP Lenders and the DIP/First Lien Group, (i) Gibson, Dunn & Crutcher

LLP, 200 Park Ave., New York, NY 10166, Attn: Scott J. Greenberg, Esq., AnnElyse Scarlett

Gains, Esq., and Jonathan M. Dunworth, Esq.; and (ii) Klerh Harrison Harvey Branzburg LLP,

919 N. Market Street, Suite 1000, Wilmington, DE 19801, Attn: Domenic E. Pacitti (d) counsel to

the Second Lien Group, (i) Vinson & Elkins LLP, 1114 Avenue of the Americas, 32nd Floor, New

York, NY 10036, Attn: George R. Howard, Esq., Steven Zundell, Esq., and Matthew D. Struble,

Esq.; and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor,

Wilmington, DE 19899, Attn: Robert Dehney, Esq. and Andrew Remming Esq; (e) counsel to the

DIP Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY

10019, Attn: Jeffrey R. Gleit, Esq. and Brett D. Goodman, Esq; (f) counsel to the Prepetition First

Lien Agent, (i) Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn: Joel

Moss, Esq., Daniel Anderson, Esq., and Jordan A. Wishnew, Esq., and (ii) Richards, Layton &

Finger PA, One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Mark D.

Collins; (g) counsel to the Prepetition Second Lien Agent, Pryor Cashman LLP, 7 Times Square,

New York, NY 10036; (h) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35,

Wilmington, Delaware 19801, Attn: Joseph Cudia; and (i) counsel to any statutory committee

appointed in these chapter 11 cases.  In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

43.     <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

44.     <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

# EXHIBIT A

**DIP Credit Agreement**

SUPER-PRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION
CREDIT AGREEMENT

dated as of
May 23, 2024

among

New Insight Holdings, Inc.,
as Holdings, a Debtor and a Debtor-in-Possession

The Intermediate Holdings Guarantors Party Hereto,
each as a Debtor and a Debtor-in-Possession

Research Now Group, LLC and Dynata, LLC,
each as a Borrower, a Debtor and a Debtor-in-Possession,

The Lenders Party Hereto,

and

Wilmington Savings Fund Society, FSB,
as Administrative Agent,

---

# TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS

Section 1.01    Defined Terms ............................................................................................2
Section 1.02    Classification of Loans and Borrowings.............................................35
Section 1.03    Terms Generally.................................................................................35
Section 1.04    Accounting Terms; GAAP..................................................................35
Section 1.05    [Reserved]...........................................................................................36
Section 1.06    [Reserved]...........................................................................................36
Section 1.07    Classification.......................................................................................36
Section 1.08    Effectuation of Transactions ..............................................................36
Section 1.09    Exchange Rate Fluctuations................................................................36
Section

                1.10........................................................................................Rates
                36
Section 1.11    Divisions ............................................................................................37

## ARTICLE II

## THE CREDITS

Section 2.01    Commitments and Loans .....................................................................37
Section 2.02    Loans and Borrowings ........................................................................37
Section 2.03    Requests for Borrowings.....................................................................38
Section 2.04    Syndication .........................................................................................38
Section 2.05    [Reserved]...........................................................................................39
Section 2.06    Funding of Borrowings .......................................................................39
Section 2.07    Interest Elections.................................................................................40
Section 2.08    [Reserved]...........................................................................................41
Section 2.09    Repayment of Loans; Evidence of Debt .............................................41
Section 2.10    Repayment of Loans ...........................................................................41
Section 2.11    Prepayment of Loans ..........................................................................42
Section 2.12    Fees .....................................................................................................43
Section 2.13    Interest.................................................................................................43
Section 2.14    Alternate Rate of Interest ....................................................................44
Section 2.15    Increased Costs ...................................................................................45
Section 2.16    Break Funding Payments ....................................................................46
Section 2.17    Taxes ...................................................................................................46
Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Setoffs...................50
Section 2.19    Mitigation Obligations; Replacement of Lenders......................................52
Section 2.20    Super Priority Nature of Obligations and Administrative Agent's
                Liens; Payment of Obligations...................................................................53
Section 2.21    [Reserved]...........................................................................................53
Section 2.22    [Reserved]...........................................................................................53
Section 2.23    Illegality ..............................................................................................53

i

Section 2.24    Joint and Several Liability of Borrowers ....................................................54
Section 2.25    Benchmark Replacement Setting. ...............................................................54

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Section 3.01    Organization; Powers...................................................................................56
Section 3.02    Authorization; Enforceability......................................................................56
Section 3.03    Governmental Approvals; No Conflicts ......................................................56
Section 3.04    Financial Condition; No Material Adverse Effect ......................................57
Section 3.05    Properties .....................................................................................................57
Section 3.06    Litigation and Environmental Matters .......................................................57
Section 3.07    Compliance with Laws and Agreements .....................................................58
Section 3.08    Investment Company Status ........................................................................58
Section 3.09    Taxes ............................................................................................................58
Section 3.10    ERISA ..........................................................................................................58
Section 3.11    Disclosure ....................................................................................................59
Section 3.12    Subsidiaries ..................................................................................................59
Section 3.13    Intellectual Property; Licenses, Etc. ..........................................................59
Section 3.14    [Reserved] ....................................................................................................59
Section 3.15    [Reserved] ....................................................................................................59
Section 3.16    Federal Reserve Regulations.......................................................................59
Section 3.17    Use of Proceeds...........................................................................................59
Section 3.18    Labor Matters ..............................................................................................59
Section 3.19    Security Documents .....................................................................................60
Section 3.20    Sanctions ......................................................................................................60
Section 3.21    Anti-Corruption Laws; Anti-Money Laundering Laws ..............................60
Section 3.22    Absence of Defaults.....................................................................................60
Section 3.23    Absence of Broker's or Finder's Fees ........................................................60
Section 3.24    Bankruptcy Matters.....................................................................................61

ARTICLE IV

CONDITIONS

Section 4.01    Conditions Precedent to Effective Date ......................................................64

ARTICLE V

AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements and Other Information ..............................................66
Section 5.02    Notices of Material Events...........................................................................68
Section 5.03    Information Regarding Collateral.................................................................68
Section 5.04    Existence; Conduct of Business...................................................................69
Section 5.05    Payment of Taxes, Etc. ...............................................................................69
Section 5.06    Maintenance of Properties ..........................................................................69

Section 5.07    Insurance ...............................................................................69
Section 5.08    Books and Records; Inspection and Audit Rights .....................69
Section 5.09    Compliance with Laws ............................................................70
Section 5.10    Use of Proceeds .......................................................................70
Section 5.11    Additional Subsidiaries ...........................................................70
Section 5.12    Further Assurances ...................................................................71
Section 5.13    [Reserved] ................................................................................71
Section 5.14    Certain Post-Closing Obligations .............................................71
Section 5.15    Ratings ......................................................................................72
Section 5.16    Lender Calls ..............................................................................72
Section 5.17    Approved Budget. .....................................................................72
Section 5.18    Milestones. ...............................................................................73

ARTICLE VI

NEGATIVE COVENANTS

Section 6.01    Indebtedness .............................................................................73
Section 6.02    Liens .........................................................................................76
Section 6.03    Fundamental Changes ..............................................................78
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions ...80
Section 6.05    Asset Sales ...............................................................................82
Section 6.06    Sale and Leaseback Transactions .............................................83
Section 6.07    Restricted Payments; Certain Payments of Indebtedness .........83
Section 6.08    Transactions with Affiliates .....................................................85
Section 6.09    Restrictive Agreements ............................................................86
Section 6.10    Amendment of Junior Financing Documents and Organizational
                Documents ...............................................................................86
Section 6.11    [Reserved] ................................................................................86
Section 6.12    Changes in Fiscal Year ............................................................87
Section 6.13    Anti-Corruption Laws; Sanctions ............................................87

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01    Events of Default .....................................................................87
Section 7.02    Chapter 11 Cases ......................................................................90

ARTICLE VIII

ADMINISTRATIVE AGENT

Section 8.01    Appointment and Authority ......................................................94
Section 8.02    Rights as a Lender ....................................................................94
Section 8.03    Exculpatory Provisions ............................................................94
Section 8.04    Reliance by Administrative Agent ............................................96
Section 8.05    Delegation of Duties ................................................................96

Section 8.06    Resignation of Administrative Agent ........................................97
Section 8.07    Non-Reliance on Administrative Agent and Other Lenders....................97
Section 8.08    [Reserved] ................................................................98
Section 8.09    Administrative Agent May File Proofs of Claim........................98
Section 8.10    No Waiver; Cumulative Remedies; Enforcement......................98
Section 8.11    Withholding Taxes .......................................................99
Section 8.12    Right to Realize on Collateral and Enforce Guarantee............................99
Section 8.13    Certain ERISA Matters. ................................................100
Section 8.14    Erroneous Payments.....................................................101

ARTICLE IX

MISCELLANEOUS

Section 9.01    Notices .....................................................................104
Section 9.02    Waivers; Amendments...................................................105
Section 9.03    Expenses; Indemnity; Damage Waiver.................................108
Section 9.04    Successors and Assigns..................................................110
Section 9.05    Survival.....................................................................115
Section 9.06    Counterparts; Integration; Effectiveness...............................115
Section 9.07    Severability ...............................................................115
Section 9.08    Right of Setoff............................................................116
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.................116
Section 9.10    WAIVER OF JURY TRIAL...............................................116
Section 9.11    Headings ...................................................................117
Section 9.12    Confidentiality............................................................117
Section 9.13    PATRIOT Act.............................................................118
Section 9.14    Intercreditor Agreement.................................................118
Section 9.15    Release of Liens and Guarantees .....................................119
Section 9.16    [Reserved] ................................................................119
Section 9.17    No Advisory or Fiduciary Responsibility .............................119
Section 9.18    Interest Rate Limitation ................................................120
Section 9.19    Acknowledgement and Consent to Bail-In of EEA Financial Institutions............................................................120

<u>SCHEDULES</u>:

Schedule 1.01(a)    —    Excluded Subsidiaries
Schedule 1.01(b)    —    Permitted Holders
Schedule 2.01    —    Commitments
Schedule 2.04    —    Syndication
Schedule 2.12(c)    —    Backstop Allocation Schedule
Schedule 3.12    —    Subsidiaries
Schedule 6.01    —    Existing Indebtedness
Schedule 6.02    —    Existing Liens
Schedule 6.04(e)    —    Existing Investments
Schedule 6.08    —    Existing Affiliate Transactions
Schedule 6.09    —    Existing Restrictions
Schedule 9.01    —    Notices

<u>EXHIBITS</u>:

Exhibit A    —    Form of Assignment and Assumption
Exhibit B    —    Form of Super-Priority Senior Secured Debtor-In-Possession Guarantee
Agreement
Exhibit C    —    Form of Perfection Certificate
Exhibit D    —    Form of Super-Priority Senior Secured Debtor-In-Possession Collateral
Agreement
Exhibit E    —    Form of Borrowing Request
Exhibit F    —    [Reserved]
Exhibit G    —    Form of Intercompany Note
Exhibit H    —    [Reserved]
Exhibit I    —    [Reserved]
Exhibit J    —    Form of Budget
Exhibit K    —    [Reserved]
Exhibit L    —    [Reserved]
Exhibit M    —    [Reserved]
Exhibit N    —    [Reserved]
Exhibit O-1    —    Form of United States Tax Compliance Certificate 1
Exhibit O-2    —    Form of United States Tax Compliance Certificate 2
Exhibit O-3    —    Form of United States Tax Compliance Certificate 3
Exhibit O-4    —    Form of United States Tax Compliance Certificate 4

SUPER-PRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of May 23, 2024 (this "Agreement"), among New Insight Holdings, Inc., a Delaware corporation ("Holdings"), the Intermediate Holdings Guarantors party hereto from time to time, Research Now Group, LLC, a Delaware limited liability company ("RN Borrower"), and Dynata, LLC (f/k/a Survey Sampling International, LLC), a Delaware limited liability company ("SSI Borrower"; RN Borrower and SSI Borrower, each, a "Borrower" and, collectively, the "Borrowers"), the Lenders party hereto from time to time and Wilmington Savings Society, FSB, as Administrative Agent.

WHEREAS, on May 22, 2024 (the "Petition Date"), Holdings, the Borrowers and certain other Loan Parties (together with any of their Subsidiaries and Affiliates that are or become debtors under the Chapter 11 Cases, collectively, the "Debtors", and each individually, a "Debtor") voluntarily commenced Chapter 11 Cases, jointly administered under Chapter 11 Case No.24-11057 (collectively, the "Chapter 11 Cases" and each individually a "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, certain Lenders (or certain Affiliates or Affiliated Debt Funds thereof) provided financing to the Borrowers pursuant to that First Lien Credit Agreement, dated as of December 20, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including by that certain Amendment No. 1 to First Lien Credit Agreement, dated as of February 14, 2019, that certain Amendment No. 2 to First Lien Credit Agreement, dated as of June 25, 2021, that certain Amendment No. 3 to First Lien Credit Agreement, dated as of June 25, 2021, that certain Amendment No. 4 to First Lien Credit Agreement, dated as of May 27, 2022, that certain Amendment No. 5 to First Lien Credit Agreement, dated as of December 8, 2022, that certain Amendment No. 6 to First Lien Credit Agreement, dated as of April 26, 2023, that certain Amendment No. 7 to First Lien Credit Agreement, dated as of May 30, 2023, that certain Amendment No. 8 to First Lien Credit Agreement, dated as of February 8, 2024, that certain Amendment No. 9 to First Lien Credit Agreement, dated as of March, 28, 2024, that certain Amendment No. 10 to First Lien Credit Agreement, dated as of May 4, 2024, and that certain Amendment No. 11 to First Lien Credit Agreement, dated as of May 9, 2024, the "Pre-Petition Credit Agreement"), among Holdings, the Borrowers, the Intermediate Holdings Guarantors from time to time party thereto, Goldman Sachs Bank USA, as administrative agent (the "Pre-Petition Administrative Agent"), the lenders party thereto from time to time (the "Pre-Petition Lenders") and the other parties thereto;

WHEREAS, on the Petition Date, (x) the outstanding principal balance of the Term Loans (as defined in the Pre-Petition Credit Agreement (the "Existing Term Loans")) under the Pre-Petition Credit Agreement was approximately $920,767,206.45 (y) the outstanding principal balance of the Revolving Loans (as defined in the Pre-Petition Credit Agreement (the "Existing Revolving Loans" and, together with the Existing Term Loans, the "Existing Loans")) under the Pre-Petition Credit Agreement was approximately $96,899,999.99 and (z) the aggregate principal amount of LC Exposure (as defined in the Pre-Petition Credit Agreement) (the "Existing LC Exposure" and, together with the Existing Loans, the "Existing Claims") was approximately $1,267,667,206.44;

WHEREAS, the Borrowers have requested, and, upon the terms and subject to the conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a super-priority senior secured debtor-in-possession credit facility in an aggregate principal amount of $31,500,000 (the "DIP Facility" and the loans made thereunder, the "Loans"), subject to certain conditions, pursuant to the DIP Order, to fund the general corporate purposes and working capital requirements of the Borrowers during the pendency of the Chapter 11 Cases, solely pursuant to and in accordance with the Approved

1

Budget (subject to the Permitted Variance, the Non-Loan Party Debt Amount, and the Non-Loan Party Investment Amount);

WHEREAS, the Administrative Agent's and the Lenders' willingness to extend financial accommodations to the Borrowers, and to administer the Borrowers' and the Guarantors' collateral security therefor, on a combined basis as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrowers and the Guarantors and at the Borrowers' and the Guarantors' request and in furtherance of the Borrowers' and the Guarantors' mutual and collective enterprise;

WHEREAS, subject to the terms of this Agreement, the other Loan Documents and the DIP Order, Holdings, the Borrowers and the other Loan Parties have agreed to secure all of their Obligations under the Loan Documents by granting to the Collateral Agent, for the benefit of the Administrative Agent and the other Secured Parties, a first priority priming security interest in and lien upon substantially all of their property, whether now existing or acquired after the date hereof, subject to exceptions specified herein or in the other Loan Documents;

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ABR Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Actual Disbursement Amounts" means the actual operating disbursements, including, without limitation, capital expenditures and M&A transaction costs, made by the Debtors on a line-by-line and aggregate basis during the applicable Variance Testing Period.

"Actual Net Cash Flows" means the Loan Parties' net cash flow during the applicable Variance Testing Period, calculated by subtracting Actual Disbursement Amounts from Actual Receipts.

"Actual Receipts" means the Debtors' actual operating receipts, excluding, for the avoidance of doubt, any intercompany transactions, on a line-by-line and aggregate basis during the applicable Variance Testing Period.

"Actual Restructuring Related Amounts" means the Loan Parties' disbursements in respect of restructuring professional fees (including, without limitation, payments made to the secured parties on account of professional fees and professional fee payments to other creditors or creditor groups) on a line-by-line and aggregate basis during the applicable Variance Testing Period.

"<u>Adjusted Term SOFR</u>" means, for purposes of any calculation and subject to the provisions of Section 2.25(a), the rate per annum equal to (a) Term SOFR for such calculation <u>plus</u> (b) the applicable Term SOFR Adjustment; <u>provided</u> that if the Adjusted Term SOFR as so determined shall ever be less than the applicable Floor, then the Adjusted Term SOFR shall be deemed to be the applicable Floor.

"<u>Administrative Agent</u>" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"<u>Administrative Agent Fee Letter</u>" means that certain Fee Letter, dated as of the Effective Date, by and among the Borrowers and the Administrative Agent.

"<u>Administrative Borrower</u>" means RN Borrower.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified. For purposes of this Agreement and the other Loan Documents, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and its Affiliates.

"<u>Agent</u>" means each of the Administrative Agent, the Collateral Agent and their respective successors and assigns in their capacities as such, and "Agents" means two or more of them.

"<u>Agent Parties</u>" has the meaning assigned to such term in Section 9.01(d).

"<u>Agreement</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the Adjusted Term SOFR for a one-month tenor in effect on such day plus 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR, respectively. Notwithstanding the foregoing, the Alternate Base Rate will be deemed to be 2.00% per annum if the Alternate Base Rate calculated pursuant to the foregoing provisions would otherwise be less than 2.00% per annum.

"<u>Anti-Corruption Laws</u>" means any and all laws, rules or regulations of any jurisdiction relating to corruption or bribery applicable to Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary by virtue of such Person being organized or operating in such jurisdiction, including, but not limited to, the FCPA.

"<u>Anti-Money Laundering Laws</u>" means any and all laws, rules or regulations of any jurisdiction relating to money laundering or terrorism financing applicable to Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary by virtue of such Person being organized or operating in such jurisdiction, including (a) 18 U.S.C. §§ 1956 and 1957; and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., as amended by the PATRIOT Act, and its implementing regulations.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Rate" means, for any day, (i) 7.75% per annum, in the case of an ABR Loan, or (ii) 8.75% per annum, in the case of a SOFR Loan; and

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Budget" means the rolling 13-week operating cash flow forecast/budget of the Debtors substantially in the form attached hereto as Exhibit J, to be approved by the Required Lenders in their sole discretion. Any updated Approved Budget shall be subject to approval in form and substance by the Required Lenders in their sole discretion and otherwise subject to updates by the Debtors every fourth Friday following the week in which filing occurred (such updates to be approved by the Required Lenders in their sole discretion). The Approved Budget shall include a line-item for weekly professional fee forecasts for the professionals in the budget. In the event an Approved Budget is not approved or if the Debtors and the Required Lenders otherwise affirmatively agree, the prior Approved Budget shall continue to govern.

"Approved Foreign Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means, with respect to any Lender, any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers or manages such Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form (including electronic documentation generated by MarkitClear or other electronic platform) reasonably approved by the Administrative Agent.

"Audited Financial Statements" means the audited consolidated balance sheet and related statements of income, cash flow and shareholders' equity of each Holdings and its consolidated subsidiaries for the fiscal year ended 2022.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.25(d).

"Backstop Allocation Schedule" has the meaning assigned to such term in Section 2.12(c).

"Backstop Parties" has the meaning assigned to such term in Section 2.12(c).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.25(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event,  the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)  the sum of (i) Daily Simple SOFR and (ii) 0.26161% (26.161 basis points); or

(b)  the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrowers giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)  in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such

5

component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)  in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)  a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)  a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

(c)  a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information

6

set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.25 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.25.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors or board of managers, manager or managing member of a general partner of such Person or the functional equivalent of the foregoing and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" and "Borrowers" have the respective meanings assigned to such terms in the preamble hereto.

"Borrower Materials" has the meaning assigned to such term in Section 5.01(j).

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" means (a) in the case of a SOFR Borrowing, $250,000 and (b) in the case of an ABR Borrowing, $100,000.

"Borrowing Multiple" means (a) in the case of a SOFR Borrowing, $250,000 and (b) in the case of an ABR Borrowing, $100,000.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with Section 2.03 which, if in writing, shall be substantially in the form of Exhibit E.

"Budgeted Disbursement Amounts" means the projected operating disbursements, excluding Budgeted Restructuring Related Amounts, to be made by the Loan Parties on a line-by-line and aggregate basis during the applicable Variance Testing Period as set forth in the Approved Budget.

"Budgeted Net Cash Flows" means the Loan Parties' projected net cash flow during the applicable Variance Testing Period, calculated by subtracting Budgeted Disbursement Amounts from Budgeted Receipts.

"Budgeted Receipts" means the Loan Parties' projected operating receipts on a line-by-line and aggregate basis during the applicable Variance Testing Period as set forth in the Approved Budget.

"Budgeted Restructuring Related Amounts" means the Loan Parties' projected disbursements in respect of restructuring professional fees (including, without limitation, payments made to the secured parties on account of professional fees and professional fee payments to other creditors or creditor groups) during the applicable Variance Testing Period as set forth in the Approved Budget.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided, that with respect to any Borrowing, prepayment or interest election with respect to any SOFR Loan, the term "Business Day" shall mean any day that is a U.S. Government Securities Business Day.

"Capital Lease Obligations" of any Person means the obligations of such Person under a Capitalized Lease and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP as in effect on the Effective Date. For purposes of Section 6.02, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP as in effect on the Effective Date, recorded as capitalized leases.

"Carve-Out" has the meaning assigned to such term in the DIP Order.

"Cash Management Obligations" means obligations of Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary in respect of (a) any overdraft and other liabilities arising from treasury, cash pooling, depository and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit card, commercial credit, debit, stored value or purchase card programs or similar programs or arrangements.

"Cash Management Order" means the *Interim Order (I) Authorizing the Debtors to (A) Continue and Maintain Their Cash Management System, Including Bank Accounts and Business Forms, (B) Continue Intercompany Transactions, and (C) Honor Certain Prepetition Obligations Related Thereto, (II) Waiving Certain Operating Guidelines, (III) Extending the Time to Comply With Section 345(B) of the Bankruptcy Code, and (IV) Granting Related Relief* [D.I. ●], as such order may be amended, modified or extended in a manner reasonably satisfactory to the Required Lenders, and the final order entered by the Bankruptcy Court substantially in the form of such interim order (subject to customary changes to make such order final) and otherwise reasonably satisfactory to the Required Lenders.

"Casualty Event" means any event that gives rise to the receipt by any Borrower or any Subsidiary of any insurance proceeds or condemnation awards or in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Control" means (a) the failure of Holdings, directly or indirectly through one or more Loan Parties, to own all of voting Equity Interests of each Borrower, (b) the failure of the Permitted Holders to own, directly or indirectly, beneficially or of record, more than 50.0% of the voting Equity

Interests of Holdings, or (c) the occurrence of a "Change of Control" (or similar event, however denominated), as defined in each document governing any Material Indebtedness.

"Change in Law" means: (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Case(s)" has the meaning assigned to such term in the recitals hereto.

"Chapter 11 Plan" shall mean a chapter 11 plan of reorganization for Loan Parties and certain of their Affiliates in form and substance satisfactory to the Required Lenders (and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, to the Administrative Agent) in all respects and consented to by the Required Lenders; confirmed by an order (in form and substance satisfactory to the Required Lenders (and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, to the Administrative Agent)) of the bankruptcy court (which consent or satisfaction in each case of the Required Lenders may be communicated by means of a Direction of the Required Lenders), containing, among other things, (i) a release in favor of the Administrative Agent and the Lenders and their respective Affiliates and their representatives, counsel and advisors, and (ii) provisions with respect to the settlement or discharge of all claims and other debts and liabilities, as such plan of reorganization may be modified, altered, amended or otherwise changed or supplemented with the prior written consent of the Required Lenders (which consent of the Required Lenders may be communicated by means of a Direction of the Required Lenders) (and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, the Administrative Agent).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations.

"Collateral Agent" means Wilmington Savings Fund Society, FSB, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors and permitted assigns in such capacity as provided in Article VIII.

"Collateral Agreement" means the Super-Priority Senior Secured Debtor-In-Possession Collateral Agreement among the Borrowers, each other Loan Party and the Administrative Agent, substantially in the form of Exhibit D.

"Collateral and Guarantee Requirement" means, at any time, subject in each case to Section 5.14, the requirement that:

(a)     the Administrative Agent shall have received from (i) Holdings, each Intermediate Holdings Guarantor, each Borrower and each of the Subsidiaries (other than any Excluded Subsidiaries listed on Schedule 1.01(a)) either (x) a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes (or that is required to become) a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (ii) Holdings, each Intermediate Holdings Guarantor, each Borrower and each Loan Party either (x) a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes (or that is required to become) a Subsidiary Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to each of the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, to the extent reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders), documents of the type referred to in Section 4.01(a)(i), Section 4.01(c) and Section 4.01(d);

(b)     all outstanding Equity Interests of each Intermediate Holdings Guarantor, each Borrower and each Subsidiary owned directly by any Loan Party (other than any Equity Interests constituting Excluded Assets), shall have been pledged pursuant to the Collateral Agreement, and, to the extent required by the Collateral Agreement, the Collateral Agent shall have received certificates, if any, or other instruments, if any, representing all such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)     if any Indebtedness for borrowed money owed to Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary Loan Party in a principal amount of $1.0 million or more is evidenced by a promissory note (other than Indebtedness constituting Excluded Assets), such promissory note shall have been pledged pursuant to the Collateral Agreement, and, to the extent required by the Collateral Agreement, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank; and

(d)     all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements, required by the Security Documents to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (i) [reserved], (ii) Liens required to be granted from time to time pursuant to provisions above of the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth herein and in the Security Documents, (iii) [reserved], (iv) in no event shall any Loan Party be required to complete any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States (including any Equity Interests of Foreign Subsidiaries and any Foreign Intellectual Property) or to perfect or make enforceable any security interests in any such assets), (v) in no event shall any Loan Party be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements, (vi) no landlord lien waivers, estoppels or collateral access letters shall be required and (vii) in no event shall the Collateral include any Excluded Assets (other than those assets described in clauses (b) and (i) of the definition of "Excluded Assets", which shall be included in the Collateral but in no event shall any Loan Party be required to complete any filings or other action with

respect to perfection of security interests therein). The Administrative Agent (acting at the Direction of the Required Lenders) may grant extensions of time for the creation and perfection of security interests in or the obtaining of legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or the timelines set forth in Section 5.14 or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

"Commitment" means, with respect to each Lender that is a Lender on the Effective Date, the commitment, if any, of such Lender to make a Loan hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Loan to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.01 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption.  The amount of each Lender's Commitment is set forth on Schedule 2.01 as of the Effective Date or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as the case may be.  The initial aggregate amount of the Lenders' Commitments on the Effective Date is $31,500,000.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §§ 1 et seq.), as amended from time to time, and any successor statute.

"Competitor" means (a) any competitor of Holdings, any Intermediate Holdings Guarantor, any Borrowers or any of their Subsidiaries that is in the same or a substantially similar line of business as Holdings, any Intermediate Holdings Guarantor, any Borrower or any of their Subsidiaries and (b) any customer, panel sponsor or supplier of Holdings, any Intermediate Holdings Guarantor, any Borrower or any of their Subsidiaries (other than any customer, panel sponsor or supplier that is a bank, financial institution, other institutional lender or an affiliate thereof).

"Compliance Certificate" has the meaning assigned to such term in Section 5.01(d).

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.16 and other technical, administrative or operational matters) that the Administrative Agent decides in its reasonable discretion, with the consent of the Borrowers, may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent reasonably determines, with the consent of the Borrowers, that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent, with the consent of the Borrower, decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Consolidated Total Assets" means, as of any date of determination, the amount that would be set forth opposite the caption "total assets" (or any like caption) in the most recent consolidated balance sheet of Holdings and the Subsidiaries in accordance with GAAP.

"Contractual Obligation" means, as applied to any Person, any provision of any indenture, mortgage, deed of trust, or other contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlled" has the meaning correlative thereto.

"Controlled Investment Affiliate" means, with respect to any Person, any fund or investment vehicle that (a) is organized by such Person for the purpose of making investments in one or more companies and (b) is Controlled by, or under common control with, such Person. For the purpose of this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership or by contract.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DIP Facility" has the meaning assigned to such term in the recitals hereto.

"DIP Order" means the Interim Order, and upon its entry, the Final Order.

"Direction of the Required Lenders" means a written direction or instruction from Lenders constituting the Required Lenders which may be in the form of an email or other form of written communication and which may come from any Specified Lender Advisor delivered in accordance with Section 9.01. Each Lender and Specified Lender Advisor hereby acknowledges and agrees that any such email or other communication from a Specified Lender Advisor shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Lenders and such Specified Lender Advisor shall be conclusively presumed to have acted on behalf of and at the written direction or instruction from the Required Lenders (and the Administrative Agent and Loan Parties shall be entitled to rely on such presumption). For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory", "acceptable", "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Lenders, such determination may be communicated by a Direction of the Required Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Lenders, such consent, approval or determination may be communicated by a Direction of the Required Lenders as contemplated above. The Administrative Agent and Loan Parties shall be entitled to rely upon, and shall not incur any liability for relying upon, any purported Direction of the Required Lenders, and the Administrative Agent and the

Loan Parties shall not have any responsibility to independently determine whether such direction has in fact been authorized by the Required Lenders.

"<u>Disposition</u>" has the meaning assigned to such term in Section 6.05.

"<u>Disqualified Equity Interest</u>" means, with respect to any Person, any Equity Interest in such Person or in the IPO Entity that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

      (a)     matures or is mandatorily redeemable (other than solely for Equity Interests in such Person or in the IPO Entity that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

      (b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person or in the IPO Entity that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

      (c)     is redeemable (other than solely for Equity Interests in such Person or in the IPO Entity that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the Latest Maturity Date as of the date of issuance of such Equity Interests; <u>provided</u>, <u>however</u>, that (i) an Equity Interest in any Person or in the IPO Entity that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person or the IPO Entity to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after, or is subject to the occurrence of, the Termination Date, (ii) if an Equity Interest in any Person or in the IPO Entity is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants of Holdings (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such directors, officers, employees, members of management, managers or consultants, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by Holdings (or any direct or indirect parent company thereof) or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person or in the IPO Entity and (iii) no Equity Interest held by any future, present or former director, officer, employee, member of management, manager or consultant (or their respective affiliates or immediate family members) of Holdings (or any direct or indirect parent thereof) or any of its subsidiaries shall be considered a Disqualified Equity Interest solely because such stock is redeemable or subject to repurchase pursuant to any customary stock option, employee stock award or similar agreement that may be in effect from time to time.

"<u>Disqualified Lenders</u>" means (i) any bank, financial institution, other institutional lender or other entities and Affiliates of the foregoing, in each case, identified in writing by the Sponsor, Holdings or the Borrowers to the Administrative Agent and the Specified Lender Advisors on or prior to the Effective Date, (ii) those Persons who are Competitors and/or Affiliates of Competitors identified in writing by the Sponsor or Holdings to the Administrative Agent and the Specified Lender Advisors on or prior to the Effective Date and (iii) any known Affiliate of any Person referred to in clauses (i) or (ii) above that is readily identifiable as such on the basis of such Affiliate's name; <u>provided</u> that (x) an Affiliate of a

Competitor shall not include any such Affiliate that is primarily engaged in, or that advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which any such Person referred to in clauses (i) or (ii) above does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity and (y) the Borrowers, upon reasonable notice to the Administrative Agent, shall be permitted to supplement in writing the list of persons that are Disqualified Lenders to the extent such supplemented person is or becomes a Competitor (or an Affiliate thereof), which supplement will not apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest in the Loans or Commitments.

"Dollars", "dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary, FSHCO, or a Subsidiary of a Foreign Subsidiary or FSHCO.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Eligible Assignee" means (a) a Lender, (b) a commercial bank, insurance company, finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), (c) any Affiliate of a Lender and (d) an Approved Fund; provided that in any event "Eligible Assignee" shall not include (i) any Disqualified Lender, (ii) natural Person or (iii) the Borrowers or any of their Affiliates.

"Environmental Laws" means the applicable common law and treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or, to the extent relating to exposure to Hazardous Materials, the protection of human health or safety.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities), of Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation or storage treatment of any

Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any legally binding contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Interests</u>" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that, together with Holdings, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"<u>ERISA Event</u>" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the applicable notice period is waived pursuant to applicable regulations), (b) any failure by any Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each case whether or not waived, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a receipt of notification by any Borrower or an ERISA Affiliate from a Plan's actuary of its determination that any Plan is, or is reasonably expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan, (f) the receipt by Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary or any ERISA Affiliate from the PBGC of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (g) the cessation of operations at a facility of Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA, (h) the incurrence by Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary or any ERISA Affiliate of any liability with respect to its withdrawal or partial withdrawal from any Plan or Multiemployer Plan, (i) the receipt by Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary or any ERISA Affiliate of any notice from the sponsor of a Multiemployer Plan concerning the imposition of Withdrawal Liability on it or a determination that a Multiemployer Plan is, or is reasonably expected to be, insolvent, within the meaning of Title IV of ERISA or in "endangered" or "critical" status, within the meaning of Section 305 of ERISA or (j) any Foreign Benefit Event.

"<u>Erroneous Payment</u>" shall have the meaning provided in Section 8.14(a).

"<u>Erroneous Payment Deficiency Assignment</u>" shall have the meaning provided in Section 8.14(d).

"<u>Erroneous Payment Impacted Class</u>" shall have the meaning provided in Section 8.14(d).

"<u>Erroneous Payment Return Deficiency</u>" shall have the meaning provided in Section 8.14(d).

"Erroneous Payment Subrogation Rights" shall have the meaning provided in Section 8.14(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Assets" means (a) any fee-owned real property and all leasehold interests (including ground lease) in real property (other than Material Real Property), (b) motor vehicles and other assets subject to certificates of title or ownership except to the extent that the filing of UCC financing statements is sufficient for perfection of security interests in such motor vehicles, subject to all other clauses of this definition, (c) Equity Interests in any Person (other than any Wholly Owned Subsidiaries) to the extent the pledge thereof to the Administrative Agent is not permitted by the terms of such Person's organizational or joint venture documents, (iii) Immaterial Subsidiaries listed on Schedule 1.01(a) and (iv) not-for-profit Subsidiaries and captive insurance companies listed on Schedule 1.01(a), (d) voting Equity Interests of any (i) Foreign Subsidiary, (ii) FSHCO, or (iii) Subsidiary that is disregarded as an entity separate from its owner, within the meaning of Treasury Regulation Section 301.7701-2(c)(2) that holds (either directly or through one or more disregarded entities) Equity Interests in one or more direct or indirect Foreign Subsidiaries, in each case, directly owned by a Loan Party to the extent the pledge of such Equity Interests would result in significant adverse tax consequences to Holdings, any Intermediate Holdings Guarantor, any Borrower or any of the Subsidiaries (as determined by the Borrowers and the Required Lenders (or the Specified Lender Advisors)), and (iv) any Equity Interests of any (A) Foreign Subsidiary, (B) FSHCO, or (C) Subsidiary that is disregarded as an entity separate from its owner, within the meaning of Treasury Regulation Section 301.7701-2(c)(2) that holds (either directly or through one or more disregarded entities) Equity Interests in one or more direct or indirect Foreign Subsidiaries, in each case, that is not directly owned by a Loan Party, (e) any lease, license, contract or other agreement or document or any property or asset subject to a security interest securing any purchase money Lien, capital lease obligation or similar arrangement, in each case not prohibited under the Loan Documents, to the extent that, and for so long as, a grant of a security interest therein would require the consent of a third party (unless such consent has been received) or violate or invalidate such lease, license or agreement or purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than a Loan Party), in each case, after giving effect to the applicable anti-assignment provisions of applicable law (including the UCC), rule or regulation other than proceeds and receivables thereof, to the extent the assignment thereof is expressly deemed effective under applicable law (including the UCC) notwithstanding such prohibition, (f) any asset subject to a Lien permitted by Section 6.02(iv) or a Lien permitted by Section 6.02(xi), in each case if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than Holdings or any of its Subsidiaries) to, any agreement pursuant to which such Lien has been created (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any Requirements of Law), (g) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act and any other Intellectual Property in any jurisdiction where such pledge or security interest would cause the invalidation or abandonment of such Intellectual Property, (h) [reserved], (i) the rights in any commercial tort claims

and any letter of credit in cash and any other letter of credit, in each case, with a value below $1.0 million (except to the extent a security interest therein can be perfected by a UCC filing), (j) margin stock (as defined in Regulation U of the Board of Governors), (k) any asset with respect to which the grant of a Lien thereon to secure the Secured Obligations would result in adverse tax consequences to Holdings, any Intermediate Holdings Guarantor, any Borrower or any of the Subsidiaries (other than on account of any Taxes payable in connection with filings, recordings, registrations, stampings and any similar acts in connection with the creation or perfection of Liens) that shall have been reasonably agreed by Holdings and the Administrative Agent (acting at the Direction of the Required Lenders) to be material to Holdings, any Intermediate Holdings Guarantor, any Borrower or any of the Subsidiaries, (l) pledges and security interests prohibited by applicable law, rule or regulation or agreements with any Governmental Authority (including any requirement to obtain the consent of any Governmental Authority or third party) (other than to the extent that any such prohibition would be rendered ineffective pursuant to the Uniform Commercial Code or any other applicable Requirements of Law) or which would require governmental (including regulatory) consent, approval license or authorization to provide such security interest unless such consent, approval, license or authorization has been received, (m) [reserved], (n) any asset if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any Requirements of Law or any permitted Contractual Obligation binding on such asset that is in existence on the Effective Date (or, if later, the date it becomes a  Subsidiary) and so long as such contractual restrictions have not been entered into in contemplation of such acquisition or designation (other than to the extent that any such prohibition would be rendered ineffective pursuant to the Uniform Commercial Code or any other applicable Requirements of Law) and (o) those assets to which the Administrative Agent (acting at the Direction of the Required Lenders) and the Administrative Borrower reasonably agree in writing that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit to the Lenders of the security to be afforded thereby.

"Excluded Subsidiary" means any of the following listed on Schedule 1.01(a): (a) [reserved], (b) for so long as such Subsidiaries remain inactive subsidiaries, Instantly Europe, Ltd., Digital Marketing Services, Inc., Instantly Deutschland GmbH and Universal Sample France SARL, (c) any subsidiary for which the provision of a Guarantee would result in adverse tax consequences to Holdings, any Intermediate Holdings Guarantor, any Borrower or any of the Subsidiaries that shall have been reasonably agreed by Holdings and the Administrative Agent (acting at the Direction of the Required Lenders) to be material to Holdings, any Intermediate Holdings Guarantor, any Borrower or any of the Subsidiaries, (d) a Subsidiary that is prohibited or restricted by applicable law, rule, regulation or Contractual Obligations (including any requirement to obtain the consent of any Governmental Authority or third party pursuant to any such Contractual Obligation) in effect (in the case of any Contractual Obligation) on the Effective Date (or, if later, the date it becomes a Subsidiary and, in the case of a Contractual Obligation, not entered into in contemplation thereof) or at the time of acquisition of such Subsidiary and not incurred in contemplation of such acquisition from guaranteeing the Contractual Obligations, or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee unless such consent, approval, license or authorization has been received, (e) not-for-profit subsidiaries, captive insurance subsidiaries and other special purpose subsidiaries, (f) joint ventures, (g) [reserved], (h) a Foreign Subsidiary, a FSHCO or a Subsidiary of a FSHCO, CFC, or foreign corporation that is treated as a disregarded entity (as defined in the Code) which owns Equity Interests in one or more direct or indirect Foreign Subsidiaries, in each case, if causing such Person to become a Loan Party (i) would result in significant adverse tax consequences to Holdings, any Intermediate Guarantor, any Borrower or any of the Subsidiaries or the Borrowers (as determined by the Borrowers and the Required Lenders (or the Specified Lender Advisors)), (ii) would be prohibited or restricted by applicable law, rule, regulation or Contractual Obligations (including any requirement to obtain the consent of any Governmental Authority or third party pursuant to any such Contractual Obligation if obtaining such consent is not successful after the Borrowers' commercially reasonable efforts) in effect (in the case of any Contractual Obligation) on the Effective Date or (iii) the Required Lenders

17

reasonably agree that the cost, burden, difficulty or consequence of causing such Person to become a Loan Party (taking into account any adverse tax consequences to Holdings and its Affiliates (including the imposition of significant withholding or other taxes)) is excessive in relation to the value afforded thereby, (i) any Immaterial Subsidiary (except as may be designated as a Guarantor by Holdings by complying with the Collateral and Guarantee Requirement), (j) [reserved], (k) in the case of any obligation under any Swap Agreement, any Subsidiary of any Borrower that is not an "Eligible Contract Participant" as defined under the Commodity Exchange Act, (l) any Subsidiary of each Borrower that is an investment company under the Investment Company Act of 1940 (or would be such an investment company if it were to provide or maintain a Guarantee) and (m) any other Subsidiary with respect to which the Borrowers and the Administrative Agent (acting at the Direction of the Required Lenders) reasonably agree that the cost, burden, difficulty or consequence of providing such a guarantee (taking into account any adverse tax consequences to Holdings and its Affiliates (including the imposition of material withholding or other taxes)) is excessive in relation to the value afforded thereby.

"Excluded Taxes" means, with respect to any Recipient, (a) Taxes imposed on (or measured by) net income (however denominated) and franchise Taxes, in each case, by (i) the jurisdiction (or any political subdivision thereof) under the laws of which such Recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or (ii) any other jurisdiction as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than a connection arising from such Recipient having executed, delivered, or become a party to, performed its obligations or received payments under, received or perfected a security interest under, sold or assigned an interest in, or engaged in any other transaction pursuant to, or enforced, any Loan or Loan Document), (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax imposed by any jurisdiction described in clause (a) above, (c) any U.S. federal withholding Tax pursuant to FATCA, (d) any Tax that is attributable to a Lender's failure to comply with Section 2.17(f), and (e) except in the case of an assignee pursuant to a request by the Borrowers under Section 2.19(b) hereto, any U.S. federal withholding Taxes imposed due to a Requirement of Law in effect at the time a Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.17(a).

"Existing Claims" has the meaning assigned to such term in the recitals hereto.

"Existing LC Exposure" has the meaning assigned to such term in the recitals hereto.

"Existing Loans" has the meaning assigned to such term in the recitals hereto.

"Existing Revolving Loans" has the meaning assigned to such term in the recitals hereto.

"Existing Term Loans" has the meaning assigned to such term in the recitals hereto.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (including any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any applicable intergovernmental agreement with respect thereto and applicable official implementing guidance thereunder.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended from time to time, and the rules and regulations thereunder.

"<u>Federal Funds Effective Rate</u>" means the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate.

"<u>Fee Letters</u>" means, collectively, the Administrative Agent Fee Letter and the Fronting Fee Letter.

"<u>Final Order</u>" means the final order entered by the Bankruptcy Court approving entry into the DIP Facility and the use of cash collateral on a final basis, and authorizing the entry into and performance of this Agreement, substantially in the form of the Interim Order (subject to customary changes to make such order final) and otherwise reasonably satisfactory to the Required Lenders.

"<u>Financial Officer</u>" means the chief financial officer (or equivalent officer), principal accounting officer, treasurer or corporate controller of Holdings.

"<u>Fitch</u>" means Fitch Ratings Inc. and any successor to its rating agency business.

"<u>Floor</u>" means a rate of interest equal to 1.00% per annum.

"<u>Flow of Funds Statement</u>" means a flow of funds statement relating to payments to be made and credited by all of the parties on the Effective Date (including wire instructions therefor) as prepared by the Borrowers and their financial advisor in consultation with (and approved by) the Administrative Agent, the Lenders and the Specified Lender Advisors.

"<u>Foreign Benefit Event</u>" means with respect to any Foreign Plan, the existence of unfunded liabilities of the relevant Loan Party in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority.

"<u>Foreign Intellectual Property</u>" means any right, title or interest in or to any Intellectual Property governed by or arising or existing under the laws of any jurisdiction other than the United States of America or any state thereof.

"<u>Foreign Lender</u>" means a Lender that is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"<u>Foreign Plan</u>" shall mean any defined benefit plan (as defined in Section 3(35) of ERISA, but whether or not subject to ERISA) maintained or contributed to by Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary with respect to its employees employed outside the United States, other than any such plan sponsored or to which contributions are mandated by any Governmental Authority.

"<u>Foreign Subsidiary</u>" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"<u>Fronting Fee Letter</u>" means that certain Fronting Fee Letter, dated as of the Effective Date, by and among, *inter alia*, the Borrowers and the Fronting Lender (as such Fronting Fee Letter may be amended, supplemented or otherwise modified from time to time).

"<u>Fronting Lender</u>" means Jefferies Capital Services, LLC.

"<u>FSHCO</u>" means any direct or indirect Domestic Subsidiary of Holdings (other than the Borrowers) that has no material assets (either held directly or through one or more disregarded entities) other than Equity Interests in one or more direct or indirect Foreign Subsidiaries that are CFCs (excluding for purposes of such assets determination any debt of such Foreign Subsidiaries).

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, as in effect from time to time but subject to Section 1.04.

"<u>Governmental Authority</u>" means the government of the United States of America, any other nation or any political subdivision thereof, whether federal, state, provincial, territorial, local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra national bodies such as the European Union or the European Central Bank).

"<u>Guarantee</u>" of or by any Person (the "<u>guarantor</u>") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; <u>provided</u> that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"<u>Guarantee Agreement</u>" means the Super-Priority Senior Secured Debtor-In-Possession Guarantee Agreement among the Loan Parties and the Administrative Agent, substantially in the form of Exhibit B.

"<u>Hazardous Materials</u>" means all pollutants or contaminants, petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, materials, constituents, chemicals, compounds or wastes of any nature regulated as hazardous or toxic, or any other term of similar import, pursuant to any Environmental Law.

"<u>Holdings</u>" has the meaning assigned to such term in the preamble.

"<u>Immaterial Subsidiary</u>" means any Subsidiary other than a Material Subsidiary.

"<u>Indebtedness</u>" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred

purchase price of property or services (excluding trade and other ordinary course accounts payable in the ordinary course of business and earn-out and other similar contingent deferred purchase price obligations), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (j) all obligations of such Person in respect of Disqualified Equity Interests and (k) all earn-out and other similar contingent deferred purchase price obligations, but solely to the extent that such obligation has become a non-contingent liability on the balance sheet of such Person in accordance with GAAP and is not paid within 30 days after the date payable in accordance with the terms thereof; provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue or (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the seller. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) only to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith. The amount of Guarantees by such Person of Indebtedness of others for clause (f) above shall be deemed to be an amount equal to the principal amount of the obligations guaranteed and outstanding.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Initial Budget" has the meaning assigned to such term in Section 3.24(d).

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Interest Election Request" means a request by the Borrowers to convert or continue a Term Borrowing in accordance with Section 2.07.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last Business Day of each calendar month and (b) with respect to any SOFR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a SOFR Borrowing with an Interest Period of more than one months' duration, each day prior to the last day of such Interest Period that occurs at intervals of one months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a SOFR Borrowing and ending on the date that is one month thereafter (in each case, subject to the availability thereof), as selected by the Borrowers in their Borrowing Request (or, if agreed to by each Lender participating therein twelve months or periods shorter than one month); provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next

succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period, (c) no Interest Period shall extend beyond the Maturity Date and (d) no tenor that has been removed from this definition pursuant to Section 2.25(d) shall be available for specification in any Borrowing Request or Interest Election Request. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Intermediate Holding Company" means any Subsidiary of Holdings that directly or indirectly holds any Equity Interests of a Borrower.

"Intermediate Holdings Guarantor" means each of (a) New Insight Intermediate Holdings, Inc., a Delaware corporation, (b) SSI/Opinionology Interco LLC, a Delaware limited liability company, (c) SSI Holdings, LLC, a Delaware limited liability company, (d) Research Now, Inc., a Delaware corporation, (e) New Insight International, Inc., a Delaware corporation, (f) Dynata Holdings Corp., a Delaware corporation, (g) iPinion, Inc., a Delaware corporation, (h) each New Loan Party and (i) each Intermediate Holding Company that becomes a party to this Agreement after the Effective Date in accordance with Section 5.11.

"Interim Order" means *Interim Order (I) Authorizing Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling Final Hearing, and (VII) Granting Related Relief* [D.I. ●].

"Investment" means, as to any Person, any direct or indirect acquisition or investment in such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (i) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, <u>minus</u> any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (ii) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (iii) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair market value (as determined in good faith by a Financial Officer) of such Equity Interests or other property as of the time of the transfer, <u>minus</u> any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (iv) any Investment (other than any Investment referred to in clause (i), (ii) or

(iii) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus (x) the cost of all additions thereto and minus (y) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause (y) do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of Section 6.04, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; provided that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"IP Rights" means (i) patents (including all reissues, reexaminations, divisionals, continuations, continuations-in-part and extensions thereof); (ii) trademarks, service marks, trade names, logos, Internet domain names, business names or brand names (in each case, whether or not registered) and all goodwill associated with any of the foregoing; (iii) copyrights (whether or not registered) and design registrations; and (iv) trade secrets, including confidential information, inventions, know-how, formulae, processes, procedures, research records, records of inventions, test information, market surveys and marketing know-how, in each case, to the extent they qualify for trade secret protection under applicable law.

"IPO" means an underwritten initial public offering (other than a public offering pursuant to a registration statement on Form S-8) of common Equity Interests in the IPO Entity.

"IPO Entity" means, at any time after an IPO, Holdings or a parent entity of Holdings the Equity Interests of which were issued or otherwise sold pursuant to the IPO; provided that immediately following the IPO, each Borrower is a direct or indirect Wholly Owned Subsidiary of such IPO Entity and such IPO Entity owns, directly or through its subsidiaries, the business and assets owned or conducted, directly or indirectly, by each Borrower immediately prior to the IPO.

"Joint Venture" means any Person, the Equity Interests (except for any such Equity Interests in the nature of directors' qualifying shares required pursuant to applicable law) of which is owned, in part, by a Loan Party and, in part, by one or more other Persons which are not Loan Parties.

"Junior Financing" means (a) any Indebtedness (other than any permitted intercompany Indebtedness owing to Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary Loan Party) that constitutes Subordinated Indebtedness, (b) any Indebtedness (other than permitted intercompany Indebtedness owing to Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary) that is unsecured or (c) Indebtedness secured by a Lien on Collateral that is junior to the Lien on such Collateral that secures the Secured Obligations.

"Latest Maturity Date" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of the Loans as extended in accordance with this Agreement from time to time.

"Lenders" means the Fronting Lender and any Lender with a Commitment or an outstanding Loan and any other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrowers and the Administrative Agent which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or such Affiliate. Unless the context otherwise requires each reference to a Lender shall include its applicable Lending Office.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"<u>Loan Document Obligations</u>" means (a) the due and punctual payment by the Borrowers of (i) the principal of and interest at the applicable rate or rates provided herein (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding (or that would accrue but for the existence of such proceeding), regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) [reserved] and (iii) all other monetary obligations of the Borrowers under or pursuant hereto and each of the other Loan Documents, including obligations to pay fees (including for the avoidance of doubt, the Exit Fee), expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of each Borrower under or pursuant to this Agreement and each of the other Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including monetary obligations accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding (or that would accrue but for the existence of such proceeding), regardless of whether allowed or allowable in such proceeding.

"<u>Loan Documents</u>" means this Agreement, the Fee Letters, the Guarantee Agreement, the Collateral Agreement, the other Security Documents and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.09(e).

"<u>Loan Parties</u>" means Holdings, each Intermediate Holdings Guarantor, each Borrower and the Subsidiary Loan Parties.

"<u>Loan Proceeds Account</u>" means the deposit account of Borrower Agent numbered 2000031628378 held at the Loan Proceeds Account Bank.

"<u>Loan Proceeds Account Bank</u>" means Wells Fargo Bank, N.A.

"<u>Loans</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Management Investors</u>" means the directors, officers and employees of Holdings, the Intermediate Holdings Guarantors, the Borrowers and/or the Subsidiaries who are (directly or indirectly through one or more investment vehicles) investors in Holdings (or any direct or indirect parent thereof).

"<u>Material Adverse Effect</u>" means any event, circumstance or condition affecting the business, financial condition, or results of operations of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries, taken as a whole, that has had, or would reasonably be expected to have, a materially adverse effect on (a) the ability of each Borrower and the other Loan Parties, taken as a

24

whole, to perform their payment obligations under the Loan Documents or (b) the rights and remedies of the Administrative Agent and the Lenders (taken as a whole) under the Loan Documents; provided that no Material Adverse Effect shall result from (w) any matters publicly disclosed in writing or disclosed to the Administrative Agent, the Specified Lender Advisors and/or the Lenders in writing prior to the filing of the Chapter 11 Cases, (x) any matters disclosed in the schedules hereto, (y) any matters disclosed in any first day pleadings or declarations and (z) the filing of the Chapter 11 Cases, the financial condition of the Debtors on the Effective Date and any action required to be taken under the Loan Documents or under the DIP Orders).

"Material Indebtedness" means Indebtedness (other than the Loan Document Obligations), or obligations in respect of one or more Swap Agreements, of any one or more of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries in an aggregate principal amount exceeding $5.0 million. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Holdings, such Intermediate Holdings Guarantor, such Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Intellectual Property" means any IP Rights that are material to the operation of the business of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries, taken as a whole.

"Material Property" means any Property (including IP Rights and Material Real Property) that is material to the operation of the business of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries, taken as a whole.

"Material Real Property" means any fee-owned real property with a book value greater than $2,000,000 as determined on the Effective Date (for existing fee-owned real property) or, with respect to after-acquired fee-owned real property, on the date of acquisition thereof or of the Person that owns such fee-owned real property.

"Material Subsidiary" means each Wholly Owned Subsidiary that, as of the last day of the fiscal quarter of the Borrowers most recently ended, had revenues or Consolidated Total Assets for such quarter in excess of 2.5% of the consolidated revenues or Consolidated Total Assets, as applicable, of the Borrowers for such quarter; provided that in the event that the Immaterial Subsidiaries, taken together, had as of the last day of the fiscal quarter of the Borrowers most recently ended revenues or Consolidated Total Assets in excess of 2.5% of the consolidated revenues or Consolidated Total Assets, as applicable, of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries for such quarter, the Borrowers shall designate one or more Immaterial Subsidiaries to be a Material Subsidiary as may be necessary such that the foregoing 2.5% limit shall not be exceeded, and any such Subsidiary shall thereafter be deemed to be a Material Subsidiary hereunder; provided, further, that the Borrowers may re-designate Material Subsidiaries as Immaterial Subsidiaries so long as the Borrowers are in compliance with the foregoing.

"Maturity Date" means the earliest of (i) the date that is 75 days after the Effective Date, (ii) the date of acceleration of the obligations under the DIP Facility, (iii) the date the Bankruptcy Court orders a conversion of any Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Loan Party; (iv) the consummation of a plan of reorganization of the Loan Parties, which has been confirmed by an order entered by the Bankruptcy Court; (v) the appointment of a chapter 11 trustee, examiner or other fiduciary with decision-making authority; and (vi) the date of consummation of a sale of all or substantially all of the Loan Parties' assets.

"Maximum Rate" has the meaning assigned to such term in Section 9.18.

"Milestones" means each of the milestones set forth in Section 5.18.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary in connection with such event (including attorney's fees, investment banking fees, survey costs, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, original issue discount, upfront fees, arrangement or commitment fees, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction, by way of merger or consolidation, or a casualty or a taking, condemnation or similar proceeding), (x) the amount of all payments that are not prohibited hereunder and are made by Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary as a result of such event to repay Indebtedness (other than the Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the pro rata portion of such proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of Holdings, such Intermediate Holdings Guarantor, such Borrower or such Subsidiary as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary and (iii) the amount of all taxes paid (or reasonably estimated to be payable), and the amount of any reserves established by Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, including, for the avoidance of doubt, any incremental income taxes that will be payable as a result of such event, including pursuant to tax sharing arrangements or any tax distributions.

"New Loan Party" means each of inBrain, LLC, a Georgia limited liability company, inBrain Holdings, LLC, a Georgia limited liability company, Apps that Pay, LLC, a Georgia limited liability company, ScreenLift.io LLC, a Georgia limited liability company, Instantly, Inc., a Delaware corporation, Branded Research, Inc., a Delaware corporation, Research Now DE I, LLC, a Delaware limited liability company, Research Now DE II, LLC, a Delaware limited liability company and Imperium LLC, a Connecticut limited liability company.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Non-Loan Party Debt Amount" means, at any time, the amount of Indebtedness to any Subsidiaries which are not Loan Parties as reflected in the relevant Approved Budged *plus* $500,000 (less the aggregate amount of Indebtedness incurred under such amount prior to such time and then outstanding pursuant to Section 6.01(xiv)).

"Non-Loan Party Investment Amount" means, at any time, the amount of Investments to any Subsidiaries which are not Loan Parties as reflected in the relevant Approved Budged *plus* $500,000 (less the aggregate amount of Investments or Dispositions made using such amount prior to such time and then outstanding pursuant to Section 6.04(c), 6.04(w) or 6.05(n)(z)(ii)).

"OFAC" means the U.S. Department of Treasury's Office of Foreign Assets Control.

"Organizational Documents" means, with respect to any Person, the charter, articles or certificate of organization or incorporation (or equivalent thereof) and bylaws or other organizational or governing documents of such Person.

"Other Taxes" means any and all present or future recording, filing, stamp, court, documentary, intangible, or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19) as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than a connection arising from such Recipient having executed, delivered or become a party to, performed its obligations or received payments under, received or perfected a security interest under, sold or assigned an interest in, engaged in any other transaction pursuant to, any Loan or Loan Document).

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(ii).

"PATRIOT Act" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Perfection Certificate" means a certificate substantially in the form of Exhibit C.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Permitted Encumbrances" means:

(a)     Liens for Taxes that are not overdue for a period of more than 60 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 60 days or, if more than 60 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

27

(c)     Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Borrower or any Subsidiary;

(d)     Liens incurred or deposits made to secure the performance of bids, trade contracts, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(e)     easements, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar non-monetary encumbrances and minor title defects affecting real property that, in each case, in the aggregate, do not materially detract from the value of the affected property or interfere with the ordinary conduct of the business of any Borrower and the Subsidiaries, taken as a whole;

(f)     Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j);

(g)     Liens on goods the purchase price of which is financed by a documentary letter of credit issued for the account of any Borrower or any of the Subsidiaries; provided that such Lien secures only the obligations of such Borrower or such Subsidiary in respect of such letter of credit to the extent such obligations are permitted by Section 6.01; and

(h)     Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by each Borrower or any of the Subsidiaries;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money.

"Permitted Holders" means (a) the Sponsors and their respective Controlled Investment Affiliates, (b) the Management Investors and their respective Permitted Transferees and (c) the other Persons set forth on Schedule 1.01(b) and their respective Controlled Investment Affiliates.

"Permitted Investments" means any of the following, to the extent owned by any Borrower or any Subsidiary:

(a)     dollars, euro or such other currencies held by it from time to time in the ordinary course of business;

(b)     readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States having average maturities of not more than 12 months from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(c)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250.0 million (any such bank in the foregoing clause (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

28

(d)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)     repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $250.0 million for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) or title to which shall have been transferred to such Person and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(f)     marketable short-term money market and similar highly liquid funds either (i) having assets in excess of $250.0 million or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)     securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)     investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)     instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or operating in such jurisdiction;

(j)     investments, classified in accordance with GAAP as current assets of any Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250.0 million, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)     with respect to any Foreign Subsidiary: (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; <u>provided</u> such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; <u>provided</u> such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "<u>Approved Foreign</u>

Bank"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(l)     interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G8 government or other G8 governmental agency or a G8 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof; and

(m)     investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (l) above.

"Permitted Transferees" means, with respect to any Person that is a natural Person (and any Permitted Transferee of such Person), (a) such Person's immediate family, including his or her spouse, ex-spouse, children, step-children and their respective lineal descendants, (b) any trust or other legal entity the beneficiary of which is such Person's immediate family, including his or her spouse, ex-spouse, children, stepchildren or their respective lineal descendants and (c) without duplication with any of the foregoing, such Person's heirs, executors and/or administrators upon the death of such Person and any other Person who was an Affiliate of such Person upon the death of such Person and who, upon such death, directly or indirectly owned Equity Interests in Holdings or any other IPO Entity.

"Permitted Variances" means (a) in respect of aggregate Actual Disbursement Amounts (excluding, for the avoidance of doubt, Actual Restructuring Related Amounts), 12.5% of Budgeted Disbursement Amounts (excluding, for the avoidance of doubt, Budgeted Restructuring Related Amounts) for each Variance Testing Period and (b) in respect of aggregate Actual Receipts, 15.0% of Budgeted Receipts for each Variance Testing Period.

"Person" means any natural person, corporation, limited liability company, trust, Joint Venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform" has the meaning assigned to such term in Section 5.01.

"Prepayment Event" means:

(a)     any non-ordinary course sale, transfer or other disposition (including (x) pursuant to a sale and leaseback transaction, (y) by way of merger or consolidation and (z) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of) of any property or asset of the Borrowers or any of the Subsidiaries permitted by Section 6.05(j) and Section 6.05(k), other than dispositions resulting in aggregate Net Proceeds not exceeding (A) $100,000 in the case of any single transaction or series of related transactions and (B) $500,000 for all such transactions, provided that upon the aggregate amount of Net Proceeds received by the Borrowers and/or any of their Subsidiaries exceeding $500,000 as a result

of a Prepayment Event under this clause (a), the entire aggregate amount of such Net Proceeds shall be subject to mandatory prepayment pursuant to Section 2.11(c); or

(b)      the incurrence by any Borrower or any Subsidiary of any Indebtedness, other than Indebtedness permitted under Section 6.01 or permitted by the Required Lenders pursuant to Section 9.02.

"Pre-Petition Administrative Agent" has the meaning assigned to such term in the recitals hereto.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Pre-Petition Lenders" has the meaning assigned to such term in the recitals hereto.

"Prime Rate" means, for any day, a rate per annum equal to the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent (acting at the Direction of the Required Lenders)) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent (acting at the Direction of the Required Lenders)).

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning assigned to such term in Section 5.01.

"Recipient" means (a) the Administrative Agent and (b) any Lender, as applicable.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, members, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns.

"Release" means any release, spill, emission, leaking, dumping, injection, emptying, pumping, escaping, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, indoor air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Repayment" has the meaning assigned to such term in Section 6.07(b).

"Required Lenders" means, at any time, Lenders having Loans representing more than 50.1% of the aggregate outstanding Loans and unused Commitments at such time.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning assigned to such term in Section 8.06.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to paragraph (a)(i) of the definition of the term "Collateral and Guarantee Requirement," any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Financing" has the meaning assigned to such term in Section 6.07(b).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in any Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in any Borrower or any Subsidiary.

"RN Borrower" has the meaning assigned to such term in the preamble hereto.

"RN Intermediate Holdings Guarantor" has the meaning assigned to such term in the preamble hereto.

"RSA" means that certain Restructuring Support Agreement, dated as of May 21, 2024, among the Company Parties, the Sponsors and the Consenting Lenders (each as defined therein), as may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"Sanctioned Jurisdiction" means any country or territory that is the subject of comprehensive Sanctions (including, without limitation, and as of the Effective Date, Cuba, Iran, North Korea, Syria, Russia and the Crimea region of Ukraine).

"Sanctioned Person" means any individual or entity (a) identified on a Sanctions List, (b) organized, domiciled or resident in a Sanctioned Jurisdiction, (c) owned or controlled by, or acting on behalf or for the benefit of, directly or indirectly, any individual or entity described in the foregoing clause (a) or (b) or (d) otherwise the subject or target of any Sanctions.

32

"Sanctions" means any economic or financial sanctions or trade embargoes administered, imposed or enforced by (a) the U.S. (including OFAC and the U.S. Department of State), (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) the United Kingdom (including His Majesty's Treasury) or (e) any other relevant national sanctions authority of any jurisdiction or supra-national sanctions authority, in each case applicable to Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary by virtue of such Person being organized or operating in such jurisdiction (or such jurisdiction subject to such supra-national authority).

"Sanctions List" means any list of designated individuals or entities that are the subject of Sanctions, including, without limitation, (a) the Specially Designated Nationals and Blocked Persons List maintained by OFAC, (b) the Consolidated United Nations Security Council Sanctions List, (c) the consolidated list of persons, groups and entities subject to EU financial sanctions maintained by the European Union and (d) the Consolidated List of Financial Sanctions Targets in the UK maintained by His Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Obligations" has the meaning assigned to such term in the Collateral Agreement; provided that Secured Obligations shall not, for purposes of this Agreement or any other Loan Document, include any Excluded Swap Obligations.

"Secured Party" has the meaning assigned to such term in the Collateral Agreement.

"Security Documents" means the Collateral Agreement, the Perfection Certificate, intellectual property security agreement, and any other security agreement or pledge agreement executed and delivered pursuant to the Collateral and Guarantee Requirement, Section 5.11, 5.12 or 5.14 to secure any of the Secured Obligations.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on the Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"Specified Event of Default" means an Event of Default under Section 7.01(a), (b) (for all purposes under this Agreement (other than Section 9.04) solely with respect to any failure to pay any interest payment and fees referred to therein), (h) or (i).

"Specified Lender Advisors" means (x) Gibson, Dunn & Crutcher LLP, as legal counsel for the Required Lenders, (y) PJT Partners, Inc. as financial advisor to the Lenders and (z) any replacement legal or financial advisor to the Required Lenders designated in writing by the Required Lenders to the Administrative Agent to the Borrower.

"Sponsor" means each of Court Square Capital Partners, Court Square Capital Partners III, L.P., Court Square Capital Partners III-A, L.P., Court Square Capital Partners (Offshore) III, L.P. Capital Court Square Capital Partners (Executive) III, L.P., HGGC Saber Topco LLC, HGGC, LLC, HGGC Fund II, L.P, HGGC Fund II-A, L.P., HGGC Fund II-B, L.P., HGGC Fund II-C, L.P., HGGC Fund II-D, L.P., HGGC Associates Fund II, L.P. and HGGG Affiliate Investors II, L.P.

"SSI Borrower" has the meaning assigned to such term in the preamble hereto.

"SSI Intermediate Holdings Guarantor" has the meaning assigned to such term in the preamble hereto.

"Subordinated Indebtedness" means Indebtedness that is subordinated in right of payment to the Loan Document Obligations.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50.0% of the equity or more than 50.0% of the ordinary voting power or, in the case of a partnership, more than 50.0% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of Holdings (unless otherwise specified).

"Subsidiary Loan Party" means each Subsidiary that is a party to the Guarantee Agreement.

"Successor Borrower" has the meaning assigned to such term in Section 6.03(a)(iv).

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement or contract involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Intermediate Holdings Guarantors, the Borrowers or the Subsidiaries shall be a Swap Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Syndication" has the meaning assigned to such term in Section 2.04.

"Syndication Procedures" has the meaning assigned to such term in Section 2.04.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term SOFR" means,

(a)       for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day,

(b)       for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Adjustment" means with respect to any Loans, a percentage equal to 0.11448 % per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" means the date on which all Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable under each Loan Document shall have been paid in full, all other Secured Obligations shall have been paid in full (other than Secured Cash Management Obligations (as defined in the Collateral Agreement) and Secured Swap Obligations (as defined in the Collateral Agreement)).

"Transaction Costs" has the meaning set forth in the definition of "Transactions."

"Transactions" means collectively, (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the borrowing of Loans, the use of the proceeds thereof and (b) the payment of all fees, premiums, expenses and other transaction costs incurred in connection with the transactions described in the foregoing provisions of this definition, including any original issue discount or upfront fees (the "Transaction Costs").

"<u>Type</u>," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted Term SOFR or the Alternate Base Rate.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; <u>provided</u>, <u>however</u>, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Administrative Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Unaudited Financial Statements</u>" has the meaning assigned to such term in Section 3.04(b).

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>Variance Test Report</u>" means, for each Variance Testing Period, a budget variance report/reconciliation in form and substance satisfactory to the Required Lenders, setting forth in detail for such Variance Testing Period (i) the Actual Disbursements; (ii) the Actual Receipts; (iii) the fees and expenses of the Debtor and committee professionals incurred; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) for such Variance Testing Period of the Actual Receipts (and each line item thereof), the Actual Disbursements (and each line item thereof), and the fees and expenses of professional persons for such Variance Testing Period to the amount of Debtors' projected cash receipts (and each line item thereof) set forth in the Approved Budget for such Variance Testing Period and the Debtors' projected disbursements (and each line item thereof), respectively, set forth in the Approved Budget for such Variance Testing Period; and (v) as to each variance contained in the Variance Test Report, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance.

"<u>Variance Testing Period</u>" means May 21, 2024 to May 31, 2024 set out in the Variance Test Report of June 7, 2024, and every other Friday thereafter for the prior two-week period.

"<u>Wholly Owned Subsidiary</u>" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    <u>Classification of Loans and Borrowings</u>. For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type (e.g., a "SOFR Loan" or "ABR Loan").

Section 1.03    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Except to the extent otherwise expressly provided herein, if performance of any obligation under any Loan Document shall be due on a day that is not a Business Day, the date for performance shall be extended to the next succeeding Business Day.

Section 1.04    <u>Accounting Terms; GAAP</u>.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u>, <u>however</u>, that if the Borrowers notify the Administrative Agent that the Borrowers request an amendment to any provision (including any definitions) hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary at "fair value" as defined therein.  Notwithstanding any other provision contained herein, any lease that is treated as an operating lease for purposes of GAAP as of the Effective Date shall continue to be treated as an operating lease (and any future lease, if it were in effect on the Effective Date, that would be treated as an operating lease for purposes of GAAP as of the Effective

Date shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any change in GAAP after the Effective Date.

Section 1.05    [Reserved].

Section 1.06    [Reserved].

Section 1.07    Classification.  It is understood and agreed that any Indebtedness, Lien, Investment, Disposition, Restricted Payment, Repayment or Affiliate transaction need not be permitted solely by reference to one category of permitted Indebtedness, Lien, Investment, Disposition, Restricted Payment, Repayment or Affiliate transaction under Sections 6.01, 6.02, 6.04, 6.05, 6.07 and 6.08, respectively, but may instead be permitted in part under any combination thereof.

Section 1.08    Effectuation of Transactions.  All references herein to Holdings, the Intermediate Holdings Guarantors, the Borrowers and their subsidiaries shall be deemed to be references to such Persons.

Section 1.09    Exchange Rate Fluctuations.  When applying any monetary limits, thresholds and other exceptions to the representations and warranties, covenants and Events of Default under the Loan Documents, the Dollar equivalent to an amount in the relevant currency shall be calculated at the rate for the conversion set forth in any applicable Swap Agreement or, in the absence of such rate, such other conversion rate which the Borrowers acting reasonably and in good faith have used, in each case, as at the date of the incurring or making the relevant disposal, acquisition, investment, lease, loan, debt or guarantee or taking any other relevant action.  No Default or Event of Default or breach of any representation and warranty or undertaking under this Agreement or the other Loan Documents shall arise merely as a result of fluctuations in exchange rates.

Section 1.10    Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Alternate Base Rate, the Term SOFR Reference Rate, the Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Alternate Base Rate, the Term SOFR Reference Rate, the Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, the Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, the Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.11    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different

jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II

### THE CREDITS

Section 2.01    Commitments and Loans. Subject to the terms and conditions set forth herein, each Lender agrees, severally and not jointly, to make Loans in Dollars to the Borrowers in one (1) Borrowing in an aggregate principal amount not to exceed its Commitment.  The Borrowing of Loans (the "Draw") will be in an amount equal to $31,500,000 and shall occur on the Effective Date. Upon a Lender's funding of a Loan, such Lender's Commitment shall be automatically and permanently reduced to zero. Amounts repaid or prepaid in respect of the Loans may not be reborrowed.  The Loans shall be made by the Fronting Lender on the date of the Borrowing in accordance with the Lenders' respective Commitments.

Section 2.02    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)    Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Administrative Borrower may request in accordance herewith.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of (i) such Lender to make such Loan as required hereby, except to the extent actually made by such domestic or foreign branch or Affiliate of such Lender or (ii) the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)    At the commencement of each Interest Period for any SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a SOFR Borrowing that results from a continuation of an outstanding SOFR Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that an ABR Borrowing that results from a conversion of all or any portion of an outstanding SOFR Borrowing may be in an aggregate amount that is equal to the amount so converted.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of ten SOFR Borrowings outstanding.

(d)    Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03    Requests for Borrowings.  To request a Borrowing, the Administrative Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a SOFR

Borrowing, not later than 2:00 p.m., New York City time, one U.S. Government Securities Business Day before the date of the proposed Borrowing (or such later time on such date as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion); or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing (or such later time on such date as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion).  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by delivery to the Administrative Agent of a written Borrowing Request signed by the Administrative Borrower.  Each such telephonic and written Borrowing Request shall specify the following information:

> (a)    the aggregate amount of such Borrowing;

> (b)    the date of such Borrowing, which shall be a Business Day;

> (c)    whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing;

> (d)    in the case of a SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

> (e)    that as of the date of such Borrowing Request, the conditions set forth in Article IV are satisfied as of the date of such Borrowing.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested SOFR Borrowing, then the Administrative Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

> Section 2.04    Syndication.  Following the Effective Date, the Borrowers shall use commercially reasonable efforts to assist the Backstop Parties in connection with a syndication process (the "Syndication") for the assignment of a proportionate share of Loans in accordance with syndication procedures (the "Syndication Procedures") acceptable to each of the Administrative Agent (acting at the Direction of the Required Lenders), the Fronting Lender and the Backstop Parties (each in their sole discretion), in consultation with the Borrowers.  Upon completion of the Syndication, a Schedule 2.04, which shall be prepared by the Specified Lender Advisors and satisfactory to the Required Lenders, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate principal amount of Loans held by each Lender upon closing of the Syndication.

> Section 2.05    [Reserved].

> Section 2.06    Funding of Borrowings.

> (a)    The Administrative Agent, following receipt of a Borrowing Request, shall promptly notify each Lender of the applicable amount of Loans to be funded.  Whereupon, each Lender shall remit to the Administrative Agent its share of such Loans, in immediately available funds not later than 12:00 noon, New York City time, on the Business Day specified in the Borrowing Request to the Applicable Account.  Upon receipt of all requested funds with respect to the Loans, the Administrative Agent will promptly in accordance with the Flow of Funds Statement, (I) remit to (A) the Specified Lender Advisors, (B) ArentFox Schiff LLP and (C) Mandel, Katz & Brosnan LLP, as counsel to the Fronting Lender all fees and expenses payable on the date of the funding of the Loans, (II) deduct and apply all fees

payable to the Administrative Agent on the date of the funding of the Loan for its own account and (III) remit the amount specified in the Flow of Funds Statement to the Loan Proceeds Account. For the avoidance of doubt, all parties agree that all Loans shall be funded and accrue interest starting on the Effective Date, including any Loans the proceeds of which have been deposited into the Loan Proceeds Account.

(b)     Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance on such assumption and in its sole discretion, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrowers, and the Borrowers agree to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such Lender or the Borrowers interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent (acting at the Direction of the Required Lenders) in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrowers, the interest rate applicable to such Borrowing in accordance with Section 2.13.

(c)     The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 9.03(c).

Section 2.07     Interest Elections.

(a)     Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Administrative Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Administrative Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Administrative Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Administrative Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by to the Administrative Agent of a written Interest Election Request signed by the Administrative Borrower.

(c)     Each telephonic and written Interest Election Request shall specify the following information:

41

(i)   the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)   the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)   whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)   if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Administrative Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)   Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)   If the Administrative Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notify the Borrowers, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.08   [Reserved].

Section 2.09   Repayment of Loans; Evidence of Debt.

(a)   The Borrowers hereby unconditionally promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.10.

(b)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)   The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.09 shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement.  In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section 2.09, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section 2.09 shall control; <u>provided further</u> that to the extent that the entries made pursuant to paragraphs (b) and (c) conflict with the Register, the Register shall prevail.

(e)     Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form provided by the Administrative Agent and approved by the Borrowers.

Section 2.10     Repayment of Loans.

(a)     The Borrowers hereby unconditionally promise, jointly and severally, to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of outstanding Loans, plus any interest accrued and unpaid on such Loans, on the Maturity Date unless such Loans have been otherwise satisfied in accordance with the Chapter 11 Plan.  The Lenders hereby expressly agree that the Loan Document Obligations may be satisfied in accordance with the Chapter 11 Plan.

(b)     Prior to any repayment of any Borrowings hereunder, the Administrative Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent by telephone (confirmed by hand delivery or facsimile) of such election not later than 2:00 p.m., New York City time, one Business Day before the scheduled date of such repayment.  In the absence of a designation by the Administrative Borrower as described in the preceding sentence, the Administrative Agent shall apply such repayment <u>first</u>, to the repayment of outstanding ABR Borrowings and <u>second</u>, to the repayment of outstanding SOFR Borrowings, with such SOFR Borrowings with the nearest expiring Interest Period being repaid first.  Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Term Borrowings shall be accompanied by accrued interest on the amount repaid.

Section 2.11     Prepayment of Loans.

(a)     The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to the requirements of this Section 2.11 and Section 2.16.

(b)     [Reserved].

(c)     Subject to the DIP Order, in the event and on each occasion that any Net Proceeds are received by or on behalf of any of the Loan Parties or their Subsidiaries in respect of any Prepayment Event, such Loan Party shall, within five Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (b) of the definition of the term "Prepayment Event," on the Business Day immediately following such Prepayment Event), prepay Borrowings in an aggregate amount equal to the amount of such Net Proceeds.

(d)     [Reserved].

(e)     In the event of any optional or mandatory prepayment of Borrowings, the Borrowers shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section 2.11; provided that the aggregate amount of such prepayment is allocated among all Borrowings that are entitled to such mandatory prepayment pro rata based on the aggregate principal amount of outstanding Borrowings.  Any such repayment shall be applied first, to the repayment of outstanding ABR Borrowings and second, to the repayment of outstanding SOFR Borrowings, with such SOFR Borrowings with the nearest expiring Interest Period being repaid first.  Notwithstanding anything to the contrary herein, any Lender may elect, by notice to the Administrative Agent by telephone (confirmed by facsimile) no later than ten Business Days after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment, to decline all (but not part) of any prepayment of its Loans pursuant to this Section.

(f)     The Borrowers shall notify the Administrative Agent by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a SOFR Borrowing, not later than 2:00 p.m., New York City time, three U.S. Government Securities Business Days before the date of prepayment (or such later time on such date as the Administrative Agent may agree in its reasonable discretion) or (ii) in the case of prepayment of an ABR Borrowing, not later than 1:00 p.m., New York City time, one Business Day before the date of prepayment (or such later time on such date as the Administrative Agent may agree in its reasonable discretion).  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked, or the effective date thereof may be delayed, by the Administrative Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.

Section 2.12     Fees.

(a)     The Borrowers agree to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrowers and the Administrative Agent.

(b)     The Borrowers agree to pay on the Effective Date to each Lender party to this Agreement as a Lender on the Effective Date, as compensation for the funding of such Lender's Loan, an upfront fee in an amount equal to 3.50% of the stated principal amount of such Lender's Loan that has actually been funded by it on the Effective Date. Such upfront fees shall be payable to each Lender out of the proceeds of such Lender's Loan as and when funded on the Effective Date and shall be treated (and reported) by the Borrowers and DIP Lenders as a reduction in issue price of the Loans for U.S. federal, state and local income tax purposes. All such upfront fees payable under this Section 2.12(b) will be in all respects fully earned, due and payable on the Effective Date and non-refundable and non-creditable thereafter.

(c)     The Borrowers agree to pay on the Effective Date to funds and/or accounts affiliated with, or managed and/or advised by, the entities set forth on Schedule 2.12(c), on file with the Administrative Agent (the "Backstop Allocation Schedule", and such entities, together with their respective successors and permitted assignees, or any fronting lender or other funding agent operating on their behalf, the "Backstop Parties"), ratably in accordance with the amounts set forth opposite each such Backstop Party's name on the Backstop Allocation Schedule in cash a non-refundable fee equal to 9.0% of the

Commitments actually provided on the Effective Date. All such fees payable under this Section 2.12(c) will be in all respects fully earned, due and payable on the Effective Date and non-refundable and non-creditable thereafter and shall be treated (and reported) by the Borrowers and Backstop Parties as put option premium for U.S. federal, state and local income tax purposes.

(d)     The Borrowers agree to pay to the Fronting Lender for the sole account of the Fronting Lender, the fronting fee set forth in the Fronting Fee Letter. All such fees payable under this Section 2.12(d) will be in all respects fully earned, due and payable on the Effective Date and non-refundable and non-creditable thereafter.

(e)     The Borrowers agree to pay to the Administrative Agent, for the ratable account of each of the Lenders, on the Maturity Date or on any other date that the Loans are repaid (whether through a mandatory prepayment, voluntarily prepayment, acceleration or otherwise) a non-refundable fee equal to 2.0% of the aggregate principal amount of the Loans repaid on such applicable date, which fee shall be in all respects fully earned, due and payable on such date and non-refundable and non-creditable thereafter the (the "Exit Fee") and shall be treated as a reduction in issue price of the DIP Loans for U.S. federal, state and local income tax purposes.

Section 2.13     Interest.

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Loans comprising each SOFR Borrowing shall bear interest at the Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     Notwithstanding the foregoing, after the occurrence and during the continuation of any Specified Event of Default, overdue principal of, interest on or fees with respect to any Loan shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of overdue interest or fees, 2.00% per annum plus the rate applicable to the Loans with respect to which such interest or fees has accrued.

(d)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate, Adjusted Term SOFR or the Prime Rate shall, in each case, be determined by the Administrative Agent (acting at the Direction of the Required Lenders) and such determination shall be conclusive absent manifest error.

(f)     Term SOFR Conforming Changes. In connection with the use or administration of Term SOFR, the Administrative Agent will have the right, with the consent of the Administrative Borrower, to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will

become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Borrowers and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

Section 2.14   <u>Alternate Rate of Interest</u>.  Subject to Section 2.25, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)      the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(b)      the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that the Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

then, in each case, the Administrative Agent will promptly so notify the Borrowers and each Lender.

Upon notice thereof by the Administrative Agent to the Borrowers, any obligation of the Lenders to make SOFR Loans, and any right of the Borrowers to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (b), at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrowers may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrowers will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrowers shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.16.  Subject to Section 2.25, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "Alternate Base Rate" until the Administrative Agent revokes such determination.

Section 2.15   <u>Increased Costs</u>.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(ii)      subject any Lender to any Taxes (other than (A) Indemnified Taxes and (B) Excluded Taxes) on its loans, loan principal, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender any other condition, cost or expense affecting this Agreement or SOFR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or for such increased costs actually incurred or reduction actually suffered.

(b)     If any Lender determines that any Change in Law regarding liquidity or capital requirements has the effect of reducing the rate of return on such Lender's liquidity or capital or on the liquidity or capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered. Notwithstanding the foregoing, this paragraph will not apply to (A) Indemnified Taxes or Other Taxes or (B) Excluded Taxes.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail as specified in paragraph (a) or (b) of this Section 2.15 delivered to the Administrative Borrower shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     Notwithstanding any other provision of this Section, (i) any Lender shall only be permitted to demand compensation for any increased cost or reduction pursuant to this Section 2.15 if such costs would have been otherwise been imposed under this Section 2.15 and then only to the extent applicable and only to the extent such Lender is imposing such charges on similarly situated borrowers under comparable other syndicated credit facilities with respect to which such Lender is a lender to and (ii) requests for additional payments under this Section 2.15 in connection with market disruptions shall be limited to circumstances generally affecting the banking market and with respect to which the Required Lenders have made such a request.

Section 2.16     Break Funding Payments.  In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(f) and is revoked in accordance therewith) (other than any revocation pursuant to Section 2.14) or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Administrative Borrower pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrowers shall, after receipt of a written request by any Lender affected by any such

event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 delivered to the Administrative Borrower shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt of such demand. Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern.

Section 2.17   Taxes.

(a)   Except as required by applicable Requirements of Law, any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes; provided that if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold any Indemnified Taxes from such payments, then (i) the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional amounts payable under this Section 2.17) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)   Without limiting the provisions of paragraph (a) above and without duplication of any amounts payable pursuant to this Section 2.17, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with the Requirements of Law or at the request of the Administrative Agent (acting at the Direction of the Required Lenders), timely reimburse it for the payment of any such other Taxes.

(c)   Without duplication of any additional amounts paid under Section 2.17(a) or (b), the Borrowers shall indemnify the Administrative Agent and each Lender within 30 days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by the Administrative Agent or such Lender as the case may be, imposed or asserted on or with respect to any payment by or on account of any obligation of any Loan Party under, or otherwise with respect to, any Loan Document or activities related thereto (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Administrative Borrower by a Lender with a copy to the Administrative Agent, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)   Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each

48

Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)       As soon as practicable after any payment of Indemnified Taxes by a Loan Party to a Governmental Authority, the Administrative Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)       Each Lender shall, at such times as are reasonably requested by the Administrative Borrower or the Administrative Agent, provide the Administrative Borrower and the Administrative Agent with any properly completed and executed documentation as will permit any payments made under any Loan Document to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Administrative Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Administrative Borrower or the Administrative Agent as will enable the Administrative Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation expired, obsolete or inaccurate in any respect, deliver promptly to the Administrative Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Administrative Borrower and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.17(f)(i), (f)(ii)(A), (f)(ii)(B), (f)(ii)(C), (f)(ii)(D) and (iii) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)       Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Administrative Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower) two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax.

(ii)      Each Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent) whichever of the following is applicable:

(A)      two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party and such other documentation as required under the Code,

(B)      two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

49

(C)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of the applicable form provided in Exhibit O (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms),

(D)     to the extent a Foreign Lender is not the beneficial owner, two properly completed and duly signed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by an Internal Revenue Service Form W-8ECI, W-8BEN, W-8BEN-E, the applicable United States Tax Compliance Certificate, Internal Revenue Service Form W-9, Internal Revenue Service Form W-8IMY (or other successor forms) or any other required information from each beneficial owner (provided that, if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such partner(s)), or

(E)     to the extent such Foreign Lender is legally entitled to do so, any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Administrative Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)  Such Lender or Administrative Agent shall deliver to the Administrative Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Administrative Borrower or the Administrative Agent as may be necessary for the Administrative Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender or Administrative Agent has or has not complied with such Lender or Administrative Agent's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.  For the purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iv)  Any successor or supplemental Administrative Agent that is not a United States person under Section 7701(a)(30) of the Code, shall deliver to each Borrower two duly completed copies of Internal Revenue Service Form W-8IMY certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Administrative Borrower to be treated as a United States person with respect to such payments (and each Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Administrative Borrower can make payments to the Administrative Agent without deduction or withholding of any U.S. federal withholding Taxes.

(g)     If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by the Borrowers

or with respect to which the Borrowers have paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrowers (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrowers, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or such Lender be required to pay any amount to the Borrowers pursuant to this paragraph (g) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential) to any Loan Party or any other person.

(h)     The agreements in this Section 2.17 shall survive resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the occurrence of the Termination Date.

Section 2.18     Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     The Borrowers shall make each payment required to be made by it under any Loan Document (whether of principal, interest, fees or of amounts payable under Sections 2.15, 2.16, 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time (or such later time on the date when due as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion)), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars.

(b)     At all times when Section 2.18(c) does not apply and except as otherwise expressly provided herein, monies to be applied to the Loan Document Obligations, whether arising from payments

by the Loan Parties, realization on Collateral, setoff, or otherwise, shall be allocated as follows (subject in all respects to the Carve-Out):

(1)     *First*, to payment of that portion of the Loan Document Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including attorney costs and fees and expenses of the Agents payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17) payable to the Agents in their capacities as such, until paid in full;

(2)     *Second*, to payment of that portion of the Loan Document Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including attorney costs and fees and expenses of the Specified Lender Advisors payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17), ratably among them in proportion to the amounts described in this clause (2) payable to them, until paid in full;

(3)     *Third*, to pay interest and principal due in respect of all Loans;

(4)     *Fourth*, to the payment of all other Loan Document Obligations of the Loan Parties that are due and payable to the Agents and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Loan Document Obligations owing to the Agents and the other Secured Parties on such date, until paid in full;

(5)     *Fifth*, the balance, if any, to the Borrowers or as otherwise required by Requirement of Law.

Amounts shall be applied to each category of Loan Document Obligations set forth above until paid in full and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Loan Document Obligations in the category.

(c)     After the occurrence and during the continuation of an Event of Default, monies to be applied to the Loan Document Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff or otherwise, shall be allocated as follows (subject, in all respects, to the Carve-Out):

(1)     *First*, to payment of that portion of the Loan Document Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including attorney costs and fees and expenses of the Agents payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17) payable to the Agents in their capacities as such, until paid in full;

(2)     *Second*, to payment of that portion of the Loan Document Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including attorney costs and fees and expenses of the Specified Lender Advisors payable under Section 9.03 and amounts payable under Section 2.15, 2.16 or 2.17), ratably among them in proportion to the amounts described in this clause (2) payable to them, until paid in full;

(3)     *Third*, to pay interest and principal due in respect of all Loans;

(4)     *Fourth*, to the payment of all other Loan Document Obligations of the Loan Parties that are due and payable to the Agents and the other Secured Parties on such date,

ratably based upon the respective aggregate amounts of all such Loan Document Obligations owing to the Agents and the other Secured Parties until paid in full;

        (5)    *Fifth*, to pay any other Loan Document Obligations until paid in full; and

        (6)    *Last*, the balance, if any, after all of the Loan Document Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by Requirement of Law.

Amounts shall be applied to each category of Loan Document Obligations set forth above until paid in full and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a *pro rata* basis among the Loan Document Obligations in the category.  The allocations set forth in this Section 2.18(c) are solely to determine the rights and priorities of the Agents and Lenders as among themselves, may be changed by agreement among the Agents and all of the Lenders without the consent of any Loan Party.  Appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Loan Document Obligations otherwise set forth above in this Section 2.18(c).  This Section 2.18(c) is not for the benefit of or enforceable by any Loan Party.

        (d)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (a) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (b) the provisions of this paragraph shall not be construed to apply to (i) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement, (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant or (iii) any disproportionate payment obtained by a Lender result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension.  The Borrowers consent to the foregoing.

        (e)    Unless the Administrative Agent shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent (acting at the Direction of the Required Lenders) in accordance with banking industry rules on interbank compensation.

      Section 2.19    <u>Mitigation Obligations; Replacement of Lenders</u>.

        (a)    If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.23, then such Lender

shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or Section 2.17 or mitigate the applicability of Section 2.23, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)        If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.23 or (ii) the Borrowers are required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, either (x) require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee selected by the Borrowers that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (1) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld, conditioned or delayed, (2) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (3) the Borrowers or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (4) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrowers to require such assignment and delegation cease to apply or (y) terminate the Commitments and repay the Loans of such Lender; provided such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the Borrowers.  Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact, with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior written notice to such Lender, to take any action and to execute any such Assignment and Assumption or other instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this paragraph (b).

Section 2.20    Super Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.  The priority of the Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the DIP Order (and, for the avoidance of doubt, are subject to the Carve-Out).  Subject to the terms of the DIP Order, upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations under this Agreement or any of the other Loan Documents, the

Administrative Agent and the Lenders shall be entitled to immediate payment of such Loan Document Obligations without application to or order of the Bankruptcy Court.

Section 2.21    [Reserved].

Section 2.22    [Reserved].

Section 2.23    Illegality.  If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, the Adjusted Term SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, the Adjusted Term SOFR or Term SOFR, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender to make or continue SOFR Loans or to convert ABR Loans to SOFR Loans shall be suspended until such Lender notifies the Administrative Agent and each Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice,  the Borrowers shall, upon three Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans of such Lender to ABR Loans on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans to such day, in each case, until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, the Adjusted Term SOFR or Term SOFR.  Each Lender agrees to notify the Administrative Agent and each Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, the Adjusted Term SOFR or Term SOFR.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.  Notwithstanding any other provision of this Section 2.23, requests for additional payments under this Section 2.23 in connection with market disruptions shall be limited to circumstances generally affecting the banking market and when the Required Lenders have made such a request.

Section 2.24    Joint and Several Liability of Borrowers.  Each Borrower accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Loan Document Obligations.  Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Loan Document Obligations (including any Loan Document Obligations arising under this Section 2.24), it being the intention of the parties hereto that all the Loan Document Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.  If and to the extent that any Borrower shall fail to make any payment with respect to any of the Loan Document Obligations as and when due or to perform any of the Loan Document Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Loan Document Obligations.  The Loan Document Obligations of each Borrower under the provisions of this Section 2.24 constitute the absolute and unconditional, full recourse Loan Document Obligations of each Borrower enforceable against each Borrower, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  Except notices to the Administrative Borrower as provided for herein and in the other Loan Documents and as otherwise expressly provided in this Agreement and the other Loan Documents, each Borrower hereby waives, to the fullest extent permitted by law, notice of acceptance of its joint and several liability and notice of any demand for any payment

under this Agreement, notice of any action at any time taken or omitted by any Agent Party or any other Secured Party under or in respect of any of the Loan Document Obligations, any requirement of diligence or to mitigate damages and all demands, notices and other formalities of every kind in connection with this Agreement.  The Borrowers (other than the Administrative Borrower) each hereby reaffirm its appointment of the Administrative Borrower to act as its exclusive agent for all purposes under this Agreement and the other Loan Documents (including, without limitation, with respect to all matters related to the borrowing and repayment of Loans as described in Article II).  Each Borrower (other than the Administrative Borrower), in such capacity, acknowledges and agree that (i) the Administrative Borrower may execute such documents on behalf of all the Borrowers as the Administrative Borrower deems appropriate in its sole discretion and each Borrower shall be bound by and obligated by all the terms of any such document executed by the Administrative Borrower on its behalf, (b) any notice or other communication delivered by the Administrative Agent or any Lender hereunder to the Administrative Borrower shall be deemed to have been delivered to each Borrower and (c) the Administrative Agent or any Lender shall accept (and shall be permitted to rely on) any document or agreement executed by the Administrative Borrower on behalf of the Borrowers (or any of them).

Section 2.25    Benchmark Replacement Setting.

(a)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and the definition of "Adjusted Term SOFR" shall be deemed modified to delete the addition of the Term SOFR Adjustment to Term SOFR for any calculation and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is based upon Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(b)    Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrowers and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will promptly notify the Borrowers of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.25(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group

of Lenders) pursuant to this Section 2.25, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.25.

(d)    <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    <u>Benchmark Unavailability Period</u>.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrowers may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Alternate Base Rate.

ARTICLE III

<u>REPRESENTATIONS AND WARRANTIES</u>

Holdings, each Intermediate Holdings Guarantor and each Borrower represents and warrants to the Lenders as of the Effective Date (after giving effect to the Transactions) that:

Section 3.01    <u>Organization; Powers</u>.  Holdings, each Intermediate Holdings Guarantor, each Borrower and each Subsidiary (i) is duly organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization, (ii) subject to entry of and terms of the DIP Order, has the corporate or other organizational power and authority (A) to carry on its business as now conducted and as currently proposed to be conducted, (B) to execute, deliver and perform its obligations under each Loan Document to which it is a party and (C) to effect the Transactions, and (iii) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02    <u>Authorization; Enforceability</u>.  Subject to the entry of and the terms of the DIP Order, the Transactions to be entered into by each Loan Party have been duly authorized by all

necessary corporate, limited liability company or other organizational action, and, if required by such Loan Party's Organizational Documents, action by the holders of such Loan Party's Equity Interests. This Agreement has been duly executed and delivered by Holdings, each Intermediate Holdings Guarantor and each Borrower and each other Loan Document to which any Loan Party is a party has been duly executed and delivered by such Loan Party. Subject to the entry of and the terms of the DIP Order, this Agreement and each other Loan Document to which any Loan Party is a party constitutes a legal, valid and binding obligation of Holdings, the Intermediate Holdings Guarantors, the Borrowers or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    Governmental Approvals; No Conflicts.   Subject to the entry of and the terms of the DIP Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made (or as will be obtained or made on the Effective Date) and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of, or (ii) any Requirements of Law applicable to, Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary, (c) will not violate or result in a default under any Contractual Obligation of Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder or (d) will not result in the creation or imposition of any Lien on any asset of Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary, except Liens created under the Loan Documents, in each case with respect to the foregoing clauses (a), (b)(ii) and (c), except to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 3.04    Financial Condition; No Material Adverse Effect.

(a)     The Audited Financial Statements fairly present in all material respects the financial condition of Holdings and its subsidiaries on a consolidated basis as of the respective dates thereof and the results of operations and cash flows on a consolidated basis for the periods covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein.

(b)     The unaudited consolidated balance sheets and the related consolidated statements of income, shareholders' equity and cash flows of Holdings and its subsidiaries case dated for the quarterly fiscal period ending March 30, 2024 (the "Unaudited Financial Statements") (A) were prepared in accordance with GAAP consistently applied, and (B) fairly present in all material respects the financial condition of Holdings and its subsidiaries as of the respective dates thereof and the results of operations of Holdings and its subsidiaries for the period covered thereby, subject, in the case of clauses (A) and (B), to the absence of footnotes and to normal year-end audit adjustments and except as otherwise noted therein.

(c)     [Reserved].

(d)     Since December 31, 2023 and except for the Chapter 11 Cases, no Material Adverse Effect has occurred.

Section 3.05    <u>Properties</u>.  Each of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries have good title to, or valid leasehold interests in, all its real and personal property material to its business, if any, (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, which such defects in title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.06    <u>Litigation and Environmental Matters</u>.

(a)    Except for the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Holdings, the Intermediate Holdings Guarantors or the Borrowers, threatened in writing against or affecting Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than as disclosed in writing to the Specified Lender Advisors and/or the Lenders prior to the Effective Date).

(b)    Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of Holdings, the Intermediate Holdings Guarantors or the Borrowers, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of Holdings, the Intermediate Holdings Guarantors or the Borrowers, any basis to reasonably expect that Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary thereof will become subject to any Environmental Liability.

Section 3.07    <u>Compliance with Laws and Agreements</u>. Each of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries is in material compliance with (a) its Organizational Documents, (b) all Requirements of Law applicable to it or its property and (c) all indentures and other agreements and instruments binding upon it or its property, except, in the case of clauses (b) and (c) of this Section 3.07, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.08    <u>Investment Company Status</u>.  None of Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary is required to register as an "investment company" as defined in the Investment Company Act of 1940, as amended from time to time.

Section 3.09    <u>Taxes</u>.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Holdings, each Intermediate Holdings Guarantor, each Borrower and each Subsidiary thereof (a) have timely filed or caused to be filed all federal, state and local income and other Tax returns and reports required to have been filed and (b) have paid or caused to be paid all federal, state and local income and other Taxes levied or imposed on their properties, income or assets (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes that are being contested in good faith by appropriate proceedings, <u>provided</u> that Holdings, such Intermediate Holdings Guarantor, such Borrower or such Subsidiary thereof, as the case may be, has set aside on its books adequate reserves in relation thereto accordance with GAAP.

There is no current Tax assessment, deficiency or other claim against Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary except (a) those being actively contested

by a Loan Party or such Subsidiary in good faith and by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP or (b) those that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

Section 3.10    ERISA.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary thereof nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (iii) neither Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary thereof nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan and (iv) neither Holdings, any Intermediate Holdings Guarantor, any Borrower, any Subsidiary thereof nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(c)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, each Foreign Plan has been maintained, funded and administered in compliance with all requirements of law applicable thereto and the respective requirements of the governing documents for such plan.

Section 3.11    Disclosure.  None of the reports, financial statements, certificates or other written information by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished) when furnished and when taken as a whole contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements therein not materially misleading in the light of the circumstances under which they were made (giving effect to all supplements and updates thereto); provided that, with respect to projected financial information, Holdings, the Intermediate Holdings Guarantors and the Borrowers represent only that such information was prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time prepared, it being understood and agreed that any such projected financial information is not a guarantee of financial performance and that actual results may differ from such projected financial information and such differences may be material.

Section 3.12    Subsidiaries.  As of the Effective Date, Schedule 3.12 sets forth the name of, and the ownership interest of Holdings and each of its Subsidiaries in, each Subsidiary of Holdings.

Section 3.13    Intellectual Property; Licenses, Etc.  Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries own, or possess the right to use, all of the IP Rights that are reasonably necessary for the operation of their respective businesses, without infringement of the IP Rights of any other Person, except to the extent such failure to own or possess the right to use or such infringement, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any of the IP Rights is pending or, to the knowledge of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries, threatened in writing against

60

Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 3.14   [Reserved].

Section 3.15   [Reserved].

Section 3.16   Federal Reserve Regulations.   None of Holdings, any Intermediate Holdings Guarantor, any Borrower or any other Subsidiary is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.   No part of the proceeds of the Loans will be used, directly or, to the knowledge of the Borrowers, indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

Section 3.17   Use of Proceeds.   The Borrowers will use the proceeds of the Loans as set forth in Section 5.10.

Section 3.18   Labor Matters.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no strikes or other labor disputes against any of Holdings, the Intermediate Holdings Guarantors, the Borrowers or the Subsidiaries pending.

Section 3.19   Security Documents.   Upon execution and delivery thereof by the parties thereto and upon the entry by the Bankruptcy Court of the Interim Order or Final Order, as applicable, the Security Documents are effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) or, if so contemplated by the respective Security Document, the Collateral Agent and the other Secured Parties, in each case, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof (subject to the exceptions set forth in Section 3.02).   Upon the entry by the Bankruptcy Court of the Interim Order or the Final Order, as applicable, and in accordance therewith, the security interests and liens granted to the Collateral Agent to secure the Secured Obligations pursuant to the Interim Order or the Final Order, as applicable, and the Security Documents shall automatically, and without further action, constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (subject to Liens permitted by Section 6.02 and the Carve-Out).

Section 3.20   Sanctions.   None of Holdings, the Intermediate Holdings Guarantors, the Borrowers, their respective Subsidiaries, or their respective officers and directors or, to the knowledge of Holdings, the Intermediate Holdings Guarantors and the Borrowers, their respective employees, agents or controlled Affiliates (i) is a Sanctioned Person; (ii) is currently engaging or has, since January 1, 2014, engaged, directly or indirectly, in any dealings or transactions with any Sanctioned Person or in any Sanctioned Jurisdiction in violation of Sanctions; or (iii) is subject to any legal action, proceeding, litigation, or investigation by a Governmental Authority with regard to any actual or alleged violation of Sanctions. The Borrowers will not, directly or, to the knowledge of Holdings, the Intermediate Holdings Guarantors or the Borrowers, indirectly, use any part of the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Person, (i) to fund or finance any business or activities of, with or involving a Sanctioned Person, or in or involving any Sanctioned Jurisdiction or (ii) in any other manner that would constitute or cause a violation of Sanctions by any party hereto, including any Lender.

Section 3.21   Anti-Corruption Laws; Anti-Money Laundering Laws.   None of (x) Holdings, the Intermediate Holdings Guarantors, the Borrowers, their respective Subsidiaries or (y) after the Effective Date, any of their respective officers or directors or, to the knowledge of Holdings, the

61

Intermediate Holdings Guarantor or the Borrowers, employees, agents or controlled Affiliates (i) has taken any action, directly or indirectly, that would constitute or give rise to a violation of Anti-Corruption Laws or Anti-Money Laundering Laws or (ii) is subject to any legal action, proceeding, litigation or (to the knowledge of the Borrowers) investigation by a Governmental Authority with regard to any actual or alleged violation of Anti-Corruption Laws or Anti-Money Laundering Laws, in each case, that would be material to the business of Holdings and its Subsidiaries, taken as a whole. The Borrowers will not, directly or, to the knowledge of Holdings, the Intermediate Holdings Guarantors or the Borrowers, indirectly, use any part of the proceeds of the Loans in a manner that would constitute or cause a violation of Anti-Corruption Laws or Anti-Money Laundering Laws by any party hereto, including any Lender.

Section 3.22    Absence of Defaults.    None of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries are in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its material Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, would not reasonably be expected to have a Material Adverse Effect.

Section 3.23    Absence of Broker's or Finder's Fees.    No broker's or finder's fee or commission will be payable by or on behalf of Holdings, the Borrowers or their Subsidiaries with respect to the Transactions.

Section 3.24    Bankruptcy Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given.  Proper notice was also provided for (x) the motion seeking approval of the Loan Documents pursuant to the DIP Order and (y) the hearing for the approval of the DIP Order.

(b)    After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Loan Document Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 6.02 and (ii) prior and superior to any other Person or Lien pursuant to Section 364(d)(1) of the Bankruptcy Code, in each case, other than the Carve-Out and subject to the priorities set forth in the Interim Order or the Final Order, as applicable (with respect to specified property of the estate, with respect to which the Loan Document Obligation shall have a junior lien pursuant to Section 364(c)(3) of the Bankruptcy Code).

(c)    The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Administrative Agent and Required Lenders' consent (which consent of the Required Lenders may be communicated via an email from the Specified Lender Advisors).

(d)    A true and complete copy of the initial Approved Budget, as agreed to with the Required Lenders as of the Effective Date, is attached as Schedule 3.24 hereto (the "Initial Budget").

ARTICLE IVARTICLE IV

CONDITIONS

Section 4.01    Effective Date.  On or prior to the Effective Date, the following conditions to the Draw shall have been satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) shall have received from each Loan Party party thereto (i) a counterpart signed by such Loan Party or (ii) written evidence reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) which may include delivery of a signed signature page of the applicable agreement by electronic transmission (e.g., "pdf")) that such Loan Party has signed a counterpart of each Loan Document.

(b)    [Reserved].

(c)    The Administrative Agent shall have received a customary certificate of each Loan Party, dated the Effective Date, in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) with appropriate insertions, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in clauses (i) through (iv) of Section 4.01(d), below.

(d)    The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which such Loan Party is a party, (iii) resolutions of the board of directors and/or similar governing bodies of each Loan Party approving and authorizing the execution, delivery and performance of the Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect and that such resolutions or written consents have not been modified, rescinded or amended (other than as attached thereto), (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation and (v) customary UCC, tax, judgment and bankruptcy Lien searches with respect to each Loan Party, in each case, performed in the jurisdiction of organization of such Loan Party.

(e)    Prior to or substantially concurrently with the funding of the Loans hereunder, the Administrative Agent, the Lenders and the Fronting Lender shall have received (or will receive from the proceeds of the Loans) all fees payable hereunder or under any Loan Documents, including the Fee Letters, on or prior to the Effective Date and, to the extent invoiced at least one Business Day prior to the Effective Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including the reasonable and documented fees, charges, disbursements and expenses of the (i) Specified Lender Advisors, (ii) ArentFox Schiff LLP, as counsel to the Administrative Agent, (iii) Mandel, Katz & Brosnan LLP, as counsel to the Fronting Lender (subject to the terms of the Fronting Fee Letter) and (iv) such other advisors as are necessary and appropriate, subject to the consent of the Borrowers (not to be unreasonably withheld, conditioned or delayed)) shall be paid (or will be paid from the proceeds of the Loans), in each case to the extent required to be reimbursed or paid by the Loan Parties hereunder or under any other Loan Document on or prior to the Effective Date.

(f)    After giving effect to the Interim Order, the Collateral and Guarantee Requirement (other than in accordance with Section 5.14) shall have been satisfied and the Administrative Agent shall have received a completed Perfection Certificate dated the Effective Date and signed by a Responsible Officer of each Borrower, together with all attachments required thereby.

63

(g)      [Reserved].

(h)      The Administrative Agent and the Lenders shall have received the Audited Financial Statements and the Unaudited Financial Statements.

(i)      The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date; provided that, to the extent that any representation and warranty specifically refers to a given date or period, it shall be true and correct in all material respects as of such date or for such period; provided, however, that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(j)      All necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the Transactions shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Required Lenders (which may be communicated via a Direction of the Required Lenders)) and shall remain in effect and shall not have been vacated, reversed, amended, modified, repealed or stayed in any respect without the Required Lenders' consent (which consent of the Required Lenders may be communicated via a Direction of the Required Lenders); and the making of the loans under the DIP Facility shall not violate any material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

(k)      On the Effective Date and immediately after giving effect to the Draw, no Default or Event of Default shall have occurred and be continuing on such date.

(l)      Except for the Chapter 11 Cases, no event, circumstance or condition shall have occurred since December 31, 2022 that has had, or would reasonably be expected to have, a Material Adverse Effect.

(m)      To the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, no later than three Business Days in advance of the Effective Date, the Administrative Agent shall have received a Beneficial Ownership Certification in relation to such Loan Party to the extent reasonably requested by it at least five Business Days in advance of the Effective Date.

(n)      The Administrative Agent and the Lenders shall have received, at least three Business Days prior to the Effective Date, all documentation and other information about the Borrowers and the Guarantors as shall have been reasonably requested in writing at least five Business Days prior to the Effective Date by the Administrative Agent or the Lenders that they shall have reasonably determined is required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act.

(o)      The Administrative Agent shall have received a certificate executed by a Responsible Officer of the Borrowers certifying as to the satisfaction of the conditions referred to in paragraphs (i), (j), (k) and (l) of this Section 4.01.

(p)      The RSA shall be in full force and effect and shall not have been amended or modified in a fashion other than in accordance with the RSA and no Termination Event (as defined in the RSA) shall have occurred and be continuing under the RSA.

(q)      The Administrative Agent and the Lenders shall have received the Initial Budget.

(r)      The Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(s)      The Chapter 11 Cases shall have been commenced by Debtors and the same shall each be a debtor and a debtor in possession.  The Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  No trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases.

(t)      Other than (and subject to the entry of) the Interim Order, there shall not exist any law, regulation, ruling, judgment, order, injunction, or other restraint that prohibits, restricts, or imposes an adverse condition on the DIP Facility or the exercise by the Administrative Agent of its rights as a secured party on a material portion of the Collateral.

(u)      (i) The Bankruptcy Court shall have entered the Interim Order, no later than three Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Required Lenders (which satisfaction of the Required Lenders may be communicated via a Direction of the Required Lenders) (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (which consent of the Required Lenders may be communicated via a Direction of the Required Lenders, as applicable) (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent); (ii) counsel to the Required Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Required Lenders (which satisfaction may be communicated via a Direction of the Required Lenders), not later than a reasonable time in advance of the Petition Date for the Lenders' counsel to review and analyze the same; (iii) all motions, orders (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Required Lenders (which satisfaction may be communicated via a Direction of the Required Lenders); and (iv) all "first day" orders shall have been approved and entered by the Bankruptcy Court except as otherwise reasonably agreed by the Required Lenders (which agreement of the Required Lenders may be communicated via a Direction of the Required Lenders).

(v)      The Pre-Petition Administrative Agent and the Pre-Petition Lenders shall have each consented to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the Termination Date, each of Holdings, the Intermediate Holdings Guarantors and the Borrowers covenant and agrees with the Lenders that:

Section 5.01      Financial Statements and Other Information.      The Administrative Borrower will furnish to the Administrative Agent, on behalf of each Lender:

(a)      within 120 days after the end of each fiscal year of Holdings, the audited consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year, and the audited consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such fiscal year, and related notes thereto, setting forth in each case in comparative form the figures for (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all reported on by independent

public accountants of recognized national standing (without a "going concern" or like qualification or exception (other than qualifications with respect to, or expressly resulting solely from, impending debt maturities scheduled to occur within one year from the time such report and opinion are delivered) and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the consolidated financial condition as of the end of and for such year and consolidated results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP consistently applied, together with a customary "management discussion and analysis" provision;

(b)      within 45 days after the end of each fiscal quarter of Holdings (other than the fourth fiscal quarter of any fiscal year), the unaudited consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal quarter, and the unaudited consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for the then elapsed portion of such fiscal year, setting forth in each case in comparative form the figures for (or, in the case of the balance sheet, as of the end of) the corresponding period of the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the consolidated financial condition of Holdings and its Subsidiaries as of the end of such fiscal quarter and consolidated results of operations and cash flows of Holdings and its Subsidiaries for the then-elapsed portion of such fiscal year in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, together with a customary "management discussion and analysis" provision;

(c)      [reserved];

(d)      not later than five Business Days after delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer (a "<u>Compliance Certificate</u>") certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

(e)      [reserved];

(f)      not later than 90 days after the commencement of each fiscal year of Holdings, a detailed consolidated budget for Holdings and its Subsidiaries for such fiscal year (including a projected consolidated balance sheet and consolidated statements of projected income and cash flows as of the end of and for such fiscal year and setting forth the material assumptions used for purposes of preparing such budget);

(g)      promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and registration statements (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) filed by Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary with the SEC or with any national securities exchange;

(h)      promptly following any request therefor, such other information regarding the business, operations and financial condition of Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing; and

(i)      [reserved].

66

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 5.01 may be satisfied with respect to financial information of Holdings by furnishing the Form 10-K or 10-Q (or the equivalent), as applicable, of Holdings or any IPO Entity filed with the SEC; provided that to the extent such information is in lieu of information required to be provided under Section 5.01(a), such materials are accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception (other than as expressly permitted to be contained therein under paragraph (a) of this Section 5.01) or any qualification or exception as to the scope of such audit.

Documents required to be delivered pursuant to Section 5.01(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which each Borrower posts such documents, or provides a link thereto on each Borrower's website on the Internet at the website address listed on Schedule 9.01 (or otherwise notified pursuant to Section 9.01(e)); or (ii) on which such documents are posted on each Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that each Borrower shall notify the Administrative Agent (by telecopier or electronic mail) of the posting of any such documents and upon its reasonable request, provide to the Administrative Agent (acting at the Direction of the Required Lenders) by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Each Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of each Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks, Debt X, SyndTrak Online or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to each Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  Each Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of each Borrower's Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrowers or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Notwithstanding the foregoing, the Borrowers (i) acknowledge and agree that the financial information required to be delivered pursuant to Section 5.01(a), (b) and (d) shall be treated as if marked "PUBLIC" for purposes of this paragraph and (ii) shall be under no obligation to mark any other Borrower Materials "PUBLIC."  The Borrowers acknowledge and agree that the list of Disqualified Lenders does not constitute material non-public information.

Section 5.02    Notices of Material Events. Promptly after any Responsible Officer of the Administrative Borrower obtains actual knowledge thereof, the Administrative Borrower will furnish to the

Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)       the occurrence of any Default or Event of Default;

(b)       to the extent permissible by applicable law, the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity by or before any arbitrator or Governmental Authority against or affecting Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary of the receipt of a written notice of an Environmental Liability, in each case that would reasonably be expected to result in a Material Adverse Effect; and

(c)       the occurrence of any ERISA Event that would reasonably be expected to result in a Material Adverse Effect.

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of the Administrative Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03       Information Regarding Collateral.

(a)       The Administrative Borrower will furnish to the Administrative Agent prompt (and in any event within 30 days after the occurrence thereof or such longer period as reasonably agreed to by the Administrative Agent (acting at the Direction of the Required Lenders)) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number.

(b)       Not later than five Business Days after delivery of financial statements pursuant to Section 5.01(a) or (b), the Administrative Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of the Administrative Borrower (i) setting forth any material changes to the information required pursuant to the Perfection Certificate or confirming that there has been no material change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section 5.03 and (ii) identifying any Wholly Owned Subsidiary that has become, or ceased to be, an Excluded Subsidiary during the most recently ended fiscal quarter.

Section 5.04       Existence; Conduct of Business. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises and Material Intellectual Property, except to the extent (other than with respect to the preservation of the existence of Holdings and the Borrowers) that the failure to do so would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

Section 5.05       Payment of Taxes, Etc. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary to, pay its obligations and liabilities in respect of Taxes imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except to the extent (i) any such Taxes are being contested in good faith and by appropriate proceedings diligently conducted and for which adequate reserves have

been provided in accordance with GAAP or (ii) the failure to make payment would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

Section 5.06    Maintenance of Properties. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

Section 5.07    Insurance. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary to, maintain, with insurance companies that Holdings, the Intermediate Holdings Guarantors or the Borrowers, as applicable believes (in the good faith judgment of the management of Holdings, the Intermediate Holdings Guarantors or the Borrowers, as applicable) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which Holdings, the Intermediate Holdings Guarantors or the Borrowers believe (in the good faith judgment of management of Holdings, the Intermediate Holdings Guarantors or the Borrowers, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as Holdings, the Intermediate Holdings Guarantors or the Borrowers believe (in the good faith judgment or the management of Holdings, the Intermediate Holdings Guarantors or the Borrowers, as applicable) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Administrative Agent (acting at the Direction of the Required Lenders), information presented in reasonable detail as to the insurance so carried. Each such policy of insurance, to the extent maintained by the Loan Parties and covering Collateral, shall (i) name the Administrative Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause endorsement that names the Administrative Agent, on behalf of the Lenders as the loss payee thereunder.

Section 5.08    Books and Records; Inspection and Audit Rights. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are sufficient to prepare financial statements in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Intermediate Holdings Guarantors, the Borrower or any Subsidiary, as the case may be. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary that is a Loan Party to, permit any representatives designated by the Administrative Agent (at the request and on behalf of any Lender), during normal business hours and upon reasonable advance notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this Section 5.08 and the Administrative Agent shall not exercise such rights more often than once during any calendar year absent the existence of an Event of Default, at the Borrowers' expense; provided further that (a) when an Event of Default exists and is continuing, the Administrative Agent and any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent shall give Holdings, the Intermediate Holdings Guarantors and the Borrowers the opportunity to participate in any discussions with the independent public accountants of such Persons.

Section 5.09    Compliance with Laws. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary to (a) comply with all Requirements of Law (including Environmental Laws) and all rules, regulations and orders applicable to it, its property and operations, and (b) maintain in effect all governmental approvals or authorizations required to conduct its business, except in the case of each of clauses (a) and (b), except where the failure to do so would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

Section 5.10    Use of Proceeds. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Subsidiary to:

(a)    subject to the terms and conditions herein, use the proceeds of the Loans on or after the Effective Date, solely in accordance with the Approved Budget (subject to the Permitted Variance, the Non-Loan Party Debt Amount, and the Non-Loan Party Investment Amount), including to: (i) pay related transaction costs, fees and expenses (including attorney's fees required to be paid hereunder) with respect to the Facility, (ii) fund interest, fees, and other payments contemplated in respect of the Facility and (iii) to provide working capital and for other general corporate purposes of the Loan Parties and their Subsidiaries.

(b)    not use the proceeds of the Loans or any cash collateral in contravention of the provisions of the Loan Documents, the Approved Budget (subject to the Permitted Variance, the Non-Loan Party Debt Amount, and the Non-Loan Party Investment Amount), the Bankruptcy Code or any other applicable insolvency laws governing an ongoing insolvency proceeding with respect to such Loan Party, including any restrictions or limitations on the use of proceeds contained therein.

(c)    not, directly or indirectly, use any part of the proceeds of the Loans in violation of any Anti-Corruption Laws or Anti-Money Laundering Laws.

Section 5.11    Additional Subsidiaries. If (a) any additional (x) Intermediate Holding Company or (y) Subsidiary of any Borrower is formed or acquired after the Effective Date or (b) if any Subsidiary of any Borrower ceases to be an Excluded Subsidiary, the Administrative Borrower will notify the Administrative Agent thereof in accordance with Section 5.03(b) and will, within 30 days after such notice (or such longer period as the Administrative Agent shall agree (acting at the Direction of the Required Lenders)), (x) cause such Intermediate Holding Company or such Subsidiary (in each case, unless constituting an Excluded Subsidiary), as applicable, to satisfy the Collateral and Guarantee Requirement, (y) cause the Collateral and Guarantee Requirement to be satisfied with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party (in each case, unless constituting Excluded Assets) and (z) cause to be delivered to the Administrative Agent a completed Perfection Certificate with respect to such Subsidiary, together with all attachments contemplated thereby.

Section 5.12    Further Assurances. Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request and that is not inconsistent with any express provision of this Agreement or any other Loan Document, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties.

Section 5.13    [Reserved].

Section 5.14    Certain Post-Closing Obligations.

(a)      Following the Effective Date, each Foreign Subsidiary (other than an Excluded Subsidiary) that the Required Lenders, acting in their commercially reasonable discretion, shall request to become a Subsidiary Guarantor shall promptly deliver such documents and take such actions reasonably requested by the Required Lenders in connection with such designation; provided, that no Foreign Subsidiary shall be required to deliver any documents or take any such actions requested by the Required Lenders if (i) causing such Foreign Subsidiary to become a Subsidiary Guarantor would be prohibited or restricted by applicable law, rule, regulation or Contractual Obligations (including any requirement to obtain the consent of any Governmental Authority or third party pursuant to any such Contractual Obligation if obtaining such consent is not successful after the Borrowers' commercially reasonable efforts) in effect (in the case of any Contractual Obligation) on the Effective Date, or (ii) the cost, burden, difficulty or consequence of causing such Foreign Subsidiary to become a Subsidiary Guarantor (taking into account any adverse tax consequences to Holdings and its Affiliates (including the imposition of material withholding or other taxes)) is excessive in relation to the value afforded thereby as reasonably determined by the Borrowers and the Required Lenders.

(b)      No later than thirty (30) days after the Effective Date (or such later date as the Administrative Agent may agree (acting at the Direction of the Required Lenders) in its reasonable discretion), the Borrowers shall, and shall cause each of the other Loans Parties to, deliver to the Administrative Agent (i) certificates of insurance evidencing the existence of insurance to be maintained by Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries pursuant to Section 5.07 and, (ii) if applicable, the Administrative Agent shall have received endorsements designating the Administrative Agent as an additional insured and loss payee as its interest may appear thereunder, or solely as the additional insured, as the case may be, thereunder and provides that the insurer will give notice of cancellation to the Administrative Agent promptly (but in no event later than 10 days) following cancellation due to the failure to pay any premium or at least thirty (30) days' prior notice of cancellation for any other reason.

(c)      No later than ten (10) Business Days after the Effective Date (or such later date as the Administrative Agent may agree (acting at the Direction of the Required Lenders) in its reasonable discretion), the Borrowers shall cause each New Loan Party to deliver to the Administrative Agent customary UCC, tax, judgment and bankruptcy Lien search results with respect to such New Loan Party, in each case, performed in the jurisdiction of organization of such New Loan Party.

Section 5.15      <u>Ratings</u>. Holdings, the Intermediate Holdings Guarantors and the Borrowers shall use commercially reasonable efforts to obtain within 75 days after the Effective Date (or such longer period of time that the Required Lenders may agree in their sole discretion) and maintain (i) a public corporate credit rating (but not any particular rating) from S&P and a public corporate family rating (but not any particular rating) from Fitch, in each case in respect of Holdings and (ii) a public rating (but not any particular rating) in respect of the Loans made available under this Agreement from each of S&P and Fitch.

Section 5.16      <u>Lender Calls</u>. Annually at a time mutually agreed with the Administrative Agent that is promptly after the delivery of the information required pursuant to Section 5.01(a), participate in a conference call with Lenders to discuss the financial condition and results of operations of each Borrower and the Subsidiaries for the most recently-ended period for which such financial statements have been delivered.

Section 5.17      <u>Approved Budget</u>.

(a)      The Approved Budget shall set forth, on a weekly basis, among other things, Budgeted Receipts, Budgeted Disbursement Amounts and Budgeted Restructuring Related Amounts for

the 13-week period commencing with the week that includes the Effective Date and such Approved Budget shall be approved in writing by, and be in form and substance satisfactory to, the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached to this Agreement is approved by and satisfactory to the Required Lenders and is and shall be the Approved Budget unless and until replaced in accordance with terms of this Section) and disclosed in writing to the Administrative Agent and the Specified Lender Advisors.  The Approved Budget shall be updated, modified or supplemented by the Administrative Borrower every four weeks, commencing with the end of the fourth full week following the Effective Date, in writing transmitted to the Administrative Agent and the Lenders, and no such updated, modified or supplemented budget shall be effective if the Administrative Agent (at the Direction of the Required Lenders in their reasonable discretion) reasonably objects in writing within five Business Days of receipt and if no such written objection is received within five Business Days of receipt, the updated, modified or supplemented budget shall be deemed the newly approved Approved Budget; provided that in the event the Required Lenders, on the one hand, and the Borrowers, on the other hand, cannot agree as to an updated, modified or supplemented budget as a resolution to such a reasonable objection, such then current approved Approved Budget shall remain in effect unless and until a new Approved Budget is not objected to by the Administrative Agent (at the Direction of the Required Lenders in their sole discretion).  Each Approved Budget shall be prepared in good faith based upon assumptions believed by the Borrowers to be reasonable at the time of preparation.

(b)     For each Variance Testing Period, the Borrowers shall not permit (i) aggregate Actual Disbursement Amounts (excluding, for the avoidance of doubt, Actual Restructuring Related Amounts and intercompany transfers between Subsidiaries) to exceed the aggregate Budgeted Disbursement Amounts (excluding, for the avoidance of doubt, Budgeted Restructuring Related Amounts) or (ii) aggregate Actual Receipts to exceed the aggregate Budgeted Receipts (each calculated on an aggregate basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance for such Variance Testing Period.  Notwithstanding anything to the contrary set forth herein or otherwise, (i) the requirement to use the proceeds of the Loans in accordance with the Approved Budget (subject to the Permitted Variance, the Non-Loan Party Debt Amount, and the Non-Loan Party Investment Amount) shall not require compliance with the Approved Budget on a line-by-line basis but only on an aggregate disbursement basis as set forth in the first sentence of this Section 5.18(b) and (ii) the Budgeted Restructuring Related Amounts shall not restrict the ability of Holdings, the Intermediate Holdings Guarantors, the Borrowers and their Subsidiaries to incur such expenses or make disbursements in respect thereof.

(c)     The Borrowers shall deliver to the Administrative Agent and the Lenders on or before 5:00 p.m. (New York City time) on Friday following the end of each Variance Testing Period a Variance Test Report.

(d)     The Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget (subject to the Permitted Variance, the Non-Loan Party Debt Amount, and the Non-Loan Party Investment Amount) and (ii) shall have no duty to monitor such compliance.  The line items in the Approved Budget are estimates only (except as set forth in Section 5.18(b)), and the Loan Parties remain obligated to pay any and all amounts incurred regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document.

Section 5.18     Milestones.  Each of Holdings, the Intermediate Holdings Guarantors and the Borrowers will, and will cause each Loan Party and certain of their Affiliates acceptable to the Required

Lenders to, by the following dates (or such later date as the Required Lenders may agree in their sole discretion), do each of the following:

(a)    no later than 11:59 pm (New York City time) on May 21, 2024 (or such later date as the Administrative Agent shall agree (acting at the Direction of the Required Lenders), (i) enter into a restructuring support agreement in form and substance acceptable to the Required Lenders in their sole discretion, and (ii) commence solicitation of the Chapter 11 Plan.

(b)    no later than May 22, 2024, the Petition Date shall have occurred;

(c)    no later than the Petition Date, the Debtors shall have filed a Chapter 11 Plan and Disclosure Statement, in form and substance acceptable to the Consenting First Lien Lenders;

(d)    no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall enter, on an interim basis, the DIP Order;

(e)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall enter, on a final basis, the DIP Order;

(f)    no later than thirty-five (45) days after the Petition Date, the Bankruptcy Court shall enter the Disclosure Statement Order and Confirmation Order;

(g)    no later than fifty (50) days after the Petition Date, the Chapter 11 Plan effective date shall occur and the Restructuring Transactions shall be consummated.

ARTICLE VI

NEGATIVE COVENANTS

Until the Termination Date, each of Holdings and the Intermediate Holdings Guarantors (with respect to Sections 6.03(c), 6.03(d) and 6.12 only) and each Borrower covenants and agrees with the Lenders that:

Section 6.01    Indebtedness. Each Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness of the Borrowers and any of the Subsidiaries under the Loan Documents;

(ii)    (A) Indebtedness outstanding on the date hereof and, to the extent the principal amount in respect thereof exceeds $1.0 million, listed on Schedule 6.01;

(iii)    Guarantees by the Borrowers and the Subsidiaries in respect of Indebtedness of the Borrowers or any Subsidiary otherwise permitted hereunder; provided that such Guarantee is otherwise permitted by Section 6.04;

(iv)    Indebtedness of the Borrowers owing to any Subsidiary or of any Subsidiary owing to any other Subsidiary or the Borrowers, to the extent not prohibited by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Subsidiary that is not a Loan Party shall be subordinated to the Loan Document Obligations on terms (i) not materially less favorable, taken as a whole, to the Lenders as those set forth in the form of intercompany note attached as Exhibit

G or (ii) otherwise reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders);

(v)  Capital Lease Obligations and purchase money Indebtedness of the Borrowers or any Subsidiaries financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; provided that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with the applicable acquisition, construction, repair, replacement or improvement; provided, further, that, at the time of any such incurrence of Indebtedness and after giving pro forma effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (v) shall not exceed $2.5 million;

(vi)  Indebtedness in respect of Swap Agreements incurred (a) in the ordinary course of business, (b) consistent with past practices and (c) not for speculative purposes;

(vii) [reserved];

(viii)      [reserved];

(ix)  Indebtedness representing deferred compensation owed to employees of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries incurred in the ordinary course of business and consistent with past practices;

(x)  Indebtedness consisting of unsecured promissory notes issued by any Loan Party to current or former officers, directors and employees or their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Holdings (or any direct or indirect parent thereof) or any Intermediate Holdings Guarantor permitted by Section 6.07(a);

(xi)  [reserved];

(xii) [reserved];

(xiii)      Cash Management Obligations and other Indebtedness in respect of netting services, overdraft protections and similar arrangements, in each case, in connection with deposit accounts in the ordinary course of business and consistent with past practices;

(xiv)Indebtedness of the Borrowers and the Subsidiaries; provided that at the time of the incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xiv) shall not exceed $500,000; provided that the aggregate principal amount of such Indebtedness of which any obligor or guarantor is a Subsidiary that is not a Loan Party outstanding in reliance on this clause (xiv) shall not exceed, at the time of the incurrence thereof and after giving pro forma effect thereto, the Non-Loan Party Debt Amount;

(xv) Indebtedness consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and consistent with past practices;

(xvi)Indebtedness incurred by the Borrowers or any of the Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business and consistent with past practices, including in respect of workers

compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xvii)      obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrowers or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments related thereto, in each case in the ordinary course of business and consistent with past practices;

(xviii)      [reserved];

(xix)      [reserved];

(xx)      [reserved];

(xxi)      [reserved];

(xxii)      [reserved];

(xxiii)      [reserved];

(xxiv)      [reserved];

(xxv)      working capital facilities, overdraft facilities, cash-pooling arrangements and other local lines of credit of the Borrower and its Subsidiaries; provided that at the time of the incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xxv) shall not exceed $500,000; and

(xxvi)      [reserved];

(xxvii)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxvi) above.

Section 6.02    <u>Liens</u>. Each Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(i)   Liens created under the Loan Documents;

(ii)   Permitted Encumbrances;

(iii)   (A) Liens existing on the Effective Date and, to the extent securing obligations with a principal amount in excess of $1.0 million, set forth on Schedule 6.02 and (B) any modifications, replacements, renewals or extensions thereof; <u>provided</u> that (x) such modified, replacement, renewal or extension Lien does not extend to any additional property other than after-acquired property that is affixed or incorporated into the property covered by such Lien and proceeds and products thereof, and (y) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.01;

(iv) Liens securing Indebtedness permitted under Section 6.01(v); provided that (i) such Liens attach concurrently with the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness except for accessions to such property and the proceeds and the products thereof and (iii) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for accessions to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v) leases, non-exclusive licenses, subleases or sublicenses granted to others that do not (A) interfere in any material respect with the business of the Borrowers and the Subsidiaries, taken as a whole, or (B) secure any Indebtedness, in each case, in the ordinary course of business and consistent with past practices;

(vi) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii) Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or equivalent provisions of applicable law, in the case of any Foreign Subsidiary) on items in the course of collection and (B) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(viii)    Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition), or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix) Liens on property of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness of such Subsidiary or another Subsidiary that is not a Loan Party, in each case permitted under Section 6.01;

(x) Liens granted by a Subsidiary that is not a Loan Party in favor of any Loan Party, Liens granted by a Subsidiary that is not a Loan Party in favor of another Subsidiary that is not a Loan Party and Liens granted by a Loan Party in favor of any other Loan Party;

(xi) Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary, in each case after the Effective Date (other than Liens on the Equity Interests of any Person that becomes a Subsidiary); provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted

to apply to any property to which such requirement would not have applied but for such acquisition) and (C) the Indebtedness secured thereby is permitted under Section 6.01(xiv);

(xii)     any interest or title of a lessor under leases (other than leases constituting Capital Lease Obligations) entered into by any of the Borrowers or any Subsidiaries in the ordinary course of business and consistent with past practices;

(xiii)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods by any of the Borrowers or any Subsidiaries in the ordinary course of business and consistent with past practices;

(xiv)Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi )     Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers and the Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrowers or any Subsidiary in the ordinary course of business;

(xvii)     ground leases in respect of real property on which facilities owned or leased by the Borrowers or any of the Subsidiaries are located;

(xviii)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)     [reserved];

(xx)     [reserved];

(xxi)     Liens with respect to any letters of credit, bank guarantees, bankers' acceptances or similar instruments, in each case, in existence on the Effective Date, cash collateral to secure obligations thereunder in an amount not to exceed 105.0% of the face amount thereof;

(xxii)     Liens in connection with (A) Swap Agreements permitted under Section 6.01(vi) and (B) Indebtedness under Section 6.01(xxv);

(xxiii)     [reserved];

(xxiv)     with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by Requirements of Law; and

(xxv)     [reserved];

(xxvi)     [reserved]; and

(xxvii)       other Liens; provided that at the time of the granting of and after giving pro forma effect to any such Lien and the obligations secured thereby (including the use of proceeds thereof) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xxvii) shall not exceed $500,000; provided further that, Liens existing in reliance on this clause (xxvii) shall not (A) exist on property of any Subsidiary that is not a Loan Party or (B) secure Indebtedness of any Subsidiary that is not a Loan Party.

Section 6.03       Fundamental Changes.

(a)       The Borrowers will not, and will not permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that:

(i)       any Subsidiary may merge, consolidate or amalgamate with (A) a Borrower; provided that such Borrower shall be the continuing or surviving Person, or (B) in the case of any Subsidiary, any one or more other Subsidiaries; provided that when any Subsidiary Loan Party is merging, consolidating or amalgamating with another Subsidiary the continuing or surviving Person shall be a Subsidiary Loan Party or if the continuing or surviving Person is not a Subsidiary Loan Party, the acquisition of such Subsidiary Loan Party by such surviving Subsidiary is otherwise permitted under Section 6.04 (other than Section 6.04(c));

(ii)       any Subsidiary that is not a Loan Party may merge, consolidate or amalgamate with or into any other Subsidiary that is not a Loan Party;

(iii)       any Subsidiary may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any Borrower or another Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party, (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04 or (iii) to the extent constituting a Disposition to a Subsidiary that is not a Loan Party, such Disposition is for fair market value as determined by the Borrowers and the Administrative Agent (acting at the Direction of the Required Lenders) in good faith and any consideration received in respect thereof is a permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04;

(iv) any Borrower may merge, consolidate or amalgamate with any (x) any other Borrower; provided that when the Administrative Borrower is merging, consolidating or amalgamating with another Borrower, the continuing or surviving Person shall be the Administrative Borrower or (y) other Person; provided, in the case of this clause (y), that (A) such Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is not one of the Borrowers (any such Person, the "Successor Borrower"), the Successor Borrower shall be an entity organized or existing under the laws of the United States, any State thereof or the District of Columbia, the Successor Borrower shall expressly assume all the obligations of such Borrower under this Agreement and the other Loan Documents to which such Borrower is a party pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), each Loan Party other than such Borrower, unless it is the other party to such merger, consolidation or amalgamation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), that its Guarantee of, and grant of any Liens as security for, the Secured Obligations shall apply to the Successor Borrower's obligations under this Agreement and such Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer

78

and an opinion of counsel, each stating that such merger or consolidation complies with this Agreement; provided, further that (y) if such Person is not a Loan Party, no Default exists prior to and after giving effect to such merger or consolidation and (z) if the foregoing requirements are satisfied, the Successor Borrower will succeed to, and be substituted for, such Borrower under this Agreement and the other Loan Documents; provided further that such Borrower shall have delivered to the Administrative Agent any documentation and other information about the Successor Borrower as shall have been reasonably requested in writing by the Administrative Agent (acting at the Direction of the Required Lenders) or any Lender through the Administrative Agent that the Administrative Agent (acting at the Direction of the Required Lenders) or such Lender, as applicable, shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act (and the results thereof shall be reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) or such Lender, as applicable);

(v)    any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to Section 6.04; provided that the continuing or surviving Person shall be a Subsidiary, which together with each of the Subsidiaries, shall have complied with the requirements of Sections 5.11 and 5.12; and

any Subsidiary may effect a merger, dissolution, liquidation consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05 (other than Section 6.05(e)).

(b)    The Borrowers will not, and will not permit any Subsidiary to, engage to any material extent in any business other than businesses of the type conducted by the Borrowers and the Subsidiaries on the Effective Date and businesses activities which are extensions thereof or otherwise incidental, reasonably related or ancillary to any of the foregoing.

(c)    Neither Holdings nor any Intermediate Holdings Guarantor will conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests of, as applicable, the Borrowers, the Intermediate Holdings Guarantors or any other Subsidiary of Holdings or such Intermediate Holdings Guarantor that is an inactive Subsidiary, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance (provided that notwithstanding the foregoing, nothing in this Agreement shall prohibit any merger, consolidation or amalgamation of any Intermediate Holdings Guarantor with and into any other Intermediate Holdings Guarantor, Holdings or, subject to this Section 6.03, a Borrower), (iii) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings, the Intermediate Holdings Guarantors and the Borrowers, (iv) the performance of its obligations under and in connection with (x) the Loan Documents and (y) any documentation governing any Guarantee of any Indebtedness of the Borrowers or any Subsidiary permitted under Section 6.01, and, in the case of clauses (x) and (y), the other agreements contemplated hereby and thereby, (v) any public offering of its common stock or any other issuance or registration of its Equity Interests for sale or resale not prohibited by this Agreement, including the costs, fees and expenses related thereto, (vi) the payment of any dividend or other distribution not prohibited by Section 6.07, or any Investment permitted under Section 6.03(d), (vii) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, (viii) providing indemnification to officers and directors, (ix) activities incidental to the consummation of the Transactions, and (x) activities incidental to the businesses or activities described in clauses (i) through (ix) of this paragraph.

(d)      Neither Holdings nor any Intermediate Holdings Guarantor will own or acquire any material assets (other than Equity Interests as referred to in paragraph (c)(i) above, cash and Permitted Investments or intercompany Investments in the Loan Parties permitted hereunder or assignments of Loans that will be contributed to the Borrowers for cancellation) or incur any liabilities (other than liabilities as referred to in paragraph (c) above, liabilities imposed by law, including tax liabilities, and other liabilities incidental to its existence and business and activities permitted by this Agreement); provided that Holdings or any Intermediate Holdings Guarantor may consummate acquisitions that are promptly contributed to a Borrower. Without limiting the foregoing, neither Holdings nor any Intermediate Holdings Guarantor shall at any time own the Equity Interests of any subsidiary other than (i) as applicable, the Borrowers, the Intermediate Holdings Guarantors or any other Subsidiary of Holdings or such Intermediate Holdings Guarantor that is an inactive Subsidiary and (ii) in accordance with the proviso of the immediate preceding sentence of this paragraph (d).

Section 6.04      Investments, Loans, Advances, Guarantees and Acquisitions. The Borrowers will not, and will not permit any Subsidiary to, make or hold any Investment, except:

(a)      Permitted Investments;

(b)      loans or advances to officers, directors and employees of Holdings (or any direct or indirect parent thereof), the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries (a) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (b) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof) and (c) for purposes not described in the foregoing clauses (i) and (ii); provided that at the time of the relevant loan or advance and after giving Pro Forma Effect thereto, the aggregate principal amount of loans and advances outstanding in reliance on this clause (b) shall not exceed $500,000;

(c)      Investments (i) by any Borrower or any Subsidiary in any Borrower or any Subsidiary Loan Party (excluding any new Subsidiary that becomes a Subsidiary Loan Party pursuant to such Investment), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is also not a Loan Party, (iii) by any Borrower or any Subsidiary (A) in any Subsidiary; provided that the aggregate amount of such Investments made by Loan Parties after the Effective Date in Subsidiaries that are not Loan Parties outstanding in reliance on this clause (iii)(A) shall not exceed, at the time of such Investment and after giving pro forma effect thereto, the Non-Loan Party Investment Amount, (B) [reserved] or (C) constituting Guarantees of Indebtedness or other monetary obligations of Subsidiaries that are not Loan Parties owing to any Loan Party, (iv) [reserved] and (v) by the Borrowers or any Subsidiary in any Subsidiary that is not a Loan Party, consisting of the contribution of Equity Interests of any other Subsidiary that is not a Loan Party so long as, to the extent contributed by a Loan Party, the Equity Interests of the transferee Subsidiary are pledged to secure the Secured Obligations;

(d)      Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business and consistent with past practices;

(e)      Investments (d) existing on the Effective Date and set forth on Schedule 6.04(e) and any modification, replacement, renewal, reinvestment or extension thereof and (e) Investments existing on the Effective Date by the Borrowers or any Subsidiary in the Borrowers or any Subsidiary and any modification, renewal or extension thereof; provided that the amount of the original Investment is not increased except by the terms of such Investment to the extent set forth on Schedule 6.04(e) or as otherwise permitted by this Section 6.04;

(f)      Investments in Swap Agreements incurred in the ordinary course of business and consistent with past practices and not for speculative purposes;

(g)      [reserved];

(h)      [reserved];

(i)      [reserved];

(j)      Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(k)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)      [reserved];

(m)      [reserved];

(n)      advances of payroll payments to employees in the ordinary course of business;

(o)      [reserved];

(p)      Investments of a Subsidiary acquired after the Effective Date or of a Person merged or consolidated with any Subsidiary in accordance with this Section 6.04 and Section 6.03 after the Effective Date or that otherwise becomes a Subsidiary to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(q)      receivables (other than in respect of Indebtedness for borrowed money) owing to the Borrowers or any Subsidiary, if created or acquired in the ordinary course of business;

(r)      non-cash Investments in connection with tax planning and reorganization activities; provided that, in the reasonable judgment of the Administrative Agent (following consultation with the Borrowers and acting at the Direction of the Required Lenders), after giving effect to any such activities, the security interests of the Lenders in the Collateral, taken as a whole, would not be materially impaired;

(s)      Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business and consistent with past practices;

(t)      [reserved];

(u)      [reserved];

(v)      [reserved]; and

(w)      other Investments; provided that at the time of the relevant Investment and after giving pro forma effect thereto, the aggregate principal amount of Investments outstanding in reliance on

this clause (w) shall not exceed $250,000; provided further that the aggregate amount of consideration paid or provided by the Borrowers or any other Loan Party after the Effective Date in reliance on this Section 6.04(w) to any Subsidiary that is not a Loan Party and for any assets that shall not be Collateral, shall not exceed, at the time of such Investment and after giving pro forma effect thereto, the Non-Loan Party Investment Amount.

Section 6.05    Asset Sales. None of Holdings, Intermediate Holdings, Guarantors and the Borrowers will, and will not permit any Subsidiary to, (i) sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it or (ii) permit any Subsidiary to issue any additional Equity Interests in such Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to the Borrowers or a Subsidiary in compliance with Section 6.04(c)) (each, a "Disposition"), except:

(a)    Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and consistent with past practices and Dispositions of property no longer used or useful in the conduct of the business of the Borrowers and the Subsidiaries;

(b)    Dispositions of inventory and other assets in the ordinary course of business and consistent with past practices;

(c)    Dispositions of property to the extent that (a) such property is exchanged for fair market value credit against the purchase price of similar replacement property or (b) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property to the Borrowers or a Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then (c) the transferee must be a Loan Party, (d) to the extent constituting an Investment, such Investment must be a permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04 or (e) to the extent constituting a Disposition to a Subsidiary that is not a Loan Party, such Disposition is for fair market value (as determined by the Borrowers and the Administrative Agent (acting at the Direction of the Required Lenders)) in good faith and any consideration received in respect thereof is a permitted Investment in a Subsidiary that is not a Loan Party in accordance with Section 6.04;

(e)    Dispositions permitted by Section 6.03, Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.07 and Liens permitted by Section 6.02;

(f)    [reserved];

(g)    Dispositions of Permitted Investments;

(h)    Dispositions or forgiveness of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business;

(i)    leases, subleases, non-exclusive licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and consistent with past practices and that do not materially interfere with the business of the Borrowers and the Subsidiaries, taken as a whole;

(j)    transfers of property subject to Casualty Events upon receipt of the Net Proceeds of such Casualty Event provided that 100% of such proceeds are applied in accordance with Section 2.11;

(k)      Dispositions of property to Persons other than the Borrowers and the Subsidiaries (including the sale or issuance of Equity Interests of a Subsidiary) not otherwise permitted under this Section 6.05; provided that (i) no Event of Default shall exist at the time of, or would result from, such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Event of Default existed or would have resulted from such Disposition) and (ii) with respect to any Disposition pursuant to this clause (k) for a purchase price in excess of $1.0 million, the Borrowers or a Subsidiary shall receive not less than 100.0% of such consideration in the form of cash or Permitted Investments;

(l)      Dispositions of Investments in Joint Ventures, to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(m)      [reserved];

(n)      Dispositions of assets from Loan Parties to Subsidiaries that are not Loan Parties, not to exceed at the time of such swap or exchange or other Disposition and after giving pro forma effect thereto, the Non-Loan Party Investment Amount; provided that such Dispositions pursuant to this clause shall be for fair market value;

provided that any Disposition of any property pursuant to Section 6.05(k) shall be for no less than the fair market value of such property at the time of such Disposition (as determined by the Borrowers in good faith).

Section 6.06      Sale and Leaseback Transactions. The Borrowers will not, and will not permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

Section 6.07      Restricted Payments; Certain Payments of Indebtedness.

(a)      (a)      The Borrowers will not, and will not permit any Subsidiary to, declare or make, directly or indirectly, any Restricted Payment, except:

(i)      each Subsidiary may make Restricted Payments to the Borrowers or to any Wholly Owned Subsidiary;

(ii)      the Borrowers and each Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person; provided that in the case of any such Restricted Payment by a Subsidiary that is not a Wholly Owned Subsidiary of the Borrowers, such Restricted Payment is made to the Borrowers, any Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests;

(iii)      [reserved];

(iv)      [reserved];

(v)      [reserved];

(vi) the Borrowers and the Subsidiaries may make Restricted Payments in cash to Holdings and the Intermediate Holdings Guarantors:

(A)    the proceeds of which shall be used by Holdings or any direct or indirect equity owner of Holdings to pay Tax liabilities of Holdings or such direct or indirect equity owner to the relevant jurisdiction in respect of consolidated, combined, unitary or affiliated returns, if any, attributable to the income of the Borrower or the Subsidiaries; provided that the Restricted Payments made pursuant to this clause (a)(vi)(A) shall be reduced by the amount of the tax effect from any net operating loss attributable to the operations of the Borrowers and the Subsidiaries previously taken into account by Holdings or such direct or indirect owner during a taxable year after the date hereof taking into account any limitations on usage of such net operating losses (such as Section 382 of the Code or the limitations on using net operating losses under the alternative minimum tax); provided further that Restricted Payments made pursuant to this clause (a)(vi)(A) shall not exceed the Tax liability that the Borrowers and/or the Subsidiaries (as applicable) would have incurred were such Taxes determined as if such entity(ies) were a stand-alone taxpayer or a stand-alone group;

(B)    the proceeds of which shall be used by Holdings or any Intermediate Holdings Guarantor to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings to pay) (1) its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses payable to third parties) that are reasonable and customary and incurred in the ordinary course of business, in an aggregate amount not to exceed $500,000 in any calendar year plus any reasonable and customary indemnification claims made by directors or officers of Holdings (or any parent thereof) or any Intermediate Holdings Guarantor attributable to the ownership or operations of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries and (2) amounts permitted to be paid pursuant to Section 6.08(iv);

(C)    the proceeds of which shall be used by Holdings or any Intermediate Holdings Guarantor to pay franchise Taxes and other fees, Taxes and expenses required to maintain its corporate existence;

(D)    [reserved];

(E)    [reserved]; and

(F)    which are required to be made pursuant to the governing documents of Holdings or any Intermediate Holdings Guarantor in effect on the Effective Date;

(vii) to make AHYDO "catch up" payments in respect of any Indebtedness permitted to be incurred under this Agreement.

(b)    (b)    None of Holdings, the Intermediate Holdings Guarantors or the Borrowers will, nor will they permit any Subsidiary to, make, directly or indirectly, any prepayment, purchase or redemption (whether in cash, securities or other property) of or in respect of principal or any interest, fees or other amounts of any Junior Financing, including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of the principal of any Junior Financing that has a substantially similar effect to any of the foregoing (collectively, a "Repayment"), except:

(i)   payments of regularly scheduled interest, principal (including payments of principal at or within 30 days prior to maturity) and payments of fees (including amendment or consent fees), expenses, and indemnification obligations as and when due in respect of any Restricted Financing (other than payments with respect to Subordinated Indebtedness prohibited by the subordination provisions applicable thereto, if any);

(ii)   refinancings of Indebtedness to the extent permitted by Section 6.01;

(iii) (A) the conversion of any Restricted Financing to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parent companies and (B) payments and distributions consisting of Equity Interests, and the proceeds from the issuance of Equity Interests, of a Loan Party (or parent entity or Subsidiary thereof) and payments and distributions of cash and other property otherwise permitted hereby (including loans issued hereunder); and

(iv)   Repayments constituting AHYDO "catch up" payments in respect of Restricted Financings.

Section 6.08   <u>Transactions with Affiliates</u>. The Borrowers will not, and will not permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions among the Loan Parties and the Subsidiaries (or any entity that becomes a Subsidiary as a result of such transaction) to the extent permitted by this Agreement, (b) [reserved], (c) the Transactions and the payment of fees and expenses related to the Transactions, (d) [reserved], (e) issuances of Equity Interests of the Borrowers to the extent otherwise permitted by this Agreement, (f) employment and severance arrangements between the Borrowers and the Subsidiaries and their respective officers and employees in the ordinary course of business (including loans and advances pursuant to Sections 6.04(b) and 6.04(n), (g) payments by the Borrowers and the Subsidiaries pursuant to tax sharing agreements among Holdings (and any such parent thereof), the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Borrowers and the Subsidiaries, to the extent payments are permitted by Section 6.07, (h) the payment of and reasonable and documented out-of-pocket costs, fees and expenses to, and indemnities provided on behalf of, directors, officers and employees of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Borrowers and the Subsidiaries, (i) transactions pursuant to permitted agreements in existence on the Effective Date and set forth on Schedule 6.08, (j) Restricted Payments permitted under Section 6.07, (k) [reserved], (b) [reserved]; and (c) (A) Guarantees permitted by Section 6.01 or Section 6.04 and (B) Investments or Dispositions pursuant to Section 6.04(c) or 6.05(n)(z)(ii).

Section 6.09   <u>Restrictive Agreements</u>.  The Borrowers will not, and will not permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrowers or any Subsidiary Loan Party to create, incur or permit to exist any Lien upon any of its property or assets to secure the Secured Obligations or (b) the ability of any Subsidiary that is not a Loan Party to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrowers or any Subsidiary or to Guarantee Indebtedness of any Subsidiary; <u>provided</u> that the foregoing clauses (a) and (b) shall not apply to any such restrictions that (a)(x) exist on the Effective Date and (to the extent not otherwise permitted by this Section 6.09) are listed on Schedule 6.09 and (y) any renewal or extension of a restriction permitted by clause (i)(x) or any agreement evidencing such restriction so long as such renewal or extension does not expand the scope of such restrictions, (b)(x) are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such restrictions were not entered into solely in contemplation of such

Person becoming a Subsidiary and (y) any renewal or extension of a restriction permitted by clause (ii)(x) or any agreement evidencing such restriction so long as such renewal or extension does not expand the scope of such restrictions, (c) represent Indebtedness of a Subsidiary that is not a Loan Party that is permitted by Section 6.01, (d) are customary restrictions that arise in connection with any Disposition permitted by Section 6.05 applicable pending such Disposition solely to the assets subject to such Disposition, (e) are customary provisions in joint venture agreements and other similar agreements applicable to Joint Ventures permitted under Section 6.04, (f) are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 6.01 but solely to the extent any negative pledge relates to the property financed by or securing such Indebtedness (and excluding in any event any Indebtedness constituting any Subordinated Indebtedness), (g) are imposed by Requirements of Law, (h) are customary restrictions contained in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto, (i) comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 6.01(v) to the extent that such restrictions apply only to the property or assets securing such Indebtedness, (j) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary, (k) are customary provisions restricting assignment of any license, lease or other agreement, (l) are restrictions on cash (or Permitted Investments) or deposits imposed by customers under contracts entered into in the ordinary course of business (or otherwise constituting Permitted Encumbrances on such cash or Permitted Investments or deposits),(m) are customary net worth provisions contained in real property leases or licenses of Intellectual Property entered into by the Borrowers or any Subsidiary, so long as the Borrowers have determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their subsidiaries to meet their ongoing obligation and/or (xiv) comprise restrictions imposed by any agreement relating to Indebtedness permitted pursuant to Section 6.01 to the extent that such restrictions or encumbrances are, in the good faith judgment of the Borrowers, not materially more restrictive with respect to such encumbrances and other restrictions, taken as a whole, than the corresponding restrictions or encumbrances hereunder.

Section 6.10    Amendment of Junior Financing Documents and Organizational Documents.  The Borrowers will not, and will not permit any Subsidiary to, amend, modify, waive, terminate or release the documentation governing any other Junior Financing or Organizational Documents, in each case if the effect of such amendment, modification, waiver, termination or release is adverse to the Administrative Agent and the Lenders; provided that such modification will not be deemed to be adverse if such Junior Financing could be otherwise incurred under this Agreement (including as Indebtedness that does not constitute a Junior Financing) with such terms as so modified at the time of such modification.

Section 6.11    [Reserved].

Section 6.12    Changes in Fiscal Year.  Holdings will not make any change in fiscal year; provided, however, Holdings may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders, in which case, Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.13    Anti-Corruption Laws; Sanctions.  The Borrowers shall not and shall not permit any Subsidiary to, directly or, to the knowledge of the Borrowers, indirectly, (i) use any part of the proceeds of the Loans in violation of any applicable Anti-Corruption Law, (ii) use any part of the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Person, to fund or finance any business or activities of, with or involving a Sanctioned Person, or in or involving any Sanctioned

Jurisdiction, or (iii) use any part of the proceeds of the Loans in any other manner that would constitute or cause a violation of Sanctions by any party hereto, including any Lender.

Section 6.14     Material Property.  The Borrowers shall not and shall not permit any Subsidiary to (i) make any Investment, Restricted Payment, or Disposition of, other otherwise assign or transfer, any Material Property to a non-Loan Party, or (ii) permit any non-Loan Party to hold any Material Property.

ARTICLE VIIARTICLE VII

EVENTS OF DEFAULT

Section 7.01     Events of Default. If any of the following events (any such event, an "Event of Default") shall occur:

(a)     any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     any Loan Party shall fail to pay any interest on any Loan or any fee (including, for the avoidance of doubt, the Exit Fee) or any other amount (other than an amount referred to in paragraph (a) of this Section 7.01) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of Holdings, any Intermediate Holdings Guarantor, any Borrower or any of the Subsidiaries in any Loan Document  or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall be untrue or incorrect in any material respect when made or deemed made;

(d)     Holdings, any Intermediate Holdings Guarantor, any Borrower or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02, Section 5.04 Section 5.04(with respect to the existence of Holdings and the Borrowers), Sections 5.10, 5.14, 5.17, 5.18, 5.19 or in Article VI;

(e)     Holdings, the Intermediate Holdings Guarantors, the Borrowers or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement to be observed or performed by it contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section 7.01), and such failure shall continue unremedied for a period of 30 days;

(f)     Holdings, the Intermediate Holdings Guarantors, the Borrowers or any of the Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period) other than to the extent such payment is prohibited hereunder or with the prior written consent of the Required Lenders which may be communicated by means of a Direction of the Required Lenders; provided that this Section 8.01(f) shall not apply to any Material Indebtedness outstanding on the Petition Date unless such Material Indebtedness has been accelerated and the enforcement of remedies with respect to such Material Indebtedness shall not have been stayed by the commencement of the Chapter 11 Cases;

(g)     any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this paragraph (g) shall not apply to (a) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (b) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness (it being understood that paragraph (f) of this Section 7.01 will apply to any failure to make any payment required as a result of any such termination or similar event); provided further, that such failure is unremedied and is not validly waived by the holders of such Material Indebtedness in accordance with the terms of the documents governing such Material Indebtedness prior to any acceleration of the Loans pursuant to this Section 7.01; provided further that this Section 8.01(g) shall not apply to any Material Indebtedness outstanding on the Petition Date unless such Material Indebtedness has been accelerated and the enforcement of remedies with respect to such Material Indebtedness shall not have been stayed by the commencement of the Chapter 11 Cases;

(h)     [reserved];

(i)     [reserved];

(j)     one or more final, non-appealable, enforceable judgments for the payment of money in an aggregate amount in excess of $5.0 million (to the extent not covered by (i) insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage or (ii) an enforceable indemnity to the extent Holdings, any Intermediate Holdings Guarantor, any Borrower and any of the Subsidiaries shall have made a claim for indemnification and to which the applicable indemnifying party has not disputed or otherwise contested in writing such indemnification obligation) shall be rendered against Holdings, any Intermediate Holdings Guarantor, any Borrower and any of the Subsidiaries or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Subsidiaries, taken as a whole, to enforce any such judgment;

(k)     (i) an ERISA Event occurs, either alone or together with all other ERISA Events, that has resulted in liability of any Loan Party in an aggregate amount that would reasonably be expected to result in a Material Adverse Effect, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan that has resulted in liability to any Loan Party in an aggregate amount that would reasonably be expected to result in a Material Adverse Effect;

(l)     any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document, except (c) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents, (d) as a result of the Administrative Agent's failure to (i) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or (ii) file Uniform Commercial Code continuation statements, or (e) as a result of acts or omissions of the Administrative Agent or any Lender;

(m)     any provision of any Loan Document or any Guarantee of the Loan Document Obligations shall for any reason be asserted by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)     any Guarantees of the Loan Document Obligations by any Loan Party pursuant to the Guarantee Agreement shall cease to be in full force and effect (in each case, other than in accordance with the terms of the Loan Documents);

(o)     a Change in Control shall occur;

(p)     any Loan Document shall for any reason be asserted in writing by the Parent, any Borrower or any Subsidiary Loan Party not to be a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Security Document or the DIP Order and to extend to assets that constitute a material portion of the Collateral shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (perfected as or having the priority required by this Agreement or the relevant Security Document and subject to such limitations and restrictions as are set forth herein and therein) in the securities, assets or properties covered thereby, except to the extent that any such loss of perfection or priority results from the limitations of foreign laws, rules and regulations as they apply to pledges of Equity Interests in Foreign Subsidiaries or the application thereof, or from failure of the Collateral Agent to maintain possession of certificates actually delivered to it or to file Uniform Commercial Code continuation statements or take actions described in on Schedule 3.04 (or their equivalent in any applicable jurisdiction) (so long as such failure does not result from the breach or non-compliance with the Loan Documents by any Loan Party), or (iii) the Guarantee of Holdings, or a material portion of the Guarantees pursuant to the Loan Documents by the Intermediate Holdings Guarantors and the Subsidiary Loan Parties guaranteeing the Loan Document Obligations, shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by Holdings, any Intermediate Holdings Guarantor or any Subsidiary Loan Party not to be in effect or not to be legal, valid and binding obligations (other than in accordance with the terms thereof); provided, that no Event of Default shall occur under this Section 7.01(p) if the Loan Parties cooperate with the Collateral Agent to replace or perfect such security interest and Lien, such security interest and Lien is promptly replaced or perfected (as needed) and the rights, powers and privileges of the Secured Parties are not materially adversely affected by such replacement; or

(q)     The occurrence of any of the following in any of the Chapter 11 Cases, except to the extent consented to be the Required Lenders (which may be evidenced by a Direction of the Required Lenders) or if Lenders (or Related Funds thereof) seek or support any such action:

(1)     other than a motion in support of the DIP Order or actions in accordance with the RSA, the bringing of any motion, or the filing of any plan of reorganization or disclosure statement attendant thereto, by any of the Loan Parties or any Subsidiary in the Chapter 11 Cases (or the entry of an order of the Bankruptcy Court granting a motion) seeking: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens; (C) except as provided in the DIP Order, to use cash collateral of the Administrative Agent and the other Secured Parties or Pre-Petition Lenders or Pre-Petition Agent under Section 363(c) of the Bankruptcy Code or (D) to approve any other action or actions adverse to the Administrative Agent and Lenders' rights and remedies under the Loan Documents or the validity or perfection of their Liens on the Collateral;

(2)     other than in accordance with the RSA, (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to

89

such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement on or before the effective date of such plan or plans, (B) if any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement on or before the effective date of such plan or plans, (C) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (D) the expiration of any Loan Party's exclusive right to file a plan of reorganization;

(3)     the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that is not either (A) in accordance with the RSA or (B) otherwise acceptable to the Required Lenders in their reasonable discretion, other than to the extent that such plan of reorganization provides for the termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(4)     (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the DIP Order or the Cash Management Order (including any order in respect of the Required Milestones specified herein), (B) the filing by a Loan Party of a motion for reconsideration with respect to the DIP Order or (C) any Loan Party or any Subsidiary shall fail to comply with Section 5.17, the DIP Order or the Cash Management Order and such default shall continue unremedied for a period of 3 Business Days after notice thereof from the Administrative Agent to the Administrative Borrower;

(5)     [reserved];

(6)     [reserved];

(7)     the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties;

(8)     (A) the dismissal or conversion of any Chapter 11 Case or (B) any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(9)     any Loan Party shall file a motion (without consent of the Required Lenders) seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral of a value in excess of $5,000,000;

(10)     the entry of an order in the Chapter 11 Cases avoiding or requiring the disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement, the other Loan Documents or the RSA;

(11)     [reserved];

(12)     other than in respect of this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents, the DIP Order or the Cash Management Order, (A) the existence of any claims or charges, or the entry of any order of the Court authorizing any claims or charges entitled to superpriority administrative expense claim

status in any Chapter 11 Case pursuant to Section 364(c)(1), clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents or (B) there shall arise or be granted by the Bankruptcy Court any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted by the Loan Documents;

(13)    the DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal (other than through the entry of the Final Order), in each case so as to cause the DIP Order to cease to create a valid and perfected Lien on the Collateral (without further action other than the entry and terms of the DIP Order) to the extent it does so on the Effective Date;

(14)    an order in the Chapter 11 Cases shall be entered charging any of, or authorizing the recovery of any amount from, the Collateral under Section 506(c) of the Bankruptcy Code in an aggregate amount in excess of $5,000,000;

(15)    any order having been entered or granted (or requested, unless actively opposed by the Loan Parties) by either the Court or any other court of competent jurisdiction materially adversely impacting the rights of the Administrative Agent and the Lenders under the Loan Documents;

(16)    an order of the Court shall be entered denying or terminating use of cash collateral by the Loan Parties authorized by the DIP Order;

(17)    if the Final Order does not include a waiver, in form and substance reasonably satisfactory to the Required Lenders, of the right to surcharge, or recover any amount from, the Collateral under Section 506(c) of the Bankruptcy Code;

(18)    (A) any Loan Party shall challenge (or support or encourage a challenge of) the validity, enforceability, perfection or priority (as applicable) of (1) the Pre-Petition Loan Documents, (2) the Liens created pursuant to the foregoing, (3) the obligations thereunder, or (4) any payments made (I) to the Administrative Agent or any Lender with respect to the Obligations or (II) to the Pre-Petition Agent or the Pre-Petition Lenders with respect to the obligations under the Pre-Petition Loan Documents, or (B) the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Court approving) adequate protection to any pre-petition creditor in respect of Junior Liens on the Collateral that is inconsistent with the DIP Order;

(19)    [reserved];

(20)    if, unless otherwise approved by the Administrative Agent and the Required Lenders, an order of the Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed, vacated or stayed within 15 days;

(21)    any Loan Party or any Subsidiary thereof shall file any motion or other request with the Court seeking to modify or affect any of the rights of the Administrative Agent or the Lenders under the DIP Order or the Loan Documents;

(22)    (A) any Loan Party or any Subsidiary thereof shall take any action in support of any matter prohibited by this Section 7.01(q) or (B) any other Person file a motion before

91

the Bankruptcy Court seeking the entry of order in violation of this Section 7.01(q) and such motion is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(23)     the filing of a motion or the taking of any action in the Chapter 11 Cases by any Loan Party seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in the Chapter 11 Cases, precluding the Administrative Agent, the Collateral Agent or the Pre-Petition Administrative Agent from having the right to, or being permitted to, or precluding any holder of Prepetition First Lien Indebtedness from directing or instructing any of the foregoing parties to exercise the right to, "credit bid" in respect of applicable collateral;

(24)     [reserved];

(25)     [reserved];

(26)     the RSA shall have been terminated by (A) any Termination Event (as defined in the RSA); or (B) pursuant to section 14.05 or 14.06 thereof;

(27)     the valid commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against any Agent or any Lender or any Pre-Petition Agent or any Pre-Petition Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, and the continuation thereof without dismissal for forty-five (45) days after service thereof on either the Administrative Agent or such Lender or any Pre-Petition Agent or any Pre-Petition Lender, that asserts or seeks by or on behalf of a Loan Party, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would, other than as contemplated by the DIP Order or the Cash Management Order, (x) have the effect of invalidating, subordinating or challenging (I) any or all of the Obligations or Liens of the Agents or any Lender under the Loan Documents or (II) any material portion of the obligations under the Pre-Petition Loan Documents or Liens of the Pre-Petition Agents or the Pre-Petition Lenders under the Pre-Petition Loan Documents to any other claim, or (y) have a material adverse effect on the rights and remedies of any Agents or any Lender under any Loan Document or the Pre-Petition Agent or Pre-Petition Lenders under the Pre-Petition Loan Documents or the collectability of all or any portion of the Obligations under the Loan Documents or the obligations under the Pre-Petition Loan Documents;

(28)     any Debtor shall deny in writing that such Debtor has liability or obligation under this Agreement for the Obligations or seek to recover any monetary damages from any Agent, any Lender or any of the Pre-Petition Secured Parties in their capacity as such;

(29)     [reserved];

(30)     the Bankruptcy Court shall grant relief under any motion or other pleading filed by any Debtor that results in the occurrence of an Event of Default; provided that the Loan Parties hereby agree that the Administrative Agent shall be entitled to request an expedited hearing on any such motion and hereby consent to such expedited hearing (and the Administrative Agent is authorized to represent to the Bankruptcy Court that the Loan Parties have consented to such expedited hearing on the motion);

then, and in every such event (other than an event with respect to Holdings, any Intermediate Holdings Guarantor or any Borrower described in paragraph (h) or (i) of this Section 7.01), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to each Borrower, take either or both of the following actions, at the same or different times: (a) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (b) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees (including for the avoidance of doubt, an amount equal to the Exit Fee that would have been due and payable had such Loans been prepaid pursuant to Section 2.11), premium and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and in case of any event with respect to Holdings, any Intermediate Holdings Guarantor or any Borrower described in paragraph (h) or (i) of this Section 7.01, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees (including for the avoidance of doubt, an amount equal to the Exit Fee that would have been due and payable had such Loans been prepaid pursuant to Section 2.11), premium and other obligations of the Borrowers accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers.

ARTICLE VIII

ADMINISTRATIVE AGENT

Section 8.01    Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably appoints Wilmington Savings Fund Society, FSB to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article VIII are solely for the benefit of the Administrative Agent and the Lenders, and, other than in connection with the resignation of the Administrative Agent under Section 8.06, the Borrowers shall not have rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the Collateral Agent under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent (acting at the Direction of the Required Lenders), shall be entitled to the benefits of all provisions of this Article VIII and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the Collateral Agent under the Loan Documents) as if set forth in full herein with respect thereto.

Section 8.02    Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall,

93

unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 8.03    Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents and its duties hereunder and under the other Loan Documents shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law;

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.02 and in the last paragraph of Section 7.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and non-appealable judgment; provided that any action or inaction taken at the Direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.02 and in the last paragraph of Section 7.01) shall not be deemed gross negligence or willful misconduct of the Administrative Agent; provided further that the Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrowers or a Lender;

(e)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien or security interest purported to be created by the Security Documents or for any failure of any Loan Party or any other party to the Loan Documents to perform its obligations thereunder, (v) the value or the sufficiency of any

Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or the satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent;

(f)     shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which each Lender shall be solely responsible for), or the payment of taxes with respect to, any of the Collateral. The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as the Administrative Agent;

(g)     shall have no responsibility, duty or liability for monitoring or enforcing the list of Disqualified Lenders or for any assignment of any Loan or Commitment or for the sale of any participation, in either case, to a Disqualified Lender;

(h)     shall not be liable for interest on any money received by it. Money held by the Administrative Agent hereunder need not be segregated from other funds except to the extent required by law. The Administrative Agent shall not have any liability for interest on any money received by it hereunder except as otherwise agreed in writing; and

(i)     For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this Article VIII), phrases such as "satisfactory to the [Administrative Agent] [Collateral Agent]," "approved by the [Administrative Agent] [Collateral Agent]," "acceptable to the [Administrative Agent] [Collateral Agent]," "as determined by the [Administrative Agent] [Collateral Agent]," "in the [Administrative Agent] [Collateral Agent]'s discretion," "selected by the [Administrative Agent] [Collateral Agent]," "elected by the [Administrative Agent] [Collateral Agent]," "requested by the [Administrative Agent] [Collateral Agent]," and phrases of similar import that authorize and permit the [Administrative Agent] [Collateral Agent]to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the [Administrative Agent] [Collateral Agent] receiving written Direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

Section 8.04     <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in good faith in accordance with the advice of any such counsel, accountants or experts.

Section 8.05    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 8.06    Resignation of Administrative Agent.  The Administrative Agent may resign at any time upon 30 days' notice to the Lenders. Upon receipt of any such notice of resignation or upon such removal, the Required Lenders shall have the right, with the Borrowers' consent (such consent not to be unreasonably withheld, conditioned or delayed) (provided that no consent of the Borrowers shall be required if a Specified Event of Default has occurred and is continuing), to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent, which shall be an Approved Bank (or financial institution that acts as an administrative agent in the ordinary course of its business) with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Administrative Agent is replaced, the "Resignation Effective Date") in each case as consented to by the Borrowers (such consent not to be unreasonably withheld, conditioned or delayed) (provided that no consent of the Borrowers shall be required if a Specified Event of Default has occurred and is continuing). Whether or not a successor has been appointed, the resigning Administrative Agent's resignation shall become effective in accordance with its notice or resignation on the Resignation Effective Date.  With effect from the Resignation Effective Date (a) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents except (i) that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed and (ii) with respect to any outstanding payment obligations and (b) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders or the retiring Administrative Agent appoint a successor Administrative Agent as provided for above in this Section 8.06.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date, and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article VIII and Section 9.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent. No Disqualified Lender may be appointed Administrative Agent.

Section 8.07    Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.08     [Reserved]

Section 8.09     Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, amounts owing in respect all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 2.12 and Section 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 8.10     Section 8.10     No Waiver; Cumulative Remedies; Enforcement.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Article VII for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.18), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (a) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Article VII and (b) in addition to the matters set forth in clauses (c) and (d) of the preceding proviso and subject to Section 2.18, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Each of the Lenders hereby agrees that after the exercise of remedies provided for in Section 7.01 (or after the Loans have automatically become immediately due and payable as set forth in Section 7.01), any amounts received on account of the Secured Obligations shall be applied by the Administrative Agent first to the payment of all Secured Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent) payable to the Administrative Agent in its capacity as such and second as set forth herein or such other Loan Documents as applicable.

Section 8.11    Withholding Taxes.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  Without limiting or expanding the provisions of Section 2.17, each Lender shall, and does hereby, indemnify the Administrative Agent against, and shall make payable in respect thereof within 30 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph.  The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

Section 8.12    Right to Realize on Collateral and Enforce Guarantee.  Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrowers, the Administrative Agent, and each other Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by Administrative Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Loan Documents may be exercised solely

by the Administrative Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

Section 8.13    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto to, and (y) covenants, from the date such Person became a Lender party hereto until the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Agents, in their sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as

provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

      (i)  none of the Agents or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Agents under this Agreement, any Loan Document or any documents related to hereto or thereto),

      (ii)  the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

      (iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the obligations under this Agreement),

      (iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

      (v)  no fee or other compensation is being paid directly to any of the Agents or any of their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

      (c)     The Agents hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

      Section 8.14    <u>Erroneous Payments</u>

      (a)     If the Administrative Agent notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "Payment Recipient") that the

Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof) (provided that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a)(i) with respect to an Erroneous Payment unless such demand is made within five Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including such second Business Day until the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Lender, or any Person who has received funds on behalf of such Lender, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(1)     in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(2)     such Lender shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.14(b).

(c)     Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)    In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) of the relevant Tranche with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to a Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any promissory notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment in accordance with Section 9.04 and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement. In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)    The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from or on behalf of any Borrower or any other Loan Party (including from the proceeds of any Collateral) for the purpose of making such Erroneous Payment.

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations, agreements and waivers under this Section 8.14 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, and the termination of the Commitments.

ARTICLE IX

MISCELLANEOUS

Section 9.01     Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)     if to Holdings, the Intermediate Holdings Guarantors, the Borrowers or the Administrative Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)     if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrowers).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)     Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites); provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

(c)     Notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(d)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."     THE AGENT PARTIES DO NOT WARRANT THE ACCURACY OR

COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to Holdings, the Intermediate Holdings Guarantors, the Borrowers, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Holdings', the Intermediate Holdings Guarantors', the Borrowers' or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Intermediate Holdings Guarantors, the Borrowers, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)      Change of Address, Etc.  Each of Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto.  Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrowers and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (a) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (b) accurate wire instructions for such Lender.

(f)      Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrowers even if (c) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (d) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  Each Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers in the absence of gross negligence or willful misconduct of such Person as determined in a final and non-appealable judgment by a court of competent jurisdiction.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

Section 9.02      Waivers; Amendments.

(a)      No failure or delay by any of the Agents or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the

purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrowers, any Intermediate Holdings Guarantor or Holdings in any case shall entitle the Borrowers, any Intermediate Holdings Guarantor or Holdings to any other or further notice or demand in similar or other circumstances.

(b)        Neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Borrowers, in each case with the consent of the Required Lenders, <u>provided</u> that no such agreement shall (a) increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default, mandatory prepayment (or component definition used in the calculation thereof) or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (b) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees or premiums payable hereunder, without the written consent of each Lender directly and adversely affected thereby (it being understood that (x) a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default, mandatory prepayment (or component definition used in the calculation thereof) or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness of any such principal amount and (y) any change to the definition of any ratio used in the determination of any interest rate or fees or in the component definitions of any such ratio shall not constitute a reduction of interest or fees), <u>provided</u> that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay default interest pursuant to Section 2.13(c), (c) reduce or postpone the maturity of any Loan, or the date of any scheduled amortization payment of the principal amount of any Loan under Section 2.10 or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default, mandatory prepayment (or component definition used in the calculation thereof) or mandatory reduction of the Commitments shall not constitute an extension of any maturity date), (d) change Section 2.18(b), (c) or (d) or any other provision in the Loan Documents that would by its terms alter the pro rata sharing and/or application of payments or proceeds of Collateral required thereby or any other provision in the Loan Documents in a manner that would alter the pro rata sharing and/or application of payments or proceeds of Collateral required thereby, without the written consent of each Lender directly and adversely affected thereby, (e) change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby, (f) change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (g) release a material portion of the value of the Guarantees under the Guarantee Agreement (taking into account the value of the Borrowers) (except as expressly provided in the Guarantee Agreement) without the written consent of each Lender, (h) release a material portion the Collateral from the Liens of the Security Documents, without the written consent of each Lender (except as expressly provided in the Security Documents), (i) amend or modify the definition of "Excluded Subsidiary", (j) [reserved], (xi) permit the creation or existence of any Subsidiary that would be "unrestricted" or otherwise excluded from the requirements, taken as a whole, applicable to Subsidiaries pursuant to this Agreement without the written consent of each Lender affected thereby, (xii) amend or

modify the definition of "Material Property" or Section 6.14 without the written consent of each Lender directly and adversely affected thereby, (xiii) authorize additional indebtedness for the purpose of influencing voting thresholds without the written consent of each Lender directly and adversely affected thereby, (xiv) amend or modify the Loan Documents to allow for purchases of Loans (by dutch auction, open market purchase or through other assignments) by Holdings, any Intermediate Holdings Guarantor, any Borrower or any of their Subsidiaries or Affiliates without the written consent of each Lender directly and adversely affected thereby, (xv) amend or modify Section 9.15 or provide that Subsidiaries (other than Excluded Subsidiaries) that are not Wholly Owned Subsidiaries are not required to become Subsidiary Loan Parties without the written consent of each Lender directly and adversely affected thereby, or (xvi) subordinates all or any portion of the Facility to any other Indebtedness or subordinates all or any portion of the Liens securing the Facility to any other Lien securing any other Indebtedness without the written consent of Lenders having Loans representing more than 66.67% of the aggregate Dollar Amount of Loans (provided that, to the extent any Lender is providing such other Indebtedness, the opportunity to participate in such financing shall be offered to all other Lenders on a pro rata basis including all economics in connection therewith (other than a customary arrangement or similar fee), in each case, except in the case of (x) any Indebtedness that is expressly permitted by the Loan Documents as in effect on the Effective Date to be senior to the Loans and/or secured by a Lien that is senior to the Lien securing the Loans, (y) any "debtor-in-possession" facility or (z) any other Indebtedness exchanged for Loans so long as such Indebtedness is offered ratably to all Lenders; provided further that (i) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent without the prior written consent of the Administrative Agent, and (ii) subject to the preceding clause (A), any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by Holdings, the Intermediate Holdings Guarantors, the Borrowers and the Administrative Agent to cure any ambiguity, omission, mistake, error, defect or inconsistency so long as, in each case, the Lenders shall have received at least ten Business Days' prior written notice thereof and the Administrative Agent shall not have received, within ten Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders (which may be communicated via Direction of the Required Lenders) stating that the Required Lenders object to such amendment.

(c)    In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section 9.02 being referred to as a "Non-Consenting Lender"), then, the Borrowers may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (i) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, conditioned or delayed, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), and (c) unless waived, the Borrowers or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b) or (ii) terminate the Commitments and repay the Loans of such Lender; provided such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder.  In the event that a Non-Consenting Lender does not comply with the requirements of the immediately-preceding

sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs the Administrative Agent to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 9.04 on behalf of a Non-Consenting Lender and any such documentation so executed by the Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 9.04.

Section 9.03     Expenses; Indemnity; Damage Waiver.

(a)     The Borrowers shall pay, if the Effective Date occurs, (a) all reasonable and documented or invoiced out-of-pocket costs and expenses incurred by the Administrative Agent and its respective Affiliates (without duplication); provided that, only the reasonable fees, charges and disbursements of one primary counsel to the Administrative Agent and its respective Affiliates shall be paid by the Borrowers and to the extent reasonably determined by the Administrative Agent to be necessary, one local counsel in each applicable jurisdiction (exclusive of any reasonably necessary special counsel), in each case for the Administrative Agent in connection with the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof, including any and all recording and filing fees, costs and expenses incurred pursuant to any Security Document, (b) all reasonable and documented or invoiced out-of-pocket expenses incurred by the Required Lenders, provided that, only the reasonable fees, charges and disbursements of the Specified Lender Advisors and to the extent reasonably determined by the Required Lenders to be necessary one local counsel in each applicable jurisdiction or otherwise retained with the Borrower's consent (not to be unreasonably withheld, conditioned or delayed), in each case for the Required Lenders in connection with the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof, (c) all reasonable and documented or invoiced out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the fees, charges and disbursements of counsel for the Administrative Agent and its Affiliates, in connection with the enforcement or protection of any rights or remedies (i) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section or (ii) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to one lead counsel and such local counsel (exclusive of any reasonably necessary special counsel) as may reasonably be deemed necessary by the Administrative Agent in each relevant jurisdiction, and (iv) all reasonable and documented or invoiced out-of-pocket expenses incurred by the Lenders, including the fees, charges and disbursements of counsel for the Lenders (including, for the avoidance of doubt, the Specified Lender Advisors), in connection with the enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to the Specified Lender Advisors and such local counsel (exclusive of any reasonably necessary special counsel) as may reasonably be deemed necessary by the Required Lenders in each relevant jurisdiction and, in the case of an actual or reasonably perceived conflict of interest, one additional counsel per affected party.

(b)     Each Borrower shall indemnify the Administrative Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including reasonable and documented or invoiced out-of-pocket fees and expenses of a single counsel for all similarly situated Indemnitees, taken as a whole (in addition to one local counsel in each relevant jurisdiction and, in the event of an actual conflict of interest that arises, one additional counsel (plus one local counsel in each relevant jurisdiction) for the conflicted Indemnitees (taken as a whole) and excluding

any allocated costs of in-house legal counsel and any other third parties and consultants), incurred by or asserted against any Indemnitee by any third party or by Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary arising out of, in connection with, or as a result of (d) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (e) any Loan or the use of the proceeds therefrom, (f) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any property currently or formerly owned or operated by Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary, or any other Environmental Liability related in any way to Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary, or (g) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary or any of their respective equity holders or creditors or any other Person and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such obligations, losses, claims, damages, penalties, demands, actions, judgments, suits, liabilities, costs, expenses or disbursements (x) resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Parties as determined by a court of competent jurisdiction in a final and non-appealable judgment, (y) resulted from a material breach of the Loan Documents by such Indemnitee or its Related Parties as determined by a court of competent jurisdiction in a final and non-appealable judgment or (z) arise from disputes between or among Indemnitees that do not involve an act or omission by Holdings, the Intermediate Holdings Guarantors, the Borrowers or any Subsidiary (other than against any of the Administrative Agent in its capacity as such, unless such claims arise from the gross negligence, bad faith or willful misconduct of such Administrative Agent (as determined by a court of competent jurisdiction in a final and non-appealable judgment)).

(c)     To the extent that the Borrowers fail to indefeasibly pay any amount required to be paid by it to the Administrative Agent, (or any sub-agent thereof) or any Related Party thereof or any Lender under paragraph (a) or (b) of this Section 9.03, each Lender severally agrees to pay to the Administrative Agent (or any sub-agent thereof) or such Related Party of the Administrative Agent, such Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) (or if such indemnity payment is sought after the date on which the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than contingent amounts not yet due) under any Loan Document have been paid in full, in each case, in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any sub-agent thereof), such Lender in its capacity as such or against any Related Party of the Administrative Agent (or sub-agent thereof) acting for the Administrative Agent (or any sub-agent thereof) in connection with such capacity). For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full and the Commitments are terminated in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full and the Commitments are terminated). Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any source against any amount due to the Administrative Agent under this paragraph (c). The obligations of the Lenders under this paragraph (c) are subject to the last sentence of Section 2.02(a) (which shall apply *mutatis mutandis* to the Lenders' obligations under this paragraph (c)).

(d)     To the extent permitted by applicable law, (i) neither Holdings, any Intermediate Holdings Guarantor nor any Borrowers shall assert, and each hereby waives, any claim against any Indemnitee for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties and (ii) the Borrowers, each other Loan Party, the Administrative Agent, each Lender, each Indemnitee and any other party to this Agreement shall not be liable on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof and each such Person hereby waives, releases and agrees not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(e)     All amounts due under this Section 9.03 shall be payable not later than thirty (30) days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

(f)     This Section 9.03 shall not apply with respect to Taxes other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(g)     The agreements in this Section 9.03 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, the termination of this Agreement and the repayment, satisfaction or discharge of the Secured Obligations.

Section 9.04     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (a) the Borrowers may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void), (b) [reserved] and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), the Indemnitees and, to the extent expressly contemplated hereby, the Administrative Agent, each Lender and each Related Party of any of the foregoing Persons) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in paragraphs (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of (A) the Borrowers; provided that no consent of the Borrowers shall be required for an assignment (x) by a Lender to any Lender, an Affiliate of any Lender or an Approved Fund, (y) [reserved], or (z) if a Specified Event of Default has

occurred and is continuing, unless in each case such assignment is to a Disqualified Lender, and (B) the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund.  Notwithstanding anything in this Section 9.04 to the contrary, other than with respect to a purported assignment to a Disqualified Lender, if the Borrowers have not given the Administrative Agent written notice of its objection to an assignment within three (3) Business Days after written notice is received by the Borrowers from the Administrative Agent of such assignment, the Borrowers shall be deemed to have consented to such assignment.

(ii)   Assignments shall be subject to the following additional conditions: (i) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1.0 million (and integral multiples thereof), unless the Borrowers and the Administrative Agent otherwise consent (in each case, such consent not to be unreasonably withheld, conditioned or delayed); provided that no such consent of the Borrowers shall be required if a Specified Event of Default has occurred and is continuing, (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, (iii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption (which shall include a representation by the assignee and the assignor that the assignee is not a Disqualified Lender or an Affiliate of a Disqualified Lender) via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent and Assignment and Assumption, and, in each case, together (unless waived or reduced by the Administrative Agent) with a processing and recordation fee of $3,500, which processing and recordation fee will not apply in the case of any assignment to an Affiliate of the Administrative Agent; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided further that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective and (iv) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax forms to the extent required by Section 2.17(f) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrowers, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii)   Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Section 2.15, Section 2.16, Section 2.17 and Section 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid).  Any assignment or transfer by a Lender of rights or obligations

110

under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section 9.04; provided that any participation sold or otherwise transferred to a Disqualified Lender shall be subject to Section 9.04(i), below.

(iv)   The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amounts of (and interest amounts on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and Holdings, the Intermediate Holdings Guarantors, the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  The parties intend that all extensions of credit to the Borrowers and its Affiliates hereunder shall at all times be treated as being in registered form within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code (and any successor provisions) and the regulations thereunder and shall interpret the provisions herein regarding the Register consistent with such intent.

(v)   Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms to the extent required by Section 2.17(f) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)   The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)      (i)   Any Lender may, at any time, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person, that (i) is not an Eligible Assignee or (ii) is Holdings or any of its Subsidiaries) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (v) such Lender's obligations under this Agreement shall remain unchanged, (vi) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (vii) Holdings, the Intermediate Holdings Guarantors, the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents;

provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations of such Sections, including Section 2.17(f) (it being understood that the documentation requirement under Section 2.17(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 2.19 as if it were an assignee under paragraph (b) of this Section; and (B) if the Borrowers have not agreed to such participation in writing, shall not be entitled to receive any greater payment under Section 2.15 or Section 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with each Borrower to effectuate the provisions of Section 2.19 with respect to any Participant. To the extent permitted by law, each Participant shall also be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(d) as though it were a Lender.

(ii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of each Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts of (and related interest amounts on) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"), provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may, without the consent of the Borrowers or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    [Reserved].

(f)    [Reserved].

(g)    [Reserved].

(h)    [Reserved].

(i)    Any assignment or participation by a Lender without the Borrowers' consent to a Disqualified Lender shall not be void, but shall be subject to the following provisions:

(1)    If any assignment is made to any Disqualified Lender without the Borrowers' prior written consent, or if any Person becomes a Disqualified Lender after the Effective Date, the Borrowers may, upon notice to the applicable Disqualified Lender and the Administrative Agent, cancel any unfunded Commitment the subject thereof and (A) in the case of outstanding Loans held by Disqualified Lenders, prepay such Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Lender paid to acquire such Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder, less any costs and expenses incurred by Borrowers as a result of such assignment or participation, including any costs and expenses in connection with enforcing its rights hereunder (it being understood that, notwithstanding anything in the Loan Documents to the contrary, any such prepayment shall not be subject to any provisions requiring prepayments of the Loans on a pro rata basis and no other Loans shall be required to be repaid as a result of such prepayment) and/or (B) require such Disqualified Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this Section 9.04), all of its interest, rights and obligations under this Agreement and related Loan Documents to an Eligible Assignee that shall assume such obligations at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Lender paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder; it being agreed that any costs and expenses incurred by Borrowers as a result of such assignment or participation, including any costs and expenses in connection with enforcing its rights hereunder, shall be deducted from the purchase price paid to such Disqualified Lender and paid directly to Borrowers.

(2)    Notwithstanding anything to the contrary contained in this Agreement, Disqualified Lenders (A) will not (x) have the right to receive information, reports or other materials provided to Lenders by the Borrowers, the Administrative Agent or any other Lender, (y) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (z) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (B) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws ("Plan of Reorganization"), each Disqualified Lender party hereto hereby agrees (1) not to vote on such Plan of Reorganization, (2) if such Disqualified Lender does vote on such Plan of Reorganization notwithstanding the restriction in the foregoing clause (1), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan of Reorganization in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (3) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (2).

(3)    Notwithstanding anything to the contrary contained herein, no supplement to the list of Disqualified Lenders shall have retroactive effect with respect to any Person that holds any Loans and/or commitments or participations. Upon the request of any Lender, the Administrative Agent shall make available to such Lender the list of Disqualified Lenders; provided that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions relating to Disqualified Lenders. Without limiting the generality of the foregoing, the Administrative Agent shall not (x)

be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to, or the restrictions on any exercise of rights or remedies of, any Disqualified Lender.

(j)      No such assignment or participation shall be made to a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of natural Person. Any references to "natural person" in this Agreement shall be deemed to include any a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of natural Person.

Section 9.05      Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 2.15, Section 2.16, Section 2.17, Section 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and all other amounts payable hereunder, the expiration or termination the Commitments or the termination of this Agreement or any provision hereof.

Section 9.06      Counterparts; Integration; Effectiveness.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07      Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08      Right of Setoff.  If a Specified Event of Default shall have occurred and be continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) (excluding any deposits in or relating to any payroll, trust, or tax withholding accounts) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers against any of and all the obligations of the Borrowers then due and owing under this Agreement

held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness.  The applicable Lender shall notify each Borrower and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section.  The rights of each Lender and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender and its respective Affiliates may have.

Section 9.09     Governing Law; Jurisdiction; Consent to Service of Process.

(a)     This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

(b)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York sitting in New York County, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against Holdings, the Intermediate Holdings Guarantors or the Borrowers or their respective properties in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.09.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10     WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality.

(a)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' respective directors, officers, employees, members, employees, legal counsel, independent auditors and other experts or agents who need to know such information (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information, on a confidential and need-to-know basis, and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant Lender, as applicable), (a) pursuant to the order of any Governmental Authority or to the extent requested or required by any regulatory authority or self-regulatory authority or otherwise required by applicable law or by any subpoena or similar legal process in any pending legal, judicial or administrative proceeding (in each case based on the reasonable advice of legal counsel); provided that solely to the extent permitted by law and other than in connection with routine audits and reviews by regulatory and self-regulatory authorities, each Lender and the Administrative Agent shall notify each Borrower as promptly as practicable of any such requested or required disclosure in connection with any legal or regulatory proceeding prior to the disclosure of such Information; provided further that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by Holdings, the Intermediate Holdings Guarantors, the Borrowers or any of the Subsidiaries, (b) to any other party to this Agreement, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement (other than to a Disqualified Lender), (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement or derivative transaction relating to any Loan Party or its Subsidiaries and its obligations under the Loan Documents or (iii) any pledgee referred to in Section 9.04(d), (e) if required by any rating agency in connection with obtaining the ratings described in Section 5.15 hereof; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (f) to the extent such Information (x) becomes publicly available other than as a result of improper disclosure by the Administrative Agent or any applicable Lender in violation of any confidentiality obligations owing to Holdings, the Intermediate Holdings Guarantors, the Borrowers and its Subsidiaries or a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Intermediate Holdings Guarantors, the Borrowers or a third party that is not, to the knowledge of the Administrative Agent, any Lender or any of their respective Affiliates subject to contractual or fiduciary confidentially obligations owed to Holdings, the Intermediate Holdings Guarantors, the Borrowers or any of its Subsidiaries, (viii) to the extent the Borrowers shall have consented in writing to such disclosure or (viii) to the extent such disclosure is required for purposes of establishing a defense in any legal proceeding. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.  For the purposes hereof, "Information" means all information received from Holdings, the Intermediate Holdings Guarantors, the Borrowers or any of their Subsidiaries relating to Holdings, the Intermediate Holdings Guarantors, the Borrowers, any other Subsidiary or their business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by Holdings, the Intermediate Holdings

Guarantors, the Borrowers or any Subsidiary.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)     EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE INTERMEDIATE HOLDINGS GUARANTORS, THE BORROWERS, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)     ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWERS OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE INTERMEDIATE HOLDINGS GUARANTORS, THE BORROWERS, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWERS AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Section 9.13     PATRIOT Act.  Each Lender that is subject to the PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act.

Section 9.14     [Reserved].

Section 9.15     Release of Liens and Guarantees.

(a)     A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary; provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to Holdings, any Intermediate Holdings Guarantor, any Borrower or any Subsidiary Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral in accordance with Section 9.02(b), the security interest in such Collateral created by the Security Documents shall be automatically released.  Upon the release of any Subsidiary Loan Party from its Guarantee in compliance with this Agreement, the security interest in any Collateral

owned by such Subsidiary Loan Party created by the Security Documents shall be automatically released. Upon the Termination Date (regardless of whether any Secured Cash Management Obligations (as defined in the Collateral Agreement or Secured Swap Obligations (as defined in the Collateral Agreement) are then outstanding), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release and shall perform such other actions reasonably requested by such Loan Party to effect such release, including delivery of certificates, securities and instruments, so long as the Borrowers or applicable Loan Party shall have provided the Administrative Agent such certifications or documents as the Administrative Agent (acting at the Direction of the Required Lenders) shall reasonably request in order to demonstrate compliance with this Agreement.  Notwithstanding anything to the contrary, no Loan Party shall be automatically released from its Guarantee (and related Collateral security) solely by virtue of such Person becoming an Excluded Subsidiary, other than in each case, in connection with a transaction permitted under this Agreement that was done for a bona fide business purpose and not in contemplation of adversely affecting the Secured Parties' interests in the Guarantees and Collateral.

(b)        The Administrative Agent will, at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to subordinate the Administrative Agent's Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

(c)        Each of the Lenders irrevocably authorizes the Administrative Agent to provide any release or evidence of release, termination or subordination contemplated by this Section 9.15.  Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Document and this Section 9.15.

Section 9.16    [Reserved].

Section 9.17    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrowers, the Intermediate Holdings Guarantors and Holdings acknowledge and agree that (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrowers, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (ii) each of the Borrowers, the Intermediate Holdings Guarantors and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) each of the Borrowers, the Intermediate Holdings Guarantors and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrowers, Holdings, any of their respective Affiliates or any other Person and (ii) none of the Administrative Agent or the Lenders has any obligation to the Borrowers, the Intermediate Holdings Guarantors, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, the Intermediate Holdings Guarantors, Holdings and their respective Affiliates, and none of the Administrative Agent or the Lenders

118

has any obligation to disclose any of such interests to the Borrowers, the Intermediate Holdings Guarantors, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrowers, the Intermediate Holdings Guarantors and Holdings hereby waive and release any claims that it may have against the Administrative Agent or the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.18    <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "<u>Maximum Rate</u>"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 9.19    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[*Remainder of Page Intentionally Left Blank.*]

119

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWERS:**

RESEARCH NOW GROUP, LLC

By: _____
Name:  Steven Macri
Title: Chief Financial Officer

DYNATA, LLC

By: _____
Name:  Steven Macri
Title: Chief Financial Officer

*[DIP Credit Agreement]*

**HOLDINGS:**

NEW INSIGHT HOLDINGS, INC.

By: _____

Name:  Steven Macri

Title: Chief Financial Officer

**INTERMEDIATE HOLDINGS GUARANTORS:**

NEW INSIGHT INTERMEDIATE HOLDINGS, INC.
SSI/OPINIONOLOGY INTERCO LLC
SSI HOLDINGS, LLC
RESEARCH NOW, INC.
NEW INSIGHT INTERNATIONAL, INC.

By:_____

Name:  Steven Macri

Title: Chief Financial Officer

DYNATA HOLDINGS CORP.

By:_____

Name:  Steven Macri

Title: Treasurer

IPINION, INC.

By:_____

Name:  Steven Macri

Title: Vice President

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent


By: _____
    Name:
    Title:

JEFFERIES FINANCE LLC,
as a Lender


By: _____
    Name:
    Title:

**<u>EXHIBIT B</u>**

**Budget**

| Forecast Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
|---|---|---|---|---|---|---|---|---|
| Week Ending | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 | 7/5/2024 | Total |
| **Operating Receipts** | | | | | | | | |
| Cash Collections | $ 2,476.0 | $ 5,390.8 | $ 6,188.7 | $ 6,804.3 | $ 7,161.9 | $ 5,657.2 | $ 5,617.7 | $ 39,296.6 |
| Other | - | 250.0 | - | - | - | - | - | 250.0 |
| **Total Operating Receipts** | **2,476.0** | **5,640.8** | **6,188.7** | **6,804.3** | **7,161.9** | **5,657.2** | **5,617.7** | **39,546.6** |
| | | | | | | | | |
| **Operating Disbursements** | | | | | | | | |
| Employee (Payroll, Benefits, Taxes) | - | (4,062.5) | (200.0) | (4,062.5) | (200.0) | (4,062.5) | (200.0) | (12,787.5) |
| Rewards | - | (825.0) | (825.0) | (825.0) | (825.0) | (825.0) | (825.0) | (4,950.0) |
| Trade AP | - | (5,419.1) | (3,350.0) | (3,350.0) | (3,300.1) | (3,300.0) | (3,300.0) | (22,019.2) |
| Other Disbursements | - | - | (845.0) | (40.0) | (40.0) | - | (845.0) | (1,770.0) |
| Corporate Tax | - | (1.9) | (55.2) | (1.3) | - | (9.0) | - | (67.5) |
| **Total Operating Disbursements** | **-** | **(10,308.6)** | **(5,275.2)** | **(8,278.8)** | **(4,365.1)** | **(8,196.5)** | **(5,170.0)** | **(41,594.2)** |
| **Net Operating Cash Flow** | **2,476.0** | **(4,667.7)** | **913.5** | **(1,474.5)** | **2,796.8** | **(2,539.3)** | **447.7** | **(2,047.6)** |
| | | | | | | | | |
| **Non-Operating** | | | | | | | | |
| DIP Financing | (4,047.8) | (161.2) | - | - | - | (322.4) | (710.6) | (5,242.0) |
| Other Non-Operating | - | (517.1) | - | (239.7) | - | (426.7) | (90.4) | (1,273.9) |
| Intercompany | | | | | | | | |
| From EMEA | - | - | - | - | 5,085.0 | - | - | 5,085.0 |
| From APAC | - | - | - | - | 485.2 | - | - | 485.2 |
| To EMEA | - | (1,170.0) | - | - | (1,116.7) | (200.0) | - | (2,486.7) |
| To APAC | - | (876.8) | - | (450.0) | - | (1,194.0) | - | (2,520.8) |
| **Total Non-Operating** | **(4,047.8)** | **(2,725.1)** | **-** | **(689.7)** | **4,453.5** | **(2,143.1)** | **(801.0)** | **(5,953.2)** |
| | | | | | | | | |
| **RX & Professional Fees** | | | | | | | | |
| Professional Fees | (1,992.4) | - | - | - | - | (1,485.6) | (250.0) | (3,727.9) |
| Total RX & Professional Fees | (1,992.4) | - | - | - | - | (1,485.6) | (250.0) | (3,727.9) |
| **Net Cash Flow** | **(3,564.1)** | **(7,392.9)** | **913.5** | **(2,164.2)** | **7,250.2** | **(6,167.9)** | **(603.3)** | **(11,728.7)** |
| | | | | | | | | |
| Beginning Cash Balance | $ 4,451.3 | $ 32,387.2 | $ 24,994.4 | $ 25,907.9 | $ 23,743.7 | $ 30,993.9 | $ 24,826.0 | $ 4,451.3 |
| Net Cash Flow | (3,564.1) | (7,392.9) | 913.5 | (2,164.2) | 7,250.2 | (6,167.9) | (603.3) | (11,728.7) |
| DIP Draws (Paydown) | 31,500.0 | - | - | - | - | - | - | 31,500.0 |
| **Ending Cash Balance** | **$ 32,387.2** | **$ 24,994.4** | **$ 25,907.9** | **$ 23,743.7** | **$ 30,993.9** | **$ 24,826.0** | **$ 24,222.7** | **$ 24,222.7** |