IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DYNATA, LLC, *et al.*,[1] | Case No. 24-11057 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ETHAN KOPP IN SUPPORT OF DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED POSTPETITION FINANCING, (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Ethan Kopp, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am a Senior Vice President in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan"), an investment banking and financial advisory firm. I am based out of Houlihan's New York office, located at 245 Park Avenue, 20th Floor, New York, New York 10167. Houlihan is the proposed investment banker to the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). Houlihan and its senior

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Dynata, LLC (8807), New Insight Holdings, Inc. (1844), New Insight Intermediate Holdings, Inc. (6495), Dynata Holdings Corp. (0668), Research Now Group, LLC (7588), SSI/Opiniology Interco LLC (1855), iPinion, Inc. (9463), Research Now, Inc. (5523), SSI Holdings, LLC (6379), New Insight International, Inc. (0453), Imperium LLC (8375), inBrain, LLC (8031), Apps That Pay, LLC (9028), inBrain Holdings, LLC (9696), Branded Research, Inc. (9577), Screenlift.io, LLC, Research Now DE I, LLC (5528), Research Now DE II, LLC (5613), and Instantly, Inc. (6756). The Debtors' headquarters is located at 4 Research Drive, Suite 300, Shelton, CT 06484.

professionals have extensive experience with reorganizing and restructuring distressed companies, both out-of-court and in chapter 11 proceedings.

2. I submit this declaration (this "Declaration") in support of the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").[2]

3. Except as otherwise indicated, all statements in this declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by Houlihan employees working under my supervision, (iv) information provided to me by, or in discussions with, the members of the Debtors' management team or their other advisors, and (v) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the facts set forth herein. I am not being compensated specifically for this testimony other than through payments received by Houlihan as a professional proposed to be retained by the Debtors in these chapter 11 cases. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.

## BACKGROUND AND QUALIFICATIONS

4. Houlihan is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 2,500 professionals. Houlihan is a leader in providing investment banking and financial advisory services to debtors, unsecured and secured

---

[2] Capitalized terms used but not defined herein shall have the meaning given to them in the DIP Motion.

creditors, acquirers, and other parties in interest involved with financially troubled companies. Houlihan has been retained to provide investment banking and financial advisory services in some of the largest restructurings in the United States, including, *In re Cano Health, Inc.*, Case No. 24-10164 (Bankr. D. Del. Feb. 4, 2024); *In re MVK Farmco LLC,* Case No. 23-11721 (Bankr. D. Del. Oct. 13, 2023); *In re David's Bridal, LLC*, Case No. 23-13131 (Bankr. D.N.J. Apr. 17, 2023); *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (Bankr. S.D. Tex. Apr. 11, 2022); *In re Bristow Group Inc.,* Case No. 19-32713 (Bankr. S.D. Tex. May 11, 2019); *In re PHI, Inc.,* Case No. 19-30923 (Bankr. N.D. Tex. Mar 14, 2019); *In re Walter Investment Management Corporation*, Case No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Limited*, Case No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Electric Company LLC*, Case No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Roust Corporation*, Case No. 16-23786 (Bankr. S.D.N.Y. Dec. 30, 2016); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (Bankr. D. Del. Mar. 2, 2016); *In re Relativity Fashion, LLC* (a.k.a. Relativity Media), Case No. 15-11989 (Bankr. S.D.N.Y. Jul. 30, 2015); *In re RadioShack Corporation*, Case No. 15-10197 (Bankr. D. Del. Feb. 5, 2015); *In re Caesars Entertainment Operating Company, Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. Jan. 15, 2015); *In re Entegra Power Group LLC*, Case No. 14-11859 (Bankr. D. Del. Aug. 4, 2014); *In re Premier International Holdings Inc.* (a.k.a. Six Flags Theme Parks), Case No. 09-12019 (Bankr. D. Del. June 13, 2009); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (Bankr. D. Del. Jan. 22, 2008); *In re Conseco Inc.*, Case No. 02-49672 (Bankr. N.D. Ill. Dec. 17, 2002); *In re WorldCom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002); and *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

5. I have approximately eight (8) years of investment banking experience, entirely in Houlihan's financial restructuring group. Since joining Houlihan in 2016, I have provided investment banking expertise and financial advice relating to companies both in and out of chapter 11—including with respect to postpetition debtor-in-possession financing—to companies, lenders, and other parties-in-interest. A few of my most recent engagements in a chapter 11 on both the company and creditor-side include, among others, *In re Cano Health, Inc.*, Case No. 24-10164 (Bankr. D. Del. Feb. 4, 2024), *In re David's Bridal, LLC*, Case No. 23-13131 (Bankr. D.N.J. Apr. 17, 2023), *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (Bankr. S.D. Tex. Apr. 11, 2022), *In re Katerra, Inc.*, Case No. 21-31861 (Bankr. S.D. Tex. June 6, 2021), *In re New Cotai Holdings, LLC*, Case No. 19-22911 (Bankr. S.D.N.Y. May 1, 2019), *In re GulfMark Offshore, Inc.*, Case No. 17-11125 (Bankr. D. Del. May 17, 2017), *In re American Apparel, Inc.*, Case No. 15-12055 (Bankr. D. Del. Oct. 5, 2015).

6. Before Houlihan, I worked at RAIT Financial Trust as Vice President and Director of Tax for approximately four (4) years. Before working at RAIT Financial, I was a public accountant at Ernst & Young Global Limited for six (6) years. I hold a B.S. in accounting from the University of Richmond and an MBA from the Wharton School of the University of Pennsylvania. I am also a certified public accountant.

**THE DEBTORS' NEED FOR IMMEDIATE ACCESS TO THE DIP FACILITY AND CASH COLLATERAL**

7. Since Houlihan's engagement in December 2022, I, along with other members of the Houlihan team, have worked closely with the Debtors and their other professional advisors (the "Restructuring Advisors") to become knowledgeable about the Debtors' business, finances, operations and systems. Houlihan provided investment banking advisory services to the Debtors

in connection with their evaluation of strategic alternatives, including contingency planning in the event that a chapter 11 filing became necessary.

8. In the months leading up to the Petition Date, the Debtors faced numerous challenges. These included industry headwinds, rising competition, and the increased risk of an inability to satisfy certain requirements under the Debtors' prepetition loan facilities. The Debtors commenced negotiations with certain of the Debtors' prepetition secured lenders and were unable to secure a comprehensive out of court solution to address these challenges.

9. I understand that this process culminated in the execution of a restructuring support agreement ("Restructuring Support Agreement") with certain of the Debtors' prepetition secured lenders and sponsors pursuant to which the Debtors will, among other things, consummate the Plan that will provide for a partial equitization of approximately $1.3 billion of the Debtors' prepetition funded debt obligations, $81.5 million of new money financing (inclusive of the proposed DIP Facility) in the form of the First Out Converted Term Loans and First Out New Money Term Loans. Importantly, the Plan also provides that all trade, customer, employee, and other non-funded debt claims will be unimpaired and reinstated.

10. Pursuant to the Restructuring Support Agreement, the Debtors and advisors analyzed the Debtors' liquidity position, including the necessary pre-and-postpetition financing that would be required to operate the Debtors' business and fund the administrative costs of this chapter 11 process. As part of this analysis and the overall evaluation of the Debtors' liquidity position, Houlihan assisted in the development of the Debtors' 13-week cash flow forecast (the "DIP Budget"), which takes into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of a chapter 11 filing on the operations of the business, the fees and interest expense associated with

the DIP Facility and consensual use of Cash Collateral, restructuring costs (including professional fees), required operational payments, and the potential acceleration of demands on available liquidity.

11. Based on this analysis, the Debtors determined that they would need incremental liquidity to comfortably operate their businesses in the ordinary course postpetition and satisfy all administrative costs and expenses. More specifically, given the Debtors' liquidity needs, and in light of the size and scope of the Debtors' business, the Debtors require immediate access to proceeds under the DIP Facility and the use of Cash Collateral to, among other things, administer these Chapter 11 Cases to preserve the value of the Debtors' estates. Further, the Debtors believe that the DIP Facility and access to Cash Collateral will provide a strong, clear message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the filing of these Chapter 11 Cases will not impact the Debtors' business operationally.

12. Access to liquidity through the proposed DIP Facility will communicate that the Debtors are able to continue meeting the needs of their customers, provide compensation to their employees, and continue to manage their businesses as close to the ordinary course as possible. Furthermore, access to the proposed DIP Facility and Cash Collateral will provide the Debtors with sufficient funds to honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses as set forth in the DIP Budget, maintain ordinary course relationships with vendors, suppliers, and customers, and administer these Chapter 11 Cases, thereby enabling the Debtors to continue their efforts to preserve and maximize the value of their estates during these Chapter 11 Cases.

**THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING**

13. The Debtors and Houlihan conducted a debtor-in-possession financing marketing process designed to identify specific parties that might be interested in providing postpetition financing to the Debtors. Specifically, my team and I contacted multiple third-party financial institutions. However, based upon my experience and review of the Debtors' capital structure and financial records, any potential lenders that were to put forth a financing proposal would condition such proposal on a requirement to prime the existing secured parties. In my experience, any such attempt, even if actionable by the Debtors, would likely result in expensive and distracting litigation at the outset of these Chapter 11 Cases for which the Debtors lack the financing to support. Because the Debtors have limited unencumbered assets available to serve as security for a new financing facility, none of the parties contacted by Houlihan were willing to submit an offer on an unsecured or junior secured basis. The third-party financial institutions contacted also confirmed that they were not interested in providing a priming facility that would require engaging in expensive litigation with the Prepetition Secured Parties.

14. In connection with the Debtors' efforts to obtain debtor-in-possession financing, Houlihan assisted the Debtors in negotiating a new money senior-secured superpriority debtor-in-possession term loan credit facility from its First Lien Lenders (the "DIP Lenders"), the primary stakeholders with which the Debtors were negotiating the global restructuring contemplated by the Restructuring Support Agreement. The Debtors and their advisors engaged in various conversations and extensive arm's-length negotiations with the DIP Lenders to achieve the best possible terms for the DIP Facility and the consensual use of Cash Collateral. Following these arm's-length negotiations, the Debtors were able to secure the proposed $31.5 million DIP Facility.

I understand that the negotiations resulted in certain concessions made by the DIP Lenders, including, but not limited to reductions in the fees and interest rate on the DIP Facility.

15. Further, the DIP Financing from the DIP Lenders is fully consensual and does not have the execution risk associated with a new lender transaction, including timing and due diligence constrains, or litigation regarding priming. Accordingly, I believe the proposed consensual DIP Facility is the Debtors' only viable source of postpetition funding, and no other, better alternative is reasonably attainable at this time.

## THE DIP FACILITY PROPOSAL

16. The DIP Facility is a single draw term loan facility in an aggregate principal amount of up to $31.5 million. The Debtors will be able to draw the full amount upon entry of the Interim Order, which will be made available through a fronting bank. All First Lien Lenders will have the opportunity to participate in the financing after it has been fronted. I understand that the DIP Facility is an essential component of the Restructuring Support Agreement and the transactions contemplated thereunder. Absent the DIP Lenders' support of any debtor-in-possession financing, the DIP Lenders would not consent to the Debtors' use of Cash Collateral during these Chapter 11 Cases and the absence of their support could result in the termination the Restructuring Support Agreement. It is my understanding that, in tandem with the Restructuring Support Agreement, the DIP Facility provides a path to emergence from these Chapter 11 Cases that is of critical importance with respect to ensuring that customers and vendors are reassured of the viability of the Debtors' go-forward businesses, protecting ongoing operations, and maximizing the value of the Debtors' estates for the benefit of their creditors and all stakeholders.

17. In preparation for the commencement of these Chapter 11 Cases, my team and I, along with the Debtors' other advisors, negotiated the terms and provisions of the DIP Facility on

behalf of the Debtors. During that time, the parties exchanged term sheets and mark-ups of a draft Interim Order and draft DIP Credit Agreement. Over the course of these negotiations, the size and terms of the DIP Facility improved to the benefit of the Debtors. Importantly, participation in the DIP Facility will be available to all holders of First Lien Claims on a pro rata basis and will be backstopped by certain members of the First Lien Ad Hoc Group as set forth in the Restructuring Support Agreement. The DIP Facility provides for payment of interest at a rate of SOFR plus 8.75% per annum. In addition, the DIP Facility provides for payment of: (a) a non-refundable commitment fee equal to 3.5% of the aggregate principal amount of the DIP Commitment on the Closing Date in cash, (b) a non-refundable backstop fee equal to 9.0% of the aggregate principal amount of the DIP Loans payable in cash, and (c) upon the repayment or conversion of DIP Loans into First Out Term Loans, the in cash on a pro rata basis an exit fee equal to 2.00% of the aggregate amount of such DIP Loans being repaid or converted.

18. The fees and rates described above and as otherwise provided in the DIP Credit Agreement to be paid under the proposed DIP Facility were the subject of arm's-length and good faith negotiations between the Debtors and the DIP Lenders. I believe that the fees are comparable to fees agreed upon in similar debtor-in-possession financing arrangements, and are customary and reasonable under the circumstances. Additionally, I believe that the fees should not be viewed separately, but rather as part of the overall, substantial benefits provided under the DIP Facility. These fees were the subject of arm's-length and good faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for their extension of the postpetition financing.

19. The DIP Facility is also expressly linked to certain case milestones, which provide a foundation for the Debtors' anticipated chapter 11 process. These milestones were also required

by the DIP Lenders as a condition to providing the DIP Facility, and were a critical inducement for the DIP Lenders to provide the Debtors with the liquidity necessary to operate the Debtors' business and fund these Chapter 11 Cases. I believe that the milestones are within the range of market and provide adequate time to implement the Debtors' reorganization process through these cases.

20. Furthermore, the DIP Facility does not contain any roll-up feature or payment of postpetition interest as adequate protection to the prepetition secured lenders, which would have reduced the Debtors' liquidity (or, alternatively, required a larger DIP Facility).

21. As stated above, the DIP Facility provides the Debtors with access to $31.5 million in financing and contains several terms and conditions favorable to the Debtors, including that it:

(i) is being funded by a group of the Debtors' prepetition secured lenders who have a vested interest in the success of the Chapter 11 Cases;

(ii) contemplates a post-petition syndication period allowing all interested First Lien Lenders to fund their pro rata share of the DIP Facility instead of providing overall economics to only a small group of the Debtors' secured prepetition lenders;

(iii) is anticipated to provide sufficient liquidity for the Debtors to fund their operations and avoid business disruptions during the pendency of the Chapter 11 Cases;

(iv) avoids the prospect of a costly and value-destructive priming fight with the Debtors' senior lenders and/or a substantially more costly adequate protection package;

(v) provides for a mechanism for the DIP Lenders to convert their claims under the DIP Facility into First Out Converted Term Loans, and thus avoids the additional risks and costs of a marketing process to obtain exit financing and potential delays associated therewith or requirement to rapidly repay the DIP Financing in full in cash upon emergence; and

(vi) provides the Debtors with a clear path to emergence by providing the liquidity needed (together with the First Out New Money Term Loans) to implement the de-leveraging transactions contemplated under the Restructuring Support Agreement.

22. Further, I believe the economic terms of the DIP Facility are the best terms available particularly given (i) the trading price of the Debtors' prepetition debt, and (ii) that the Debtors' primary assets are its people and systems, rather than hard assets with durable value to lend against as collateral.

23. For these reasons, I believe that the benefits to the Debtors and their estates provided by the proposed DIP Financing significantly outweighs the fees incurred by the Debtors and are, taken as a whole, reasonable and appropriate under the circumstances of the Chapter 11 Cases.

**THE DIP FACILITY IS THE BEST POSTPETITION FINANCING ARRANGEMENT AVAILABLE TO THE DEBTORS AND SHOULD BE APPROVED**

24. Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the DIP Facility and the facts of this case, the DIP Facility is the best financing option available to the Debtors under the circumstances. Given the circumstances of the Debtors' unsuccessful solicitation of alternative financing proposals, I do not believe that alternative sources of financing are reasonably available. The DIP Lenders agreed to provide the DIP Facility to the Debtors on terms that I consider to be reasonable under the circumstances.

25. I also believe that the proposed DIP Facility provides sufficient and necessary liquidity to administer these Chapter 11 Cases. As of the Petition Date, the Debtors cash on hand, all of which constitutes the Cash Collateral of the DIP Lenders, will be insufficient to run the Debtors' operations and administer these Chapter 11 Cases. I do not believe it would be prudent,

or even possible, to administer these Chapter 11 Cases solely on a "cash collateral" basis. Moreover, I believe the DIP Facility is an essential component to funding the Debtors' operations and providing a path to emergence, and is critical to reassure the Debtors' vendors and business partners, as well as protect the Debtors' normal-course operations.

26. I understand that the DIP Facility is an essential component of the Debtors' Restructuring Support and the transactions contemplated thereunder, including but not limited to the First Out Term Loan Facility contemplated upon exit, and each of the proposed DIP Lenders signed the Restructuring Support Agreement in full support of the contemplated restructuring transactions. Absent the support of any DIP financing, the Prepetition Secured Parties would not consent to the Debtors' use of Cash Collateral during these Chapter 11 Cases and may even terminate the Restructuring Support Agreement. Further, the lack of DIP financing could jeopardize the terms of the Debtors' exit financing facilities which provides the Debtors with crucial runway for a strong emergence.

## **CONCLUSION**

27. In sum, it is my professional opinion that the terms of the DIP Facility are reasonable under the circumstances and were the product of good faith, arm's-length negotiations and that the DIP Facility will benefit all stakeholders in these Chapter 11 Cases. For the reasons set forth in this declaration, I submit that it would be appropriate for the Court to approve the DIP Facility and the use of Cash Collateral as contemplated by the DIP Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Remainder of page intentionally left blank.]*

- 13 -

Dated: May 22, 2024  
New York, New York

/s/ *Ethan Kopp*
Ethan Kopp
Senior Vice President
Houlihan Lokey Capital, Inc.

*Proposed Investment Banker to the Debtors and Debtors in Possession*