**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| DYNATA, LLC, *et al.*,[1] | Case No. 24-11057 (TMH) |
| Debtors. | (Joint Administration Requested) |

**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY
CODE WITH RESPECT TO JOINT PLAN OF REORGANIZATION
OF DYNATA, LLC AND ITS DEBTOR AFFILIATES**

Dated: May 21, 2024

**WILLKIE FARR & GALLAGHER LLP**
Jeffrey D. Pawlitz (*pro hac vice* pending)
Andrew S. Mordkoff (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
Amanda X. Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
jpawlitz@willkie.com
amordkoff@willkie.com
eryan@willkie.com
afang@willkie.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Rodney Square
1000 North King Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
emorton@ycst.com
mlunn@ycst.com

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Dynata, LLC (8807), New Insight Holdings, Inc. (1844), New Insight Intermediate Holdings, Inc. (6495), Dynata Holdings Corp. (0668), Research Now Group, LLC (7588), SSI/Opiniology Interco LLC (1855), iPinion, Inc. (9463), Research Now, Inc. (5523), SSI Holdings, LLC (6379), New Insight International, Inc. (0453), Imperium LLC (8375), inBrain, LLC (8031), Apps That Pay, LLC (9028), inBrain Holdings, LLC (9696), Branded Research, Inc. (9577), Screenlift.io, LLC, Research Now DE I, LLC (5528), Research Now DE II, LLC (5613), and Instantly, Inc. (6756).  The Debtors' headquarters is located at 4 Research Drive, Suite 300, Shelton, CT 06484.

This Disclosure Statement and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes accepting the Debtors' joint chapter 11 plan disclosed herein (as may be amended, the "Plan"). No representations have been authorized by the Bankruptcy Court concerning the Debtors, their business operations or the value of their assets, except as explicitly set forth in this Disclosure Statement.

This Disclosure Statement contains only a summary of the Plan. The Disclosure Statement is not intended to replace careful and detailed review and analysis of the Plan, but to aid and supplement such review. This Disclosure Statement is qualified in its entirety by reference to the more detailed provisions set forth in the Plan (which is included as **Exhibit A** to this Disclosure Statement). In the event of a conflict between the Plan and the Disclosure Statement, the provisions of the Plan will govern. All holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits annexed hereto, before deciding whether to vote to accept or reject the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, create any implication that the information contained herein is correct at any time after the date hereof.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure. Dissemination of this Disclosure Statement is controlled by Bankruptcy Rule 3017. This Disclosure Statement was prepared to provide parties in interest in these Chapter 11 Cases with "adequate information" (as defined in section 1125 of the Bankruptcy Code) so that those creditors who are entitled to vote with respect to the Plan can make an informed judgment regarding such vote on the Plan.

Holders of Claims and Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice. Each such holder should, therefore, consult with his or her own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan and the transactions contemplated thereby.

Information contained herein is subject to completion or amendment. The Debtors reserve the right to file an amended plan and related disclosure statement from time to time, subject to the terms of the Plan. This Disclosure Statement does not constitute an offer to sell, or the solicitation of an offer to buy, any securities.

The effectiveness of the Plan is subject to several conditions precedent. There is no assurance that these conditions will be satisfied or waived.

No person has been authorized by the Debtors in connection with the Plan or the solicitation to give any information or to make any representation other than as contained in this Disclosure Statement, the Plan and the Exhibits, Notices and Schedules attached to or incorporated by reference or referred to in this Disclosure Statement and/or the Plan, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

**Except where specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles.**

*[The rest of this page is intentionally left blank]*

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

    A.      Purpose of this Disclosure Statement ............................................. 1

II.     THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE ...... 4

    A.      General Background, Corporate History, and Key Products ......................... 4
    B.      Existing Capital Structure ................................................................. 5

III.    KEY EVENTS LEADING TO RESTRUCTURING ............................................ 6

    A.      Financial Performance and Liquidity Constraints ........................................ 6
    B.      Negotiations with Key Stakeholders ................................................. 7

IV.     SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT
    AGREEMENT .................................................................................................... 8

    A.      The Plan ............................................................................................ 8
    B.      Other Material Terms of the Restructuring Support Agreement ................... 9
    C.      Acceptance of the Plan ................................................................... 11
    D.      Management Incentive Plan ............................................................ 12
    E.      The Debtors' First-Day Motions and Certain Related Relief ...................... 12

V.      SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11
    CASES AND THE PLAN ................................................................................. 13

    A.      Voting on the Plan .......................................................................... 13
    B.      The Confirmation Hearing .............................................................. 14
    C.      Summary of Classification and Treatment Under the Plan ......................... 14

VI.     SECURITIES LAWS MATTERS .................................................................... 32

    A.      Issuance and Resale of the New Common Stock Under the Plan ............... 32

VII.    ALTERNATIVES TO CONSUMMATION OF THE PLAN ............................... 33

    A.      Liquidation Under the Bankruptcy Code ...................................... 33
    B.      Alternative Plan of Reorganization ............................................... 34
    C.      Inaction/Maintenance of Status Quo ............................................. 35

VIII.   RISK FACTORS .............................................................................................. 35

    A.      Risks Associated with the Debtors' Business ............................... 35
    B.      Certain Bankruptcy Considerations ............................................... 38
    C.      Risks Relating to Tax and Accounting Consequences of the Plan ............. 44
    D.      Other Risks ..................................................................................... 44

IX.     DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH
    THE PLAN ....................................................................................................... 46

    A.      New Common Stock. ...................................................................... 46
    B.      New Warrants ................................................................................. 46

X.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ........................... 47

XI.     IMPLEMENTATION OF THE PLAN ....................................................... 58

        A.      Plan Distributions and Transactions ........................................ 58
        B.      Continued Corporate Existence and Corporate Action ............................... 59
        C.      Effectuating Documents and Further Transactions ..................................... 60
        D.      First Out Exit Financing Facility ...................................................... 60
        E.      Second Out Take Back Term Loan Facility ..................................... 61
        F.      New ABL Facility. ...................................................................... 62
        G.      Cancellation of Certain Existing Agreements. ............................................. 62
        H.      Release of Liens, Claims and Interests. ....................................... 62
        I.      Directors of the Reorganized Debtors. ............................................. 63
        J.      Management Incentive Plan. ................................................. 63
        K.      General Distribution Mechanics. .......................................... 63
        L.      Allocation of Plan Distributions Between Principal and Interest ................ 64
        M.      Withholding Taxes ............................................................ 64
        N.      Exemption from Certain Transfer Taxes .................................. 64
        O.      Exemption from Securities Laws ........................................ 65
        P.      Setoffs and Recoupments ................................................. 66
        Q.      Solicitation of Debtors ...................................................... 66

XII.    EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND
        INTERESTS ................................................................................. 66

        A.      Discharge ......................................................................... 66
        B.      Vesting and Retention of Causes of Action .............................. 66
        C.      Release of Claims ............................................................. 67
        D.      Objections to Claims and Interests ....................................... 71

XIII.   EXECUTORY CONTRACTS UNDER THE PLAN ........................................... 72

        A.      Assumption of Executory Contracts and Unexpired Leases ....................... 72
        B.      Cure of Defaults for Assumed Executory Contracts or Unexpired Leases .. 72
        C.      Ipso Facto and Similar Provisions Ineffective ............................ 73
        D.      Compensation and Benefit Programs ..................................... 74
        E.      Severance Agreements and Compensation and Benefit Programs;
                Employment Agreements ................................................... 74
        F.      Insurance Policies .............................................................. 74
        G.      Survival of Certain Indemnification Obligations ......................... 75
        H.      Postpetition Contracts and Leases ........................................ 75

XIV.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
        OF THE PLAN ............................................................................... 75

        A.      Conditions to the Effective Date .......................................... 75
        B.      Waiver of Conditions Precedent ........................................... 77
        C.      Effect of Non-Occurrence of the Effective Date ......................... 77
        D.      Withdrawal of the Plan ....................................................... 77

XV.    CONFIRMATION OF THE PLAN ......................................................................... 77

    A.    Confirmation Generally.............................................................................. 77
    B.    Voting Procedures and Standards............................................................... 78
    C.    Acceptance ................................................................................................. 80
    D.    Confirmation and Consummation .............................................................. 81

XVI.    ADDITIONAL INFORMATION ......................................................................... 85

XVII.    CONCLUSION ...................................................................................................... 86

**INDEX OF EXHIBITS**

EXHIBIT A    Plan of Reorganization
EXHIBIT B    Liquidation Analysis
EXHIBIT C    Valuation
EXHIBIT D    Financial Projections
EXHIBIT E    Restructuring Support Agreement

# I.    INTRODUCTION

## A.    Purpose of this Disclosure Statement

On May 21, 2024, New Insight Holdings, Inc. ("Parent"), New Insight Intermediate Holdings, Inc., Dynata Holdings Corp, Instantly, Inc., Research Now Group, LLC, SSI/Opinionology Interco LLC, iPinion, Inc., Research Now, Inc., SSI Holdings, LLC, Dynata, LLC, New Insight International, Inc., Imperium LLC, inBrain Holdings, LLC, Branded Research, Inc., Research Now DE I, LLC, Research Now DE II, LLC, inBrain, LLC, Apps That Pay, LLC, and ScreenLift.io, LLC (collectively, the "Company" or the "Debtors"), beneficial owners holding more than 67% in the aggregate principal amount of the First Lien Term Loan Claims, beneficial owners holding more than 67% in the aggregate principal amount of the Revolving Credit Loan Claims, beneficial owners holding more than 67% in the aggregate principal amount of the Second Lien Term Loan Claims, and Court Square Capital Partners, Court Square Capital Partners III, L.P., Court Square Capital Partners III-A, L.P., Court Square Capital Partners (Offshore) III, L.P., Court Square Capital Partners (Executive) III, L.P. and HGGC Saber Topco LLC, HGGC, LLC, HGGC Fund II, L.P, HGGC Fund II-A, L.P., HGGC Fund II-B, L.P., HGGC Fund II-C, L.P., HGGC Fund II-D, L.P., HGGC Associates Fund II, L.P. and HGGG Affiliate Investors II, L.P. (the "Sponsors") entered into the Restructuring Support Agreement.

The Debtors jointly submit this *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to Joint Prepackaged Plan of Reorganization for Dynata, LLC and Its Debtor Affiliates* (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections from certain holders of Claims against the Debtors of the *Joint Prepackaged Plan of Reorganization for Dynata, LLC and Its Debtor Affiliates*, annexed hereto as Exhibit A (the "Plan").

Following the commencement of solicitation of votes of certain holders of Claims against the Debtors, the Debtors each intend to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Court") and shall file this Disclosure Statement and the Plan with the Court.

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Restructuring Support Agreement.

The Debtors urge all parties in interest to read this Disclosure Statement and the Plan carefully.  This Disclosure Statement does not include a description of each and every term of the Plan.  Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

This Disclosure Statement contains information regarding the history of the Debtors and their business and descriptions of the Plan and the Plan Supplement.  It is being provided to holders of First Lien Claims and Second Lien Term Loan Claims.

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders and to enhance the ongoing financial viability of the Debtors.

Generally, the Plan provides the following:

- Holders of DIP Facility Claims shall receive their *pro rata* share of the First Out Converted Term Loans. To the extent a Holder of an Allowed DIP Facility Claim does not elect to convert its DIP Facility Claim into First Out Converted Term Loans, such Holder shall have its DIP Facility Claim paid in full in Cash and any resulting deficit will be backstopped by the Exit Backstop Parties.

- Holders of First Lien Term Loan Claims shall receive their *pro rata* share, along with the Holders of the Revolving Credit Loan Claims, of (i) the option to fund their *pro rata* share of First Out New Money Term Loans; (ii) the Second Out Take Back Term Loans; (iii) 95% of New Common Stock, subject to (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of Revolving Credit Loan Claims opting to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount; and (iv) a cash payment of $11,669,935.04.

- Holders of Revolving Credit Loan Claims shall receive their *pro rata* share, along with the Holders of Allowed First Lien Term Loan Claims, of: (i) the option to fund their *pro rata* share of the First Out New Money Term Loans; (ii) the Second Out Take Back Term Loans; (iii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants; provided, however, a holder of an Allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount[2] in lieu of receiving the New Common Stock;[3] provided further, however, that as a result of any holder making the aforementioned election, the New Common Stock to be allocated to non-electing holders of Allowed Revolving Credit Loan Claims shall be increased accordingly; and (iv) a cash payment of $11,669,935.04.

---

[2]    For the avoidance of doubt, the *pro rata* share of the Incremental Second Out Take Back Term Loans shall be determined based on the aggregate amount of Revolving Credit Loan Claims held by those Revolving Credit Lenders opting to receive additional take back debt in lieu of the New Common Stock.

[3]    For the avoidance of doubt, the New Common Stock that otherwise would have been distributed holders of Revolving Credit Loan Claims who opt instead to receive Incremental Second Out Take Back Term Loans, shall be distributed pro-rata among the other holders of First Lien Claims.

- Holders of Second Lien Term Loan Claims shall directly or through a designee receive their *pro rata* share of (i) 5% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery, (ii) the New Warrants Recovery, and (iii) a cash payment of $750,000.

- Payment in full of all Allowed General Unsecured Claims;

- Payment in full of all Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims, U.S. Trustee Fees, Other Secured Claims, and Other Priority Claims;

- Payment in full of, or no recovery to, Intercompany Claims or Intercompany Interests; and

- No recovery to the Holders of Section 510(b) Claims or Existing Equity Interests.

**PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, THE CONSENTING FIRST LIEN LENDERS, REPRESENTING (1) OVER 67% OF FIRST LIEN TERM LOAN CLAIMS AND (2) OVER 67% OF THE REVOLVING CREDIT LOAN CLAIMS, THE CONSENTING SECOND LIEN TERM LOAN LENDERS, REPRESENTING MORE THAN 67% OF SECOND LIEN TERM LOAN CLAIMS, AND THE SPONSORS HAVE ALREADY AGREED TO CONSENT TO THE PLAN.**

Additional copies of this Disclosure Statement (including its Exhibits) are available upon request made to the office of the Debtors' counsel:

      Willkie Farr & Gallagher LLP
      787 Seventh Avenue
      New York, New York 10019
      Attention:     Jeffrey D. Pawlitz
                  Andrew S. Mordkoff
                  Erin C. Ryan
      E-mail address:  jpawlitz@willkie.com
                       amordkoff@willkie.com
                       eryan@willkie.com

      If you have any questions concerning the procedures for voting on the Plan (including the Plan), please contact the Voting Agent at:

Dynata, LLC
c/o Kroll Restructuring Administration LLC
850 Third Avenue
Suite 412
Brooklyn, New York 11232
Telephone:    877-635-8928 (domestic) or
              929-203-3305 (international)

## II.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE[4]

### A.    General Background, Corporate History, and Key Products

The Debtors were founded in 1997 under the name Survey Sampling International ("SSI") and primarily focused on mail surveys, phone surveys, and face-to-face interviews.  In 1999, another historical arm of the Debtors, E-Rewards, was founded.  In the following years, SSI and E-Rewards purchased other similar companies and underwent various mergers.  In 2014, E-Rewards was renamed to Research Now, and then in 2017, SSI merged with Research Now.  Finally, in 2019, SSI and Research Now rebranded to become Dynata, LLC ("Dynata").

The Debtors continued to acquire a number of companies in the following years, including: the 2019 acquisition of Reimagine Holdings Group for its survey automation solutions, visualization tools and fraud prevention methodologies, amongst others, the 2020 acquisition of Sharpr to integrate its artificial intelligence content syndication technology, the 2020 acquisition of CrowdLab for its innovative digital ethnography solutions, the 2021 acquisition of inBrain.ai for its mobile consumer engagement and survey platform, the 2021 acquisition of Ameritest for its advertising solution offerings, the 2021 acquisition of Optimus Analytics for its machine learning technology, and the 2022 acquisition of Branded Research Inc. for its panel communities that generate nearly 15 million high-quality completed surveys annually.  These acquisitions greatly expanded and enhanced the Debtors' operations.  Today, Dynata services its clients with a database of information on a global scale throughout the United States, Latin America, Europe, Asia, and Australia.  The Debtors maintain their headquarters in Shelton, Connecticut.

The Debtors have built a large network of panelists through which they derive insights with great breadth and depth.  Each panelist begins as an individual who has joined a Dynata-owned online panel.  Panelists are asked a series of demographic and related questions when they are onboarded to a panel in order to determine what surveys would be appropriate to offer them.  The Debtors are able to map out additional data points for panelists as they take more and more surveys on behalf of Dynata customers.  Panelists are motivated to participate in more surveys through panel or loyalty program incentives such as airline miles in exchange for completed survey.  The more surveys completed over time from a panelist, the more valuable that panelist becomes as a provider of first-party data.  For example, a panelist that has done surveys

---

[4]    The term "Company" used in this Section II. means New Insight Holdings, Inc. and all of its subsidiaries.

monthly for three years can provide richer more layered data insights than a panelist that has only done one survey per year.

Clients engage with the Debtors by purchasing access to the Debtors' database of panelists.  Clients can reach out to the Debtors' salespeople with specific inquiries—for example, a client may want to survey 100 male left-handed golfers in Arizona to understand how this demographic will react to a specific product launch.  The clients can provide the Debtors with the exact survey they want to disseminate, or the Debtors can assist with writing or curating the survey.  The Debtors can then reach out to the applicable demographic of panelists and create a report of results for the client.

## B.    Existing Capital Structure

### 1.    Existing First Lien Credit Facility

On December 20, 2017, Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), as borrowers, New Insight Holdings, Inc., as parent, New Insight Intermediate Holdings, Inc., SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp., and iPinion, Inc., as guarantors, the First Lien Lenders party thereto from time to time, and Goldman Sachs Bank USA, as administrative agent, entered into the Existing First Lien Credit Agreement.

#### (a)    First Lien Revolving Credit Loan

The Debtors entered into various security and collateral documents in favor of the First Lien Agent (for the benefit of the Revolving Credit Lenders) and various security and collateral documents, pursuant to which the First Lien Lenders were granted first priority liens on substantially all of the Debtors' assets (the "First Lien Collateral").  The maturity date of the First Lien Revolving Credit Loan is June 14, 2024.   As of the date hereof, approximately $96,899,999.99 of principal remains outstanding under the First Lien Revolving Credit Loan, plus all accrued and outstanding interest (including interest paid in kind, accrued but unpaid interest payable in cash and interest at the default rate, each as applicable), fees, reimbursements, expenses and all other obligations outstanding under the First Lien Revolving Credit Loan documents as of the date hereof.

#### (b)    First Lien Term Loan

The Debtors also entered into various security and collateral documents in favor of the First Lien Agent (for the benefit of the First Lien Term Loan Lenders) and various security and collateral documents, pursuant to which the First Lien Term Loan Lenders were granted first priority liens on the First Lien Collateral.   The maturity date of the First Lien Term Loan is December 20, 2024.   As of the date hereof, approximately $920,767,206.45 of principal remains outstanding under the First Lien Term Loan, plus all accrued and outstanding interest (including interest paid in kind, accrued but unpaid interest payable in cash and interest at the default rate, each

as applicable), fees, reimbursements, expenses and all other obligations outstanding under the First Lien Term Loan documents as of the Petition Date.

## 2.   Existing Second Lien Credit Agreement

On December 20, 2017, Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), as borrowers, New Insight Holdings, Inc., as parent, New Insight Intermediate Holdings, Inc., SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp., and iPinion, Inc., as guarantors, the Second Lien Term Loan Lenders party thereto from time to time, and Goldman Sachs Bank USA, as administrative agent (the "Second Lien Agent"), entered into the Existing Second Lien Credit Agreement.

The Debtors entered into various security and collateral documents in favor of the Second Lien Agent (for the benefit of the Second Lien Term Loan Lenders) and various security and collateral documents, pursuant to which the Second Lien Term Loan Lenders were granted second priority liens on substantially all of the Debtors' assets (the "Second Lien Collateral"). The maturity date of the Second Lien Term Loan is December 20, 2025.  As of the Petition Date, approximately $250,000,000.00 million of principal remains outstanding under the Second Lien Term Loan, plus all accrued and outstanding interest (including interest paid in kind, accrued but unpaid interest payable in cash and interest at the default rate, each as applicable), fees, reimbursements, expenses and all other obligations outstanding under the Second Lien Term Loan documents as of the Petition Date.

## III.   KEY EVENTS LEADING TO RESTRUCTURING

### A.   Financial Performance and Liquidity Constraints

Despite the revenues generated from sales of their data services and management's efforts to stabilize operations, the Debtors' business prospects have significantly declined in recent months.  Several factors, among others, have contributed to this decline:

#### (i)   Industry Competition

Competition in the data intelligence industry is robust and the market is saturated with competitors who are constantly developing new technologies and products for more efficiently gathering, cataloging, and updating data.  The Debtors' inability to keep pace with competitor technological innovation such as the lack of a platform to connect with panelists directly, as some competitors are able to, has led to difficulties in retaining and obtaining clients, as clients have numerous firms to turn to for their data intelligence needs.

#### (ii)   Slow Market Environment

M&A deal volume and deal value has fallen over the recent years which has generally caused headwinds in the data intelligence industry.  Many of the Debtors' clients

typically enlist the Debtors as part of the due diligence process in an M&A context.  As such, the slowdown in M&A activity has had a material effect on the Debtors' ability to generate revenue.

### (iii)    COVID-19 Pandemic

The Debtors have also faced difficulty in recent years growing and maintaining their panelist base due to the COVID-19 pandemic's lingering effect on travel.  As a majority of the Debtors' panelists are recruited and incentivized to submit surveys in exchange for loyalty air travel or hotel points, the travel restrictions imposed by the COVID-19 pandemic negatively affected the Debtors' ability to attract panelists to take surveys and resulted in a diminished repository from which to draw data insights.  Although the travel restrictions from the COVID-19 pandemic have eased, the Debtors still have not seen a full recovery in their panelist base.

### (iv)    Fluctuating Interest Rates

The Debtors were impacted by the variable interest rate and the ever increasing global inflation, causing the Debtors interest payments to steeply increase. In particular, the Debtors' LIBOR benchmark rate (now the Secured Overnight Financing Rate) increased 500bps, almost doubling the amount of cash interest obligations for the Debtors.

### B.    Negotiations with Key Stakeholders

For the past several months, the Debtors have been engaged with two ad hoc groups of its lenders:  the "First Lien Ad Hoc Group" represented by, inter alia, Gibson Dunn & Crutcher LLP and PJT Partners LP (collectively, the "First Lien Ad Hoc Group Advisors"), which the Debtors understand consists of unaffiliated lenders holding primarily First Lien Claims; and the "Second Lien Ad Hoc Group" represented by (i) Vinson & Elkins LLP, (ii) Morris, Nichols, Arsht, & Tunnell LLP, and (iii) Lazard Frères & Co. LLC (collectively, the "Second Lien Ad Hoc group Advisors"), which the Debtors understand consists of unaffiliated lenders holding Second Lien Term Loan Claims.  In December 2023, it became clear that the Debtors would be unable to remain in compliance with both the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement without a waiver or forbearance from one or both of the ad hoc groups. Members that constituted "Required Lenders" within the First Lien Ad Hoc Group and members of the Second Lien Ad Hoc Group executed confidentiality agreements with the Debtors in early 2024 to facilitate discussions.  After extensive good-faith, arms length negotiations with both ad hoc groups, the Debtors entered into an amendment under the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement on February 6, 2024 in respect of certain events of default that would have occurred under the Existing First Lien Credit Agreement as of the expiration of a three business day grace period that began on February 1, 2024 and triggering a cross-default under the Existing Second Lien Credit Agreement (such amendments, the "Existing First Lien Credit Agreement Amendment" and the "Existing Second Lien Credit Agreement Amendment," and collectively, the "Credit Agreement Amendments").  Significantly, the Credit Agreement Amendments included a milestone requiring the execution of a restructuring support agreement between the Debtors and the First Lien Ad Hoc Group by

February 29, 2024 (which could be extended with the written consent of the Required First Lien Lenders (as that term is defined in the Existing First Lien Credit Agreement)).

During the grace period, which was subsequently extended under the terms of the Credit Agreement Amendments to May 21, 2024, the Debtors delivered to the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors, as well as to those unaffiliated revolver lenders, substantial diligence materials to facilitate the development of a restructuring proposal that would maximize the value of the estates.  Since the execution of the Credit Agreement Amendments, the Debtors have worked tirelessly to negotiate a consensual restructuring with the members of both the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group as well as the unaffiliated revolving lenders, and have received multiple extensions of the 'RSA milestone' under the Existing First Lien Credit Agreement Amendment to provide additional time for negotiations on a consensual restructuring.  As a result of those efforts, on May 21, 2024, the Debtors, certain members of the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group, revolver lenders and the Sponsors entered into the Restructuring Support Agreement, as described below.

## IV.    SUMMARY OF THE PLAN AND RESTRUCTURING SUPPORT AGREEMENT

### A.    The Plan

The Debtors are soliciting acceptances, subject to the conditions set forth in this Disclosure Statement, from all Voting Parties under the Plan consistent with sections 1125 and 1126 of the Bankruptcy Code, Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law (the "**Solicitation**").  Pursuant to the Plan, among other things, the treatment of holders of First Lien Claims and Second Lien Term Loan Claims shall receive be as follows:

- Holders of DIP Facility Claims shall receive their *pro rata* share of the First Out Converted Term Loans. To the extent a Holder of an Allowed DIP Facility Claim does not elect to convert its DIP Facility Claim into First Out Converted Term Loans, such Holder shall have its DIP Facility Claim paid in full in Cash and any resulting deficit will be backstopped by the Exit Backstop Parties.

- Holders of First Lien Term Loan Claims shall receive their *pro rata* share, along with the Holders of the Revolving Loan Claims of (i) the option to fund their *pro rata* share of First Out New Money Term Loans; (ii) the Second Out Take Back Term Loans, (iii) 95% of New Common Stock, subject to (x) dilution from the MIP and the New Warrant Recovery, and (y) increase as a result of any Holder of Revolving Credit Loan Claims opting to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount; and (iv) a cash payment of $11,669,935.04.

- Holders of Revolving Credit Loan Claims shall receive their *pro rata* share, along with the Holders of Allowed First Lien Term Loan Claims, of: (i) the option to fund their *pro rata* share of the First Out New Money Term Loans; (ii) the Second Out Take Back Term Loans; (iii) 95% of the New Common Stock, subject to dilution by the MIP and

the New Warrants; provided, however, a holder of an Allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount[5] in lieu of receiving the New Common Stock;[6] *provided further*, however, that as a result of any holder making the aforementioned election, the New Common Stock to be allocated to non-electing holders of Allowed Revolving Credit Loan Claims shall be increased accordingly; and (iv) a cash payment of $11,669,935.04.

- Holders of Second Lien Term Loan Claims shall directly or through a designee receive their pro rata share of (i) 5% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery, (ii) the New Warrants Recovery, and (iii) a cash payment of $750,000.

In addition to the foregoing, the Plan shall provide as follows:

- All Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims shall be paid in full in Cash or receive such other treatment that renders such Claims Unimpaired.

- All outstanding and undisputed General Unsecured Claims will be Unimpaired by the restructuring unless otherwise agreed to by the Holder of such General Unsecured Claim.

- Holders of Intercompany Claims and Intercompany Interests, at the option of the Debtors with the reasonable consent of the Required Consenting First Lien Lenders, shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

- Holders of Section 510(b) Claims and Existing Equity Interests and shall not receive or retain any other property or interests under the Plan.

### B.    Other Material Terms of the Restructuring Support Agreement

The Restructuring Support Agreement contains a number of termination events that may be triggered if, among other things, the Debtors pursue a restructuring transaction that is inconsistent with the Plan or otherwise file restructuring documents that are not in form and substance consistent with the terms contemplated by the Restructuring Support Agreement.

---

[5]    For the avoidance of doubt, the *pro rata* share of the Incremental Second Out Take Back Term Loans shall be determined based on the aggregate amount of Revolving Credit Loan Claims held by those Revolving Credit Lenders opting to receive additional take back debt in lieu of the New Common Stock.

[6]    For the avoidance of doubt, the New Common Stock that otherwise would have been distributed holders of Revolving Credit Loan Claims who opt instead to receive Incremental Second Out Take Back Term Loans, shall be distributed pro-rata among the other holders of First Lien Claims.

Importantly, the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement and can terminate the Restructuring Support Agreement if New Insight Holdings, Inc.'s board of directors (the "Board"), in good faith and after consulting with counsel, determines that proceeding with the Restructuring Transactions and pursuing confirmation and consummation of the Plan would be inconsistent with the Board's fiduciary obligations under applicable law.

The Restructuring Support Agreement also contains a number of milestones for these Chapter 11 Cases, including:

- the Plan, Disclosure Statement and DIP Motion must be filed on the Petition Date;

- the Interim DIP Order must be entered within three (3) calendar days of the Petition Date;

- the Final DIP Order must be entered within thirty (30) calendar days of the Petition Date;

- the Confirmation Order must be entered within forty-five (45) calendar days of the Petition Date; and

- the Plan must be consummated within fifty (50) calendar days of the Petition Date.

Failure to achieve these milestones provides the Required Consenting First Lien Lenders, and in certain instances the Required Consenting Second Lien Lenders and the Required Consenting Revolving Credit Lenders, the right to terminate their obligations under the Restructuring Support Agreement.

The Restructuring Support Agreement includes customary releases and exculpatory and injunctive protection, including consensual third-party releases in favor of the Released Parties, which includes the Debtors, the Reorganized Debtors, the lenders under the DIP Facility, the DIP Agent, DIP Backstop Parties, the Consenting Lenders, the First Lien Agent, the Second Lien Agent, the Sponsors, the Debtors' directors and officers, and each of their respective related parties.

Pursuant to the Restructuring Support Agreement and the Plan, Reorganized Parent will issue shares of New Common Stock to the Holders of First Lien Claims and Second Lien Term Loan Claims on the Effective Date. Reorganized Parent will also issue New Warrants to the Holders of Second Lien Term Loan Claims on the Effective Date.

The chart below summarizes the Reorganized Debtors' anticipated capital structure upon emergence:

| Debt | Principal Amount |
|---|---|
| First Out Term Loan Facility | $81,500,000 |
| New ABL Facility | Up to $75,000,000 commitment |
| Second Out Take Back Term Loan Facility | $694,000,000, subject to increase by the Incremental Second Out Take Back Term Loans. |

Obligations under the First Out Term Loan Facility are expected to be secured by a first payment priority, perfected first lien security interest over substantially all of the Collateral (as defined in the Existing First Lien Credit Agreement), including, without limitation, pledges of equity interests, subject to customary exceptions (the "First Out Collateral"). Obligations under the Second Out Take Back Term Loan Facility are expected to be secured by second payment priority, perfected first lien security interests over substantially all of the Collateral (as defined in the Existing First Lien Credit Agreement), including, without limitation, pledges of equity interests, subject to customary exceptions (the "Second Out Collateral").

Reorganized Parent shall be a private company on the Effective Date. The composition of the New Board will be set forth pursuant to the terms and procedures in the New Corporate Governance Documents which will be filed with the Plan Supplement. Such New Corporate Governance Documents will include customary minority protections for the equity being issued in exchange of the Second Lien Term Loan Claims.

### C.    Acceptance of the Plan

An acceptance of the Plan will constitute an acceptance and consent to all of the terms and provisions in the Plan, including, without limitation, the releases, exculpations, and injunction provisions included therein.

**All Voting Parties are urged to read this Disclosure Statement and the documents attached hereto and enclosed herewith in full. The Debtors believe that the Plan is in the best interests of the Debtors, their Estates, and all of its stakeholders, including the Voting Parties. Accordingly, the Voting Parties are urged to vote in favor of the Plan.**

**No person has been authorized to give any information or make any representation about the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither this Disclosure Statement's distribution nor the consummation of Plan will, under any circumstance, create any implication that the information herein is correct as of any time after the date hereof. All summaries herein are qualified by reference to the actual terms of each of the documents attached to this Disclosure Statement. In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability, but shall**

**be deemed a statement made in settlement negotiations.  Unless otherwise indicated, the Debtors have provided the factual information in this Disclosure Statement.**

> **D.      Management Incentive Plan**

On the Effective Date, the New Board will be required to adopt the MIP and enact and enter into related policies and agreements, and distribute New Common Stock to participants, in each case, based on the terms and conditions set forth in the Restructuring Term Sheet.

> **E.      The Debtors' First-Day Motions and Certain Related Relief**

> **1.      Operational First-Day Pleadings**

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of these Chapter 11 Cases, the Debtors intend to file various first-day motions seeking authority to, among other things, (i) continue using the Debtors' existing cash management system; (ii) pay prepetition claims owed to employees and on account of employee benefit programs and to continue offering employee benefit programs postpetition; (iii) pay prepetition claims owed due to maintaining insurance and continue maintaining the Debtors' insurance; (iv) pay prepetition claims owed to taxing authorities and continue paying taxes in the ordinary course of business; (v) provide adequate assurance of payment to utility companies; (vi) pay trade claims in the ordinary course of business; and (vii) honor customer obligations and otherwise continue prepetition customer programs in the ordinary course of business.  All of the relief requested by the first-day motions and throughout these Chapter 11 Cases will be subject to the DIP Orders.

> **2.      Postpetition Financing**

The Debtors will also seek approval of a DIP Facility to ensure sufficient liquidity is available during these Chapter 11 Cases.  The DIP Facility will have a term ending 75 days after the closing date and bear interest at a rate equal to S+8.75% per annum.  Each of the Debtors will be an obligor under the DIP Facility.  The DIP Facility will provide the Debtors with approximately $31.5 million in aggregate proceeds to (i) pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with these Chapter 11 Cases, and (ii) for working capital and general corporate purposes.  Each DIP Facility Claim, at the Holder's election, will be exchanged to the First Out Term Loans under the First Out Term Loan Facility on a *pro rata* basis.  To the extent a Holder of an Allowed DIP Facility Claim does not elect to convert its DIP Facility Claim into First Out Converted Term Loans, such Holder shall have its DIP Facility Claim paid in full in cash and any resulting deficit will be backstopped by the Exit Backstop Parties.  The Debtors also expect to seek Court approval to use cash collateral of their prepetition secured lenders.

The ability to backstop the DIP Facility has been offered to all restricted members of the First Lien Ad Hoc Group on a *pro rata* basis.  All First Lien Lenders are eligible to participate in their *pro rata* share (based on each First Lien Lender's holdings of First Lien Loans as a percentage of the aggregate amount of First Lien Loans) of the DIP Facility post-closing

pursuant to syndication procedures, such syndication to be completed by the end of any applicable "seasoning" period or such later date as determined by the DIP Backstop Parties.  Each First Lien Lender that elects to participate in the DIP Facility must also become a signatory to the Restructuring Support Agreement in addition to submitting all other forms and signature pages necessary pursuant to any such syndication procedures.

## V.  SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11 CASES AND THE PLAN

As described herein, the Debtors anticipate filing these Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware and seek approval of the Plan.  This Article details certain issues in connection with these Chapter 11 Cases and the Plan.

### A.  Voting on the Plan

As described herein and in the Plan, only certain classes under the Plan are entitled to vote on the Plan.  Specifically, holders of First Lien Term Loan Claims, Revolving Lender Claims and Second Lien Term Loan Claims are members of the only Classes that are "Impaired" and entitled to vote to accept or reject the Plan.  Any holder of a Claim whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan, or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code, is considered "Impaired."  Each holder of a Claim or Interest of a Class that is deemed to accept or reject the Plan will receive a notice of non-voting status after the Petition Date, but will not have received a Notice and Election Form because they are not eligible to vote on the Plan.  All holders of Claims or Interests may receive a copy of these documents and/or the Plan Supplement, if applicable, by mailing a written request to the Voting Agent.

---

**Which Classes of Claims and Interests Are Entitled to Vote on the Plan?**

Classes of Claims and Interests are entitled to vote on the Plan as follows:

- Claims and Interests in Classes 1, 2, and 5 are Unimpaired under the Plan, are deemed to have accepted the Plan and are not entitled to vote on the Plan.

- Claims and Interests in Classes 3A, 3B and 4 are Impaired and entitled to vote on the Plan.

- Claims and Interests in Class 6, (if so treated), 7, 8 (if so treated), and 9 are Impaired and deemed to have rejected the Plan and are not entitled to vote on the Plan.

---

For a description of the Classes of Claims and Interests and their treatment under the Plan, see Section VI.C., "*Summary of Classification and Treatment Under the Plan*," below.

Under the Bankruptcy Code, a Class of Claims shall have accepted the Plan if it is accepted or deemed accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan. The votes in favor of the Plan must be obtained from one impaired accepting Class excluding the votes of any insiders.

**Although the solicitation of votes on the Plan relates to these Chapter 11 Cases and voluntary petitions for relief under chapter 11 of the Bankruptcy Code, no filing has yet occurred and may never occur.**

**B.     The Confirmation Hearing**

The Debtors intend to request that the Court schedule, as promptly as practicable, a hearing to approve this Disclosure Statement as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code and the solicitation of votes on the Plan as being in compliance with section 1126(b) of the Bankruptcy Code, and to consider confirmation of the Plan. Even if the Debtors do not receive the requisite votes in favor of the Plan prior to filing the petitions, the Debtors may decide to file for chapter 11 relief and seek confirmation of the Plan or a modified plan.

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan. Section 1128(b) provides that a party-in-interest may object to confirmation of a plan. Objections to confirmation must be filed with the Bankruptcy Court and served on the Debtors as well as the other parties set forth in the notice of the Confirmation Hearing (the "**Notice of Confirmation Hearing**") by the objection deadline, as set forth in the Notice of Confirmation Hearing. The Notice of Confirmation Hearing will be mailed to parties at a later date, after the filing of these Chapter 11 Cases.

At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether the solicitation of votes on the Plan was in compliance with section 1126 of the Bankruptcy Code;

- determine whether the Plan has been accepted by a sufficient number of holders and amount of claims entitled to vote on the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

**C.     Summary of Classification and Treatment Under the Plan**

The following table and description summarize the classification and treatment of Claims and Interests and the consideration contemplated to be distributed to the holders of Allowed Claims and Interests under the Plan.  Unless otherwise noted, these estimates are as of the date hereof.  For an explanation of the assumptions and uncertainties regarding these calculations, see Section IX, "*Risk Factors*."

**Note on Numerical Information.   The numerical information in this Disclosure Statement, including the Projections annexed as <u>Exhibit D</u> hereto and the estimated Allowed amounts, has been prepared by the Debtors, with the assistance of its financial advisor, Alvarez & Marsal.  The assumptions used in preparing such Projections and estimates are inherently subject to significant uncertainties and actual results may differ from such Projections and estimates, as further described in Section XVI.**

*[The remainder of this page is intentionally left blank.]*

1.       **Summary of Classification and Treatment of Claims**

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| Class 1: Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders: (i) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as practicable after the date such claim becomes due and payable; (ii) the collateral securing its Allowed Other Secured Claim; (iii) reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired | No (presumed to accept) | N/A | 100% |

---

[7]     The amounts set forth in this chart reflect the Debtors' most current estimates of projected claim amounts.

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| Class 2:<br><br>Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Priority Claim, each Holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Consenting First Lien Lenders. | Unimpaired | No (presumed to accept) | N/A | 100% |
| Class 3A:<br><br>First Lien Term Loan Claims | Except to the extent that a holder of an allowed First Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed First Lien Term Loan Claim, on the Effective Date each holder shall directly or through a designee receive its *pro rata* share, along with the Holders of the Revolving Loan Claims of:<br><br>(i) the option to fund their *pro rata* share of First Out New Money Term Loans;<br><br>(ii) the Second Out Take Back Term Loans; | Impaired | Yes | $920,767,206.45, plus interest, fees, costs, charges, and other amounts arising under or in connection with the First Lien Term Loans | TBD % |

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| | (iii) 95% of New Common Stock, subject to (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of Revolving Credit Loan opting to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount; and<br><br>(iv) a cash payment of 11,669,935.04. | | | | |
| Class 3B:<br><br>Revolving Credit Loan Claims | Except to the extent that a holder of an allowed Revolving Credit Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Revolving Credit Loan Claim, on the Effective Date each holder thereof shall receive its *pro rata* share, along with the holders of the First Lien Term Loan Claims, of:<br><br>(i) the option to fund their *pro rata* share of the First Out New Money Term Loans;<br><br>(ii) the Second Out Take Back Term Loans; | Impaired | Yes | $96,899,999.99, plus interest, fees, costs, charges, and other amounts arising under or in connection with the Revolving Credit Loans | TBD % |

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| | (iii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants; *provided*, *however*, a holder of an allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount[8] in lieu of receiving the New Common Stock;[9] *provided further*, however, that as a result of any holder making the aforementioned election, the New Common Stock to be allocated to non-electing holders of Allowed Revolving Credit Loan Claims shall be increased accordingly; and<br><br>(iv) a cash payment of $11,669,935.04. | | | | |

---

[8]     For the avoidance of doubt, the *pro rata* share of the Incremental Second Out Take Back Term Loans shall be determined based on the aggregate amount of Revolving Credit Loan Claims held by those Revolving Credit Lenders opting to receive additional take back debt in lieu of the New Common Stock.

[9]     For the avoidance of doubt, the New Common Stock that otherwise would have been distributed holders of Revolving Credit Loan Claims who opt instead to receive Incremental Second Out Take Back Term Loans, shall be distributed pro-rata among the other holders of First Lien Claims.

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| Class 4: Second Lien Term Loan Claims | Except to the extent that a holder of an allowed Second Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Second Lien Term Loan Claim, on the Effective Date, each holder shall directly or through a designee receive its pro rata share of:<br><br>(i) 5% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery;<br><br>(ii) the New Warrants Recovery; and<br><br>(iii) a cash payment of $750,000. | Impaired | Yes | $250,000,000.00, plus accrued but unpaid prepetition interest and fees through the Effective Date | TBD % |

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| Class 5: General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim has already been paid during these Chapter 11 Cases or such Holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, at the Debtors' option and with the reasonable consent of the Required Consenting First Lien Lenders: (i) if such Allowed General Unsecured Claim is due and payable on or before the Effective Date, payment in full, in Cash, of the unpaid portion of its Allowed General Unsecured Claim on the Effective Date; (ii) if such Allowed General Unsecured Claim is not due and payable before the Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting First Lien Lenders, and the Holder of such Allowed General Unsecured Claim, such that the Allowed General Unsecured Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code. | Unimpaired | No (deemed to accept) | $158,942,000 | 100% |

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| Class 6: Intercompany Claims | On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the Reorganized Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution. | Unimpaired / Impaired | No (deemed to accept); No (deemed to reject) | $12,471,000 | 100% / 0% |
| Class 7: Section 510 (b) Claims | Section 510(b) Claims shall be discharged, canceled, released, and extinguished without any distribution to Holders of such Claims. | Impaired | No (deemed to reject) | N/A | N/A |
| Class 8: Intercompany Interest | On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Interest, at the option of the Reorganized Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, each Intercompany Interest shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution. | Unimpaired / Impaired | No (deemed to accept); No (deemed to reject) | N/A | N/A |

| Class | Treatment | Status | Entitled to Vote | Estimated Amount of Claims in Class[7] | Estimated Recovery (%) |
|---|---|---|---|---|---|
| Class 9: Existing Equity Interests | On the Effective Date, the Existing Equity Interests shall be canceled, and Holders of Existing Equity Interests shall receive no recovery on account of such Existing Equity Interests. | Impaired | No (deemed to reject) | 115,356,000 | 0% |

**2.**      **Summary of Treatment Under the Plan**

The following section describes more fully the treatment to be provided to each Class of Claims and Interests under the Plan.  This description is only a summary of certain important provisions of the Plan and should not replace careful review of the Plan.  Each holder of a Claim or Interest should read the Plan carefully.  Please refer particularly to Articles III and IV of the Plan, Section V.C.2 below, and the Liquidation Analysis annexed as <u>Exhibit B</u> hereto for a more detailed description of the classification and treatment of Claims and Interests provided under the Plan.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Facility Claims, Professional Fee Claims, and U.S. Trustee Fees have not been classified and are not entitled to vote on the Plan.

**Administrative Claims**.  Subject to subparagraph (i) below, in full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Administrative Claim (except to the extent that (a) the Holder of such Allowed Administrative Claim agrees in writing to less favorable treatment or (b) the Holder of such Allowed Administrative Claim has been paid in full during these Chapter 11 Cases), the Debtors or Reorganized Debtors, as applicable, at the option of the Debtors or Reorganized Debtors, as applicable, and with the reasonable consent of the Required Consenting First Lien Lenders, (i) shall pay to each Holder of an Allowed Administrative Claim Cash in an amount equal to the due and unpaid portion of its Allowed Administrative Claim on the later of (x) the Effective Date, or as soon thereafter as is reasonably practicable and (y) as soon as practicable after such Allowed Administrative Claim becomes due and payable, (ii) shall provide such other treatment to render such Allowed Administrative Claim Unimpaired or (iii) shall provide such other treatment as the Holder of such Allowed Administrative Claim may agree to or otherwise as permitted by section 1129(a)(9) of the Bankruptcy Code; *provided*, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(i)      **Professional Fee Claims**.  Professionals (a) asserting a Professional Fee Claim shall deliver to the Debtors their estimates for purposes of the Debtors computing the Professional Fee Reserve Amount no later than five (5) Business Days prior to the anticipated Effective Date; *provided*, that, for the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court; *provided*, *further*, that if a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional; and (b) asserting a Professional Fee Claim for services rendered before the Confirmation Date, for the avoidance of doubt, excluding any claims for Restructuring Expenses, must file and serve on the Reorganized Debtors and the U.S. Trustee an application for final allowance of such Professional Fee Claim no later than the

Professional Claims Bar Date; *provided*, that any Professional who is subject to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. For the avoidance of doubt, no fee applications will be required in respect of services performed by Professionals on and after the Confirmation Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice.

(ii)    **Professional Fee Escrow Account**.  On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim without any further action of the Bankruptcy Court. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Reorganized Debtors.

**Priority Tax Claims**.  In full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Priority Tax Claim (except to the extent that (i) the Holder of such Allowed Priority Tax Claim agrees in writing to less favorable treatment or (ii) the Holder of such Allowed Priority Tax Claim has been paid in full during these Chapter 11 Cases), on the Effective Date, each Holder of an Allowed Priority Tax Claim will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

**DIP Facility Claims**.  The DIP Facility Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Credit Agreement as of the Effective Date, including, for the avoidance of doubt, (i) the principal amount outstanding under the DIP Facility on that date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued fees, expenses, and indemnification obligations payable under DIP Loan Documents. For the avoidance of doubt, the DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.  For the avoidance of doubt, DIP Professional Fees

related to the DIP Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

On the Effective Date, in full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed DIP Facility Claim (except to the extent that the Holder of such Allowed DIP Facility Claim agrees in writing to less favorable treatment), each Holder of an Allowed DIP Facility Claim shall (i) receive its *pro rata* share of the First Out Converted Term Loans and (ii) shall be offered *pro rata* share First Out New Money Term Loans in accordance with the terms of the First Out Term Loan Credit Agreement.

**U.S. Trustee Fees**.   Notwithstanding anything herein to the contrary, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6).  On and after the Effective Date, to the extent these Chapter 11 Cases remain open, and for so long as the Reorganized Debtors remain obligated to pay quarterly fees, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of these Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

## Other Secured Claims – Class 1

Classification: Class 1 consists of Other Secured Claims against each Debtor.

Treatment: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders: (i) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as practicable after the date such claim becomes due and payable; (ii) the collateral securing its Allowed Other Secured Claim; (iii) reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

Impairment and Voting: Class 1 is Unimpaired by the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

## Other Priority Claims – Class 2

Classification: Class 2 consists of Other Priority Claims against each Debtor.

Treatment: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Priority Claim, each Holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Consenting First Lien Lenders.

Impairment and Voting: Class 2 is Unimpaired by the Plan. Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

### First Lien Term Loan Claims – Class 3A

Classification: Class 3A consists of First Lien Term Loan Claims. The First Lien Term Loan Claims shall be Allowed in an aggregate principal amount of no less than $920,767,205.45, *plus* all other unpaid and outstanding obligations including any accrued and unpaid interest thereon (including at any applicable default rate), and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the Existing First Lien Credit Agreement, in each case, as of the Petition Date. The First Lien Term Loan Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, impairment, surcharge under section 506(c) of the Bankruptcy Code, objection, any challenges under applicable law or regulation, or any other claim or defense.

Treatment: Except to the extent that a holder of an allowed First Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed First Lien Term Loan Claim, on the Effective Date each holder shall directly or through a designee receive its *pro rata* share, along with the Holders of the Revolving Loan Claims, of:

> (i)     the option to fund its pro rata share of First Out New Money Term Loans;

> (ii)    the Second Out Take Back Term Loans;

> (iii)   95% of the New Common Stock, subject to: (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of Revolving Credit Loan opting to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount; and

> (iv)    a cash payment of $11,669,935.04.

Impairment and Voting: Class 3A is Impaired by the Plan. Each Holder of a First Lien Term Loan Claim is entitled to vote to accept or reject the Plan.

## Revolving Credit Loan Claims – Class 3B

Classification: Class 3B consists of Revolving Credit Loan Claims. The Revolving Credit Loan Claims shall be Allowed in an aggregate principal amount of no less than $96,899,999.99, *plus* all other unpaid and outstanding obligations including any accrued and unpaid interest thereon (including at any applicable default rate), and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the Existing First Lien Credit Agreement, in each case, as of the Petition Date. The Revolving Credit Loan Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, impairment, surcharge under section 506(c) of the Bankruptcy Code, objection, any challenges under applicable law or regulation, or any other claim or defense.

Treatment: Except to the extent that a Holder of an Allowed Revolving Credit Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Revolving Credit Loan Claim, each Holder thereof shall receive its *pro rata* share, along with the Holders of Allowed First Lien Term Loan Claims, of:

> (i) the option to fund its pro rata share of the First Out New Money Term Loans;

> (ii) the Second Out Take Back Term Loans;

> (iii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants; *provided*, *however*, a holder of an allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount[10] in lieu of receiving the New Common Stock;[11] *provided further*, however,  that as a result of any holder making the aforementioned election, the New Common Stock to be allocated to non-electing holders of Allowed Revolving Credit Loan Claims shall be increased accordingly; and

> (iv) a cash payment of $11,669,935.04.

## Second Lien Term Loan Claims – Class 4

Classification: Class 4 consists of Second Lien Term Loan Claims. The Second Lien Term Loan Claims shall be Allowed in an aggregate principal amount no less than $250,000,000.00, as of the Petition Date, *plus* all other unpaid and outstanding obligations including any accrued and unpaid

---

[10]    For the avoidance of doubt, the *pro rata* share of the Incremental Second Out Take Back Term Loans shall be determined based on the aggregate amount of Revolving Credit Loan Claims held by those Revolving Credit Lenders opting to receive additional take back debt in lieu of the New Common Stock.

[11]    For the avoidance of doubt, the New Common Stock that otherwise would have been distributed holders of Revolving Credit Loan Claims who opt instead to receive Incremental Second Out Take Back Term Loans, shall be distributed pro-rata among the other holders of First Lien Claims.

interest thereon as of the Petition Date at the applicable rate, fees, costs, charges, premiums or other amounts arising under the Existing Second Lien Term Loan Credit Agreement.

<u>Treatment</u>: Except to the extent that a holder of an allowed Second Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Second Lien Term Loan Claim, on the Effective Date, each holder shall directly or through a designee receive their *pro rata* share of :

> (i)      5% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery;

> (ii)     New Warrants Recovery; and

> (iii)    a cash payment of $750,000.

<u>Impairment and Voting</u>: Class 4 is Impaired by the Plan. Each Holder of a Second Lien Term Loan Claim is entitled to vote to accept or reject the Plan.

### General Unsecured Claims – Class 5

<u>Classification</u>: Class 5 consists of General Unsecured Claims against each Debtor.

<u>Treatment</u>: Except to the extent that a Holder of an Allowed General Unsecured Claim has already been paid during these Chapter 11 Cases or such Holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, at the Debtors' option and with the reasonable consent of the Required Consenting First Lien Lenders: (i) if such Allowed General Unsecured Claim is due and payable on or before the Effective Date, payment in full, in Cash, of the unpaid portion of its Allowed General Unsecured Claim on the Effective Date; (ii) if such Allowed General Unsecured Claim is not due and payable before the Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting First Lien Lenders, and the Holder of such Allowed General Unsecured Claim, such that the Allowed General Unsecured Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code.

<u>Impairment and Voting</u>: Class 5 is Unimpaired by the Plan. Each Holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code. Therefore, each Holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan.

**Intercompany Claims – Class 6**

Classification: Class 6 consists of Intercompany Claims.

Treatment: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the Reorganized Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

Impairment and Voting: If an Intercompany Claim in Class 6 is Unimpaired by the Plan, then such Holder of an Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. If an Intercompany Claim in Class 6 is Impaired by the Plan, then such Holder of an Intercompany Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In either case, each Holder of an Intercompany Claim is not entitled to vote to accept or reject the Plan.

**Section 501(b) Claims – Class 7**

Classification: Class 7 consists of Section 510(b) Claims against each Debtor.

Treatment: Section 510(b) Claims shall be discharged, canceled, released, and extinguished without any distribution to Holders of such Claims.

Impairment and Voting: Class 7 is Impaired by the Plan, and each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Section 510(b) Claim is not entitled to vote to accept or reject the Plan.

**Intercompany Interests – Class 8**

Classification: Class 8 consists of Intercompany Interests.

Treatment: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Interest, at the option of the Reorganized Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, each Intercompany Interest shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

<u>Impairment and Voting</u>: If an Intercompany Interest in Class 8 is Unimpaired by the Plan, then such Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. If an Intercompany Interest in Class 8 is Impaired by the Plan, then such Holder of an Intercompany Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In either case, each Holder of an Intercompany Interest is not entitled to vote to accept or reject the Plan.

### Existing Equity Interests – Class 9

<u>Classification</u>: Class 9 consists of Existing Equity Interests.

<u>Treatment</u>: On the Effective Date, the Existing Equity Interests shall be canceled, and Holders of Existing Equity Interests shall receive no recovery on account of such Existing Equity Interests.

<u>Impairment and Voting</u>: Class 9 is Impaired by the Plan, and each Holder of an Existing Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Existing Equity Interest is not entitled to vote to accept or reject the Plan.

---

**Important Note on Estimates**

Statements regarding projected amounts of Claims and Interests or distributions are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts. Except as otherwise indicated, these statements are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.

---

**VI.      SECURITIES LAWS MATTERS**

> **The Issuance of the New Common Stock Raises Issues Under U.S. Federal and State Securities Laws.**
>
> The issuance of the New Common Stock under the Plan or the Plan raises certain securities law issues under the Bankruptcy Code and U.S. federal and state securities laws that are discussed in this section.  The information in this section should not be considered applicable to all situations or to all holders of Claims receiving the New Common Stock.  Holders of Claims should consult their own legal counsel concerning the facts and circumstances relating to the transfer of the New Common Stock.

**A.      Issuance and Resale of the New Common Stock Under the Plan**

The Debtors will seek, pursuant to section 1145 of the Bankruptcy Code, to exempt the New Common Stock from the registration requirements of the Securities Act of 1933 (as amended, the "Securities Act") (and of any state securities or "blue sky" laws).  Section 1145 exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administration expense in a case concerning, such debtor.  In reliance upon this exemption, the New Common Stock generally will be exempt from the registration requirements of the Securities Act.  Recipients will be able to resell the New Common Stock without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of section 1145(b) of the Bankruptcy Code.  Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan, or (iv) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act.  An entity is not an "underwriter" under Section 2(a)(11) of the Securities Act with regard to securities received under section 1145(a)(1), in "ordinary trading transactions" made on a national securities exchange.  However, the Debtors do not anticipate that the New Common Stock will be listed in the near term on a stock exchange.  What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC.  Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the Plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, or (iii) payment of special compensation to brokers or dealers in connection with the sale.  The term "issuer" is defined in Section 2(4) of the Securities Act;

however, the reference contained in section 1145(b)(l)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a statutory underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

To the extent persons are deemed to be "underwriters," such persons may be deemed to have received "control securities" and resales by such control may not be exempt from registration under section 1145 of the Bankruptcy Code. Under certain circumstances, such persons may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Parties which believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.

## VII.   ALTERNATIVES TO CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors may be unable to service their debt obligations. Accordingly, if the Plan is not consummated, the alternatives include:

### A.   Liquidation Under the Bankruptcy Code

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. A discussion of how a chapter 7 liquidation would affect the recoveries of the holders of Claims is set forth in this Section of this Disclosure Statement. The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in attached Exhibit B to this Disclosure Statement.

Specifically, as noted in the Liquidation Analysis, in the event of a chapter 7 liquidation, the Holders of First Lien Term Loan Claims would share *pro rata* in recoveries, ranging between $0 million and $149.4 million. In contrast, under the Plan, the Holders of First Lien Claims would receive their *pro rata* share of (i) the option to fund their *pro rata* share of the First Out New Money Term Loans; (ii) the Second Out Take Back Term Loans; (iii) 95% of New Common Stock, subject to: (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of Revolving Credit Loan opting to receive their Incremental Second Out Take Back Term Loan Amount; and (iv) a cash payment of $11,669,935.04.

Accordingly, such holders would receive greater value under the Plan than such holders would receive in a chapter 7 liquidation.

Similarly, the Holders of Revolving Credit Loan Claims would share *pro rata* in recoveries, ranging between $0 million and $15.6 million. In contrast, under the Plan, the Holders of First Lien Claims would receive their *pro rata* share of (i) the option to fund their *pro rata* share of the First Out New Money Term Loans; (ii) the Second Out Take Back Term Loans; (iii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants; provided, however, a holder of an allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive their *pro rata* share of the Incremental Second Out Take Back Term Loan Amount in lieu of receiving the New Common Stock; provided further, however, that as a result of any Holder making the aforementioned election, the New Common Stock to be allocated to non-electing Holders of Allowed Revolving Credit Loan Claims shall be increased accordingly; and (iv) a cash payment of $11,669,935.04. Accordingly, such holders would receive greater value under the Plan than such holders would receive in a chapter 7 liquidation.

Additionally, as noted in the Liquidation Analysis, in the event of a chapter 7 liquidation, the holders of Second Lien Term Loan Claims would receive no recovery. Under the Plan, the Holders of Second Lien Term Loan Claims would directly or through a designee receive their *pro rata* share of 5% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery; (ii) New Warrants Recovery, and (iii) a cash payment of $750,000. Accordingly, such holders would receive greater value under the Plan than such holders would receive in a chapter 7 liquidation.

With respect to Holders of General Unsecured Claims, such holders are Unimpaired and accordingly, such holders will receive at least as much value under the Plan as they would receive in a chapter 7 liquidation.

Finally, holders of Intercompany Claims, Intercompany Interests, and Existing Equity Interests in the event of a chapter 7 liquidation would receive no recovery.

**B.      Alternative Plan of Reorganization**

In formulating and developing the Plan, the Debtors have explored other alternatives, and have engaged in a negotiating process with the Consenting Stakeholders. The Debtors believe that the Plan fairly adjusts the rights of various Classes of Claims, and also provides superior recoveries to Classes 3A, 3B and 4 over any likely alternative (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**THE DEBTORS BELIEVE THAT THE PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL FIRST LIEN LENDERS AND ALL SECOND LIEN TERM LOAN LENDERS CONSENT TO ACCEPT THE PLAN.**

C.      **Inaction/Maintenance of Status Quo**

If the Restructuring Transactions are not consummated, the Debtors could be in default under the Existing First Lien Credit Agreement and Existing Second Lien Credit Agreement. As the Debtors believe they will be unable to repay such indebtedness if it were to be accelerated or upon maturity, the Debtors believe that inaction is not an option. Further, if the Debtors are forced to file for bankruptcy protection without a consensual restructuring agreement among its creditors, the bankruptcy cases could be time-consuming and much more costly than the current contemplated restructuring. The Debtors believe that these actions could seriously undermine its ability to obtain financing and could possibly lead to its inability to restructure its debt obligations. Therefore, the Debtors believe that inaction is not a viable alternative to consummation of the Restructuring Transaction.

## VIII.   RISK FACTORS

**Important Risks to Be Considered**

**Holders of Claims against and Interests in the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan before voting to accept or reject the Plan.**

**These risk factors should not, however, be regarded as constituting the only risks involved in connection with the implementation of the Plan.**

A.      **Risks Associated with the Debtors' Business**

1.      **The Reorganized Debtors may not be able to generate sufficient cash to service all of their indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness, including, without limitation, anticipated borrowings under the First Out Term Loan Facility and the Second Out Take Back Term Loan Facility upon emergence.

2. **The Debtors rely on a limited number of key vendors to operate its business**

The loss of any of the Debtors' key vendors or an interruption of production at these vendors from work stoppages, equipment failures or other adverse events or quality control failure would adversely affect the Debtors' ability to provide services and fill customer orders. The Debtors may not be able to find replacement vendors to provide critical supplies on attractive rates.

3. **The Debtors are subject to the conditions of the general economy**

Unfavorable economic conditions may adversely affect the Debtors' business, financial condition or results of operations. The Debtors are globally vulnerable to general economic downturns. Any decline in demand for the Debtors' services resulting from a general economic downturn could materially and adversely affect the Debtors' business, financial condition or results of operations. A prolonged period of sluggish economic conditions has had and may continue to have an adverse impact on the level of maintenance expenditures of the Debtors' customers and their ability to maintain historic levels of these expenditures. Furthermore, the volatility of the international financial markets, the sovereign debt crisis, and the decision of the United Kingdom to leave the European Union, all affected the economies of the United States, Europe, and the rest of the world, thus affecting the Debtors' business. As a result of significantly increased volatility and instability in the international financial markets and unfavorable global economic conditions, it is difficult for the Debtors, their customers and their suppliers to forecast demand trends accurately. The Debtors are unable to accurately predict the extent or duration of cycles or their effect on the Debtors' financial condition or results of operations and can give no assurance as to the timing, extent or duration of the current or future business cycles.

4. **The Debtors' performance depends on the ability to engage new customers and collect on and maintain existing customer relationships**

A portion of the Debtors' revenue is directly or indirectly derived from projects with longstanding customers. It is generally very difficult to predict whether and when the Debtors will be awarded such contracts as they frequently involve a lengthy and sometimes complex bidding and selection process.

If the Debtors are not engaged by new customers or if the contracts the Debtors enter into are delayed and the Debtors are unable to execute the work they are contracted to perform within the timeframe they have agreed, the Debtors' workflow may be interrupted, the Debtors' contracts may not be renewed and their business, financial condition or results of operations may be adversely affected.

In addition, the Debtors' business depends on their customer goodwill, their reputation, and maintaining good relationships with their customers, joint venture partners, employees and regulators. Any circumstances which publicly damage the Debtors' goodwill, harm their reputation, or damage their business relationships may lead to a broader effect that may result in a loss of business, goodwill, customers, joint venture partners and employees, as

well as financial liability arising directly from the damaging events, which could materially adversely affect the Debtors' business, financial conditions, or results of operations.  Though the Debtors are taking every precaution and are maintaining their operations, the Plan may lead some customers to question the Debtors' ability to function.

      **5.**       **The Debtors have operations in countries in which they may be susceptible to political or social instability**

A portion of the Debtors' operations are in parts of the world where there may be social or political upheaval or unrest.  Such a disruption could lead to: disruption of operations; increasing security threats for the Debtors' personnel; the deterioration of customer relationships; exposure of the Debtors to taxation or other adverse policies in those jurisdictions; foreign exchange volatility; or other disruptions.  Any of these events would disrupt the Debtors' operations.

      **6.**       **The Debtors' business subjects them to litigation risk**

The Debtors' business exposes them to potential litigation risks.  From time to time, various suits and claims have been brought against the Debtors.  Although the Debtors generally seek to insure against these risks, there can be no assurance that insurance coverage is adequate, and the Debtors may not be able to maintain insurance on acceptable terms.  A successful liability claim in excess of insurance coverage could have a material adverse effect on the Debtors and could prevent the Debtors from obtaining adequate liability insurance in the future on commercially reasonable terms, or at all.

      **7.**       **The Debtors must retain and attract a skilled workforce to provide products and services to their customers**

A shortage of skilled employees or the inability to train replacement personnel could have an adverse impact on the Debtors' labor productivity and costs and their ability to provide services to their customers.  Employee attrition and the failure to maintain a skilled workforce could have a material adverse effect on the Debtors' business, financial condition, results of operations or prospects.

      **8.**       **Technological innovations may create alternatives to the products and services offered by the Debtors**

New technologies could create an alternative to the products created and sold by the Debtors, thereby reducing demand.  Despite the Debtors' best efforts to stay on the cutting edge, should the Debtors be unable to innovate or to keep up with the potential of new technologies in this sector, their  customers and suppliers may choose not to renew their contracts with the Debtors.

      **9.**       **Fluctuations in foreign currency exchange could affect the Debtors' financial results**

The Debtors earn revenues, pay expenses, own assets and incur liabilities in countries using currencies other than the U.S. dollar.  Because the Debtors' consolidated financial

statements are presented in U.S. dollars, the Debtors must translate revenues, income and expenses as well as assets and liabilities into U.S. dollars at exchange rates in effect during or at the end of each reporting period.  Therefore, increases or decreases in the value of the U.S. dollar against other currencies in countries where the Debtors operate will affect the Debtors' results of operations and the value of balance sheet items denominated in foreign currencies.  These risks are non-cash exposures, and the Debtors manage these risks through normal operating and financing activities.  However, the Debtors may not be successful in reducing the risks inherent in exposures to foreign currency fluctuations.

### 10. Loss of key management or personnel could negatively impact the Debtors' business

The Debtors have an experienced management team and key personnel who play critical roles in the Debtors' operations.  The Debtors believe their ability to be successful in the future will be due, in part, to their management team and key personnel.  Losing the services of one or more members of the Debtors' management team or key personnel could adversely affect their business.

### 11. A cybersecurity incident could negatively impact the Debtors' business

The Debtors use computers and cloud software in substantially all aspects of their business operations, along with mobile devices and other online activities to connect with their employees and customers.  Such uses give rise to cybersecurity risks, including security breach, espionage, system disruption, theft and inadvertent release of information.  If the Debtors fails to assess and identify cybersecurity risks, they may become increasingly vulnerable to such risks.  The theft, destruction, loss, misappropriation, or release of sensitive and/or confidential information or intellectual property, or interference with information technology systems or the technology systems of third parties on which the Debtors rely, could result in business disruption, negative publicity, brand damage, violation of privacy laws, loss of customers, potential liability and competitive disadvantage.  While the Debtors have implemented measures to prevent security breaches and cyber incidents, such preventative measures and incident response efforts may not be entirely effective.

### B. Certain Bankruptcy Considerations

### 1. General

While the Debtors believe that these Chapter 11 Cases (if any), commenced in order to implement the Plan, will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, these Chapter 11 Cases could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy

proceedings could adversely affect the Debtors' relationships with their key vendors and suppliers, customers, employees and agents. Bankruptcy proceedings also will involve additional expenses and may divert the attention of the Debtors' management away from the operation of the business.

The extent to which bankruptcy proceedings disrupt the Debtors' business will likely be directly related to the length of time it takes to complete the proceedings. If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while it tries to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the potentially adverse effects described herein.

## 2.      Failure to receive adequate acceptances

The Debtors believe they will receive the requisite amount of votes in favor of the Plan in light of the fact that, as set forth herein, the Consenting Stakeholders who hold more than 67% of the First Lien Term Loan Claims, more than 67% of the Revolving Credit Loan Claims, and more than 67% of the Second Lien Term Loan Claims agreed to vote for, support and not object to the Plan. However, if for some reason the Debtors do not receive, with respect to each Debtor, votes from holders of at least two-thirds in dollar amount and a majority in number of holders (the "Requisite Acceptances") with respect to at least one Class of Claims that is Impaired and entitled to vote (excluding insiders), the Debtors will not be able to seek confirmation of the Plan. Further, if the Requisite Acceptances are not received, the Debtors may, subject to the terms and conditions of the Restructuring Support Agreement, seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Consenting Stakeholders and/or the Debtors may be required to sell their business under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

## 3.      Failure to confirm the Plan

Even if the Requisite Acceptances are received, there is some risk that the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may deny confirmation of the Plan. A non-accepting (or deemed rejecting) creditor or equity security holder of the Debtors might, among other things, challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of

the Bankruptcy Code.  While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will satisfy the statutory requirements for confirmation and will not be followed by a need for further financial reorganization and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a restructuring of the Debtors could be implemented and what distribution holders of Claims ultimately would receive with respect to their Claims, which may constitute less favorable treatment than they would receive under the Plan.  If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

### 4.       Prepetition Solicitation of acceptances

In many instances, a plan of reorganization is filed and votes to accept or reject the plan are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes before the commencement of a chapter 11 case in accordance with section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

o       the plan of reorganization be transmitted to substantially all creditors and interest holders entitled to vote;

o       the time prescribed for voting is not unreasonably short; and

o       the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of adequate information.

Section 1125(a)(1) of the Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the Plan.  With regard to solicitation of votes before the commencement of a bankruptcy case, if the Bankruptcy Court concludes that the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, whereupon the Plan could not be confirmed without a resolicitation of votes to accept or reject the Plan.  While the Debtors believe that the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

5. **Failure to receive Bankruptcy Court approval of the compromises and settlements contemplated by the Plan**

The Plan constitutes a settlement, compromise and release of all rights arising from or relating to the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan, taking into account and conforming to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination or section 510(b) and (c) of the Bankruptcy Code. This settlement, compromise and release require approval by the Bankruptcy Court. The Debtors cannot ensure that the Bankruptcy Court will approve of the settlement contemplated in the Plan.

The Plan also provides for certain releases, injunctions and exculpations that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties. The releases, injunctions, and exculpations may not be approved, in which case certain Released Parties may withdraw their support from the Plan, notwithstanding the existence of the Restructuring Support Agreement.

6. **Alternative Plans of Reorganization may be proposed**

If these Chapter 11 Cases are commenced, other parties-in-interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization. However, such exclusivity period can be reduced or terminated upon a showing of cause and an order of the Bankruptcy Court. Were such an order to be entered, other parties-in-interest would then have the opportunity to propose alternative plans of reorganization.

If other parties-in-interest were to propose an alternative plan following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to holders of Claims or Interests. If there are competing plans of reorganization, these Chapter 11 Cases are likely to become longer and more complicated.

7. **Failure to consummate the Plan**

Article IX of the Plan contains various conditions to consummation of the Plan, including the Confirmation Order having become final and non-appealable, the Debtors having entered into the Plan Documents, and all conditions precedent to effectiveness of such agreements having been satisfied or waived in accordance with the terms thereof. As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed. If the Plan is not consummated and the restructuring completed, these

Chapter 11 Cases will be prolonged and the Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

### 8.    Extended stay in a bankruptcy proceeding

While the Debtors expects that a chapter 11 bankruptcy filing solely for the purpose of implementing the Plan would be of short duration and would not be unduly disruptive to the Debtors' business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan would be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business.  There is a risk, due to uncertainty about the Debtors' future, that:

- customers could seek alternative sources of products from the Debtors' competitors, including competitors that are in little or no relative financial or operational distress;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- vendors, suppliers or agents and other business partners could terminate their relationship with the Debtors or require financial assurances or trade terms which are materially different from what the Debtors have today.

A lengthy bankruptcy proceeding would also involve significant expenses and divert the attention of management from operating the Debtors' business, as well as creating concerns for employees, suppliers and customers.

The disruption that a bankruptcy proceeding could inflict upon the Debtors' business would increase with the length of time it takes to complete these Chapter 11 Cases and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties on whom the Debtors depend, including vendors, employees, agents and customers.  If the Debtors are unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed.  A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

### 9.    Failure to receive Bankruptcy Court approval of the use of cash collateral

On or shortly after commencing Chapter 11 Cases, the Debtors may decide to ask the Bankruptcy Court to authorize them to use cash collateral to fund these Chapter 11 Cases.  Such access to cash collateral will provide liquidity during the pendency of these Chapter 11 Cases.  There can be no assurance that the Bankruptcy Court will approve the use of cash collateral on the terms requested.  Moreover, if these Chapter 11 Cases take longer than expected

to conclude, the Debtors may exhaust their available cash collateral.  In such case, there is no assurance that the Debtors will be able to obtain an extension of the right to use cash collateral from their secured lenders or, in the alternative, obtain debtor-in-possession financing, and, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### 10.    Termination of the Restructuring Support Agreement in certain circumstances

Pursuant to the Restructuring Support Agreement, the Consenting Stakeholders have agreed to support the Plan, however, such support can be terminated and such votes revoked pursuant to the terms and conditions thereof upon the occurrence of certain "Termination Events" (as defined therein) under the Restructuring Support Agreement.  Such Termination Events include, among other things, the failure of the Debtors to reach certain milestones in these Chapter 11 Cases in a timely manner, such as the occurrence of the Effective Date in accordance with the timeline set forth in the Restructuring Support Agreement.  While the Debtors believe that they will be able to meet such milestones, there can be no assurance that will be the case.  Additional events that constitute Termination Events under the Restructuring Support Agreement include the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, a material breach by the Debtors of their obligations under the Restructuring Support Agreement, or a final determination by a court or governmental agency of competent jurisdiction that the transactions contemplated by the Plan cannot legally go forward.  See Exhibit E for additional detail.  If a Termination Event occurs and the support of the Consenting Lenders were to be withdrawn, and the votes of such holders were revoked, the Debtors may need to amend the Plan and re-solicit votes thereon, or formulate a new chapter 11 plan and solicit votes on such new plan.  Such amendment and/or re-solicitation could cause material delay in these Chapter 11 Cases, and may adversely impact the Debtors' businesses and its ability to reorganize.

### 11.    Distributions could be delayed

If the Plan is confirmed, the date of the distributions to be made pursuant to the Plan will not occur until the Effective Date.  The Debtors estimate that the process of obtaining confirmation of the Plan will be no longer fifty (50) days from the date of the commencement of the Debtors' Chapter 11 Cases and, if these Chapter 11 Cases are filed, intends to seek to confirm the Plan on an expedited timeframe.  While the Debtors anticipates making Distributions within fifteen (15) days after entry of the Confirmation Order, they may be delayed for a substantially longer period if the conditions to consummation of the Plan have not yet been met.

### 12.    Objections to classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

13.    **Failure to receive Bankruptcy Court approval of first day orders**

The Debtors will seek to address potential concerns of their customers, vendors, employees and other key parties-in-interest that might arise from the filing of the Plan by filing motions seeking appropriate court orders to permit the Debtors to pay accounts payable to key parties-in-interest in the ordinary course of business.  There can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party-in-interest the Debtors may seek to treat in this manner.

C.    **Risks Relating to Tax and Accounting Consequences of the Plan**

1.    **Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations**

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors currently do not intend to seek any ruling from the Internal Revenue Service (the "IRS") on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.  Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment of the Plan, or that a court would not sustain such a challenge.  Holders of Claims and Interests should carefully review Article X hereof, "Certain U.S. Federal Income Tax Considerations," to determine how the tax implications of the Plan may adversely affect the Debtors, Reorganized Debtors, and Holders of Claims and Interests.

2.    **Use of Historical Financial Information**

As a result of the consummation of the Plan and the transactions contemplated thereby, the Debtors believe they will be subject to the fresh-start accounting rules.  Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued.  This process is guided by purchase price allocation standards under GAAP.  Application of fresh-start accounting rules could result in the values of certain of the Debtors' assets being written down.

D.    **Other Risks**

1.    **The Effective Date May Not Occur**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  Effectiveness of the Plan is also subject to certain conditions as described in Article XI of the Plan.  If these conditions have not occurred or have not been waived as set forth in the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be

restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to the Claims and Interests would remain unchanged.

## 2.   The Restructuring Support Agreement May Terminate

The Restructuring Support Agreement may terminate if, among, other things, the deadlines set forth therein are not met.  Should a termination event occur, all obligations of the parties to the Restructuring Support Agreement will terminate, except that, in certain cases, a party's termination solely with respect to itself may not result in the termination of the Restructuring Support Agreement with respect to any other party.  Termination of the Restructuring Support Agreement could result in protracted bankruptcy proceedings, which could significantly and detrimentally impact the Debtors' relationships with their customers, employees and vendors.

## 3.   Subject to the Terms and Conditions of the Restructuring Support Agreement, the Debtors May Seek Alternatives to the Confirmation of the Plan

If the Plan is not confirmed, the Debtors may be unable to satisfy their financial obligations and the Debtors' ability to continue operating as a going concern could be severely jeopardized.  The realistic alternatives likely will be:  (i) the preparation and presentation of an alternative plan of reorganization; (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (iii) a liquidation under Chapter 7 of the Bankruptcy Code.  The Debtors believe that seeking relief under the Bankruptcy Code other than in connection with the Plan could materially and adversely affect the relationships between the Debtors and their existing and potential customers, employees, vendors, suppliers, and other stakeholders, and subject the Debtors to other direct and indirect adverse consequences.

For example:

- reputational damage could cause customers to move to the Debtors' competitors;

- such a bankruptcy filing could erode the Debtors' customers' confidence in the Debtors' ability to produce and deliver competitive services and products and, as a result, there could be a significant and precipitous decline in the Debtors' revenues, profitability and cash flow;

- it may become more difficult to retain, attract or replace key employees;

- the Debtors could be forced to operate in bankruptcy for an extended period of time while they try to develop a confirmable reorganization plan;

- the Debtors' trade creditors, customers and other partners could seek to terminate their relationships with the Debtors, require financial assurances or enhanced performance, or refuse to provide credit on the same terms as they provided prior to the reorganization case;

- the Debtors may not be able to obtain debtor-in-possession financing or use of cash collateral to sustain operations during these Chapter 11 Cases; and

- if the Debtors are not able to confirm and implement a plan of reorganization, or if sufficient postpetition financing is not available, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code.

### 4. The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 5. No representations outside this Disclosure Statement are authorized

No representations concerning or related to the Debtors or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your vote to accept the Plan, that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 6. No legal or tax advice is provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to provide you with information regarding the Debtors and the proposed Restructuring Transactions to assist you in making a decision regarding whether or not to support the Out-of-Court Restructuring and vote in favor of the Plan.

## IX. DESCRIPTION OF SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN

### A. New Common Stock.

As part of their recovery, the Holders of First Lien Term Loan Claims, Revolving Credit Loan Claims, and Second Lien Term Loan Claims will receive New Common Stock in exchange for their Claims. The New Common Stock shall be described in the Plan Supplement.

### B. New Warrants

As part of their recovery, the Holders of Second Lien Term Loan Claims will receive the New Warrants Recovery in exchange for their Second Lien Term Loan Claims. The

New Warrants Recovery and the New Warrant Agreement shall be described in the Plan Supplement.

## X.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims (each, a "Holder") entitled to vote on the Plan. This summary is based on the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes to, or new interpretations of, the Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Common Stock or New Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders who are in bankruptcy). Further, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than as a Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary generally does not address the U.S. federal income tax consequences to Non-U.S. Holders (as defined below).

For purposes of this discussion, a U.S. Holder is a Holder of a Claim that is: (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the

source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is a Holder that is not a U.S. Holder.

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult with their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**A. Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

**1. Characterization of the Plan**

The Debtors anticipate that the Plan will be effectuated pursuant to one of two potential structures.  In one structure, the New Common Stock and New Warrants will be issued by Reorganized Parent, which will continue to own the Debtors and their subsidiaries (the "Existing Structure").  In the alternative structure, the Debtors' assets will be transferred to an entity ("Newco") to be formed by a nominee of certain Holders (the "Newco Structure").  Certain tax consequences of the Plan will depend on whether the Existing Structure or the Newco Structure will be used.

The Debtors and the Required Consenting First Lien Lenders have not yet determined how the Plan will be structured.  Such decision will principally depend on whether a determination can be reached that the Newco Structure would not result in significant cash tax liability for the Debtors.  In the Newco Structure, the Debtors would realize taxable gain or loss upon the transfer (or deemed transfer) of assets in an amount equal to the difference between the aggregate fair market value of the assets transferred (or deemed transferred) by the Debtors and

the Debtors' aggregate tax basis in such assets. Any gain not offset by the Debtors' net operating loss carryforwards (the "NOLs") or other tax attributes would result in a cash tax liability.

## 2. Cancellation of Debt

The Debtors expect to incur a substantial amount of cancellation of indebtedness income ("COD Income") as a result of the Plan.

In general, COD Income is includable in a taxpayer's gross income. If COD Income is recognized by a debtor in a bankruptcy case, it is generally excluded from the debtor's gross income. The Tax Code provides that where COD Income is excluded because of this bankruptcy exception, the debtor must reduce certain of its tax attributes, such as NOLs, current year losses, tax credits and tax basis in property, by the amount of any excluded COD Income after the determination of the U.S. federal income tax for the year of the discharge of the debt. Although not free from doubt, it is expected that carryover of disallowed business interest expense would not be a tax attribute subject to such reduction. The Debtors expect that COD Income realized as a result of the implementation of the Plan will be excluded from the Debtors' gross income, resulting in a reduction of certain tax attributes.

The amount of the COD Income will generally equal the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (a) the amount of Cash paid, (b) the issue price of any new indebtedness of the taxpayer issued, and (c) the fair market value of any other consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such indebtedness at the time of the exchange, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD Income (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent the amount of COD Income exceeds the tax attributes available for reduction, the remaining COD Income is without further current or future tax cost to the debtor. Special rules apply where the excluded COD Income is recognized by a debtor that is a member of a consolidated group. Under these rules, the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member) are first subject to reduction. To the extent that the excluded COD Income exceeds the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member), the Treasury Regulations generally require the reduction of certain consolidated tax attributes attributable to other members of the group. If one of the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that certain corresponding reductions be made to the tax attributes of the lower-tier member (including consolidated tax attributes of such lower-tier member).

If COD Income is realized, the amount of COD Income will depend, in part, on the value of the New Common Stock and the New Warrants distributed in discharge of Claims.

Under the rules discussed above, certain tax attributes of the Debtors (primarily, tax basis in assets) could be substantially reduced if there is significant COD Income.

In the Newco Structure, COD Income will not result in a reduction in the tax basis of assets acquired by Newco. Instead, Newco will have tax basis in the assets acquired from the Debtors equal to the fair market value of such assets.

### 3. Section 382

Section 382 of the Tax Code places significant limitations upon the use of a corporation's (or consolidated group's) NOLs and certain other tax attributes if an "ownership change" occurs with respect to such corporation's stock. Section 382 generally imposes an annual limitation on the use of pre-ownership change losses equal to the product of (i) the fair market value of the corporation immediately before the ownership change multiplied by (ii) the "long term tax-exempt rate" for the month in which the ownership change occurs. If a corporation (or consolidated group) recognizes tax losses during the tax year in which an ownership change occurs, the tax losses are generally apportioned between the period prior to the ownership change and the period after the ownership change using a "daily proration" methodology. Losses that are apportioned to the period prior to the ownership change will be subject to the Section 382 limitations on the use of NOLs, and losses that are apportioned to the period after the ownership change will not be subject to such limitations. It is anticipated that an ownership change will occur with respect to the Debtors on the Effective Date.

If a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then built-in losses recognized during the five-year period following the ownership change generally will be treated as pre-ownership change losses and will be subject to the annual limitation provided under Section 382. If a corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the five-year period following the ownership change generally will increase the annual limitation in the year such gains are recognized.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's pre-ownership change losses are not limited on an annual basis, but, instead, NOLs will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after

the Effective Date, then the Reorganized Debtors' pre-ownership change losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its pre-ownership change losses. Instead, if a subsequent ownership change occurs, the resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not yet determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

In the Newco Structure, Newco would not succeed to any of the tax attributes of the Debtors, but should have tax basis in the assets acquired from the Debtors equal to the fair market value of such assets. Accordingly, the discussion above regarding Section 382 would be generally irrelevant for Newco.

**B. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Consenting First Lien Term Loan Claims, Revolving Credit Loan Claims and Second Lien Term Loan Claims**

The following discussion assumes that the Debtors will undertake the Plan. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Plan.

**1. Certain U.S. Federal Income Tax Consequences to U.S. Holders of First Lien Term Loan Claims, Revolving Credit Loan Claims and Second Lien Term Loan Claims; General**

Under the Plan, each Holder of First Lien Term Loan Claims, in exchange for such Claims, shall directly or through a designee receive its *pro rata* share of (i) the Second Out Take Back Term Loans, (ii) 95% of New Common Stock, subject to: (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of Revolving Credit Loan opting to directly or through a designee receive its *pro rata* share of the Incremental Second Out Take Back Term Loan Amount, and (iii) a cash payment of $11,669,935.04; and each holder of Second Lien Term Loan Claims, in exchange for such Claims, shall directly or through a designee

receive its *pro rata* share of (i) 5% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery; (ii) New Warrants Recovery; and (iii) a cash payment of $750,000.  In addition, each Holder of Revolving Credit Loan Claims, in exchange for such Claims, shall receive its *pro rata* share, along with the Holders of Allowed First Lien Term Loan Claims, of: (i) the Second Out Take Back Term  Loans; and (ii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery; *provided, however*, a holder of a Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive its *pro rata* share of its Incremental Second Out Take Back Term Loan Amount in lieu of receiving the New Common Stock; and (iv) a cash payment of $11,669,935.04.

The tax consequences of the Plan to a U.S. Holder of a Claim may depend in part upon (i) whether such Claim is based on an obligation that constitutes a "security" for federal income tax purposes and (ii) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for federal income tax purposes. The determination of whether a debt obligation constitutes a security for federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim. Generally, obligations arising out of the extension of trade credit have been held not to be tax securities, while corporate debt obligations evidenced by written instruments with original maturities of ten (10) years or more have been held to be tax securities. An instrument with a term of less than five (5) years generally has been held not to be a security. However, the IRS has ruled that new debt obligations with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities may also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the issuing corporation in substantially the same form.  It is uncertain whether the debt obligations under the Existing First Lien Credit Agreement or the Existing Second Lien Credit Agreement will be considered securities for U.S. federal income tax purposes and U.S. Holders are advised to consult their tax advisors with respect to this issue. The Second Out Take Back Term Loan Facility will mature within 4.25 years after its date of issuance, and the discussion herein assumes that it will not constitute a security.

If the debt obligations under the Existing First Lien Credit Agreement are considered securities for federal income tax purposes, each U.S. Holder of First Lien Term Loan Claims should recognize gain, but not loss (other than amounts received in payment of accrued but unpaid interest, as discussed below), in an amount equal to the lesser of (i) the sum of the issue price of the Second Out Take Back Term Loans and the amount of Cash received, and (ii) the excess of (a) the sum of Cash, fair market value of the New Common Stock, and the issue price of the Second Out Take Back Term Loans received over (b) the adjusted basis of U.S. Holder's Claim.  Such U.S. Holder's holding period in the New Common Stock would include the U.S. Holder's holding period in its Claim, while the U.S. Holder would start a new holding period in the Second Out Take Back Loans. Such U.S. Holder's basis in the New Common Stock received would equal the U.S. Holder's basis in its Claim, less the issue price of the Second Out Take Back Term Loan and the amount of Cash received and any deductions claimed in respect of any previously accrued but unpaid interest income, plus the amount of gain or interest income, if any, recognized on the exchange.

If the debt obligations under the Existing First Lien Credit Agreement are not considered securities for U.S. federal income tax purposes then, other than with respect to any

amounts received that are attributable to accrued but unpaid interest, each U.S. Holder of First Lien Term Loan Claims would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash plus (b) the fair market value of New Common Stock plus (c) the issue price of the Second Out Take Back Term Loans received, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

The debt obligations under the First Lien Revolving Credit Loan are not expected to be considered securities for U.S. federal income tax purposes. Other than with respect to any amounts received that are attributable to accrued but unpaid interest, each U.S. Holder of Revolving Credit Loan Claims would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) Cash plus (b) the fair market value of New Common Stock plus (iii) the issue price of the Second Out Take Back Term Loans received, and (ii) such U.S. Holder's adjusted tax basis in its Claim.

If the debt obligations under the Existing Second Lien Credit Agreement are considered securities for federal income tax purposes, each U.S. Holder of Second Lien Term Loan Claims should recognize no gain or loss (other than amounts received in payment of accrued but unpaid interest, as discussed below).  Such U.S. Holder's holding period in the New Common Stock and the New Warrants would include the U.S. Holder's holding period in its Claim, and its basis in the New Common Stock and the New Warrants would equal the U.S. Holder's basis in its Claim.

If the debt obligations under the Existing Second Lien Credit Agreement are not considered securities for U.S. federal income tax purposes then, other than with respect to any amounts received that are attributable to accrued but unpaid interest, each U.S. Holder of Second Lien Term Loan Claims would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of New Common Stock and the New Warrants received and (ii) the adjusted basis of such U.S. Holder's Claim.

If the Newco Structure is used, all U.S. Holders should be treated as engaging in a fully taxable exchange.

The character of any gain or loss as capital gain or loss or ordinary income or loss will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

## 2. Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to

that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 Plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

### 3.  Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  U.S. Holders are urged to consult their tax advisors concerning the application of the market discount rules to the Claims.

### 4. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors

regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan or the Plan Supplement.

## 5. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock

### (a) Dividends on New Common Stock

Generally, distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the issuer of such New Common Stock as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by share basis) generally will be treated as capital gain. Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividend-received deduction may be disallowed.

### (b) Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

### (c) Ownership, Exercise, and Disposition of New Warrants

A U.S. Holder that elects to exercise the New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants. A U.S. Holder's aggregate tax basis in the New Common Stock will equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its New Warrants plus (ii) such U.S. Holder's tax basis in its New Warrants immediately

before the New Warrants are exercised. A U.S. Holder's holding period in the New Common Stock will begin on the day after the exercise date of the New Warrants.

Under section 305 of the Tax Code, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

A U.S. Holder that elects not to exercise the New Warrants and instead allows the New Warrants to lapse may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants. In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the U.S. Holder if such stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants.[12]

### 6. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the First Out Take Back Term Loans and Second Out Take Back Term Loans

#### (a) Interest and Original Issue Discount.

Payments of stated interest under the First Out Take Back Term Loans or Second Out Take Back Term Loans will constitute payments of "qualified stated interest" and generally will be taxable to holders as ordinary income at the time the payments are received or accrued, in accordance with the holder's method of tax accounting. The preceding discussion assumes the First Out Take Back Term Loans and Second Out Take Back Term Loans will not be issued with original issue discount ("OID"). The First Out Take Back Term Loans or Second Out Take Back Term Loans generally would be treated as issued with OID if the principal amount of the First Out Take Back Term Loans or Second Out Take Back Term Loans, as applicable, plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the issue price of the debt instrument by more than a de minimis amount. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly

---

[12]     Tax disclosure to be confirmed when terms of New Warrants are finalized.

traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (i.e., interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange. A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. However, a debt instrument will generally not be treated as publicly traded if at the time the determination is made the outstanding stated principal amount of the issue that includes the debt instrument does not exceed $100 million.

### (b) Sale, Retirement or Other Taxable Disposition

A U.S. Holder of the First Out Take Back Term Loans or Second Out Take Back Term Loans will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the obligations due under the First Out Take Back Term Loans or Second Out Take Back Term Loans equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the First Out Take Back Term Loans and Second Out Take Back Term Loans, as applicable. Any such gain or loss generally will be capital gain or loss, and will be long term capital gain or loss if the U.S. Holder has held the First Out Take Back Term Loans or Second Out Take Back Term Loans, as applicable, for more than one year as of the date of disposition. If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

### C. Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XI.    IMPLEMENTATION OF THE PLAN

### A.    Plan Distributions and Transactions

As soon as reasonably practicable after the Effective Date, the distributions provided for under the Plan will be effectuated pursuant to the following restructuring transactions, which shall take place, *in seriatim*, pursuant to documentation reasonably satisfactory to the Debtors and the Required Consenting First Lien Lenders:

(a)    the Debtors will implement the transactions as set forth in Section V of the Plan;

(b) the Debtors will enter into the First Out Term Loan Facility and the Second Out Take Back Term Loan Facility;

(c)    the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order;

(d)    certificates of incorporation, by-laws and other organizational documents of the Reorganized Debtors, in form and substance satisfactory to the Required Consenting Lenders, shall be amended and restated as necessary to effectuate the terms of the Plan;

(e)    Reorganized Parent shall issue the New Common Stock pursuant to the terms of the Plan and enter into its applicable New Corporate Governance Documents;

(f)  Reorganized Parent shall issue the New Warrants pursuant to the terms of the Plan;

(g)     the Debtors shall consummate the Plan by: (i) making Distributions of the New Common Stock to the First Lien Lenders and the Second Lien Term Loan Lenders; (ii) making Distributions of the New Warrants to the Second Lien Term Loan Lenders; (iii) paying all DIP Facility Claims in full in Cash; and (iv) entering into the First Out Term Loan Facility, the New ABL Facility, and the Second Out Take Back Term Loan Facility;

(h)     the releases provided for in the Plan, which are an essential element of the Restructuring Transactions, shall become effective.

## B.     Continued Corporate Existence and Corporate Action

Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.  On or after the Effective Date, each Reorganized Debtor, in its discretion, may take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, subject in each case, to the terms and conditions of the applicable New Corporate Governance Documents, including causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor, or its subsidiary and/or affiliate; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's case on the Effective Date or any time thereafter.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights and Causes of Action and any property, wherever located, acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests.  Subject to the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property, wherever located, and prosecute, compromise or settle any Claims (including any Administrative Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and

clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

On the Effective Date, these Chapter 11 Cases for all of the Debtors, other than Dynata, LLC (or other such entity that may be designated by the Debtors and the Required Consenting First Lien Lenders), shall be closed without the need to file any further documents with the Bankruptcy Court, and the Confirmation Order shall act as a final decree closing each of such other Debtor's Chapter 11 Cases; provided that, notwithstanding the foregoing, the Reorganized Debtors shall pay when due all U.S. Trustee Fees owing through the day before the Effective Date; provided further that, in no way will the closing of such Chapter 11 Cases prejudice the treatment of any holder of an Allowed Claim, including any right to receive Distributions under the Plan, nor will the closing of such Chapter 11 Cases otherwise alter or modify the terms of the Plan.

## C.    Effectuating Documents and Further Transactions

The Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements (including the Plan Documents) and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, shareholder, or shareholder approval or action.

## D.    First Out Exit Financing Facility

On the Effective Date, the Reorganized Debtors shall execute and deliver the First Out Term Loan Credit Agreement and the other First Out Term Loan Facility Documents. Confirmation shall be deemed approval of the First Out Term Loan Facility (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the First Out Term Loan Facility, including the First Out Term Loan Facility Documents.

On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the First Out Term Loan Facility Credit Agreement shall be deemed granted by the Reorganized Debtors pursuant to the First Out Term Loan Facility Agreement, and all Liens and security interests granted pursuant to, or in connection with First Out Term Loan Facility Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the First Out Term Loan Facility Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) not be enjoined or subject to

discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (i) further notice to or order of the Bankruptcy Court or (ii) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

The form of the First Out Term Loan Facility Agreement, which shall be filed with the Plan Supplement, shall be consistent with the Restructuring Support Agreement and the First Out Term Loan Facility Term Sheet, and shall be in form and substance acceptable to the Debtors and the Required Consenting First Lien Lenders.

### E.     Second Out Take Back Term Loan Facility

On the Effective Date, the Reorganized Debtors shall execute and deliver the Second Out Take Back Term Loan Credit Agreement and the other Second Out Take Back Term Loan Documents. Confirmation shall be deemed approval of the Second Out Take Back Term Loan Facility (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the Second Out Take Back Term Loan Facility, including the Second Out Take Back Term Loan Credit Documents.

On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the Second Out Take Back Term Loan Facility Credit Agreement shall be deemed granted by the Reorganized Debtors pursuant to the Second Out Take Back Term Loan Credit Agreement, and all Liens and security interests granted pursuant to, or in connection with the Second Out Take Back Term Loan Credit Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Second Out Take Back Term Loan Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in

each case, without (i) further notice to or order of the Bankruptcy Court or (ii) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

The form of the Second Out Take Back Term Loan Credit Agreement, which shall be filed with the Plan Supplement, shall be consistent with the Restructuring Support Agreement and the Second Out Take Back Term Loan Term Sheet, and shall be in form and substance acceptable to the Required Consenting First Lien Lenders. For the avoidance of doubt, on the Effective Date, all applicable holders of First Lien Claims shall be deemed party to the Second Out Take Back Term Loan Credit Agreement and the applicable other Second Out Take Back Term Loan Documents, in each case, without the need for execution by any party thereto other than Reorganized Parent.

F.     **New ABL Facility.**

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the New ABL Facility, as well as any notes, documents or agreements required thereunder, including any documents required in connection with the creation or perfection of the liens on collateral securing the obligations arising under the New ABL Facility.

G.     **Cancellation of Certain Existing Agreements.**

Except for the purpose of evidencing a right to Distribution under the Plan, and except as otherwise expressly provided in the Plan, on the Effective Date, all notes, instruments, and certificates related to the Existing First Lien Credit Agreement, the Existing Second Lien Credit Agreement, and the Existing Equity Interests shall be deemed surrendered and cancelled and obligations of the Debtors thereunder shall be discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or any requirement of further action, vote or other approval or authorization by any Person.

H.     **Release of Liens, Claims and Interests.**

Except as expressly provided therein, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all Liens, Claims and Interests in or against the property of the Debtors' Estates which secure the First Lien Claims and Second Lien Term Loan Claims will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.  Any Person holding Liens, Claims or Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in

recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Person in connection with its execution and delivery of such instruments.

### I.      Directors of the Reorganized Debtors.

The New Board shall consist of the individuals selected in accordance with the New Corporate Governance Documents of Reorganized Parent and shall be set forth in the Plan Supplement.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Corporate Governance Documents of such Reorganized Debtor.

The members of the board of New Insight Holdings, Inc. prior to the Effective Date shall have no continuing obligations to the Debtors on and after the Effective Date and each such members shall be deemed to have resigned or shall otherwise cease to be a director of New Insight Holdings, Inc., respectively, on the Effective Date.

### J.      Management Incentive Plan.

The Confirmation Order, if any, shall authorize the New Board's adoption and entry into the MIP.  The securities issued under the MIP shall dilute the New Common Stock and New Warrants issued by Reorganized Parent.  On the Effective Date, Reorganized Parent shall issue or cause to be delivered the applicable Interests in the Debtors directly to applicable members of management in accordance with the terms of the Management Incentive Plan.

### K.      General Distribution Mechanics.

(a)      Distributions on Account of Allowed Claims Only. Notwithstanding anything in the Plan to the contrary, no Distribution shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

(b)      Distribution Agent.  Except as otherwise provided in the Plan, all distributions under the Plan, including the distribution of the New Common Stock and New Warrants, shall be made by the Distribution Agent or by such other Entity designated by the Reorganized Debtors as a Distribution Agent on the Effective Date.

(c)      Distribution Record Date.  Distributions under the Plan to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Any transfers of Claims after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided herein.

(d)      No Recourse.  Except with respect to Claims which are Reinstated, no claimant shall have recourse to the Reorganized Debtors (or any property thereof), other than with regard to the enforcement of rights or Distributions under the Plan.

(e)      Method of Cash Distributions.  Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars and may be made by draft, check, or wire transfer, in the sole discretion of the Debtors or the Reorganized Debtors, or as otherwise required or provided in any relevant agreement or applicable law.

(f)      <u>Distributions on Non-Business Days</u>.  Any payment or Distribution due on a day other than a Business Day may be made, without interest, on the next Business Day.

(g)      <u>No Distribution in Excess of Allowed Amount of Claim</u>. Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

(h)      <u>Disputed Payments</u>.  If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Reorganized Debtors may, in lieu of making such Distribution to such Person, make such Distribution into a segregated account until the disposition thereof shall be determined by Court order or by written agreement among the interested parties.

### L.      Allocation of Plan Distributions Between Principal and Interest

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest accrued through the Effective Date, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### M.      Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

### N.      Exemption from Certain Transfer Taxes

To the fullest extent permitted by applicable law, all transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by

the Debtors of any owned property pursuant to section 363(b) or 1123(b)(4) of the Bankruptcy Code, any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, and the creation, modification, consolidation or recording of any mortgage pursuant to the terms of the Plan, or any ancillary documents, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### O.    Exemption from Securities Laws

The issuance of and the distribution under the Plan of the Plan Securities shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Regulation D promulgated under the Securities Act Regulation S promulgated under the Securities Act, to the maximum extent permitted thereunder.

Except as otherwise set forth immediately below, the New Common Stock and New Warrants issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. New Common Stock and New Warrants issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Common Stock and New Warrants issued pursuant to section 1145 of the Bankruptcy Code are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and, subject to the terms of the applicable New Corporate Governance Documents, are freely tradable and transferable by any holder thereof that:  (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act; (ii) has not been an "affiliate" within 90 days of such transfer; (iii) has not acquired the New Common Stock and New Warrants from an "affiliate" within one year of such transfer; and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, THE DEBTORS DO NOT MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE DEBT EXCHANGE. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE DEBT EXCHANGE CONSULT THEIR OWN COUNSEL

CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

**P.      Setoffs and Recoupments**

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim, other than an Allowed First Lien Term Loan Claim, Allowed Revolving Credit Loan Claim or Allowed Second Lien Term Loan Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights and causes of action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim thereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights and causes of action that a Reorganized Debtor or its successor may possess against such holder.

**Q.      Solicitation of Debtors**

Notwithstanding anything to the contrary in the Plan, each Debtor and all non-Debtor direct or indirect subsidiaries of any Debtor that would otherwise be entitled to vote to accept or reject the Plan as a holder of a Claim against or Interest in another Debtor shall not be solicited for voting purposes, and such Debtor or non-Debtor subsidiary will be deemed to have voted to accept the Plan.

**XII.    EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND INTERESTS**

**A.      Discharge**

(a)      Scope.  Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1141 of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge, effective as of the Effective Date, of all debts of, Claims against, Liens on, and Interests in the Debtors, their assets or properties, which debts, Claims, Liens, and Interests arose at any time before the entry of the Confirmation Order.  The discharge of the Debtors shall be effective as to each Claim, regardless of whether a proof of claim therefor was filed, whether the Claim is an Allowed Claim or whether the holder thereof votes to accept the Plan.  On the Effective Date, as to every discharged Claim and Interest, the holder of such Claim or Interest shall be precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code from asserting against the Debtors, the Reorganized Debtors or the assets or properties of any of them, any other or further Claim or Interest based upon any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

(b)      Injunction.  In accordance with section 524 of the Bankruptcy Code, the discharge provided by this section and section 1141 of the Bankruptcy Code, *inter alia,* acts as an injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the Claims, Liens and Interests discharged hereby.

**B.      Vesting and Retention of Causes of Action**

Except as otherwise provided in the Plan, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Debtors' Estates (including Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the New Corporate Governance Documents

### C.   Release of Claims

(a)   **Satisfaction of Claims and Interests.** The treatment to be provided for respective Allowed Claims or Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release and discharge of such respective Claims or Interests

(b)   **Debtor Releases**

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtors, Reorganized Debtors, and the Debtors' Estates, in each case on behalf of themselves and their Related Parties, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, Reorganized Debtors, or the Debtors' Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or Cause of Action against, or interest in, a Debtor or other Entity (or that any holder of any claim, interest, or Cause of Action could have asserted on behalf of the Debtors), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in  or out of court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document**

created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan by the Debtors, Reorganized Debtors, and the Debtors' Estates, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (ii) in the best interest of the Debtors, Reorganized Debtors, and the Debtors' Estates and all holders of Interests and Causes of Action; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) subject to the terms and provisions herein, a bar to the Debtors, Reorganized Debtors, and the Debtors' Estates asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their assets and property.

(c)      Releases by Holders of Claims and Interests

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in or out of court restructuring efforts, intercompany transactions between or among a Debtor, another Debtor and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the

Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, the New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, (ii) any Person from any claim or Causes of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence by such Person, or (iii) any lender under either the Existing First Lien Credit Agreement or the Existing Second Lien Credit Agreement of any indemnification or contribution claims of either the First Lien Agent or the Second Lien Agent (or the predecessor to the Second Lien Agent) under such agreements.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases in this Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such releases are: (i) in exchange for good and valuable consideration provided by, and the contributions of, the Debtors and the other Released Parties, representing good faith settlement and compromise of the claims released in the Plan; (ii) in the best interests of the Debtors and all holders of Claims and Interests; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any claim or cause of action released by such Releasing Party against any of the Debtors or Reorganized Debtors or any other Released Parties or their respective property.

(d)    **Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT

**TO <u>ARTICLE XI.E</u> OR <u>ARTICLE XI.F</u> OF THE PLAN, DISCHARGED PURSUANT TO <u>ARTICLE XI.C</u> OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE XI.D</u> OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (i) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (ii) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (iii) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (iv) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (v) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THE PLAN OR UNDER ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THE PLAN OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

(e)    <b>Exculpation</b>

**Except as otherwise specifically provided in the Plan, to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, amendment, or filing or termination of the Restructuring Support Agreement and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during**

**these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce this Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

(f)      **Injunction Related to Exculpation**

**The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities for which exculpation is provided pursuant to <u>Article XI</u> of the Plan.**

D.      **Objections to Claims and Interests**

Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed and served on the applicable holder of such Claim not later than 120 days after the later to occur of: (i) the Effective Date; and (ii) the filing of the relevant Claim. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (x) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (y) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (z) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in these Chapter 11 Cases (so long as such appearance has not been subsequently withdrawn).

After the Confirmation Date, only the Reorganized Debtors shall have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to Claims. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without Bankruptcy Court approval. **Any Claims filed after the Effective Date shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors and shall not be enforceable against a Reorganized Debtor.**

## XIII.   EXECUTORY CONTRACTS UNDER THE PLAN

### A.      Assumption of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by such Debtor; (ii) expired or terminated pursuant to its own terms prior to the Effective Date; or (iii) is the subject of a motion to reject filed on or before the Effective Date. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to one or more Reorganized Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above described assumptions and assignments.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed, or amended and assumed, and, in either case, potentially assigned, restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption, or amendment and assumption, and, in either case, the potential assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default related rights with respect thereto.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### B.      Cure of Defaults for Assumed Executory Contracts or Unexpired Leases

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the

Reorganized Debtors of the applicable Cure Claim; provided, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim. The Debtors, with the consent of the Required Consenting First Lien Lenders, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Confirmation Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must have been filed with the Bankruptcy Court by the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Confirmation Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that did not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (i) the amount of any Cure Claim, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the reasonable consent of the Required Consenting First Lien Lenders), or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## C.     Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract, or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of,

or gives rise to a right of any Person or entity based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of any of these Chapter 11 Cases; (iii) confirmation or consummation of the Plan, including any change of control that will occur as a result of such consummation; or (iv) the Restructuring Transactions.

### D.    Compensation and Benefit Programs

Except as otherwise expressly provided under the Plan, in a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees and retirees including, without limitation, all savings plans, unfunded retirement plans, healthcare plans, disability plans, severance benefit plans, bonus plans, retention plans, incentive plans (other than equity issued pursuant to any applicable equity incentive plans), workers' compensation plans and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### E.    Severance Agreements and Compensation and Benefit Programs; Employment Agreements

Except as otherwise provided in the Plan, the Plan Supplement or any order of the Bankruptcy Court, all severance policies, all severance arrangements and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to their employees and retirees, including all savings plans, retirement plans, healthcare plans, disability plans, severance agreements and arrangements, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### F.    Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto, including all D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair or otherwise modify any indemnity obligations presumed or otherwise referenced in the foregoing insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an

Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect or purchased as of the Petition Date, and all members, managers, directors and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such D&O Liability Insurance Policy shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date.

### G.    Survival of Certain Indemnification Obligations

The indemnification provisions in any Indemnification Agreement with respect to or based upon any act or omission taken or omitted by an indemnified party in such indemnified party's capacity under such Indemnification Agreement will be Reinstated (or assumed, as the case may be) and will survive effectiveness of the Plan. All such obligations are treated as and deemed to be Executory Contracts to be assumed by the Debtors pursuant to <u>Article VI.A</u> of the Plan. Notwithstanding the foregoing, nothing shall impair the Reorganized Debtors from prospectively modifying any such indemnification provisions (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts or otherwise) after the Effective Date, for indemnification claims and/or rights arising after the Effective Date.

### H.    Postpetition Contracts and Leases

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

## XIV. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Conditions to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX</u> of the Plan:

(a)    the Restructuring Support Agreement shall have been executed and shall not have been terminated and remains in full force and effect;

(b)    the Definitive Documents (as defined in the Restructuring Support Agreement) shall, subject to any consent rights contained in the Restructuring Support Agreement, contain terms and conditions consistent in all material respects with the Restructuring Term Sheet, the Restructuring Support Agreement and the exhibits attached thereto;

(c)       the Bankruptcy Court shall have entered the Prepack Scheduling Order and such Order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(d)       the DIP Facility shall remain in full force and effect and shall not have been terminated, and no event of default shall have occurred and be continuing thereunder;

(e)       the Plan shall have been confirmed by the Bankruptcy Court and all related Plan exhibits and other documents shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

(f)       the Confirmation Order shall have been entered and shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(g)       there shall not be in effect any (i) order, opinion, ruling, or other decision entered by any court or other governmental unit or (ii) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

(h)       the Restructuring Transactions shall have been consummated, and all transactions contemplated herein, in a manner consistent in all respects with the Restructuring Support Agreement, the Restructuring Term Sheet, the exhibits attached thereto, and the Plan;

(i)       the Debtors shall have paid or reimbursed all Restructuring Expenses;

(j)       the First Out Term Loan Facility, the Second Out Take Back Term Loan Facility and any related documents shall have been executed, delivered, and be in full force and effect with all conditions precedent thereto having been satisfied or waived, on or prior to the Effective Date, other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred;

(k)       none of these Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

(l)       no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors;

(m)       the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with the terms of the Plan and the Restructuring Support Agreement;

(n)       all conditions to the issuance of the MIP, New Common Stock and New Warrants contemplated to be issued pursuant to the Plan shall have occurred;

(o)      the Debtors shall have paid or reimbursed all fees and expenses of the DIP Lenders and DIP Agent, including the DIP Professional Fees; and

(p)      any and all requisite governmental, regulatory, environmental, and third-party approvals and consents shall have been obtained

## B.      Waiver of Conditions Precedent

The conditions to the Effective Date of the Plan may be waived only if waived in writing by the Debtors and the Required Consenting First Lien Lenders (and, with respect to section IX.A.(ix), each affected First Lien Ad Hoc Group Advisor); *provided*, that the condition requiring that the Confirmation Order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered may not be waived.

## C.      Effect of Non-Occurrence of the Effective Date

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (ii) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## D.      Withdrawal of the Plan

The Debtors reserve the right, with the consent of the Required Consenting First Lien Lenders, to modify or revoke and withdraw the Plan at any time before the Confirmation Date or, if the Debtors are for any reason unable to consummate the Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke and withdraw the Plan: (i) nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Persons in any further proceeding involving the Debtors; and (ii) the result shall be the same as if the Confirmation Order were not entered, the Plan was not filed and no actions were taken to effectuate it.

# XV.    CONFIRMATION OF THE PLAN

## A.      Confirmation Generally

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It requires further that a debtor's disclosures concerning its plan of reorganization are adequate.

If the Plan is confirmed, the Debtors expect the Effective Date to occur no later than fifteen (15) days after the Confirmation Date.

To confirm the Plan, the Bankruptcy Court must find that all of the requirements of section 1129 of the Bankruptcy Code have been met. Thus, even if the statutorily required majority vote in number and dollar amount is achieved for Classes 3 and 4 (the only Classes entitled to vote under the Plan), the Bankruptcy Court must make independent findings respecting the Plan's satisfaction of the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

## B.    Voting Procedures and Standards

Holders of Claims and Interests in Classes 3 and 4 (the only Classes entitled to vote under the Plan) as of the Record Date will receive prior to the commencement of these Chapter 11 Cases, this Disclosure Statement, the Plan, a Notice and Election Form for accepting or rejecting the Plan and Plan, and related credit and investment documents. Classes 3 and 4 are entitled to vote because they are they only Classes that are Impaired under the Plan.

A class is "Impaired" under a plan unless, with respect to each claim or interest of such class, the Plan:

- leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or

- notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based on such claim or interest.

A class that is not Impaired under a plan of reorganization is deemed to have accepted the Plan, or is Impaired and deemed to have rejected the Plan and, therefore, solicitation of acceptances with respect to such class is not required and will not occur.

Among other things, the following are the Voting Procedures in connection with voting on the Plan and Plan:

- Any Notice and Election Form which is otherwise properly completed, executed, and timely returned to the Voting Agent that does not indicate an acceptance or rejection of the Plan and the Plan Supplement or indicates both an acceptance and rejection of the Plan and the Plan shall not be counted.

- Any Notice and Election Form which is returned to the Voting Agent indicating acceptance or rejection of the Plan and the Plan Supplement, but which is unsigned shall not be counted, except in the sole discretion of the Debtors.

- Any Notice and Election Form postmarked prior to the deadline for submission of Notice and Election Forms but <u>actually</u> received by the Voting Agent afterward shall not be counted, unless agreed otherwise by the Debtors and the Required Consenting Lenders.

- Whenever a holder of a Claim submits more than one Notice and Election Form voting the same Claim prior to the deadline for receipt of Notice and Election Forms, the last such properly completed Notice and Election Form received by the Voting Agent prior to the Expiration Date will be deemed to reflect the voter's intent and thus to supersede any prior Notice and Election Forms.

- Only the votes of the holders of Allowed Claims in one or more voting Classes as of the Record Date will be counted for purposes of tabulating acceptances and rejections of the Plan and the Plan Supplement. The Voting Agent will use records as of May 9, 2024 for solicitation purposes, however, the Record Date may be subsequently extended up to the closing of the Plan to account for the closing of trades.

- Any holder of Claims in a voting Class must vote all of its Claims in each such Class either to accept or reject the Plan and the Plan Supplement and may not split its vote. A Notice and Election Form (or multiple Notice and Election Forms with respect to separate Claims within the same voting Class) that partially rejects and partially accepts the Plan and the Plan Supplement, or that indicates both a vote for and against the Plan and the Plan Supplement, shall not be counted.

- If a creditor casts simultaneous Notice and Election Forms with respect to the same Claim which are voted inconsistently, such Notice and Election Forms shall not be counted.

- For the purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated as if such creditor held one Claim against the Debtors in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan and the Plan Supplement.

- Each creditor shall be deemed to have voted the full amount of its Claim.

- The authority of the signatory of each Notice and Election Form to complete and execute the Notice and Election Form shall be presumed, but each such signatory shall certify that he or she has such authority and is the holder of record of the applicable Claims as of the Record Date.

- Any Notice and Election Form cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan and the Plan Supplement will not be counted.

- Notice and Election Forms that are illegible, or contain insufficient information to permit the Debtors and the Voting Agent to determine in their sole discretion the identity of the creditor, shall not be counted.

- Except as otherwise ordered by the Bankruptcy Court in the event Chapter 11 Cases are commenced, questions as to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of Notice and Election Forms will be determined by the Voting Agent and the Debtors, with the consent of the Required Consenting Lenders, which determination will be final and binding.

- The Voting Agent is permitted, but not required, to make reasonable efforts to contact any holder regarding any defect or irregularity in connection with their Notice and Election Form, and will not incur any liability for failure to do so.

In connection with these Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to approve the process by which holders of Claims submit their votes (the "Voting Procedures"). In the event these Chapter 11 Cases are commenced, to the extent that the Bankruptcy Court does not or is unable to approve any portion of these Voting Procedures, the Debtors reserve the right to modify the Voting Procedures and recalculate the balloting in accordance with such modified procedures.

**If a Notice and Election Form is damaged or lost or if you have any questions concerning Voting Procedures, you may contact the Voting Agent at:**

**New Insight Holdings, Inc.**
**c/o Kroll Restructuring Administration LLC,**
**850 3rd Avenue, Suite 412,**
**Brooklyn, NY 11232**

**A vote may be designated (i.e., disregarded) if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not made or solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.**

**Under the Bankruptcy Code, the Plan will be "accepted" by a voting Class if (excluding insiders) at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in such voting Class that cast Notice and Election Forms to accept or reject the Plan vote in favor of the Plan.**

**A vote in favor of the Plan also shall be a vote in favor of the Plan, including the agreement to provide the releases set forth in Section 8.4 of the Plan.**

C.    **Acceptance**

The Bankruptcy Code provides that a class of claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of

the allowed claims in such class that have voted on the Plan.    There must be one impaired accepting class excluding insiders.  Here, acceptance of the Plan need only be solicited from holders of Claims in Classes 3 and 4 as those are the only Classes which are Impaired and entitled to vote under the Plan.  Except in the context of a "cram down" (described below), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each Impaired Class accepts the Plan.  If these Chapter 11 Cases are filed, the Debtors intend to request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any voting Classes that vote to reject or are deemed to reject the Plan, including Class 8.  This procedure is commonly referred to as a "cram down."  For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation of the Plan notwithstanding rejection by certain Impaired Classes, see Section XVI.D.4., "Cram Down," below.

## D.    Confirmation and Consummation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the proponent, by the debtor or by a person issuing securities under the Plan, for services or for costs and expenses in, or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the Plan with the debtor, or a successor to the debtor under the Plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder

would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the Plan or is not impaired under the Plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that allowed administrative expenses and priority claims (other than priority tax claims) will be paid in full on the Effective Date (except that if a class of priority claims has voted to accept the Plan, holders of such claims may receive deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amounts of such claims) and that holders of priority tax claims may receive on account of such claims regular installment payments in cash of a total value, as of the Effective Date, equal to the allowed amount of such claims over a period that ends no later than 5 years from the Petition Date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan;

- if a class of claims is impaired, at least one impaired class of claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class; and

- confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain statutory confirmation requirements.

## 1.    Best Interests of Holders of Claims and Interests

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case. The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the cash held by such Debtor at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

**The Debtors have determined, as discussed in the Liquidation Analysis attached as <u>Exhibit B</u> hereto, that if these Chapter 11 Cases are commenced, confirmation of the Plan will provide each creditor and Interest holder of each Debtor with a recovery that is not less than it would receive pursuant to a liquidation of the applicable Debtor under chapter 7 of the Bankruptcy Code.** See the Liquidation Analysis annexed as <u>Exhibit B</u> hereto and Section XVI.D. herein for a further discussion of how the Plan satisfies the "best interests" test.

### 2.    Valuation

As described in greater detail in Section IV.C above, the Plan, including the Plan, is the culmination of extensive negotiations among the Debtors, the Consenting Lenders and the Sponsors regarding a restructuring and recapitalization of the Debtors. Solely for purposes of the Plan, the Debtors have been advised by Houlihan Lokey, their investment banker and financial advisor, with respect to the going-concern value of Reorganized Parent. Houlihan Lokey has undertaken the valuation analysis attached hereto as <u>Exhibit C</u> (the "<u>Valuation Analysis</u>") to estimate the value available for distribution to holders of equity interests in Reorganized Parent under the Plan and to analyze the relative recoveries of each thereunder.

Houlihan Lokey, Inc.'s view as to the value of Reorganized Parent based on consummation of the Restructuring Transaction and the post-reorganization capital structure does not constitute a recommendation as to how to vote on the Plan and does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

### 3.    Financial Feasibility

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Debtors for the fiscal years 2025 through 2027 (the "<u>Financial Projections</u>"). The Financial Projections, and certain of the assumptions on which they are based, are set forth in the projected financial information contained in <u>Exhibit D</u> hereto.

THE PROJECTIONS SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED ABOVE IN SECTION VIII.A. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE PROJECTIONS.

The Debtors prepared these financial projections based upon certain assumptions that they believe to be reasonable under the circumstances. The financial projections have not been examined or compiled by independent accountants. The Debtors makes no representation as to the accuracy of the projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period of the Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

The Financial Projections indicate, on a pro forma basis, that the projected level of cash flow is sufficient to satisfy the Debtors' future capital expenditures and other obligations during the applicable period. Accordingly, if these Chapter 11 Cases are commenced, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

### 4.    Cram Down

The Bankruptcy Code contains provisions for confirmation of a plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the Plan does not discriminate unfairly with respect to each non accepting impaired class;

- the Plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the Plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims, or equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive any value under the Plan on account of such junior claims or interests.

Specifically, with respect to equity interests, a plan is "fair and equitable" if either (i) each holder of an equity interest will receive or retain under the Plan a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Plan on account of such interest.

### 5.    Classification of Claims and Interests

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a plan of reorganization place each claim or interest into a class with other claims or interests that are "substantially similar."

## XVI.   ADDITIONAL INFORMATION

All of the exhibits to the Plan, the Plan Supplement and to this Disclosure Statement will be available for inspection by contacting the Voting Agent.

## XVII.  CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of First Lien Claims, Second Lien Term Loan Claims, and Existing Equity Interests to vote to **ACCEPT** the Plan, and to duly complete and return their Notice and Election Forms so that they will be **ACTUALLY RECEIVED** on or before **4:00 p.m. (prevailing Eastern Time) on June 25, 2024**.

Dated:  Wilmington, Delaware
       May 21, 2024

> New Insight Holdings, Inc.
> New Insight Intermediate Holdings, Inc.
> Dynata Holdings Corp.
> Instantly, Inc.
> Research Now Group, LLC
> SSI/Opinionology Interco LLC
> iPinion, Inc.
> Research Now, Inc.
> SSI Holdings, LLC
> Dynata, LLC
> New Insight International, Inc.
> Imperium LLC
> inBrain Holdings, LLC
> Branded Research, Inc.
> Research Now DE I, LLC
> Research Now DE II, LLC
> inBrain, LLC
> Apps That Pay, LLC
> ScreenLift.io, LLC

> By: /s/ Steven Macri
>     Name: Steven Macri
>     Title: Authorized Signatory

**Schedule 1**

- New Insight Holdings, Inc.
- New Insight Intermediate Holdings, Inc.
- Dynata Holdings Corp.
- Instantly, Inc.
- Research Now Group, LLC
- SSI/Opinionology Interco LLC
- iPinion, Inc.
- Research Now, Inc.
- SSI Holdings, LLC
- Dynata, LLC
- New Insight International, Inc.
- Imperium LLC
- inBrain Holdings, LLC
- Branded Research, Inc.
- Research Now DE I, LLC
- Research Now DE II, LLC
- inBrain, LLC
- Apps That Pay, LLC
- ScreenLift.io, LLC

# EXHIBIT A

## Plan of Reorganization

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DYNATA, LLC, *et al.*,[1] | Case No. 24-_____ (  ) |
| Debtors. | (Joint Administration Requested) |

## JOINT PREPACKAGED PLAN OF REORGANIZATION
## OF DYNATA, LLC AND ITS DEBTOR AFFILIATES

Dated: May 21, 2024

**WILLKIE FARR & GALLAGHER LLP**
Jeffrey D. Pawlitz (*pro hac vice* pending)
Andrew S. Mordkoff (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
Amanda X. Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
jpawlitz@willkie.com
amordkoff@willkie.com
eryan@willkie.com
afang@willkie.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Rodney Square
1000 North King Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
emorton@ycst.com
mlunn@ycst.com

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Dynata, LLC (8807), New Insight Holdings, Inc. (1844), New Insight Intermediate Holdings, Inc. (6495), Dynata Holdings Corp. (0668), Research Now Group, LLC (7588), SSI/Opiniology Interco LLC (1855), iPinion, Inc. (9463), Research Now, Inc. (5523), SSI Holdings, LLC (6379), New Insight International, Inc. (0453), Imperium LLC (8375), inBrain, LLC (8031), Apps That Pay, LLC (9028), inBrain Holdings, LLC (9696), Branded Research, Inc. (9577), Screenlift.io, LLC, Research Now DE I, LLC (5528), Research Now DE II, LLC (5613), and Instantly, Inc. (6756).  The Debtors' headquarters is located at 4 Research Drive, Suite 300, Shelton, CT 06484.

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING
LAW AND DEFINED TERMS ..............................................................2

    A.      Rules of Interpretation, Computation of Time and Governing Law............2

    B.      Definitions.................................................................................2

    C.      Consultation, Notice, Information, and Consent Rights............................18

ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS .....................................19

    A.      Administrative Claims ................................................................19

    B.      Priority Tax Claims....................................................................20

    C.      DIP Facility Claims....................................................................20

    D.      U.S. Trustee Fees ......................................................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND
EXISTING EQUITY INTERESTS .........................................................21

    A.      Introduction.............................................................................21

    B.      Summary of Classification and Treatment of Classified Claims and
Existing Equity Interests.............................................................21

    C.      Classification and Treatment of Claims and Existing Equity Interests .....22

    D.      Special Provisions Regarding Unimpaired Claims..................................28

    E.      Subordinated Claims ..................................................................29

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ..............................29

    A.      Presumed Acceptance of the Plan..................................................29

    B.      Deemed Rejection of the Plan.......................................................29

    C.      Voting Classes .........................................................................29

    D.      Acceptance by Impaired Classes of Claims........................................29

    E.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........29

    F.      Plan Cannot Be Confirmed as to Some or All Debtors ...........................30

    G.      Elimination of Vacant Classes ......................................................30

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN...........................30

    A.      Corporate and Organizational Existence. .........................................30

    B.      Corporate Action......................................................................31

    C.      Organizational Documents of the Reorganized Debtors .........................31

| | | |
|---|---|---|
| D. | Managers, Directors and Officers of Reorganized Debtors; Corporate Governance | 32 |
| E. | New Operating Agreement | 32 |
| F. | First Out Term Loan Credit Documents | 32 |
| G. | Second Out Take Back Term Loan Documents | 34 |
| H. | New ABL Facility | 35 |
| I. | Exemption from Registration Requirements. | 36 |
| J. | Cancellation of Certain Existing Security Interests | 37 |
| K. | Management Incentive Plan | 37 |
| L. | Restructuring Transactions | 37 |
| M. | Effectuating Documents; Further Transactions | 38 |
| N. | Vesting of Assets in the Reorganized Debtors | 38 |
| O. | Release of Liens, Claims and Existing Equity Interests | 39 |
| P. | Cancellation of Stock, Certificates, Instruments and Agreements | 39 |
| Q. | Preservation and Maintenance of Debtors' Causes of Action | 40 |
| R. | Exemption from Certain Transfer Taxes | 41 |
| S. | Certain Tax Matters | 41 |
| T. | Restructuring Expenses | 42 |
| U. | Distributions | 42 |

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 43

| | | |
|---|---|---|
| A. | Debtors Assumption of Executory Contracts and Unexpired Leases | 43 |
| B. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 43 |
| C. | Assumption of Insurance Policies | 44 |
| D. | Indemnification | 45 |
| E. | Severance Agreements and Compensation and Benefit Programs; Employment Agreements | 45 |
| F. | Workers' Compensation Benefits | 46 |
| G. | Reservation of Rights | 46 |

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ... 46

| | | |
|---|---|---|
| A. | Distribution Record Date | 46 |
| B. | Dates of Distributions | 46 |
| C. | Distribution Agent | 47 |

D. Cash Distributions ..................................................................................... 47

E. Rounding of Payments ............................................................................... 47

F. Allocation Between Principal and Interest ................................................ 47

G. General Distribution Procedures ............................................................... 48

H. Address for Delivery of Distributions ....................................................... 48

I. Unclaimed Distributions ........................................................................... 48

J. Withholding Taxes .................................................................................... 49

K. No Postpetition Interest on Claims .......................................................... 49

L. Setoffs ....................................................................................................... 49

M. Surrender of Cancelled Instruments or Securities .................................... 50

ARTICLE VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........................... 50

A. Disputed Claims Process ........................................................................... 50

B. Claims Administration Responsibilities ................................................... 50

C. Estimation of Claims ................................................................................. 51

D. Amendments to Claims; Adjustment to Claims on Claims Register ........ 51

E. No Distributions Pending Allowance ....................................................... 51

F. Distributions After Allowance .................................................................. 52

G. No Interest ................................................................................................. 52

ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................ 52

A. Conditions to Effective Date ..................................................................... 52

B. Waiver of Conditions ................................................................................ 53

C. Substantial Consummation ........................................................................ 54

D. Effect of Non-Occurrence of Conditions to Consummation ..................... 54

ARTICLE X. RETENTION OF JURISDICTION ................................................................... 54

A. Retention of Jurisdiction ........................................................................... 54

B. Failure of Bankruptcy Court to Exercise Jurisdiction .............................. 56

ARTICLE XI. EFFECTS OF CONFIRMATION ................................................................... 56

A. Binding Effect ........................................................................................... 56

B. Discharge of the Debtors ........................................................................... 56

C. Exculpation and Limitation of Liability ................................................... 57

D. Releases by the Debtors ............................................................................ 57

E. Consensual Releases by Holders of Claims and Existing Equity
Interests ..................................................................................................... 58

F.     Injunction ...................................................................................................60

G.    Protection Against Discriminatory Treatment ...........................................61

ARTICLE XII. MISCELLANEOUS PROVISIONS ...................................................................61

A.    Modification of Plan ..................................................................................61

B.    Revocation of Plan ....................................................................................61

C.    Severability of Plan Provisions .................................................................62

D.    Successors and Assigns .............................................................................62

E.    Term of Injunctions or Stays ....................................................................62

F.     Reservation of Rights ................................................................................62

G.    Notices ......................................................................................................63

H.    Governing Law .........................................................................................64

I.      Exhibits .....................................................................................................64

J.     No Strict Construction ...............................................................................64

K.    Conflicts ....................................................................................................64

L.     Immediate Binding Effect .........................................................................64

M.   Entire Agreement ......................................................................................64

## JOINT PREPACKAGED PLAN OF REORGANIZATION OF DYNATA, LLC AND ITS DEBTOR AFFILIATES

### INTRODUCTION

Dynata, LLC, a Delaware limited liability company, and each of the other above-captioned Debtors[2] hereby propose the Plan for, among other things, the resolution of the outstanding Claims against, and Existing Equity Interests in, the Debtors. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (distributed contemporaneously herewith) for a discussion of the Debtors' history, business, properties, projections and the events leading up to solicitation of the Plan and for a summary of the Plan and the treatment provided for herein. The Debtors urge all Holders of Claims entitled to vote on the Plan to review the Disclosure Statement and the Plan in full before voting to accept or reject the Plan. There may be other agreements and documents that will be filed with the Bankruptcy Court that are referenced in the Plan and the Plan Supplement as Exhibits. All such Exhibits are incorporated into and are a part of the Plan as if set forth in full herein. Subject to certain restrictions set forth in the Restructuring Support Agreement and the Plan, and the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to amend, supplement, amend and restate, modify, revoke or withdraw the Plan prior to the Effective Date.

These Chapter 11 Cases are consolidated for procedural purposes only and the Debtors are jointly administered pursuant to an order of the Bankruptcy Court for administrative purposes and voting. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each Debtor, including for purposes of distribution. Each Debtor reserves the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class.

---

[2]   Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I.B of the Plan.

# ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof and unless otherwise specified herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) any reference herein to an existing document or exhibit shall mean that document or exhibit, as it may thereafter be amended, amended and restated, modified or supplemented from time to time in accordance with the terms thereof; (iv) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections hereof; (v) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) any reference to an Entity as a Holder of a Claim or Existing Equity Interest includes such Entity's successors and assigns; (viii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) "$" or "dollars" means dollars in lawful currency of the U.S.; and (xi) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

### B.    Definitions

1.1.    "**Administrative Claim**" refers to any right to payment constituting a cost or expense of administration incurred during these Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) all Allowed Professional Fee Claims; (iii) Restructuring Expenses.

1.2.    "**Affiliate**" has the meaning as set forth in section 101(2) of the Bankruptcy Code.

2

1.3.    "**Allowed**" means, with respect to any Claim or Existing Equity Interest, such Claim or Existing Equity Interest or any portion thereof that a Debtor, with the reasonable consent of the Required Consenting First Lien Lenders, or a Reorganized Debtor has assented to the validity of, or that has been (i) allowed by a Final Order of the Bankruptcy Court, (ii) allowed pursuant to the terms of the Plan, (iii) allowed by agreement between the Holder of such Claim, on one hand, and the applicable Debtor, with the reasonable consent of the Required Consenting First Lien Lenders, or Reorganized Debtor, as applicable, on the other hand or (iv) allowed by a Final Order of a court in which such Claim could have been determined, resolved or adjudicated if these Chapter 11 Cases had not been commenced; *provided*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.4.    "**Avoidance Actions**" means any and all avoidance, recovery or subordination claims and causes of action, whether actual or potential, to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 594, 550, 551, and 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.5.    "**Backstop Premium**" means the backstop premium provided to each of the Exit Backstop Party equal to 9% of First Out New Money Term Loans and paid in cash on the Effective Date.

1.6.    "**Bankruptcy Code**" means title 11 of the United States Code, as now in effect or hereafter amended.

1.7.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

1.8.    "**Bankruptcy Rules**" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms and the Local Rules, in each case as amended from time to time and as applicable to these Chapter 11 Cases or proceedings therein.

1.9.    "**Branded Warrants**" means those certain warrants to acquire 1.5% of the New Common Stock be issued pursuant to the Third Amended and Restated Promissory Note No. 1, dated as of May 21, 2024.

1.10.    "**Business Day**" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)).

1.11.    "**Cash**" means legal tender of the U.S. or the equivalent thereof.

1.12.    "**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

1.13.    "**Cause of Action**" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character

whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. "Cause of Action" also includes: (i) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (ii) with respect to the Debtors, the right to object to Claims or Existing Equity Interests; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Action.

1.14.  "**Chapter 11 Cases**" means the cases commenced by the Debtors under chapter 11 of the Bankruptcy Code on the Petition Date in the Bankruptcy Court.

1.15.  "**Claim**" means a "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

1.16.  "**Claims Register**" means the official register of Claims against the Debtors maintained by the Solicitation Agent.

1.17.  "**Class**" means a category of Claims or Existing Equity Interests classified under Article III of the Plan pursuant to section 1122 of the Bankruptcy Code.

1.18.  "**Confirmation**" means the entry by the Bankruptcy Court of the Confirmation Order on the docket of these Chapter 11 Cases, within the meanings of Bankruptcy Rules 5003 and 9021.

1.19.  "**Confirmation Date**" means the date upon which Confirmation occurs.

1.20.  "**Confirmation Hearing**" means the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.21.  "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan and approving the Disclosure Statement.

1.22.  "**Consenting First Lien Lenders**" means the Holders of First Lien Claims that are party to the Restructuring Support Agreement and pursuant to the terms thereunder.

1.23.  "**Consenting Lenders**" means the Consenting First Lien Lenders and Consenting Second Lien Lenders.

1.24.  "**Consenting Second Lien Lenders**" means the Holders of Second Lien Term Loan Claims that are party to the Restructuring Support Agreement and that have not breached their obligations thereunder.

1.25.  "**Consenting Stakeholders**" means the Consenting Lenders and the Sponsors.

1.26.   "**Consummation**" means the occurrence of the Effective Date.

1.27.   "**Cure**" means the payment of Cash, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtors that the Debtors seek to assume under section 365(a) of the Bankruptcy Code.

1.28.   "**Cure Claim**" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

1.29.   "**Debtors**" means each of the above-captioned debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.30.   "**Definitive Documents**" has the meaning set forth in the Restructuring Support Agreement.

1.31.   "**DIP Agent**" means the administrative agent and collateral agent under the DIP Facility, together with its successors and assigns in such capacities.

1.32.   "**DIP Backstop Parties**" has the meaning given to it in the Restructuring Term Sheet.

1.33.   "**DIP Credit Agreement**" means that certain debtor-in-possession credit agreement (as amended, restated, supplemented or otherwise modified in accordance with its terms), by and among Research Now Group, LLC and Dynata, LLC, as borrowers, each of the guarantors named therein, the DIP Agent, and the DIP Lenders from time to time party thereto, consistent in all respects with the terms set forth in **Annex 4** to the Restructuring Term Sheet (as may be amended, modified, or supplemented).

1.34.   "**DIP Facility**" means the $31.5 million super-priority senior secured debtor-in-possession financing facility to the Debtors in accordance with the terms, and subject in all respects to the conditions, set forth in the DIP Credit Agreement and the DIP Orders.

1.35.   "**DIP Facility Claims**" means any Allowed Claim held by the DIP Lenders or DIP Agent arising under or related to the DIP Facility.

1.36.   "**DIP Lenders**" means, collectively, the banks, financial institutions, and other lenders party to the DIP Credit Agreement from time to time, each solely in their capacity as such.

1.37.   "**DIP Loan Documents**" means, collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement.

1.38.   "**DIP Orders**" means the Interim DIP Order and the Final DIP Order.

1.39.   "**DIP Professional Fees**" means, as of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the DIP Agent and the DIP Lenders.

1.40.   "**Disclosure Statement**" means that certain *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Dynata, LLC and Its Debtor Affiliates*, dated as of May 21, 2024, that was prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and applicable non-bankruptcy law.

1.41.   "**Disputed**" means, with respect to any Claim, or any portion thereof, (i) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503 or 1111 of the Bankruptcy Code, or (ii) for which a Proof of Claim or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order; *provided*, *however*, in no event shall a Claim that is deemed Allowed under the Plan be classified as a Disputed Claim.

1.42.   "**Distribution**" means  payment or distribution of consideration to holders of Allowed Claims pursuant to this Plan in respect of the holder's Allowed Claim.

1.43.   "**Distribution Agent**" means an entity selected to make Distributions at the direction of the Reorganized Debtors, which may include the Claims Agent or the Reorganized Debtors.

1.44.   "**Distribution Record Date**" means the Confirmation Date.

1.45.   "**D&O Liability Insurance Policies**" means any insurance policy for, among others, directors, members, trustees, and officers liability (or any equivalents) maintained by the Debtors' Estates, and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

1.46.   "**Effective Date**" means the date on which a notice of effectiveness is filed with the Bankruptcy Court confirming that (i) all conditions in Article IX.A of the Plan have been satisfied or waived as provided for in Article IX.B and (ii) consummation of the Restructuring Transactions has occurred.

1.47.   "**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.48.    "**Estate**" means the estate of a Debtor in the applicable Chapter 11 Case, as created under section 541 of the Bankruptcy Code.

1.49.   "**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; and (iii) each Related Party of each Entity in clause (i) through (ii).

1.50.   "**Executory Contract**" means a contract to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.51.   "**Exhibit**" means an exhibit annexed to either the Plan or the Plan Supplement or as an exhibit or appendix to the Disclosure Statement (as such exhibits may be amended, supplemented, amended and restated, or otherwise modified from time to time).

1.52.   "**Existing Equity Interests**" means all Interests in New Insight Holdings, Inc. issued and outstanding as of the Petition Date.

1.53.   "**Existing First Lien Credit Agreement**" means that certain First Lien Credit Agreement (as supplemented, amended, amended and restated, or modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto, and Goldman Sachs Bank USA, as Administrative Agent.

1.54.   "**Existing Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement (as supplemented, amended, amended and restated, or modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto, and Goldman Sachs Bank USA (or any successor party thereto), as Administrative Agent.

1.55.   "**Exit Backstop Parties**" has the meaning set forth in the Restructuring Term Sheet.

1.56.   "**Final DIP Order**" means a Final Order entered by the Bankruptcy Court approving entry into the DIP Facility and the use of Cash Collateral, and authorizing the entry into and performance of the DIP Credit Agreement, substantially in the form of the Interim DIP Order (subject to customary changes to make such order Final).

1.57.   "**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in these Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (x) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, as applicable, or (y) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule

8002 of the Federal Rules of Bankruptcy Procedure; *provided* that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules may be filed with respect to such order.

1.58.   "**First Lien Ad Hoc Group**" means an ad hoc group of Consenting First Lien Lenders represented by the First Lien Ad Hoc Group Advisors.

1.59.   "**First Lien Ad Hoc Group Advisors**" means, collectively, (i) Gibson, Dunn & Crutcher LLP, as counsel to the First Lien Ad Hoc Group, (ii) PJT Partners LP, as financial advisor to the First Lien Ad Hoc Group, (iii) Mercer (US) LLC, as executive compensation advisor, (iv) Klerh Harrison Harvey Branzburg LLP, as Delaware counsel to the First Lien Ad Hoc Group, (v) any other local or foreign counsels to the First Lien Ad Hoc Group, and (vi) any other professionals or advisors retained by the First Lien Ad Hoc Group.

1.60.   "**First Lien Agent**" means Goldman Sachs Bank USA, in its capacity as administrative agent and collateral agent under the Existing First Lien Credit Agreement.

1.61.   "**First Lien Agent's Counsel**" means Cahill Gordon & Reindel LLP and Richards, Layton & Finger, P.A.

1.62.   "**First Lien Claim**" means any First Lien Term Loan Claim or Revolving Credit Loan Claim.

1.63.   "**First Lien Lender**" means any lender under the Existing First Lien Credit Agreement.

1.64.   "**First Lien Term Loan Claim**" means any Claim arising under or related to the term loans pursuant to the Existing First Lien Credit Agreement or any other loan documents related thereto.

1.65.   "**First Out Term Loan Agent**" means the administrative agent under the First Out Term Loan Credit Agreement, which shall be selected by the Required Consenting First Lien Lenders and disclosed in the Plan Supplement.

1.66.   "**First Out Term Loan Credit Agreement**" means that certain credit agreement (as amended, restated, supplemented, or otherwise modified in accordance with its terms) governing the First Out Term Loan Facility, by and among Research Now Group, LLC and Dynata, LLC as borrowers, the guarantors named therein, the First Out Term Loan Agent and the lenders party thereto, which shall be consistent with the Restructuring Term Sheet and First Out Term Loan Facility Term Sheet, and filed as part of the Plan Supplement.

1.67.   "**First Out Term Loan Credit Documents**" means the First Out Term Loan Credit Agreement and any related notes, guaranties, collateral agreements, certificates, documents and instruments related to or executed in connection with the First Out Term Loan Credit Agreement, which shall be consistent with the Restructuring Support Agreement and the First Out Term Loan Facility Term Sheet and filed as part of the Plan Supplement.

1.68.    "**First Out Term Loan Facility**" means the new priority senior secured term loan credit facility of up to $81.5 million, under and evidenced by the First Out Priority Term Loan Credit Agreement, which shall be on the terms set forth in the First Out Priority Term Loan Facility Term Sheet and otherwise consistent with the Restructuring Term Sheet and consisting of: (i) $50 million in new money exit term loans (the "**First Out New Money Term Loans**"), and (ii) $31.5 million of converted DIP Facility Claims (the "**First Out Converted Term Loans**", and together with the First Out New Money Term Loans, the "**First Out Term Loans**").

1.69.    "**First Out Term Loan Facility Term Sheet**" means the First Out term loan facility term sheet attached as **Annex 2** to the Restructuring Term Sheet, as such term sheet may be amended, modified, or supplemented in accordance with the Restructuring Support Agreement.

1.70.    "**First Out Term Loan Syndication Documents**" means the syndication procedures for the First Out Term Loans which are reasonably satisfactory to the Debtors and the Required Consenting First Lien Lenders, which procedures shall be described in the Plan Supplement.

1.71.    "**General Unsecured Claims**" means any Claim, against any Debtor, that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, First Lien Claim, Second Lien Term Loan Claim, Intercompany Claim, or Section 510(b) Claim.

1.72.    "**Governmental Unit**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

1.73.    "**Holder**" means any Entity that is the legal and/or beneficial owner of a Claim as of the applicable date of determination. For the avoidance of doubt, if a Claim is subject to an unsettled trade as of the Voting Record Date, the Holder shall be deemed to be the Entity that is the legal and/or beneficial owner of such claim after such trade has settled.

1.74.    "**Impaired**" means, with respect to a Claim, Existing Equity Interest or Class of Claims or Existing Equity Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

1.75.    "**Incremental Second Out Take Back Term Loan Amount**" means the 5% increase in the Second Out Take Back Term Loans allocated to holders of Allowed Revolving Credit Loan Claims who elect to receive such increase in the Second Out Take Back Term Loans in lieu of their Pro Rata share of the New Common Stock.

1.76.    "**Indemnification Agreement**" means any organizational or employment and/or service document or agreement of or with the Debtors and currently in place that provides for the indemnification of any current or former director, officer, agent or employee of the Debtors with respect to all present and future actions, suits and proceedings against the Debtors or such directors, officers, agents or employees based upon any act or omission for or on behalf of the Debtors.

1.77. "**Intercompany Claim**" means any Claim by a Debtor or non-Debtor affiliate against another Debtor.

1.78. "**Intercompany Interest**" means an Interest held by a Debtor or non-Debtor affiliate in another Debtor or non-Debtor affiliate.

1.79. "**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

1.80. "**Interim DIP Order**" means the interim order of the Bankruptcy Court authorizing the entry into and performance of the DIP Credit Agreement and use of Cash Collateral.

1.81. "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

1.82. "**Issuance Amount**" means the shares of New Common Stock or such other amount as may be agreed by the Debtors and the Required Consenting First Lien Lenders.

1.83. "**Lien**" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

1.84. "**Loan Agents**" means the First Lien Agent and the Second Lien Agent.

1.85. "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.86. "**MIP**" means a management incentive plan, providing for the issuance of up to 11% of the New Common Stock, to be approved by the New Board and adopted by the Reorganized Parent on the Effective Date, which will be substantially similar to the terms set forth in the annexes to the Restructuring Term Sheet.

1.87. "**New ABL Facility**" means the new ABL facility, comprised of asset-based revolving loans, which shall be consistent with the terms set forth in the Restructuring Term Sheet and otherwise consistent with the Restructuring Support Agreement.

1.88. "**New ABL Facility Agreement**" means that certain credit agreement (as amended, restated, supplemented, or otherwise modified in accordance with its terms) governing the New ABL Facility, by and among Research Now Group, LLC and Dynata, LLC as borrowers, the guarantors named therein, and the lenders party thereto, which shall be consistent with the Restructuring Term Sheet.

1.89. "**New Board**" means the initial board of directors (or similar governing body) of Reorganized Parent as selected in accordance with the New Corporate Governance Documents, the Restructuring Term Sheet and the New Operating Agreement and as disclosed in the Plan Supplement.

1.90.  "**New Common Stock**" means the shares of common stock of the Reorganized Parent (other such other entity to be determined by the Required Consenting First Lien Lenders) to be authorized, issued and outstanding on and after the Effective Date, with governance rights set forth in the Plan Supplement which shall include reasonable and customary minority protections.

1.91.  "**New Operating Agreement**" means the operating agreement (as amended, restated, supplemented or otherwise modified in accordance with its terms), including all annexes, exhibits, and schedules thereto, that will govern certain matters related to the governance of Reorganized Parent and the New Common Stock, which agreement shall become effective on the Effective Date and be consistent with the terms and conditions of the Restructuring Support Agreement and the Restructuring Term Sheet.

1.92.  "**New Corporate Governance Documents**" means the new corporate governance documents, including the New Operating Agreement, charters, bylaws, operating agreements, or other organization or formation documents, as applicable; *provided*, *however*, the Debtors and the Required Consenting First Lien Lenders will use commercially reasonable efforts to work with the holders of Revolving Credit Loan Claims who receive the New Common Stock to incorporate appropriate bank regulatory protections and provisions into the relevant shareholders agreement to ensure that regulations or laws applicable to holders of the New Common Stock do not run afoul of any and all regulations governing their receipt of such equity interests, including, without limitations, the Bank Holding Company Act and any regulations promulgated thereunder.

1.93.  "**New Warrant Agreement**" means the warrant agreement attached as an annex to the Plan Supplement, including all annexes, exhibits and schedules thereto, that will govern the terms of the New Warrants, which agreement shall (i) become effective on the Effective Date, and (ii) be consistent with the terms and conditions set forth in the Restructuring Term Sheet.

1.94.  "**New Warrants**" means the 5 year warrants issued by Reorganized Parent (or other such entity determined by the Required Consenting First Lien Lenders) on the Effective Date, which shall be in the form and manner consistent with the Restructuring Term Sheet and the New Warrant Agreement.

1.95.  "**New Warrants Recovery**" means, each applicable holders' Pro Rata share of New Warrants to acquire 12.5% of the New Common Stock.

1.96.  "**Ordinary Course Professionals Order**" means an order of the Bankruptcy Court approving a motion to employ ordinary course professionals in these Chapter 11 Cases.

1.97.  "**Other Priority Claim**" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a Priority Tax Claim or a Professional Fee Claim.

1.98.  "**Other Secured Claim**" means any Secured Claim against any Debtor other than DIP Facility Claims, First Lien Claims or Second Lien Term Loan Claims.

1.99.   "**Parent**" means New Insight Holdings, Inc.

1.100.   "**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code.

1.101.   "**Petition Date**" means the date on which the Debtors filed their petition for relief commencing these Chapter 11 Cases.

1.102.   "**Plan**" means, collectively, this joint prepackaged chapter 11 plan of reorganization, the Exhibits, all annexes, supplements and schedules hereto, and any document to be executed, delivered, assumed or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, in each case as may be amended, modified or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement.

1.103.   "**Plan Supplement**" means one or more supplements to the Plan containing certain agreements, lists, documents or forms of documents and/or schedules or exhibits relating to the implementation of the Plan, which may include certain agreements, lists, documents or forms of documents and/or schedules or exhibits necessary to comply with Bankruptcy Code sections 1123(a)(7) and 1129(a)(5).

1.104.   "**Preference Actions**" means any and all avoidance, recovery or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under section 547 of the Bankruptcy Code.

1.105.   "**Prepack Scheduling Order**" means an order of the Bankruptcy Court scheduling a combined hearing with respect to approval of the Disclosure Statement and confirmation of this Plan.

1.106.   "**Priority Tax Claim**" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.107.   "**Professional**" means: (i) any Entity employed in these Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code and (ii) any Entity seeking compensation or reimbursement of expenses in connection with these Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.108.   "**Professional Claims Bar Date**" means forty-five (45) days after the Effective Date.

1.109.   "**Professional Fee Claim**" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred by Professionals after the Petition Date and prior to the Effective Date; *provided*, that Professional Fee Claims shall not include Restructuring Expenses.

1.110. "**Professional Fee Escrow Account**" means an interest-bearing account funded by the Debtors in Cash on the Effective Date pursuant to Article II.A(ii) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

1.111. "**Professional Fee Reserve Amount**" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.A(i) of the Plan.

1.112. "**Proof of Claim**" means a proof of claim filed against any Debtor in these Chapter 11 Cases.

1.113. "**Pro Rata**" means, at any time, the proportion that the face amount of a Claim or Existing Equity Interest in a particular Class bears to the aggregate face amount of all Claims or Existing Equity Interests in that Class, unless the Plan provides otherwise.

1.114. "**Reinstated**" means, with respect to any Claim: (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder of such Claim in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (d) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by the Holder of such Claim as a result of such failure; and (e) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder of such Claim.

1.115. "**Related Parties**" means, collectively, with respect to any Entity or Person, including each Released Party and Exculpated Party, such Entity or Person's, current, former and future Affiliates, member firms and associated entities, and with respect to each of the foregoing, their Affiliates, current and former directors, current and former managers, current and former officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including, for the avoidance of doubt, the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors); *provided*, *however*, for the avoidance of doubt, any Affiliates of any Revolving Credit Lender (including any separate branch of a Revolving Credit Lender) shall not be deemed to be either a Related Party of such Revolving Credit Lender or a Revolving Credit Lender itself, unless such Affiliate has itself has submitted a

Ballot or specifically authorized a third party to submit a Ballot on its behalf.  The Revolving Credit Lenders voting on this Plan are doing so only in their capacity as holders of Revolving Credit Loan Claims as of the Voting Record Date, this Plan does not cover any other Claims or Interests other than the Revolving Credit Loan Claims that are now owned or subsequently acquired by the Revolving Credit Lenders that submit a Ballot with regards to this Plan, and the provisions of this Plan shall only apply to such trading desk(s), fund(s), and/or business group(s) reflected on the Ballot of such Revolving Credit Lender and shall not apply to any other trading desk, fund, or business group of the Revolving Credit Lender so long as they are not acting at the direction or for the benefit of such Revolving Credit Lender or such Revolving Credit Lender's investment in the Debtors.

1.116.  "**Released Party**" means, each of, and in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Sponsors and each other holder of Interests in the Parent; (iv) the Consenting Lenders; (v) the First Lien Lender Ad Hoc Group, (vi) the Second Lien Ad Hoc Group; (vii) the DIP Lenders; (viii) the DIP Backstop Parties; (ix) the Exit Backstop Parties; (x) the DIP Agent; (xi) the First Lien Agent, (xii) the Second Lien Agent and any predecessor thereto; (xiii) the First Lien Lenders and Second Lien Lenders that vote to accept the Plan; (xiv) each Related Party of each Entity in clause (i) through (xiii); *provided* that any holder of a Claim or Interest that objects to or opts out of the third party releases contained therein, shall not be a "Released Party."

1.117.  "**Releasing Party**" means, each of, and in each case in its capacity as such: (i) the Released Parties; (ii) each holder of a Claim entitled to vote to accept or reject the Plan that (a) votes to accept the Plan or (b) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by checking the "opt out" box on the  Ballot and returning it in accordance with the instructions set forth thereon indicating that they opt not to grant the releases contained in the Plan; (iii) each holder of a Claim or Interest that (x) is Unimpaired and presumed to accept the Plan, or (y) that is Impaired and is deemed to reject the Plan, in each case that does not affirmatively elect to "opt out" of being a Releasing Party by checking the "opt out" box on the Opt-Out Election Form and returning it in accordance with the instructions set forth thereon indicating that they opt not to grant the releases contained in the Plan; and (iv) each Related Party of each Entity in clause (i) through (iii) to the extent such Related Party can be bound by law or contract to the releases contemplated herein.

1.118.  "**Reorganized Debtors**" means the Debtors from and after the Effective Date.

1.119.  "**Reorganized Parent**" means New Insight Holdings, Inc. as reorganized pursuant to the Restructuring, and any successor(s) thereto.

1.120.  "**Required Consenting First Lien Lenders**" has the meaning set forth in the Restructuring Support Agreement.

1.121.  "**Required Consenting Second Lien Lenders**" means, as of any date of determination, Consenting Second Lien Lenders who collectively (i) own (or have voting control of) at least 50.01% of the aggregate outstanding principal amount of each of the Second Lien Term Loans held by the Second Lien Ad Hoc Group at such time and (ii) constituting at least two of the

Consenting Second Lien Term Loan Lenders that are members of the Second Lien Ad Hoc Group. A consenting Second Lien Term Loan Lender and its Affiliates who are subject to this Agreement shall be deemed to collectively constitute one (1) Consenting Second Lien Term Loan Lender for purposes of clause (ii) of this definition.

1.122.   "**Restructuring**" means a transaction, negotiated in good faith and at arms' length between the parties to the Restructuring Support Agreement, that will effectuate a financial restructuring of the Debtors' capital structure and financial obligations, on the terms and conditions set forth in the Restructuring Support Agreement, the Restructuring Term Sheet, this Plan and related documents.

1.123.   "**Restructuring Expenses**" means the reasonable and documented fees and out-of-pocket expenses of the (i) First Lien Ad Hoc Group Advisors (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court; *provided* that any and all fixed monthly fees, restructuring fees, liability management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in an engagement or fee letter between the Debtors and any First Lien Ad Hoc Group Advisor, (ii) First Lien Agent's Counsel (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable), (iii) the Second Lien Ad Hoc Group Advisors, (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court; provided that any and all fixed monthly fees, restructuring fees, liability management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in an engagement letter between any Company Party and any Second Lien Ad Hoc Group Advisor, (iv) Second Lien Agent's Counsel (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable), and (iv) one lead counsel to the Sponsors.

1.124.   **Restructuring Support Agreement**" means that certain Restructuring Support Agreement (as amended, restated, supplemented or otherwise modified in accordance with its terms), including all annexes, exhibits, and schedules thereto, dated as of May 21, 2024, by and among the Debtors, the Consenting First Lien Lenders, the Consenting Second Lien Lenders, and the Sponsors, attached as **Exhibit D** to the Disclosure Statement

1.125.   "**Restructuring Term Sheet**" means the restructuring term sheet attached as **Exhibit B** to the Restructuring Support Agreement, as such term sheet may be amended, modified, or supplemented in accordance with the Restructuring Support Agreement.

1.126.   "**Restructuring Transactions**" means the restructuring transactions for the Debtors, in accordance with, and subject to the terms and conditions set forth in, the Restructuring Support Agreement, the Plan and the Plan Supplement.

1.127.   "**Revolving Credit Lender**" means the several banks and other financial institutions or entities from time to time party to the Existing First Lien Credit Agreement as lenders of the Revolving Credit Loans.

1.128.  "**Revolving Credit Loans**" means any revolving loan made and outstanding pursuant to a "Revolving Commitment" under and as defined the Existing First Lien Credit Agreement.

1.129.  "**Revolving Credit Loan Claims**" means all claims held by the Revolving Credit Lenders, in their capacities as such, derived from, based upon, or secured pursuant to the Existing First Lien Credit Agreement and the "Loan Documents" (as defined in the Existing First Lien Credit Agreement), including any aggregate principal amount outstanding, plus all interest, fees, expenses, costs, and other charges arising under or related to the Obligations (as defined in the Existing First Lien Credit Agreement), but excluding, for the avoidance of doubt, any First Lien Term Loan Claims.

1.130.  "**Second Lien Ad Hoc Group**" means an ad hoc group of Consenting Second Lien Term Loan Lenders represented by the Second Lien Ad Hoc Group Advisors.

1.131.  "**Second Lien Ad Hoc Group Advisors**" means, collectively, (a) Vinson & Elkins, LLP, as counsel to the Second Lien Ad Hoc Group, (ii) Lazard Freres & Co. LLC, as financial advisor to the Second Lien Ad Hoc Group, and (iii) Morris, Nichols, Arsht & Tunnell LLP, as Delaware counsel to the Second Lien Ad Hoc Group.

1.132.  "**Second Lien Agent**" means Acquiom Agency Services LLC, in its capacity as administrative agent and collateral agent under the Existing Second Lien Credit Agreement through the effective date of its resignation, as well as its successor agent.

1.133.  "**Second Lien Agent's Counsel**" means Pryor Cashman LLP and one Delaware counsel, in their capacities as counsel to the Administrative Agent and Collateral Agent under the Existing Second Lien Credit Agreement.

1.134.  "**Second Lien Lenders**" means the lenders under the Existing Second Lien Credit Agreement.

1.135.  "**Second Lien Term Loan Claim**" means any Claim arising under or related to the Existing Second Lien Credit Agreement or any other loan documents related thereto, including any accrued and unpaid interest, premiums (if any), fees, makewholes (if any), and other expenses arising under the Existing Second Lien Credit Agreement.

1.136.  "**Second Out Take Back Term Loan Agent**" means the administrative agent under the Second Out Take Back Term Loan Credit Agreement.

1.137.  "**Second Out Take Back Term Loan Credit Agreement**" means that certain credit agreement (as amended, restated, supplemented, or otherwise modified in accordance with its terms) governing the Second Out Take Back Term Loan Facility, by and among Research Now Group, LLC and Dynata, LLC as borrowers, the guarantors named therein, the Second Out Take Back Term Loan Agent and the lenders party thereto, which shall be consistent with the Restructuring Term Sheet and the Second Out Take Back Term Loan Term Sheet.  For the avoidance of doubt, the First Out Term Loan Credit Agreement and the Second Out take Back Term Loan Credit Agreement may, with the consent of the Required Consenting First Lien Lenders, be documented through a single credit agreement.

1.138.  "**Second Out Take Back Term Loan Documents**" means the Second Out Take Back Term Loan Credit Agreement and any related notes, guaranties, collateral agreements, certificates, documents and instruments related to or executed in connection with the Second Out Take Back Term Loan Credit Agreement, which shall be consistent with the Second Out Take Back Term Loan Term Sheet and filed as part of the Plan Supplement.

1.139.  "**Second Out Take Back Term Loan Facility**" means the senior secured term loan facility of $ 694 million, provided that such amount shall be increased by the amount of Incremental Second Out Take Back Term Loan Amount, pursuant to and evidenced by the Second Out Take Back Term Loan Credit Agreement, which shall be on the terms set forth in the Second Out Take Back Term Loan Term Sheet and otherwise consistent with the Restructuring Support Agreement.

1.140.  "**Second Out Take Back Term Loan Term Sheet**" means the exit term loan term sheet attached as **Annex 3** to the Restructuring Term Sheet, as such term sheet may be amended, modified, or supplemented only in accordance with the Restructuring Support Agreement.

1.141.  "**Second Out Take Back Term Loans**" means the term loans made under the Second Out Take Back Term Loan Facility.

1.142.  "**Section 510(b) Claim**" means a Claim subordinated pursuant to Section 510(b) of the Bankruptcy Code.

1.143.  "**Secured Claim**" means a Claim against a Debtor that is secured by a Lien on property in which such Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable under applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.144.  "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder.

1.145.  "**Solicitation**" means the Debtors' formal request for acceptances of the Plan, consistent with sections 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Bankruptcy Rules and applicable non-bankruptcy law.

1.146.  "**Solicitation Agent**" means Kroll, LLC, the notice, claims and solicitation agent retained by the Debtors for these Chapter 11 Cases.

1.147.  "**Sponsors**" means, collectively, Court Square Capital Partners, Court Square Capital Partners III, L.P., Court Square Capital Partners III-A, L.P., Court Square Capital Partners (Offshore) III, L.P. Capital Court Square Capital Partners (Executive) III, L.P., HGGC Saber Topco LLC, HGGC, LLC, HGGC Fund II, L.P, HGGC Fund II-A, L.P., HGGC Fund II-B, L.P., HGGC Fund II-C, L.P., HGGC Fund II-D, L.P., HGGC Associates Fund II, L.P. and HGGG Affiliate Investors II, L.P.

1.148.  "**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of Delaware or the Uniform Commercial Code as in effect in any other state to the extent it may be applicable to any security interests in property of the Debtors.

1.149.  "**Unclaimed Distribution**" means any distribution under the Plan or as otherwise authorized by the Bankruptcy Court on account of an Allowed Claim to a Holder that, within six (6) months from when the distribution was first made, has not: (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to Reorganized Parent of an intent to accept a particular distribution; (iii) responded to Reorganized TNT's request for information necessary to facilitate a particular distribution; (iv) taken delivery of such distribution or where such distribution was returned for lack of a current address or otherwise; or (e) taken any other action necessary to facilitate such distribution.

1.150.  "**Unexpired Lease**" means a lease to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.151.  "**Unimpaired**" means any Claim or Existing Equity Interest that is not designated as Impaired.

1.152.  "**Unimpaired Claim**" means Administrative Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, DIP Facility Claims and General Unsecured Claims.

1.153.  "**U.S.**" means the United States of America.

1.154.  "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

1.155.  "**Voting Classes**" means collectively, Classes 3A, 3B, and 4.

1.156.  "**Voting Record Date**" means the date for determining which Holders are entitled to receive the Disclosure Statement and vote to accept or reject the Plan, as applicable, which date is May 9, 2024 for all Holders of Claims in the Voting Classes.

## C.  Consultation, Notice, Information, and Consent Rights

Notwithstanding anything herein to the contrary, all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as applicable, and as respectively set forth therein, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in **Article I.B** hereof) and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement, as applicable, shall not impair such rights and obligations.

## ARTICLE II.

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Facility Claims, and U.S. Trustee Fees are not classified and are not entitled to vote on the Plan.

## A.    Administrative Claims

Subject to subparagraph (i) below, in full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Administrative Claim (except to the extent that (a) the Holder of such Allowed Administrative Claim agrees in writing to less favorable treatment or (b) the Holder of such Allowed Administrative Claim has been paid in full during these Chapter 11 Cases), the Debtors or Reorganized Debtors, as applicable, at the option of the Debtors or Reorganized Debtors, as applicable, and with the reasonable consent of the Required Consenting First Lien Lenders, (i) shall pay to each Holder of an Allowed Administrative Claim Cash in an amount equal to the due and unpaid portion of its Allowed Administrative Claim on the later of (x) the Effective Date, or as soon thereafter as is reasonably practicable and (y) as soon as practicable after such Allowed Administrative Claim becomes due and payable, (ii) shall provide such other treatment to render such Allowed Administrative Claim Unimpaired or (iii) shall provide such other treatment as the Holder of such Allowed Administrative Claim may agree to or otherwise as permitted by section 1129(a)(9) of the Bankruptcy Code; *provided*, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(i)    Professional Fee Claims

Professionals (a) asserting a Professional Fee Claim shall deliver to the Debtors their estimates for purposes of the Debtors computing the Professional Fee Reserve Amount no later than five (5) Business Days prior to the anticipated Effective Date; *provided*, that, for the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court; *provided*, *further*, that, if a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional; and (b) asserting a Professional Fee Claim for services rendered before the Confirmation Date, for the avoidance of doubt, excluding any claims for Restructuring Expenses, must file and serve on the Reorganized Debtors and the U.S. Trustee an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; *provided*, that any Professional who is subject to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. For the avoidance of doubt, no fee applications will be required in respect of services performed by Professionals on and after the Confirmation Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing

of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for a hearing on twenty-one (21) days' notice.

       (ii)    <u>Professional Fee Escrow Account</u>

On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim without any further action of the Bankruptcy Court. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Reorganized Debtors.

## B.    Priority Tax Claims

In full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Priority Tax Claim (except to the extent that (i) the Holder of such Allowed Priority Tax Claim agree in writing to less favorable treatment or (ii) the Holder of such Allowed Priority Tax Claim has been paid in full during these Chapter 11 Cases), on the Effective Date, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

## C.    DIP Facility Claims

The DIP Facility Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Credit Agreement as of the Effective Date, including, for the avoidance of doubt, (i) the principal amount outstanding under the DIP Facility on that date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued fees, expenses, and indemnification obligations payable under DIP Loan Documents. For the avoidance of doubt, the DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation. For the avoidance of doubt, DIP Professional Fees related to the DIP Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

On the Effective Date, in full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed DIP Facility Claim (except to the extent that the Holder of such Allowed DIP Facility Claim agree in writing to less favorable treatment), each Holder of an Allowed DIP Facility Claims shall (i) receive its Pro Rata share of the First Out Converted Term Loans and (ii) shall be offered Pro Rata share First Out New Money Term Loans in accordance with the terms of the First Out Term Loan Credit Agreement.

### D.    U.S. Trustee Fees

Notwithstanding anything herein to the contrary, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). On and after the Effective Date, to the extent these Chapter 11 Cases remains open, and for so long as the Reorganized Debtors remain obligated to pay quarterly fees, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of these Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EXISTING EQUITY INTERESTS

### A.    Introduction

All Claims and Existing Equity Interests, except Administrative Claims, Priority Tax Claims, DIP Facility Claims, and U.S. Trustee Fees are placed in the Classes set forth below in accordance with section 1123(a)(1) of the Bankruptcy Code. The categories of Claims and Existing Equity Interests listed below classify Claims and Existing Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Existing Equity Interest is in a particular Class only to the extent that any such Claim or Existing Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

### B.    Summary of Classification and Treatment of Classified Claims and Existing Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3A | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 3B | Revolving Credit Loan Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Unimpaired; Impaired | Presumed to Accept; Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired; Impaired | Presumed to Accept; Deemed to Reject |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 9 | Existing Equity Interests | Impaired | Deemed to Reject |

**C.      Classification and Treatment of Claims and Existing Equity Interests**

Class 1 – Other Secured Claims.

(A)     <u>Classification</u>: Class 1 consists of Other Secured Claims against each Debtor.

(B)     <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders: (i) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as practicable after the date such claim becomes due and payable; (ii) the collateral securing its Allowed Other Secured Claim; (iii) reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

(C)     <u>Impairment and Voting</u>: Class 1 is Unimpaired by the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

Class 2 – Other Priority Claims.

(A)     <u>Classification</u>: Class 2 consists of Other Priority Claims against each Debtor.

(B)     <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Priority Claim, each Holder thereof shall receive treatment consistent with the provisions of

section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Consenting First Lien Lenders.

(C)     <u>Impairment and Voting</u>: Class 2 is Unimpaired by the Plan. Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

Class 3A – First Lien Term Loan Claims.

(A)     <u>Classification</u>: Class 3 consists of First Lien Term Loan Claims. The First Lien Term Loan Claims shall be Allowed in an aggregate principal amount of no less than $920,767,205.45, *plus* all other unpaid and outstanding obligations including any accrued and unpaid interest thereon (including at any applicable default rate), and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the Existing First Lien Credit Agreement, in each case, as of the Petition Date. The First Lien Term Loan Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, impairment, surcharge under section 506(c) of the Bankruptcy Code, objection, any challenges under applicable law or regulation, or any other claim or defense.

(B)     <u>Treatment</u>: Except to the extent that a holder of an allowed First Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed First Lien Term Loan Claim, on the Effective Date each holder shall directly or through a designee receive its Pro Rata share, along with the Holders of the Revolving Loan Claims, of:

(i) the option to fund its Pro Rata share of First Out New Money Term Loans;

(ii) the Second Out Take Back Term Loans;

(iii) 95% of the New Common Stock, subject to: (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of

23

Revolving Credit Loan opting to receive their Pro Rata share of the Incremental Second Out Take Back Term Loan Amount; and

(iv) a cash payment of $11,669,935.04.

(C) <u>Impairment and Voting</u>: Class 3A is Impaired by the Plan. Each Holder of a First Lien Term Loan Claim is entitled to vote to accept or reject the Plan.

Class 3B – Revolving Credit Loan Claims.

(A) <u>Classification</u>: Class 3B consists of Revolving Credit Loan Claims. The Revolving Credit Loan Claims shall be Allowed in an aggregate principal amount of no less than $96,899,999.99, *plus* all other unpaid and outstanding obligations including any accrued and unpaid interest thereon (including at any applicable default rate), and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the Existing First Lien Credit Agreement, in each case, as of the Petition Date. The Revolving Credit Loan Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual, or otherwise), counterclaim, defense, disallowance, impairment, surcharge under section 506(c) of the Bankruptcy Code, objection, any challenges under applicable law or regulation, or any other claim or defense.

(B) <u>Treatment</u>: Except to the extent that a Holder of an Allowed Revolving Credit Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed a Revolving Credit Loan Claim, each Holder thereof shall receive its Pro Rata share, along with the Holders of Allowed First Lien Term Loan Claims, of:

(i) the option to fund its Pro Rata share of the First Out New Money Term Loans;

(ii) the Second Out Take Back Term Loans;

(iii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery; *provided*, *however*, a holder of an allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive their Pro Rata share of the Incremental Second Out Take Back Term Loan Amount[3] in lieu of receiving the New Common Stock;[4] provided further, however, that as a result of any holder making the aforementioned election, the New Common Stock to be allocated to non-electing holders of Allowed Revolving Credit Loan Claims shall be increased accordingly; and

(iv) a cash payment of $11,669,935.04.

(C)    <u>Impairment and Voting</u>: Class 3B is Impaired by the Plan. Each Holder of a Revolving Credit Loan Claim is entitled to vote to accept or reject the Plan.

Class 4 – Second Lien Term Loan Claims.

(A)    <u>Classification</u>: Class 4 consists of Second Lien Term Loan Claims. The Second Lien Term Loan Claims shall be Allowed in an aggregate principal amount of no less than $250,000,000.00,  as of the Petition Date, *plus* all other unpaid and outstanding obligations including any accrued and unpaid interest thereon as of the Petition Date at the applicable rate, fees, costs, charges, premiums or other amounts arising under the Existing Second Lien Term Loan Credit Agreement.

(B)    <u>Treatment</u>: Except to the extent that a holder of an allowed Second Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Second Lien Term Loan Claim, on the Effective Date, each holder shall directly or through a designee receive their Pro Rata share of :

(i) 5% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery;

---

[3]    For the avoidance of doubt, the Pro Rata share of the Incremental Second Out Take Back Term Loans shall be determined based on the aggregate amount of Revolving Credit Loan Claims held by those Revolving Credit Lenders opting to receive additional take back debt in lieu of the New Common Stock.

[4]    For the avoidance of doubt, the New Common Stock that otherwise would have been distributed holders of Revolving Credit Loan Claims who opt instead to receive Incremental Second Out Take Back Term Loans, shall be distributed pro-rata among the other holders of First Lien Claims.

(ii) New Warrants Recovery;

(iii) a cash payment of $750,000.

(C)     <u>Impairment and Voting</u>: Class 4 is Impaired by the Plan. Each Holder of a Second Lien Term Loan Claim is entitled to vote to accept or reject the Plan.

Class 5 – General Unsecured Claims.

(A)     <u>Classification</u>: Class 5 consists of General Unsecured Claims against each Debtor.

(B)     <u>Treatment</u>: Except to the extent that a Holder of an Allowed General Unsecured Claim has already been paid during these Chapter 11 Cases or such Holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, at the Debtors' option and with the reasonable consent of the Required Consenting First Lien Lenders: (i) if such Allowed General Unsecured Claim is due and payable on or before the Effective Date, payment in full, in Cash, of the unpaid portion of its Allowed General Unsecured Claim on the Effective Date; (ii) if such Allowed General Unsecured Claim is not due and payable before the Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting First Lien Lenders, and the Holder of such Allowed General Unsecured Claim, such that the Allowed General Unsecured Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code.

(C)     <u>Impairment and Voting</u>: Class 5 is Unimpaired by the Plan. Each Holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan.

Class 6 – Intercompany Claims.

(A)     <u>Classification</u>: Class 6 consists of Intercompany Claims.

(B)     <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the

26

Reorganized Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

(C)     <u>Impairment and Voting</u>: If an Intercompany Claim in Class 6 is Unimpaired by the Plan, then such Holder of an Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. If an Intercompany Claim in Class 6 is Impaired by the Plan, then such Holder of an Intercompany Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In either case, each Holder of an Intercompany Claim is not entitled to vote to accept or reject the Plan.

Class 7 – Section 510(b) Claims.

(A)     <u>Classification</u>: Class 7 consists of Section 510(b) Claims against each Debtor.

(B)     <u>Treatment</u>: Section 510(b) Claims shall be discharged, canceled, released, and extinguished without any distribution to Holders of such Claims.

(C)     <u>Impairment and Voting</u>: Class 7 is Impaired by the Plan, and each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Section 510(b) Claim is not entitled to vote to accept or reject the Plan.

Class 8 – Intercompany Interests.

(A)     <u>Classification</u>: Class 8 consists of Intercompany Interests.

(B)     <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Interest, at the option of the Reorganized Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, each Intercompany Interest shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

(C)     <u>Impairment and Voting</u>: If an Intercompany Interest in Class 8 is Unimpaired by the Plan, then such Holder of an

27

Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. If an Intercompany Interest in Class 8 is Impaired by the Plan, then such Holder of an Intercompany Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In either case, each Holder of an Intercompany Interest is not entitled to vote to accept or reject the Plan.

Class 9 – Existing Equity Interests.

    (A)    <u>Classification</u>: Class 9 consists of Existing Equity Interests.

    (B)    <u>Treatment</u>: On the Effective Date, the Existing Equity Interests shall be canceled, and Holders of Existing Equity Interests shall receive no recovery on account of such Existing Equity Interests.

    (C)    <u>Impairment and Voting</u>: Class 9 is Impaired by the Plan, and each Holder of an Existing Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Existing Equity Interest is not entitled to vote to accept or reject the Plan.

**D.**     **Special Provisions Regarding Unimpaired Claims**

The Debtors, the Reorganized Debtors and any other Entity shall retain all defenses, counterclaims, rights to setoff and rights to recoupment, if any, as to Unimpaired Claims. Holders of Unimpaired Claims shall not be required to file a Proof of Claim with the Court and shall retain all their rights under applicable non-bankruptcy law to pursue their Unimpaired Claims in any forum with jurisdiction over the parties. Notwithstanding anything to the contrary in the Plan, each Holder of an Unimpaired Claim shall be entitled to enforce its rights in respect of such Unimpaired Claim against the Debtors or the Reorganized Debtors, as applicable, until such Unimpaired Claim has been either (i) paid in full (a) on terms agreed to between the Holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as applicable, or (b) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (ii) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

Notwithstanding anything to the contrary in the Plan, until an Allowed Claim in Class 1, 2 or 5 that arises prior to the Effective Date has been (x) paid in full in accordance with applicable law, or on terms agreed to between the Holder of such Claim and the Debtors (or Reorganized Debtors) or in accordance with the terms and conditions of the particular transaction giving rise to such Claim, or (y) resolved pursuant to the disputed claims procedures set forth in this <u>Article III.D</u> and <u>Article VIII</u> of the Plan: (i) such Claim shall not be deemed settled, satisfied, resolved,

released, discharged, or enjoined by any provision of the Plan, and (ii) the applicable Reorganized Debtor shall remain liable for such Claims. For the avoidance of doubt, upon the satisfaction of subpart (x) or (y) of the foregoing sentence, subparts (i)-(ii) of the foregoing sentence shall no longer apply under the Plan. Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

**E.      Subordinated Claims**

Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Claim or Existing Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Presumed Acceptance of the Plan**

Classes 1, 2, 5, 6 (if so treated) and 8 (if so treated) are Unimpaired by the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**B.      Deemed Rejection of the Plan**

Classes 6 (if so treated), 7, 8 (if so treated) and 9 are Impaired by the Plan and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.      Voting Classes**

Each Holder of an Allowed Claim in the Voting Classes as of the applicable Voting Record Date is entitled to vote to accept or reject the Plan.

**D.      Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**E.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors may request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code or that is deemed to reject the Plan. The Debtors, with the reasonable consent of the Required Consenting First Lien Lenders, and in accordance with Article XII.A of the Plan,

reserve the right to modify the Plan, the Plan Supplement or the Disclosure Statement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**F.      Plan Cannot Be Confirmed as to Some or All Debtors**

If the Plan cannot be confirmed as to any Debtor, then the Debtors, with the reasonable consent of the Required Consenting First Lien Lenders and without prejudice to and subject to the respective parties' rights under the Restructuring Support Agreement, (i) may revoke the Plan as to such Debtor or (ii) may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted, continued or dismissed) and confirm the Plan as to the remaining Debtors to the extent required without the need for re-solicitation as to any Holder of a Claim against and/or Existing Equity Interest in a Debtor for which the Plan is not so revoked.

**G.      Elimination of Vacant Classes**

Any Class of Claims or Existing Equity Interests that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Existing Equity Interest, or a Claim or Existing Equity Interest that is temporarily Allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of: (i) voting to accept or reject the Plan; and (ii) determining the acceptance or rejection of the Plan by such Class pursuant to sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      Corporate and Organizational Existence.**

The Debtors or Reorganized Debtors, as applicable, in accordance with any Restructuring Steps Plan, are authorized, but not required, to take any actions they determine to be necessary or advisable to effectuate the dissolution of any of the Debtors under applicable law, including, without limitation, the filing of any certificate of dissolution or certificate of cancellation, as applicable, in the office of the Secretary of State of the State of Delaware. The organizational structure of the Reorganized Debtors shall be described in the Plan Supplement.

Subject to the preceding paragraph, except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist, pursuant to its organizational documents in effect prior to the Effective Date, except as otherwise set forth herein or in the Plan Supplement, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended on or prior to the Effective Date, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order or approval of the Bankruptcy Court.

**B.      Corporate Action**

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including: (i) adoption or assumption, as applicable, of the agreements with existing management; (ii) selection of the directors, managers, and officers for the Reorganized Debtors; (iii) implementation of the Restructuring Transactions; (iv) issuance and distribution of the New Common Stock by the Distribution Agent; (v) if applicable, issuance and distribution of the New Warrants and the Branded Warrants by the Distribution Agent; (vi) adoption of the New Corporate Governance Documents; (vii) entry into the First Out Term Loan Credit Agreement and Second Out Take Back Term Loan Credit Agreement, as applicable; (viii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (ix) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (x) the dissolution of any of the Debtors and (xi) all other acts or actions contemplated or reasonably necessary or appropriate to properly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Corporate Governance Documents, the First Out Term Loan Credit Agreement, the Second Out Take Back Term Loan Credit Agreement, the New Warrant Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by <u>Article V.J</u> of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law**.**

**C.      Organizational Documents of the Reorganized Debtors**

On the Effective Date, the New Corporate Governance Documents shall become effective and be deemed to amend and restate the Debtors' existing corporate governance documents without the need for any further notice or approvals. To the extent necessary, the New Corporate Governance Documents will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. Such New Corporate Governance Documents shall include reasonable and customary minority protections.    After the Effective Date, each Reorganized Debtor may amend and restate its existing corporate governance documents, as permitted by applicable law and pursuant to the terms contained therein.

**D.      Managers, Directors and Officers of Reorganized Debtors; Corporate Governance**

On the Effective Date, Reorganized Parent shall enter into and deliver the New Corporate Governance Documents and the New Warrant Agreement, in substantially the forms included in the Plan Supplement, to each Holder of New Common Stock and New Warrants and such Holders shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Parent.  On the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Reorganized Debtors, shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

The New Board shall be selected in accordance with the New Corporate Governance Documents and the Restructuring Term Sheet. To the extent not previously disclosed, the Debtors will disclose prior to or at the Confirmation Hearing, the affiliations of each Person proposed to serve on the New Board or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a manager, director or officer, the nature of any compensation for such Person.

**E.      New Operating Agreement**

Subject to the Restructuring Transactions permitted by this Plan, on the Effective Date, Reorganized Parent shall enter into the New Operating Agreement, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the New Operating Agreement).

On and as of the Effective Date, each Holder of New Common Stock shall be deemed to be a party to the New Operating Agreement without the need for execution by such Holder. The New Operating Agreement shall be binding on all Entities receiving, and all Holders of, the New Common Stock and New Warrants, if applicable (and their respective successors and assigns), whether such New Common Stock or New Warrants, as applicable is received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to the New Operating Agreement.

The form of New Operating Agreement, which shall be filed with the Plan Supplement, shall be consistent with the Restructuring Support Agreement and the Restructuring Term Sheet, and shall be in form and substance acceptable to the Debtors and the Required Consenting First Lien Lenders.

**F.      First Out Term Loan Credit Documents**

On the Effective Date, the Reorganized Debtors shall execute and deliver the First Out Term Loan Credit Agreement and the other First Out Term Loan Credit Documents. Confirmation shall be deemed approval of the First Out Term Loan Facility (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized

Debtors shall execute and deliver those documents necessary or appropriate to obtain the First Out Term Loan Facility, including the First Out Term Loan Credit Documents.

On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the First Out Term Loan Facility Credit Agreement shall be deemed granted by the Reorganized Debtors pursuant to the First Out Term Loan Credit Agreement, and all Liens and security interests granted pursuant to, or in connection with the First Out Term Loan Credit Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the First Out Term Loan Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (i) further notice to or order of the Bankruptcy Court or (ii) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

The form of the First Out Term Loan Credit Agreement, which shall be filed with the Plan Supplement, shall be consistent with the Restructuring Support Agreement and the First Out Term Loan Facility Term Sheet, and shall be in form and substance acceptable to the Debtors and the Required Consenting First Lien Lenders.

On and as of the Effective Date, all DIP Lenders and Holders of Allowed First Lien Claims that elect to receive First Out Term Loans in accordance with the First Lien Term Loan Syndication Documents shall be deemed to be parties to, and bound by, the First Out Term Loan Credit Agreement, without the need for execution thereof by any such DIP Lender or Holder of an Allowed First Lien Claim.

The Exit Backstop Parties shall fund any such deficit in Cash (Pro Rata based on the percentages indicated on the annex to the Restructuring Term Sheet) and in exchange each Exit Backstop Party will receive its Pro Rata share (based on the percentages indicated on such annex) of: (i) First Out Converted Term Loans on account of their DIP Facility Claims and (ii) the Backstop Premium.

Subject only to the occurrence of the Effective Date and the provision of the First-Out Exit Term Loans, the terms and conditions of the Backstop Premium are satisfied and earned as of the entry of the Confirmation Order.

By voting to accept this Plan, each DIP Lender and First Lien Lender thereby instructs and directs the Distribution Agent and the First Out Term Loan Agent, to (i) act as Distribution Agent to the extent required by this Plan, (ii) execute and deliver the First Out Term Loan Credit Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the First Out Term Loan Agent is a party and to promptly consummate the transactions contemplated thereby, and (iii) take any other actions required or contemplated to be taken by the First Out Term Loan Agent and/or the Distribution Agent (as applicable) under this Plan or any of the Restructuring Documents to which it is a party.

**G.     Second Out Take Back Term Loan Documents**

On the Effective Date, the Reorganized Debtors shall execute and deliver the Second Out Take Back Term Loan Credit Agreement and the other Second Out Take Back Term Loan Documents. Confirmation shall be deemed approval of the Second Out Take Back Term Loan Facility (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the Second Out Take Back Term Loan Facility, including the Second Out Take Back Term Loan Credit Documents.

On and as of the Effective Date, all Holders of Allowed First Lien Claims shall be deemed to be parties to, and bound by, the Second Out Take Back Term Loan Credit Agreement, without the need for execution thereof by any Holder of an Allowed First Lien Claim.

By voting to accept this Plan, each First Lien Lender thereby instructs and directs the Distribution Agent and the Second Out Take Back Term Loan Agent (as applicable), to (i) act as Distribution Agent to the extent required by this Plan, (ii) execute and deliver the Second Out Take Back Term Loan Documents, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Second Out Take Back Term Loan Agent is a party and to promptly consummate the transactions contemplated thereby, and (iii) take any other actions required or contemplated to be taken by the Second Out Take Back Term Loan Agent and/or the Distribution Agent (as applicable) under this Plan or any of the Restructuring Documents to which it is a party

On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the Second Out Take Back Term Loan Facility Credit Agreement shall be deemed granted by the Reorganized Debtors pursuant to the Second Out Take Back Term Loan Credit Agreement, and all Liens and security interests granted pursuant to, or in connection with the Second Out Take Back Term Loan Credit Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Second Out Take Back Term Loan Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (i) further notice to or order of the Bankruptcy Court or (ii) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

The form of the Second Out Take Back Term Loan Credit Agreement, which shall be filed with the Plan Supplement, shall be consistent with the Restructuring Support Agreement and the Second Out Take Back Term Loan Term Sheet, and shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

For the avoidance of doubt, on the Effective Date, all applicable Holders of First Lien Loan Claims shall be deemed party to the Second Out Take Back Term Loan Credit Agreement and the applicable other Second Out Take Back Term Loan Documents, in each case, without the need for execution by any party thereto other than Reorganized Parent.

## H.    New ABL Facility

On the Effective Date, Effective Date, the Reorganized Debtors shall be authorized, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, to enter into the New ABL Facility, as well as any notes, documents or agreements required thereunder, including any documents required in connection with the creation or perfection of the liens on collateral securing the obligations arising under the New ABL Facility.

On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the New ABL Facility Agreement shall be deemed granted by the Reorganized Debtors pursuant to the New ABL Facility Agreement, and all Liens and security interests granted pursuant to, or in connection with the New ABL Facility Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the New ABL Facility Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (i) further notice to or order of the Bankruptcy Court or (ii) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate

to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

The form of the New ABL Facility Agreement, which shall be filed with the Plan Supplement, shall be consistent with the Restructuring Support Agreement and the Restructuring Term Sheet, and shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders.

## I.     Exemption from Registration Requirements.

All shares of New Common Stock, New Warrants or other Securities, as applicable, issued and distributed pursuant to the Plan, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon (i) section 1145 of the Bankruptcy Code; (ii) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder; or (iii) such other exemption as may be available from any applicable registration requirements.

To the extent that the offering, issuance, and distribution of any shares of New Common Stock or New Warrants pursuant to the Plan is in reliance upon section 1145 of the Bankruptcy Code, it is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. Such shares of New Common Stock, New Warrants or other Securities to be issued under the Plan pursuant to section 1145 of the Bankruptcy Code (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) subject to the terms of the New Corporate Governance Documents and the New Warrant Agreement, will be freely tradable and transferable by any initial recipient thereof that (a) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, and (c) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

All shares of New Common Stock, New Warrants or other Securities issued pursuant to the Plan that are not issued in reliance on section 1145 of the Bankruptcy Code will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements. All shares of New Common Stock or New Warrants issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. The New Common Stock or New Warrants underlying the MIP will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors and the Required Consenting First Lien Lenders elect, on or after the Effective Date, to reflect all or any portion of the ownership of Reorganized Parent's

New Common Stock or New Warrants through the facilities of the Depository Trust Company ("**DTC**"), the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Final Order with respect to the treatment of such applicable portion of Reorganized Parent's New Common Stock or the New Warrants, and such Plan or Final Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Final Order in lieu of a legal opinion regarding whether Reorganized Parent's New Common Stock or the New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether Reorganized Parent's New Common Stock or the New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## J.    Cancellation of Certain Existing Security Interests

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfaction or releases of all security interests with respect to its Allowed Other Secured Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens or lis pendens and take any and all other steps reasonably requested by the Debtors, the Reorganized Debtors, the First Out Term Loan Agent or the Second Out Take Back Term Loan Agent that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Other Secured Claim.

## K.    Management Incentive Plan

After the Effective Date, the New Board shall be authorized to adopt and institute the MIP, enact and enter into related policies and agreements, and distribute New Common Stock to participants, in each case, based on the terms and conditions set forth in the Restructuring Support Agreement and the MIP Term Sheet.

## L.    Restructuring Transactions

Following Confirmation, the Debtors and/or the Reorganized Debtors, as applicable, shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization or capital structure subject to and consistent with the terms of the Plan and the Restructuring Support Agreement and subject to the consent rights set forth therein in all respects. The actions taken by the Debtors and/or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, dissolution, liquidation, merger or transfer containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and any documents contemplated hereunder or thereunder and that satisfy the applicable requirements of applicable state law and

any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement and any documents contemplated hereunder or thereunder and having any other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation or formation, reincorporation, merger, conversion, dissolution or other organizational documents, as applicable, pursuant to applicable state law, including certificates of dissolution with respect to certain Debtors; (iv) the execution, delivery, adoption and/or amendment of all filings, disclosures or other documents necessary to obtain any necessary third-party approvals; and/or (v) all other actions that the Debtors and/or the Reorganized Debtors, as applicable, determine, with the consent of the Required Consenting First Lien Lenders, to be necessary, desirable or appropriate to implement, effectuate and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. All matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, managing members, members, managers, directors, or officers of any Debtor (as of or prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, the provisions of the New Corporate Governance Documents, and without any requirement of further action by the equity holders, managing members, members, managers, directors or officers of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

The Confirmation Order shall and shall be deemed to, pursuant to sections  105(a), 363, and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

## M.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Board and any other board of directors or managers of any of the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, deliver, file or record such agreements, securities, instruments, releases and other documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Restructuring Transactions, including the First Out Term Loan Credit Documents, the Second Out Take Back Term Loan Documents and any New Corporate Governance Documents of the Reorganized Debtors in the name of and on behalf of one or more of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

## N.    Vesting of Assets in the Reorganized Debtors

Except as provided elsewhere in the Plan, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Debtors' Estates (including Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will

vest in the Reorganized Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the New Corporate Governance Documents.

**O.    Release of Liens, Claims and Existing Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims or Existing Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Existing Equity Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

On the Effective Date, in exchange for the treatment described herein and as set forth in Article III.C, the First Lien Claims shall be discharged, the Liens on the Collateral (as defined in the Existing First Lien Credit Agreement) shall be released and the Existing First Lien Credit Agreement shall be cancelled and be of no further force or effect. On the Effective Date, in exchange for the treatment described herein and as set forth in Article III.C, the Second Lien Term Loan Claims shall be discharged, the Liens on the Collateral (as defined in the Second Lien Term Credit Agreement) shall be released and the Existing Second Lien Term Credit Agreement in respect thereof shall be cancelled and be of no further force or effect.

**P.    Cancellation of Stock, Certificates, Instruments and Agreements**

On the Effective Date, except as provided below, all stock, units, instruments, certificates, agreements and other documents evidencing the Existing Equity Interests will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person. On the Effective Date, the First Lien Agent will be released and discharged from any further responsibility under the Existing First Lien Credit Agreement. On the Effective Date, the Second Lien Agent will be released and discharged from any further responsibility under the Existing Second Lien Term Credit Agreement provided, however, that notwithstanding confirmation or the occurrence of the Effective Date, the Existing First Lien Credit Agreement and Existing Second Lien Term Credit Agreement shall continue in effect solely for purposes of (i) allowing Holders of Allowed Claims to receive distributions under the Plan, (ii) allowing and preserving the rights of the Distribution Agent to make or receive distributions pursuant to the Plan and to take other actions pursuant to the terms of the Plan on account of Allowed Claims, (iii) preserving the Loan Agents' exercise of their rights,

claims, causes of action, and interests (including their rights, if any, to compensation and indemnification) as against any money or property distributable to the holders of First Lien Claims and Second Lien Term Loan Claims, including permitting the Loan Agents to maintain, enforce, and exercise any charging liens against such distributions, (iv) preserving all rights, including rights of enforcement, of the Loan Agents against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the holders of the First Lien Claims, and Second Lien Term Loan Claims pursuant and subject to the terms of the Existing First Lien Credit Agreement and the Existing Second Lien Term Credit Agreement as in effect on the Effective Date, (v) permitting the Loan Agents to enforce any obligation (if any) owed to the other Loan Agent, under the Plan, (vi) permitting the Loan Agents to appear in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Existing First Lien Credit Agreement or the Existing Second Lien Term Credit Agreement, as applicable, in furtherance of the foregoing, (vii) the Loan Agents, the First Lien Lenders, and the Second Lien Lenders to assert any rights with respect to any contingent obligations under the First Lien Credit Agreement or contingent obligations under the Second Lien Term Credit Agreement, as applicable, and (viii) permitting the Loan Agents to perform any functions that are necessary to effectuate the foregoing; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan. The Loan Agents and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall, without any further action or approval of the Bankruptcy Court or any holders of Claims, shall each be automatically and fully discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Loan Agents and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Loan Agents shall be relieved of and released from any obligations and duties arising thereunder. The fees, expenses, and costs of the Loan Agents, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the Existing First Lien Credit Agreement or the Existing Second Lien Term Credit Agreement, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan, if any, will be paid in accordance with the terms of the Plan.

**Q.      Preservation and Maintenance of Debtors' Causes of Action**

**(i)      Maintenance of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in Article XI or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release or other agreement entered into in connection with the Plan, on and after the Effective Date, the Reorganized Debtors shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action of the Debtors, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal, including in an adversary proceeding filed in these Chapter 11 Cases. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all such Causes of Action, without notice to or approval from the Bankruptcy Court. The

Reorganized Debtors or their respective successor(s) may pursue such retained claims, rights or Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successor(s) who hold such rights.

### (ii) Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Existing Equity Interest or other Entity is (i) expressly waived, relinquished, released, compromised or settled in the Plan (including and for the avoidance of doubt, the releases contained in <u>Article XI</u> of the Plan) or any Final Order (including the Confirmation Order), or (ii) subject to the discharge and injunction provisions in <u>Article XI</u> of the Plan, and the Confirmation Order, in the case of each of clauses (i) and (ii), the Debtors and the Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

### R. Exemption from Certain Transfer Taxes

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtors to the Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, UCC filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the following instruments or other documents without the payment of any such tax or governmental assessment. Such exemption under section 1146(a) of the Bankruptcy Code specifically applies to (i) the creation of any mortgage, deed of trust, Lien or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any Restructuring Transaction; (iv) the issuance, distribution and/or sale of any of the New Common Stock and any other securities of the Debtor or the Reorganized Debtor; or (v) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

### S. Certain Tax Matters

The Debtors and the Required Consenting First Lien Lenders will work together in good faith and will use reasonable best efforts to structure and implement the Restructuring Transactions

and the transactions related thereto in a tax-efficient and advantageous structure. In connection with the issuance of the New Common Stock, the Reorganized Parent (or such other entity determined by the Required Consenting First Lien Lenders) shall be an entity that will be treated as a corporation for tax purposes.

The Plan Supplement shall include a restructuring steps plan, in form and substance reasonably acceptable to the Required Consenting First Lien Lenders, that shall outline the steps, considerations, treatment of intercompany claims and interests, and agreed funding, as applicable, for any Company Party, including, for the avoidance of doubt, any foreign non-Debtor Company Party.

## T.    Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of these Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided*, that the Debtors and Reorganized Debtors (as applicable) shall have the right to review (subject to applicable attorney-client privilege) and, to the extent set forth in any engagement or fee letter between the Debtors and any First Lien Ad Hoc Group Advisor or Second Lien Ad Hoc Group Advisor, object to any such Restructuring Expenses on reasonableness grounds. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *further*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, after the Effective Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to file a fee application with the Bankruptcy Court.

## U.    Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be paid from the proceeds of the First Out Term Loan Facility or the Cash balances of the Debtors or the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors, as applicable, or any designated Affiliates of the Reorganized Debtors on their behalf.

**ARTICLE VI.**

**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

**A.    Debtors Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by such Debtor; (ii) expired or terminated pursuant to its own terms prior to the Effective Date; or (iii) is the subject of a motion to reject filed on or before the Effective Date. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to one or more Reorganized Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed, or amended and assumed, and, in either case, potentially assigned, restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption, or amendment and assumption, and, in either case, the potential assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall

be deemed fully satisfied, released and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim; *provided*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim. The Debtors, with the consent of the Required Consenting First Lien Lenders, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Confirmation Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must have been filed with the Bankruptcy Court by the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Confirmation Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that did not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (i) the amount of any Cure Claim, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the reasonable consent of the Required Consenting First Lien Lenders), or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## C.    Assumption of Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies

and any agreements, documents and instruments related thereto, including all D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair or otherwise modify any indemnity obligations presumed or otherwise referenced in the foregoing insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect or purchased as of the Petition Date, and all members, managers, directors and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such D&O Liability Insurance Policy shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date.

## D.     Indemnification

The indemnification provisions in any Indemnification Agreement with respect to or based upon any act or omission taken or omitted by an indemnified party in such indemnified party's capacity under such Indemnification Agreement will be Reinstated (or assumed, as the case may be) and will survive effectiveness of the Plan. All such obligations are treated as and deemed to be Executory Contracts to be assumed by the Debtors pursuant to Article VI.A of the Plan. Notwithstanding the foregoing, nothing shall impair the Reorganized Debtors from prospectively modifying any such indemnification provisions (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts or otherwise) after the Effective Date, for indemnification claims and/or rights arising after the Effective Date.

## E.     Severance Agreements and Compensation and Benefit Programs; Employment Agreements

Except as otherwise provided in the Plan, the Plan Supplement or any order of the Bankruptcy Court, all severance policies, all severance arrangements and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to their employees and retirees, including all savings plans, retirement plans, healthcare plans, disability plans, severance agreements and arrangements, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### F.        Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance; all such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### G.        Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date or such other date the Reorganized Debtors deem appropriate.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.        Distribution Record Date

Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Any transfers of Claims after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided herein.

### B.        Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions

provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

## C.    Distribution Agent

Except as otherwise provided in the Plan, all distributions under the Plan, including the distribution of the New Common Stock and New Warrants, shall be made by the Distribution Agent or by such other Entity designated by the Reorganized Debtors as a Distribution Agent on the Effective Date. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) empower professionals to represent it with respect to its responsibilities and (iv) exercise such other powers as are necessary and proper to implement the provisions hereof. If the Distribution Agent is an entity other than the Reorganized Debtors, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

## D.    Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors.

## E.    Rounding of Payments

Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.

No fractional membership units or shares shall be issued or distributed under the Plan. Each Person entitled to receive New Common Stock shall receive the total number of whole units or shares of New Common Stock to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for the distribution of a fraction of a unit or share of New Common Stock, the actual distribution of units or shares of such Existing Equity Interests shall be rounded down to the nearest whole number.

To the extent Cash, shares, stock or units that are to be distributed under the Plan remain undistributed as a result of the rounding down of such fraction to the nearest whole dollar or whole number of notes, shares, stock or units, such Cash, shares, stock or units shall be treated as an Unclaimed Distribution under the Plan.

## F.    Allocation Between Principal and Interest

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, and then, to the extent the consideration exceeds such amount,

to the remainder of such Claim comprising interest accrued through the Effective Date, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## G.    General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

All distributions to holders on account of Allowed First Lien Claims shall be deemed completed when made to or at the direction of the First Lien Agent, which shall be deemed to be the holder of such Claims for purposes of distributions to be made under this Plan. The First Lien Agent shall hold or direct such distributions for the benefit of the holders of the foregoing Allowed First Lien Claims.  The First Lien Agent shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct. If the First Lien Agent is unable to make, or consent to the Reorganized Debtors making, such distributions, the Reorganized Debtors or an authorized Disbursing Agent, with the First Lien Agent's cooperation, shall make such distribution. The First Lien Agent shall have no duties, obligations, or responsibilities with respect to any form of distribution to holders of the foregoing Allowed Claims that is not DTC-eligible, and the Reorganized Debtors shall make such distributions. For the avoidance of doubt, all distributions referenced in this paragraph shall be subject to any charging liens exercised by the First Lien Agent.

## H.    Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (i) at the address set forth on any Proofs of Claim filed by such Holders (to the extent such Proofs of Claim are filed in these Chapter 11 Cases), (ii) at the address set forth in any written notices of address change delivered to the Debtors, (iii) at the address in the Debtors' books and records or (iv) in accordance with the Existing First Lien Credit Agreement and the Existing Second Lien Term Credit Agreement.

## I.    Unclaimed Distributions

If the distribution to the Holder of any Allowed Claim becomes an Unclaimed Distribution, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder.

Such Unclaimed Distribution and such Holder's rights to the distribution or any subsequent distribution shall be deemed forfeit under the Plan. Notwithstanding any federal or state escheat, abandoned or unclaimed property laws to the contrary, such Unclaimed Distribution and any subsequent distributions on account of such Holder's Allowed Claim shall be deemed disallowed, discharged and forever barred as unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to and vest in the Reorganized Debtors free of any restrictions thereon. Holders that fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed Distribution, or any subsequent distributions, against the Debtors or the Reorganized

Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

## J.  Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

## K.  No Postpetition Interest on Claims

Unless otherwise specifically provided for in an order of the Court, the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Existing Equity Interests, and no Holder of a Claim or Existing Equity Interest shall be entitled to interest, dividends or other accruals accruing on or after the Petition Date on any such Claim or Existing Equity Interest.

## L.  Setoffs

Except as otherwise expressly provided for herein, the Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and Causes of Action that the Reorganized Debtors possesses against such Holder; *provided, further*, that no such setoff shall be permitted against any Allowed First Lien Claim or any distributions to be made pursuant to the Plan on account of any such Allowed Claims.

**M.      Surrender of Cancelled Instruments or Securities**

Except as otherwise provided herein, as a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of an Allowed Claim in the Voting Classes based upon an instrument or other security shall be deemed to have surrendered such instrument, security or other documentation underlying such Claim and all such surrendered instruments, securities and other documentation shall be deemed cancelled pursuant to Article V.N of the Plan.

**ARTICLE VIII.**

**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**A.      Disputed Claims Process**

Holders of Claims are not required to file a Proof of Claim with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan. On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized Debtors and shall survive the Effective Date as if these Chapter 11 Cases had not been commenced. Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, if the Debtors or the Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if these Chapter 11 Cases had not been commenced and shall survive the Effective Date as if these Chapter 11 Cases had not been commenced. Solely to the extent that an Entity is required to file a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VIII of the Plan. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan. All Proofs of Claim required to be filed by the Plan that are filed after the date that they are required to be filed pursuant to the Plan shall be disallowed and forever barred, estopped and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order or approval of the Bankruptcy Court, unless leave to file is obtained via order of the Bankruptcy Court or the written authorization of the Reorganized Debtors.

**B.      Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (i) file, withdraw, or litigate to judgment, objections to Claims; (ii) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements, compromises or withdrawals without any further notice to or action, order or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor or its assignor had immediately prior

to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article V.O of the Plan.

## C.   Estimation of Claims

Before or after the Effective Date, the Debtors, with the reasonable consent of the Required Consenting First Lien Lenders, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim or contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of each other. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## D.   Amendments to Claims; Adjustment to Claims on Claims Register

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further action, order or approval of the Bankruptcy Court. Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order or approval of the Bankruptcy Court.

## E.   No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**F.      Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

**G.      No Interest**

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.      Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)      the Restructuring Support Agreement shall have been executed and shall not have been terminated and remains in full force and effect;

(ii)      the Definitive Documents (as defined in the Restructuring Support Agreement) shall, subject to any consent rights contained in the Restructuring Support Agreement, contain terms and conditions consistent in all material respects with the Restructuring Term Sheet, the Restructuring Support Agreement and the exhibits attached thereto;

(iii)      the Bankruptcy Court shall have entered the Prepack Scheduling Order and such Order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(iv)      the DIP Facility shall remain in full force and effect and shall not have been terminated, and no event of default shall have occurred and be continuing thereunder;

(v)      the Plan shall have been confirmed by the Bankruptcy Court and all related Plan exhibits and other documents shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

(vi)      the Confirmation Order shall have been entered and shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(vii)    there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other governmental unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

(viii)    the Restructuring Transactions shall have been consummated, and all transactions contemplated herein, in a manner consistent in all respects with the Restructuring Support Agreement, the Restructuring Term Sheet, the exhibits attached thereto, and the Plan;

(ix)    the Debtors shall have paid or reimbursed all Restructuring Expenses;

(x)    the First Out Term Loan Facility, the Second Out Take Back Term Loan Facility and any related documents shall have been executed, delivered, and be in full force and effect with all conditions precedent thereto having been satisfied or waived, on or prior to the Effective Date, other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred;

(xi)    none of these Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

(xii)    no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors;

(xiii)    the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with the terms of the Plan and the Restructuring Support Agreement;

(xiv)    all conditions to the issuance of the MIP, New Common Stock and New Warrants contemplated to be issued pursuant to the Plan shall have occurred;

(xv)    the Debtors shall have paid or reimbursed all fees and expenses of the DIP Lenders and DIP Agent, including the DIP Professional Fees; and

(xvi)    any and all requisite governmental, regulatory, environmental, and third-party approvals and consents shall have been obtained.

## B.    Waiver of Conditions

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived only if waived in writing by the Debtors and the Required Consenting First Lien Lenders (and, with respect to section A.(ix), each affected First Lien Ad Hoc Group Advisor); *provided*, that the condition requiring that the Confirmation Order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered may not be waived.

C.      **Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

D.      **Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (ii) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.

## RETENTION OF JURISDICTION

A.      **Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over these Chapter 11 Cases and all Entities with respect to all matters related to these Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including jurisdiction to:

(i)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Existing Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Existing Equity Interest; *provided*, that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

(ii)      grant or deny any applications for allowance of Professional Fee Claims;

(iii)      resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party and, if necessary, liquidate any Claims arising therefrom;

(iv)      resolve any issues related to any matters adjudicated in these Chapter 11 Cases;

(v)      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(vi)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending in these Chapter 11 Cases as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date; *provided*, that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, and all orders previously entered into by the Bankruptcy Court, or any Entity's obligations incurred in connection with the Plan;

(viii)     issue and enforce injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(ix)     enforce the terms and condition of the Plan and the Confirmation Order;

(x)     resolve any cases, controversies, suits or disputes with respect to the releases, the exculpations, the indemnification provisions and other provisions contained in Article XI hereof and enter such orders or take such others actions as may be necessary or appropriate to implement, enforce or determine the scope of all such releases, exculpations, injunctions and other provisions;

(xi)     enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xii)     resolve any cases, controversies, suits or disputes that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted or entered into in connection with the Plan, the Plan Supplement or the Disclosure Statement;

(xiii)     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order previously entered by the Bankruptcy Court, including the Confirmation Order;

(xiv)     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xv)     hear any other matter not inconsistent with the Bankruptcy Code; and

(xvi)     enter an order closing each of these Chapter 11 Cases.

As of the Effective Date, notwithstanding anything in this Article X to the contrary, the First Out Term Loan Credit Agreement, the Second Out Take Back Term Loan Credit Agreement, and the New Corporate Governance Documents shall be governed by the respective jurisdictional provisions therein.

B.      **Failure of Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in <u>Article X.A</u> of the Plan, the provisions of this <u>Article X</u> shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE XI.**

**EFFECTS OF CONFIRMATION**

A.      **Binding Effect**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EXISTING EQUITY INTERESTS IN THE DEBTORS, AND EACH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT ANY SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR EXISTING EQUITY INTEREST IN THESE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.**

B.      **Discharge of the Debtors**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Existing Equity Interests herein will be in exchange for and in complete satisfaction, settlement, discharge and release of all Claims and Existing Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Existing Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Existing Equity Interests will be satisfied, discharged and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g), 502(h) or 502(i) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Existing Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

C.      **Exculpation and Limitation of Liability**

Except as otherwise specifically provided in the Plan, to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, amendment, or filing or termination of the Restructuring Support Agreement and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, or any Restructuring Transaction, any contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce this Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

D.      **Releases by the Debtors**

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtors, Reorganized Debtors, and the Debtors' Estates, in each case on behalf of themselves and their Related Parties, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, Reorganized Debtors, or the Debtors' Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of**

any claim or Cause of Action against, or interest in, a Debtor or other Entity (or that any holder of any claim, interest, or Cause of Action could have asserted on behalf of the Debtors), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in  or out of court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan by the Debtors, Reorganized Debtors, and the Debtors' Estates, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (ii) in the best interest of the Debtors, Reorganized Debtors, and the Debtors' Estates and all holders of Interests and Causes of Action; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) subject to the terms and provisions herein, a bar to the Debtors, Reorganized Debtors, and the Debtors' Estates asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their assets and property.

E.      Consensual Releases by Holders of Claims and Existing Equity Interests

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, each Released Party

and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in or out of court restructuring efforts, intercompany transactions between or among a Debtor, another Debtor and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, the New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, (ii) any Person from any claim or Causes of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence by such Person, or (iii) any lender under either the Existing First Lien Credit Agreement or the Existing Second Lien Credit Agreement of any indemnification or contribution claims of either the First Lien Agent or the Second Lien Agent (or the predecessor to the Second Lien Agent) under such agreements.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases in this Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such releases are: (i) in exchange for good and valuable consideration provided by, and the contributions of, the Debtors and the other Released Parties, representing good faith settlement and compromise of the claims released in the Plan; (ii) in the best interests of the

**Debtors and all holders of Claims and Interests; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any claim or cause of action released by such Releasing Party against any of the Debtors or Reorganized Debtors or any other Released Parties or their respective property.**

F.    Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE XI.E</u> OR <u>ARTICLE XI.F</u> OF THE PLAN, DISCHARGED PURSUANT TO <u>ARTICLE XI.C</u> OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE XI.D</u> OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (i) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (ii) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (iii) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (iv) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (v) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THE PLAN OR UNDER ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THE PLAN OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

**G.      Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors has been associated, solely because such Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of these Chapter 11 Cases (or during these Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in these Chapter 11 Cases.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**A.      Modification of Plan**

Subject in all respects to the limitations in the Restructuring Support Agreement (including the consent rights set forth therein) and this Plan: (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, supplement, amend and restate, or otherwise modify the Plan prior to the entry of the Confirmation Order; (ii) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend, supplement, amend and restate, or otherwise modify the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; and (iii) a Holder of a Claim or Existing Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as amended, supplemented, amended and restated, or otherwise modified, if the proposed amendment, supplement, amendment and restatement, or other modification does not materially and adversely change the treatment of the Claim or Existing Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under the Plan. Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019. Prior to the Effective Date, the Debtors may make appropriate technical adjustments to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments or modifications shall be reasonably satisfactory to the Required Consenting First Lien Lenders. Notwithstanding anything to the contrary contained herein, the Debtors or the Reorganized Debtors, as applicable, shall not amend or modify the Plan other than in accordance with the Restructuring Support Agreement.

**B.      Revocation of Plan**

The Debtors, with the prior written consent of the Required Consenting First Lien Lenders, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the Restructuring Support Agreement. If the Debtors revoke or withdraw the Plan, or if Confirmation

or consummation of the Plan does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Existing Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

## C.     Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted and the Debtors, with the consent of the Required Consenting First Lien Lenders, may amend, supplement, amend and restate, or otherwise modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. Notwithstanding any such holding of the Bankruptcy Court, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## D.     Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, designee, successor or assign of that Person or Entity.

## E.     Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Effective Date has occurred.

## F.     Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date shall have occurred. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (i) the Debtors with respect to the Holders of Claims or Existing Equity Interests or other Entity; or (ii) any Holder of a Claim or Existing Equity Interest or other Entity, in each case, prior to the Effective Date.

## G.    Notices

Any notice, request, or demand required or permitted to be made or provided to or upon the Debtors or any of the Consenting Stakeholders under the Plan shall be (i) in writing; (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) facsimile transmission or (e) email transmission; and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

**If to the Debtors:**

Dynata, LLC
4 Research Drive, Suite 300
Shelton, CT 06484
Attn:        Mike Petrullo
               Steve Macri
**with a copy to (which shall not constitute notice):**

Counsel to the Debtors

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attn:   Jeffrey D. Pawlitz, Esq. (jpawlitz@willkie.com)
          Andrew S. Mordkoff, Esq. (amordkoff@willkie.com)
          Erin C. Ryan, Esq. (eryan@willkie.com)
Fax:    (212) 728-8111

– and –

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attn:   Edmon L. Morton, Esq. (emorton@ycst.com)
          Matthew B. Lunn, Esq. (mlunn@ycst.com)
Fax:    (302) 571-1253

**If to a Consenting First Lien Lender:**

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attn:   Scott J. Greenberg (SGreenberg@gibsondunn.com)
          AnnElyse Scarlett Gains (agains@gibsondunn.com)
          Jonathan M. Dunworth (jdunworth@gibsondunn.com)

**H.      Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

**I.      Exhibits**

All exhibits and schedules to the Plan, including the Exhibits, are incorporated and are a part of the Plan as if set forth in full herein.

**J.      No Strict Construction**

The Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Consenting Stakeholders and their respective professionals. Each of the foregoing was represented by counsel of its choice who either (i) participated in the formulation and documentation of, or (ii) was afforded the opportunity to review and provide comments on, the Plan, the Plan Supplement, the Disclosure Statement, and the agreements and documents contemplated therein or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "*contra proferentem*" or other rule of strict construction shall not apply to the construction or interpretation of any provision of the Plan, the Plan Supplement, the Disclosure Statement, and the documents contemplated thereunder and related thereto.

**K.      Conflicts**

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control.

**L.      Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the Holders of Claims and Existing Equity Interests, the Exculpated Parties, the Released Parties, and each of their respective successors and assigns.

**M.      Entire Agreement**

On the Effective Date, this Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into this Plan.

[Remainder of page intentionally left blank]

Dated: May 21, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

By: _Edmon L. Morton_
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email: emorton@ycst.com
           mlunn@ycst.com

- and -

**WILLKIE FARR & GALLAGHER LLP**

Jeffrey D. Pawlitz (*pro hac vice* pending)
Andrew S. Mordkoff (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
Amanda X. Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 728-8000
Facsimile:    (212) 728-8111
Email:        jpawlitz@willkie.com
              amordkoff@willkie.com
              eryan@willkie.com
              afang@willkie.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

## EXHIBIT B

## Liquidation Analysis

A. Introduction

Often referred to as the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each Holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors' assets were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. In determining whether the best interests test has been met, the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in a chapter 7 proceeding must be determined.

This Liquidation Analysis was prepared by the Debtors with assistance from their financial advisors, and represents the Debtors' best estimate of the cash proceeds, net of liquidation related costs, which would be available for distribution to the Holders of Claims and Interests if the Debtors were to be liquidated in chapter 7 cases that do not preserve the going concern value of the Debtors' estates.

To conduct the Liquidation Analysis, the Debtors and their advisors have:

- estimated the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each Debtor's chapter 11 case were converted to a chapter 7 case and the assets of such Debtor's estate were liquidated or sold;

- determined the distribution (the "Liquidation Distribution") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and

- compared each Holder's Liquidation Distribution to the estimated distribution under the Plan (the "Plan Distribution") that such Holders would receive if the Plan were confirmed and consummated.

As the Liquidation Analysis is a hypothetical analysis based on certain assumptions, certain aspects may vary from the Plan, as discussed in the Disclosure Statement, including asset values. The Liquidation Analysis is based upon certain estimates and assumptions discussed herein and in the Disclosure Statement, which should be read in conjunction with the Liquidation Analysis.

**THE INFORMATION SET FORTH IN THIS LIQUIDATION ANALYSIS IS PRELIMINARY AND IS SUBJECT TO MODIFICATION AND SUPPLEMENTATION BY THE DEBTORS AT ANY TIME UP TO THE CONFIRMATION HEARING. THERE**

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which this Liquidation Analysis is attached as **Exhibit B** or the Plan attached to the Disclosure Statement as **Exhibit A**.

**CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HERE.**

B.  <u>Basis of Presentation</u>

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation would commence on or about June 30, 2024 (the "<u>Conversion Date</u>"), which is the assumed effective date of the Plan. The pro forma values referenced herein are projected as of June 30, 2024. The Debtors assume the Conversion Date to be a reasonable proxy for the projected Effective Date of the Plan. The Liquidation Analysis was prepared on a legal entity basis for each Debtor, and summarized into a consolidated report.

The Liquidation Analysis represents an estimate of recovery values and percentages based on a hypothetical liquidation if a chapter 7 trustee were appointed by the Bankruptcy Court to convert assets into cash. The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management team and their advisors, are inherently subject to significant business, economic, and competitive uncertainties, and contingencies beyond the control of the Debtors and their management team. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.

To estimate the liquidation proceeds, the Liquidation Analysis assumes that the Debtors and its subsidiaries are wound down during a three-month wind-down period (the "<u>Liquidation Period</u>"), in which the assets of the Debtors and its subsidiaries are sold in a straight liquidation. In addition to expenses required to liquidate certain assets, the Debtors anticipate that they would pay certain limited personnel to finalize and bill for unbilled revenue as well as organize an orderly exit of field and corporate personnel. Liquidation proceeds available for distribution to Holders of Claims and Interests would consist of the net proceeds.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of claims include various potential employee claims, customer contract rejection claims, lease damage claims, and unpaid chapter 11 administrative claims. The Liquidation Analysis includes an estimate of these claims, but actual claims could be significantly greater. The Liquidation Analysis does not include estimates for the federal and state tax consequences that may be triggered upon the liquidation in the manner described above. Such tax consequences may be material. In addition, the Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions.

C.   Liquidation Process

The Debtors' liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code, with the Trustee managing the estate to maximize recovery in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity specific assets for distribution to creditors. The three major components of the liquidation are as follows:

   I.      Generation of cash proceeds

   •   Collection of customer proceeds associated with items reflected in billed accounts receivable as of the Conversion Date.

   •   Liquidation of prepaid expenses and other current assets, which include primarily gift cards and prepaid insurance.

   •   Liquidation of fixed assets owned outright by the company.

   •   Liquidation of other assets primarily related to proceeds from the sale of a minority interest investment.

   •   Monetization of certain intangible assets such as the Debtors' customer relationships, trade names, and technology.

   •   Liquidation of the Debtors' investments in non-debtor entities and net proceeds generated after satisfying local statutory requirements, allowed liquidation costs, local debts, and entity-level liabilities.

   II.     Costs related to the liquidation process, including corporate support, personnel retention, rent, utilities, other costs, chapter 7 trustee, and professional fees.

   III.    Distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

D.   Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to Holders of Claims against, and Interests in, the Debtors in accordance with section 726 of the Bankruptcy Code—for example, the priority scheme applicable in a chapter 7 proceeding.

• *Debtor in Possession Financing (the "DIP Facility"):* DIP Facility comprised of a $31.5 million postpetition delayed draw term loan provided by the DIP Lenders.

• *Secured Claims*: Claims arising under the Debtors' secured credit facilities, which include the (i) Revolving Credit Loan Claims, (ii) First Lien Term Loan Claims, and (iii) Second Lien Term Loan Claims. Revolving Credit Loan Claims and First Lien Term Loan Claims are secured on the remaining net distributable value, after paying the DIP Facility Claims in full. Second Lien Term Loan Claims are secured on the remaining net distributable value, after

3

paying the DIP Facility Claims, Revolving Credit Loan Claims and First Lien Term Loan Claims in full. The Revolving Credit Loan Claims and First Lien Term Loan Claims, and Second Lien Term Loan Claims are assumed to include unpaid interest as of the Petition Date.

- ***Administrative & Priority Claims:*** Including but not limited to claims as a result of (i) postpetition accounts payable (ii) postpetition accrued expenses, (iii) accrued payroll, and (iv) tax liabilities.

- ***General Unsecured Claims:*** Including but not limited to (i) promissory note claims, (ii) change of control payments triggered and owed to certain employees, (iii) contingent liabilities related to certain earnouts that have not yet been achieved, (iv) remaining lease obligations, (vi) prepetition accounts payable, and (vii) secured debt deficiency claims.

E. Conclusion

The Debtors have determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what such holders would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

*Remainder of page intentionally left blank*

## **Recovery Comparison**

The following table compares estimated Plan recoveries versus the high recovery scenario of the Liquidation Analysis recoveries by class:

| Class | Claims & Interest | Plan Treatment | Estimated Recovery Under Hypothetical Chapter 7 Liquidation | Estimated Recovery Under Plan of Reorganization | Test |
|-------|-------------------|----------------|-------------------------------------------------------------|-------------------------------------------------|------|
| 1 | Other Secured Claims | Unimpaired | n.a. | 100.0% | Pass |
| 2 | Other Priority Claims | Unimpaired | n.a. | 100.0% | Pass |
| 3A | First Lien Term Loan Claims | Impaired | 15.5% | % TBD | Pass |
| 3B | Revolving Credit Loan Claims | Impaired | 15.5% | % TBD | Pass |
| 4 | Second Lien Term Loan Claims | Impaired | 0.0% | % TBD | Pass |
| 5 | General Unsecured Claims | Unimpaired | 0.0% | 100.0% | Pass |
| 6 | Intercompany Claims | Unimpaired / Impaired | 0.0% | 100.0% | Pass |
| 7 | Section 510(b) Claims | Impaired | 0.0% | N/A | Pass |
| 8 | Intercompany Interests | Unimpaired / Impaired | 0.0% | 100.0% | Pass |
| 9 | Existing Equity Interests | Impaired | 0.0% | 0.0% | Pass |

*Remainder of page intentionally left blank*

## Consolidated Debtor Waterfall

($ in 000s)

| Distributable Value Summary | Pro Forma Book Value | Note | Recovery Estimate % | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash and Cash Equivalents | $ 23,249 | [1] | 100.0% | 100.0% | 100.0% | $ 23,249 $ | 23,249 $ | 23,249 |
| Accounts Receivable | 36,922 | [2] | 50.0% | 70.0% | 90.0% | 18,461 | 25,845 | 33,230 |
| Prepaid Expenses and Other Current Assets | 13,316 | [3] | 10.0% | 20.0% | 35.0% | 1,332 | 2,663 | 4,660 |
| Fixed Assets (Gross) | 176,593 | [4] | 0.0% | 0.0% | 5.0% | - | - | 8,830 |
| Other Assets | 6,829 | [5] | 3.0% | 4.0% | 5.0% | 205 | 273 | 341 |
| Intangibles | 508,163 | [6] | 0.0% | 14.8% | 24.7% | - | 75,204 | 125,341 |
| Goodwill | 778,222 | [7] | 0.0% | 0.0% | 0.0% | - | - | - |
| Investment in Subsidiaries | 511,586 | [8] | 0.0% | 0.5% | 8.9% | - | 2,529 | 45,759 |
| **Total Asset Value** | **$ 2,054,878** | | **2.1%** | **6.3%** | **11.7%** | **$ 43,246 $** | **129,764 $** | **241,410** |
| **Gross Distributable Value** | | | | | | **$ 43,246 $** | **129,764 $** | **241,410** |
| Total Liquidation Adjustments | | [9] | | | | $ (18,580) $ | (31,115) $ | (44,907) |
| **Net Distributable Value** | | | | | | **$ 24,666 $** | **98,649 $** | **196,503** |

Claims Recovery Summary

| | Claim $ | Note | Recovery Estimate % | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Net Distributable Value** | | | | | | **$ 24,666 $** | **98,649 $** | **196,503** |
| DIP Facility | 31,500 | | 78.3% | 100.0% | 100.0% | 24,666 | 31,500 | 31,500 |
| **Total Superpriority Secured Claims** | **31,500** | **[10]** | **78.3%** | **100.0%** | **100.0%** | **24,666** | **31,500** | **31,500** |
| **Proceeds Available after Superpriority Secured Claims** | | | | | | **$ - $** | **67,149 $** | **165,003** |
| First Lien Term Loan Claims | 962,518 | | 0.0% | 6.3% | 15.5% | - | 60,804 | 149,413 |
| Revolving Credit Loan Claims | 100,434 | | 0.0% | 6.3% | 15.5% | - | 6,345 | 15,590 |
| Second Lien Term Loan Claims | 250,000 | | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Secured Claims** | **1,312,952** | **[11]** | **0.0%** | **5.1%** | **12.6%** | **-** | **67,149** | **165,003** |
| **Proceeds Available after Secured Claims** | | | | | | **$ - $** | **- $** | **-** |
| **Total Admin & Priority Claims** | **69,357** | **[12]** | **0.0%** | **0.0%** | **0.0%** | **-** | **-** | **-** |
| **Proceeds Available after Admin & Priority Claims** | | | | | | **$ - $** | **- $** | **-** |
| General Unsecured Claims | 1,257,026 to 1,428,863 | | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Unsecured Claims** | **1,257,026 to 1,428,863** | **[13]** | **0.0%** | **0.0%** | **0.0%** | **$ - $** | **- $** | **-** |
| **Proceeds Available for External Equity & Intercompany Claims** | | **[14]** | | | | **$ - $** | **- $** | **-** |

*Remainder of page intentionally left blank*

## Notes to the Liquidation Analysis

- The Liquidation Analysis assumes the Debtors enter chapter 7 on June 30, 2024, which is a reasonable proxy for the projected Effective Date.

- The Liquidation Analysis is based on the liquidation of individual legal entity assets. The consolidated waterfall shown in this analysis is a summary based on an aggregation of the individual liquidation claims and recoveries.

- The recoverable value for each asset is calculated based on each asset's pro forma asset book value, as of the Conversion Date, adjusted for the corresponding recovery estimate, for which additional commentary is provided below. The aggregation of all calculated recoverable asset value (the "Gross Distributable Value") is then used as the starting point for each legal entity's recovery waterfall.

## Specific Notes to the Liquidation Analysis

### Note 1 - Cash and cash equivalents

- The projected value is based on the DIP Budget[2] as of the Conversion Date, the Debtors estimate to hold approximately $23.2 million of available cash.

- Cash consists of cash held in bank accounts, and excludes amounts carved out to satisfy chapter 11 professional fees.

- All projected cash is assumed to be fully recoverable.

### Note 2 - Accounts receivable

- Receivable balances are based on the Debtors' estimated balance as of the Conversion Date.

- Billed accounts receivable balances have an estimated recovery between 50% - 90%.

- Unbilled accounts receivable balances, which occurs when the Company has not yet achieved relevant billing milestones, have no recoverable value.

### Note 3 - Prepaid expenses and other current assets

- Prepaid expenses and other current assets balances are based on the Debtors' estimated balance as of the Conversion Date.

- Prepaid expenses and other current assets balances include gift cards purchased in advance for panelists, prepaid insurance, etc.

---

[2] "DIP Budget" means the Approved DIP Budget (as defined in the DIP Orders).

- Prepaid expenses and other current assets have an estimated recovery between 10% - 35%.

## Note 4 - Fixed assets

- Fixed assets balances primarily consist of furniture, office equipment, vehicles, telephone equipment, internally developed software ("IDSW"), purchased software, and computer hardware.

- Computer hardware, furniture, office and telephone equipment and vehicles are anticipated to have minimal liquidation value due to age of assets.

- IDSW and purchased software are tailored to the Debtor's business model and not anticipated to be transferrable, which leads to limited recovery in an event of liquidation.

- Fixed Assets based on the above assumptions have an estimated recovery between 0% - 5%.

## Note 5 - Other assets

- Other assets balances are based on the Debtors' estimated balances as of the Conversion Date.

- Other assets primarily include deposits, deferred tax assets, deferred financing costs, right-of-use asset, and minority interest investments.

- Deposits, deferred tax assets and deferred financing costs assets are not recoverable and assumed to have no liquidation value.

- Right-of-use asset is related to the Debtors' operating leases and is assumed to have no liquidation value.

- Minority interest investment is estimated to have a recovery between 50% - 90%, due to the saleable nature of this asset, and the anticipated buyer market.

- Other assets balances have an aggregate estimated recovery between 3% - 5%.

## Note 6 - Intangible assets

- Intangible assets primarily include value ascribed to the Debtors' customer relationships, non-compete agreements, trade names, and technology.

- Customer relationships are an estimate of future cash flows from having these customer relationships with the company rather than in the marketplace.

- Given the nature of the chapter 7 liquidation, customer relationships and non-compete agreements are estimated to have no recovery value.

8

- The Debtors' trade names and technology may have potential buyers, but the likelihood of a successful transaction to monetize trade names and technology was deemed to be low.

- Intangible assets have an estimated aggregate recovery between 0% - 25%.

**Note 7 - Goodwill**

- Goodwill is related to the Company's historical acquisitions at a purchase price value in excess of the acquired company's book value.

- Goodwill is assumed to have no recoverable value.

**Note 8 - Investment in subsidiaries**

- Investment in subsidiaries assets represent the tangible book value of investment in non-debtor (non-US) subsidiaries.

- The non-debtor subsidiaries are dependent on the support and resources of the US operations.

- In an event of liquidation where the Debtors cease operations, the ability of non-debtor subsidiaries to generate value may be severely compromised, reducing their worth to potential buyers or investors.

- This analysis assumes the assets owned by the non-debtor subsidiaries will be locally liquidated, with the net proceeds made available to the Debtors.

- With the complexity of winding down businesses across different jurisdictions and uncertainties related to asset realization, investment in subsidiaries assets have an estimated aggregate recovery between 0% - 8.9%.

*Remainder of page intentionally left blank*

<u>Liquidation Costs</u>

**Note 9 - Total Liquidation Adjustments**

- Chapter 7 Trustee Fees

  I.   Pursuant to section 326 of the Bankruptcy Code, the Liquidation Analysis assumes the chapter 7 trustee receives 3% of Gross Distributable Value.

  II.  Fees for all scenarios are estimated as 3% of Gross Distributable Value.

- Chapter 7 Professional Fees

  I.   Professional fees in chapter 7 include costs for professionals engaged by the Trustee after the Conversion Date and may include legal counsel, financial advisors, liquidators, and other professionals.

  II.  Fees for all scenarios are estimated as 2% of Gross Distributable Value.

- Company Liquidation Costs

  I.   The Liquidation Period includes personnel expenses for certain of the Company's employees, who will assist the chapter 7 trustee in winding down the estate.

  II.  The Liquidation Analysis includes estimated retention bonuses, which are anticipated to be paid to retain critical employees.

  III. The Liquidation Analysis includes an estimate of non-personnel costs including rent, utilities, office expenses, and leases to support the winddown process.

*Remainder of page intentionally left blank*

**Claims**

**Note 10 - Super-priority Secured Claims**

| ($ in '000s) | Claims $ |
|---|---|
| DIP Facility | 31,500 |
| **Total Superpriority Secured Claims** | **31,500** |

- Superpriority secured claims include any outstanding amounts on the DIP Facility based on estimated amounts on Conversion Date. The DIP Facility consists of a postpetition delayed draw term loan provided by the DIP Lenders.

- The DIP Facility exclude postpetition interest and any exit fees owed, because it is assumed that interest is paid in normal course during the postpetition period and no exit fees are owed due to the conversion.

- The DIP Facility is expected to have an 78.3%-100% recovery.

- The Liquidation Analysis assumes that the DIP Facility is used to fund an escrow account ("Professional Fee Escrow Account") to pay chapter 11 professionals.

- The remaining balance in the Professional Fee Escrow Account will be used to settle any unpaid chapter 11 professional fees as of the Conversion Date.

*Remainder of page intentionally left blank*

**Note 11 – Secured Claims**

| ($ in '000s) | Claims $ |
|---|---|
| First Lien Term Loan Claims | 962,518 |
| Revolving Credit Loan Claims | 100,434 |
| Second Lien Term Loan Claims | 250,000 |
| **Total Secured Claims** | **1,312,952** |

- Secured claims include the (i) Revolving Credit Loan Claims, (ii) First Lien Term Loan Claims, and (iii) Second Lien Term Loan Claims, and Other Secured Claims (if any).

- The Revolving Credit Loan includes estimated unpaid interest as of the Conversion Date and is secured on the remaining net distributable value after paying the superpriority secured claims in full. The Revolving Credit Loan is expected to have a 0% - 15.5% recovery.

- The First Lien Term Loan Claims include unpaid interest as of the Petition date and are secured on the remaining net distributable value after paying the superpriority secured claims in full. The First Lien Term Loan Claims are expected to have a 0% - 15.5% recovery.

- The Second Lien Term Loan Claims exclude interest as of the Petition date and are secured on the remaining net distributable value after paying the superpriority secured claims, Revolving Credit Loan Claims, and First Lien Term Loan Claims in full. The Second Lien Term Loan Claims are expected to have no recovery in all scenarios.

*Remainder of page intentionally left blank*

**Note 12 - Administrative & Priority Claims**

| ($ in '000s) | Claims $ |
|---|---|
| Postpetition Accounts Payable | 15,883 |
| Postpetition Accrued Expenses | 19,491 |
| Accrued Payroll | 13,692 |
| Tax Liabilities | 20,290 |
| **Total Admin / Priority Claims** | **69,357** |

- Postpetition accounts payable are the estimated outstanding payables incurred on or after the Petition Date through the Conversion Date to preserve the Debtors' estates and operate the Debtors' businesses.

- Postpetition accrued expenses are the estimated outstanding costs and expenses incurred on or after the Petition Date through the Conversion Date to preserve the Debtors' estates and operate the Debtors' businesses.

- Accrued payroll balances are the estimated outstanding balances related to salary and benefits.

- Tax liabilities consist of any claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code as of the Conversion Date.

- All administrative and priority claims are expected to have no recovery value under all scenarios.

*Remainder of page intentionally left blank*

**Note 13 - General Unsecured Claims**

| ($ in '000s) | Claims $ |
|---|---|
| Promissory Note | 54,214 |
| Change of Control Payments | 18,225 |
| Contingent Liabilities | 16,790 |
| Lease Liabilities | 9,942 |
| Prepetition Accounts Payable | 9,906 |
| Deficiency Claim - DIP Facility | 0 to 6,834 |
| Deficiency Claim - Revolving Credit & First Lien Term Loan | 897,949 to 1,062,952 |
| Deficiency Claim - Second Lien Term Loan | 250,000 |
| **General Unsecured Claims** | **1,257,026 to 1,428,863** |

- Promissory note is the Debtors' estimated balances owed to various current and former employees associated with a previously completed acquisition including accrued interest as of the Conversion Date.

- Change of control payments are the Debtors' estimated balances owed to certain management personnel as a result of the change in control as of the Conversion Date.

- Contingent liabilities are the Debtors' estimated balances related to certain earnouts as of the Conversion Date.

- Lease liabilities are the Debtors' estimated remaining lease obligations, excluding damages claims, anticipated to be owed from non-payment as of the Conversion Date.

- Prepetition accounts payable are the Debtors' estimated account payable balances as of the Conversion Date.

- Deficiency claims are the remaining secured debt claim value that was not paid via the respective collateral.

- DIP Facility Claims, Revolving Credit Loan Claims and First Lien Term Loan Claims represent a range based on the high and low recovery scenarios.

- All General Unsecured Claims are expected to have no recovery value under all scenarios.

**Note 14 – Intercompany & Equity Claims**

- Intercompany Claims, Intercompany Interests and Existing Equity Claims are subordinated to General Unsecured Claims and are not anticipated to receive any recovery in a hypothetical liquidation.

14

# **EXHIBIT C**

**Valuation**

## EXHIBIT C

### Valuation Analysis

**Estimated Enterprise Valuation of the Reorganized Debtors**

THE VALUATION INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN (AS DEFINED BELOW). THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.  THIS VALUATION SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for purposes of the *Chapter 11 Plan of Reorganization of DYNATA, LLC and Its Affiliated Debtors* (as may be further amended, modified, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**") and the *Disclosure Statement for Chapter 11 Plan of Reorganization of DYNATA, LLC and Its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Disclosure Statement**"), Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), as investment banker and financial advisor to the Debtors, has estimated the enterprise value of the Reorganized Debtors (the "**Total Enterprise Value**") in these chapter 11 cases.

In addition, Houlihan Lokey has estimated the implied equity value (the "**Equity Value**") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

In preparing the estimates set forth below, Houlihan Lokey has relied upon the accuracy, completeness, and fairness of financial and other information furnished by the Debtors. Houlihan Lokey did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors. Houlihan Lokey did not conduct an independent investigation into any of the legal or accounting matters affecting the Debtors, and therefore makes no representation as to their potential impact on the Total Enterprise Value.

The valuation information set forth in this section represents a valuation of the Reorganized Debtors based on the application of standard valuation techniques. The estimated values set forth in this Section:

- do not purport to constitute an appraisal of the assets of the Reorganized Debtors;
- do not constitute an opinion on the terms and provisions or fairness to any person, from a financial point of view, of the consideration to be received by such person under the Plan;
- do not constitute a recommendation to any Holder of Allowed Claims as to how such Holder should vote or how such Holder otherwise should act with respect to the Plan; and
- do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In conducting its analysis, Houlihan Lokey, among other things: (a) reviewed certain financial information relating to the Debtors, and the market and survey research and related industries that Houlihan Lokey deemed relevant; (b) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets, liabilities, and prospects of the Reorganized Debtors, including the Financial Projections, furnished to Houlihan Lokey by the Debtors; (c) conducted discussions with members of senior management and representatives of the Debtors concerning the matters described in clauses (a) and (b) of this paragraph, as well as their views concerning the Debtors' and Reorganized Debtors' business and prospects before and after giving effect to the Plan; (d) reviewed publicly available financial and stock market data for certain other companies in lines of business that Houlihan Lokey deemed relevant; (e) reviewed the financial terms of certain transactions that Houlihan Lokey deemed relevant; (f) reviewed drafts of the Plan and related transactional documents; and (g) conducted such other financial studies and analyses and took into account such other information as Houlihan Lokey deemed appropriate.

The Debtors' Financial Projections served as the basis, along with other financial information and projections provided by the Debtors, in estimating the Total Enterprise Value of the Reorganized Debtors. The estimated values

set forth herein assume that the Reorganized Debtors will achieve their Financial Projections in all material respects. Houlihan Lokey has relied on the Debtors' representation that the Financial Projections:

- have been prepared in good faith;
- are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable;
- reflect the Debtors' best currently available estimates; and
- reflect the good faith judgments of the Debtors.

Houlihan Lokey does not offer an opinion as to the attainability of the Financial Projections. As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Houlihan Lokey, and consequently are inherently difficult to project.

This report contemplates facts and conditions known and existing as of the date of the Disclosure Statement, other than as outlined in the Financial Projections. Events and conditions subsequent to this date, including updated Financial Projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, Houlihan Lokey has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the contemplated Effective Date projected for purposes of this report of June 30, 2024.

In preparing its valuation, Houlihan Lokey performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses considered by Houlihan Lokey, which consisted of (a) a selected publicly traded comparable companies analysis, (b) a discounted cash flow ("**DCF**") analysis, and (c) analysis of precedent transactions for similar companies in the industry. These analyses primarily formed the basis for the valuations of the Reorganized Debtors.

This summary does not purport to be a complete description of the analyses performed and factors considered by Houlihan Lokey. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description. The following valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create misleading or incomplete conclusions as to enterprise value.

### A. Valuation Methodology

The Total Enterprise Value of the Reorganized Debtors was estimated by primarily relying upon three generally accepted valuation techniques: (i) Comparable Companies Analysis, (ii) DCF analysis, and (iii) analysis of precedent transactions:

#### i. Comparable Company Analysis

The comparable company analysis estimates the value of a company based on a relative comparison with publicly traded companies with similar operating and financial characteristics. A group of publicly traded companies was selected based on similar business and financial characteristics to the Reorganized Debtors. Criteria for the selected reference group included, but were not limited to, similarity in core business (type of data insight or analytics provided and data aggregation method), geographical footprint, and exposure to similar macroeconomic factors. The selection of appropriate comparable companies is often difficult and relies on certain qualitative judgements.

Using the comparable company methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the outstanding net debt for such company. Such enterprise values are typically expressed as multiples of various measures of financial and operating statistics and projected financial metrics. The Total Enterprise Value of the Reorganized Debtors is calculated by applying these relevant selected multiples to the Reorganized Debtors' historical financials and Financial Projections.

#### ii. Discounted Cash Flow Analysis

The DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Houlihan Lokey's DCF analysis used the Reorganized Debtors' financial projections and its after-tax cash flows through December 31, 2028. These cash flows were then discounted at a range of estimated weighted average costs of capital, which was determined by reference to, among other things, the cost of debt of selected companies that are similar to the Reorganized Debtors in certain respects and the estimated cost of equity of selected publicly traded companies that are similar to the Reorganized Debtors in certain respects. Houlihan Lokey's DCF analysis also included an estimate of the value of the Reorganized Debtors for the period beyond December 31, 2028, known as the terminal value. The terminal value was derived by applying a multiple range to the EBITDA level in the final year of the projection period and discounted back to the assumed Effective Date. The terminal year multiple range is based on the Comparable Company Analysis. The discounted cash flow analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates.

### iii. Precedent Transactions Analysis

The selected transactions analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions for which the targets had operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, a multiple is derived using the enterprise value of each such target, calculated as the consideration paid and the net debt assumed in the selected precedent transaction relative to a financial metric, in this case the target's LTM EBITDA. Houlihan Lokey analyzed various merger and acquisition transactions involving data platform and market research targets since 2016.

### B. Valuation Conclusions

As a result of the analyses described above, Houlihan Lokey estimates the Total Enterprise Value of the Reorganized Debtors, as of the assumed Effective Date of June 30, 2024, to be between $820 million and $1,020 million with a midpoint of $920 million. Assuming net debt of approximately $745 million as of the assumed Effective Date, the implied equity value range of the Reorganized Debtors is estimated to be between $75 million and $275 million with a midpoint of $175 million.

The estimate of the Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Houlihan Lokey's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Houlihan Lokey, nor any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

# EXHIBIT D

**Financial Projections**

## Exhibit D

## FINANCIAL PROJECTIONS[1]

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtors (and together with their non-Debtor affiliates, the "Company"). In accordance with this condition and in order to assist each holder of a Claim in determining whether to vote to accept or reject the Plan, the Company's management team ("Management"), with the assistance of their advisors, developed financial projections (the "Financial Projections") to support the feasibility of the Plan.

The Financial Projections were prepared by Management and are based on a number of assumptions made by Management, within the bounds of their knowledge of their business and operations, with respect to the future performance of the Company's operations. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized.

The Financial Projections were not prepared with a view towards compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

### *Safe Harbor Under the Private Securities Litigation Reform Act of 1995*

The Financial Projections contain certain statements that are "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and management with respect to the timing of, completion of, and scope of the current restructuring, Plan, Debtors' business plan, and market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement.

### Accounting Policies

The Financial Projections have been prepared using accounting policies that are consistent with those applied in the Debtors' historical financial statements.

Upon emergence from chapter 11, the Reorganized Debtors anticipate they will implement "fresh start" reporting pursuant to Accounting Standards Codification ("ASC") Topic 852, "Reorganization." The main principles of fresh start reporting require that the reorganization value of the emerging entity be allocated to all of the entity's assets and liabilities in accordance with the guidance in ASC Topic 805, "Business Combinations." Any portion of the reorganization value not attributable to specific tangible or identifiable intangible assets or liabilities of the emerging entity is required to be reported as goodwill. The Projections may not reflect all the adjustments necessary to implement fresh start reporting.

### Summary of Significant Assumptions

The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections for 2025 to 2027. The Financial Projections are based on a number of assumptions with respect to the future performance of the Reorganized Debtors' operations. Although these Financial Projections have been prepared in good faith and are believed to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. As described in detail in Article VIII of the Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and should be considered. The Financial Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth herein.

### General Assumptions

The Financial Projections assume that the Effective Date will be June 30, 2024 and that the Reorganized Debtors will continue to conduct operations substantially similar to their current businesses. The Financial Projections take into account the current market environment in which the Debtors compete, including many economic and financial forces that are beyond the control of the Debtors and management. The Debtors provide digital marketing data and data analytics services through access to the Debtors' first-party panel data. In addition, the Debtors also provide value-added services to the market research industry. Economic growth or slowdowns on a global or national basis may impact the reorganized debtors' revenues and expenses. In addition, general trends in the market research and advertising industry, level of general M&A activity, legislation and regulation around data privacy, customer and/or vendor challenges related to the Company's bankruptcy proceedings, and changes to the market research budgets of the Debtors key customers may all impact performance.

The budget process is led by business unit leaders with input from the corporate Financial Planning & Analysis team. The financial planning team collaborates with relevant business owners, including the local business leaders to develop the operational and financial projections for each of the key drivers of the business, by program and market. Key drivers include known ongoing and near-term project backlog, pipeline with new and existing customers, anticipated price changes, and projected investments. These inputs are projected by business unit and summarized

into a consolidated financial view that is reviewed by the senior leadership team and the Board of Directors.

### Risk Factors

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' management team's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in Article VIII of the Disclosure Statement and the assumptions described herein.

### Projected Statements of Operations

"Adjusted EBITDA" is defined as earnings (operating income) before depreciation, amortization, taxes, interest, stock compensation, and other non-recurring costs. Adjusted EBITDA is a key measure of the Company's operational performance, and management uses Adjusted EBITDA consistently for all purposes, including internal reporting, the evaluation of business objectives, opportunities and performance, and the determination of management compensation. Adjusted EBITDA is not a measure of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

"Segments" The Company's revenue channels consist of three main segments: (i) Online, (ii) Voice Services, and (iii) Political.

**New Insight Holdings, Inc.**
**Projected Statement of Operations (Unaudited)**

| | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Revenue** | **$589.0** | **$593.1** | **$599.6** | **$662.3** | **$680.5** |
| *YoY Growth* | *N/A* | *0.7%* | *1.1%* | *10.5%* | *2.8%* |
| (–) Cost of Sales | (228.8) | (222.4) | (221.3) | (238.4) | (245.0) |
| **Gross Profit** | **$360.2** | **$370.7** | **$378.3** | **$423.9** | **$435.5** |
| *Margin %* | *61.2%* | *62.5%* | *63.1%* | *64.0%* | *64.0%* |
| (–) SG&A / OpEx | (204.2) | (207.6) | (198.7) | (210.7) | (214.4) |
| (–) Depreciation & Amortization | (78.9) | (55.5) | (50.9) | (49.1) | (49.2) |
| (–) Debt Service | (159.8) | (64.2) | (87.1) | (86.2) | (85.7) |
| (–) Non-Cash Interest | – | (1.3) | – | – | – |
| (–) Tax | (3.7) | (12.0) | (13.5) | (15.0) | (15.4) |
| (–) Other Income & Expenses | (16.8) | (54.1) | (15.8) | (14.9) | (14.9) |
| **Net Income** | **($103.1)** | **($24.0)** | **$12.3** | **$48.0** | **$56.0** |
| (+) Depreciation & Amortization | 78.9 | 55.5 | 50.9 | 49.1 | 49.2 |
| (+) Tax | 3.7 | 12.0 | 13.5 | 15.0 | 15.4 |
| (+) Debt Service | 159.8 | 64.2 | 87.1 | 86.2 | 85.7 |
| (+) Other Income & Expenses | 17.3 | 55.3 | 15.8 | 14.9 | 14.9 |
| **Adjusted EBITDA** | **$156.6** | **$163.1** | **$179.6** | **$213.2** | **$221.2** |
| *YoY Growth* | *N/A* | *4.2%* | *10.1%* | *18.7%* | *3.7%* |
| *Margin %* | *26.6%* | *27.5%* | *30.0%* | *32.2%* | *32.5%* |
| *Memo: Segment Revenue* | | | | | |
| *Online and Voice Services* | *$583.5* | *$567.3* | *$594.1* | *$637.3* | *$675.5* |
| *Political* | *5.4* | *25.7* | *5.4* | *25.0* | *5.0* |

## Notes to Projected Statement of Operations

### *Revenue*

Online

The Online segment is comprised of four channels: 1) Market Research Agencies (MRA), 2) Consulting, Investment and Healthcare (CI&H), 3) Corporate (selling direct to Brands) and, 4) Media (Media and marketing agencies). Revenue for MRA and CI&H is highly re-occurring, with roughly 30% of revenues driven by long-term tracking studies. CI&H revenues are highly correlated with general M&A market activity as the largest customers are large consulting firms that utilize the Debtors' services to help their clients analyze potential investment opportunities. MRA revenues are correlated to the broader market research industry as many of the customers in this segment are large, legacy market research firms. Geographically, revenue in this category is

heavily weighted toward the Americas at ~60%, with 30% in EMEA[2] and the balance in APAC[3]. Growth in this segment is expected to be seen primarily with the roll-out of the Company's DIY and programmatic survey platform and a normalization in general M&A market activity providing a tailwind in the CI&H segment.

Political

The Political segment is categorized as offline revenue. Political is highly cyclical as it is tied to the political cycle, with the bulk of revenues occurring every two years during active political cycles in the US mid-term and Presidential elections. Growth for the segment is expected to be flat over the forecast period.

*Gross Margin*

A key driver for the improvement in gross margins is continuation of data quality improvements, enhanced panel operations and cost synergies from Branded and inBrain panel supply. The Company has made investments in machine learning and member validation tools which has significantly reduced wastage (e.g., bad survey completes). Enhancements to panel operations have improved new panelists activity and increased panel member retention which have reduced overall cost of sales. Additionally, the Company expects continued margin improvement from use of cost-effective inventory from recent acquisitions (i.e., Branded and inBrain), which have helped improve gross margins from the high-50s to low-60s.

*Sales, General and Administrative ("SG&A")*

SG&A for the business includes costs related to corporate functions such as Legal, IT, Finance and Accounting, HR, and other centralized functions, which are not allocated to the business segments. These costs can include office expenses, rent, utilities and marketing expenses, among others. For the purposes of the financial forecast presentation, the amounts shown exclude certain non-recurring items as well as restructuring costs.

The Financial Projections assume SG&A costs will decrease as a percentage of revenue as a result of continued cost-out efforts focusing on automation and consolidation of business processes taking place in 2024 and 2025 while marketing and technology expenses are expected to increase relative to historical levels in support of the Debtors' initiatives.

---

[2] Legal entities in EMEA include Bulgaria, Denmark, France, Germany, Hungary, Italy, Netherlands, Romania, Spain, Sweden, and U.K.

[3] Legal entities in APAC include Australia, China, Hong Kong, India, Japan, Philippines, New Zealand, Singapore, and South Korea

**New Insight Holdings, Inc.**
**Projected Pro Forma Consolidated Balance Sheet at Emergence (Unaudited)**

| ($ in mm) | Jun-24 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| Cash and Cash Equivalents | $40 | $28 | $40 | $81 | $144 |
| Accounts Receivable, Net | 132 | 146 | 149 | 160 | 164 |
| Prepaid Expenses and Other Current Assets | 20 | 18 | 18 | 23 | 24 |
| Total Current Assets | $192 | $192 | $207 | $264 | $332 |
| | | | | | |
| Property Plant & Equipment, Net | $30 | $29 | $30 | $30 | $31 |
| Goodwill | 881 | 881 | 881 | 881 | 881 |
| Other Intangible Assets, Net | 188 | 171 | 148 | 130 | 111 |
| Deferred Tax Asset | 1 | 1 | 1 | 1 | 1 |
| Right of Use Asset | 18 | 18 | 18 | 18 | 18 |
| Other Non-Current Assets | 5 | 5 | 5 | 5 | 5 |
| Total Non-Current Assets | $1,121 | $1,103 | $1,082 | $1,064 | $1,046 |
| | | | | | |
| **Total Assets** | **$1,313** | **$1,295** | **$1,289** | **$1,328** | **$1,378** |
| | | | | | |
| Accounts Payable | $39 | $48 | $49 | $52 | $54 |
| Foreign Taxes Payable | 4 | 4 | 4 | 4 | 4 |
| Accrued Expenses & Other Current Liabilities | 69 | 68 | 66 | 69 | 71 |
| Current Lease Liability | 6 | 6 | 6 | 6 | 6 |
| Current Portion of Long-term Debt | 12 | 12 | 12 | 4 | 4 |
| Total Current Liabilities | $129 | $137 | $136 | $135 | $139 |
| | | | | | |
| Long-term Debt | $816 | $800 | $781 | $769 | $757 |
| Deferred Income Taxes | 21 | 21 | 21 | 21 | 21 |
| Long-term Lease Liability | 17 | 17 | 17 | 17 | 17 |
| Other Long-term Liabilities | 5 | 5 | 5 | 5 | 5 |
| Total Long Term Liabilities | $859 | $843 | $824 | $812 | $800 |
| | | | | | |
| **Total Liabilities** | **$988** | **$981** | **$960** | **$948** | **$939** |
| | | | | | |
| **Total Stockholders' Equity** | **$325** | **$314** | **$329** | **$380** | **$439** |
| | | | | | |
| **Total Liabilities & Stockholders' Deficit** | **$1,313** | **$1,295** | **$1,289** | **$1,328** | **$1,378** |

*Notes to Projected Pro Forma Consolidated Balance Sheet*

The pro forma balance sheet adjustments contained herein account for (i) the reorganization and related adjustments pursuant to the Plan and (ii) the estimated impact from the implementation of fresh start accounting pursuant to ASC Topic 852, "Reorganization."

The Debtors have not yet completed their fresh start reporting analysis.

**New Insight Holdings, Inc.**
**Projected Consolidated Free Cash Flow (Unaudited)**

| | 2H2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|
| **Adj. EBITDA** | **$94.6** | **$179.6** | **$213.2** | **$221.2** |
| (–) Cash Taxes | (6.7) | (13.5) | (15.0) | (15.4) |
| (–) (Increase) / Decrease in Working Capital | (2.3) | (1.9) | (8.5) | (1.8) |
| (–) Capital Expenditures | (14.5) | (29.7) | (30.7) | (31.8) |
| **UFCF before One-Time Items** | **$71.1** | **$134.5** | **$159.0** | **$172.2** |
| (–) One-Time Items | (22.8) | (16.3) | (12.0) | (12.0) |
| **UFCF** | **$48.3** | **$118.3** | **$147.0** | **$160.2** |
| (–) Debt Amortization | (3.9) | (7.8) | (7.8) | (7.8) |
| (–) Cash Interest | (44.2) | (87.1) | (86.2) | (85.7) |
| (–) Cash Dividend | – | – | – | – |
| (–) Other Cash Debt Service | (11.6) | (11.6) | (11.6) | (4.2) |
| **Levered Free Cash Flow before RCF / ABL Draw (Paydown)** | **($11.5)** | **$11.8** | **$41.4** | **$62.6** |
| (+/–) RCF / ABL Draw (Paydown) | – | – | – | – |
| **Levered Free Cash Flow after RCF / ABL Draw (Paydown)** | **($11.5)** | **$11.8** | **$41.4** | **$62.6** |
| Beginning Cash Balance | 39.7 | 28.2 | 40.0 | 81.4 |
| (+) Levered Free Cash Flow | (11.5) | 11.8 | 41.4 | 62.6 |
| (+/–) RCF / ABL Draw (Paydown) | – | – | – | – |
| **Ending Cash Balance** | **$28.2** | **$40.0** | **$81.4** | **$144.0** |

*Notes to Consolidated Free Cash Flow*

*Working Capital*

The Financial Projections assume the Reorganized Debtors' working capital accounts, including accounts receivable, accounts payable, accrued expenses and others, continue to perform according to the historical relationships with respect to revenue and expense activity.

*Capital Expenditures*

Total capital expenditures are forecasted to grow at a 3.2% CAGR through the projection period. The bulk of capital expenditures is made up of capitalized labor for internally developed software, which is expected to grow from $23mm in 2023 to over $28mm by 2027. Other capital expenditures related to office equipment, computer hardware, and leasehold improvements are expected to decline from $4.9mm in 2023 to $3.5mm in 2027.

*Non-Recurring Items*

This category includes one-time cash expenditures made up of earnouts and other non-recurring items such as an estimate for professional fees for discrete projects or assignments that are non-recurring in nature. One-time items also include income tax payments in 2H24 related to 2023 taxes, as well as remaining restructuring costs in the near-term associated with the Debtors' cost-

out initiatives. Non-recurring items are forecasted to be $12mm annually by 2027 but may fluctuate from time to time given the unpredictable nature of these items.

### Debt Amortization and Cash Interest

The projections include expected cash interest payments for the First Out Term Loan Facility and Second Out Take Back Term Loan Facility, ABL, and EMEA revolver, as well as term loan principal amortization payments and payments on the seller note related to a recent acquisition. The First Out Term Loan Facility has a cash interest rate of SOFR + 500 due quarterly and quarterly amortization payments equal to 1% of the balance outstanding as of the Effective Date. The Second Out Take Back Term Loan Facility has a cash interest rate of SOFR+550 due quarterly and 1% quarterly amortization. The EMEA revolver has the same terms as pre-petition. The new ABL has a rate of S+250. ABL interest is paid monthly, and the ABL is modelled based on a borrowing base with the assumption that any excess cash at the end of the month is used to pay down the ABL to reduce interest costs. The projections assume that the funded debt will be refinanced at their respective maturities, with substantially the same terms.

*[Remainder of page intentionally left blank]*

# **EXHIBIT E**

## **Restructuring Support Agreement**

DYNATA, LLC

RESEARCH NOW GROUP, LLC

<u>RESTRUCTURING SUPPORT AGREEMENT</u>

May 21, 2024

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED, AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES, OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and including all exhibits, annexes, and schedules hereto in accordance with Section 15, this "**Agreement**") is made and entered into as of May 21, 2024 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**"):[1]

 i. New Insight Holdings, Inc., a company incorporated under the Laws of Delaware ("**Parent**"), and each of its Affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement in accordance with this Agreement (the Entities in this clause (i), collectively, the "**Company Parties**");

 ii. the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold the First Lien Term Loans that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement in accordance with this Agreement (the Entities in this clause (ii), collectively, the "**Consenting First Lien Term Loan Lenders**");

 iii. the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold the Revolving Credit Loans that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement in accordance with this Agreement (the Entities in this clause (iii) collectively, the "**Consenting Revolving Credit Lenders**[2]", and, together with the Consenting First Lien Term Loan Lenders, the "**Consenting First Lien Lenders**");

 iv. the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold the Second Lien Term Loans that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement in accordance with this Agreement (the Entities in this clause (iii) collectively, the "**Consenting Second Lien Term Loan Lenders**" and, together with the Consenting First Lien Term Loan Lenders and the Consenting Revolving Credit Lenders, collectively, the "**Consenting Lenders**"); and

 v. Court Square Capital Partners, Court Square Capital Partners III, L.P., Court Square Capital Partners III-A, L.P., Court Square Capital Partners (Offshore) III, L.P. Capital Court Square Capital Partners (Executive) III, L.P., HGGC Saber Topco

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 of this Agreement.

[2] For the avoidance of doubt, any Affiliates or related parties of any Consenting Revolving Credit Lender (including any separate branch of a Consenting Revolving Credit Lender) shall not be deemed to be Consenting Revolving Credit Lenders themselves, unless such Affiliate or related party has itself signed this Agreement. The Consenting Revolving Lenders are signing this Agreement only in their capacity as holders of Revolving Credit Loan Claims (both currently owned and that may be acquired after the Agreement Effective Date (subject to the terms of Section 10 hereto)), and this Agreement does not cover any other Company Claims/Interests other than the Revolving Credit Loan Claims that are now owned or subsequently acquired by the Consenting Revolving Credit Lenders; provided that the Consenting Revolving Credit Lenders may execute separate signature pages to this Agreement on behalf of their other Company Claims/Interests, if any.

LLC, HGGC, LLC, HGGC Fund II, L.P, HGGC Fund II-A, L.P., HGGC Fund II-B, L.P., HGGC Fund II-C, L.P., HGGC Fund II-D, L.P., HGGC Associates Fund II, L.P. and HGGG Affiliate Investors II, L.P. (the "**Sponsors**" and, together with the Consenting First Lien Term Loan Lenders, the Consenting Revolving Credit Lenders and the Consenting Second Lien Term Loan Lenders, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Restructuring Transactions shall be implemented through a chapter 11 plan of reorganization (the "**Chapter 11 Plan**") to be implemented through the commencement by certain of the Company Parties of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

1.01.    Definitions.  The following terms shall have the following definitions:

"**Administrative Expense Claim**" refers to any right to payment constituting a cost or expense of administration incurred during these Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Plan Effective Date of preserving the estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Transaction**" means any solicited or unsolicited written or oral plan, inquiry, proposal, offer, bid, term sheet, discussion or agreement with respect to a dissolution, winding up, liquidation, receivership, assignment for the benefit of creditors, restructuring, reorganization, workout, exchange, extension, sale, disposition, merger, amalgamation, acquisition, consolidation, partnership, plan of arrangement, plan of reorganization, plan of liquidation, investment, debt investment, equity investment, tender offer, refinancing, recapitalization, share exchange, business combination, joint venture, or similar transaction to any of the foregoing involving all or a subset of the Company Parties and their respective subsidiaries and debt and/or equity interests; provided, however, that the Restructuring Transactions shall not individually or collectively be considered an Alternative Transaction so long as such transactions are consistent in all respects with the terms of this Agreement or otherwise consented to in an advance written communication by the Required Consenting First Lien Lenders and the Required Consenting Second Lien Lenders.

"**Ameritest Earnout**" means any "Earn-Out Payment" as defined in and provided by that certain Asset Purchase Agreement, dated as of December 1, 2021 between CY Research, Inc and Hello-Hello Inc., as Sellers, Charles Young, Norma Young, Christopher Young and Paul Young, as Indemnifying Owners, and Dynata, LLC, as Buyer.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Branded Research Seller Note Claim**" means any Claim related to or arising out of (i) that certain Second Amended and Restated Promissory Note, dated April 26, 2023, issued by Dynata, LLC to Matthew Gaffney in an amount of $46,500,000.00 or (ii) that certain Promissory Note, dated April 26, 2023, issued by Dynata, LLC to Matthew Gaffney in an amount of $6,765,000.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"**Causes of Action**" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits,

obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise.

"**Change of Control Payments**" means any bonus or similar payment to any current or former officer or employee of the Company Parties, or any other individual, triggered by a "change of control" transaction, including, but not limited to (x) any payment triggered by a "Change in Control Transaction" as defined in that certain Stockholders Agreement, dated as of December 20, 2027, by and among New Insight Holdings, Inc., Insight Holdings (DE), LP, HGGC Saber Topco LLC and the other Persons party thereto, and (y) any "Sale Bonus" as defined in that certain Employment Agreement, dated as of September 20, 2023, between New Insight Holdings, Inc. and Michael Petrullo.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Plan**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Claims, the Second Lien Term Loan Claims, and the Equity Interests held by the Sponsor.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Termination Event**" has the meaning set forth in Section 14.05.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Chapter 11 Plan under section 1129 of the Bankruptcy Code, which Confirmation Order shall be (i) in accordance with this Agreement and the Definitive Documents and (ii) a Final Order.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Term Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Revolving Credit Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Second Lien Term Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means all definitive documents, instruments, deeds, notifications, agreements, and filings related to documentation, implementation, and consummation of the Chapter 11 Plan or the in-court Restructuring Transactions generally, including, without limitation: (i) the In-Court Solicitation Materials; (ii) the Exit Facilities Documents; (iii) the New ABL Facility; (iv) the Chapter 11 Plan; (v) the Confirmation Order; (vi) the Disclosure Statement Motion; (vii) the Disclosure Statement; (viii) the Disclosure Statement Order; (ix) all material pleadings and motions filed by the Company Parties in connection with these Chapter 11 Cases, including the First Day Pleadings and all orders sought pursuant thereto; (x) the Plan Supplement (including, but not limited to, any restructuring transactions memorandum and/or schedule(s) to assume or reject unexpired leases and executory contracts); (k) the DIP Orders and any motions seeking entry of the DIP Orders; (xi) the DIP Facility Documentation; (xii) the New Corporate Governance Documents; (n) the New Common Stock Documents; (o) agreements governing the New Warrants; (xiii) any Management Incentive Plan; (xiv) any and all agreements or documents governing any key employee incentive or retentive programs, including employment and/or other benefit or severance agreements; and (xv) all filings and requests for regulatory or other approvals from any governmental entity or unit necessary to be obtained by the Company Parties to implement the Restructuring Transactions; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).  For the avoidance of doubt, Consenting Stakeholder consent shall not be required for the filing of any ministerial notices and similar ministerial documents, retention applications, fee applications, fee statements, similar pleadings or motions relating to the retention or fees of any professional, or statements of financial affairs and schedules of assets and liabilities.  All Definitive Documents shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

"**DIP Budget**" means the budget for the Company Parties' use of the DIP Facility and/or Cash Collateral as contemplated by the DIP Orders, which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

"**DIP Facility**" means any debtor-in-possession financing facility approved pursuant to the DIP Orders.

"**DIP Facility Documentation**" means any documents governing the DIP Facility that are entered into in accordance with the Restructuring Term Sheet the DIP Orders and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, fee letters, guarantees and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**DIP Orders**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms for the use of Cash Collateral and/or the DIP Facility, which shall be consistent in all material respects with the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Chapter 11 Plan in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure, and other applicable Law, including all exhibits, annexes, schedules, and supplements thereto, each as may be amended, supplemented, or modified from time to time.

"**Disclosure Statement Motion**" means the motion filed with the Bankruptcy Court seeking entry of an order scheduling a combined hearing with respect to confirmation of the Chapter 11 Plan and approval of the Disclosure Statement.

"**Disclosure Statement Order**" means the order (and all exhibits thereto) entered by the Bankruptcy Court approving the adequacy of information in the Disclosure Statement and, to the extent necessary, approving the In-Court Solicitation Materials and the solicitation of votes on the Chapter 11 Plan, which order may be the Confirmation Order.

"**Earnout Payment Claims**" means any Claim arising from or related to the Ameritest Earnout, the Optimus Earnout or the inBrain Earnout.

"**EMEA RCF Agreement**" means that certain Receivables Financing Agreement, dated July 28, 2023, between Leumi UK Group Limited and Dynata Global UK Ltd.

"**EMEA RCF Claim**" means any Claim arising from or related to the EMEA RCF Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof) of common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party (regardless of whether such interests are held directly or indirectly), and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement and regardless of whether such interests are held directly or indirectly).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Credit Agreements**" means the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement.

"**Existing First Lien Credit Agreement**" means that certain First Lien Credit Agreement (as supplemented, amended, amended and restated, or modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a

Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto, and Goldman Sachs Bank USA, as Administrative Agent.

"**Existing Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement (as supplemented, amended, amended and restated, or modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto, and Acquiom Agency Services LLC, as Administrative Agent and any successor thereto.

"**Exit Facilities**" means the Exit Term Loan Facilities and the New ABL Facility.

"**Exit Facilities Documents**" means the credit agreements governing the Exit Facilities and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**Exit Term Loan Facilities**" means the First Out Term Loan Facility and Second Out Exit Term Loan Facility (each as defined in the Restructuring Term Sheet).

"**Fee Claim**" refers to the reasonable and documented fees, costs and out-of-pocket expenses incurred on or after the Petition Date through the Effective Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in these Chapter 11 Cases.

"**Final Order**" means, as applicable, an order or judgment of any court of competent jurisdiction, including the Bankruptcy Court, with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**First Day Pleadings**" means any first-day and second-day pleadings that the Company Parties determine, in consultation with the Required Consenting First Lien Lenders, are necessary or desirable to file with the Bankruptcy Court.

"**First Lien Ad Hoc Group**" means an ad hoc group of Consenting Lenders represented by the First Lien Ad Hoc Group Advisors.

"**First Lien Ad Hoc Group Advisors**" means, collectively, (i) Gibson, Dunn & Crutcher LLP, as counsel to the First Lien Ad Hoc Group, (ii) PJT Partners LP, as financial advisor to the First Lien Ad Hoc Group, (iii) Mercer (US) LLC, as executive compensation advisor, (iv) Klerh Harrison Harvey Branzburg LLP, as Delaware counsel to the First Lien Ad Hoc Group, (v) any other local or foreign counsels to the First Lien Ad Hoc Group, and (vi) any other professionals or advisors retained by the First Lien Ad Hoc Group.

8

"**First Lien Ad Hoc Group Steering Committee**" means the members of the First Lien Ad Hoc Group that executed Confidentiality Agreements with the Company Parties on or about January 17, 2024.

"**First Lien Agent's Counsel**" means Cahill Gordon & Reindel LLP and Richards Layton & Finger, PA, in their capacities as counsel to the Administrative Agent and Collateral Agent under the Existing First Lien Credit Agreement.

"**First Lien Claims**" means the First Lien Term Loan Claims and the Revolving Credit Loan Claims.

"**First Lien Term Loans**" means any term loan made and outstanding under the Existing First Lien Credit Agreement (including for the avoidance of doubt, the Initial Term Loans, the Other Term Loans, and the Incremental Term Loans, each as defined in the Existing First Lien Credit Agreement).

"**First Lien Term Loan Claims**" means any Claim against the Company Parties arising from or relating to the First Lien Term Loans, including any accrued and unpaid interest, premiums (if any), fees, makewholes (if any), and other expenses arising under the Existing First Lien Credit Agreement.

"**First Lien Term Loan Lenders**" means the several banks and other financial institutions or entities from time to time party to the Existing First Lien Credit Agreement as lenders of the First Lien Term Loans.

"**First Lien Termination Event**" has the meaning set forth in Section 14.01.

"**inBrain Earnout**" means any "Earn-Out Payment" as defined in and provided by that certain Membership Interest Purchase Agreement, dated as of July 30, 2021 between Jason Schubert and William Schubert, as Sellers, inBrain Holdings, LLC, as the Company, and Dynata, LLC, as Buyer.

"**In-Court Solicitation**" means the solicitation of votes in connection with the confirmation of the Chapter 11 Plan, pursuant to sections 1125 and 1126 of the Bankruptcy Code and other applicable law.

"**In-Court Solicitation Materials**" means all solicitation materials in respect of the Chapter 11 Plan, including all documents, forms, ballots, notices, and other materials, which materials may be in the form of the Disclosure Statement, and which shall be in form and substance consistent with this Agreement.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction.

"**Loan Documents**" means, collectively, the Existing Credit Agreements and all other agreements, documents, and instruments with respect to the First Lien Term Loans, Second Lien Term Loans and Revolving Credit Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

"**Management Incentive Plan**" has the meaning set forth in the Restructuring Term Sheet.

"**Milestones**" means the milestones set forth in Section 5 of this Agreement.

"**New ABL Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**New Common Stock**" means a single class of common equity interests issued by the reorganized Parent on the Plan Effective Date, as applicable.

"**New Common Stock Documents**" means the documentation governing the New Common Stock and the issuance thereof.

"**New Corporate Governance Documents**" has the meaning set forth in the Restructuring Term Sheet.

"**New Credit Agreement**" means the agreement governing the New Credit Facility.

"**New Credit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**New Credit Facility Documents**" means the documents governing the New Credit Facility and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, the New Credit Agreement, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**New Warrants**" has the meaning set forth in the Restructuring Term Sheet.

"**Optimus Earnout**" means any "Earn-Out Payment" as defined in and provided by that certain Asset Purchase Agreement, dated as of December 1, 2021 between 0ptimus Analytics, LLC, as Seller, Scott Tranter, as Indemnifying Owner, and Dynata, LLC, as Buyer.

"**Parent**" has the meaning set forth in the preamble to this Agreement.

"**Participating Claims**" means any Company Claims/Interests now owned or hereafter acquired, in each case that are subject to the terms of this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 10.01.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the first date on which any of the Company Parties commences a Chapter 11 Case.

"**Plan Effective Date**" means the date on which all conditions to consummation of the Chapter 11 Plan have been satisfied or waived in full, and the Chapter 11 Plan becomes effective.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Chapter 11 Plan.

"**Public Disclosure**" has the meaning set forth in Section 16.23.

"**Qualified Marketmaker**" means an Entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Term Loan Lenders (i) holding at least 50.01% of the aggregate combined outstanding principal amount of the First Lien Claims that are that are held by the Consenting First Lien Term Loan Lenders and (ii) constituting at least half of the Consenting First Lien Term Loan Lenders that are members of the First Lien Ad Hoc Group Steering Committee.  A Consenting First Lien Term Loan Lender and its Affiliates who are subject to this Agreement shall be deemed to collectively constitute one (1) Consenting Lender for purposes of clause (ii) of this definition.

"**Required Consenting Revolving Credit Lenders**" means, as of the relevant date, Consenting Revolving Credit Lenders holding at least 50.01% of the aggregate combined outstanding principal amount of the Revolving Credit Loans that are held by the Consenting Revolving Credit Lenders.

"**Required Consenting Second Lien Lenders**" means, as of the relevant date, Consenting Second Lien Term Loan Lenders (i) holding at least 50.01% of the aggregate combined outstanding principal amount of the Second Lien Term Loans that are held by the Second Lien Ad Hoc Group and (ii) constituting at least two of the Consenting Second Lien Term Loan Lenders that are members of the Second Lien Ad Hoc Group.  A Consenting Second Lien Term Loan Lender and its Affiliates who are subject to this Agreement shall be deemed to be collectively constitute one (1) Consenting Second Lien Term Loan Lender for purposes of clause (ii) of this definition.

"**Required Consenting Stakeholders**" means, collectively, the (i) Required Consenting First Lien Lenders, (ii) Required Consenting Second Lien Lenders, and (iii) the Sponsors.

"**Restructuring Expenses**" means the reasonable and documented fees and out-of-pocket expenses of the (i) First Lien Ad Hoc Group Advisors (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court; provided that any and all fixed monthly fees, restructuring fees, liability

management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in an engagement or fee letter between the Debtors and any First Lien Ad Hoc Group Advisor, (ii) First Lien Agent's Counsel (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable), (iii) the Second Lien Ad Hoc Group Advisors, (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court; *provided* that any and all fixed monthly fees, restructuring fees, liability management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in an engagement or fee letter between any Company Party and any Second Lien Ad Hoc Group Advisor, (iv) Second Lien Agent's Counsel (including, in each case, fees and expenses incurred before, on, or after the Petition date, to the extent applicable), and (v) one lead counsel to the Sponsors.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Revolving Credit Lender**" means the several banks and other financial institutions or entities from time to time party to the Existing First Lien Credit Agreement as lenders of the Revolving Credit Loans.

"**Revolving Credit Loan Claims**" means all claims held by the Revolving Credit Lenders, in their capacities as such, derived from, based upon, or secured pursuant to the Existing First Lien Credit Agreement and the "Loan Documents" (as defined in the Existing First Lien Credit Agreement), including any aggregate principal amount outstanding, plus all interest, fees, expenses, costs, and other charges arising under or related to the Obligations (as defined in the Existing First Lien Credit Agreement), but excluding, for the avoidance of doubt, any First Lien Term Loan Claims.

"**Revolving Credit Loans**" means any revolving loan made and outstanding pursuant to a "Revolving Commitment" under and as defined the Existing First Lien Credit Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Ad Hoc Group**" means an ad hoc group of Consenting Second Lien Term Loan Lenders represented by the Second Lien Ad Hoc Group Advisors.

"**Second Lien Ad Hoc Group Advisors**" means, collectively, (a) Vinson & Elkins, LLP, (ii) Lazard Freres & Co. LLC, and (iii) Morris, Nichols, Arsht & Tunnell LLP.

"**Second Lien Agent's Counsel**" means Pryor Cashman LLP and one Delaware counsel, in their capacities as counsel to the Administrative Agent and Collateral Agent under the Existing Second Lien Credit Agreement.

"**Second Lien Term Loan Claims**" means any Claim against the Company Parties arising from or relating to the Second Lien Term Loans, including any accrued and unpaid interest, premiums (if any), fees, makewholes (if any), and other expenses arising under the Existing Second Lien Credit Agreement.

"**Second Lien Term Loan Lenders**" means the several banks and other financial institutions or entities from time to time party to the Existing Second Lien Credit Agreement as lenders of the Second Lien Term Loans.

"**Second Lien Term Loans**" means any loan made and outstanding under the Existing Second Lien Credit Agreement.

"**Second Lien Termination Event**" has the meaning set forth in Section 14.02.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Date**" has the meaning set forth in Section 5.01(a).

"**Sponsor Termination Event**" has the meaning set forth in Section 14.0214.04.

"**Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Superior Proposal**" means an unsolicited Alternative Transaction that the Company Parties' board of directors shall have determined in good faith, with the written advice of counsel, constitutes a transaction that: (x) would be in the best interests of the Company Parties and their creditors as a whole, and (y) would be superior to the Restructuring Transactions for the Company Parties and their creditors as a whole.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 14.

"**Termination Event**" means either a First Lien Termination Event, a Second Lien Termination Event, a Sponsor Termination Event, or a Company Termination Event.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Tranter Settlement Payment Claim**" means any Claim against the Company Parties arising out of that certain Settlement and Mutual Release Agreement, dated May 8, 2023, between Minimus LLC, Scott Tranter and Dynata, LLC.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "stockholders," "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein;

(j)      the use of "include" or "including" is without limitation, whether stated or not; and

(k)      any references to dates and times shall be prevailing Eastern Time, unless otherwise noted.

**Section 2.**      *Effectiveness of this Agreement*

2.01.   This Agreement shall become effective and binding upon each of the Parties immediately on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      the Company Parties shall have executed a signature page to this Agreement and delivered it to the First Lien Ad Hoc Group Advisors;

(b)      holders of at least 66.7% of the aggregate combined outstanding principal amount of First Lien Claims shall have executed counterpart signature pages of this Agreement and delivered it to counsel to the Company Parties;

(c)      holders of at least 66.7% of the aggregate combined outstanding principal amount of Second Lien Term Loan Claims shall have executed counterpart signature pages of this Agreement and delivered it to counsel to the Company Parties and the First Lien Ad Hoc Group Advisors;

(d)      each of the Sponsors shall have executed a signature page to this Agreement and delivered it to counsel to the Company Parties and to the First Lien Ad Hoc Group Advisors; and

(e)      the Company Parties shall have paid in full the then accrued Restructuring Expenses on or before the Agreement Effective Date.

2.02.    No Party or its advisors shall disclose to any other Entity (other than counsel to the Company Parties and the First Lien Ad Hoc Group Advisors) the principal amount or percentage of Claims held by any other Party (including the signature pages hereto, which shall not be publicly disclosed or filed), unless (i) the affected Consenting Stakeholder consents in writing, (ii) such information has been previously publicly disclosed, or (iii) such information is required to be disclosed by law, rule, regulation, legal, judicial, or administrative process, subpoena, court order, or by a governmental, regulatory, self-regulatory, or similar body.

**Section 3.       *Closing Conditions.***

3.01.    Consummation of the Chapter 11 Plan and occurrence of the Plan Effective Date is conditioned upon obtaining the following (in addition to any "closing condition" that is contained in any applicable Definitive Document, the "Plan Closing Conditions"):

(a)      the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order;

(b)      each document or agreement constituting the applicable Definitive Documents shall (i) have been executed and/or effectuated and remain in full force and effect, and (ii) be consistent with this Agreement, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;

(c)      the Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the transactions contemplated by the Chapter 11 Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

(d)      all governmental and third-party approvals and consents that may be necessary in connection with the transactions contemplated by the Chapter 11 Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority

that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(e)    no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the transactions contemplated by the Chapter 11 Plan;

(f)    this Agreement shall be in full force and effect, no Termination Event or event that would give rise to a Termination Event under this Agreement upon the expiration of the applicable grace period shall have occurred, and this Agreement shall not have been validly terminated prior to the Plan Effective Date;

(g)    no default or Event of Default (as defined in the DIP Orders) shall have occurred under the DIP Facility or the DIP Facility Documentation;

(h)    the New Common Stock and the New Warrants shall have been issued in accordance with the Restructuring Term Sheet;

(i)    the Company Parties shall have entered into the Exit Facility; and

(j)    the Company Parties shall have paid all Restructuring Expenses.

**Section 4.    *Definitive Documents.*** The Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation, agreement and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with this Agreement.  The Definitive Documents, including those not executed or in a form attached to this Agreement as of the Agreement Effective Date, shall be consistent with this Agreement in all material respects and otherwise shall be acceptable in form and substance (such acceptance not to be unreasonably withheld),[3] including with respect to any amendment, modification or supplement thereto to: (i) the applicable Company Parties, (ii)  the Required Consenting First Lien Lenders, (iii) Required Consenting Second Lien Lenders, (iv) Required Consenting Revolving Credit Lenders and (v) the Sponsors;  provided, however, that for (iii) and (iv) herein, solely to the extent that such Definitive Document (or applicable portion thereof) adversely and materially affects the economic rights/entitlements, obligations or releases proposed to be granted to, or received by, the Consenting Second Lien Lenders or the Consenting Revolving Credit Lenders pursuant to this Agreement, it being understood that neither the Plan nor any other Definitive Document may modify the claim treatment to be provided to holders of the Second Lien Term Loan Claims or the Revolving Credit Loan Claims as set forth in the Restructuring Term Sheet without the consent of the Required Consenting Second Lien Lenders or Required Consenting Revolving Credit Lenders as applicable;  provided, further however, that,

---

[3]    Notwithstanding anything else herein to the contrary, the requirement that such consent may not be "unreasonably withheld" by the Required Consenting First Lien Lenders shall not apply to the DIP Budget, the DIP Orders, and any motions seeking entry of the DIP Orders, and DIP Facility Documentation.

notwithstanding the foregoing, the Parties agree that the New Warrants Agreement, reasonable and customary protections for minority equity holders in the New Corporate Governance Documents and/or New Common Stock Documents, and adequate protection in the DIP Orders shall be in form and substance reasonably acceptable to the Consenting Second Lien Lenders and the Consenting Revolving Credit Lenders as applicable; provided, further, however, that for (v) herein, solely to the extent that such Definitive Document disproportionately, materially, and directly and adversely affects the economic rights of the Sponsors.

In addition, and notwithstanding anything to the contrary herein, (1) the DIP Orders (other than as set forth above with respect to the Required Consenting Second Lien Lenders and the Required Consenting Revolving Credit Lenders ), DIP Budget, any motions seeking entry of the DIP Orders, and DIP Facility Documentation, (2) any and all agreements or documents governing any key employee incentive or retentive programs, including employment and/or other benefit or severance agreements (other than the Change of Control Payments, Earnout Payment Claims, the Tranter, Settlement Payment Claim and the Branded Research Seller Note Claims), (3) Exit Facilities Documents, or (4) the New Credit Facility Documents, such documents need to be acceptable only to the Company Parties and the Required Consenting First Lien Lenders; provided, that the Required Consenting First Lien Lenders shall consider in good faith any comments to the Exit Facilities Documents, or the New Credit Facility Documents that may be provided by the Required Consenting Revolving Credit Lenders.

**Section 5.**    *Milestones.*

5.01.    The Parties agree to take all actions necessary or appropriate to implement the Restructuring Transactions as soon as practicable in accordance with the terms and conditions set forth in this Agreement, in accordance with the following milestones ("Milestones"), which shall remain in effect unless extended or waived in writing by (i) the Required Consenting First Lien Lenders and (ii) solely with respect to an extension or waiver of the Milestone contained in Section 5.01(f) beyond 65 days after the Petition Date, the Required Consenting Second Lien Lenders:

(a)    no later than 11:59 p.m. (prevailing Eastern Time) on the calendar day immediately before the Petition Date, the Company Parties shall commence solicitation of the Chapter 11 Plan (the "Solicitation Date");

(b)    no later than May 22, 2024, the Petition Date shall have occurred;

(c)    no later than three (3) days after the Petition Date, the Bankruptcy Court shall enter, on an interim basis, the DIP Order;

(d)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall enter, on a final basis, the DIP Order;

(e)    no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall enter the Disclosure Statement Order and Confirmation Order; and

(f)    no later than fifty (50) days after the Petition Date, the Plan Effective Date shall occur and the Restructuring Transactions shall be consummated.

**Section 6.**        *Commitments of the Consenting Stakeholders.*

6.01.    <u>Affirmative Commitments</u>.    During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, in respect of all Company Claims/Interests, as applicable, subject to the terms and conditions of this Agreement, including all consent rights detailed herein, to:

(a)      support and act in good faith with the Company Parties and take all commercially reasonable actions necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      (i) not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Stakeholders' obligations under this Agreement, any Definitive Document, or the Chapter 11 Plan, as applicable, and (ii) if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Stakeholders' obligations under this Agreement, such Consenting Stakeholder shall direct such administrative agent or collateral agent (a) to cease, desist, and refrain from taking any such action, and (b) to take such action as may be necessary to effect the Restructuring Transactions; <u>provided</u> that no Consenting Stakeholder shall be required to give any notice, order, instruction, or direction to any administrative agent, or collateral agent (as applicable) or other such agent or trustee, if the Consenting Stakeholder is required to incur any out-of-pocket costs or provide any indemnity in connection therewith;

(c)      complete, enter into, and effectuate the agreed Definitive Documents (as applicable) within the timeframes contemplated herein and the Milestones in all material respects;

(d)      not, directly or indirectly, seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter into or participate in any discussions or any agreement with any non-Party regarding any Alternative Transaction, and timely vote (or cause to be voted) its Claims against any Alternative Transaction;

(e)      to the extent that such Consenting Stakeholder is or becomes the holder of a First Lien Claim or a DIP Claim, elect to, and take all commercially reasonable actions in furtherance of such election, receive payment on account of such DIP Claims in the form of such Consenting Stakeholders' allocated commitment of the Exit Facilities;

(f)      to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, use commercially reasonable efforts to negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u> that no Consenting Stakeholder shall be obligated to incur any out-of-pocket costs in discharging such obligations;

(g)      refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or would interfere with the Restructuring Transactions (including encouraging another person to undertake any action prohibited by this Agreement);

(h)      act in good faith with regard to the Restructuring Transactions consistent with this Agreement;

(i)    cooperate with the Company Parties to obtain any and all required third-party governmental, regulatory, licensing, and/or other third-party approvals (including, without limitation, any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions; provided that no Consenting Stakeholder shall be obligated to incur any out-of-pocket costs in discharging such obligation;

(j)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other material stakeholders provided that no Consenting Stakeholder shall be obligated to incur any out-of-pocket costs in discharging such obligation; and

(k)    forbear from exercising or directing any Entity to exercise remedies on account of, any breach by any Company Party of, and any default or event of default (howsoever described) under the Existing Credit Agreements which shall or may arise as a result of, directly or indirectly: any of the steps, actions, or transactions required by, specified or contemplated in, and/or implemented by or undertaken pursuant to this Agreement.

6.02.    Negative Commitments.  During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, in respect of all of its Company Claims/Interests, subject to the terms and conditions of this Agreement, including all consent rights detailed herein, that it shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    propose, file, support, or vote for any Alternative Transaction that is inconsistent in any material respect with the Restructuring Transactions;

(c)    file with any court any motion, pleading, or other document (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement;

(d)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(e)    encourage or facilitate any Entity to do any of the foregoing.

6.03.    Chapter 11 Commitments.  Following the Petition Date, and during the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, in respect of all Company Claims/Interests, as applicable, subject to the terms and conditions of this Agreement, including all consent rights detailed herein to:

(a)    to the extent that it is permitted to vote, vote each of its Company Claims/Interests to accept the Chapter 11 Plan by delivering its duly executed and completed ballot accepting the Chapter 11 Plan on a timely basis following the commencement of the solicitation of the Chapter 11 Plan and its actual receipt of the In-Court Solicitation Materials and the related ballot;

(b)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Chapter 11 Plan, and to the extent such releases are consistent in all respects with this Agreement, elect not to opt out of the releases set forth in the Chapter 11 Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(c)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided that such votes or elections shall be immediately revoked and deemed void ab initio upon the occurrence of a Termination Date described in Section 14.01, 14.02, or 14.03; provided further that if Bankruptcy Court authority shall be required to effectuate such change or withdrawal, no Party to this Agreement shall oppose any attempt by such Party to change or withdraw such vote.

**Section 7.      *Additional Provisions Regarding Consenting Stakeholder Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (i) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in these Chapter 11 Cases (including any official committee and the United States Trustee); (ii) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (iii) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (iv) limit the rights of a Consenting Stakeholder under these Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in these Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (v) limit the ability of a Consenting Stakeholder to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof; (vi) constitute a waiver or amendment of any term or provision of the Existing Credit Agreements or any intercreditor agreement; (vii) pending consummation of the Restructuring Transactions, constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the Existing Credit Agreements; (viii) require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder; (ix) prevent a Consenting Stakeholder from taking any action that is required to comply with applicable Law; (x) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (xi) obligate a Consenting Stakeholder to deliver a vote to support the Chapter 11 Plan (or any other Restructuring Transactions) or prohibit a Consenting Stakeholder from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); provided that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void ab initio and such Consenting Stakeholder shall have the opportunity to change its vote; or (xii) require any Consenting Stakeholder to take any

action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege.

**Section 8.**      *Commitments of the Company Parties.*

8.01.    <u>Affirmative Commitments</u>.  Except as set forth in Section 9, during the Agreement Effective Period, each of the Company Parties agrees to:

(a)      Support, act in good faith, and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including (i) commencing the In-Court Solicitation pursuant to the Disclosure Statement and related In-Court Solicitation Materials, (ii) using commercially reasonable efforts to consummate the Restructuring Transactions, and (iii) obtaining entry of the Confirmation Order, approval of the applicable Definitive Documents, and consummation of the Restructuring Transactions pursuant to the Chapter 11 Plan, in each case, in accordance with the applicable Milestones unless waived in accordance with the terms hereof;

(b)      comply with the Milestones;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, use commercially reasonable efforts to address any such impediment, including negotiating in good faith appropriate additional or alternative provisions to address any such impediment;

(d)      use commercially reasonable efforts to obtain any and all required governmental, regulatory, licensing, and/or other third-party approvals (including, without limitation, any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions;

(e)      negotiate in good faith to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)      pay in full, in cash, when due and payable all of the accrued Restructuring Expenses;

(h)      (i) provide to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors (solely to the extent of the  Required Consenting Second Lien Lenders' consent rights in Section 4), and the First Lien Agent's Counsel and the Required Consenting Revolving Credit Lenders (solely to the extent of the Required Consenting Revolving Credit Lenders' consent rights in Section 4) with a reasonable opportunity to review draft copies of all Definitive Documents, including, but not limited to, all material motions or pleadings, and any drafts or proposed amended version of the Chapter 11 Plan and Disclosure Statement that the Company Parties intend to file with the Bankruptcy Court, at least three (3) calendar days before the date of filing any such pleading or other document (or such shorter period as is necessary or appropriate

under the circumstances), (ii) without limiting any approval or consent rights set forth in this Agreement, consult in good faith with the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors (solely to the extent of the Required Consenting Second Lien Lenders' consent rights in Section 4), and the First Lien Agent's Counsel and the Required Consenting Revolving Credit Lenders (solely to the extent of the Required Consenting Revolving Credit Lenders' consent rights in Section 4) regarding the form and substance of any such proposed filing, (iii) not file, execute, distribute, or use (as applicable) any of the Definitive Documents unless each document is materially consistent with this Agreement and in accordance with the consent rights in Section 4), and (iv) provide draft copies of any motion or pleading that materially affects any Consenting Stakeholder to the counsel of such Consenting Stakeholders in no event less than three (3) Business Days prior to the date when the Company Parties intend to file such motion or pleading with the Bankruptcy Court; provided that in the event that such notice periods are impossible or impracticable under the circumstances, the Company Parties shall provide such draft copies to the applicable Consenting Stakeholders as soon as otherwise practicable before the date when the Company Parties intend to file any such motion or other pleading;

(i)      maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of these Chapter 11 Cases;

(j)      except as otherwise expressly set forth in this Agreement, operate their businesses and operations in the ordinary course in a manner that is consistent with its past practices and this Agreement (taking into account the Restructuring Transactions and the potential Chapter 11 Cases), and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including, without limitation, suppliers, customers, and governmental and regulatory authorities and employees);

(k)      promptly notify the First Lien Ad Hoc Group Advisors, the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel in writing (email being sufficient) after becoming aware of the commencement of any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(l)      inform the First Lien Ad Hoc Group Advisors the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel after becoming aware of (and in any event within two (2) Business Days of becoming aware): (i) a Termination Event or event that they know will, or reasonably expect is likely, to give rise to a Termination Event; (ii) any matter or circumstance that is, or is reasonably expected to be, a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) the written threat, commencement, or receipt of written notice of any material proceeding (including any insolvency proceeding, other than these Chapter 11 Cases), lawsuit, investigation, hearing, or enforcement action commenced against any Company Party; or (iv) a breach of this Agreement by any Party (including a Company Party);

(m)      use commercially reasonable efforts to actively and timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring

Transactions (including, if applicable, the Debtors' timely filing of objections or written responses in these Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions after consultation with the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group, and the Required Consenting Revolving Credit Lenders;

(n)    (i) stipulate to the allowance and amounts of First Lien Claims and Second Lien Term Loan Claims in accordance with the Restructuring Term Sheet, and to the validity and priority of the liens securing such Claims and (ii) timely file a formal objection to any motion filed with the Bankruptcy Court by a third party challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, disallowance or subordination of, any portion of the First Lien Claims or Second Lien Term Loan Claims, or the liens securing such claims (as applicable);

(o)    except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to operate its businesses and operations in the ordinary course in a manner that is consistent with its past practices and this Agreement in all material respects, use commercially reasonable efforts to preserve intact the Company Parties' business organization and material relationships with third parties (including material suppliers, material distributors, material customers, and governmental and regulatory authorities and key employees) and maintain in effect all of its material foreign, federal, state, and local licenses, permits, consents, franchises, approvals, and authorizations required to operate its business, in each case, consistent with this Agreement and the Restructuring Transactions in all material respects, and to the extent reasonably practicable and permitted by applicable law, provide updates to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel with respect to any material development in connection with any Company Party, including businesses, operations (including material changes to the cash management system, employee benefit programs, and insurance programs), material expenditures (including any payments on account of pension withdrawal liabilities or increased funding obligations of any non-debtor affiliates to the extent not provided for in the DIP Budget ), and relationships with material third parties (including, without limitation, vendors, and customers);

(p)    timely file a formal objection to (in consultation with counsel to the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group, and the First Lien Agent's Counsel) any motion, application, or proceeding filed with the Bankruptcy Court by any person seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers), (ii) converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of these Chapter 11 Cases, (iv) seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a chapter 11 plan, (v) terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset; or (vi) for relief that (a) is inconsistent with this Agreement, or (b) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions;

(q)    cause any and all of its subsidiaries to comply with the terms of this Agreement and the other Definitive Documents as if they were a party hereto and had the obligations of the Company Parties hereunder and, at the request of Consenting Stakeholders, shall use commercially

reasonable efforts to cause such subsidiaries to sign reasonable documentation (including joinder agreements) as may be required to effect the foregoing; or

(r) provide the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel with (i) reasonable access to, during regular business hours, the non-privileged, non-confidential books, work papers, records, and materials of any Company Party, (ii) reasonable access to, during regular business hours, the personnel and advisors of any Company Party, and (iii) reasonably timely responses to all reasonable diligence requests provided by the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel.

8.02. <u>Negative Commitments</u>. During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b) subject to the terms of Section 9, solicit, negotiate, propose, support or vote for any Alternative Transaction that the Company Parties or its affiliates intend to, or take any action to, consummate or enter into a binding agreement to consummate, prior to the consummation of the Restructuring Transactions;

(c) take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this Agreement, the Definitive Documents, or the Chapter 11 Plan;

(d) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Chapter 11 Plan, and/or the Restructuring Transactions that, in whole or in part, is materially inconsistent with this Agreement (including the consent rights set forth in Section 3 hereof);

(e) seek to modify the Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement and the Restructuring Term Sheet in any material respect;

(f) file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is inconsistent with this Agreement or the Restructuring Term Sheet or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(g) sell, or file any motion or application seeking to sell, any assets, other than in the ordinary course of business and consistent with past practice, without the prior written consent of the Required Consenting First Lien Lenders;

(h) amend any of their corporate governance or organizational documents without the prior written consent of the Required Consenting First Lien Lenders and reasonable consent of the Required Consenting Second Lien Lenders and Required Consenting Revolving Credit Lenders (such consent not to be unreasonably withheld);

(i)     other than in the ordinary course of business and consistent with past practice, (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (x) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any employee, or (y) any contracts, arrangements, or commitments that entitle any current or former director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), in each case without the prior written consent of the Required Consenting First Lien Lenders;

(j)     grant, agree to grant, or make any payment on account of (including pursuant to a key employee retention plan, key employee incentive plan, or other similar arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any employee or director qualifying as an insider under the Bankruptcy Code without the prior written consent of the Required Consenting First Lien Lenders;

(k)     other than in the ordinary course of business and consistent with past practice, (i) enter into any settlement regarding any Company Claims/Interests, (ii) enter into any material agreement, (iii) amend, supplement, modify, or terminate any material agreement, (iv) allow any material agreement to expire, or (v) allow any material permit, license or regulatory approval to lapse, expire, terminate or be revoked, suspended or modified, in each case without the prior written consent of the Required Consenting First Lien Lenders;

(l)     without the prior written consent of the Required Consenting First Lien Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(m)     (i) authorize, create, issue, sell, or grant any additional Equity Interests, (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests, or (iii) enter into, terminate, or modify any material operational contracts, leases, or other agreements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Company Parties, taken as a whole, without the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Lenders and the Required Consenting Revolving Credit Lenders (such consent not to be unreasonably withheld);

(n)     pay, amend, or compromise any of the Change of Control Payments, Earnout Payment Claims, the Tranter Settlement Payment Claim, and the Branded Research Seller Note Claims, without the consent of the Required Consenting First Lien Lenders;

(o)     file with any court any motion, pleading, or Definitive Document (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement;

(p)     encourage or facilitate any Entity to do any of the foregoing; or

(q)     take any steps to become a "United States real property holding corporation" as defined in Section 897 of the U.S. Internal Revenue Code of 1986, as amended, and any applicable regulations promulgated thereunder.

**Section 9.**     *Fiduciary Out; Additional Commitments.*

9.01.     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the officers, board of directors, board of managers, or similar governing body of a Company Party, including any properly authorized committee thereof to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent that such person or persons reasonably determines in good faith upon the advice of counsel that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 9.01 shall not be deemed to constitute a breach of this Agreement; provided that the Company Parties shall promptly provide written notice to the First Lien Ad Hoc Group Advisors and the Second lien Ad Hoc Group Advisors (and, in any case, within two (2) Business Days) after such determination.     Notwithstanding anything to the contrary herein, each Consenting Stakeholder shall have the right to terminate this Agreement upon such determination by a Company Party.

9.02.     Notwithstanding anything to the contrary in this Agreement (but subject to Section 9.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (i) consider and respond to, but not solicit, propose, or encourage, Alternative Transactions; (ii) solely upon the occurrence of the filing of these Chapter 11 Cases, if applicable, provide access to non-public information concerning any Company Party to any Entity or enter into confidentiality agreements or nondisclosure agreements with any Entity for the purpose of facilitating such Entity's participation in the Restructuring Transactions or such Entity's Alternative Transaction proposal; provided, that the Company Parties must provide copies of any such Alternative Transaction received to the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors on a professional eyes only basis, no later than three (3) calendar days following receipt thereof, subject to any applicable confidentiality agreements; and (iii) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest or any other Entity regarding the Restructuring Transactions.  The Company Parties and their counsel shall provide prompt updates on the status of discussions regarding any Alternative Transaction, and, if a Company Party or the board of directors, board of managers, or similar governing body of a Company Party determines that an Alternative Transaction is a Superior Proposal, the Company Parties or their counsel shall (x) notify the First Lien Ad Hoc Group Advisors and the Second lien Ad Hoc Group Advisors no later than two (2) calendar days following such determination, and (y) promptly provide such information as reasonably requested by the First Lien Ad Hoc Group Advisors and/or the Second lien Ad Hoc Group Advisors in connection with such Alternative Transaction.

9.03.     Nothing in this Agreement shall: (i) impair or waive the rights of any Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (ii) prevent any Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.**     *Transfer of Interests and Securities.*

10.01.   During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Participating Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act; (iii) an institutional accredited investor (as defined in the Rules); or (iv) a Consenting Stakeholder; and

(b)     either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the First Lien Ad Hoc Group, respectively, at or before the time of the proposed Transfer, a Transfer Agreement; (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests transferred) to counsel to the Company Parties and counsel to the First Lien Ad Hoc Group at or before the time of the proposed Transfer or (iii) the transfer is to an affiliated party that is bound by this Agreement.

10.02.   Upon compliance with the requirements of Section 10.01 the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 10.01 shall be void *ab initio*.

10.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (i) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed Company Claims/Interests subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders); and (ii) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and the First Lien Ad Hoc Group within five (5) Business Days of such acquisition.

10.04.   This Section 10 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.   Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

10.05.   Notwithstanding Section 10.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement

in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 10.01; and (iii) the Transfer otherwise is a permitted Transfer under Section 10.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

10.06.  Notwithstanding Section 10.01, any Consenting Stakeholder may Transfer any of its Company Claims/Interests to an affiliate of such Consenting Stakeholder or one or more of its affiliated funds or an affiliated Entity or Entities with a common investment advisor or investment manager (in each case, other than portfolio companies); provided that (i) for the avoidance of doubt, any transferee under this Section 10.06 shall be deemed a Consenting Stakeholder for purposes of this Agreement, effective as of the date of the Transfer, (ii) any transferor under this Section 10.06 shall remain liable in all respects for any breach of this Agreement by such transferee, and (iii) such transferor must provide notice of such Transfer to counsel to the Company Parties within five (5) Business Days of such Transfer.

10.07.  Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 11.**    ***Representations and Warranties of Consenting Stakeholders.***  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Agreement Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 10);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (b) not a U.S. person (as defined in Regulation S of the Securities Act), or (c) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder (or that may be assigned to any of its Affiliates) in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f)      it is signing this Agreement on behalf of all Company Claims/Interests held by such Consenting Stakeholder and for all Company Claims/Interests which it is the nominee, investment manager, or advisor for beneficial holder in the Company Parties, and such Consenting Stakeholder agrees to be bound by the terms of this Agreement.

**Section 12.    *Representations and Warranties of Company Parties*.**  Each of the Company Parties represents, warrants, and covenants to each other Party that, as of the Execution Date:

(a)      to the best of the Company Parties' reasonable knowledge, the execution and delivery by it of this Agreement does not result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of these Chapter 11 Cases of any Company Parties undertaking to implement the Restructuring Transactions through these Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(b)      the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including, without limitation, approval of each of the independent directors of each of the corporate entities that comprise the Company Parties;

(c)      to the best of the Company Parties' reasonable knowledge, the diligence materials and other information concerning the Company Parties that the Company Parties or their advisors provided to any other Party are true and correct in all material respects; and

(d)      none of the Company Parties are, nor have they ever been, a "United States real property holding corporation" as defined in Section 897 of the U.S. Internal Revenue Code of 1986, as amended, and any applicable regulations promulgated thereunder.

**Section 13.    *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Agreement Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Chapter 11 Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 14.     *Termination Events.***

14.01.   <u>Consenting First Lien Lender Termination Events</u>.    This Agreement may be terminated by the Required Consenting First Lien Lenders by the delivery to counsel to the Company Parties and the Consenting Stakeholders of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events (each such event, a "<u>First Lien Termination Event</u>"):

(a)     the breach in any material respect by a Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured for three (3) Business Days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such breach; <u>provided</u> however, with respect to the Consenting Second Lien Term Loan Lenders, only if the non-breaching Consenting Second Lien Term Loan Lenders that remain Party to this Agreement at any time own less than 66.7% of the principal amount of the Second Lien Term Loan Claims;

(b)     the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the Company Parties fail to pay when due and payable all of the accrued Restructuring Expenses;

(d)      the failure to meet a Milestone that has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting First Lien Lender in violation of its obligations under this Agreement;

(e)      without the prior written consent of the Required Consenting First Lien Lenders, if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except these Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(f)      an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(g)      any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors file any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within two (2) Business Days of receipt by the Company Parties of written notice from the Required Consenting First Lien Lenders that such motion or pleading is inconsistent with this Agreement;

(h)      entry of a DIP Order or approval of a DIP Budget that is not acceptable to the Required Consenting First Lien Lenders, or the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors seeking an order (without the prior written consent of the Required Consenting First Lien Lenders), vacating or modifying the DIP Orders;

(i)      any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or Sponsor files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the First Lien Claims or asserts any other Cause of Action against any Consenting First Lien Lender, or with respect or relating to such First Lien Claims, the Existing First Lien Credit Agreement or any Loan Document, or the prepetition liens securing the First Lien Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of such First Lien Claims;

(j)    the termination of any Company Party's use of Cash Collateral under the DIP Orders, unless such Company Party's use of Cash Collateral has been restored through a modified DIP Order acceptable to the Required Consenting First Lien Lenders;

(k)    any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(l)    any default or Event of Default (as defined in the DIP Orders) arising under the DIP Facility or DIP Facility Documentation that has not been cured or waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the DIP Facility Documentation;

(m)    the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof (without the consent of the Required Consenting First Lien Lenders);

(n)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors seeking an order (without the prior written consent of the Required Consenting First Lien Lenders), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of these Chapter 11 Cases; or

(o)    the Company Parties, the Consenting Revolving Credit Lenders, the Consenting Second Lien Term Loan Lenders, or the Sponsors  (i) execute a definitive written agreement with respect to an Alternative Transaction, (ii) negotiate, file, propound or otherwise support any alternative restructuring proposal or transaction contemplated thereby, (iii) publicly announce their intention to do either of (i) or (ii), or (iv) provide notice to the First Lien Ad Hoc Group Advisors of a determination as contemplated by Section 9 hereof.

14.02.  <u>Consenting Second Lien Lender Termination Events</u>.  This Agreement may be terminated by the Required Consenting Second Lien Lenders with respect to the Consenting Second Lien Term Loan Lenders, by the delivery to counsel to the Consenting Stakeholders of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events (each such event, a "<u>Second Lien Termination Event</u>"):

(a)    the breach in any material respect by a Company Party or Consenting First Lien Term Loan Lender of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured for three (3) Business Days after such terminating Consenting Second Lien Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such breach; <u>provided</u> however, with respect to the Consenting First Lien Term Loan Lenders, only if the non-breaching Consenting First Lien Term Loan Lenders that remain Party to this Agreement at any time own less than 66.7% of the principal amount of the First Lien Term Loan Claims;

(b)        the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Second Lien Term Loan Lenders transmit a written notice in accordance with Section 16.09 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)        the Company Parties fail to pay when due and payable all of the accrued Restructuring Expenses;

(d)        the failure to meet a Milestone over which the Required Consenting Second Lien Lenders have consent that has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Second Lien Lender in violation of its obligations under this Agreement;

(e)        without the prior written consent of the Required Consenting Second Lien Lenders, if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except the Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(f)        an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(g)        any Company Party or the First Lien Ad Hoc Group files any motion or pleading with the Bankruptcy Court that (i) is not consistent in all material respects with this Agreement (ii) directly, adversely impacts the Consenting Second Lien Lenders, and (iii) has not been withdrawn within three (3) calendar days of receipt by the Company Parties of written notice from the Required Consenting Second Lien Lenders that such motion or pleading is inconsistent with this Agreement;

(h)        entry of a DIP Order that is not reasonably acceptable to the Required Consenting Second Lien Lenders (solely to the extent of the Second Lien Ad Hoc Group's consent rights in Section 4), or the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or the First Lien Ad Hoc Group seeking an order (without the prior written

consent of the Required Consenting Second Lien Lenders), vacating or modifying the DIP Orders (solely to the extent such vacation or modification would be inconsistent with the Second Lien Ad Hoc Group's consent rights in Section 4);

(i)      any amendment to this Agreement that materially, adversely and disproportionately affects the rights of the Consenting Second Lien Term Loan Lenders without the prior written consent of the Required Consenting Second Lien Lenders;

(j)      any Company Party or the First Lien Ad Hoc Group files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Second Lien Term Loan Claims or asserts any other Cause of Action against any Consenting Second Lien Term Loan Lender, or with respect or relating to such Second Lien Term Loan Claims, the Existing Second Lien Credit Agreement or any Loan Document, or the prepetition liens securing the Second Lien Term Loan Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of such Second Lien Term Loan Claims;

(k)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(l)      the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof (without the consent of the Required Consenting Second Lien Lenders);

(m)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Second Lien Lenders), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of the Chapter 11 Cases; or

(n)      the Company Parties or the First Lien Ad Hoc Group (A) executes a definitive written agreement with respect to an Alternative Transaction, (B) negotiate, file, propound or otherwise supports any alternative restructuring proposal or transaction contemplated thereby, (C) publicly announces their intention to do either of (A) or B, or (D) provides notice to the Second Lien Ad Hoc Group Advisors of a determination as contemplated by Section 9 hereof.

14.03.   Consenting Revolving Credit Lender Termination Events.  This Agreement may be terminated by the Required Consenting Revolving Credit Lenders with respect to the Consenting Revolving Credit Lenders, by the delivery to counsel to the Consenting Stakeholders of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events (each such event, a "Revolving Lender Termination Event"):

(a)      the breach in any material respect by a Company Party or Consenting First Lien Term Loan Lender of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured for three (3) Business Days after such terminating

Consenting Revolving Credit Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such breach; provided however, with respect to the Consenting First Lien Term Loan Lenders, only if the non-breaching Consenting First Lien Term Loan Lenders that remain Party to this Agreement at any time own less than 66.7% of the principal amount of the First Lien Term Loan Claims;

(b)     the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Revolving Credit Lenders transmit a written notice in accordance with Section 16.09 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the Company Parties fail to pay when due and payable all of the accrued Restructuring Expenses;

(d)     the failure to meet a Milestone over which the Required Consenting Revolving Credit Lenders have a consent that has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Revolving Credit Lender in violation of its obligations under this Agreement;

(e)     without the prior written consent of the Required Consenting Revolving Credit Lenders, if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except the Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(f)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(g)     any Company Party or the First Lien Ad Hoc Group files any motion or pleading with the Bankruptcy Court that (i) is not consistent in all material respects with this Agreement, (ii) directly, adversely impacts the Consenting Revolving Credit Lenders, and (iii) has not been withdrawn within three (3) calendar days of receipt by the Company Parties of written notice from

the Required Consenting Revolving Lenders that such motion or pleading is inconsistent with this Agreement;

(h)    entry of a DIP Order that is not reasonably acceptable to the Required Consenting Revolving Credit Lenders (solely to the extent of the Required Consenting Revolving Credit Lenders' consent rights in Section 4), or the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or the First Lien Ad Hoc Group seeking an order (without the prior written consent of the Required Consenting Revolving Credit Lenders), vacating or modifying the DIP Orders (solely to the extent such vacation or modification would be inconsistent with the Required Consenting Revolving Credit Lenders' consent rights in Section 4);

(i)    any amendment to this Agreement that materially, adversely and disproportionately affects the rights of the Consenting Revolving Lenders without the prior written consent of the Required Consenting Revolving Lenders;

(j)    any Company Party or the First Lien Ad Hoc Group files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Revolving Credit Loan Claims or asserts any other Cause of Action against any Consenting Revolving Credit Lender, or with respect or relating to such Revolving Credit Loan Claims, the Existing First Lien Credit Agreement or any Loan Document, or the prepetition liens securing the Revolving Credit Loan Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of such Revolving Credit Loan Claims;

(k)    any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code; or

(l)    the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof (without the consent of the Required Consenting Revolving Credit Lenders);

(m)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Revolving Credit Lenders, not to be unreasonably withheld), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of the Chapter 11 Cases; or

(n)    the Company Parties or the First Lien Ad Hoc Group (A) executes a definitive written agreement with respect to an Alternative Transaction, (B) negotiate, file, propound or otherwise supports any alternative restructuring proposal or transaction contemplated thereby, (C) publicly announces their intention to do either of (A) or (B), or (D) provides notice to the First Lien Agent Counsel and the Required Consenting Revolving Credit Lenders of a determination as contemplated by Section 9 hereof.

14.04.  <u>Sponsor Termination Events</u>.  The Sponsors may terminate this Agreement as to themselves (solely in their capacity as Sponsor) by the delivery to counsel to the Consenting Stakeholders in accordance with Section 16.12 hereof upon the occurrence of any of the following events (each such event, a "<u>Sponsor Termination Event</u>"):

(a)    the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after the Sponsors transmit a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(b)    if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except these Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(c)    the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof that directly, adversely, and materially effects the Sponsors (solely in their capacity as Sponsors); or

(d)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Sponsors, such consent not to be unreasonably withheld), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of these Chapter 11 Cases.

14.05.  <u>Company Party Termination Events</u>.  The Company Parties may terminate this Agreement as to all Parties by the delivery to counsel to the Consenting Stakeholders in accordance with Section 16.12 hereof upon the occurrence of any of the following events (each such event, a "<u>Company Termination Event</u>"):

(a)    the breach in any material respect by one or more of the Consenting First Lien Lenders or Consenting Second Lien Lenders of any of the representations, warranties, or covenants of such Consenting Lenders set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof); <u>provided</u>, that this Agreement cannot be terminated pursuant to this Section

14.05(a) as a result of a breach of this Agreement by Consenting First Lien Lenders or Consenting Second Lien Lenders if the non-breaching Consenting Lenders (i) own or control 66.7% or more in aggregate principal amount of the First Lien Claims or (ii) 66.67% or more in aggregate principal amount of the Second Lien Term Loan Claims;

(b)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after notifying the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors and otherwise complying with Section 9 hereof, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue a Superior Proposal; provided, that the Company Parties shall give the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors not less than two (2) Business Days' prior written notice before exercising the termination right in accordance with this paragraph;

(c)    the Bankruptcy Court enters an order denying confirmation of the Plan, and such order remains in effect for five (5) business days after entry of such order;

(d)    any Consenting First Lien Lenders or Consenting Second Lien Lender files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement and such motion or pleading has not been withdrawn within two (2) Business Days of receipt by the applicable Consenting Lender of written notice from the Company Parties that such motion or pleading is inconsistent with this Agreement; provided, that this Agreement cannot be terminated pursuant to this Section 14.04(a) as a result of a breach of this Agreement by Consenting First Lien Lenders or Consenting Second Lien Lenders if the non-breaching Consenting Lenders (i) own or control 66.7% or more in aggregate principal amount of the First Lien Claims or (ii) 66.67% or more in aggregate principal amount of the Second Lien Term Loan Claims; or

(e)    the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.12 hereof detailing any such issuance; provided, however, that the Company Parties have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement provided, further, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

14.06.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (i) the Required Consenting Stakeholders; and (ii) each Company Party.

14.07.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date; other than with respect to the Company Parties' obligations (or the obligations of their successors in interest) to pay all of the accrued Restructuring Expenses, which obligation will survive automatic termination.

14.08.  Individual Consenting Stakeholder Termination Right.  An individual Consenting Lender may terminate this Agreement if this Agreement or any Definitive Document is amended, modified, or supplemented in a manner that materially, adversely and disproportionately affects the rights or treatment of such Consenting Lender relative to other similarly situated or classified Consenting Lender; provided, that this paragraph shall only apply to a Consenting Lender whose rights or treatment are materially, adversely and disproportionately affected by such amendment, modification, or supplement (and, for the avoidance of doubt, with respect to any Consenting Lender, shall not include any amendments, modifications or supplements that are generally applicable to all Consenting Lenders), and, if a Consenting Lender terminates this Agreement in accordance with this Section 14.08, such Agreement shall otherwise remain in full force and effect with respect to all other Parties.

14.09.  Termination Limitation.  Notwithstanding anything to the contrary herein, no Party may terminate this Agreement based on any event that was directly or indirectly caused by or arises out of such Party's breach of this Agreement.

14.10.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; provided, however, that each of the following shall survive any such termination:  (i) any claim for breach of or non-performance of its obligations under this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall remain in full force and effect and not be prejudiced in any way by such termination; and (ii) any obligations under this Agreement that expressly survive any such termination under this Agreement.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (i) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder; and (ii) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.

14.11.  Automatic Stay.  The Company Parties acknowledge that after the Petition Date, providing notice of termination and the exercise of any rights under this Agreement by any Party shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code; provided, that nothing herein shall prejudice any Party's right to argue that providing notice of termination or the exercise of any remedies was not proper under the terms of this Agreement. The Company Parties, to the extent enforceable, waive any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulate and consent hereunder to the prospective modification

of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

**Section 15.**     *Amendments and Waivers.*

15.01.  This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 15.

15.02.  This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party, (b) the Required Consenting First Lien Lenders, (c) the Required Consenting Second Lien Lenders, solely to the extent such modification, amendment, supplement or waiver would directly or indirectly affect the consent rights of the Consenting Second Lien Term Loan Lenders, and (d) the Required Consenting Revolving Credit Lenders solely to the extent such modification, amendment, supplement or waiver would directly or indirectly affect the consent rights of the Consenting Revolving Credit Lenders; provided, that if the proposed modification, amendment, waiver, or supplement has a disproportionate, material, and adverse effect on any of the rights of any individual Consenting Lender or Sponsor (or relates to the payment of Restructuring Expenses), then the consent of such Consenting Lender or Sponsor shall also be required to effectuate such modification, amendment, waiver or supplement (which, for the avoidance of doubt, shall not include amendments that are generally applicable to all Consenting Lenders); provided, further, that (x) any amendment to this Agreement to the definition of "Required Consenting Stakeholders," and  "Consenting Stakeholders," or to this Section 15 shall require the consent of each Consenting Stakeholder and (y) any amendment to the "Corporate Governance" section of the Term Sheet concerning the bank regulatory provisions within the shareholders agreement shall require the reasonable consent of the Required Consenting Revolving Credit Lenders.

15.03.  Any proposed modification, amendment, waiver or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

15.04.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 16.**     *Miscellaneous*

16.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the

Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  This Agreement and any claim, controversy, dispute or cause of action (whether at law, in equity, in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the law of the State of New York.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Federal District Court for the Southern District of New York in New York City, New York or the state courts located therein; <u>provided</u> that each Party hereto agrees that during an in-court Restructuring Transaction it shall bring any action or proceeding in respect of any such claim, controversy, dispute or cause of action arising out of or related to this Agreement in the Bankruptcy Court.  Each Party, solely in connection with claims arising under this Agreement, further:  (i) irrevocably submits to the exclusive jurisdiction of such courts; (ii) waives any objection to laying venue in any such action or proceeding in such courts; and (iii) waives any objection that such courts are an inconvenient forum or do not have jurisdiction over any Party to this Agreement.

16.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing

this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09. <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity, except as otherwise explicitly provided herein.

16.10. <u>Restructuring Expenses</u>.

(a)    Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash all Restructuring Expenses: (i) incurred up to (and including) and after the Agreement Effective Date, (ii) incurred after the Petition Date (if applicable), on a regular and continuing basis, (iii) upon any termination of this Agreement that have been incurred up to (and including) the applicable Termination Date;; and (iv) on the Effective Date, promptly (but in any event within five (5) Business Days of the delivery to the Company Parties of any invoice in respect thereto), without any requirement for the Bankruptcy Court to provide further review or additional court Orders; <u>provided</u> that, payment of the Restructuring Expenses shall be subject in all respects to any order of the Bankruptcy Court governing the payment of any such fees and expenses;

(b)    The terms set forth in this Section 16.10 shall survive termination of this Agreement, and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated.  The Company Parties hereby acknowledge and agree that the Consenting First Lien Lenders, the Consenting Second Lien Lenders and the Consenting Revolving Credit Lenders have expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation of the Restructuring Transactions, and that this Agreement provides substantial value to, is beneficial to, and necessary to preserve the Company Parties, and that the Consenting First Lien Lenders, the Consenting Second Lien Lenders and the Consenting Revolving Credit Lenders have made a substantial contribution to the Company Parties and the Restructuring Transactions.  If and to the extent not previously reimbursed or paid in connection with the foregoing, the Company Parties shall reimburse or pay (as the case may be) all reasonable and documented fees, costs and out-of-pocket expenses of the First Lien Ad Hoc Group Advisors, the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Company Parties hereby acknowledge and agree that the Restructuring Expenses are of the type that should be entitled to treatment as, and the Company Parties shall seek treatment of such fees, costs and out-of-pocket expenses of the

First Lien Ad Hoc Group Advisors, the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel as, Administrative Expense Claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

16.11.  _Relationship Among the Parties_.  It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in Company Claims/Interests without the consent of the Company Parties, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable Confidentiality Agreement or non-disclosure agreement, and the terms of this Agreement; _provided_ that no Party shall have any responsibility for any such trading by any other Party by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

16.12.  _Notices_.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:


Dynata, LLC
4 Research Drive, Suite 300
Shelton, CT 06484
Attention:     Mike Petrullo
               Steve Macri


_with a copy (which shall not constitute notice) to_:


Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:     Jeffrey D. Pawlitz
               Andrew S. Mordkoff
               Erin C. Ryan
E-mail address:  jpawlitz@willkie.com
                 amordkoff@willkie.com
                 eryan@willkie.com


(b)     if to a Consenting First Lien Term Loan Lender:


To each Consenting First Lien Term Loan Lender at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

Gibson, Dunn & Crutcher LLP
200 Park Ave.
New York, NY 10166
Attention:          Scott J. Greenberg
                    AnnElyse Scarlett Gains
                    Jonathan M. Dunworth
E-mail address:  sgreenberg@gibsondunn.com
                    agains@gibsondunn.com
                    jdunworth@gibsondunn.com

(c)     if to a Consenting Revolving Credit Lender:

To each Consenting Revolving Credit Lender at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

(d)     if to a Consenting Second Lien Term Loan Lender:

To each Consenting Second Lien Term Loan Lender at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.
*With a copy (which shall not constitute notice) to*:

Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Attention:          George R. Howard
                    Steven Zundell
                    Matthew D. Struble
E-mail address:  ghoward@velaw.com
                    szundell@velaw.com
                    mstruble@velaw.com

(e)     if to the Sponsors:

Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022
Attention:          Christopher Marcus, P.C.
E-mail address:  christopher.marcus@kirkland.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.13.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.14.  <u>No Waiver of Participation and Preservation of Rights</u>.

(a)  Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, so long as, in each case, such actions are not inconsistent with the Party's obligations under this Agreement or the other Definitive Documents, respectively.

(b)  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights, remedies, claims, and defenses.

(c)  This Agreement is part of a proposed settlement of matters that could otherwise be subject to litigation among the Parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.15.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that, without limiting any other remedies available at law or in equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including, without limitation, an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.16.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.17.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.18.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.19.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.20.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.  In addition, the Parties understand that the Consenting Stakeholders and the Consenting Revolving Credit Lenders are engaged in a wide range of financial services and businesses.  In furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting Stakeholders or Consenting Revolving Credit Lender expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s), funds, and/or business group(s) of the Consenting Stakeholder or Consenting Revolving Credit Lender, as applicable, the obligations set forth in this Agreement shall only apply to such trading desk(s), fund(s), and/or business group(s) and shall not apply to any other trading desk, fund, or business group of the Consenting Stakeholder or Consenting Revolving Credit Lender so long as they are not acting at the direction or for the benefit of such Consenting Stakeholder or Consenting Revolving Credit Lender or such Consenting Stakeholder's or Consenting Revolving Credit Lender's investment in the Company Parties; <u>provided</u>, that the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that (i) executes this Agreement or (ii) on whose behalf this Agreement is executed by a Consenting Stakeholder or Consenting Revolving Credit Lender.

16.21.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 8.01(g) (to the extent accrued up to and including such Termination Date or as provided in Section 14.07) and Section 14, shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

16.22.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties or any Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.23.  <u>Public Disclosure</u>.  The Company Parties shall deliver drafts to the counsel to the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group and the First Lien Agent's Counsel of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each a "**<u>Public Disclosure</u>**") at least two (2) calendar days before making any such disclosure, and the counsel to the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group and the First Lien Agent's Counsel shall be authorized to share such Public Disclosure with their respective clients.  Any Public

Disclosure shall be in form and substance reasonably acceptable to the Required Consenting First Lien Lenders and the Required Second Lien Lenders, and the Required Consenting Revolving Credit Lenders.  Under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Lender (including on the signature pages of the Consenting Lender, which shall not be publicly disclosed or filed) or (ii) the identity of any Consenting Lender without the prior written consent of such Consenting Lender or the order of a Bankruptcy Court or other court with competent jurisdiction; provided, however, notwithstanding the foregoing, each Consenting Lender hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms hereof, in the Chapter 11 Plan, the Disclosure Statement filed therewith, and any filings by the Company Parties with the Bankruptcy Court or as required by the Securities Act, or as otherwise required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body; provided, further, that if disclosure of additional identifying information of any Consenting Lender is required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body, advance notice of the intent to disclose such information, if permitted by applicable law, shall be given by the disclosing Party to each Consenting Lender (who shall have the right to seek a protective order prior to disclosure) and such Party shall take all reasonable measures to limit such disclosure.  The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

*[Signature pages follow]*

**Company Parties' Signature Page to**
**the Restructuring Support Agreement**

**NEW INSIGHT HOLDINGS, INC.**
**NEW INSIGHT INTERMEDIATE HOLDINGS, INC.**
**DYNATA HOLDINGS CORP.**
**INSTANTLY, INC.**
**RESEARCH NOW GROUP, LLC**
**SSI/OPINIONOLOGY INTERCO LLC**
**IPINION, INC.**
**RESEARCH NOW, INC.**
**SSI HOLDINGS, LLC**
**DYNATA, LLC**
**NEW INSIGHT INTERNATIONAL, INC.**
**IMPERIUM LLC**
**INBRAIN HOLDINGS, LLC**
**BRANDED RESEARCH, INC.**
**RESEARCH NOW DE I, LLC**
**RESEARCH NOW DE II, LLC**
**INBRAIN, LLC**
**APPS THAT PAY, LLC**
**SCREENLIFT.IO, LLC**

By: _____
Name: Michael Petrullo
Title: Authorized Person

**Consenting Stakeholder Signature Pages**

**[Signature Pages On File With The Debtors]**

**<u>EXHIBIT A</u>**

**Company Parties**

**Company Parties**

- New Insight Holdings, Inc.
- New Insight Intermediate Holdings, Inc.
- Dynata Holdings Corp.
- Instantly, Inc.
- Research Now Group, LLC
- SSI/Opinionology Interco LLC
- iPinion, Inc.
- Research Now, Inc.
- SSI Holdings, LLC
- Dynata, LLC
- New Insight International, Inc.
- Imperium LLC
- inBrain Holdings, LLC
- Branded Research, Inc.
- Research Now DE I, LLC
- Research Now DE II, LLC
- inBrain, LLC
- Apps That Pay, LLC
- ScreenLift.io, LLC

# EXHIBIT B

**Restructuring Term Sheet**

---

**DYNATA, LLC**

**RESEARCH NOW GROUP, LLC**

**Restructuring Term Sheet**

**May 21, 2024**

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 1145 OF THE BANKRUPTCY CODE AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE RESTRUCTURING DOCUMENTS. EXCEPT AS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE RESTRUCTURING DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.

---

This Term Sheet (including the annexes attached hereto, the "Term Sheet") sets forth the principal terms of a restructuring (the "Restructuring Transactions") of the capital structure and financial obligations of New Insight Holdings, Inc. ("Parent") and each of its affiliates set forth on **Annex 1** hereto (collectively, the "Company Parties" or the "Debtors"). The Restructuring Transactions will be accomplished through the Debtors commencing cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement a chapter 11 plan of reorganization described herein (the "Plan"). The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring Transactions have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring Transactions. The Restructuring Transactions detailed in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of definitive documentation.

THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE BY OR DISCLOSURE TO ANY PARTY OR PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

Capitalized terms used but not initially defined in this Term Sheet shall have the meaning hereinafter ascribed to such terms, or if not defined in this Term Sheet, such terms shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

| Restructuring Summary | |
|---|---|
| **Overview** | The Debtors will implement the Restructuring Transactions in accordance with the restructuring support agreement (the "<u>Restructuring Support Agreement</u>"), to which this Term Sheet shall be attached and incorporated by reference.  The Restructuring Transactions will be implemented pursuant to a Plan to be confirmed by the Bankruptcy Court and occur on the date the Plan becomes effective (the "<u>Effective Date</u>"). The Restructuring Transactions described herein shall be subject in all respects to and as provided by the other terms of this Term Sheet, the Restructuring Support Agreement, and the Definitive Documents. |
| **Claims and Interests to be Restructured** | ***First Lien Term Loan Claims***:  consisting of unpaid principal in the amount of $920,767,206.45, plus accrued interest as of the Petition Date (as defined below), deferred interest payments, fees, costs, charges, and other amounts arising under or in connection with term loans pursuant to that certain First Lien Credit Agreement (as supplemented, amended, amended and restated, or otherwise modified from time to time), dated as of December 20, 2017 (the "<u>Existing First Lien Credit Agreement</u>") (including for the avoidance of doubt, the Initial Term Loans, the Other Term Loans, and the Incremental Term Loans, each as defined in the Existing First Lien Credit Agreement) by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto (the "<u>First Lien Lenders</u>")[1], and Goldman Sachs Bank USA, as Administrative Agent and Collateral Agent (the "<u>First Lien Agent</u>") (collectively, the "<u>First Lien Term Loan Claims</u>" and the lenders holding such claims, the "<u>First Lien Term Loan Lenders</u>"). <br><br> ***Revolving Credit Loan Claims:*** consisting of unpaid principal in the amount of $96,899,99.99, plus accrued interest as of the Petition Date, fees, costs, charges, and other amounts arising under or in connection with the revolving loans made and outstanding pursuant to a "Revolving Commitment" under and as defined in the Existing First Lien Credit Agreement (the "<u>Revolving Credit Loan Claims</u>", and together with the First Lien Term Loan Claims, the "<u>First Lien Claims</u>") and the lenders party thereto (the "<u>Revolver Lenders</u>"). <br><br> ***Second Lien Term Loan Claims***: consisting of unpaid principal in the amount of $250,000,000.00, plus accrued interest as of the Petition Date, fees, costs, charges, and other amounts arising under or in connection with term loans pursuant to that certain Second Lien Credit Agreement (as supplemented, amended, amended and restated, or otherwise modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto (the "<u>Second Lien Lenders</u>"), and Acquiom Agency Services LLC, as Administrative Agent (and any successors thereto, collectively, the "<u>Second Lien Agent</u>") (collectively, the "<u>Second Lien Term Loan Claims</u>"). <br><br> ***General Unsecured Claims:*** consisting of any claim against the Debtors or the Company Parties, as applicable, arising prior to commencement of these Chapter 11 Cases (such date, the "<u>Petition Date</u>"), that is not a First Lien Claim, Second Lien Term Loan Claim, an Intercompany Claim (as defined below), or a claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "<u>General Unsecured Claims</u>"). |

---

[1]     For the avoidance of doubt, lenders who extended revolving loans under the Existing First Lien Credit Agreement are also considered "First Lien Lenders" for all purposes under this Term Sheet.

2

| | **Existing Equity Interests:** consisting of any Interests in Parent outstanding as of the Petition Date (the "<u>Existing Equity Interests</u>"). | |
|---|---|---|
| **Treatment of Claims and Interests In a Chapter 11 Restructuring** | | |
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | |
| **DIP Facility Claims** | Except to the extent that a holder of an allowed DIP Facility Claim (as defined in **Annex 4**) agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed DIP Facility Claim, each holder shall receive its *pro rata* share of the First Out Converted Term Loans (as defined in **Annex 2**). <br><br> To the extent a Holder of an Allowed DIP Facility Claim does not elect to convert its DIP Facility Claim into First Out Converted Term Loans, such Holder shall have its DIP Facility Claim paid in full in Cash and any resulting deficit will be backstopped by the Exit Backstop Parties. <br><br> The Exit Backstop Parties shall fund any such deficit in Cash (*pro rata* based on the percentages indicated on **Annex 8**) and in exchange each Exit Backstop Party will receive its *pro rata* share (based on the percentages indicated on **Annex 8**) of: (i) First Out Converted Term Loans on account of their DIP Facility Claims, (ii) First Out Converted Term Loans that otherwise would have been paid to such non-converting DIP Lender had such DIP Lender elected to convert its DIP Facility Claims to First Out Converted Term Loans, and (iii) the Backstop Premium. | N/A |
| **Administrative Expense Claims** | Except to the extent that a holder of an allowed Administrative Expense Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Administrative Expense Claim, each holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders: (i) payment in full in cash of the due and unpaid portion of its Administrative Expense Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such claim becomes due and payable; (ii) such other treatment to render such Administrative Expense Claim unimpaired under section 1124 of the Bankruptcy Code; or (iii) such other treatment as such holder may agree to or as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code. <br><br> "<u>Administrative Expense Claim</u>" has the meaning ascribed in the RSA. | N/A |
| **Priority Tax Claims** | Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Priority Tax Claim, on the Effective Date each holder of such allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |

3

| | "Priority Tax Claim" means any claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. | |
|---|---|---|
| **Classified Claims and Interests of the Debtors** | | |
| **Other Secured Claims** | Except to the extent that a holder of an allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Other Secured Claim, each holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders: (i) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such claim becomes due and payable; (ii) the collateral securing its allowed Other Secured Claim; (iii) reinstatement of its allowed Other Secured Claim; or (iv) such other treatment rendering its allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired; deemed to accept |
| **Other Priority Claims** | Except to the extent that a holder of an allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Other Priority Claim, each holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Consenting First Lien Lenders.<br><br>"Other Priority Claim" means any claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. | Unimpaired; deemed to accept |
| **First Lien Term Loan Claims** | Except to the extent that a holder of an allowed First Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed First Lien Term Loan Claim, on the Effective Date each holder shall directly or through a designee receive its *pro rata* share, along with the holders of the Revolving Credit Loan Claims, of:<br><br>(i) the option to fund their pro-rata share of First Out New Money Term Loans (as defined in **Annex 2**);<br><br>(ii) the Second Out Take Back Term Loans;<br><br>(iii) 95% of the New Common Stock, subject to (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of a Revolving Credit Loan opting to receive their Incremental Second Out Take Back Term Loan Amount (defined below); and<br><br>(iv) a cash payment of $11,669,935.04. | Impaired; entitled to vote |

| Revolving Credit Loan Claims | Except to the extent that a holder of an allowed Revolving Credit Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Revolving Credit Loan Claim, on the Plan Effective Date each holder thereof shall receive its *pro rata* share, along with the holders of the First Lien Term Loan Claims, of:<br><br>(i) the option to fund their *pro rata* share of the First Out New Money Term Loans (as defined in **Annex 2**);<br><br>(ii) the Second Out Take Back Term Loans;<br><br>(iii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery; provided, however, a holder of an allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive a 5% increase in the Second Out Take Back Term Loans such holder would otherwise receive (all such loans, the "Incremental Second Out Take Back Term Loan Amount")[2] in lieu of receiving the New Common Stock; and<br><br>(iv) a cash payment of $11,669,935.04. | Impaired; entitled to vote |
| Second Lien Claims | Except to the extent that a holder of an allowed Second Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Second Lien Term Loan Claim, on the Effective Date, each holder shall directly or through a designee receive its *pro rata* share of:<br><br>(i) 5 % of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery;<br><br>(ii) New Warrants Recovery; and<br><br>(iii) a cash payment of $750,000. | Impaired; entitled to vote |
| General Unsecured Claims | General Unsecured Claims shall be paid in full or otherwise rendered unimpaired pursuant to 1124(1) of the Bankruptcy Code. | Unimpaired; deemed to accept |
| Intercompany Claims | On the Effective Date, each Intercompany Claim shall be, at the option of the Debtors and with the consent of the Required Consenting First Lien Lenders, either reinstated, compromised, or canceled and released without any distribution.<br><br>"Intercompany Claim" means any claim against a Debtor held by another Debtor entity or non-Debtor affiliate. | Impaired, deemed to reject / Unimpaired, deemed to accept |
| Section 510(b) Claims | Section 510(b) Claims shall be discharged, canceled, released, and extinguished without any distribution to holders of such claims. | Impaired; deemed to reject |

---

[2] For the avoidance of doubt, the *pro rata* share of the Incremental Second Out Take Back Term Loan Amount shall be determined based on the aggregate amount of Revolving Credit Lender Claims held by those revolving lenders opting to receive additional take back debt in lieu of the New Common Stock.

| Intercompany Interests | On the Effective Date, each Intercompany Interest shall be, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, either reinstated, compromised, or canceled and released without any distribution.<br><br>"Intercompany Interest" means any interest in a Debtor held by another Debtor or non-Debtor entity. | Impaired, deemed to reject / Unimpaired, deemed to accept |
|---|---|---|
| Existing Equity Interests | On the Effective Date, the Existing Equity Interests shall be canceled, and holders of Existing Equity Interests shall receive no recovery on account of such Existing Equity Interests. | Impaired; deemed to reject |

| Implementation & Material Provisions of Chapter 11 Restructuring | | |
|---|---|---|
| **DIP Facility and Cash Collateral** | On or after the Petition Date, the Debtors will obtain debtor-in-possession financing pursuant to the DIP Facility, the material terms of which are set forth in **Annex 4**. | |
| **First Out Term Loan Facility** | On the Effective Date, the Debtors will issue First Out Term Loans pursuant to a term loan facility with an agent reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders as the administrative agent, and the lenders party thereto from time to time (the "First Out Term Loan Facility"), consistent with the terms set forth in **Annex 2** hereto. | |
| **New ABL Facility** | Subject to the consent of the Required Consenting First Lien Lenders, on the Effective Date, the Debtors will enter into the New ABL Facility, with an agent reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders as the administrative agent, and the lenders party thereto from time to time (the "New ABL Facility"), comprised of up to $75 million of asset-based revolving loans, with Research Now Group, LLC and Dynata, LLC as Borrowers. The New ABL Facility shall be guaranteed by each other Loan Party (as defined in the Existing First Lien Credit Agreement), and secured by first priority liens in working capital assets which secured the Existing First Lien Credit Agreement and second priority liens on all other assets which secured the Existing First Lien Credit Agreement. | |
| **Second Out Take Back Term Loan Facility** | On the Effective Date, the Debtors will enter into the Second Out Take Back Term Loan Facility consistent with the terms set forth in **Annex 3** hereto. | |
| **New Equity** | Shall be issued by Reorganized Parent (or such other entity determined by the Required Consenting First Lien Lenders), with governance rights set forth in the Plan Supplement which shall include reasonable and customary minority protections.<br><br>Reorganized Parent (or such other entity determined by the Required Consenting First Lien Lenders) shall be an entity that will be treated as a corporation for tax purposes. | |
| **New Warrants / New Warrants Recovery** | The "New Warrants Recovery" means each applicable holder's *pro rata* share of the warrants to acquire, collectively, 12.5% of the New Common Stock.<br><br>The New Warrants shall have (i) a 5-year tenor, (ii) have a cashless exercise, only upon a change of control, (iii) no Black-Scholes protection, and (iv) customary anti-dilution provisions.<br><br>The strike price of the New Warrants shall be equal to the value of the New Common Equity at which the holders of First Lien Claims receive a par plus accrued interest recovery under the Plan on the total value of the First Lien Claims, taken together (including the value of the Second Out Term Loan Facility, any cash distributions paid to holders of First Lien Claims under the Plan, and the New Common Equity). For the | |

6

| | avoidance of doubt, the First Out New Money Loan shall be added to the enterprise value and equity value calculation. |
|---|---|
| **Earnout & Settlement Claims** | The Debtors shall pay in full, amend, discharge, or compromise, as the case may be for each claim, the Earnout Payment Claims, the Change of Control Payments the Tranter Settlement Payment Claim, and the Branded Research Seller Note Claims, in a manner acceptable to the Required Consenting First Lien Lenders.<br><br>Sponsors to waive any General Unsecured Claims they have or may hold. |
| **Restructuring Expenses** | To be paid in full in accordance with the Restructuring Support Agreement and DIP Orders. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be as set forth in the Restructuring Support Agreement. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall enter into all agreements and other documents required pursuant to the Restructuring and shall issue the New Common Stock, the New Warrants, and all other securities, notes, certificates, and other instruments required to be issued pursuant to the Restructuring, including pursuant to section 1145 of the Bankruptcy Code, to the extent applicable, or another available exemption from the registration requirements of the Securities Act of 1933, as amended. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Miscellaneous Provisions** | |
| **Management Incentive Plan** | On or after the Effective Date, the New Board shall adopt a management incentive plan (the "<u>Management Incentive Plan</u>"), substantially on the terms set forth in **<u>Annex 5</u>**, in form and substance acceptable to the go-forward management of the Reorganized Debtors and the Required Consenting First Lien Lenders. |
| **Conditions Precedent to the Effective Date** | The effectiveness of the Plan shall be conditioned on obtaining the Plan Closing Conditions as set forth in the Restructuring Support Agreement. |
| **Corporate Governance** | On the Effective Date, the Company Parties will enter into new corporate governance documents, including charters, bylaws, operating agreements, or other organization or formation documents, as applicable (the "<u>New Corporate Governance Documents</u>"), which shall be subject to the consent rights set forth in the Restructuring Support Agreement. Such New Corporate Governance Documents shall include reasonable and customary minority protections.<br><br>All holders of shares of the New Common Stock from time to time outstanding will agree that they cannot transfer any of such shares if, in the Reorganized Debtors' judgment, it could, or may reasonably be expected to, result in an increase in the number of holders of record of such class of its equity securities which could cause the Reorganized Debtors to become required to register such securities under Section 12(g) of the Securities Exchange Act of 1934, as amended.  Notwithstanding the foregoing, the Company Parties will use commercially reasonable efforts to work with the holders of Revolving Credit Loan Claims who receive the New Common Stock to incorporate appropriate bank regulatory protections and provisions into the relevant shareholders agreement to |

| | ensure that regulations or laws applicable to holders of the New Common Stock do not run afoul of any and all regulations governing their receipt of such equity interests, including, without limitations, the Bank Holding Company Act and any regulations promulgated thereunder. |
|---|---|
| **Board of Directors** | On the Effective Date, the board of directors of the Reorganized Debtors (the "<u>New Board</u>") shall be constituted in accordance with the New Corporate Governance Documents and the New Shareholders Agreement and in a manner as determined by the Required Consenting First Lien Lenders. |
| **Good Faith Negotiations/Tax Issues** | The Restructuring Transactions shall be structured in the most tax efficient and advantageous manner possible and subject to the consent rights of the Required Consenting First Lien Lenders as set forth in the Restructuring Support Agreement, and solely in the event that the proposed tax structure would materially and disproportionately affect the Second Lien Ad Hoc Group's economic interests, the Second Lien Ad Hoc Group, each acting reasonably.<br><br>Reorganized Parent (or such other entity determined by the Required Consenting First Lien Lenders) shall be an entity that will be treated as a corporation for tax purposes. |
| **Restructuring Steps Plan** | The Plan Supplement shall include a restructuring steps plan, in form and substance reasonably acceptable to the Required Consenting First Lien Lenders, that shall outline the steps, considerations, treatment of intercompany claims and interests, and agreed funding, as applicable, for any Company Party, including, for the avoidance of doubt, any foreign non-Debtor Company Party. |
| **Releases** | The Plan will contain the exculpation provisions, the Debtor releases, and the "third-party" releases in the form set forth in **<u>Annex 6</u>** hereto. |
| **Other Executory Contracts and Unexpired Leases** | On the Effective Date, each Executory Contract and Unexpired Lease of the Debtors shall be, subject to the reasonable consent of the Required First Lien Consenting Lenders, assumed by the Debtors unless determined to be rejected by the Debtors with the reasonable consent of the Required First Lien Consenting Lenders. |
| **Survival of Indemnification Obligations and D&O Insurance** | Any obligations of the Debtors pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Debtors, will not be discharged or impaired by confirmation of the Plan. All such obligations will be deemed and treated as executory contracts to be assumed by the Debtors.<br><br>After the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |

**<u>Annex 1</u>**

**List of Debtors**

**<u>Company Parties / Debtors</u>**
- New Insight Holdings, Inc.
- New Insight Intermediate Holdings, Inc.
- Dynata Holdings Corp.
- Instantly, Inc.
- Research Now Group, LLC
- SSI/Opinionology Interco LLC
- iPinion, Inc.
- Research Now, Inc.
- SSI Holdings, LLC
- Dynata, LLC
- New Insight International, Inc.
- Imperium LLC
- inBrain Holdings, LLC
- Branded Research, Inc.
- Research Now DE I, LLC
- Research Now DE II, LLC
- inBrain, LLC
- Apps That Pay, LLC
- ScreenLift.io, LLC

**Annex 2**

**First Out Term Loan Facility Term Sheet**

| | |
|---|---|
| **First Out Term Loan Facility** | A senior secured term loan facility in an aggregate principal amount of $81.5 million (the "**First Out Term Loan Facility**"), comprised of $50,000,000 new money exit term loans (the "**First Out New Money Term Loans**"), and $31.5 million of converted DIP Facility Claims (the "**First Out Converted Term Loans**", and together with the First Out New Money Term Loans, the "**First Out Term Loans**"). Once repaid, amounts under the First Out Term Loan Facility may not be reborrowed. |
| **Borrower** | Research Now Group, LLC, and Dynata, LLC (as reorganized under the Plan), or a newly formed entity that acquires substantially all of the assets of such entity in connection with confirmation and consummation of the Plan (in either case, collectively, the "**Borrower**" or the "**Company**"). |
| **Guarantors** | All obligations of the Borrower under the First Out Term Loan Facility will be unconditionally guaranteed on a joint and several basis by: (i) Research Now Group, LLC, and Dynata, LLC (as reorganized under the Plan), (ii) each other Loan Party (as defined in the Existing First Lien Credit Agreement) (collectively, the "**Guarantors**") and (iii) all other Subsidiaries (as defined in the Existing First Lien Credit Agreement) of the Borrowers other than Excluded Subsidiaries (as defined in the Existing First Lien Credit Agreement). The Borrower and the Guarantors are each referred to herein as a "**Loan Party**". |
| **Administrative Agent; Administrative Agent Fee** | A financial institution reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders (in such capacity, the "**First Out Term Loan Agent**"). <br><br> The Agent shall be paid an annual agency fee to be agreed by the Agent and the Required Consenting First Lien Lenders. |
| **Lenders** | Each of the lenders under the First Out Term Loan Facility, a "**First Out Term Loan Lender**." <br><br> Pursuant to the Plan, (i) up to $31,500,000 shall be deemed advanced to the Borrower thereunder in exchange for Allowed DIP Facility Claims pursuant to the terms of the Plan and (ii) up to $50,000,000 of First Out New Money Term Loans shall be offered ratably to each First Lien Lender based on such First Lien Lender's *pro rata* holdings of First Lien Loans.  To the extent that a holder of First Out Converted Term Loans does not elect to participate in their *pro rata* share of the First Out New Money Term Loans, the deficit will be backstopped by the Exit Backstop Parties (defined below). <br><br> First Out Term Loan Lenders and Exit Backstop Parties, as applicable, shall be entitled to designate participation in the First Out Term Loans to one or more affiliates or funds or accounts managed, advised or sub-advised by such First Out Term Lenders or Exit Backstop Parties, as applicable. |
| **Exit Backstop Parties** | Each member of the First Lien Ad Hoc Group (or their affiliates) that commits to backstop the First Out Exit Term Loans (collectively, the "**Exit Backstop Parties**"). |

|  | The Exit Backstop Parties shall fund at the percentages indicated on **Annex 8**.[3] The obligations of each of the Exit Backstop Parties shall be several (and not joint and several), and no failure of any Exit Backstop Party to comply with any of its obligations shall prejudice the rights of any other Exit Backstop Party. |
|  | Each Exit Backstop Party may assign all or a portion of its Backstop to (i) any other Exit Backstop Party, (ii) any of its affiliates or related funds/accounts or (iii) any investment funds, accounts, vehicles or other entities that are managed, advised or subadvised by such Exit Backstop Party, its affiliates or the same person or entity as such Exit Backstop Party or its affiliates (all such persons described in clauses (ii) and (iii), such Exit Backstop Party's "**Fund Affiliates**"). |
| **Maturity Date** | All obligations under the First Out Term Loan Facility shall be due and payable in full in cash on the earliest of: (i) the date that is four years after the Effective Date; and (ii) the date of acceleration of the obligations under the First Out Term Loan Facility. |
| **Use of Proceeds** | The proceeds of the First Out Term Loans may be used only (i) to repay all reasonable and documented outstanding administrative costs and (ii) for working capital and general corporate purposes of the Loan Parties. |
| **Interest** | Interest on the First Out Term Loans shall be payable in cash at the end of each quarter in arrears. At all times prior to the occurrence of an Event of Default which is continuing, interest on the outstanding principal amount of the First Out Term Loans shall accrue at a rate equal to S + 5.00% *per annum*. |
|  | Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **OID** | The First Out New Money Term Loans shall be issued with 1.50% OID. |
| **Amortization** | Amortization is 1% per annum, payable quarterly. |
| **Default Interest** | During the continuance of an Event of Default, the First Out Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand. |
| **Backstop Premium** | To each Exit Backstop Party, 9.0% of the aggregate principal amount of the First Out New Money Term Loans backstopped by the Exit Backstop Parties, payable in cash on demand. The Backstop Premium shall be fully and finally approved upon entry of the Confirmation Order. |
| **Collateral** | All obligations of the Loan Parties to the First Out Term Loan Lenders and the First Out Term Loan Agent, including, without limitation, all principal, accrued interest, costs, fees and expenses and other amounts under the First Out Term Loan Facility (collectively, the "**First Out Term Loan Obligations**"), shall be secured by first priority liens on all Collateral (as defined in the Existing First Lien Credit Agreement) and shall be secured by first priority liens on any and all assets, whether real or personal, tangible or intangible of the other Loan parties. The property securing the First Out Term Loan Obligations is collectively referred to as the "**First Out Collateral**" and shall include substantially all assets of the Loan Parties, including without limitation, pledges of equity interests, subject to customary |

---

[3]    For the avoidance of doubt, **Annex 8** shall be provided to the Company Parties and their advisors only and shall otherwise be considered PEO and strictly confidential.  Any amendment to **Annex 8** shall only require the consent of the Exit Backstop Parties.

| | |
|---|---|
| | exceptions to be agreed upon; *provided* that in the event the Company Parties, with the consent of the Required Consenting First Lien Lenders, enter into the New ABL Facility the First Out Term Loan Obligations shall be secured by a second priority lien on any working capital assets. |
| **Reporting Covenants, Affirmative Covenants and Negative Covenants** | The First Out Term Loan Facility shall contain reporting requirements, affirmative covenants and negative covenants customarily found in loan agreements for facilities of this type and other reporting requirements, affirmative covenants and negative covenants reasonably satisfactory to the Required Consenting First Lien Lenders including, without limitation:<br><br>(i) the delivery of reporting information customarily found in loan agreements for facilities of this type, and<br><br>(ii) limitations on indebtedness, liens, asset sales, restricted payments, investments, repayments of indebtedness, affiliate transactions, fundamental changes, sale leaseback transactions, intercompany loans and cross guarantees, including but not limited to, no non-ordinary course capacity with respect to negative covenants. |
| **Financial Covenants** | To be agreed, usual and customary for facilities similar to the First Out Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders. |
| **Optional Prepayments** | The Borrower may make optional prepayments of the First Out Term Loans without paying any premium. |
| **Mandatory Prepayments** | To be agreed, usual and customary for facilities similar to the First Out Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders, including but not limited to:<br><br>1) 100% of net proceeds of asset sales in an amount to be agreed, to prepay First Out Term Loans at par plus accrued interest, within five (5) business days of receipt, with no reinvestment period permitted, subject to customary exceptions.<br><br>2) 25% of excess cash flow for the previous twelve-month period (measured on an annual basis) to prepay First Out Term Loans at par plus accrued interest; provided that the excess cash flow shall first be measured as of June 30, 2025 and as of June 30 each year thereafter and payable within sixty (60) days of such measurement date; provided further that the payment of excess cash flow shall be limited to an amount that would not cause the Company's minimum liquidity, measured as of June 30, to fall below $75 million, inclusive of availability under the New ABL Facility. |
| **Call Premium** | None. |
| **First Out Term Loan Facility Documents** | The First Out Term Loan Facility will be documented by a credit agreement, guarantee, security agreement and other loan documentation reflecting the terms and provisions set forth herein and otherwise in form and substance satisfactory to the Borrowers and the Required Consenting First Lien Lenders. |
| **Conditions Precedent to the Closing** | The First Out Term Loan Facility shall be subject to customary conditions to closing for facilities of this type, which shall be satisfactory to the Required Consenting First Lien Lenders, including without limitation:<br><br>(i)     execution and delivery of the First Out Term Loan Agreement and any other related documentation being executed and delivered on the Closing Date;<br><br>(ii)    receipt of certain reporting in form and substance reasonably acceptable to the Required Consenting First Lien Lenders; |

| | |
|---|---|
| | (iii)     the concurrent effectiveness of the Second Out Take Back Term Loan Facility in an amount, containing such terms, and pursuant to such documentation as contemplated by the Plan;<br><br>(iv)     the payment of Restructuring Expenses to the First Lien Ad Hoc Group Advisors;<br><br>(v)     the entry of the Confirmation Order and the effectiveness of the Plan;<br><br>(vi)     all conditions precedent to the issuance of the New Common Stock and, if applicable, the New Warrants shall have been satisfied or waived; and<br><br>(vii)     the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto. |
| **Events of Default** | The First Out Term Loan Facility shall contain events of default customarily found in loan agreements for facilities of this type and other events of default (if any) agreed upon by the Borrower and the Required Consenting First Lien Lenders. |
| **Rating** | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the First Out Term Loan Facility by Moody's and S&P seventy-five (75) days after the closing date of the First Out Term Loan Facility. |
| **Miscellaneous** | The First Out Term Loan Facility shall include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, illegality, SOFR breakage costs, payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary SOFR and benchmark replacement provisions (iv) customary liability management protections including, without limitation, (a) Chewy, (b) Serta, (c) J.Crew, (d) Incora, and (e) Double-dip, and (v) customary expense reimbursement, indemnification and other provisions as are usual and customary for facilities of this kind. |
| **Governing Law and Submission to Exclusive Jurisdiction** | State of New York. |

**Annex 3**

**Second Out Take Back Term Loan Term Sheet**

| | |
|---|---|
| **Second Out Term Loan Facility** | A secured term loan facility in an aggregate principal amount of $694 million (the "**Second Out Take Back Term Loan Facility**"), provided that such amount shall be increased by the amount of Incremental Second Out Take Back Term Loans, pursuant to which Second Out Term Loans shall be deemed advanced to the Borrower thereunder in exchange for a portion of allowed First Lien Claims. Once repaid, the Second Out Take Back Term Loans may not be reborrowed. |
| **Borrower** | Research Now Group, LLC and Dynata, LLC (as reorganized under the Plan), or a newly formed entity that acquires substantially all of the assets of such entity in connection with confirmation and consummation of the Plan (in either case, collectively, the "**Borrower**" or the "**Company**"). |
| **Guarantors** | All obligations of the Borrower under the Second Out Take Back Term Loan Facility will be unconditionally guaranteed on a joint and several basis by: (i) Research Now Group, LLC, and Dynata, LLC (as reorganized under the Plan), (ii) each other Loan Party (as defined in the Existing First Lien Credit Agreement) and (iii) all other Subsidiaries (as defined in the Existing First Lien Credit Agreement) of the Borrowers other than Excluded Subsidiaries (as defined in the Existing First Lien Credit Agreement) (collectively, the "**Guarantors**"). The Borrower and the Guarantors are each referred to herein as a "**Loan Party**". |
| **Administrative Agent; Administrative Agent Fee** | A financial institution reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders (in such capacity, the "**Second Out Take Back Term Loan Agent**"). <br><br> The Second Out Take Back Term Loan Agent shall be paid an annual agency fee to be agreed by the Second Out Take Back Term Loan Agent and the Required Consenting First Lien Lenders. |
| **Lenders** | The Second Out Take Back Term Loans shall be distributed to all First Lien Lenders on a *pro rata* basis pursuant to the terms of the Plan. <br><br> Each of the lenders under the Second Out Take Back Term Loan Facility, a "**Second Out Take Back Term Loan Lender**". |
| **Maturity Date** | All obligations under the Second Out Term Loan Facility shall be due and payable in full in cash on the earliest of: (i) the date that is 4.25 years after the Effective Date and (ii) the date of acceleration of the obligations under the Second Out Take Back Term Loan Facility. |
| **Interest** | Interest on the Second Out Take Back Term Loans shall be payable in cash at the end of each quarter in arrears. At all times prior to the occurrence of an Event of Default which is continuing, interest on the outstanding principal amount of the Second Out Take Back Term Loans shall accrue at a rate equal to S + 5.50% *per annum*. <br><br> Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **Amortization** | Amortization is 1%, payable quarterly on reset balance. |
| **Default Interest** | During the continuance of an Event of Default, the Second Out Take Back Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts |

| | |
|---|---|
| | (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand. |
| **Collateral** | All obligations of the Loan Parties to the Second Out Take Back Term Loan Lenders and the Second Out Take Back Term Loan Agent, including, without limitation, all principal, accrued interest, costs, fees and expenses and other amounts under the Second Out Exit Term Loan Facility (collectively, the "**Second Out Take Back Term Loan Obligations**"), shall be secured by first liens with second payment priority on all First Out Collateral; *provided* that in the event the Company Parties, with the consent of the Required Consenting First Lien Lenders, enter into the New ABL Facility the Second Out Take Back Term Loan Obligations shall be secured by a second priority lien with second payment priority on any working capital assets. |
| **Reporting Covenants, Affirmative Covenants and Negative Covenants** | The Second Out Term Loan Facility shall contain reporting requirements, affirmative covenants and negative covenants customarily found in loan agreements for facilities of this type and other reporting requirements, affirmative covenants and negative covenants reasonably satisfactory to the Required Consenting First Lien Lenders including, without limitation: |
| | (i)   the delivery of reporting information customarily found in loan agreements for facilities of this type, and |
| | (ii)   limitations on indebtedness, liens, asset sales, restricted payments, investments, repayments of indebtedness, affiliate transactions, fundamental changes, sale leaseback transactions, intercompany loans and cross guarantees, including but not limited to, no non-ordinary course capacity with respect to negative covenants. |
| **Financial Covenants** | To be agreed, usual and customary for facilities similar to the First Out Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders. |
| **Optional Prepayments** | The Borrower may make optional prepayments of the Second Out Take Back Term Loans without paying any premium. |
| **Mandatory Prepayments** | To be agreed, usual and customary for facilities similar to the First Out Take Back Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders, including but not limited to 100% of net proceeds of asset sales in an amount to be agreed, to prepay Second Out Term Loans at par plus accrued interest, within five (5) business days of receipt, with no reinvestment period permitted, subject to customary exceptions. |
| **Call Premium** | None. |
| **Second Out Term Loan Documents** | The Second Out Take Back Term Loan Facility will be documented by a credit agreement, guarantee, security agreement and other loan documentation reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the Borrowers and the Required Consenting First Lien Lenders. |
| **Conditions Precedent to the Closing** | The Second Out Take Back Term Loan Facility shall be subject to customary conditions to closing for facilities of this type, which shall be reasonably satisfactory to the Required Consenting First Lien Lenders, including without limitation: |
| | (i)   execution and delivery of the Second Out Term Loan Agreement and any other related documentation being executed and delivered on the Closing Date; |

| | |
|---|---|
| | (ii)   receipt of certain reporting in form and substance reasonably acceptable to the Required Consenting First Lien Lenders; |
| | (iii)   the concurrent effectiveness of the First Out Term Loan Facility in an amount, containing such terms, and pursuant to such documentation as contemplated by the Plan; |
| | (iv)   the payment when due and payable of all reasonable and documented fees and expenses of the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel; |
| | (v)   the entry of the Confirmation Order and the effectiveness of the Plan; |
| | (vi)   all conditions precedent to the issuance of the New Common Stock and, if applicable, the New Warrants shall have been satisfied or waived; and |
| | (vii)   the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto. |
| **Events of Default** | The Second Out Take Back Term Loan Facility shall contain events of default customarily found in loan agreements for facilities of this type and other events of default (if any) agreed upon by the Borrower and the Required Consenting First Lien Lenders (collectively, the "**Events of Default**"). |
| **Rating** | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the Second Out Take Back Term Loan Facility by Moody's and S&P seventy-five (75) days after the closing date of the Second Out Take Back Term Loan Facility. |
| **Miscellaneous** | The Second Out Take Back Term Loan Facility shall include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, illegality, SOFR breakage costs, payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary SOFR and benchmark replacement provisions, (iv) customary liability management protections, including, without limitation, (a) Chewy,  (b) Serta, (c) J. Crew, (d) Incora and (e) Double-dip, and (v) customary expense reimbursement, indemnification and other provisions as are usual and customary for facilities of this kind. |
| **Governing Law and Submission to Exclusive Jurisdiction** | State of New York. |

**Annex 4**

**DIP Facility Term Sheet**

| | |
|---|---|
| **DIP Loan Facility** | A super-priority senior secured debtor-in-possession term loan facility (the "**DIP Facility**") comprised of new money loans in an aggregate principal amount of up to $31.5 million (the "**DIP Loans**" and the claims thereunder, the "**DIP Facility Claims**"), which participation shall be made available by the First Lien Lenders to the Borrower thereunder (the "**DIP Commitments**"), which shall be fully drawn upon the entry of the Interim DIP Order. Once repaid or converted into First Out Term Loans as set forth below, the DIP Loans may not be reborrowed. |
| **Borrower** | Research Now Group, LLC and Dynata, LLC (collectively, the "**Borrower**" or the "**Company**"). |
| **Guarantors** | All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by: (i) Research Now Group, LLC, and Dynata, LLC, (ii) each other Loan Party (as defined in the Existing First Lien Credit Agreement) and (iii) all other Subsidiaries (as defined in the Existing First Lien Credit Agreement) of the Borrowers other than Excluded Subsidiaries (as defined in the Existing First Lien Credit Agreement) (collectively, the "**Guarantors**"). The Borrower and the Guarantors are each referred to herein as a "**Loan Party**". |
| **Administrative Agent; Administrative Agent Fee** | A financial institution reasonably acceptable to the Debtors and the DIP Lenders (in such capacity, the "**DIP Agent**"). The DIP Agent shall be paid an annual agency fee to be agreed by the DIP Agent and the Required DIP Lenders. |
| **Lenders** | Each of the lenders under the DIP Facility, a "**DIP Lender**". "**Required DIP Lenders**" shall mean DIP Lenders holding more than 50.1% of the then outstanding DIP Loans. Following entry of the Interim DIP Order, up to $31,500,000 of the DIP Loans shall be offered ratably to each First Lien Lender based on such First Lien Lender's *pro rata* holdings of loans outstanding under the First Lien Credit Agreement. For the avoidance of doubt, "loans" under the First Lien Credit Agreement shall include both the RCF Loans (including letter of credit exposure) and the Term Loans. To the extent that a holder of First Lien Claim does not elect to participate in their *pro rata* share of the DIP Loan, the deficit will be backstopped by the DIP Backstop Parties (defined below). DIP Lenders and DIP Backstop Parties, as applicable, shall be entitled to designate participation in the DIP Loans to one or more affiliates or funds or accounts managed, advised or sub-advised by such DIP Lenders or DIP Backstop Parties, as applicable. |
| **DIP Backstop Parties** | Each member of the First Lien Ad Hoc Group (or their affiliates) that signs the RSA and commits to backstop the DIP Facility (collectively, the "**DIP Backstop Parties**"). |

| | |
|---|---|
| | The DIP Backstop Parties shall fund at the percentages indicated on **Annex 7**.[4] The obligations of each of the DIP Backstop Parties shall be several (and not joint and several), and no failure of any DIP Backstop Party to comply with any of its obligations shall prejudice the rights of any other DIP Backstop Party.<br><br>Each DIP Backstop Party may assign all or a portion of its Backstop to (i) any other DIP Backstop Party, (ii) any of its affiliates or related funds/accounts or (iii) any investment funds, accounts, vehicles or other entities that are managed, advised or subadvised by such DIP Backstop Party, its affiliates or the same person or entity as such DIP Backstop Party or its affiliates (all such persons described in clauses (ii) and (iii), such DIP Backstop Party's "Fund Affiliates"). |
| **Maturity Date** | Unless converted to First Out Term Loans upon the event set forth in clause (iv) below and subject to the Carve-Out (as defined below), all obligations under the DIP Facility shall be due and payable in full in cash on the earliest of: (i) the date that is 75 days after the closing date of the DIP Facility, (ii) the date of acceleration of the obligations under the DIP Facility, (iii) the date the Bankruptcy Court orders a conversion of these Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Loan Party; (iv) the consummation of a plan of reorganization of the Loan Parties, which has been confirmed by an order entered by the Bankruptcy Court; (v) the appointment of a chapter 11 trustee, examiner or other fiduciary with decision-making authority; (vi) the date of consummation of a sale of all or substantially all of the Loan Parties' assets; and (vii) such other maturity date triggers as are customary for debtor-in-possession financings. |
| **Interest** | Interest on the DIP Loans shall be payable in cash at the end of each month in arrears. At all times prior to the occurrence of an Event of Default which is continuing, interest on the outstanding principal amount of the DIP Loans shall accrue at a rate equal to SOFR + 8.75% *per annum*.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **DIP Budget** | The "**DIP Budget**" means the rolling 13-week operating cash flow forecast/budget of the Debtors, to be approved by the Required DIP Lenders in their sole discretion with notice to the First Lien Ad Hoc Group Advisors, Second Lien Ad Hoc Group Advisors and First Lien Agent's Counsel. Any updated DIP Budget shall be subject to approval in form and substance by the Required DIP Lenders and otherwise subject to updates by the Debtors every fourth Friday following the week in which filing occurred (such updates to be approved by the Required DIP Lenders). The DIP Budget shall include a line-item for weekly professional fee forecasts for the professionals in the budget. In the event a DIP Budget is not approved or if the Debtors and the Required DIP Lenders otherwise affirmatively agree, the prior DIP Budget shall continue to govern. Any updated DIP Budget shall promptly be provided to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors, and the First Lien Agent's Counsel.<br><br>It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered a DIP Budget in form and substance acceptable to the Required DIP Lenders. Compliance with the initial DIP Budget and each subsequent |

---

[4]    For the avoidance of doubt, **Annex 7** shall be provided to the Company Parties and their advisors only and shall otherwise be considered PEO and strictly confidential.  Any amendment to **Annex 7** shall only require the consent of the DIP Backstop Parties.

|  | DIP Budget shall be tested via Variance Test, subject to Permitted Deviations, to be conducted on the Friday of the third week following the Petition Date and every other Friday thereafter (the "**Bi-weekly Reporting Date**") following the applicable Testing Period; provided that, upon a Variance Test showing noncompliance with the Receipts Permitted Deviation, the Debtors' shall not be permitted further drawings of funds from the DIP Account (subject to the Carve Out).

"**Testing Period**" means the report delivered on June 7, 2024, covering the period of May 20, 2024 – May 31, 2024, and due every other Friday thereafter for the prior two-week period.

"**Variance Test**" means a budget variance report/reconciliation in form and substance satisfactory to the Required DIP Lenders with a copy sent to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors, and the First Lien Agent's Counsel setting forth in detail (i) the Debtors' operating disbursements (the "**Actual Disbursements**") on a line-by-line and aggregate basis for the Testing Period; (ii) the Debtors' operating receipts (the "**Actual Receipts**"), on a line-by-line and aggregate basis during the Testing Period; (iii) the fees and expenses of the Debtor and any Committee Professionals incurred during the Testing Period; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) for the Testing Period of the Actual Receipts (and each line item thereof), the Actual Disbursements (and each line item thereof), and the fees and expenses of Professional Persons for the Testing Period to the amount of Debtors' projected cash receipts (and each line item thereof) set forth in the DIP Budget for such prior week period and the Debtors' projected disbursements (and each line item thereof), respectively, set forth in the DIP Budget for such Testing Period; and (v) as to each variance contained in the Variance Test, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance.

"**Permitted Deviation**" means each such deviation from the DIP Budget of 12.5% for disbursements (excluding professionals fees, DIP financing fees and costs, and Intercompany transfers between Debtors) on an aggregate basis (such disbursements, "**Operating Disbursements**") and 15% for Receipts (consistent with how each of the Operating disbursements and Receipts are set out in the initial DIP Budget) for each reporting period.

The Debtors shall, immediately upon receipt of the net proceeds of the DIP Facility, deposit such amounts into a segregated bank account of Borrower (which account must already have a DACA) that may only be drawn in accordance with the DIP Budget, with all funds held in the account deemed to be DIP Collateral; provided that, the Debtors may deposit the net proceeds of the DIP Facility available upon entry of the Interim DIP Order into the Debtors' operating account. The release of funds from such account shall be subject to the DIP Budget and the mechanics for the release set forth in the DIP Credit Agreement. |
| **Default Interest** | During the continuance of an Event of Default, the DIP Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest, if applicable, shall be payable in cash on demand. |

| | |
|---|---|
| **Backstop Premium** | To each DIP Backstop Party, 9.0% of the aggregate principal amount of the DIP Loans backstopped by each DIP Backstop Party, payable in cash on demand.  The Backstop Premium shall be fully and finally approved pursuant to the Interim DIP Order. |
| **Collateral** | All obligations of the Loan Parties to the DIP Lenders and the DIP Agent, including, without limitation, all principal, accrued interest, costs, fees and expenses and other amounts under the DIP Facility (collectively, the "**DIP Obligations**"), shall be secured by super-priority liens in favor of the DIP Agent on all Collateral (as defined in the Existing First Lien Credit Agreement) and shall be secured by super-priority priority liens in favor of the DIP Agent on any and all assets, whether real or personal, tangible or intangible of the other Loan Parties (but in all cases subject to the Carve-Out). The property securing the DIP Obligations is collectively referred to as the "**DIP Collateral**" and shall include substantially all assets of the Loan Parties, including without limitation, pledges of equity interests, subject to customary exceptions to be agreed upon. |
| **Carve-Out** | As used herein, "**Carve-Out**" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $50,000 (without regard to the notice set forth in (iii) below); (iii) subject to the DIP Budget, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "**Pre-Carve Out Amounts**"); and (iv) Allowed Professional Fees not to exceed $1,000,000, incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").<br><br>For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **Use of Proceeds** | Solely in accordance with and subject to the DIP Budget subject to permitted variances, and the DIP Orders, the proceeds of the DIP Facility may be used only (i) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with these Chapter 11 Cases, and (ii) for reasonable incremental liquidity purposes of the Loan Parties during these Chapter 11 Cases. |

| | |
|---|---|
| **Fees** | The Borrowers shall pay to the DIP Lenders in cash on a *pro rata* basis an upfront fee equal to 3.50% of the aggregate amount of DIP Commitments on the closing date of the DIP Facility.<br><br>In addition, upon the repayment or conversion of DIP Loans into First Out Term Loans, the Borrowers shall pay in cash to the DIP Lenders in cash on a *pro rata* basis an exit fee equal to 2.00% of the aggregate amount of such DIP Loans being repaid or converted. |
| **Stipulations** | Upon entry of the Interim DIP Order, but only subject to a customary "challenge" period, the Company Parties will provide customary stipulations and releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Prepetition Obligations, the Prepetition Collateral, and documentation related thereto. |
| **CLO Adjustments** | The Debtors shall work in good faith with the DIP Lenders to address any structural requirements of any CLO funds and fund advisors under their constituent documents or investment criteria in regard to exchanging any DIP Facility Claims while providing substantially similar economics set forth herein and in the Restructuring Support Agreement. |
| **Reporting Covenants, Affirmative Covenants and Negative Covenants** | The DIP Facility shall contain reporting requirements, affirmative covenants and negative covenants customarily found in loan agreements for facilities of this type and other reporting requirements, affirmative covenants and negative covenants satisfactory to the Required DIP Lenders including, without limitation:<br><br>(i)    the Milestones set forth in Section 5 of the Restructuring Support Agreement shall be included in the DIP Credit Agreement,<br><br>(ii)    the delivery of reporting information customarily found in loan agreements for facilities of this type,<br><br>(iii)    weekly on every Thursday following the Petition Date or such other day of the week as agreed in writing by the Loan Parties and the First Lien Ad Hoc Group Advisors (which agreement may be communicated by email between Gibson, Dunn & Crutcher LLP and Willkie Farr & Gallagher LLP) with prompt notice to the Second Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel, the Loan Parties and their financial advisor shall organize and hold status and/or diligence calls with the First Lien Ad Hoc Group Advisors and Second Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel,<br><br>(iv)    the requirement to satisfy milestones customarily found in loan agreements for facilities of this type, including the filing of a plan and disclosure statement, disclosure statement approval, plan confirmation and emergence, and<br><br>(v)    limitations on indebtedness, liens, asset sales, restricted payments, investments, repayments of indebtedness, affiliate transactions, fundamental changes, sale leaseback transactions, intercompany loans and cross guarantees, including but not limited to, no non-ordinary course capacity with respect to negative covenants. |

| | |
|---|---|
| **Optional Prepayments** | To be agreed, usual and customary for facilities similar to the DIP Facility and in form and substance acceptable to the Required DIP Lenders. |
| **Mandatory Prepayments** | To be agreed, usual and customary for facilities similar to the DIP Facility and in form and substance acceptable to the Required DIP Lenders, including but not limited to 100% of net proceeds of asset sales in an amount to be agreed, after funding the Carve-Out and reserving proceeds sufficient to pay accrued and unpaid expenses to the extent set forth in the DIP Budget, to prepay DIP Loans at par plus accrued interest, within five (5) business days of receipt, with no reinvestment period permitted, subject to customary exceptions. |
| **Call Premium** | None. |
| **DIP Loan Documents** | The DIP Facility will be documented by a super-priority senior secured debtor-in-possession credit agreement (the "**DIP Loan Agreement**"), guarantee, security agreement and other loan documentation reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the DIP Agent and the Required DIP Lenders. |
| **Conditions Precedent to the Closing** | The DIP Facility shall be subject to customary conditions to closing for facilities of this type, which shall be satisfactory to the Required DIP Lenders, including without limitation: <br><br> (i)  execution and delivery of the DIP Loan Agreement and any other related documentation being executed and delivered on the closing date of the DIP Facility; <br><br> (ii)  receipt of certain reporting in form and substance reasonably acceptable to the Required DIP Lenders; <br><br> (iii)  receipt of the initial DIP Budget in form and substance acceptable to the Required DIP Lenders; <br><br> (iv)  the Loan Parties being in compliance with the DIP Budget in all respects and the proceeds of any such DIP Loan being made on the closing date of the DIP Facility being used solely in accordance with the DIP Budget, subject to permitted variances; <br><br> (v)  entry of Interim Order followed by entry of the Final Order; <br><br> (vi)  the payment when due and payable of all reasonable and documented fees and expenses of the First Lien Ad Hoc Group Advisors; and <br><br> (x)  the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto. |
| **Interim and Final Orders** | The DIP Order approving the DIP Facility on an interim basis, which shall be satisfactory in form and substance to the Required DIP Lenders (the "**Interim Order**"), shall authorize and approve, among other matters to be agreed, (i) the Loan Parties' entry into the DIP Loan Documents, (ii) the making of the DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the DIP Loan Documents with respect to the DIP Collateral, (iv) the payment of all fees and expenses of the First Lien Ad Hoc Group Advisors, and (v) the payment of all fees and expenses of the Second Lien Ad Hoc Group Advisors, (vi) the payment of all fees and expenses of the Second Lien Agent, |

| | |
|---|---|
| | (vi) the payment of all fees and expenses of the First Lien Agent and the First Lien Agent's Counsel, and (vii) the payment of all fees and expenses contemplated by the DIP Facility, including the DIP Backstop Premium. The order approving the DIP Facility on a final basis shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"). |
| **Events of Default** | The DIP Loan Documents will contain events of default substantially consistent with the Existing First Lien Credit Agreement with such modifications as are customary for facilities of this type and certain other events of default satisfactory to the Required DIP Lenders (collectively, the "**Events of Default**"). |
| **Assignments and Participations** | Assignments under the DIP Facility are subject to the consent of the Borrowers and the DIP Agent (which consent shall not be unreasonably withheld or delayed), unless such assignment is (i) to a DIP Lender, (ii) to an affiliate of the transferor or (iii) solely with regards to the Borrower's consent right, during the continuance of an Event of Default. No participation shall include voting rights, other than for matters requiring consent of 100% of the DIP Lenders or each adversely affected DIP Lender. |
| **Rating** | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the DIP Facility by Moody's and S&P within the earlier to occur of (i) seventy-five (75) days after the closing date of the DIP Facility and (ii) entry of the Final Order. |
| **Adequate Protection:** | The DIP Orders shall approve customary adequate protection to be provided to the First Lien Lenders, including (i) replacement or new liens, as well as superpriority claims, on the unencumbered and encumbered assets of the Loan Parties junior to the liens securing the DIP Facility, (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code, and (iii) the payment of all reasonable and documented out-of-pocket fees and expenses of the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel.<br><br>The DIP Orders shall approve customary adequate protection to be provided to the Second Lien Lenders, including (i) replacement or new liens, as well as superpriority claims, on the unencumbered and encumbered assets of the Loan Parties junior only to (a) the "Carve Out"; (b) the liens securing the DIP Facility; (c) the replacement or new liens and superpriority claims provided to the First Lien Lenders; (d) any prepetition liens senior to the liens securing the existing First Lien Claims; and (e) the liens securing the existing First Lien Claims; (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code, junior only to the claims provided to the First Lien Lenders, and (iii) the payment of all reasonable and documented out-of-pocket fees and expenses of the Second Lien Ad Hoc Group Advisors and the Second Lien Agent's Counsel. |
| **Waivers; Marshaling** | The Final Order shall provide for waivers of (i) sections 506(c) and 552 of the Bankruptcy Code and (ii) the doctrine of marshaling. |
| **Miscellaneous** | The DIP Facility shall include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, illegality, SOFR breakage costs, payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary SOFR and benchmark replacement provisions and (iv) customary expense reimbursement, indemnification and other provisions as are usual and customary for facilities of this kind. |

| **Governing Law and Submission to Exclusive Jurisdiction** | State of New York. |
| --- | --- |

## Annex 5

### New MIP Summary

This Annex 5 summarizes the key terms of the proposed management incentive program (the "*MIP*") to be approved after the Plan Effective Date.  Capitalized terms used but not initially defined in this Annex 5 will have the meaning ascribed to such terms herein, or if not defined in this Annex 5, such terms will have the meaning ascribed to such terms in the Term Sheet to which this Annex 5 is attached.  The actual terms of the MIP will be subject to final approval by the New Board, and the terms and conditions set forth in a final approved plan document governing the MIP and individual award agreements.  The New Board and the Chief Executive Officer will work together in good faith to establish the terms and conditions of such definitive MIP documents.

| | |
|---|---|
| **Pool Size:** | 11.0% of the Company's fully-diluted equity value above Plan equity value as of the emergence (treating the MIP as fully allocated and outstanding) will be reserved for purposes of making awards under the MIP (the "*Pool*"), subject to increase for treatment of the Branded Note payments. |
| **Initial Awards:** | 8.5% of the Pool will be granted as of the Plan Effective Date to current senior management and the balance reserved for future grants. |
| **Eligible Participants**: | Existing and future key managers, employees and service providers of the Company, as selected by the New Board from time to time (each individual selected to participate in the MIP, a "*Participant*"). |
| **Form of Awards:** | Form to be determined in the reasonable discretion of the New Board based on tax and other structuring considerations; if available, awards to be granted in the form of interests that will be tax favorable for Participants. |
| **Vesting:** | Subject to the Participant's continued employment or provision of services through each applicable vesting date, the awards shall vest in a combination of time-vesting and performance-based vesting. One-third of awards will time-vest over the course of five years, with 40% vesting on the second anniversary of emergence, and the remaining awards vesting in three equal installments of 20% on the third, fourth and fifth anniversaries of emergence. Two-third of the awards will be subject to performance-based vesting based on achievement of certain Multiple of Invested Capital or "MOIC" (as customarily defined) thresholds upon an exit, with 1/3 of the awards vesting upon achievement of a 2.25x MOIC (relative to plan equity value), and 1/3 of the awards vesting upon the achievement of a 3.0x MOIC (relative to plan equity value). |
| | Upon the consummation of a "change in control" (as customarily |

defined), and subject to the achievement of the applicable MOIC threshold for performance-based vesting awards, all then-unvested awards held by a Participant will become fully vested, subject to the to the Participant's continued employment or provision of services through the date of such change in control.  Notwithstanding anything herein to the contrary, the New Board will have discretion to accelerate the vesting of awards at any time and for any reason.

**Termination:**

Unless otherwise determined by the New Board at the time of grant or thereafter, and except as set forth herein, unvested awards will be forfeited upon a Participant's termination of employment or separation from service for any reason.  Vested awards will be forfeited if the termination is for "cause" or the Participant violates restrictive covenants applicable to the Participant.

**Operating Agreement:**

Participants will be subject to the terms and conditions of the Company's operating or stockholders agreement, including (i) limits on transferability, (ii) call rights on vested securities at fair market value on any termination of employment (other than a termination for cause) and (iii) tag along and drag along rights upon specified sale transactions.

**Other Key Terms:**

Grants may be conditioned on the execution of a customary restrictive covenant agreement to the extent the Participant is not already subject to such an agreement (and, if the Participant is subject to such covenants, they will be incorporated into the grant documentation). Vesting, exercise or settlement in respect of awards may be conditioned on the execution of a customary release of claims in favor of the Company.

The New Board may make equitable adjustments to the Pool and to awards that it determines is necessary or appropriate from time to time, including, without limitation, in connection with a change in the capital structure of the Company, business acquisition, merger, capital contribution, distribution, dividend, recapitalization or other extraordinary event.

The MIP will include other customary terms and conditions as determined by the New Board in consultation with the Chief Executive Officer.

## **Annex 6**

**Exculpation and Release Language**

1.      "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (i) the Debtors; (ii) the Reorganized Debtors; and (iii) each Related Party of each Entity in clause (i) and (ii).

2.      "*Related Party*" means, collectively, with respect to any Entity or Person, including each Released Party and Exculpated Party, such Entity or Person's, current, former and future affiliates, member firms and associated entities, and with respect to each of the foregoing, their affiliates, current and former directors, current and former managers, current and former officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals(including, for the avoidance of doubt, the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors); *provided*, *however*, for the avoidance of doubt, any Affiliates of any Revolving Credit Lender (including any separate branch of a Revolving Credit Lender) shall not be deemed to be either a Related Party of such Revolving Credit Lender or a Revolving Credit Lender itself, unless such Affiliate has itself has submitted a Ballot or specifically authorized a third party to submit a Ballot on its behalf.  The Revolving Credit Lenders voting on this Plan are doing so only in their capacity as holders of Revolving Credit Loan Claims as of the Voting Record Date, this Plan does not cover any other Claims or Interests other than the Revolving Credit Loan Claims that are now owned or subsequently acquired by the Revolving Credit Lenders that submit a Ballot with regards to this Plan, and the provisions of this Plan shall only apply to such trading desk(s), fund(s), and/or business group(s) reflected on the Ballot of such Revolving Credit Lender and shall not apply to any other trading desk, fund, or business group of the Revolving Credit Lender so long as they are not acting at the direction or for the benefit of such Revolving Credit Lender or such Revolving Credit Lender's investment in the Debtors .

3.      "*Released Party*" means, each of, and in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Sponsors[5] and each other holder of Interests in Parent; (iv) the Consenting Lenders; (v) the DIP Lenders; (vi) the DIP Backstop Parties; (vii) the Exit Backstop Parties; (viii) the DIP Agent; (ix) the First Lien Agent, (x) the Second Lien Agent and any predecessor thereto; (xi) the First Lien Lenders and Second Lien Lenders that vote to accept the Plan; (xii) the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group; (xiii) each Related Party of each Entity in clause (i) through (xii); *provided* that any holder of a Claim or Interest that objects to or opts out of the third party releases contained therein, shall not be a "Released Party."

4.      "*Releasing Party*" means, each of, and in each case in its capacity as such:  (i) the Released Parties; (ii) each holder of a Claim entitled to vote to accept or reject the Plan that (a) votes to accept the Plan or (b) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by checking the "opt out" box on the  Ballot and returning it in accordance with the instructions set forth thereon indicating that they opt not to grant the releases contained in the Plan; (iii) each holder of a Claim or Interest that (x) is Unimpaired and presumed to accept the Plan, or (y) that is Impaired and is deemed to reject the Plan, in each case that does not affirmatively elect to "opt out" of being a Releasing Party by checking the "opt out" box on the Opt-Out Election Form and returning it in accordance with the instructions set forth thereon indicating that they opt not to grant the releases contained in the Plan; and (iv) each Related Party of each Entity in clause (i) through (iii) to the extent such Related Party can be bound by law or contract to the releases contemplated herein.

* * *

A.  *Exculpation*

**Except as otherwise specifically provided in the Plan, to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, amendment, or filing or termination of the Restructuring Support Agreement and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan**

---

[5] Releases for Sponsor subject to an appropriate determination by an independent board member.

Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce this Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

B. *Releases by the Debtors*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtors, Reorganized Debtors, and the Debtors' Estates, in each case on behalf of themselves and their Related Parties, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, Reorganized Debtors, or the Debtors' Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or Cause of Action against, or interest in, a Debtor or other Entity (or that any holder of any claim, interest, or Cause of Action could have asserted on behalf of the Debtors), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in or out of court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, the DIP Facility, the DIP Loan Documents, the New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the

foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan by the Debtors, Reorganized Debtors, and the Debtors' Estates, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in the Plan is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (ii) in the best interest of the Debtors, Reorganized Debtors, and the Debtors' Estates and all holders of Interests and Causes of Action; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) subject to the terms and provisions herein, a bar to the Debtors, Reorganized Debtors, and the Debtors' Estates asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their assets and property.

C.  *Third Party Releases*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in or out of court restructuring efforts, intercompany transactions between or among a Debtor, another Debtor and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, the New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, (ii) any Person from any claim or Causes of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence by such Person, or (iii) any lender under either the Existing First Lien Credit Agreement or the Existing Second Lien Credit Agreement of any indemnification or contribution claims of either the First Lien Agent or the Second Lien Agent (or the predecessor to the Second Lien Agent) under such agreements.

**<u>Annex 7</u>**

**Backstop Funding Percentages**
**[On File with the Debtors]**

**<u>Annex 8</u>**

**Exit Backstop Funding Percentages**
**[On File with the Debtors]**

# EXHIBIT C

**Form of Transfer Agreement**

**TRANSFER AGREEMENT**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2024 (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a Consenting Stakeholder under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Revolving Loan Claims | |
| First Lien Term Loan Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests | |

---

[1] Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.

# EXHIBIT D

**Form of Joinder**

## JOINDER FOR CONSENTING STAKEHOLDER

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2024 (the "**Agreement**"),[1] and agrees to be bound by the terms and conditions thereof to the extent that the other Parties are thereby bound, and shall be deemed a Consenting Stakeholder under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date this Joinder Agreement is executed and any further date specified in the Agreement.

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Revolving Loan Claims | |
| First Lien Term Loan Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests | |

107187664.21

---

[1]    Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.