**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| DYNATA, LLC, *et al.*,[1] | Case No. 24-11057 (   ) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF STEVEN MACRI**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Steven Macri, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the

following to the best of my knowledge, information and belief:

1.       I am the Chief Financial Officer of Dynata, LLC ("Dynata" or the "Company") and

its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors").  As Chief Financial Officer, I am familiar with the day-to-day operations, business

and financial affairs, and books and records of the Debtors.  I joined Dynata in June 2020 as Chief

Financial Officer.

2.       Prior to joining Dynata, I served as Senior Vice President of Finance for

iHeartMedia, Inc., and Chief Financial Officer of the iHeartMedia business unit.   Prior to

iHeartMedia, Inc., I was the Chief Financial Officer of Warner Music Group.  I started my career

at Price Waterhouse.  I hold a B.S. degree in Accounting from Syracuse University, and an MBA

from NYU Stern School of Business.

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Dynata, LLC (8807), New Insight Holdings, Inc. (1844), New Insight Intermediate Holdings, Inc. (6495), Dynata Holdings Corp. (0668), Research Now Group, LLC (7588), SSI/Opiniology Interco LLC (1855), iPinion, Inc. (9463), Research Now, Inc. (5523), SSI Holdings, LLC (6379), New Insight International, Inc. (0453), Imperium LLC (8375), inBrain, LLC (8031), Apps That Pay, LLC (9028), inBrain Holdings, LLC (9696), Branded Research, Inc. (9577), Screenlift.io, LLC, Research Now DE I, LLC (5528), Research Now DE II, LLC (5613), and Instantly, Inc. (6756).  The Debtors' headquarters is located at 4 Research Drive, Suite 300, Shelton, CT 06484.

3.      On May 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").  The Debtors intend to be in possession of their assets and the management of their business as debtors in possession during the pendency of these chapter 11 cases (collectively, the "Chapter 11 Cases").  To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (collectively, the "First Day Pleadings").  I submit this declaration (the "Declaration") to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of the Debtors' Petitions and the First Day Pleadings.

4.      All facts set forth in the Declaration are based on: (i) my personal knowledge; (ii) my communications with members of the Restructuring Committee of Dynata's Board of Directors (the "Restructuring Committee"), the Debtors' senior management team, and the Debtors' professional advisors; or (iii) my opinions developed through my overall professional experience, personal knowledge of the Debtors' history, financial condition, and business operations and affairs.

5.      I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.  If called as a witness, I could and would testify competently to the matters set forth herein.

## **INTRODUCTION**

6.      The Debtors and their non-debtor affiliates are a global data platform company in the business of providing business-to-business insights to market research firms, brands, media and advertising agencies, and investment firms, amongst others.  Specifically, the Debtors provide

its clients the ability to collect data for market research studies via surveys completed by members enrolled in the Debtors' online panels.  Members are recruited from loyalty programs or through online advertising, affiliate marketing, and social media channels.  The Debtors also perform market research, data collection and processing, and client relationship management services.

7.      The Debtors reach more than 70 million consumers and business professionals globally, serve more than 5,000 clients, and produce over 100 million complete surveys per year. The Debtors' high-quality and reliable insights empower their clients to understand consumers' behaviors.

8.      Notwithstanding significant business growth in recent years, in the months leading up to the Petition Date, the Debtors faced numerous challenges.  These headwinds included, (i) a slow mergers & acquisitions ("M&A") environment and overall economy impacting client demand for the Debtors' services, (ii) the impending inability to satisfy certain covenants under the Debtors' loan facilities with their prepetition first and second lien lenders, (iii) fluctuating interest rates causing a steep increase in the Debtors' cash interest obligations, (iv) delay in the Debtors' ability to recruit panelists using travel loyalty points incentives due to the effects of COVID-19, and (v) an evolving competitive market where the Debtors have been late adapters to new technology in the industry.  While the Debtors continue to generate revenue, their revenue streams—even when combined with extensive cost cutting measures—will be insufficient to shoulder the prepetition first and second lien loan facility covenants and working capital requirements.

9.      To help address these challenges, in the months leading up to the Petition Date, the Debtors retained Willkie Farr & Gallagher LLP ("Willkie"), Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), Houlihan Lokey Capital, Inc. ("Houlihan"), Kroll Restructuring

Administration LLC ("Kroll"), and Alvarez & Marsal ("A&M" and collectively with Willkie, Young Conaway, Houlihan, and Kroll, the "Restructuring Advisors") to implement a financial restructuring and recapitalization of their capital structure, in a manner that will minimize business disruptions and allow Dynata to emerge with a deleveraged capital structure that will better position it for future growth and long-term success. The Debtors engaged in extensive negotiations with both the First Lien Ad Hoc Group and Second Lien Ad Hoc Group (both as defined below) to achieve a consensual restructuring which culminated into entry of the Restructuring Support Agreement (as defined below).

10.     To that end, on May 21, 2024, the Debtors executed a Restructuring Support Agreement (the "Restructuring Support Agreement") with holders of more than 67% of First Lien Term Loan Claims, Revolving Credit Loan Claims, and Second Lien Term Loan Claims (each as defined below and collectively, the "Consenting Lenders"), the Sponsors (together with the Consenting Lenders, the "Consenting Stakeholders"), and the Debtors, pursuant to which the parties agreed, among other things, to support and vote in favor of the *Joint Prepackaged Plan of Reorganization of Dynata, LLC and its Debtor Affiliates* (the "Plan"), filed concurrently herewith. The Restructuring Support Agreement sets forth the principal terms of the financial restructuring transactions of the Debtors and requires the Consenting Stakeholders to support the Plan. In addition to the accepting votes represented by the Consenting Lenders, the Debtors intend to continue solicit joinders to the Restructuring Support Agreement following the Petition Date, thereby ensuring the approval of the Plan with each class entitled to vote on it.

11.     The Plan and the Restructuring Support Agreement contemplate that **each of the Debtors' employees, ongoing vendors, suppliers and other trade creditors will be paid in full**.

Dynata's business is continuing without interruption, and the Debtors expect to exit Chapter 11 as soon as possible.

12.     Accordingly, the Debtors and the Consenting Stakeholders have proposed the following timeline for these Chapter 11 Cases:

    i.   no later than 11:59 p.m. (prevailing Eastern Time) on the calendar day immediately before the Petition Date, the Company Parties shall solicit the Chapter 11 Plan (the "Solicitation Date");

    ii.   no later than May 22, 2024, the Petition Date shall have occurred;

    iii.   no later than three (3) days after the Petition Date, the Bankruptcy Court shall enter an order approving, on an interim basis, the DIP Order;

    iv.   no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall enter, on a final basis, the DIP Order;

    v.   no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall enter the Disclosure Statement Order and Confirmation Order; and

    vi.   no later than fifty (50) days after the Petition Date, the Plan Effective Date shall occur and the Restructuring Transactions shall be consummated.

13.     To familiarize the Court with the Debtors, their business, the circumstances leading up to these Chapter 11 Cases, and the relief the Debtors seek in the First Day Pleadings, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the events leading up to the filing of these Chapter 11 Cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing and use of cash collateral; and

- **Part V** provides the factual support for the Petitions and First Day Pleadings.

## I.    The Debtors' Corporate History, Structure, and Business Operations

### A.    General Background, History, and Key Products

14.    The Debtors were founded in 1997 under the name Survey Sampling International ("SSI") and primarily focused on mail surveys, phone surveys, and face to face interviews.  In 1999, another historical arm of the Debtors, E-Rewards, was founded.  In the following years, SSI and E-Rewards purchased other similar companies and underwent various mergers.  In 2014, E-Rewards was renamed to Research Now, and then in 2017, SSI merged with Research Now. Finally, in 2019, SSI and Research Now rebranded to become Dynata.

15.    Dynata continued to acquire a number of companies in the following years, including (i) the 2019 acquisition of Reimagine Holdings Group for its survey automation solutions, visualization tools and fraud prevention methodologies, amongst others, (ii) the 2020 acquisition of Sharpr to integrate its artificial intelligence content syndication technology, (iii) the 2020 acquisition of CrowdLab for its innovative digital ethnography solutions, (iv) the 2021 acquisition of inBrain.ai for its mobile consumer engagement and survey platform, (v) the 2021 acquisition of Ameritest for its advertising solution offerings, (vi) the 2021 acquisition of 0ptimus Analytics for its machine learning technology, and (vii) the 2022 acquisition of Branded Research Inc. for its panel communities that generate nearly 15 million high-quality completed surveys annually.  These acquisitions greatly expanded and enhanced the Debtors' operations.  Today, Dynata services its clients with a database of information on a global scale throughout the United States, Latin America, Europe, Asia, and Australia.  The Debtors maintain their headquarters in Shelton, Connecticut.

16.    The Debtors have built a large network of panelists from whom they derive insights with great breadth and depth.  Each panelist begins as an individual who has joined a Dynata-owned online panel.  Panelists are asked a series of demographic and related questions when they

are onboarded to a panel in order to determine what surveys would be appropriate to offer them. The Debtors are able to map out additional data points for panelists as they take more and more surveys on behalf of Dynata clients. Panelists are motivated to participate in more surveys through panel or loyalty program incentives such as airline miles in exchange for each completed survey. The more surveys a panelist completes over time, the more valuable that panelist becomes as a provider of first-party data. For example, a panelist who has done surveys monthly for three years can provide richer more layered data insights than a panelist who has only done one survey per year.

17.     Clients engage with Dynata by purchasing access to Dynata's database of panelists. Clients can reach out to Dynata salespeople with specific inquiries—for example, a client may want to survey 100 male left-handed golfers in Arizona to understand how this demographic will react to a specific product launch. The clients can provide Dynata with the exact survey they want to disseminate or Dynata can assist with writing or curating the survey. Dynata then is able to reach out to the applicable demographic of panelists and create a report of results for the client.

**B.      Corporate Structure**

18.     As set forth in the corporate structure chart attached hereto as **Exhibit A** (the "Organizational Chart"), Dynata, LLC, is the wholly owned subsidiary of New Insight Holdings, Inc., which in turn is wholly owned by Insight Holdings (DE), LP and HGGC Saber Topco LLC. Insight Holdings (DE), LP is the HoldCo controlled by Court Square Capital Partners, Court Square Capital Partners III, L.P., Court Square Capital Partners III-A, L.P., Court Square Capital Partners (Offshore) III, L.P., Court Square Capital Partners (Executive) III, L.P. HGGC Saber Topco LLC is the HoldCo controlled by HGGC, LLC.

19.     The Company's primary indebtedness is held by Dynata, LLC, and Research Now Group, LLC.  There are nine (9) other entities within the corporate structure that constitute as guarantors.

### C.     Foreign Operations

20.     The Company also has non-Debtor subsidiaries that operate throughout Latin, America, Europe, Asia, and Australia.  None of the other corporate entities that comprise the Debtors' Latin America, European, Asian, and Australian businesses are chapter 11 Debtors (the "Non-Debtor Foreign Subsidiaries").

## II.     The Debtors' Prepetition Capital Structure

### A.     Prepetition Funded Debt Obligations

21.     As of the Petition Date, the Debtors have an aggregate principal amount of approximately $1.3 billion in funded debt principal obligations, consisting of the outstanding principal obligations, not including accrued interest, arising under the First Lien Revolving Credit Loan, the First Lien Term Loan and the Second Lien Term Loan (each as defined below), and approximately $159 million in total outstanding general operating debt and similar unsecured obligations.

| Type of Debt | Maturity | Amount |
|---|---|---|
| **Secured Debt** | | |
| First Lien Revolving Credit Loan | June 14, 2024 | $96,899,999.99 |
| First Lien Term Loan | December 20, 2024 | $920,767,206.45 |
| Second Lien Term Loan | December 20, 2025 | $250,000,000.00 |
| **Total Secured Debt** | | **$1,267,667,206.44** |
| **Unsecured Debt** | | |
| General Unsecured Obligations | | $158,942,464.00 |
| **Total** | | **$1,426,609,670.38** |

22.      **First Lien Revolving Credit Loan.**  Debtors Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC) as borrowers, Debtor New Insight Holdings, Inc. as parent, Debtors New Insight Intermediate Holdings, Inc., SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp., and iPinion, Inc. as guarantors, the lenders party to the First Lien Revolving Credit Loan (as defined below) from time to time (the "First Lien Revolving Credit Loan Lenders"), and Goldman Sachs Bank USA, as administrative agent (the "First Lien Revolving Credit Loan Agent") are parties to that certain First Lien Revolving Credit Agreement, dated as December 20, 2017, providing for the Debtors' first-lien revolving credit facility (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Revolving Credit Loan").

23.      The Debtors entered into various security and collateral documents in favor of the First Lien Revolving Credit Loan Agent (for the benefit of the First Lien Revolving Credit Loan Lenders) and various security and collateral documents, pursuant to which the First Lien Revolving Credit Loan Lenders were granted first priority liens on substantially all of the Debtors' assets (the "First Lien Collateral").  The maturity date of the First Lien Revolving Credit Loan is June 14, 2024.   As of the Petition Date, there is approximately $97 million outstanding under the First Lien Revolving Credit Loan, excluding accrued and outstanding interest, fees, reimbursements, expenses and all other obligations outstanding under the First Lien Revolving Credit Loan documents as of the Petition Date.

24.      **First Lien Term Loan.**  Debtors Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC) as borrowers, Debtor New Insight Holdings, Inc. as parent, Debtors New Insight Intermediate Holdings, Inc.,

SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp., and iPinion, Inc. as guarantors, the lenders party to the First Lien Term Loan (as defined below) from time to time (the "First Lien Term Loan Lenders" with the First Lien Revolving Credit Loan Lenders, the "First Lien Lenders"), and Goldman Sachs Bank USA, as administrative agent (the "First Lien Agent") are parties to that certain First Lien Credit Agreement, dated as December 20, 2017, providing for the Debtors' first-lien term loan credit facility (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Term Loan", and together with the First Lien Revolving Credit Loan, the "First Lien Loans").

25.     The Debtors entered into various security and collateral documents in favor of the First Lien Agent (for the benefit of the First Lien Term Loan Lenders) and various security and collateral documents, pursuant to which the First Lien Term Loan Lenders were granted first priority liens the First Lien Collateral.  The maturity date of the First Lien Term Loan is December 20, 2024.   As of the Petition Date, approximately $921 million of principal remains outstanding under the First Lien Term Loan, excluding accrued and outstanding interest, fees, reimbursements, expenses and all other obligations outstanding under the First Lien Term Loan documents as of the Petition Date.

26.     **Second Lien Term Loan.**  Debtors Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC) as borrowers, Debtor New Insight Holdings, Inc. as parent, Debtors New Insight Intermediate Holdings, Inc., SSI/Opinionology Interco LLC, SSI Holdings, LLC, Research Now, Inc., New Insight International, Inc., Dynata Holdings Corp., and iPinion, Inc. as guarantors, the lenders party to the Second Lien Term Loan (as defined below) from time to time (the "Second Lien Term Loan

Lenders", with the First Lien Lenders the "<u>Lenders</u>"), and Acquiom Agency Services LLC, as administrative agent (the "<u>Second Lien Agent</u>"), are parties to that certain Second Lien Credit Agreement dated as of December 20, 2017, providing for the Debtors' second-lien term loan credit facility (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Second Lien Term Loan</u>").

27.     The Debtors entered into various security and collateral documents in favor of the Second Lien Agent (for the benefit of the Second Lien Term Loan Lenders) and various security and collateral documents, pursuant to which the Second Lien Term Loan Lenders were granted second priority liens on substantially all of the Debtors' assets (the "<u>Second Lien Collateral</u>").  The maturity date of the Second Lien Term Loan is December 20, 2025.   As of the Petition Date, approximately $250 million of principal remains outstanding under the Second Lien Term Loan, excluding accrued and outstanding interest, fees, reimbursements, expenses and all other obligations outstanding under the Second Lien Term Loan documents as of the Petition Date.

28.     **Other Unsecured Claims.**  The Debtors also have numerous other unsecured claims outstanding as of the Petition Date, including vendor claims and litigation claims.  The Debtors estimate that such trade claims total approximately $159 million.

## III.     Events Leading to the Commencement of these Chapter 11 Cases

### A.     Recent Financial Performance and Liquidity Constraints

29.     Despite the revenues generated from sales of their data services and management's best efforts to stabilize operations, the Debtors' business prospects have significantly declined in recent months.  Several factors, among others, have contributed to this decline:

30.     **Slow Market Environment**.  M&A deal volume and deal value has dramatically reduced over the recent years which caused headwinds in the data intelligence industry.  Many of the Debtors' clients typically enlist the Debtors as part of the due diligence process in an M&A

context.  As such, the slowdown in M&A activity has had a material effect on the Debtors' ability to generate revenue.

31.    **COVID-19 Pandemic**.  The Debtors have also faced difficulty in recent years growing and maintaining its panelist base due to the COVID-19 pandemic's lingering effect on travel.  As the majority of the Debtors panelists are recruited and incentivized to submit surveys in exchange for loyalty air travel or hotel points, the travel restrictions imposed by the COVID-19 pandemic negatively affected the Debtors ability to attract panelists to take surveys and resulted in a diminished repository from which to draw data insights.  Although the travel restrictions from the COVID-19 pandemic have eased, the Debtors still have not seen a full recovery in its panelist base.

32.    **Fluctuating Interest Rates**.  The Debtors were impacted by the variable interest rate and ever increasing global inflation, which caused the Debtors interest payments to steeply increase.  In particular, the Debtors LIBOR benchmark rate (now the Secured Overnight Financing Rate) increased 500bps, almost doubling the amount of cash interest obligations for the Debtors.

33.    **Industry Competition**.  Competition in the data intelligence industry is robust and the market is saturated with competitors who are constantly developing new technologies and products for more efficient gathering, cataloging, and updating of data.  The Debtors are late adaptors to certain technological innovations in the industry, such as developing a platform to connect clients with panelists directly. This has led to difficulties in retaining and obtaining clients, as clients have numerous firms to turn to for their data intelligence needs.

**B**.    **Default Under Prepetition First Lien Facility and Forbearance Agreements**

34.    In early 2024, it became clear that the Company would be unable to remain in compliance with either the First Lien Credit Agreement or the Second Lien Credit Agreement

without a waiver or forbearance from one or both of the Lender groups. Certain events of default would have occurred with respect to the First Lien Credit Agreement after the expiration of a three business day grace period that began on February 1, 2024. This would in turn trigger a cross-default under the Second Lien Credit Agreement.

35.     The Debtors therefore engaged with two ad hoc groups of its Lenders: the "First Lien Ad Hoc Group" represented by, inter alia, Gibson Dunn & Crutcher LLP and, PJT Partners LP, which the Debtors understand consists of unaffiliated First Lien Term Loan Lenders; and the "Second Lien Ad Hoc Group" represented by, inter alia, Vinson & Elkins, LLP and Lazard, Inc., which the Debtors understand consists of unaffiliated lenders holding Second Lien Term Loan Claims.

36.     Certain members of the First Lien Ad Hoc Group that constituted "Required Lenders" and members of the Second Lien Ad Hoc Group executed confidentiality agreements with the Company in early 2024 to facilitate discussions. After extensive negotiations with both ad hoc groups, the Company entered into an amendment under the First Lien Credit Agreement and the Second Lien Credit Agreement on February 6, 2024 (such amendments, the "First Lien Credit Agreement Amendment" and the "Second Lien Credit Agreement Amendment," collectively the "Credit Agreement Amendments") to address certain events of default and cross-defaults that would have occurred beginning on February 1, 2024. Significantly, the Credit Agreement Amendments included a milestone requiring the execution of an Restructuring Support Agreement between the Debtors and the First Lien Ad Hoc Group by February 29, 2024 (which has been extended with the written consent of the Required First Lien Lenders).

37.     During the grace period, which was subsequently extended under the terms of the Credit Agreement Amendments to May 21, 2024, the Debtors delivered to advisors of the First

Lien Ad Hoc Group and Second Lien Ad Hoc Groups substantial diligence materials to facilitate the development of a restructuring proposal that would maximize the value of the estates. Throughout this time, but increasingly toward the lead-up to the Petition Date, the Company negotiated with the First Lien Ad Hoc Group, primarily because they expressed an interest in providing the Company with a restructuring proposal and must-needed new money financing, centered around a conversion of the First Lien Loans into the substantial majority of equity of the reorganized Debtors.

> **D.    Efforts to Negotiate a Comprehensive Restructuring**

38.    Since the execution of the Credit Agreement Amendments, the Debtors have worked tirelessly to negotiate a consensual restructuring with the members of both the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group and their other stakeholders, and have received multiple extensions of the 'Restructuring Support Agreement milestone' under the First Lien Credit Agreement Amendment to provide additional time for negotiations on a consensual restructuring.  As a result of those efforts, on May 21, 2024, the Debtors, certain members of the First Lien Ad Hoc Group, the Revolving Credit Lenders, the Second Lien Ad Hoc Group, and the Sponsors entered into the Restructuring Support Agreement, as described below and attached hereto as **Exhibit B**.

> **E.    The Proposed Restructuring Transactions**

39.    The Restructuring Support Agreement contemplates a comprehensive financial restructuring of the Company that will result in the deleveraging of the Company's balance sheet. Under the Restructuring Support Agreement, the Restructuring Transactions are implemented in-court through a chapter 11 proceeding.

40.    Pursuant to the Restructuring Support Agreement, the treatment of claims includes, but is not limited to, the following: (i) holders of First Lien Term Loan Claims and Revolving

Credit Loan Claims shall receive a combination of their *pro rata* share of First Out New Money Term Loans, Second Out Take Back Term Loans, New Common Stock and cash payment; (ii) holders of Second Lien Term Loan Claims shall receive their *pro rata* share of New Common Stock, the New Warrants Recovery, and a cash payment; (iii) all General Unsecured Claims will be paid in full and unimpaired, and (iv) all Existing Equity Interests shall not receive or retain any property interests.[2]

41.    On May 21, 2024, consistent with the terms of the Restructuring Support Agreement, the Debtors commenced the solicitation of the Plan, upon the terms and subject to the conditions set forth in the Disclosure Statement filed concurrently herewith (the "Solicitation"). Under the Plan, all outstanding and undisputed General Unsecured Claims will be unimpaired by the restructuring unless otherwise agreed to by the holder of such General Unsecured Claim.  In other words **the Debtors anticipate that all vendor and service provider claims will be paid or otherwise satisfied in full in the ordinary course and on customary terms.**

42.    The Debtors intend to seek the Court's conditional approval of the Disclosure Statement immediately following the filing of these Chapter 11 Cases, and accordingly their First Day Pleadings include the Solicitation Procedures Motion.[3]  It is my understanding that, pending such conditional approval of the Disclosure Statement, the Debtors intend to conclude solicitation on June 25, 2024, implement the comprehensive notice procedures set forth therein, and seek a

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code With Respect to Joint Plan of Reorganization of Dynata LLC, and Its Debtor Affiliates*, filed contemporaneously herewith.

[3]    The *Debtors' Motion for Entry of an Order (I) Scheduling Combined Hearing on Adequacy of the Disclosure Statement and Confirmation of the Plan; (II) Fixing Deadline to Object to Disclosure Statement and the Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing and Objection Deadline; (IV) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341(A) Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities and Rule 2015.3 Reports; and (VI) Granting Related Relief*, filed contemporaneously herewith.

combined hearing for simultaneous final approval of the Disclosure Statement and confirmation of the Plan on or about July 2, 2024 (subject to the Court's availability).

43.     In sum, through these Chapter 11 Cases, the Debtors seek to effectuate a financial restructuring and recapitalization that positions the Debtors for future operational and financial success, while limiting the impact of such restructuring on the Debtors' business operations, preserving jobs, and avoiding any negative impact on the Debtors' valued vendors, suppliers, and clients world-wide.   The Debtors have obtained overwhelming, broad-based support for their proposed Plan which will ensure a smooth transition through these Chapter 11 Cases and position the Debtors well for their future goals.

## IV.     The Proposed Debtor-in-Possession Financing

44.     To provide the Debtors with liquidity to commence a smooth landing into these Chapter 11 Cases, the restricted members of the First Lien Ad Hoc Group agreed to provide the DIP Facility, as well as access to prepetition cash collateral (the "Cash Collateral").   The DIP Facility and access to Cash Collateral will provide the Debtors with the necessary liquidity to fund their business operations and administrative expenses during these Chapter 11 Cases, which will minimize potential disruptions and preserve enterprise value.

### A.     Need for DIP Financing

45.     As discussed herein, the Debtors' need for immediate liquidity in the form of the proposed DIP Facility is largely driven by operational challenges.   The DIP Facility was carefully negotiated and will provide cash to administer these Chapter 11 Cases, fund the business, pay vendors in the ordinary course, and ensure that wages, taxes, and other obligations are paid.   The DIP Facility is the best available financing under the circumstances.   Access to such financing at this time is mission critical for executing on the comprehensive chapter 11 transactions discussed above.

B.    **The Debtors' Proposed Use of Cash Collateral**

46.    Pursuant to the DIP Motion (as defined below), the Debtors also seek the continued use of the Lenders' cash collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases.  Without access to cash collateral, the Debtors would be unable to operate their business and administer their estates, and their stakeholders would be immediately and irreparably harmed as a result.  Authorization to use cash collateral through the duration of these Chapter 11 Cases will provide the Debtors with sufficient liquidity to continue operating as a going-concern and to maintain relationships with key vendors and personnel, continue to provide services to their clients, and pay wages to employees.

47.    In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the Lenders with adequate protection as set forth in the DIP Motion and the accompanying proposed orders.  The Debtors' use of Cash Collateral will be subject to the same milestones agreed upon in the DIP Facility.  In addition, the Debtors have agreed on additional reporting covenants for the benefit of the Lenders, including providing Lenders the right to participate in calls with the Debtors' management and cooperate with the Debtors' financial advisors.

V.    **Evidence in Support of First Day Pleadings**[4]

48.    In my capacity as Chief Financial Officer, I believe that the relief requested in the First Day Pleadings is necessary and essential to ensuring that the Debtors' immediate needs are met, and that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of these Chapter 11 Cases.  My opinion as to the necessity of the First Day Pleadings is based upon my firsthand experience as Chief Financial Officer and

---

[4]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable First Day Pleading.

my review of various materials and information provided to me by the Debtors' senior management and the Debtors' advisors, as well as discussions had in connection therewith. In considering the necessary first-day relief, the Debtors' senior management, the Debtors' advisors, and I were cognizant of the level of cash on hand and the limitations imposed by the available cash collateral and DIP budget and, in light of these limitations, narrowed the relief requested at the outset of these Chapter 11 Cases to only those matters that require urgent relief to preserve value during the pendency of these chapter 11 proceedings.

**A.      Motions Related to Case Management**

**i.      Debtors' Motion For An Order Authorizing the Joint Administration of The Debtors' Chapter 11 Cases**

49.      The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors, and given the nature of the Debtors' operations, the treatment of certain contracts and business relationships of a single Debtor may impact the assets and operations of other Debtors. I understand that joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications and orders. I understand that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought is solely procedural and is not intended to affect substantive rights. Based on the foregoing, I believe that it would be far more efficient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration.

**ii.**   **Debtors' Motion For Entry of An Interim and Final Orders Authorizing The Debtors to (I) File a Consolidated List of Creditors In Lieu of Submitting a Separate Mailing Matrix For Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors and (III) File Under Seal Portions of The Creditor Matrix and Other Filings Containing Certain Personal Identification Information**

50.     The Debtors seek authorization to (i) file a single, consolidated list of creditors (the "Creditor Matrix") in lieu of submitting an individual mailing matrix for each Debtor, (ii) file a single, consolidated list of the Debtors' thirty largest unsecured creditors that are not insiders (the "Consolidated Top 30 Creditor List") in lieu of submitting a separate list of twenty largest creditors for each Debtor, and (iii) file under seal and redact certain personal identification information from the Creditor Matrix.

51.     The Debtors have identified a large number of entities and individuals to which numerous notices of certain matters in these Chapter 11 Cases must be provided.  Segregating the Debtors' records to a specific creditor matrix format would be an unnecessarily burdensome task and, because certain of the creditors are or may be creditors of more than one Debtor, failure to maintain a single, consolidated Creditor Matrix would result in duplicate mailings.

52.     I also believe that permitting the Debtors to file a Consolidated Top 30 List is necessary for the efficient and orderly administration of these Chapter 11 Cases, and will help alleviate administrative burdens, costs and the possibility of duplicative service because the exercise of compiling separate lists for each individual Debtor would unnecessarily consume the Debtors' and their advisors' limited time and resources.

53.     I also believe the Court should authorize the Debtors to redact personal identification information of individuals from filings in these Chapter 11 Cases, including the Debtors' equity holders and employees, because, among other reasons, such information could be used to perpetrate identity theft, stalking, or could cause the Debtors to incur liability under the

General Data Protection Regulation, exposing the Debtors to severe monetary penalties. With potentially hundreds of individual creditors, the Debtors cannot reasonably know with sufficient certainty whether a release of such individual creditors' and interest holders' personal information could potentially jeopardize their safety.

   iii. **Debtors' Motion For Entry of Order (I) Restating and Enforcing Protections of 11 U.S.C. §§ 362, 365, 525, and 541(c), (II) Approving Notice Related to Non-Debtor Affiliates, and (III) Granting Related Relief**

  54. To aid in the administration of these Chapter 11 Cases, the Debtors are seeking an order that confirms the application of four key protections provided by the Bankruptcy Code which I understand to be: (i) the automatic stay provisions of section 362; (ii) the *ipso facto* provisions of section 365; (iii) the anti-discrimination provisions of section 525; and (iv) the provisions of section 541 of the Bankruptcy Code regarding property of the estate. Because of the global nature of the Debtors' business and their dealings with non-U.S. creditors who may be unfamiliar with the protections afforded to chapter 11 debtors under the Bankruptcy Code, the Debtors are requesting an order implementing these protections be entered by this Court.

  55. The Debtors operate in numerous countries across the world with different legal systems, including India, Australia, the United Kingdom, Hungary, amongst others. Many of these non-U.S. creditors affected by sections 362, 365, 525, and 541(c) of the Bankruptcy Code are likely not aware of the significant and necessary protections these sections provide to the Debtors. Further, the "automatic" and self-executing nature of these protections may not be recognized promptly by foreign creditors or tribunals unless embodied in an order of this Court. Accordingly, the Debtors respectfully request that the Court enter an order that restates the applicable provisions of sections of the Bankruptcy Code. Such an order, which the Debtors will be able to transmit to affected parties, will maximize the protections afforded by such sections of the Bankruptcy Code.

56.      In addition, to alleviate the confusion that likely will arise concerning certain of the foreign non-Debtor affiliates, the Debtors seek approval from this Court to send a form of notice to the clients, suppliers, and other stakeholders confirming that all non-Debtor foreign affiliates are not included in these Chapter 11 Cases and are not subject to (i) the supervision of this Court or (ii) the provisions of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that this Court enter an order approving the form of notice attached to the motion.

57.      Absent the relief requested, I believe the Debtors' ability to operate seamlessly in multiple jurisdictions may be impaired to the detriment of their estates, creditors, and all parties in interest.  For at least the foregoing reasons, I believe that the relief is in the best interests of the Debtors, their estates, and creditors and should be approved.

      **iv.**      **Debtors' Motion For Interim and Final Orders Establishing Notice and Hearing Procedures For Trading in, or Certain Claims of Worthlessness With Respect to, Equity Securities in Debtor New Insight Holdings, Inc. (the "NOL Motion")**

58.      Through the NOL Motion, the Debtors seek to establish procedures to protect the potential value of the Debtors' federal tax net operating loss carryforwards ("NOLs" and, together with certain other tax attributes, the "Tax Attributes") for use during the pendency of these Chapter 11 Cases.  These procedures will apply to (i) common stock (the "Common Stock") of Dynata, LLC, and options, warrants, or similar rights (within the meaning of applicable treasury regulations) to acquire Common Stock, and (ii) any claim (for income tax reporting purposes) of a worthless stock deduction under section 165(g) of the Internal Revenue Code of 1986, as amended with respect to Common Stock (a "Worthless Stock Deduction") by a majority shareholder.

59.      The NOL Motion seeks authority to restrict trading of Common Stock and any claim of a Worthless Stock Deduction that could result in an ownership change occurring before

the effective date of a chapter 11 plan or any applicable bankruptcy court order.  Such a restriction would protect the Debtors' ability to preserve the Tax Attributes during the pendency of these Chapter 11 Cases.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.

60.     I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their business in chapter 11.

<div align="center">

**v.     Debtors' Application For Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent**

</div>

61.     The Debtors filed an application to retain Kroll Restructuring Administration LLC ("Kroll") as their Court's claims and noticing agent for these Chapter 11 Cases.  I believe that the retention of Kroll is critical because of the large number of creditors identified in these cases.

62.     I understand that Kroll is a data-processing firm with extensive experience in noticing, claims processing, and other administrative tasks in Chapter 11 cases.  I understand that, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. §156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtors obtained and reviewed engagement proposals from at least two (2) other Court-approved claims and noticing agents to ensure selection through a competitive process.  I believe that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.  Given the need for the services described above and Kroll's expertise in providing such services, I believe that retaining Kroll will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their Chapter 11 efforts.

63.     The Debtors also intend to file a separate application to retain Kroll as administrative agent to provide, among other things, certain solicitation-related services.

**B.**     **Motions Related to Operations**

    **i.**     **Debtors' Motion For Interim and Final Orders (I) Authorizing the Debtors to (A) Continue and Maintain Their Cash Management System, Including Bank Accounts and Business Forms, (B) Continue Intercompany Transactions, and (C) Honor Certain Prepetition Obligations Related Thereto, (II) Waiving Certain Operating Guidelines, (III) Extending the Time to Comply with Section 345(b) of the Bankruptcy Code, and (IV) Granting Related Relief**

64.     In the ordinary course of their business prior to the Petition Date, as is typical with businesses of similar size and scope, the Debtors maintain a centralized cash management system (the "Cash Management System") to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions accurately.  To support their operations, the Debtors maintain a total of eight (8) bank accounts at two different banks: Wells Fargo & Company and Western Alliance Bank (each, a "Bank," and collectively, the "Banks").  Specifically relating to the Debtors, the Debtors' maintain six (6) operating accounts, one (1) cash collateral account and one (1) flexible spending account with the Banks.  Additionally, the Debtors provide certain employees with access to company credit cards under a corporate credit card program to cover certain payments for necessary and approved company expenditures.

65.     Moreover, in the ordinary course of business, the Debtors engage in routine intercompany transactions among themselves and with their Non-Debtor Foreign Affiliates (the "Intercompany Transactions") related to, among other things, intercompany funding and loans, which may result in intercompany receivables and payables owing between the Debtors and the Debtors and their Non-Debtor Foreign Affiliates.  These Intercompany Transactions are essential to the Debtors' foreign business operations and are consistent with past practices by and amongst the Debtors and their Non-Debtor Foreign Affiliates.  The Cash Management System enables the Debtors to pay their financial obligations, centrally control and monitor corporate funds and available cash, reduce administrative overhead expenses, and record accurate financial data.

66.    It is my understanding that the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts (which must be designated debtor in possession bank accounts) and obtain, establish, and maintain separate debtor in possession accounts.  I also understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment, and reporting requirements.

67.    The Debtors are requesting authorization to maintain their existing Cash Management System.  I believe that the Debtors' existing cash management and intercompany accounting procedures are essential to the orderly operation of the Debtors' business.  Any material interruption in the Debtors' existing Cash Management System could cause immediate and irreparable harm, confusion, disrupt payroll, introduce inefficiency into the Debtors' operations when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could potentially negatively impact creditor recoveries in these Chapter 11 Cases.  Moreover, it is my understanding that all of the Debtors' Banks are authorized depositories under the U.S. Trustee Guidelines.

68.    It is also my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to utilize new checks bearing the designation "Debtor in Possession" and the case number for the debtor in possession accounts.  The Debtors request authority to continue using their existing business forms without interference to their status as debtors in possession until such forms are depleted, after which the Debtors intend to begin stamping or printing their business forms with "Debtor in Possession" and the chapter 11 case numbers under which these cases are being administered.

69.     Finally, the Debtors also seek authority to continue performing, in their discretion, under the Intercompany Transactions, including with respect to transactions involving the Non-Debtor Foreign Affiliates, and to grant administrative expense status to obligations arising out of intercompany claims consistent and in accordance with historical practice.  The Debtors' businesses are operationally and functionally linked to those of their Non-Debtor Foreign Affiliates.  These Intercompany Transactions promote efficiency and ensure that the Debtors and their non-Debtor subsidiaries operate in an orderly fashion.

70.     I believe that allowing the Debtors to maintain their Cash Management System, continue Intercompany Transactions, continue to use their customary business forms and modify certain requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines would be in the best interests of the Debtors' estates, creditors, and other parties in interest.

> **ii.     Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief**

71.     In the ordinary course of their business, the Debtors engage in a number of practices to develop, support, and sustain a positive reputation with their clients and in the marketplace generally (collectively, the "Customer Programs").  The Customer Programs include, but are not limited to, Rebate Programs.

72.     To effectuate a smooth transition into chapter 11, the Debtors must maintain client loyalty and goodwill by continuing to honor their obligations under the Customer Programs.  The Debtors have implemented each of the Customer Programs in the ordinary course of business as a means to maintain positive, productive, and profitable relationships with their clients, which is required to remain competitive.  I believe that the failure to maintain the Customer Programs would cause immediate and irreparable harm to the Debtors, as such failure would likely cause the

Debtors to lose clients, which in turn would prevent the Debtors from maximizing their going concern value through the sale process.

73.     The Debtors seek authority to continue the Customer Programs in the ordinary course of business and to honor obligations arising out of the Customer Programs, regardless of when they arose, to avoid any harm or disruption to their business.  I believe that the continuation of the Customer Programs is necessary to preserve the Debtors' critical client relationships and is in the best interests of the Debtors and their estates.

> **iii.     Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wage Motion</u>")**

74.     The Debtors have filed a motion seeking authority to, among other things, (a) pay all prepetition wages, salaries and compensation to employees, incentive payments and payments owed under historical severance practices, and all related administrative and incidental costs (collectively, the "<u>Compensation Obligations</u>") and prepetition employee benefits (collectively, the "<u>Employee Benefit Obligations</u>"); (b) pay all employment, unemployment, Social Security, and federal, state, and local taxes relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "<u>Payroll Taxes</u>"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, garnishments and voluntary deductions (collectively with the Payroll Taxes, the Compensation Obligations and Employee Benefit Obligations, the "<u>Prepetition Workforce Obligations</u>")); and (c) honor and continue the Debtors' prepetition programs, policies and practices as described herein and in the motion in the ordinary course of business.

75.     Moreover, as is customary with businesses of similar size, the Debtors have established various employee benefit plans, programs, and policies, including: (a) medical, dental, and vision insurance; (b) vacation and personal days; (c) a 401(k) retirement plan; (d) expense reimbursement; (e) life and accidental death & dismemberment insurance, short-term and long-term disability insurance, critical illness insurance, and benefits to certain former Employees after their termination, retirement, or disability leave, including, but not limited to, benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985; and (f) certain benefits available for Employees to opt-in at their discretion.  The Debtors seek authority to pay prepetition obligations relating to these policies, and to continue these policies postpetition.

76.     Moreover, in the ordinary course of business, the Debtors maintain several incentive and bonus programs (the "Commission Program") to drive performance and retention among their non-insider Employees, including a commission compensation plan for the Debtors' sales teams.  Additionally, the Debtors have historically maintained a bonus program for non-insider full-time employees (the "Bonus Program"), which is calculated as a percentage of the Employees' salary, and dependent upon the Employees' performance as well as the Debtors' performance and ultimate revenue for the given year.  The Debtors seek authority to continue the Commission Program and Bonus Program in the ordinary course of business and pay any prepetition amounts owed to the Employees in connection therewith.

77.     Prior to the Petition Date, the Debtors implemented a retention bonus program for 14 key non-insiders (the "Non-Insider Retention Bonus Program").  I believe that none of the employees under the  Non-Insider Retention Bonus Program are "insiders" as that term is defined in 101(31) of the Bankruptcy Code.  The Debtors seek authority to make any outstanding Non-Insider Retention Program obligations as they come due in the ordinary course.

78.     The requested authority to continue to pay their Prepetition Workforce Obligations and to maintain their current employee benefits programs is critical to ensure that the Debtors can retain personnel knowledgeable about the Debtors' business, the Debtors' employees continue to provide quality services to the Debtors at a time when they are needed most, and the Debtors remain competitive with comparable employers.

79.     The proposed interim and final orders, if entered, will grant the Debtors the authority to pay the Prepetition Workforce Obligations in accordance with the Debtors' prepetition practices; provided, however, that no single employee shall be entitled to receive more than $15,150 on account of prepetition employee obligations, except to the extent required under applicable state law.

80.     I believe that the failure to maintain the Customer Programs would cause immediate and irreparable harm to the Debtors as it would result in significant deterioration in morale among employees, which undoubtedly would have a devastating impact on the Debtors.  The Debtors' ability to run their business productively depends entirely on the expertise and continued support and service of their workforce.  Due to the disruption and uncertainty that typically accompany a chapter 11 filing, I believe that the continuity and competence of their workforce would be jeopardized if the relief requested herein is not granted.

81.     I believe that the authority to pay the Prepetition Workforce Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates.

iv.    **Debtors' Motion For Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Resolving Objections By Utility Companies and Determining Any Additional Adequate Assurance of Payment, and (IV) Granting Related Relief**

82.    In connection with the operation of their business and the management of their headquarters, the Debtors obtain utility services (collectively, the "Utility Services") from various utility companies (collectively, the "Utility Companies").  Pursuant to certain of the Debtors' lease agreements, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments.  The Debtors are not seeking relief as to such leases.  Among other things, the Debtors request that the Court: (a) prohibit the Utility Companies from altering, refusing, or discontinuing the Utility Services on account of non-payment for prepetition services, including the making of demands for security deposits or accelerated payment terms; (b) determine that the Debtors have provided each of the Utility Companies with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based on the Debtors' establishment of a segregated account in the amount of $39,624.70, which equals 50% of the Debtors' estimated monthly cost of the Utility Services subsequent to the Petition Date; and (c) establish procedures for determining additional adequate assurance of future payment, if any, and authorizing the Debtors to provide additional adequate assurance of future payment to the Utility Companies.

83.    Uninterrupted Utility Services are essential to the Debtors' business operations and the overall success of these Chapter 11 Cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, causing immediate and irreparable harm.  Accordingly, it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.  I believe that the relief requested in the

Utilities Motion is in the best interest of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

> **v.     Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief**

84.     In the ordinary course of business, the Debtors incur or collect and remit certain taxes, including income, franchise, property taxes, sales and use taxes, and various other similar taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various foreign, federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies (the "Taxing Authorities").  Payment of the Taxes and Fees is critical to the Debtors' continued, uninterrupted operations.  Further, the Debtors' failure to pay the Taxes and Fees may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors.

85.     Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business could cause immediate and irreparable harm and could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the motion.  I believe that payment of the Taxes and Fees in an amount not to exceed $78,000 upon entry of the Interim Order and relief requested in the Final Order is in the best interests of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

      **vi.**    **Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Their Insurance Policies and Pay All Obligations in Respect Thereof, (II) Authorizing the Debtors' Banks and Other Financial Institutions to Honor and Process Checks and Transfers Related Thereto, and (III) Granting Related Relief**

86.      In the ordinary course of business, the Debtors maintain various Insurance Policies administered by third-party Insurance Carriers.  The Insurance Policies provide coverage for, among other things: commercial general liability, directors' and officers' liability (including tail coverage), cyber liability, workers compensation, and business auto coverage.

87.      The Insurance Policies are essential to the ongoing operation of the Debtors' businesses.  The annual premiums for the Insurance Policies total approximately $1,000,000 in the aggregate.  The Debtors pay all premiums on an annual basis.  The Debtors seek authority to honor any prepetition obligations owing on account of the Insurance Policies in the ordinary course of business as they become due to ensure uninterrupted coverage thereunder.

88.      The Debtors also obtain certain of their Insurance Policies through a Broker.  The Broker, among other things: (i) manages renewal data; (ii) assists the Debtors with the procurement and negotiation of the Insurance Policies; (iii) markets the Insurance Policies; (iv) enables the Debtors to obtain such policies on advantageous terms at competitive rates under the Premium Financing Agreement; and (v) provides ongoing support throughout the applicable policy periods.  The Debtors do not pay the Broker directly for its services.  Instead, in accordance with the relevant insurance policy, the Broker may receive surplus lines brokers fees directly from the Insurance Carriers.

89.      The Debtors' ability to maintain the Insurance Policies and renew, supplement, and modify the same as needed in the ordinary course of business is essential to preserving the value of the Debtors' businesses, operations, and assets.  Moreover, in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors'

commercial activities, including the requirements of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, the Debtors seek authorization to maintain the Insurance Policies, pay related prepetition obligations, renew, supplement, or modify the Insurance Policies as needed, and enter into new insurance policies in the ordinary course of business. I believe the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will avoid immediate and irreparable harm, and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

      **vii.** **Motion of Debtors For Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business, and (II) Granting Related Relief ("All-Trade Motion")**

90.     The Debtors have filed a motion seeking authority to pay allowed prepetition claims for goods and services related to the Debtors' operations and other ordinary course operational expenses and claims of creditors in the ordinary course of business. The Debtors' Trade Creditors provide the Debtors with essential goods and services that facilitate their operations. The Trade Claims include claims of (i) suppliers of underlying raw data the Debtors need to provide data insights; (ii) reward balances owed as incentives to panelists who supply raw data sourced through surveys or panels, which are ultimately purchased by clients; (iii) service providers who provide the Debtors with certain services that are critical to the Debtors' upkeep of their business infrastructure; (iv) vendors who provide essential maintenance services, global regulatory compliance, and other operational needs of the Debtors; (v) third party contracts that provide the company information technology, software development, human resources, data analytics and marketing, among other areas of focus; (vi) third party freight and common carriers, including trucking services, air transport and rail carriers; (vii) utilities; and (viii) business services vendors and other general operational providers that are not addressed in other first day motions.

91.     Failure to fulfill these Trade Claims could lead to disruption to the Debtors' timely receipt of necessary services, which could create immediate and irreparable harm to the Debtors' operations and ability to meet their commitments in the ordinary course.  I believe it is imperative that the Debtors maintain positive relationships with the providers of the goods and services essential to their business operations throughout these cases.  Accordingly, I believe that the relief requested in the All-Trade Motion is in the best interests of the Debtors and their estates, and furthers the Debtors' overarching restructuring goals to maximize the value of the estates.

      **C.**      **Motions Related to Financing Process**

          i.      **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Senior Secured Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Schedule Final Hearing, and (VII) Granting Related Relief**

92.     Concurrently herewith, the Debtors filed a motion seeking authority to enter into a debtor-in-possession financing arrangement (the "DIP Facility") with the DIP Secured Parties. The DIP Facility would provide the Debtors with total financing of up to $31.5 million in new money term loans which shall be made available upon entry of the Interim Order, in each case in accordance with the Approved Budget.

93.     As explained in greater detail in the motion and supporting declaration, the Debtors are in need of financing to continue their operations.  Access to the DIP Facility, coupled with the Debtors' continued use of cash collateral, will provide the necessary liquidity to fund the Debtors' operating, working capital and other needs during these Chapter 11 Cases.

94.     I believe that access to the funds available under the DIP Facility are crucial to avoid immediate and irreparable harm to the Debtors' estates.  Moreover, I also believe that the terms of the DIP Facility are reasonable as they include favorable pricing, reasonable adequate

protection measures for the prepetition secured creditors' interests and reasonable fees.  I also believe that the terms of the DIP Facility were negotiated at arms' length and in good faith.

95.     For the foregoing reasons, I believe that the DIP Facility and the Debtors' use of cash collateral embodies the best available financing under these circumstances and that entry into the DIP Facility, coupled with consensual use of cash collateral, is in the best interests of the Debtors and their estates.

<p style="text-align:center">*     *     *</p>

96.     I have reviewed each of the First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Motions: (i) as applicable, is necessary to avoid immediate and irreparable harm; (ii) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations; and (iii) is in the best interests of the Debtors and their stakeholders.

## CONCLUSION

97.     For the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, along with such other and further relief as the Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed: May 22, 2024

/s/ Steven Macri
Steven Macri
Chief Financial Officer

## Exhibit A

## Organizational Chart



Insight Holdings (DE), LP (U.S.)
HGGC Saber Topco LLC (U.S.)
dynata
60%
40%
Legend
= Debtors
= Obligor / Guarantor of 1L and 2L Credit Agreements
= Non-Debtors
New Insight Holdings, Inc. (U.S.)
Unless otherwise indicated, ownership percentage is 100%.
New Insight Intermediate Holdings, Inc. (U.S.)
Dynata Holdings Corp. (U.S.)
Instantly, Inc. (U.S.)
Research Now Group, LLC (U.S.)
SSI/Opinionology Interco LLC (U.S.)
Dynata Philippines Inc. (Philippines)
iPinion, Inc. (U.S.)
Research Now, Inc. (U.S.)
SSI Holdings, LLC (U.S.)
0.01%
0.01%
0.2%
Dynata, LLC (U.S.)
99.99%
99.99%
99.8%
Survey Sampling Intl. Hyperabad Private Ltd. (India)
SSA do Brasil Pesquisa de Mercado Ltda (Brazil)
Survey Sampling International Service Company S. de R.L. de C.V. (Mexico)
Instantly Research (India) Pvt. Ltd. (India)
New Insight International, Inc. (U.S.)
Critical Mix GmbH (Germany)
inBrain Holdings, LLC (U.S.)
Imperium, LLC (U.S.)
Branded Research, Inc. (U.S.)
Dynata Bulgaria EOOD (Bulgaria)
e-Rewards Bidco Limited (U.K.)
Dynata Romania S.R.L. (Romania)
Dynata Hungary Kft (Hungary)
Dynata Denmark ApS (Denmark)
Dynata Global UK Limited (U.K.)
inBrain, LLC (U.S.)
Apps That Pay, LLC (U.S.)
ScreenLift.io, LLC (U.S.)
Dynata Netherlands BV (Netherlands)
Research Now DE I, LLC (U.S.)
Dynata Sinapore Pte. Ltd. (Singapore)
Research Now Japan G.K. (Japan)
Research Now DE II, LLC (U.S.)
Research Now India Pvt Ltd. (India)
93%
Dynata Hong Kong Limited (Hong Kong)
Dynata Global AU Pty Ltd. (Australia)
Dynata (Beijing) Co., Ltd. (China)
Dynata Europe, BV (Netherlands)
Dynata Italy S.r.l. (Italy)
SSI Asia BV (Netherlands)
Dynata Global Spain S.L.U. (Spain)
Dynata GmbH (Germany)
Dynata France SASU (France)
Dynata Inc. (Canada)
Survey Sampling Japan GK (Japan)
Dynata Korea Ltd. (Korea)
Dynata Sweden AB (Sweden)
Dynata Deutschland GmbH (Germany)
Dynata Pty Limited (New Zealand)

## **Exhibit B**

**Restructuring Support Agreement**

DYNATA, LLC

RESEARCH NOW GROUP, LLC

RESTRUCTURING SUPPORT AGREEMENT

May 21, 2024

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED, AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES, OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and including all exhibits, annexes, and schedules hereto in accordance with Section 15, this "**Agreement**") is made and entered into as of May 21, 2024 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**"):[1]

    i.    New Insight Holdings, Inc., a company incorporated under the Laws of Delaware ("**Parent**"), and each of its Affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement in accordance with this Agreement (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold the First Lien Term Loans that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement in accordance with this Agreement (the Entities in this clause (ii), collectively, the "**Consenting First Lien Term Loan Lenders**");

    iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold the Revolving Credit Loans that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement in accordance with this Agreement (the Entities in this clause (iii) collectively, the "**Consenting Revolving Credit Lenders**[2]", and, together with the Consenting First Lien Term Loan Lenders, the "**Consenting First Lien Lenders**");

    iv.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold the Second Lien Term Loans that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement in accordance with this Agreement (the Entities in this clause (iii) collectively, the "**Consenting Second Lien Term Loan Lenders**" and, together with the Consenting First Lien Term Loan Lenders and the Consenting Revolving Credit Lenders, collectively, the "**Consenting Lenders**"); and

    v.    Court Square Capital Partners, Court Square Capital Partners III, L.P., Court Square Capital Partners III-A, L.P., Court Square Capital Partners (Offshore) III, L.P. Capital Court Square Capital Partners (Executive) III, L.P., HGGC Saber Topco

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 of this Agreement.

[2] For the avoidance of doubt, any Affiliates or related parties of any Consenting Revolving Credit Lender (including any separate branch of a Consenting Revolving Credit Lender) shall not be deemed to be Consenting Revolving Credit Lenders themselves, unless such Affiliate or related party has itself signed this Agreement. The Consenting Revolving Credit Lenders are signing this Agreement only in their capacity as holders of Revolving Credit Loan Claims (both currently owned and that may be acquired after the Agreement Effective Date (subject to the terms of Section 10 hereto)), and this Agreement does not cover any other Company Claims/Interests other than the Revolving Credit Loan Claims that are now owned or subsequently acquired by the Consenting Revolving Credit Lenders; provided that the Consenting Revolving Credit Lenders may execute separate signature pages to this Agreement on behalf of their other Company Claims/Interests, if any.

LLC, HGGC, LLC, HGGC Fund II, L.P, HGGC Fund II-A, L.P., HGGC Fund II-B, L.P., HGGC Fund II-C, L.P., HGGC Fund II-D, L.P., HGGC Associates Fund II, L.P. and HGGG Affiliate Investors II, L.P. (the "**Sponsors**" and, together with the Consenting First Lien Term Loan Lenders, the Consenting Revolving Credit Lenders and the Consenting Second Lien Term Loan Lenders, the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Restructuring Transactions shall be implemented through a chapter 11 plan of reorganization (the "**Chapter 11 Plan**") to be implemented through the commencement by certain of the Company Parties of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### *AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

1.01.    Definitions.  The following terms shall have the following definitions:

"**Administrative Expense Claim**" refers to any right to payment constituting a cost or expense of administration incurred during these Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Plan Effective Date of preserving the estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Transaction**" means any solicited or unsolicited written or oral plan, inquiry, proposal, offer, bid, term sheet, discussion or agreement with respect to a dissolution, winding up, liquidation, receivership, assignment for the benefit of creditors, restructuring, reorganization, workout, exchange, extension, sale, disposition, merger, amalgamation, acquisition, consolidation, partnership, plan of arrangement, plan of reorganization, plan of liquidation, investment, debt investment, equity investment, tender offer, refinancing, recapitalization, share exchange, business combination, joint venture, or similar transaction to any of the foregoing involving all or a subset of the Company Parties and their respective subsidiaries and debt and/or equity interests; provided, however, that the Restructuring Transactions shall not individually or collectively be considered an Alternative Transaction so long as such transactions are consistent in all respects with the terms of this Agreement or otherwise consented to in an advance written communication by the Required Consenting First Lien Lenders and the Required Consenting Second Lien Lenders.

"**Ameritest Earnout**" means any "Earn-Out Payment" as defined in and provided by that certain Asset Purchase Agreement, dated as of December 1, 2021 between CY Research, Inc and Hello-Hello Inc., as Sellers, Charles Young, Norma Young, Christopher Young and Paul Young, as Indemnifying Owners, and Dynata, LLC, as Buyer.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Branded Research Seller Note Claim**" means any Claim related to or arising out of (i) that certain Second Amended and Restated Promissory Note, dated April 26, 2023, issued by Dynata, LLC to Matthew Gaffney in an amount of $46,500,000.00 or (ii) that certain Promissory Note, dated April 26, 2023, issued by Dynata, LLC to Matthew Gaffney in an amount of $6,765,000.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"**Causes of Action**" means any claims, cross claims, third-party claims, interests, damages, judgments, remedies, causes of action, controversies, debts, demands, rights, actions, suits,

obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, pursuant to any other theory of law or otherwise.

"**Change of Control Payments**" means any bonus or similar payment to any current or former officer or employee of the Company Parties, or any other individual, triggered by a "change of control" transaction, including, but not limited to (x) any payment triggered by a "Change in Control Transaction" as defined in that certain Stockholders Agreement, dated as of December 20, 2027, by and among New Insight Holdings, Inc., Insight Holdings (DE), LP, HGGC Saber Topco LLC and the other Persons party thereto, and (y) any "Sale Bonus" as defined in that certain Employment Agreement, dated as of September 20, 2023, between New Insight Holdings, Inc. and Michael Petrullo.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Plan**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Claims, the Second Lien Term Loan Claims, and the Equity Interests held by the Sponsor.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Termination Event**" has the meaning set forth in Section 14.05.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Chapter 11 Plan under section 1129 of the Bankruptcy Code, which Confirmation Order shall be (i) in accordance with this Agreement and the Definitive Documents and (ii) a Final Order.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Term Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Revolving Credit Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Second Lien Term Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means all definitive documents, instruments, deeds, notifications, agreements, and filings related to documentation, implementation, and consummation of the Chapter 11 Plan or the in-court Restructuring Transactions generally, including, without limitation: (i) the In-Court Solicitation Materials; (ii) the Exit Facilities Documents; (iii) the New ABL Facility; (iv) the Chapter 11 Plan; (v) the Confirmation Order; (vi) the Disclosure Statement Motion; (vii) the Disclosure Statement; (viii) the Disclosure Statement Order; (ix) all material pleadings and motions filed by the Company Parties in connection with these Chapter 11 Cases, including the First Day Pleadings and all orders sought pursuant thereto; (x) the Plan Supplement (including, but not limited to, any restructuring transactions memorandum and/or schedule(s) to assume or reject unexpired leases and executory contracts); (k) the DIP Orders and any motions seeking entry of the DIP Orders; (xi) the DIP Facility Documentation; (xii) the New Corporate Governance Documents; (n) the New Common Stock Documents; (o) agreements governing the New Warrants; (xiii) any Management Incentive Plan; (xiv) any and all agreements or documents governing any key employee incentive or retentive programs, including employment and/or other benefit or severance agreements; and (xv) all filings and requests for regulatory or other approvals from any governmental entity or unit necessary to be obtained by the Company Parties to implement the Restructuring Transactions; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable). For the avoidance of doubt, Consenting Stakeholder consent shall not be required for the filing of any ministerial notices and similar ministerial documents, retention applications, fee applications, fee statements, similar pleadings or motions relating to the retention or fees of any professional, or statements of financial affairs and schedules of assets and liabilities. All Definitive Documents shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

"**DIP Budget**" means the budget for the Company Parties' use of the DIP Facility and/or Cash Collateral as contemplated by the DIP Orders, which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

"**DIP Facility**" means any debtor-in-possession financing facility approved pursuant to the DIP Orders.

"**DIP Facility Documentation**" means any documents governing the DIP Facility that are entered into in accordance with the Restructuring Term Sheet the DIP Orders and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, fee letters, guarantees and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

6

"**DIP Orders**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms for the use of Cash Collateral and/or the DIP Facility, which shall be consistent in all material respects with the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Chapter 11 Plan in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure, and other applicable Law, including all exhibits, annexes, schedules, and supplements thereto, each as may be amended, supplemented, or modified from time to time.

"**Disclosure Statement Motion**" means the motion filed with the Bankruptcy Court seeking entry of an order scheduling a combined hearing with respect to confirmation of the Chapter 11 Plan and approval of the Disclosure Statement.

"**Disclosure Statement Order**" means the order (and all exhibits thereto) entered by the Bankruptcy Court approving the adequacy of information in the Disclosure Statement and, to the extent necessary, approving the In-Court Solicitation Materials and the solicitation of votes on the Chapter 11 Plan, which order may be the Confirmation Order.

"**Earnout Payment Claims**" means any Claim arising from or related to the Ameritest Earnout, the Optimus Earnout or the inBrain Earnout.

"**EMEA RCF Agreement**" means that certain Receivables Financing Agreement, dated July 28, 2023, between Leumi UK Group Limited and Dynata Global UK Ltd.

"**EMEA RCF Claim**" means any Claim arising from or related to the EMEA RCF Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof) of common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party (regardless of whether such interests are held directly or indirectly), and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement and regardless of whether such interests are held directly or indirectly).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Credit Agreements**" means the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement.

"**Existing First Lien Credit Agreement**" means that certain First Lien Credit Agreement (as supplemented, amended, amended and restated, or modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a

Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto, and Goldman Sachs Bank USA, as Administrative Agent.

"**Existing Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement (as supplemented, amended, amended and restated, or modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto, and Acquiom Agency Services LLC, as Administrative Agent and any successor thereto.

"**Exit Facilities**" means the Exit Term Loan Facilities and the New ABL Facility.

"**Exit Facilities Documents**" means the credit agreements governing the Exit Facilities and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**Exit Term Loan Facilities**" means the First Out Term Loan Facility and Second Out Exit Term Loan Facility (each as defined in the Restructuring Term Sheet).

"**Fee Claim**" refers to the reasonable and documented fees, costs and out-of-pocket expenses incurred on or after the Petition Date through the Effective Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in these Chapter 11 Cases.

"**Final Order**" means, as applicable, an order or judgment of any court of competent jurisdiction, including the Bankruptcy Court, with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**First Day Pleadings**" means any first-day and second-day pleadings that the Company Parties determine, in consultation with the Required Consenting First Lien Lenders, are necessary or desirable to file with the Bankruptcy Court.

"**First Lien Ad Hoc Group**" means an ad hoc group of Consenting Lenders represented by the First Lien Ad Hoc Group Advisors.

"**First Lien Ad Hoc Group Advisors**" means, collectively, (i) Gibson, Dunn & Crutcher LLP, as counsel to the First Lien Ad Hoc Group, (ii) PJT Partners LP, as financial advisor to the First Lien Ad Hoc Group, (iii) Mercer (US) LLC, as executive compensation advisor, (iv) Klerh Harrison Harvey Branzburg LLP, as Delaware counsel to the First Lien Ad Hoc Group, (v) any other local or foreign counsels to the First Lien Ad Hoc Group, and (vi) any other professionals or advisors retained by the First Lien Ad Hoc Group.

"**First Lien Ad Hoc Group Steering Committee**" means the members of the First Lien Ad Hoc Group that executed Confidentiality Agreements with the Company Parties on or about January 17, 2024.

"**First Lien Agent's Counsel**" means Cahill Gordon & Reindel LLP and Richards Layton & Finger, PA, in their capacities as counsel to the Administrative Agent and Collateral Agent under the Existing First Lien Credit Agreement.

"**First Lien Claims**" means the First Lien Term Loan Claims and the Revolving Credit Loan Claims.

"**First Lien Term Loans**" means any term loan made and outstanding under the Existing First Lien Credit Agreement (including for the avoidance of doubt, the Initial Term Loans, the Other Term Loans, and the Incremental Term Loans, each as defined in the Existing First Lien Credit Agreement).

"**First Lien Term Loan Claims**" means any Claim against the Company Parties arising from or relating to the First Lien Term Loans, including any accrued and unpaid interest, premiums (if any), fees, makewholes (if any), and other expenses arising under the Existing First Lien Credit Agreement.

"**First Lien Term Loan Lenders**" means the several banks and other financial institutions or entities from time to time party to the Existing First Lien Credit Agreement as lenders of the First Lien Term Loans.

"**First Lien Termination Event**" has the meaning set forth in Section 14.01.

"**inBrain Earnout**" means any "Earn-Out Payment" as defined in and provided by that certain Membership Interest Purchase Agreement, dated as of July 30, 2021 between Jason Schubert and William Schubert, as Sellers, inBrain Holdings, LLC, as the Company, and Dynata, LLC, as Buyer.

"**In-Court Solicitation**" means the solicitation of votes in connection with the confirmation of the Chapter 11 Plan, pursuant to sections 1125 and 1126 of the Bankruptcy Code and other applicable law.

"**In-Court Solicitation Materials**" means all solicitation materials in respect of the Chapter 11 Plan, including all documents, forms, ballots, notices, and other materials, which materials may be in the form of the Disclosure Statement, and which shall be in form and substance consistent with this Agreement.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction.

"**Loan Documents**" means, collectively, the Existing Credit Agreements and all other agreements, documents, and instruments with respect to the First Lien Term Loans, Second Lien Term Loans and Revolving Credit Loans, including any security agreements, pledge and collateral agreements, guaranty agreements, and intercreditor agreements.

"**Management Incentive Plan**" has the meaning set forth in the Restructuring Term Sheet.

"**Milestones**" means the milestones set forth in Section 5 of this Agreement.

"**New ABL Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**New Common Stock**" means a single class of common equity interests issued by the reorganized Parent on the Plan Effective Date, as applicable.

"**New Common Stock Documents**" means the documentation governing the New Common Stock and the issuance thereof.

"**New Corporate Governance Documents**" has the meaning set forth in the Restructuring Term Sheet.

"**New Credit Agreement**" means the agreement governing the New Credit Facility.

"**New Credit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**New Credit Facility Documents**" means the documents governing the New Credit Facility and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, the New Credit Agreement, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**New Warrants**" has the meaning set forth in the Restructuring Term Sheet.

"**Optimus Earnout**" means any "Earn-Out Payment" as defined in and provided by that certain Asset Purchase Agreement, dated as of December 1, 2021 between 0ptimus Analytics, LLC, as Seller, Scott Tranter, as Indemnifying Owner, and Dynata, LLC, as Buyer.

"**Parent**" has the meaning set forth in the preamble to this Agreement.

"**Participating Claims**" means any Company Claims/Interests now owned or hereafter acquired, in each case that are subject to the terms of this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 10.01.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the first date on which any of the Company Parties commences a Chapter 11 Case.

"**Plan Effective Date**" means the date on which all conditions to consummation of the Chapter 11 Plan have been satisfied or waived in full, and the Chapter 11 Plan becomes effective.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Chapter 11 Plan.

"**Public Disclosure**" has the meaning set forth in Section 16.23.

"**Qualified Marketmaker**" means an Entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Term Loan Lenders (i) holding at least 50.01% of the aggregate combined outstanding principal amount of the First Lien Claims that are that are held by the Consenting First Lien Term Loan Lenders and (ii) constituting at least half of the Consenting First Lien Term Loan Lenders that are members of the First Lien Ad Hoc Group Steering Committee. A Consenting First Lien Term Loan Lender and its Affiliates who are subject to this Agreement shall be deemed to collectively constitute one (1) Consenting Lender for purposes of clause (ii) of this definition.

"**Required Consenting Revolving Credit Lenders**" means, as of the relevant date, Consenting Revolving Credit Lenders holding at least 50.01% of the aggregate combined outstanding principal amount of the Revolving Credit Loans that are held by the Consenting Revolving Credit Lenders.

"**Required Consenting Second Lien Lenders**" means, as of the relevant date, Consenting Second Lien Term Loan Lenders (i) holding at least 50.01% of the aggregate combined outstanding principal amount of the Second Lien Term Loans that are held by the Second Lien Ad Hoc Group and (ii) constituting at least two of the Consenting Second Lien Term Loan Lenders that are members of the Second Lien Ad Hoc Group. A Consenting Second Lien Term Loan Lender and its Affiliates who are subject to this Agreement shall be deemed to be collectively constitute one (1) Consenting Second Lien Term Loan Lender for purposes of clause (ii) of this definition.

"**Required Consenting Stakeholders**" means, collectively, the (i) Required Consenting First Lien Lenders, (ii) Required Consenting Second Lien Lenders, and (iii) the Sponsors.

"**Restructuring Expenses**" means the reasonable and documented fees and out-of-pocket expenses of the (i) First Lien Ad Hoc Group Advisors (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court; provided that any and all fixed monthly fees, restructuring fees, liability

management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in an engagement or fee letter between the Debtors and any First Lien Ad Hoc Group Advisor, (ii) First Lien Agent's Counsel (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable), (iii) the Second Lien Ad Hoc Group Advisors, (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court; *provided* that any and all fixed monthly fees, restructuring fees, liability management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in an engagement or fee letter between any Company Party and any Second Lien Ad Hoc Group Advisor, (iv) Second Lien Agent's Counsel (including, in each case, fees and expenses incurred before, on, or after the Petition date, to the extent applicable), and (v) one lead counsel to the Sponsors.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Revolving Credit Lender**" means the several banks and other financial institutions or entities from time to time party to the Existing First Lien Credit Agreement as lenders of the Revolving Credit Loans.

"**Revolving Credit Loan Claims**" means all claims held by the Revolving Credit Lenders, in their capacities as such, derived from, based upon, or secured pursuant to the Existing First Lien Credit Agreement and the "Loan Documents" (as defined in the Existing First Lien Credit Agreement), including any aggregate principal amount outstanding, plus all interest, fees, expenses, costs, and other charges arising under or related to the Obligations (as defined in the Existing First Lien Credit Agreement), but excluding, for the avoidance of doubt, any First Lien Term Loan Claims.

"**Revolving Credit Loans**" means any revolving loan made and outstanding pursuant to a "Revolving Commitment" under and as defined the Existing First Lien Credit Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Ad Hoc Group**" means an ad hoc group of Consenting Second Lien Term Loan Lenders represented by the Second Lien Ad Hoc Group Advisors.

"**Second Lien Ad Hoc Group Advisors**" means, collectively, (a) Vinson & Elkins, LLP, (ii) Lazard Freres & Co. LLC, and (iii) Morris, Nichols, Arsht & Tunnell LLP.

"**Second Lien Agent's Counsel**" means Pryor Cashman LLP and one Delaware counsel, in their capacities as counsel to the Administrative Agent and Collateral Agent under the Existing Second Lien Credit Agreement.

"**Second Lien Term Loan Claims**" means any Claim against the Company Parties arising from or relating to the Second Lien Term Loans, including any accrued and unpaid interest, premiums (if any), fees, makewholes (if any), and other expenses arising under the Existing Second Lien Credit Agreement.

"**Second Lien Term Loan Lenders**" means the several banks and other financial institutions or entities from time to time party to the Existing Second Lien Credit Agreement as lenders of the Second Lien Term Loans.

"**Second Lien Term Loans**" means any loan made and outstanding under the Existing Second Lien Credit Agreement.

"**Second Lien Termination Event**" has the meaning set forth in Section 14.02.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Date**" has the meaning set forth in Section 5.01(a).

"**Sponsor Termination Event**" has the meaning set forth in Section 14.0214.04.

"**Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Superior Proposal**" means an unsolicited Alternative Transaction that the Company Parties' board of directors shall have determined in good faith, with the written advice of counsel, constitutes a transaction that: (x) would be in the best interests of the Company Parties and their creditors as a whole, and (y) would be superior to the Restructuring Transactions for the Company Parties and their creditors as a whole.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 14.

"**Termination Event**" means either a First Lien Termination Event, a Second Lien Termination Event, a Sponsor Termination Event, or a Company Termination Event.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Tranter Settlement Payment Claim**" means any Claim against the Company Parties arising out of that certain Settlement and Mutual Release Agreement, dated May 8, 2023, between Minimus LLC, Scott Tranter and Dynata, LLC.

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "stockholders," "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein;

(j)    the use of "include" or "including" is without limitation, whether stated or not; and

(k)    any references to dates and times shall be prevailing Eastern Time, unless otherwise noted.

**Section 2.**    *Effectiveness of this Agreement*

2.01.    This Agreement shall become effective and binding upon each of the Parties immediately on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    the Company Parties shall have executed a signature page to this Agreement and delivered it to the First Lien Ad Hoc Group Advisors;

(b)      holders of at least 66.7% of the aggregate combined outstanding principal amount of First Lien Claims shall have executed counterpart signature pages of this Agreement and delivered it to counsel to the Company Parties;

(c)      holders of at least 66.7% of the aggregate combined outstanding principal amount of Second Lien Term Loan Claims shall have executed counterpart signature pages of this Agreement and delivered it to counsel to the Company Parties and the First Lien Ad Hoc Group Advisors;

(d)      each of the Sponsors shall have executed a signature page to this Agreement and delivered it to counsel to the Company Parties and to the First Lien Ad Hoc Group Advisors; and

(e)      the Company Parties shall have paid in full the then accrued Restructuring Expenses on or before the Agreement Effective Date.

2.02.    No Party or its advisors shall disclose to any other Entity (other than counsel to the Company Parties and the First Lien Ad Hoc Group Advisors) the principal amount or percentage of Claims held by any other Party (including the signature pages hereto, which shall not be publicly disclosed or filed), unless (i) the affected Consenting Stakeholder consents in writing, (ii) such information has been previously publicly disclosed, or (iii) such information is required to be disclosed by law, rule, regulation, legal, judicial, or administrative process, subpoena, court order, or by a governmental, regulatory, self-regulatory, or similar body.

**Section 3.      *Closing Conditions.***

3.01.    Consummation of the Chapter 11 Plan and occurrence of the Plan Effective Date is conditioned upon obtaining the following (in addition to any "closing condition" that is contained in any applicable Definitive Document, the "Plan Closing Conditions"):

(a)      the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order;

(b)      each document or agreement constituting the applicable Definitive Documents shall (i) have been executed and/or effectuated and remain in full force and effect, and (ii) be consistent with this Agreement, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;

(c)      the Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the transactions contemplated by the Chapter 11 Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

(d)      all governmental and third-party approvals and consents that may be necessary in connection with the transactions contemplated by the Chapter 11 Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority

that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(e)     no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the transactions contemplated by the Chapter 11 Plan;

(f)     this Agreement shall be in full force and effect, no Termination Event or event that would give rise to a Termination Event under this Agreement upon the expiration of the applicable grace period shall have occurred, and this Agreement shall not have been validly terminated prior to the Plan Effective Date;

(g)     no default or Event of Default (as defined in the DIP Orders) shall have occurred under the DIP Facility or the DIP Facility Documentation;

(h)     the New Common Stock and the New Warrants shall have been issued in accordance with the Restructuring Term Sheet;

(i)     the Company Parties shall have entered into the Exit Facility; and

(j)     the Company Parties shall have paid all Restructuring Expenses.

**Section 4.     *Definitive Documents.*** The Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation, agreement and completion.   Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with this Agreement.  The Definitive Documents, including those not executed or in a form attached to this Agreement as of the Agreement Effective Date, shall be consistent with this Agreement in all material respects and otherwise shall be acceptable in form and substance (such acceptance not to be unreasonably withheld),[3] including with respect to any amendment, modification or supplement thereto to: (i) the applicable Company Parties, (ii)  the Required Consenting First Lien Lenders, (iii) Required Consenting Second Lien Lenders, (iv) Required Consenting Revolving Credit Lenders and (v) the Sponsors;  provided, however, that for (iii) and (iv) herein, solely to the extent that such Definitive Document (or applicable portion thereof) adversely and materially affects the economic rights/entitlements, obligations or releases proposed to be granted to, or received by, the Consenting Second Lien Lenders or the Consenting Revolving Credit Lenders pursuant to this Agreement, it being understood that neither the Plan nor any other Definitive Document may modify the claim treatment to be provided to holders of the Second Lien Term Loan Claims or the Revolving Credit Loan Claims as set forth in the Restructuring Term Sheet without the consent of the Required Consenting Second Lien Lenders or Required Consenting Revolving Credit Lenders as applicable;  provided, further however, that,

---

[3]     Notwithstanding anything else herein to the contrary, the requirement that such consent may not be "unreasonably withheld" by the Required Consenting First Lien Lenders shall not apply to the DIP Budget, the DIP Orders, and any motions seeking entry of the DIP Orders, and DIP Facility Documentation.

notwithstanding the foregoing, the Parties agree that the New Warrants Agreement, reasonable and customary protections for minority equity holders in the New Corporate Governance Documents and/or New Common Stock Documents, and adequate protection in the DIP Orders shall be in form and substance reasonably acceptable to the Consenting Second Lien Lenders and the Consenting Revolving Credit Lenders as applicable; provided, further, however, that for (v) herein, solely to the extent that such Definitive Document disproportionately, materially, and directly and adversely affects the economic rights of the Sponsors.

In addition, and notwithstanding anything to the contrary herein, (1) the DIP Orders (other than as set forth above with respect to the Required Consenting Second Lien Lenders and the Required Consenting Revolving Credit Lenders ), DIP Budget, any motions seeking entry of the DIP Orders, and DIP Facility Documentation, (2) any and all agreements or documents governing any key employee incentive or retentive programs, including employment and/or other benefit or severance agreements (other than the Change of Control Payments, Earnout Payment Claims, the Tranter, Settlement Payment Claim and the Branded Research Seller Note Claims), (3) Exit Facilities Documents, or (4) the New Credit Facility Documents, such documents need to be acceptable only to the Company Parties and the Required Consenting First Lien Lenders; provided, that the Required Consenting First Lien Lenders shall consider in good faith any comments to the Exit Facilities Documents, or the New Credit Facility Documents that may be provided by the Required Consenting Revolving Credit Lenders.

**Section 5.**    *Milestones*.

5.01.    The Parties agree to take all actions necessary or appropriate to implement the Restructuring Transactions as soon as practicable in accordance with the terms and conditions set forth in this Agreement, in accordance with the following milestones ("Milestones"), which shall remain in effect unless extended or waived in writing by (i) the Required Consenting First Lien Lenders and (ii) solely with respect to an extension or waiver of the Milestone contained in Section 5.01(f) beyond 65 days after the Petition Date, the Required Consenting Second Lien Lenders:

(a)    no later than 11:59 p.m. (prevailing Eastern Time) on the calendar day immediately before the Petition Date, the Company Parties shall commence solicitation of the Chapter 11 Plan (the "Solicitation Date");

(b)    no later than May 22, 2024, the Petition Date shall have occurred;

(c)    no later than three (3) days after the Petition Date, the Bankruptcy Court shall enter, on an interim basis, the DIP Order;

(d)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall enter, on a final basis, the DIP Order;

(e)    no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall enter the Disclosure Statement Order and Confirmation Order; and

(f)    no later than fifty (50) days after the Petition Date, the Plan Effective Date shall occur and the Restructuring Transactions shall be consummated.

**Section 6.**       *Commitments of the Consenting Stakeholders.*

6.01.   <u>Affirmative Commitments</u>.     During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, in respect of all Company Claims/Interests, as applicable, subject to the terms and conditions of this Agreement, including all consent rights detailed herein, to:

(a)      support and act in good faith with the Company Parties and take all commercially reasonable actions necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      (i) not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Stakeholders' obligations under this Agreement, any Definitive Document, or the Chapter 11 Plan, as applicable, and (ii) if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Stakeholders' obligations under this Agreement, such Consenting Stakeholder shall direct such administrative agent or collateral agent (a) to cease, desist, and refrain from taking any such action, and (b) to take such action as may be necessary to effect the Restructuring Transactions; <u>provided</u> that no Consenting Stakeholder shall be required to give any notice, order, instruction, or direction to any administrative agent, or collateral agent (as applicable) or other such agent or trustee, if the Consenting Stakeholder is required to incur any out-of-pocket costs or provide any indemnity in connection therewith;

(c)      complete, enter into, and effectuate the agreed Definitive Documents (as applicable) within the timeframes contemplated herein and the Milestones in all material respects;

(d)      not, directly or indirectly, seek, solicit, support, encourage, propose, assist, consent to, vote for, or enter into or participate in any discussions or any agreement with any non-Party regarding any Alternative Transaction, and timely vote (or cause to be voted) its Claims against any Alternative Transaction;

(e)      to the extent that such Consenting Stakeholder is or becomes the holder of a First Lien Claim or a DIP Claim, elect to, and take all commercially reasonable actions in furtherance of such election, receive payment on account of such DIP Claims in the form of such Consenting Stakeholders' allocated commitment of the Exit Facilities;

(f)      to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, use commercially reasonable efforts to negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u> that no Consenting Stakeholder shall be obligated to incur any out-of-pocket costs in discharging such obligations;

(g)      refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or would interfere with the Restructuring Transactions (including encouraging another person to undertake any action prohibited by this Agreement);

(h)      act in good faith with regard to the Restructuring Transactions consistent with this Agreement;

(i)      cooperate with the Company Parties to obtain any and all required third-party governmental, regulatory, licensing, and/or other third-party approvals (including, without limitation, any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions; provided that no Consenting Stakeholder shall be obligated to incur any out-of-pocket costs in discharging such obligation;

(j)      use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other material stakeholders provided that no Consenting Stakeholder shall be obligated to incur any out-of-pocket costs in discharging such obligation; and

(k)      forbear from exercising or directing any Entity to exercise remedies on account of, any breach by any Company Party of, and any default or event of default (howsoever described) under the Existing Credit Agreements which shall or may arise as a result of, directly or indirectly: any of the steps, actions, or transactions required by, specified or contemplated in, and/or implemented by or undertaken pursuant to this Agreement.

6.02.    Negative Commitments.  During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, in respect of all of its Company Claims/Interests, subject to the terms and conditions of this Agreement, including all consent rights detailed herein, that it shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      propose, file, support, or vote for any Alternative Transaction that is inconsistent in any material respect with the Restructuring Transactions;

(c)      file with any court any motion, pleading, or other document (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement;

(d)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(e)      encourage or facilitate any Entity to do any of the foregoing.

6.03.    Chapter 11 Commitments.  Following the Petition Date, and during the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, in respect of all Company Claims/Interests, as applicable, subject to the terms and conditions of this Agreement, including all consent rights detailed herein to:

(a)      to the extent that it is permitted to vote, vote each of its Company Claims/Interests to accept the Chapter 11 Plan by delivering its duly executed and completed ballot accepting the Chapter 11 Plan on a timely basis following the commencement of the solicitation of the Chapter 11 Plan and its actual receipt of the In-Court Solicitation Materials and the related ballot;

(b)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Chapter 11 Plan, and to the extent such releases are consistent in all respects with this Agreement, elect not to opt out of the releases set forth in the Chapter 11 Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(c)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided that such votes or elections shall be immediately revoked and deemed void ab initio upon the occurrence of a Termination Date described in Section 14.01, 14.02, or 14.03; provided further that if Bankruptcy Court authority shall be required to effectuate such change or withdrawal, no Party to this Agreement shall oppose any attempt by such Party to change or withdraw such vote.

**Section 7.      *Additional Provisions Regarding Consenting Stakeholder Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (i) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in these Chapter 11 Cases (including any official committee and the United States Trustee); (ii) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (iii) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (iv) limit the rights of a Consenting Stakeholder under these Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in these Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (v) limit the ability of a Consenting Stakeholder to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof; (vi) constitute a waiver or amendment of any term or provision of the Existing Credit Agreements or any intercreditor agreement; (vii) pending consummation of the Restructuring Transactions, constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the Existing Credit Agreements; (viii) require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder; (ix) prevent a Consenting Stakeholder from taking any action that is required to comply with applicable Law; (x) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (xi) obligate a Consenting Stakeholder to deliver a vote to support the Chapter 11 Plan (or any other Restructuring Transactions) or prohibit a Consenting Stakeholder from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); provided that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void ab initio and such Consenting Stakeholder shall have the opportunity to change its vote; or (xii) require any Consenting Stakeholder to take any

action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege.

**Section 8.**        *Commitments of the Company Parties.*

8.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 9, during the Agreement Effective Period, each of the Company Parties agrees to:

(a)        Support, act in good faith, and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including (i) commencing the In-Court Solicitation pursuant to the Disclosure Statement and related In-Court Solicitation Materials, (ii) using commercially reasonable efforts to consummate the Restructuring Transactions, and (iii) obtaining entry of the Confirmation Order, approval of the applicable Definitive Documents, and consummation of the Restructuring Transactions pursuant to the Chapter 11 Plan, in each case, in accordance with the applicable Milestones unless waived in accordance with the terms hereof;

(b)        comply with the Milestones;

(c)        to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, use commercially reasonable efforts to address any such impediment, including negotiating in good faith appropriate additional or alternative provisions to address any such impediment;

(d)        use commercially reasonable efforts to obtain any and all required governmental, regulatory, licensing, and/or other third-party approvals (including, without limitation, any necessary third-party consents) necessary to implement and/or consummate the Restructuring Transactions;

(e)        negotiate in good faith to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)        use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)        pay in full, in cash, when due and payable all of the accrued Restructuring Expenses;

(h)        (i) provide to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors (solely to the extent of the  Required Consenting Second Lien Lenders' consent rights in Section 4), and the First Lien Agent's Counsel and the Required Consenting Revolving Credit Lenders (solely to the extent of the Required Consenting Revolving Credit Lenders' consent rights in Section 4) with a reasonable opportunity to review draft copies of all Definitive Documents, including, but not limited to, all material motions or pleadings, and any drafts or proposed amended version of the Chapter 11 Plan and Disclosure Statement that the Company Parties intend to file with the Bankruptcy Court, at least three (3) calendar days before the date of filing any such pleading or other document (or such shorter period as is necessary or appropriate

under the circumstances), (ii) without limiting any approval or consent rights set forth in this Agreement, consult in good faith with the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors (solely to the extent of the Required Consenting Second Lien Lenders' consent rights in Section 4), and the First Lien Agent's Counsel and the Required Consenting Revolving Credit Lenders (solely to the extent of the Required Consenting Revolving Credit Lenders' consent rights in Section 4) regarding the form and substance of any such proposed filing, (iii) not file, execute, distribute, or use (as applicable) any of the Definitive Documents unless each document is materially consistent with this Agreement and in accordance with the consent rights in Section 4), and (iv) provide draft copies of any motion or pleading that materially affects any Consenting Stakeholder to the counsel of such Consenting Stakeholders in no event less than three (3) Business Days prior to the date when the Company Parties intend to file such motion or pleading with the Bankruptcy Court; provided that in the event that such notice periods are impossible or impracticable under the circumstances, the Company Parties shall provide such draft copies to the applicable Consenting Stakeholders as soon as otherwise practicable before the date when the Company Parties intend to file any such motion or other pleading;

(i)     maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of these Chapter 11 Cases;

(j)     except as otherwise expressly set forth in this Agreement, operate their businesses and operations in the ordinary course in a manner that is consistent with its past practices and this Agreement (taking into account the Restructuring Transactions and the potential Chapter 11 Cases), and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including, without limitation, suppliers, customers, and governmental and regulatory authorities and employees);

(k)     promptly notify the First Lien Ad Hoc Group Advisors, the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel in writing (email being sufficient) after becoming aware of the commencement of any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(l)     inform the First Lien Ad Hoc Group Advisors the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel after becoming aware of (and in any event within two (2) Business Days of becoming aware): (i) a Termination Event or event that they know will, or reasonably expect is likely, to give rise to a Termination Event; (ii) any matter or circumstance that is, or is reasonably expected to be, a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) the written threat, commencement, or receipt of written notice of any material proceeding (including any insolvency proceeding, other than these Chapter 11 Cases), lawsuit, investigation, hearing, or enforcement action commenced against any Company Party; or (iv) a breach of this Agreement by any Party (including a Company Party);

(m)     use commercially reasonable efforts to actively and timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring

Transactions (including, if applicable, the Debtors' timely filing of objections or written responses in these Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions after consultation with the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group, and the Required Consenting Revolving Credit Lenders;

(n)      (i) stipulate to the allowance and amounts of First Lien Claims and Second Lien Term Loan Claims in accordance with the Restructuring Term Sheet, and to the validity and priority of the liens securing such Claims and (ii) timely file a formal objection to any motion filed with the Bankruptcy Court by a third party challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, disallowance or subordination of, any portion of the First Lien Claims or Second Lien Term Loan Claims, or the liens securing such claims (as applicable);

(o)      except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to operate its businesses and operations in the ordinary course in a manner that is consistent with its past practices and this Agreement in all material respects, use commercially reasonable efforts to preserve intact the Company Parties' business organization and material relationships with third parties (including material suppliers, material distributors, material customers, and governmental and regulatory authorities and key employees) and maintain in effect all of its material foreign, federal, state, and local licenses, permits, consents, franchises, approvals, and authorizations required to operate its business, in each case, consistent with this Agreement and the Restructuring Transactions in all material respects, and to the extent reasonably practicable and permitted by applicable law, provide updates to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel with respect to any material development in connection with any Company Party, including businesses, operations (including material changes to the cash management system, employee benefit programs, and insurance programs), material expenditures (including any payments on account of pension withdrawal liabilities or increased funding obligations of any non-debtor affiliates to the extent not provided for in the DIP Budget ), and relationships with material third parties (including, without limitation, vendors, and customers);

(p)      timely file a formal objection to (in consultation with counsel to the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group, and the First Lien Agent's Counsel) any motion, application, or proceeding filed with the Bankruptcy Court by any person seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers), (ii) converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of these Chapter 11 Cases, (iv) seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a chapter 11 plan, (v) terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset; or (vi) for relief that (a) is inconsistent with this Agreement, or (b) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions;

(q)      cause any and all of its subsidiaries to comply with the terms of this Agreement and the other Definitive Documents as if they were a party hereto and had the obligations of the Company Parties hereunder and, at the request of Consenting Stakeholders, shall use commercially

reasonable efforts to cause such subsidiaries to sign reasonable documentation (including joinder agreements) as may be required to effect the foregoing; or

(r)     provide the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel with (i) reasonable access to, during regular business hours, the non-privileged, non-confidential books, work papers, records, and materials of any Company Party, (ii) reasonable access to, during regular business hours, the personnel and advisors of any Company Party, and (iii) reasonably timely responses to all reasonable diligence requests provided by the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel.

8.02.    <u>Negative Commitments</u>.    During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     subject to the terms of Section 9, solicit, negotiate, propose, support or vote for any Alternative Transaction that the Company Parties or its affiliates intend to, or take any action to, consummate or enter into a binding agreement to consummate, prior to the consummation of the Restructuring Transactions;

(c)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this Agreement, the Definitive Documents, or the Chapter 11 Plan;

(d)     execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Chapter 11 Plan, and/or the Restructuring Transactions that, in whole or in part, is materially inconsistent with this Agreement (including the consent rights set forth in Section 3 hereof);

(e)     seek to modify the Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement and the Restructuring Term Sheet in any material respect;

(f)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is inconsistent with this Agreement or the Restructuring Term Sheet or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(g)     sell, or file any motion or application seeking to sell, any assets, other than in the ordinary course of business and consistent with past practice, without the prior written consent of the Required Consenting First Lien Lenders;

(h)     amend any of their corporate governance or organizational documents without the prior written consent of the Required Consenting First Lien Lenders and reasonable consent of the Required Consenting Second Lien Lenders and Required Consenting Revolving Credit Lenders (such consent not to be unreasonably withheld);

(i)      other than in the ordinary course of business and consistent with past practice, (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (x) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any employee, or (y) any contracts, arrangements, or commitments that entitle any current or former director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), in each case without the prior written consent of the Required Consenting First Lien Lenders;

(j)      grant, agree to grant, or make any payment on account of (including pursuant to a key employee retention plan, key employee incentive plan, or other similar arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any employee or director qualifying as an insider under the Bankruptcy Code without the prior written consent of the Required Consenting First Lien Lenders;

(k)      other than in the ordinary course of business and consistent with past practice, (i) enter into any settlement regarding any Company Claims/Interests, (ii) enter into any material agreement, (iii) amend, supplement, modify, or terminate any material agreement, (iv) allow any material agreement to expire, or (v) allow any material permit, license or regulatory approval to lapse, expire, terminate or be revoked, suspended or modified, in each case without the prior written consent of the Required Consenting First Lien Lenders;

(l)      without the prior written consent of the Required Consenting First Lien Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(m)      (i) authorize, create, issue, sell, or grant any additional Equity Interests, (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests, or (iii) enter into, terminate, or modify any material operational contracts, leases, or other agreements that would, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Company Parties, taken as a whole, without the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Lenders and the Required Consenting Revolving Credit Lenders (such consent not to be unreasonably withheld);

(n)      pay, amend, or compromise any of the Change of Control Payments, Earnout Payment Claims, the Tranter Settlement Payment Claim, and the Branded Research Seller Note Claims, without the consent of the Required Consenting First Lien Lenders;

(o)      file with any court any motion, pleading, or Definitive Document (including any modifications or amendments thereto) that, in whole or in part, is not materially consistent with this Agreement;

(p)      encourage or facilitate any Entity to do any of the foregoing; or

(q)     take any steps to become a "United States real property holding corporation" as defined in Section 897 of the U.S. Internal Revenue Code of 1986, as amended, and any applicable regulations promulgated thereunder.

**Section 9.**     *Fiduciary Out; Additional Commitments.*

9.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the officers, board of directors, board of managers, or similar governing body of a Company Party, including any properly authorized committee thereof to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent that such person or persons reasonably determines in good faith upon the advice of counsel that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 9.01 shall not be deemed to constitute a breach of this Agreement; provided that the Company Parties shall promptly provide written notice to the First Lien Ad Hoc Group Advisors and the Second lien Ad Hoc Group Advisors (and, in any case, within two (2) Business Days) after such determination.    Notwithstanding anything to the contrary herein, each Consenting Stakeholder shall have the right to terminate this Agreement upon such determination by a Company Party.

9.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 9.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (i) consider and respond to, but not solicit, propose, or encourage, Alternative Transactions; (ii) solely upon the occurrence of the filing of these Chapter 11 Cases, if applicable, provide access to non-public information concerning any Company Party to any Entity or enter into confidentiality agreements or nondisclosure agreements with any Entity for the purpose of facilitating such Entity's participation in the Restructuring Transactions or such Entity's Alternative Transaction proposal; provided, that the Company Parties must provide copies of any such Alternative Transaction received to the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors on a professional eyes only basis, no later than three (3) calendar days following receipt thereof, subject to any applicable confidentiality agreements; and (iii) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest or any other Entity regarding the Restructuring Transactions.  The Company Parties and their counsel shall provide prompt updates on the status of discussions regarding any Alternative Transaction, and, if a Company Party or the board of directors, board of managers, or similar governing body of a Company Party determines that an Alternative Transaction is a Superior Proposal, the Company Parties or their counsel shall (x) notify the First Lien Ad Hoc Group Advisors and the Second lien Ad Hoc Group Advisors no later than two (2) calendar days following such determination, and (y) promptly provide such information as reasonably requested by the First Lien Ad Hoc Group Advisors and/or the Second lien Ad Hoc Group Advisors in connection with such Alternative Transaction.

9.03.    Nothing in this Agreement shall: (i) impair or waive the rights of any Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (ii) prevent any Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.**     *Transfer of Interests and Securities.*

10.01.  During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Participating Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act; (iii) an institutional accredited investor (as defined in the Rules); or (iv) a Consenting Stakeholder; and

(b)     either (i) the transferee executes and delivers to counsel to the Company Parties and counsel to the First Lien Ad Hoc Group, respectively, at or before the time of the proposed Transfer, a Transfer Agreement; (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests transferred) to counsel to the Company Parties and counsel to the First Lien Ad Hoc Group at or before the time of the proposed Transfer or (iii) the transfer is to an affiliated party that is bound by this Agreement.

10.02.  Upon compliance with the requirements of Section 10.01 the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 10.01 shall be void *ab initio*.

10.03.  This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided*, however,* that (i) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed Company Claims/Interests subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders); and (ii) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and the First Lien Ad Hoc Group within five (5) Business Days of such acquisition.

10.04.  This Section 10 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

10.05.  Notwithstanding Section 10.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement

in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 10.01; and (iii) the Transfer otherwise is a permitted Transfer under Section 10.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

10.06.  Notwithstanding Section 10.01, any Consenting Stakeholder may Transfer any of its Company Claims/Interests to an affiliate of such Consenting Stakeholder or one or more of its affiliated funds or an affiliated Entity or Entities with a common investment advisor or investment manager (in each case, other than portfolio companies); provided that (i) for the avoidance of doubt, any transferee under this Section 10.06 shall be deemed a Consenting Stakeholder for purposes of this Agreement, effective as of the date of the Transfer, (ii) any transferor under this Section 10.06 shall remain liable in all respects for any breach of this Agreement by such transferee, and (iii) such transferor must provide notice of such Transfer to counsel to the Company Parties within five (5) Business Days of such Transfer.

10.07.  Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 11.** *Representations and Warranties of Consenting Stakeholders.*  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Agreement Effective Date:

(a)  it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 10);

(b)  it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)  such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (b) not a U.S. person (as defined in Regulation S of the Securities Act), or (c) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder (or that may be assigned to any of its Affiliates) in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f)      it is signing this Agreement on behalf of all Company Claims/Interests held by such Consenting Stakeholder and for all Company Claims/Interests which it is the nominee, investment manager, or advisor for beneficial holder in the Company Parties, and such Consenting Stakeholder agrees to be bound by the terms of this Agreement.

**Section 12.    *Representations and Warranties of Company Parties*.**  Each of the Company Parties represents, warrants, and covenants to each other Party that, as of the Execution Date:

(a)      to the best of the Company Parties' reasonable knowledge, the execution and delivery by it of this Agreement does not result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of these Chapter 11 Cases of any Company Parties undertaking to implement the Restructuring Transactions through these Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(b)      the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including, without limitation, approval of each of the independent directors of each of the corporate entities that comprise the Company Parties;

(c)      to the best of the Company Parties' reasonable knowledge, the diligence materials and other information concerning the Company Parties that the Company Parties or their advisors provided to any other Party are true and correct in all material respects; and

(d)      none of the Company Parties are, nor have they ever been, a "United States real property holding corporation" as defined in Section 897 of the U.S. Internal Revenue Code of 1986, as amended, and any applicable regulations promulgated thereunder.

**Section 13.    *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Agreement Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Chapter 11 Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 14.    *Termination Events.***

14.01.   <u>Consenting First Lien Lender Termination Events</u>.   This Agreement may be terminated by the Required Consenting First Lien Lenders by the delivery to counsel to the Company Parties and the Consenting Stakeholders of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events (each such event, a "<u>First Lien Termination Event</u>"):

(a)      the breach in any material respect by a Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured for three (3) Business Days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such breach; <u>provided</u> however, with respect to the Consenting Second Lien Term Loan Lenders, only if the non-breaching Consenting Second Lien Term Loan Lenders that remain Party to this Agreement at any time own less than 66.7% of the principal amount of the Second Lien Term Loan Claims;

(b)      the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      the Company Parties fail to pay when due and payable all of the accrued Restructuring Expenses;

(d)       the failure to meet a Milestone that has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting First Lien Lender in violation of its obligations under this Agreement;

(e)       without the prior written consent of the Required Consenting First Lien Lenders, if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except these Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(f)       an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(g)       any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors file any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within two (2) Business Days of receipt by the Company Parties of written notice from the Required Consenting First Lien Lenders that such motion or pleading is inconsistent with this Agreement;

(h)       entry of a DIP Order or approval of a DIP Budget that is not acceptable to the Required Consenting First Lien Lenders, or the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors seeking an order (without the prior written consent of the Required Consenting First Lien Lenders) vacating or modifying the DIP Orders;

(i)       any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or Sponsor files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the First Lien Claims or asserts any other Cause of Action against any Consenting First Lien Lender, or with respect or relating to such First Lien Claims, the Existing First Lien Credit Agreement or any Loan Document, or the prepetition liens securing the First Lien Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of such First Lien Claims;

31

(j)    the termination of any Company Party's use of Cash Collateral under the DIP Orders, unless such Company Party's use of Cash Collateral has been restored through a modified DIP Order acceptable to the Required Consenting First Lien Lenders;

(k)    any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(l)    any default or Event of Default (as defined in the DIP Orders) arising under the DIP Facility or DIP Facility Documentation that has not been cured or waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the DIP Facility Documentation;

(m)    the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof (without the consent of the Required Consenting First Lien Lenders);

(n)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party, Consenting Revolving Credit Lender, Consenting Second Lien Term Loan Lender, or the Sponsors seeking an order (without the prior written consent of the Required Consenting First Lien Lenders), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of these Chapter 11 Cases; or

(o)    the Company Parties, the Consenting Revolving Credit Lenders, the Consenting Second Lien Term Loan Lenders, or the Sponsors  (i) execute a definitive written agreement with respect to an Alternative Transaction, (ii) negotiate, file, propound or otherwise support any alternative restructuring proposal or transaction contemplated thereby, (iii) publicly announce their intention to do either of (i) or (ii), or (iv) provide notice to the First Lien Ad Hoc Group Advisors of a determination as contemplated by Section 9 hereof.

14.02.   Consenting Second Lien Lender Termination Events.  This Agreement may be terminated by the Required Consenting Second Lien Lenders with respect to the Consenting Second Lien Term Loan Lenders, by the delivery to counsel to the Consenting Stakeholders of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events (each such event, a "Second Lien Termination Event"):

(a)    the breach in any material respect by a Company Party or Consenting First Lien Term Loan Lender of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured for three (3) Business Days after such terminating Consenting Second Lien Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such breach; provided however, with respect to the Consenting First Lien Term Loan Lenders, only if the non-breaching Consenting First Lien Term Loan Lenders that remain Party to this Agreement at any time own less than 66.7% of the principal amount of the First Lien Term Loan Claims;

(b)      the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Second Lien Term Loan Lenders transmit a written notice in accordance with Section 16.09 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      the Company Parties fail to pay when due and payable all of the accrued Restructuring Expenses;

(d)      the failure to meet a Milestone over which the Required Consenting Second Lien Lenders have consent that has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Second Lien Lender in violation of its obligations under this Agreement;

(e)      without the prior written consent of the Required Consenting Second Lien Lenders, if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except the Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(f)      an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(g)      any Company Party or the First Lien Ad Hoc Group files any motion or pleading with the Bankruptcy Court that (i) is not consistent in all material respects with this Agreement (ii) directly, adversely impacts the Consenting Second Lien Lenders, and (iii) has not been withdrawn within three (3) calendar days of receipt by the Company Parties of written notice from the Required Consenting Second Lien Lenders that such motion or pleading is inconsistent with this Agreement;

(h)      entry of a DIP Order that is not reasonably acceptable to the Required Consenting Second Lien Lenders (solely to the extent of the Second Lien Ad Hoc Group's consent rights in Section 4), or the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or the First Lien Ad Hoc Group seeking an order (without the prior written

consent of the Required Consenting Second Lien Lenders), vacating or modifying the DIP Orders (solely to the extent such vacation or modification would be inconsistent with the Second Lien Ad Hoc Group's consent rights in Section 4);

(i)      any amendment to this Agreement that materially, adversely and disproportionately affects the rights of the Consenting Second Lien Term Loan Lenders without the prior written consent of the Required Consenting Second Lien Lenders;

(j)      any Company Party or the First Lien Ad Hoc Group files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Second Lien Term Loan Claims or asserts any other Cause of Action against any Consenting Second Lien Term Loan Lender, or with respect or relating to such Second Lien Term Loan Claims, the Existing Second Lien Credit Agreement or any Loan Document, or the prepetition liens securing the Second Lien Term Loan Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of such Second Lien Term Loan Claims;

(k)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(l)      the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof (without the consent of the Required Consenting Second Lien Lenders);

(m)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Second Lien Lenders), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of the Chapter 11 Cases; or

(n)      the Company Parties or the First Lien Ad Hoc Group (A) executes a definitive written agreement with respect to an Alternative Transaction, (B) negotiate, file, propound or otherwise supports any alternative restructuring proposal or transaction contemplated thereby, (C) publicly announces their intention to do either of (A) or B, or (D) provides notice to the Second Lien Ad Hoc Group Advisors of a determination as contemplated by Section 9 hereof.

14.03.   <u>Consenting Revolving Credit Lender Termination Events</u>.  This Agreement may be terminated by the Required Consenting Revolving Credit Lenders with respect to the Consenting Revolving Credit Lenders, by the delivery to counsel to the Consenting Stakeholders of a written notice in accordance with Section 16.12 hereof upon the occurrence of the following events (each such event, a "<u>Revolving Lender Termination Event</u>"):

(a)      the breach in any material respect by a Company Party or Consenting First Lien Term Loan Lender of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured for three (3) Business Days after such terminating

Consenting Revolving Credit Lenders transmit a written notice in accordance with Section 16.12 hereof detailing any such breach; provided however, with respect to the Consenting First Lien Term Loan Lenders, only if the non-breaching Consenting First Lien Term Loan Lenders that remain Party to this Agreement at any time own less than 66.7% of the principal amount of the First Lien Term Loan Claims;

(b)     the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Revolving Credit Lenders transmit a written notice in accordance with Section 16.09 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the Company Parties fail to pay when due and payable all of the accrued Restructuring Expenses;

(d)     the failure to meet a Milestone over which the Required Consenting Revolving Credit Lenders have a consent that has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Revolving Credit Lender in violation of its obligations under this Agreement;

(e)     without the prior written consent of the Required Consenting Revolving Credit Lenders, if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except the Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(f)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(g)     any Company Party or the First Lien Ad Hoc Group files any motion or pleading with the Bankruptcy Court that (i) is not consistent in all material respects with this Agreement, (ii) directly, adversely impacts the Consenting Revolving Credit Lenders, and (iii) has not been withdrawn within three (3) calendar days of receipt by the Company Parties of written notice from

the Required Consenting Revolving Lenders that such motion or pleading is inconsistent with this Agreement;

(h)     entry of a DIP Order that is not reasonably acceptable to the Required Consenting Revolving Credit Lenders (solely to the extent of the Required Consenting Revolving Credit Lenders' consent rights in Section 4), or the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or the First Lien Ad Hoc Group seeking an order (without the prior written consent of the Required Consenting Revolving Credit Lenders), vacating or modifying the DIP Orders (solely to the extent such vacation or modification would be inconsistent with the Required Consenting Revolving Credit Lenders' consent rights in Section 4);

(i)     any amendment to this Agreement that materially, adversely and disproportionately affects the rights of the Consenting Revolving Lenders without the prior written consent of the Required Consenting Revolving Lenders;

(j)     any Company Party or the First Lien Ad Hoc Group files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Revolving Credit Loan Claims or asserts any other Cause of Action against any Consenting Revolving Credit Lender, or with respect or relating to such Revolving Credit Loan Claims, the Existing First Lien Credit Agreement or any Loan Document, or the prepetition liens securing the Revolving Credit Loan Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of such Revolving Credit Loan Claims;

(k)     any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code; or

(l)     the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof (without the consent of the Required Consenting Revolving Credit Lenders);

(m)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Revolving Credit Lenders, not to be unreasonably withheld), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of the Chapter 11 Cases; or

(n)     the Company Parties or the First Lien Ad Hoc Group (A) executes a definitive written agreement with respect to an Alternative Transaction, (B) negotiate, file, propound or otherwise supports any alternative restructuring proposal or transaction contemplated thereby, (C) publicly announces their intention to do either of (A) or (B), or (D) provides notice to the First Lien Agent Counsel and the Required Consenting Revolving Credit Lenders of a determination as contemplated by Section 9 hereof.

14.04.  <u>Sponsor Termination Events</u>.  The Sponsors may terminate this Agreement as to themselves (solely in their capacity as Sponsor) by the delivery to counsel to the Consenting Stakeholders in accordance with Section 16.12 hereof upon the occurrence of any of the following events (each such event, a "<u>Sponsor Termination Event</u>"):

(a)      the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after the Sponsors transmit a written notice in accordance with Section 16.12 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(b)      if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except these Chapter 11 Cases as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(c)      the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan or disallowing any material provision thereof that directly, adversely, and materially effects the Sponsors (solely in their capacity as Sponsors); or

(d)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Sponsors, such consent not to be unreasonably withheld), (i) converting one or more of these Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of these Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of these Chapter 11 Cases.

14.05.  <u>Company Party Termination Events</u>.  The Company Parties may terminate this Agreement as to all Parties by the delivery to counsel to the Consenting Stakeholders in accordance with Section 16.12 hereof upon the occurrence of any of the following events (each such event, a "<u>Company Termination Event</u>"):

(a)      the breach in any material respect by one or more of the Consenting First Lien Lenders or Consenting Second Lien Lenders of any of the representations, warranties, or covenants of such Consenting Lenders set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof); <u>provided</u>, that this Agreement cannot be terminated pursuant to this Section

14.05(a) as a result of a breach of this Agreement by Consenting First Lien Lenders or Consenting Second Lien Lenders if the non-breaching Consenting Lenders (i) own or control 66.7% or more in aggregate principal amount of the First Lien Claims or (ii) 66.67% or more in aggregate principal amount of the Second Lien Term Loan Claims;

(b)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after notifying the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors and otherwise complying with Section 9 hereof, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue a Superior Proposal; provided, that the Company Parties shall give the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors not less than two (2) Business Days' prior written notice before exercising the termination right in accordance with this paragraph;

(c)     the Bankruptcy Court enters an order denying confirmation of the Plan, and such order remains in effect for five (5) business days after entry of such order;

(d)     any Consenting First Lien Lenders or Consenting Second Lien Lender files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement and such motion or pleading has not been withdrawn within two (2) Business Days of receipt by the applicable Consenting Lender of written notice from the Company Parties that such motion or pleading is inconsistent with this Agreement; provided, that this Agreement cannot be terminated pursuant to this Section 14.04(a) as a result of a breach of this Agreement by Consenting First Lien Lenders or Consenting Second Lien Lenders if the non-breaching Consenting Lenders (i) own or control 66.7% or more in aggregate principal amount of the First Lien Claims or (ii) 66.67% or more in aggregate principal amount of the Second Lien Term Loan Claims; or

(e)     the issuance, promulgation or enactment by any governmental authority, including any regulatory authority, licensing authority, or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.12 hereof detailing any such issuance; provided, however, that the Company Parties have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement provided, further, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

14.06.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (i) the Required Consenting Stakeholders; and (ii) each Company Party.

14.07.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date; other than with respect to the Company Parties' obligations (or the obligations of their successors in interest) to pay all of the accrued Restructuring Expenses, which obligation will survive automatic termination.

14.08.  <u>Individual Consenting Stakeholder Termination Right</u>.  An individual Consenting Lender may terminate this Agreement if this Agreement or any Definitive Document is amended, modified, or supplemented in a manner that materially, adversely and disproportionately affects the rights or treatment of such Consenting Lender relative to other similarly situated or classified Consenting Lender; <u>provided</u>, that this paragraph shall only apply to a Consenting Lender whose rights or treatment are materially, adversely and disproportionately affected by such amendment, modification, or supplement (and, for the avoidance of doubt, with respect to any Consenting Lender, shall not include any amendments, modifications or supplements that are generally applicable to all Consenting Lenders), and, if a Consenting Lender terminates this Agreement in accordance with this Section 14.08, such Agreement shall otherwise remain in full force and effect with respect to all other Parties.

14.09.  <u>Termination Limitation</u>.  Notwithstanding anything to the contrary herein, no Party may terminate this Agreement based on any event that was directly or indirectly caused by or arises out of such Party's breach of this Agreement.

14.10.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; <u>provided</u>, <u>however</u>, that each of the following shall survive any such termination:  (i) any claim for breach of or non-performance of its obligations under this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall remain in full force and effect and not be prejudiced in any way by such termination; and (ii) any obligations under this Agreement that expressly survive any such termination under this Agreement.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (i) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder; and (ii) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.

14.11.  <u>Automatic Stay</u>.  The Company Parties acknowledge that after the Petition Date, providing notice of termination and the exercise of any rights under this Agreement by any Party shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code; <u>provided</u>, that nothing herein shall prejudice any Party's right to argue that providing notice of termination or the exercise of any remedies was not proper under the terms of this Agreement. The Company Parties, to the extent enforceable, waive any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulate and consent hereunder to the prospective modification

of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

**Section 15.**      *Amendments and Waivers.*

15.01.  This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 15.

15.02.  This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party, (b) the Required Consenting First Lien Lenders, (c) the Required Consenting Second Lien Lenders, solely to the extent such modification, amendment, supplement or waiver would directly or indirectly affect the consent rights of the Consenting Second Lien Term Loan Lenders, and (d) the Required Consenting Revolving Credit Lenders solely to the extent such modification, amendment, supplement or waiver would directly or indirectly affect the consent rights of the Consenting Revolving Credit Lenders; provided, that if the proposed modification, amendment, waiver, or supplement has a disproportionate, material, and adverse effect on any of the rights of any individual Consenting Lender or Sponsor (or relates to the payment of Restructuring Expenses), then the consent of such Consenting Lender or Sponsor shall also be required to effectuate such modification, amendment, waiver or supplement (which, for the avoidance of doubt, shall not include amendments that are generally applicable to all Consenting Lenders); provided, further, that (x) any amendment to this Agreement to the definition of "Required Consenting Stakeholders," and  "Consenting Stakeholders," or to this Section 15 shall require the consent of each Consenting Stakeholder and (y) any amendment to the "Corporate Governance" section of the Term Sheet concerning the bank regulatory provisions within the shareholders agreement shall require the reasonable consent of the Required Consenting Revolving Credit Lenders.

15.03.  Any proposed modification, amendment, waiver or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

15.04.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 16.**      *Miscellaneous*

16.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the

Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  This Agreement and any claim, controversy, dispute or cause of action (whether at law, in equity, in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the law of the State of New York.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Federal District Court for the Southern District of New York in New York City, New York or the state courts located therein; <u>provided</u> that each Party hereto agrees that during an in-court Restructuring Transaction it shall bring any action or proceeding in respect of any such claim, controversy, dispute or cause of action arising out of or related to this Agreement in the Bankruptcy Court.  Each Party, solely in connection with claims arising under this Agreement, further:  (i) irrevocably submits to the exclusive jurisdiction of such courts; (ii) waives any objection to laying venue in any such action or proceeding in such courts; and (iii) waives any objection that such courts are an inconvenient forum or do not have jurisdiction over any Party to this Agreement.

16.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing

this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity, except as otherwise explicitly provided herein.

16.10.  <u>Restructuring Expenses</u>.

(a)     Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash all Restructuring Expenses: (i) incurred up to (and including) and after the Agreement Effective Date, (ii) incurred after the Petition Date (if applicable), on a regular and continuing basis, (iii) upon any termination of this Agreement that have been incurred up to (and including) the applicable Termination Date;; and (iv) on the Effective Date, promptly (but in any event within five (5) Business Days of the delivery to the Company Parties of any invoice in respect thereto), without any requirement for the Bankruptcy Court to provide further review or additional court Orders; <u>provided</u> that, payment of the Restructuring Expenses shall be subject in all respects to any order of the Bankruptcy Court governing the payment of any such fees and expenses;

(b)     The terms set forth in this Section 16.10 shall survive termination of this Agreement, and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated.  The Company Parties hereby acknowledge and agree that the Consenting First Lien Lenders, the Consenting Second Lien Lenders and the Consenting Revolving Credit Lenders have expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation of the Restructuring Transactions, and that this Agreement provides substantial value to, is beneficial to, and necessary to preserve the Company Parties, and that the Consenting First Lien Lenders, the Consenting Second Lien Lenders and the Consenting Revolving Credit Lenders have made a substantial contribution to the Company Parties and the Restructuring Transactions.  If and to the extent not previously reimbursed or paid in connection with the foregoing, the Company Parties shall reimburse or pay (as the case may be) all reasonable and documented fees, costs and out-of-pocket expenses of the First Lien Ad Hoc Group Advisors, the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Company Parties hereby acknowledge and agree that the Restructuring Expenses are of the type that should be entitled to treatment as, and the Company Parties shall seek treatment of such fees, costs and out-of-pocket expenses of the

First Lien Ad Hoc Group Advisors, the First Lien Agent's Counsel, the Second Lien Ad Hoc Group Advisors, and the Second Lien Agent's Counsel as, Administrative Expense Claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

16.11.  <u>Relationship Among the Parties</u>.  It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Party to this Agreement may trade in Company Claims/Interests without the consent of the Company Parties, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable Confidentiality Agreement or non-disclosure agreement, and the terms of this Agreement; <u>provided</u> that no Party shall have any responsibility for any such trading by any other Party by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

16.12.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Dynata, LLC
4 Research Drive, Suite 300
Shelton, CT 06484
Attention:      Mike Petrullo
                      Steve Macri

*with a copy (which shall not constitute notice) to*:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:      Jeffrey D. Pawlitz
                      Andrew S. Mordkoff
                      Erin C. Ryan
E-mail address:  jpawlitz@willkie.com
                      amordkoff@willkie.com
                      eryan@willkie.com

(b)      if to a Consenting First Lien Term Loan Lender:

To each Consenting First Lien Term Loan Lender at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

*With a copy (which shall not constitute notice) to*:

Gibson, Dunn & Crutcher LLP
200 Park Ave.
New York, NY 10166
Attention:         Scott J. Greenberg
                      AnnElyse Scarlett Gains
                      Jonathan M. Dunworth
E-mail address:  sgreenberg@gibsondunn.com
                      agains@gibsondunn.com
                      jdunworth@gibsondunn.com

(c)      if to a Consenting Revolving Credit Lender:

To each Consenting Revolving Credit Lender at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.

(d)      if to a Consenting Second Lien Term Loan Lender:

To each Consenting Second Lien Term Loan Lender at the addresses or e-mail addresses set forth in such member's signature page to this Agreement or to a Joinder, as the case may be.
*With a copy (which shall not constitute notice) to*:

Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Attention:         George R. Howard
                      Steven Zundell
                      Matthew D. Struble
E-mail address:  ghoward@velaw.com
                      szundell@velaw.com
                      mstruble@velaw.com

(e)      if to the Sponsors:

Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022
Attention:         Christopher Marcus, P.C.
E-mail address:  christopher.marcus@kirkland.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.13.   <u>Independent Due Diligence and Decision Making</u>.   Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.14.   <u>No Waiver of Participation and Preservation of Rights</u>.

(a)      Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, so long as, in each case, such actions are not inconsistent with the Party's obligations under this Agreement or the other Definitive Documents, respectively.

(b)      If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights, remedies, claims, and defenses.

(c)      This Agreement is part of a proposed settlement of matters that could otherwise be subject to litigation among the Parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.15.   <u>Specific Performance</u>.   It is understood and agreed by the Parties that, without limiting any other remedies available at law or in equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including, without limitation, an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.16.   <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.17.   <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.18.   <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.19.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.20.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.  In addition, the Parties understand that the Consenting Stakeholders and the Consenting Revolving Credit Lenders are engaged in a wide range of financial services and businesses.  In furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting Stakeholders or Consenting Revolving Credit Lender expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s), funds, and/or business group(s) of the Consenting Stakeholder or Consenting Revolving Credit Lender, as applicable, the obligations set forth in this Agreement shall only apply to such trading desk(s), fund(s), and/or business group(s) and shall not apply to any other trading desk, fund, or business group of the Consenting Stakeholder or Consenting Revolving Credit Lender so long as they are not acting at the direction or for the benefit of such Consenting Stakeholder or Consenting Revolving Credit Lender or such Consenting Stakeholder's or Consenting Revolving Credit Lender's investment in the Company Parties; <u>provided</u>, that the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that (i) executes this Agreement or (ii) on whose behalf this Agreement is executed by a Consenting Stakeholder or Consenting Revolving Credit Lender.

16.21.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 8.01(g) (to the extent accrued up to and including such Termination Date or as provided in Section 14.07) and Section 14, shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

16.22.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties or any Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.23.  <u>Public Disclosure</u>.  The Company Parties shall deliver drafts to the counsel to the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group and the First Lien Agent's Counsel of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each a "**<u>Public Disclosure</u>**") at least two (2) calendar days before making any such disclosure, and the counsel to the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group and the First Lien Agent's Counsel shall be authorized to share such Public Disclosure with their respective clients.  Any Public

Disclosure shall be in form and substance reasonably acceptable to the Required Consenting First Lien Lenders and the Required Second Lien Lenders, and the Required Consenting Revolving Credit Lenders.  Under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Lender (including on the signature pages of the Consenting Lender, which shall not be publicly disclosed or filed) or (ii) the identity of any Consenting Lender without the prior written consent of such Consenting Lender or the order of a Bankruptcy Court or other court with competent jurisdiction; provided, however, notwithstanding the foregoing, each Consenting Lender hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms hereof, in the Chapter 11 Plan, the Disclosure Statement filed therewith, and any filings by the Company Parties with the Bankruptcy Court or as required by the Securities Act, or as otherwise required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body; provided, further, that if disclosure of additional identifying information of any Consenting Lender is required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body, advance notice of the intent to disclose such information, if permitted by applicable law, shall be given by the disclosing Party to each Consenting Lender (who shall have the right to seek a protective order prior to disclosure) and such Party shall take all reasonable measures to limit such disclosure.  The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement.


        IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

*[Signature pages follow]*

DocuSign Envelope ID: C56026B6-ZE42-442A-9320-GFF7E497A004

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**NEW INSIGHT HOLDINGS, INC.**
**NEW INSIGHT INTERMEDIATE HOLDINGS, INC.**
**DYNATA HOLDINGS CORP.**
**INSTANTLY, INC.**
**RESEARCH NOW GROUP, LLC**
**SSI/OPINIONOLOGY INTERCO LLC**
**IPINION, INC.**
**RESEARCH NOW, INC.**
**SSI HOLDINGS, LLC**
**DYNATA, LLC**
**NEW INSIGHT INTERNATIONAL, INC.**
**IMPERIUM LLC**
**INBRAIN HOLDINGS, LLC**
**BRANDED RESEARCH, INC.**
**RESEARCH NOW DE I, LLC**
**RESEARCH NOW DE II, LLC**
**INBRAIN, LLC**
**APPS THAT PAY, LLC**
**SCREENLIFT.IO, LLC**

By: _____
Name: Michael Petrullo
Title: Authorized Person

**Consenting Stakeholder Signature Pages**

**[Signature Pages On File With The Debtors]**

# **EXHIBIT A**

**Company Parties**

**Company Parties**

- New Insight Holdings, Inc.
- New Insight Intermediate Holdings, Inc.
- Dynata Holdings Corp.
- Instantly, Inc.
- Research Now Group, LLC
- SSI/Opinionology Interco LLC
- iPinion, Inc.
- Research Now, Inc.
- SSI Holdings, LLC
- Dynata, LLC
- New Insight International, Inc.
- Imperium LLC
- inBrain Holdings, LLC
- Branded Research, Inc.
- Research Now DE I, LLC
- Research Now DE II, LLC
- inBrain, LLC
- Apps That Pay, LLC
- ScreenLift.io, LLC

## **EXHIBIT B**

**Restructuring Term Sheet**

**DYNATA, LLC**

**RESEARCH NOW GROUP, LLC**

**RESTRUCTURING TERM SHEET**

**May 21, 2024**

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 1145 OF THE BANKRUPTCY CODE AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE RESTRUCTURING DOCUMENTS. EXCEPT AS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE RESTRUCTURING DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.

This Term Sheet (including the annexes attached hereto, the "Term Sheet") sets forth the principal terms of a restructuring (the "Restructuring Transactions") of the capital structure and financial obligations of New Insight Holdings, Inc. ("Parent") and each of its affiliates set forth on **Annex 1** hereto (collectively, the "Company Parties" or the "Debtors"). The Restructuring Transactions will be accomplished through the Debtors commencing cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement a chapter 11 plan of reorganization described herein (the "Plan"). The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring Transactions have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring Transactions. The Restructuring Transactions detailed in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of definitive documentation.

THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE BY OR DISCLOSURE TO ANY PARTY OR PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

Capitalized terms used but not initially defined in this Term Sheet shall have the meaning hereinafter ascribed to such terms, or if not defined in this Term Sheet, such terms shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

| **Restructuring Summary** |
|---|

| Overview | The Debtors will implement the Restructuring Transactions in accordance with the restructuring support agreement (the "Restructuring Support Agreement"), to which this Term Sheet shall be attached and incorporated by reference. The Restructuring Transactions will be implemented pursuant to a Plan to be confirmed by the Bankruptcy Court and occur on the date the Plan becomes effective (the "Effective Date"). The Restructuring Transactions described herein shall be subject in all respects to and as provided by the other terms of this Term Sheet, the Restructuring Support Agreement, and the Definitive Documents. |
|---|---|
| **Claims and Interests to be Restructured** | ***First Lien Term Loan Claims***: consisting of unpaid principal in the amount of $920,767,206.45, plus accrued interest as of the Petition Date (as defined below), deferred interest payments, fees, costs, charges, and other amounts arising under or in connection with term loans pursuant to that certain First Lien Credit Agreement (as supplemented, amended, amended and restated, or otherwise modified from time to time), dated as of December 20, 2017 (the "Existing First Lien Credit Agreement") (including for the avoidance of doubt, the Initial Term Loans, the Other Term Loans, and the Incremental Term Loans, each as defined in the Existing First Lien Credit Agreement) by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto (the "First Lien Lenders")[1], and Goldman Sachs Bank USA, as Administrative Agent and Collateral Agent (the "First Lien Agent") (collectively, the "First Lien Term Loan Claims" and the lenders holding such claims, the "First Lien Term Loan Lenders"). |
| | ***Revolving Credit Loan Claims:*** consisting of unpaid principal in the amount of $96,899,99.99, plus accrued interest as of the Petition Date, fees, costs, charges, and other amounts arising under or in connection with the revolving loans made and outstanding pursuant to a "Revolving Commitment" under and as defined in the Existing First Lien Credit Agreement (the "Revolving Credit Loan Claims", and together with the First Lien Term Loan Claims, the "First Lien Claims") and the lenders party thereto (the "Revolver Lenders"). |
| | ***Second Lien Term Loan Claims***: consisting of unpaid principal in the amount of $250,000,000.00, plus accrued interest as of the Petition Date, fees, costs, charges, and other amounts arising under or in connection with term loans pursuant to that certain Second Lien Credit Agreement (as supplemented, amended, amended and restated, or otherwise modified from time to time), dated as of December 20, 2017, by and among New Insight Holdings, Inc., Research Now Group, LLC (f/k/a Research Now Group, Inc.) and Dynata, LLC (f/k/a Survey Sampling International, LLC), the lenders party thereto (the "Second Lien Lenders"), and Acquiom Agency Services LLC, as Administrative Agent (and any successors thereto, collectively, the "Second Lien Agent") (collectively, the "Second Lien Term Loan Claims"). |
| | ***General Unsecured Claims:*** consisting of any claim against the Debtors or the Company Parties, as applicable, arising prior to commencement of these Chapter 11 Cases (such date, the "Petition Date"), that is not a First Lien Claim, Second Lien Term Loan Claim, an Intercompany Claim (as defined below), or a claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "General Unsecured Claims"). |

---

[1]    For the avoidance of doubt, lenders who extended revolving loans under the Existing First Lien Credit Agreement are also considered "First Lien Lenders" for all purposes under this Term Sheet.

2

| | |
|---|---|
| | ***Existing Equity Interests:*** consisting of any Interests in Parent outstanding as of the Petition Date (the "<u>Existing Equity Interests</u>"). |

| Treatment of Claims and Interests In a Chapter 11 Restructuring | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | |
| **DIP Facility Claims** | Except to the extent that a holder of an allowed DIP Facility Claim (as defined in <u>**Annex 4**</u>) agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed DIP Facility Claim, each holder shall receive its *pro rata* share of the First Out Converted Term Loans (as defined in <u>**Annex 2**</u>).<br><br>To the extent a Holder of an Allowed DIP Facility Claim does not elect to convert its DIP Facility Claim into First Out Converted Term Loans, such Holder shall have its DIP Facility Claim paid in full in Cash and any resulting deficit will be backstopped by the Exit Backstop Parties.<br><br>The Exit Backstop Parties shall fund any such deficit in Cash (*pro rata* based on the percentages indicated on <u>**Annex 8**</u>) and in exchange each Exit Backstop Party will receive its *pro rata* share (based on the percentages indicated on <u>**Annex 8**</u>) of: (i) First Out Converted Term Loans on account of their DIP Facility Claims, (ii) First Out Converted Term Loans that otherwise would have been paid to such non-converting DIP Lender had such DIP Lender elected to convert its DIP Facility Claims to First Out Converted Term Loans, and (iii) the Backstop Premium. | N/A |
| **Administrative Expense Claims** | Except to the extent that a holder of an allowed Administrative Expense Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Administrative Expense Claim, each holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders: (i) payment in full in cash of the due and unpaid portion of its Administrative Expense Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such claim becomes due and payable; (ii) such other treatment to render such Administrative Expense Claim unimpaired under section 1124 of the Bankruptcy Code; or (iii) such other treatment as such holder may agree to or as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code.<br><br>"<u>Administrative Expense Claim</u>" has the meaning ascribed in the RSA. | N/A |
| **Priority Tax Claims** | Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Priority Tax Claim, on the Effective Date each holder of such allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |

3

| | "Priority Tax Claim" means any claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. | |
|---|---|---|
| **Classified Claims and Interests of the Debtors** | | |
| **Other Secured Claims** | Except to the extent that a holder of an allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Other Secured Claim, each holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders: (i) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such claim becomes due and payable; (ii) the collateral securing its allowed Other Secured Claim; (iii) reinstatement of its allowed Other Secured Claim; or (iv) such other treatment rendering its allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired; deemed to accept |
| **Other Priority Claims** | Except to the extent that a holder of an allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during these Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Other Priority Claim, each holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Consenting First Lien Lenders.<br><br>"Other Priority Claim" means any claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. | Unimpaired; deemed to accept |
| **First Lien Term Loan Claims** | Except to the extent that a holder of an allowed First Lien Term Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed First Lien Term Loan Claim, on the Effective Date each holder shall directly or through a designee receive its *pro rata* share, along with the holders of the Revolving Credit Loan Claims, of:<br><br>(i) the option to fund their pro-rata share of First Out New Money Term Loans (as defined in **Annex 2**);<br><br>(ii) the Second Out Take Back Term Loans;<br><br>(iii) 95% of the New Common Stock, subject to (x) dilution by the MIP and the New Warrants Recovery and (y) increase as a result of any holder of a Revolving Credit Loan opting to receive their Incremental Second Out Take Back Term Loan Amount (defined below); and<br><br>(iv) a cash payment of $11,669,935.04. | Impaired; entitled to vote |

| Revolving Credit Loan Claims | Except to the extent that a holder of an allowed Revolving Credit Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Revolving Credit Loan Claim, on the Plan Effective Date each holder thereof shall receive its *pro rata* share, along with the holders of the First Lien Term Loan Claims, of: <br><br>(i) the option to fund their *pro rata* share of the First Out New Money Term Loans (as defined in **Annex 2**); <br><br>(ii) the Second Out Take Back Term Loans; <br><br>(iii) 95% of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery; provided, however, a holder of an allowed Revolving Credit Loan Claim may elect, in its sole and absolute discretion, to receive a 5% increase in the Second Out Take Back Term Loans such holder would otherwise receive (all such loans, the "<u>Incremental Second Out Take Back Term Loan Amount</u>")[2] in lieu of receiving the New Common Stock; and <br><br>(iv) a cash payment of $11,669,935.04. | Impaired; entitled to vote |
| Second Lien Claims | Except to the extent that a holder of an allowed Second Lien Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Second Lien Term Loan Claim, on the Effective Date, each holder shall directly or through a designee receive its *pro rata* share of: <br><br>(i) 5 % of the New Common Stock, subject to dilution by the MIP and the New Warrants Recovery; <br><br>(ii) New Warrants Recovery; and <br><br>(iii) a cash payment of $750,000. | Impaired; entitled to vote |
| General Unsecured Claims | General Unsecured Claims shall be paid in full or otherwise rendered unimpaired pursuant to 1124(1) of the Bankruptcy Code. | Unimpaired; deemed to accept |
| Intercompany Claims | On the Effective Date, each Intercompany Claim shall be, at the option of the Debtors and with the consent of the Required Consenting First Lien Lenders, either reinstated, compromised, or canceled and released without any distribution. <br><br>"<u>Intercompany Claim</u>" means any claim against a Debtor held by another Debtor entity or non-Debtor affiliate. | Impaired, deemed to reject / Unimpaired, deemed to accept |
| Section 510(b) Claims | Section 510(b) Claims shall be discharged, canceled, released, and extinguished without any distribution to holders of such claims. | Impaired; deemed to reject |

---

[2]  For the avoidance of doubt, the *pro rata* share of the Incremental Second Out Take Back Term Loan Amount shall be determined based on the aggregate amount of Revolving Credit Lender Claims held by those revolving lenders opting to receive additional take back debt in lieu of the New Common Stock.

| | | |
|---|---|---|
| **Intercompany Interests** | On the Effective Date, each Intercompany Interest shall be, at the option of the Debtors and with the reasonable consent of the Required Consenting First Lien Lenders, either reinstated, compromised, or canceled and released without any distribution.<br><br>"Intercompany Interest" means any interest in a Debtor held by another Debtor or non-Debtor entity. | Impaired, deemed to reject / Unimpaired, deemed to accept |
| **Existing Equity Interests** | On the Effective Date, the Existing Equity Interests shall be canceled, and holders of Existing Equity Interests shall receive no recovery on account of such Existing Equity Interests. | Impaired; deemed to reject |
| **Implementation & Material Provisions of Chapter 11 Restructuring** | | |
| **DIP Facility and Cash Collateral** | On or after the Petition Date, the Debtors will obtain debtor-in-possession financing pursuant to the DIP Facility, the material terms of which are set forth in **Annex 4**. | |
| **First Out Term Loan Facility** | On the Effective Date, the Debtors will issue First Out Term Loans pursuant to a term loan facility with an agent reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders as the administrative agent, and the lenders party thereto from time to time (the "First Out Term Loan Facility"), consistent with the terms set forth in **Annex 2** hereto. | |
| **New ABL Facility** | Subject to the consent of the Required Consenting First Lien Lenders, on the Effective Date, the Debtors will enter into the New ABL Facility, with an agent reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders as the administrative agent, and the lenders party thereto from time to time (the "New ABL Facility"), comprised of up to $75 million of asset-based revolving loans, with Research Now Group, LLC and Dynata, LLC as Borrowers. The New ABL Facility shall be guaranteed by each other Loan Party (as defined in the Existing First Lien Credit Agreement), and secured by first priority liens in working capital assets which secured the Existing First Lien Credit Agreement and second priority liens on all other assets which secured the Existing First Lien Credit Agreement. | |
| **Second Out Take Back Term Loan Facility** | On the Effective Date, the Debtors will enter into the Second Out Take Back Term Loan Facility consistent with the terms set forth in **Annex 3** hereto. | |
| **New Equity** | Shall be issued by Reorganized Parent (or such other entity determined by the Required Consenting First Lien Lenders), with governance rights set forth in the Plan Supplement which shall include reasonable and customary minority protections.<br><br>Reorganized Parent (or such other entity determined by the Required Consenting First Lien Lenders) shall be an entity that will be treated as a corporation for tax purposes. | |
| **New Warrants / New Warrants Recovery** | The "New Warrants Recovery" means each applicable holder's *pro rata* share of the warrants to acquire, collectively, 12.5% of the New Common Stock.<br><br>The New Warrants shall have (i) a 5-year tenor, (ii) have a cashless exercise, only upon a change of control, (iii) no Black-Scholes protection, and (iv) customary anti-dilution provisions.<br><br>The strike price of the New Warrants shall be equal to the value of the New Common Equity at which the holders of First Lien Claims receive a par plus accrued interest recovery under the Plan on the total value of the First Lien Claims, taken together (including the value of the Second Out Term Loan Facility, any cash distributions paid to holders of First Lien Claims under the Plan, and the New Common Equity). For the | |

| | avoidance of doubt, the First Out New Money Loan shall be added to the enterprise value and equity value calculation. |
|---|---|
| **Earnout & Settlement Claims** | The Debtors shall pay in full, amend, discharge, or compromise, as the case may be for each claim, the Earnout Payment Claims, the Change of Control Payments the Tranter Settlement Payment Claim, and the Branded Research Seller Note Claims, in a manner acceptable to the Required Consenting First Lien Lenders.<br><br>Sponsors to waive any General Unsecured Claims they have or may hold. |
| **Restructuring Expenses** | To be paid in full in accordance with the Restructuring Support Agreement and DIP Orders. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be as set forth in the Restructuring Support Agreement. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall enter into all agreements and other documents required pursuant to the Restructuring and shall issue the New Common Stock, the New Warrants, and all other securities, notes, certificates, and other instruments required to be issued pursuant to the Restructuring, including pursuant to section 1145 of the Bankruptcy Code, to the extent applicable, or another available exemption from the registration requirements of the Securities Act of 1933, as amended. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Miscellaneous Provisions** | |
| **Management Incentive Plan** | On or after the Effective Date, the New Board shall adopt a management incentive plan (the "<u>Management Incentive Plan</u>"), substantially on the terms set forth in **Annex 5**, in form and substance acceptable to the go-forward management of the Reorganized Debtors and the Required Consenting First Lien Lenders. |
| **Conditions Precedent to the Effective Date** | The effectiveness of the Plan shall be conditioned on obtaining the Plan Closing Conditions as set forth in the Restructuring Support Agreement. |
| **Corporate Governance** | On the Effective Date, the Company Parties will enter into new corporate governance documents, including charters, bylaws, operating agreements, or other organization or formation documents, as applicable (the "<u>New Corporate Governance Documents</u>"), which shall be subject to the consent rights set forth in the Restructuring Support Agreement. Such New Corporate Governance Documents shall include reasonable and customary minority protections.<br><br>All holders of shares of the New Common Stock from time to time outstanding will agree that they cannot transfer any of such shares if, in the Reorganized Debtors' judgment, it could, or may reasonably be expected to, result in an increase in the number of holders of record of such class of its equity securities which could cause the Reorganized Debtors to become required to register such securities under Section 12(g) of the Securities Exchange Act of 1934, as amended. Notwithstanding the foregoing, the Company Parties will use commercially reasonable efforts to work with the holders of Revolving Credit Loan Claims who receive the New Common Stock to incorporate appropriate bank regulatory protections and provisions into the relevant shareholders agreement to |

| | |
|---|---|
| | ensure that regulations or laws applicable to holders of the New Common Stock do not run afoul of any and all regulations governing their receipt of such equity interests, including, without limitations, the Bank Holding Company Act and any regulations promulgated thereunder. |
| **Board of Directors** | On the Effective Date, the board of directors of the Reorganized Debtors (the "New Board") shall be constituted in accordance with the New Corporate Governance Documents and the New Shareholders Agreement and in a manner as determined by the Required Consenting First Lien Lenders. |
| **Good Faith Negotiations/Tax Issues** | The Restructuring Transactions shall be structured in the most tax efficient and advantageous manner possible and subject to the consent rights of the Required Consenting First Lien Lenders as set forth in the Restructuring Support Agreement, and solely in the event that the proposed tax structure would materially and disproportionately affect the Second Lien Ad Hoc Group's economic interests, the Second Lien Ad Hoc Group, each acting reasonably. <br><br> Reorganized Parent (or such other entity determined by the Required Consenting First Lien Lenders) shall be an entity that will be treated as a corporation for tax purposes. |
| **Restructuring Steps Plan** | The Plan Supplement shall include a restructuring steps plan, in form and substance reasonably acceptable to the Required Consenting First Lien Lenders, that shall outline the steps, considerations, treatment of intercompany claims and interests, and agreed funding, as applicable, for any Company Party, including, for the avoidance of doubt, any foreign non-Debtor Company Party. |
| **Releases** | The Plan will contain the exculpation provisions, the Debtor releases, and the "third-party" releases in the form set forth in **Annex 6** hereto. |
| **Other Executory Contracts and Unexpired Leases** | On the Effective Date, each Executory Contract and Unexpired Lease of the Debtors shall be, subject to the reasonable consent of the Required First Lien Consenting Lenders, assumed by the Debtors unless determined to be rejected by the Debtors with the reasonable consent of the Required First Lien Consenting Lenders. |
| **Survival of Indemnification Obligations and D&O Insurance** | Any obligations of the Debtors pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Debtors, will not be discharged or impaired by confirmation of the Plan. All such obligations will be deemed and treated as executory contracts to be assumed by the Debtors. <br><br> After the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |

**<u>Annex 1</u>**

**List of Debtors**

**<u>Company Parties / Debtors</u>**
- New Insight Holdings, Inc.
- New Insight Intermediate Holdings, Inc.
- Dynata Holdings Corp.
- Instantly, Inc.
- Research Now Group, LLC
- SSI/Opinionology Interco LLC
- iPinion, Inc.
- Research Now, Inc.
- SSI Holdings, LLC
- Dynata, LLC
- New Insight International, Inc.
- Imperium LLC
- inBrain Holdings, LLC
- Branded Research, Inc.
- Research Now DE I, LLC
- Research Now DE II, LLC
- inBrain, LLC
- Apps That Pay, LLC
- ScreenLift.io, LLC

**Annex 2**

**First Out Term Loan Facility Term Sheet**

| | |
|---|---|
| **First Out Term Loan Facility** | A senior secured term loan facility in an aggregate principal amount of $81.5 million (the "**First Out Term Loan Facility**"), comprised of $50,000,000 new money exit term loans (the "**First Out New Money Term Loans**"), and $31.5 million of converted DIP Facility Claims (the "**First Out Converted Term Loans**", and together with the First Out New Money Term Loans, the "**First Out Term Loans**"). Once repaid, amounts under the First Out Term Loan Facility may not be reborrowed. |
| **Borrower** | Research Now Group, LLC, and Dynata, LLC (as reorganized under the Plan), or a newly formed entity that acquires substantially all of the assets of such entity in connection with confirmation and consummation of the Plan (in either case, collectively, the "**Borrower**" or the "**Company**"). |
| **Guarantors** | All obligations of the Borrower under the First Out Term Loan Facility will be unconditionally guaranteed on a joint and several basis by: (i) Research Now Group, LLC, and Dynata, LLC (as reorganized under the Plan), (ii) each other Loan Party (as defined in the Existing First Lien Credit Agreement) (collectively, the "**Guarantors**") and (iii) all other Subsidiaries (as defined in the Existing First Lien Credit Agreement) of the Borrowers other than Excluded Subsidiaries (as defined in the Existing First Lien Credit Agreement). The Borrower and the Guarantors are each referred to herein as a "**Loan Party**". |
| **Administrative Agent; Administrative Agent Fee** | A financial institution reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders (in such capacity, the "**First Out Term Loan Agent**"). <br><br> The Agent shall be paid an annual agency fee to be agreed by the Agent and the Required Consenting First Lien Lenders. |
| **Lenders** | Each of the lenders under the First Out Term Loan Facility, a "**First Out Term Loan Lender**." <br><br> Pursuant to the Plan, (i) up to $31,500,000 shall be deemed advanced to the Borrower thereunder in exchange for Allowed DIP Facility Claims pursuant to the terms of the Plan and (ii) up to $50,000,000 of First Out New Money Term Loans shall be offered ratably to each First Lien Lender based on such First Lien Lender's *pro rata* holdings of First Lien Loans. To the extent that a holder of First Out Converted Term Loans does not elect to participate in their *pro rata* share of the First Out New Money Term Loans, the deficit will be backstopped by the Exit Backstop Parties (defined below). <br><br> First Out Term Loan Lenders and Exit Backstop Parties, as applicable, shall be entitled to designate participation in the First Out Term Loans to one or more affiliates or funds or accounts managed, advised or sub-advised by such First Out Term Lenders or Exit Backstop Parties, as applicable. |
| **Exit Backstop Parties** | Each member of the First Lien Ad Hoc Group (or their affiliates) that commits to backstop the First Out Exit Term Loans (collectively, the "**Exit Backstop Parties**"). |

| | |
|---|---|
| | The Exit Backstop Parties shall fund at the percentages indicated on **Annex 8**.[3] The obligations of each of the Exit Backstop Parties shall be several (and not joint and several), and no failure of any Exit Backstop Party to comply with any of its obligations shall prejudice the rights of any other Exit Backstop Party.<br><br>Each Exit Backstop Party may assign all or a portion of its Backstop to (i) any other Exit Backstop Party, (ii) any of its affiliates or related funds/accounts or (iii) any investment funds, accounts, vehicles or other entities that are managed, advised or subadvised by such Exit Backstop Party, its affiliates or the same person or entity as such Exit Backstop Party or its affiliates (all such persons described in clauses (ii) and (iii), such Exit Backstop Party's "**Fund Affiliates**"). |
| **Maturity Date** | All obligations under the First Out Term Loan Facility shall be due and payable in full in cash on the earliest of: (i) the date that is four years after the Effective Date; and (ii) the date of acceleration of the obligations under the First Out Term Loan Facility. |
| **Use of Proceeds** | The proceeds of the First Out Term Loans may be used only (i) to repay all reasonable and documented outstanding administrative costs and (ii) for working capital and general corporate purposes of the Loan Parties. |
| **Interest** | Interest on the First Out Term Loans shall be payable in cash at the end of each quarter in arrears. At all times prior to the occurrence of an Event of Default which is continuing, interest on the outstanding principal amount of the First Out Term Loans shall accrue at a rate equal to S + 5.00% *per annum*.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **OID** | The First Out New Money Term Loans shall be issued with 1.50% OID. |
| **Amortization** | Amortization is 1% per annum, payable quarterly. |
| **Default Interest** | During the continuance of an Event of Default, the First Out Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand. |
| **Backstop Premium** | To each Exit Backstop Party, 9.0% of the aggregate principal amount of the First Out New Money Term Loans backstopped by the Exit Backstop Parties, payable in cash on demand. The Backstop Premium shall be fully and finally approved upon entry of the Confirmation Order. |
| **Collateral** | All obligations of the Loan Parties to the First Out Term Loan Lenders and the First Out Term Loan Agent, including, without limitation, all principal, accrued interest, costs, fees and expenses and other amounts under the First Out Term Loan Facility (collectively, the "**First Out Term Loan Obligations**"), shall be secured by first priority liens on all Collateral (as defined in the Existing First Lien Credit Agreement) and shall be secured by first priority liens on any and all assets, whether real or personal, tangible or intangible of the other Loan parties. The property securing the First Out Term Loan Obligations is collectively referred to as the "**First Out Collateral**" and shall include substantially all assets of the Loan Parties, including without limitation, pledges of equity interests, subject to customary |

---

[3]     For the avoidance of doubt, **Annex 8** shall be provided to the Company Parties and their advisors only and shall otherwise be considered PEO and strictly confidential.  Any amendment to **Annex 8** shall only require the consent of the Exit Backstop Parties.

|  | exceptions to be agreed upon; *provided* that in the event the Company Parties, with the consent of the Required Consenting First Lien Lenders, enter into the New ABL Facility the First Out Term Loan Obligations shall be secured by a second priority lien on any working capital assets. |
|---|---|
| **Reporting Covenants, Affirmative Covenants and Negative Covenants** | The First Out Term Loan Facility shall contain reporting requirements, affirmative covenants and negative covenants customarily found in loan agreements for facilities of this type and other reporting requirements, affirmative covenants and negative covenants reasonably satisfactory to the Required Consenting First Lien Lenders including, without limitation:<br>(i) the delivery of reporting information customarily found in loan agreements for facilities of this type, and<br>(ii) limitations on indebtedness, liens, asset sales, restricted payments, investments, repayments of indebtedness, affiliate transactions, fundamental changes, sale leaseback transactions, intercompany loans and cross guarantees, including but not limited to, no non-ordinary course capacity with respect to negative covenants. |
| **Financial Covenants** | To be agreed, usual and customary for facilities similar to the First Out Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders. |
| **Optional Prepayments** | The Borrower may make optional prepayments of the First Out Term Loans without paying any premium. |
| **Mandatory Prepayments** | To be agreed, usual and customary for facilities similar to the First Out Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders, including but not limited to:<br><br>1) 100% of net proceeds of asset sales in an amount to be agreed, to prepay First Out Term Loans at par plus accrued interest, within five (5) business days of receipt, with no reinvestment period permitted, subject to customary exceptions.<br><br>2) 25% of excess cash flow for the previous twelve-month period (measured on an annual basis) to prepay First Out Term Loans at par plus accrued interest; provided that the excess cash flow shall first be measured as of June 30, 2025 and as of June 30 each year thereafter and payable within sixty (60) days of such measurement date; provided further that the payment of excess cash flow shall be limited to an amount that would not cause the Company's minimum liquidity, measured as of June 30, to fall below $75 million, inclusive of availability under the New ABL Facility. |
| **Call Premium** | None. |
| **First Out Term Loan Facility Documents** | The First Out Term Loan Facility will be documented by a credit agreement, guarantee, security agreement and other loan documentation reflecting the terms and provisions set forth herein and otherwise in form and substance satisfactory to the Borrowers and the Required Consenting First Lien Lenders. |
| **Conditions Precedent to the Closing** | The First Out Term Loan Facility shall be subject to customary conditions to closing for facilities of this type, which shall be satisfactory to the Required Consenting First Lien Lenders, including without limitation:<br>(i)    execution and delivery of the First Out Term Loan Agreement and any other related documentation being executed and delivered on the Closing Date;<br>(ii)    receipt of certain reporting in form and substance reasonably acceptable to the Required Consenting First Lien Lenders; |

| | |
|---|---|
| | (iii)    the concurrent effectiveness of the Second Out Take Back Term Loan Facility in an amount, containing such terms, and pursuant to such documentation as contemplated by the Plan;<br><br>(iv)    the payment of Restructuring Expenses to the First Lien Ad Hoc Group Advisors;<br><br>(v)    the entry of the Confirmation Order and the effectiveness of the Plan;<br><br>(vi)    all conditions precedent to the issuance of the New Common Stock and, if applicable, the New Warrants shall have been satisfied or waived; and<br><br>(vii)    the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto. |
| **Events of Default** | The First Out Term Loan Facility shall contain events of default customarily found in loan agreements for facilities of this type and other events of default (if any) agreed upon by the Borrower and the Required Consenting First Lien Lenders. |
| **Rating** | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the First Out Term Loan Facility by Moody's and S&P seventy-five (75) days after the closing date of the First Out Term Loan Facility. |
| **Miscellaneous** | The First Out Term Loan Facility shall include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, illegality, SOFR breakage costs, payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary SOFR and benchmark replacement provisions (iv) customary liability management protections including, without limitation, (a) Chewy, (b) Serta, (c) J.Crew, (d) Incora, and (e) Double-dip, and (v) customary expense reimbursement, indemnification and other provisions as are usual and customary for facilities of this kind. |
| **Governing Law and Submission to Exclusive Jurisdiction** | State of New York. |

**Annex 3**

**Second Out Take Back Term Loan Term Sheet**

| | |
|---|---|
| **Second Out Term Loan Facility** | A secured term loan facility in an aggregate principal amount of $694 million (the "**Second Out Take Back Term Loan Facility**"), provided that such amount shall be increased by the amount of Incremental Second Out Take Back Term Loans, pursuant to which Second Out Term Loans shall be deemed advanced to the Borrower thereunder in exchange for a portion of allowed First Lien Claims. Once repaid, the Second Out Take Back Term Loans may not be reborrowed. |
| **Borrower** | Research Now Group, LLC and Dynata, LLC (as reorganized under the Plan), or a newly formed entity that acquires substantially all of the assets of such entity in connection with confirmation and consummation of the Plan (in either case, collectively, the "**Borrower**" or the "**Company**"). |
| **Guarantors** | All obligations of the Borrower under the Second Out Take Back Term Loan Facility will be unconditionally guaranteed on a joint and several basis by: (i) Research Now Group, LLC, and Dynata, LLC (as reorganized under the Plan), (ii) each other Loan Party (as defined in the Existing First Lien Credit Agreement) and (iii) all other Subsidiaries (as defined in the Existing First Lien Credit Agreement) of the Borrowers other than Excluded Subsidiaries (as defined in the Existing First Lien Credit Agreement) (collectively, the "**Guarantors**"). The Borrower and the Guarantors are each referred to herein as a "**Loan Party**". |
| **Administrative Agent; Administrative Agent Fee** | A financial institution reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders (in such capacity, the "**Second Out Take Back Term Loan Agent**"). <br><br> The Second Out Take Back Term Loan Agent shall be paid an annual agency fee to be agreed by the Second Out Take Back Term Loan Agent and the Required Consenting First Lien Lenders. |
| **Lenders** | The Second Out Take Back Term Loans shall be distributed to all First Lien Lenders on a *pro rata* basis pursuant to the terms of the Plan. <br><br> Each of the lenders under the Second Out Take Back Term Loan Facility, a "**Second Out Take Back Term Loan Lender**". |
| **Maturity Date** | All obligations under the Second Out Term Loan Facility shall be due and payable in full in cash on the earliest of: (i) the date that is 4.25 years after the Effective Date and (ii) the date of acceleration of the obligations under the Second Out Take Back Term Loan Facility. |
| **Interest** | Interest on the Second Out Take Back Term Loans shall be payable in cash at the end of each quarter in arrears. At all times prior to the occurrence of an Event of Default which is continuing, interest on the outstanding principal amount of the Second Out Take Back Term Loans shall accrue at a rate equal to S + 5.50% *per annum*. <br><br> Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **Amortization** | Amortization is 1%, payable quarterly on reset balance. |
| **Default Interest** | During the continuance of an Event of Default, the Second Out Take Back Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts |

| | |
|---|---|
| | (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand. |
| **Collateral** | All obligations of the Loan Parties to the Second Out Take Back Term Loan Lenders and the Second Out Take Back Term Loan Agent, including, without limitation, all principal, accrued interest, costs, fees and expenses and other amounts under the Second Out Exit Term Loan Facility (collectively, the "**Second Out Take Back Term Loan Obligations**"), shall be secured by first liens with second payment priority on all First Out Collateral; *provided* that in the event the Company Parties, with the consent of the Required Consenting First Lien Lenders, enter into the New ABL Facility the Second Out Take Back Term Loan Obligations shall be secured by a second priority lien with second payment priority on any working capital assets. |
| **Reporting Covenants, Affirmative Covenants and Negative Covenants** | The Second Out Term Loan Facility shall contain reporting requirements, affirmative covenants and negative covenants customarily found in loan agreements for facilities of this type and other reporting requirements, affirmative covenants and negative covenants reasonably satisfactory to the Required Consenting First Lien Lenders including, without limitation: <br><br> (i)     the delivery of reporting information customarily found in loan agreements for facilities of this type, and <br><br> (ii)    limitations on indebtedness, liens, asset sales, restricted payments, investments, repayments of indebtedness, affiliate transactions, fundamental changes, sale leaseback transactions, intercompany loans and cross guarantees, including but not limited to, no non-ordinary course capacity with respect to negative covenants. |
| **Financial Covenants** | To be agreed, usual and customary for facilities similar to the First Out Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders. |
| **Optional Prepayments** | The Borrower may make optional prepayments of the Second Out Take Back Term Loans without paying any premium. |
| **Mandatory Prepayments** | To be agreed, usual and customary for facilities similar to the First Out Take Back Term Loan Facility and in form and substance reasonably acceptable to the Required Consenting First Lien Lenders, including but not limited to 100% of net proceeds of asset sales in an amount to be agreed, to prepay Second Out Term Loans at par plus accrued interest, within five (5) business days of receipt, with no reinvestment period permitted, subject to customary exceptions. |
| **Call Premium** | None. |
| **Second Out Term Loan Documents** | The Second Out Take Back Term Loan Facility will be documented by a credit agreement, guarantee, security agreement and other loan documentation reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the Borrowers and the Required Consenting First Lien Lenders. |
| **Conditions Precedent to the Closing** | The Second Out Take Back Term Loan Facility shall be subject to customary conditions to closing for facilities of this type, which shall be reasonably satisfactory to the Required Consenting First Lien Lenders, including without limitation: <br><br> (i)    execution and delivery of the Second Out Term Loan Agreement and any other related documentation being executed and delivered on the Closing Date; |

|  | (ii) | receipt of certain reporting in form and substance reasonably acceptable to the Required Consenting First Lien Lenders; |
|---|---|---|
|  | (iii) | the concurrent effectiveness of the First Out Term Loan Facility in an amount, containing such terms, and pursuant to such documentation as contemplated by the Plan; |
|  | (iv) | the payment when due and payable of all reasonable and documented fees and expenses of the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel; |
|  | (v) | the entry of the Confirmation Order and the effectiveness of the Plan; |
|  | (vi) | all conditions precedent to the issuance of the New Common Stock and, if applicable, the New Warrants shall have been satisfied or waived; and |
|  | (vii) | the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto. |
| **Events of Default** | The Second Out Take Back Term Loan Facility shall contain events of default customarily found in loan agreements for facilities of this type and other events of default (if any) agreed upon by the Borrower and the Required Consenting First Lien Lenders (collectively, the "**Events of Default**"). | |
| **Rating** | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the Second Out Take Back Term Loan Facility by Moody's and S&P seventy-five (75) days after the closing date of the Second Out Take Back Term Loan Facility. | |
| **Miscellaneous** | The Second Out Take Back Term Loan Facility shall include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, illegality, SOFR breakage costs, payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary SOFR and benchmark replacement provisions, (iv) customary liability management protections, including, without limitation, (a) Chewy, (b) Serta, (c) J. Crew, (d) Incora and (e) Double-dip, and (v) customary expense reimbursement, indemnification and other provisions as are usual and customary for facilities of this kind. | |
| **Governing Law and Submission to Exclusive Jurisdiction** | State of New York. | |

**Annex 4**

**DIP Facility Term Sheet**

| | |
|---|---|
| **DIP Loan Facility** | A super-priority senior secured debtor-in-possession term loan facility (the "**DIP Facility**") comprised of new money loans in an aggregate principal amount of up to $31.5 million (the "**DIP Loans**" and the claims thereunder, the "**DIP Facility Claims**"), which participation shall be made available by the First Lien Lenders to the Borrower thereunder (the "**DIP Commitments**"), which shall be fully drawn upon the entry of the Interim DIP Order. Once repaid or converted into First Out Term Loans as set forth below, the DIP Loans may not be reborrowed. |
| **Borrower** | Research Now Group, LLC and Dynata, LLC (collectively, the "**Borrower**" or the "**Company**"). |
| **Guarantors** | All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by: (i) Research Now Group, LLC, and Dynata, LLC, (ii) each other Loan Party (as defined in the Existing First Lien Credit Agreement) and (iii) all other Subsidiaries (as defined in the Existing First Lien Credit Agreement) of the Borrowers other than Excluded Subsidiaries (as defined in the Existing First Lien Credit Agreement) (collectively, the "**Guarantors**"). The Borrower and the Guarantors are each referred to herein as a "**Loan Party**". |
| **Administrative Agent; Administrative Agent Fee** | A financial institution reasonably acceptable to the Debtors and the DIP Lenders (in such capacity, the "**DIP Agent**"). The DIP Agent shall be paid an annual agency fee to be agreed by the DIP Agent and the Required DIP Lenders. |
| **Lenders** | Each of the lenders under the DIP Facility, a "**DIP Lender**". "**Required DIP Lenders**" shall mean DIP Lenders holding more than 50.1% of the then outstanding DIP Loans. Following entry of the Interim DIP Order, up to $31,500,000 of the DIP Loans shall be offered ratably to each First Lien Lender based on such First Lien Lender's *pro rata* holdings of loans outstanding under the First Lien Credit Agreement. For the avoidance of doubt, "loans" under the First Lien Credit Agreement shall include both the RCF Loans (including letter of credit exposure) and the Term Loans. To the extent that a holder of First Lien Claim does not elect to participate in their *pro rata* share of the DIP Loan, the deficit will be backstopped by the DIP Backstop Parties (defined below). DIP Lenders and DIP Backstop Parties, as applicable, shall be entitled to designate participation in the DIP Loans to one or more affiliates or funds or accounts managed, advised or sub-advised by such DIP Lenders or DIP Backstop Parties, as applicable. |
| **DIP Backstop Parties** | Each member of the First Lien Ad Hoc Group (or their affiliates) that signs the RSA and commits to backstop the DIP Facility (collectively, the "**DIP Backstop Parties**"). |

| | |
|---|---|
| | The DIP Backstop Parties shall fund at the percentages indicated on **Annex 7**.[4] The obligations of each of the DIP Backstop Parties shall be several (and not joint and several), and no failure of any DIP Backstop Party to comply with any of its obligations shall prejudice the rights of any other DIP Backstop Party.<br><br>Each DIP Backstop Party may assign all or a portion of its Backstop to (i) any other DIP Backstop Party, (ii) any of its affiliates or related funds/accounts or (iii) any investment funds, accounts, vehicles or other entities that are managed, advised or subadvised by such DIP Backstop Party, its affiliates or the same person or entity as such DIP Backstop Party or its affiliates (all such persons described in clauses (ii) and (iii), such DIP Backstop Party's "Fund Affiliates"). |
| **Maturity Date** | Unless converted to First Out Term Loans upon the event set forth in clause (iv) below and subject to the Carve-Out (as defined below), all obligations under the DIP Facility shall be due and payable in full in cash on the earliest of: (i) the date that is 75 days after the closing date of the DIP Facility, (ii) the date of acceleration of the obligations under the DIP Facility, (iii) the date the Bankruptcy Court orders a conversion of these Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Loan Party; (iv) the consummation of a plan of reorganization of the Loan Parties, which has been confirmed by an order entered by the Bankruptcy Court; (v) the appointment of a chapter 11 trustee, examiner or other fiduciary with decision-making authority; (vi) the date of consummation of a sale of all or substantially all of the Loan Parties' assets; and (vii) such other maturity date triggers as are customary for debtor-in-possession financings. |
| **Interest** | Interest on the DIP Loans shall be payable in cash at the end of each month in arrears. At all times prior to the occurrence of an Event of Default which is continuing, interest on the outstanding principal amount of the DIP Loans shall accrue at a rate equal to SOFR + 8.75% *per annum*.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **DIP Budget** | The "**DIP Budget**" means the rolling 13-week operating cash flow forecast/budget of the Debtors, to be approved by the Required DIP Lenders in their sole discretion with notice to the First Lien Ad Hoc Group Advisors, Second Lien Ad Hoc Group Advisors and First Lien Agent's Counsel. Any updated DIP Budget shall be subject to approval in form and substance by the Required DIP Lenders and otherwise subject to updates by the Debtors every fourth Friday following the week in which filing occurred (such updates to be approved by the Required DIP Lenders). The DIP Budget shall include a line-item for weekly professional fee forecasts for the professionals in the budget. In the event a DIP Budget is not approved or if the Debtors and the Required DIP Lenders otherwise affirmatively agree, the prior DIP Budget shall continue to govern. Any updated DIP Budget shall promptly be provided to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors, and the First Lien Agent's Counsel.<br><br>It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered a DIP Budget in form and substance acceptable to the Required DIP Lenders. Compliance with the initial DIP Budget and each subsequent |

---

[4]   For the avoidance of doubt, **Annex 7** shall be provided to the Company Parties and their advisors only and shall otherwise be considered PEO and strictly confidential.  Any amendment to **Annex 7** shall only require the consent of the DIP Backstop Parties.

| | |
|---|---|
| | DIP Budget shall be tested via Variance Test, subject to Permitted Deviations, to be conducted on the Friday of the third week following the Petition Date and every other Friday thereafter (the "**Bi-weekly Reporting Date**") following the applicable Testing Period; provided that, upon a Variance Test showing noncompliance with the Receipts Permitted Deviation, the Debtors' shall not be permitted further drawings of funds from the DIP Account (subject to the Carve Out).<br><br>"**Testing Period**" means the report delivered on June 7, 2024, covering the period of May 20, 2024 – May 31, 2024, and due every other Friday thereafter for the prior two-week period.<br><br>"**Variance Test**" means a budget variance report/reconciliation in form and substance satisfactory to the Required DIP Lenders with a copy sent to the First Lien Ad Hoc Group Advisors, the Second Lien Ad Hoc Group Advisors, and the First Lien Agent's Counsel setting forth in detail (i) the Debtors' operating disbursements (the "**Actual Disbursements**") on a line-by-line and aggregate basis for the Testing Period; (ii) the Debtors' operating receipts (the "**Actual Receipts**"), on a line-by-line and aggregate basis during the Testing Period; (iii) the fees and expenses of the Debtor and any Committee Professionals incurred during the Testing Period; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) for the Testing Period of the Actual Receipts (and each line item thereof), the Actual Disbursements (and each line item thereof), and the fees and expenses of Professional Persons for the Testing Period to the amount of Debtors' projected cash receipts (and each line item thereof) set forth in the DIP Budget for such prior week period and the Debtors' projected disbursements (and each line item thereof), respectively, set forth in the DIP Budget for such Testing Period; and (v) as to each variance contained in the Variance Test, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance.<br><br>"**Permitted Deviation**" means each such deviation from the DIP Budget of 12.5% for disbursements (excluding professionals fees, DIP financing fees and costs, and Intercompany transfers between Debtors) on an aggregate basis (such disbursements, "**Operating Disbursements**") and 15% for Receipts (consistent with how each of the Operating disbursements and Receipts are set out in the initial DIP Budget) for each reporting period.<br><br>The Debtors shall, immediately upon receipt of the net proceeds of the DIP Facility, deposit such amounts into a segregated bank account of Borrower (which account must already have a DACA) that may only be drawn in accordance with the DIP Budget, with all funds held in the account deemed to be DIP Collateral; provided that, the Debtors may deposit the net proceeds of the DIP Facility available upon entry of the Interim DIP Order into the Debtors' operating account. The release of funds from such account shall be subject to the DIP Budget and the mechanics for the release set forth in the DIP Credit Agreement. |
| **Default Interest** | During the continuance of an Event of Default, the DIP Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest, if applicable, shall be payable in cash on demand. |

| | |
|---|---|
| **Backstop Premium** | To each DIP Backstop Party, 9.0% of the aggregate principal amount of the DIP Loans backstopped by each DIP Backstop Party, payable in cash on demand. The Backstop Premium shall be fully and finally approved pursuant to the Interim DIP Order. |
| **Collateral** | All obligations of the Loan Parties to the DIP Lenders and the DIP Agent, including, without limitation, all principal, accrued interest, costs, fees and expenses and other amounts under the DIP Facility (collectively, the "**DIP Obligations**"), shall be secured by super-priority liens in favor of the DIP Agent on all Collateral (as defined in the Existing First Lien Credit Agreement) and shall be secured by super-priority priority liens in favor of the DIP Agent on any and all assets, whether real or personal, tangible or intangible of the other Loan Parties (but in all cases subject to the Carve-Out). The property securing the DIP Obligations is collectively referred to as the "**DIP Collateral**" and shall include substantially all assets of the Loan Parties, including without limitation, pledges of equity interests, subject to customary exceptions to be agreed upon. |
| **Carve-Out** | As used herein, "**Carve-Out**" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $50,000 (without regard to the notice set forth in (iii) below); (iii) subject to the DIP Budget, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "**Pre-Carve Out Amounts**"); and (iv) Allowed Professional Fees not to exceed $1,000,000, incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). <br><br> For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **Use of Proceeds** | Solely in accordance with and subject to the DIP Budget subject to permitted variances, and the DIP Orders, the proceeds of the DIP Facility may be used only (i) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with these Chapter 11 Cases, and (ii) for reasonable incremental liquidity purposes of the Loan Parties during these Chapter 11 Cases. |

| Fees | The Borrowers shall pay to the DIP Lenders in cash on a *pro rata* basis an upfront fee equal to 3.50% of the aggregate amount of DIP Commitments on the closing date of the DIP Facility. |
| --- | --- |
| | In addition, upon the repayment or conversion of DIP Loans into First Out Term Loans, the Borrowers shall pay in cash to the DIP Lenders in cash on a *pro rata* basis an exit fee equal to 2.00% of the aggregate amount of such DIP Loans being repaid or converted. |
| **Stipulations** | Upon entry of the Interim DIP Order, but only subject to a customary "challenge" period, the Company Parties will provide customary stipulations and releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Prepetition Obligations, the Prepetition Collateral, and documentation related thereto. |
| **CLO Adjustments** | The Debtors shall work in good faith with the DIP Lenders to address any structural requirements of any CLO funds and fund advisors under their constituent documents or investment criteria in regard to exchanging any DIP Facility Claims while providing substantially similar economics set forth herein and in the Restructuring Support Agreement. |
| **Reporting Covenants, Affirmative Covenants and Negative Covenants** | The DIP Facility shall contain reporting requirements, affirmative covenants and negative covenants customarily found in loan agreements for facilities of this type and other reporting requirements, affirmative covenants and negative covenants satisfactory to the Required DIP Lenders including, without limitation: |
| | (i)    the Milestones set forth in Section 5 of the Restructuring Support Agreement shall be included in the DIP Credit Agreement, |
| | (ii)    the delivery of reporting information customarily found in loan agreements for facilities of this type, |
| | (iii)    weekly on every Thursday following the Petition Date or such other day of the week as agreed in writing by the Loan Parties and the First Lien Ad Hoc Group Advisors (which agreement may be communicated by email between Gibson, Dunn & Crutcher LLP and Willkie Farr & Gallagher LLP) with prompt notice to the Second Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel, the Loan Parties and their financial advisor shall organize and hold status and/or diligence calls with the First Lien Ad Hoc Group Advisors and Second Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel, |
| | (iv)    the requirement to satisfy milestones customarily found in loan agreements for facilities of this type, including the filing of a plan and disclosure statement, disclosure statement approval, plan confirmation and emergence, and |
| | (v)    limitations on indebtedness, liens, asset sales, restricted payments, investments, repayments of indebtedness, affiliate transactions, fundamental changes, sale leaseback transactions, intercompany loans and cross guarantees, including but not limited to, no non-ordinary course capacity with respect to negative covenants. |

| | |
|---|---|
| **Optional Prepayments** | To be agreed, usual and customary for facilities similar to the DIP Facility and in form and substance acceptable to the Required DIP Lenders. |
| **Mandatory Prepayments** | To be agreed, usual and customary for facilities similar to the DIP Facility and in form and substance acceptable to the Required DIP Lenders, including but not limited to 100% of net proceeds of asset sales in an amount to be agreed, after funding the Carve-Out and reserving proceeds sufficient to pay accrued and unpaid expenses to the extent set forth in the DIP Budget, to prepay DIP Loans at par plus accrued interest, within five (5) business days of receipt, with no reinvestment period permitted, subject to customary exceptions. |
| **Call Premium** | None. |
| **DIP Loan Documents** | The DIP Facility will be documented by a super-priority senior secured debtor-in-possession credit agreement (the "**DIP Loan Agreement**"), guarantee, security agreement and other loan documentation reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the DIP Agent and the Required DIP Lenders. |
| **Conditions Precedent to the Closing** | The DIP Facility shall be subject to customary conditions to closing for facilities of this type, which shall be satisfactory to the Required DIP Lenders, including without limitation:<br><br>(i)      execution and delivery of the DIP Loan Agreement and any other related documentation being executed and delivered on the closing date of the DIP Facility;<br><br>(ii)     receipt of certain reporting in form and substance reasonably acceptable to the Required DIP Lenders;<br><br>(iii)    receipt of the initial DIP Budget in form and substance acceptable to the Required DIP Lenders;<br><br>(iv)    the Loan Parties being in compliance with the DIP Budget in all respects and the proceeds of any such DIP Loan being made on the closing date of the DIP Facility being used solely in accordance with the DIP Budget, subject to permitted variances;<br><br>(v)     entry of Interim Order followed by entry of the Final Order;<br><br>(vi)    the payment when due and payable of all reasonable and documented fees and expenses of the First Lien Ad Hoc Group Advisors; and<br><br>(x)     the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto. |
| **Interim and Final Orders** | The DIP Order approving the DIP Facility on an interim basis, which shall be satisfactory in form and substance to the Required DIP Lenders (the "**Interim Order**"), shall authorize and approve, among other matters to be agreed, (i) the Loan Parties' entry into the DIP Loan Documents, (ii) the making of the DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the DIP Loan Documents with respect to the DIP Collateral, (iv) the payment of all fees and expenses of the First Lien Ad Hoc Group Advisors, and (v) the payment of all fees and expenses of the Second Lien Ad Hoc Group Advisors, (vi) the payment of all fees and expenses of the Second Lien Agent, |

| | |
|---|---|
| | (vi) the payment of all fees and expenses of the First Lien Agent and the First Lien Agent's Counsel, and (vii) the payment of all fees and expenses contemplated by the DIP Facility, including the DIP Backstop Premium. The order approving the DIP Facility on a final basis shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"). |
| **Events of Default** | The DIP Loan Documents will contain events of default substantially consistent with the Existing First Lien Credit Agreement with such modifications as are customary for facilities of this type and certain other events of default satisfactory to the Required DIP Lenders (collectively, the "**Events of Default**"). |
| **Assignments and Participations** | Assignments under the DIP Facility are subject to the consent of the Borrowers and the DIP Agent (which consent shall not be unreasonably withheld or delayed), unless such assignment is (i) to a DIP Lender, (ii) to an affiliate of the transferor or (iii) solely with regards to the Borrower's consent right, during the continuance of an Event of Default. No participation shall include voting rights, other than for matters requiring consent of 100% of the DIP Lenders or each adversely affected DIP Lender. |
| **Rating** | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the DIP Facility by Moody's and S&P within the earlier to occur of (i) seventy-five (75) days after the closing date of the DIP Facility and (ii) entry of the Final Order. |
| **Adequate Protection:** | The DIP Orders shall approve customary adequate protection to be provided to the First Lien Lenders, including (i) replacement or new liens, as well as superpriority claims, on the unencumbered and encumbered assets of the Loan Parties junior to the liens securing the DIP Facility, (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code, and (iii) the payment of all reasonable and documented out-of-pocket fees and expenses of the First Lien Ad Hoc Group Advisors and the First Lien Agent's Counsel.<br><br>The DIP Orders shall approve customary adequate protection to be provided to the Second Lien Lenders, including (i) replacement or new liens, as well as superpriority claims, on the unencumbered and encumbered assets of the Loan Parties junior only to (a) the "Carve Out"; (b) the liens securing the DIP Facility; (c) the replacement or new liens and superpriority claims provided to the First Lien Lenders; (d) any prepetition liens senior to the liens securing the existing First Lien Claims; and (e) the liens securing the existing First Lien Claims; (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code, junior only to the claims provided to the First Lien Lenders, and (iii) the payment of all reasonable and documented out-of-pocket fees and expenses of the Second Lien Ad Hoc Group Advisors and the Second Lien Agent's Counsel. |
| **Waivers; Marshaling** | The Final Order shall provide for waivers of (i) sections 506(c) and 552 of the Bankruptcy Code and (ii) the doctrine of marshaling. |
| **Miscellaneous** | The DIP Facility shall include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, illegality, SOFR breakage costs, payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary SOFR and benchmark replacement provisions and (iv) customary expense reimbursement, indemnification and other provisions as are usual and customary for facilities of this kind. |

| | |
|---|---|
| **Governing Law and Submission to Exclusive Jurisdiction** | State of New York. |

## Annex 5

### New MIP Summary

This Annex 5 summarizes the key terms of the proposed management incentive program (the "***MIP***") to be approved after the Plan Effective Date.  Capitalized terms used but not initially defined in this Annex 5 will have the meaning ascribed to such terms herein, or if not defined in this Annex 5, such terms will have the meaning ascribed to such terms in the Term Sheet to which this Annex 5 is attached.  The actual terms of the MIP will be subject to final approval by the New Board, and the terms and conditions set forth in a final approved plan document governing the MIP and individual award agreements.  The New Board and the Chief Executive Officer will work together in good faith to establish the terms and conditions of such definitive MIP documents.

**Pool Size:**            11.0% of the Company's fully-diluted equity value above Plan equity value as of the emergence (treating the MIP as fully allocated and outstanding) will be reserved for purposes of making awards under the MIP (the "***Pool***"), subject to increase for treatment of the Branded Note payments.

**Initial Awards:**          8.5% of the Pool will be granted as of the Plan Effective Date to current senior management and the balance reserved for future grants.

**Eligible Participants**:    Existing and future key managers, employees and service providers of the Company, as selected by the New Board from time to time (each individual selected to participate in the MIP, a "***Participant***").

**Form of Awards:**          Form to be determined in the reasonable discretion of the New Board based on tax and other structuring considerations; if available, awards to be granted in the form of interests that will be tax favorable for Participants.

**Vesting:**             Subject to the Participant's continued employment or provision of services through each applicable vesting date, the awards shall vest in a combination of time-vesting and performance-based vesting. One-third of awards will time-vest over the course of five years, with 40% vesting on the second anniversary of emergence, and the remaining awards vesting in three equal installments of 20% on the third, fourth and fifth anniversaries of emergence. Two-third of the awards will be subject to performance-based vesting based on achievement of certain Multiple of Invested Capital or "MOIC" (as customarily defined) thresholds upon an exit, with 1/3 of the awards vesting upon achievement of a 2.25x MOIC (relative to plan equity value), and 1/3 of the awards vesting upon the achievement of a 3.0x MOIC (relative to plan equity value).

Upon the consummation of a "change in control" (as customarily

defined), and subject to the achievement of the applicable MOIC threshold for performance-based vesting awards, all then-unvested awards held by a Participant will become fully vested, subject to the to the Participant's continued employment or provision of services through the date of such change in control.  Notwithstanding anything herein to the contrary, the New Board will have discretion to accelerate the vesting of awards at any time and for any reason.

**Termination:**

Unless otherwise determined by the New Board at the time of grant or thereafter, and except as set forth herein, unvested awards will be forfeited upon a Participant's termination of employment or separation from service for any reason.  Vested awards will be forfeited if the termination is for "cause" or the Participant violates restrictive covenants applicable to the Participant.

**Operating Agreement:**

Participants will be subject to the terms and conditions of the Company's operating or stockholders agreement, including (i) limits on transferability, (ii) call rights on vested securities at fair market value on any termination of employment (other than a termination for cause) and (iii) tag along and drag along rights upon specified sale transactions.

**Other Key Terms:**

Grants may be conditioned on the execution of a customary restrictive covenant agreement to the extent the Participant is not already subject to such an agreement (and, if the Participant is subject to such covenants, they will be incorporated into the grant documentation).  Vesting, exercise or settlement in respect of awards may be conditioned on the execution of a customary release of claims in favor of the Company.

The New Board may make equitable adjustments to the Pool and to awards that it determines is necessary or appropriate from time to time, including, without limitation, in connection with a change in the capital structure of the Company, business acquisition, merger, capital contribution, distribution, dividend, recapitalization or other extraordinary event.

The MIP will include other customary terms and conditions as determined by the New Board in consultation with the Chief Executive Officer.

**<u>Annex 6</u>**

**Exculpation and Release Language**

1.      "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (i) the Debtors; (ii) the Reorganized Debtors; and (iii) each Related Party of each Entity in clause (i) and (ii).

2.      "*Related Party*" means, collectively, with respect to any Entity or Person, including each Released Party and Exculpated Party, such Entity or Person's, current, former and future affiliates, member firms and associated entities, and with respect to each of the foregoing, their affiliates, current and former directors, current and former managers, current and former officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals(including, for the avoidance of doubt, the First Lien Ad Hoc Group Advisors and the Second Lien Ad Hoc Group Advisors); *provided*, *however*, for the avoidance of doubt, any Affiliates of any Revolving Credit Lender (including any separate branch of a Revolving Credit Lender) shall not be deemed to be either a Related Party of such Revolving Credit Lender or a Revolving Credit Lender itself, unless such Affiliate has itself has submitted a Ballot or specifically authorized a third party to submit a Ballot on its behalf.  The Revolving Credit Lenders voting on this Plan are doing so only in their capacity as holders of Revolving Credit Loan Claims as of the Voting Record Date, this Plan does not cover any other Claims or Interests other than the Revolving Credit Loan Claims that are now owned or subsequently acquired by the Revolving Credit Lenders that submit a Ballot with regards to this Plan, and the provisions of this Plan shall only apply to such trading desk(s), fund(s), and/or business group(s) reflected on the Ballot of such Revolving Credit Lender and shall not apply to any other trading desk, fund, or business group of the Revolving Credit Lender so long as they are not acting at the direction or for the benefit of such Revolving Credit Lender or such Revolving Credit Lender's investment in the Debtors .

3.      "*Released Party*" means, each of, and in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Sponsors[5] and each other holder of Interests in Parent; (iv) the Consenting Lenders; (v) the DIP Lenders; (vi) the DIP Backstop Parties; (vii) the Exit Backstop Parties; (viii) the DIP Agent; (ix) the First Lien Agent, (x) the Second Lien Agent and any predecessor thereto; (xi) the First Lien Lenders and Second Lien Lenders that vote to accept the Plan; (xii) the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group; (xiii) each Related Party of each Entity in clause (i) through (xii); *provided* that any holder of a Claim or Interest that objects to or opts out of the third party releases contained therein, shall not be a "Released Party."

4.      "*Releasing Party*" means, each of, and in each case in its capacity as such:  (i) the Released Parties; (ii) each holder of a Claim entitled to vote to accept or reject the Plan that (a) votes to accept the Plan or (b) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by checking the "opt out" box on the  Ballot and returning it in accordance with the instructions set forth thereon indicating that they opt not to grant the releases contained in the Plan; (iii) each holder of a Claim or Interest that (x) is Unimpaired and presumed to accept the Plan, or (y) that is Impaired and is deemed to reject the Plan, in each case that does not affirmatively elect to "opt out" of being a Releasing Party by checking the "opt out" box on the Opt-Out Election Form and returning it in accordance with the instructions set forth thereon indicating that they opt not to grant the releases contained in the Plan; and (iv) each Related Party of each Entity in clause (i) through (iii) to the extent such Related Party can be bound by law or contract to the releases contemplated herein.

\* \* \*

A.   *Exculpation*

**Except as otherwise specifically provided in the Plan, to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, amendment, or filing or termination of the Restructuring Support Agreement and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan**

---

[5] Releases for Sponsor subject to an appropriate determination by an independent board member.

Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce this Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

B.    *Releases by the Debtors*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtors, Reorganized Debtors, and the Debtors' Estates, in each case on behalf of themselves and their Related Parties, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, Reorganized Debtors, or the Debtors' Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or Cause of Action against, or interest in, a Debtor or other Entity (or that any holder of any claim, interest, or Cause of Action could have asserted on behalf of the Debtors), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in or out of court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, the DIP Facility, the DIP Loan Documents, the New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the

foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan by the Debtors, Reorganized Debtors, and the Debtors' Estates, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (ii) in the best interest of the Debtors, Reorganized Debtors, and the Debtors' Estates and all holders of Interests and Causes of Action; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) subject to the terms and provisions herein, a bar to the Debtors, Reorganized Debtors, and the Debtors' Estates asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their assets and property.

C.    *Third Party Releases*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in or out of court restructuring efforts, intercompany transactions between or among a Debtor, another Debtor and/or an Affiliate of a Debtor, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the First Out Term Loan Facilities, the First Out Term Loan Facility Documents, the Second Out Take Back Term Loan Facility, the Second Out Take Back Term Loan Facility Documents, the New ABL Facility, the DIP Facility, the DIP Loan Documents, the New Corporate Governance Documents, the New Common Stock Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during these Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, these Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, (ii) any Person from any claim or Causes of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence by such Person, or (iii) any lender under either the Existing First Lien Credit Agreement or the Existing Second Lien Credit Agreement of any indemnification or contribution claims of either the First Lien Agent or the Second Lien Agent (or the predecessor to the Second Lien Agent) under such agreements.

**<u>Annex 7</u>**

**Backstop Funding Percentages**
**[On File with the Debtors]**

## **Annex 8**

**Exit Backstop Funding Percentages**
**[On File with the Debtors]**

## EXHIBIT C

**Form of Transfer Agreement**

## TRANSFER AGREEMENT

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2024 (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a Consenting Stakeholder under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Revolving Loan Claims | |
| First Lien Term Loan Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests | |

---

[1]    Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.

# EXHIBIT D

**Form of Joinder**

## JOINDER FOR CONSENTING STAKEHOLDER

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2024 (the "**Agreement**"),[1] and agrees to be bound by the terms and conditions thereof to the extent that the other Parties are thereby bound, and shall be deemed a Consenting Stakeholder under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date this Joinder Agreement is executed and any further date specified in the Agreement.

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Revolving Loan Claims | |
| First Lien Term Loan Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests | |

107187664.21

---

[1]    Capitalized terms used but not defined herein shall having the meaning ascribed to such terms in the Agreement.